```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3   JOHN BRATTON                  *
 4         Plaintiff                *
 5   vs.                            *   Case Number:
 6   CHATEL REAL ESTATE, INC.,      *   1:06CV00694
 7   et al.,                        *
 8         Defendants               *
 9   *     *     *     *     *     *
10              THE DEPOSITION OF JOHN H. BRATTON
11         The Deposition of John H. Bratton, taken
12   in the above-captioned case on Friday, January 19,
13   2007, commencing at 10:00 a.m., at the law offices
14   of Eccleston & Wolf, 2001 S Street, Northwest,
15   Suite 310, Washington D.C. 20009, and reported by
16   Monique Kastner, Court Reporter and Notary Public.
17
18
19            EVANS REPORTING SERVICE
           Two North Charles Street, Suite 950
20             Baltimore, Maryland 21201
                    (410) 727-7100
21                  (800) 256-8410
```

DEFENDANT'S EXHIBIT 2

Page 98

1  ever told me her name.
2     Q  You didn't know her name at the time?
3     A  No. I didn't know her name at the
4  time.
5     Q  All right. And what happened after you
6  mentioned Mr. Pagones' name?
7     A  She then said, "Have a seat" or "Hold
8  on a moment," and she went to the back and she
9  got -- she told John that I was out there. She
10 came back to her desk, sat down and said, "He'll be
11 right with you."
12    Q  Okay. And then he came out?
13    A  I wouldn't say he came out. I would
14 say he came to the area. He never came up to me.
15 He never came within handshaking distance of me, so
16 I then had to walk to him. He was talking to me
17 from a distance. So I walked towards him, towards
18 the back area behind Hope's desk and told him why I
19 was there.
20    Q  Okay. And what did you tell him?
21    A  I told him that I just toured the

Page 99

1  property. I told him I was a real-estate agent and
2  a broker, and I was thinking about putting my
3  brokerage firm here in Georgetown. That's the
4  perfect fit, exact same size I'm looking for. It's
5  street level, exactly what I was looking for, and
6  that I was interested in doing an application to
7  lease.
8     Q  Okay. Did you indicate to him that you
9  were only interested in the street level or did you
10 specify the street level? Did you say the whole
11 property? What do you recall about that?
12    A  I spoke about the street level.
13    Q  Okay. Why didn't you mention anything
14 about the basement level at that time?
15    A  There was no need to mention anything
16 about the basement. I was asking about the whole
17 property, but I specifically said that I just
18 toured the main level, which is what I'm most
19 interested in.
20    Q  Okay. And what was his response?
21    A  His response was -- he broke out into a

Page 100

1  cold sweat, and it was not a hot day. He turned
2  red, he became flustered and extremely nervous. I
3  tried to ignore it, but it was very evident. It
4  was very obvious. He was very awkward in talking
5  with me, very on edge.
6           And so then he finally -- at this
7  point, he finally goes and sits behind the desk
8  that was back there. And I -- and then I sit at
9  the desk, and I started asking him a couple
10 questions about the property.
11    Q  Okay. Let me apologize and interrupt.
12          I asked you how did he respond, and you
13 described a bunch of physical characteristics --
14    A  That's a response to me.
15    Q  Okay. Let me finish my question.
16          You described a bunch of physical
17 characteristics. You didn't say that he verbalized
18 anything. Did he say anything?
19    A  When I asked him about the property,
20 his response was at the same time of the things I
21 just described to you. He said that -- he asked me

Page 101

1  how did I find out about the property.
2     Q  Okay.
3     A  I told him the same thing I just told
4  you. And the way he asked the question was very
5  defensive; like how did I find out about the
6  property, how did I get into this property type of
7  thing.
8           I reiterated that I was a broker and I
9  was an agent, but that's not how I got into the
10 property. Barrett Anderson was in the office and
11 he gave me a tour, I said, "But Barrett couldn't
12 answer all my questions. That's why I'm here."
13    Q  So --
14    A  So he said, "Well, what do you want to
15 know?"
16    Q  Okay.
17    A  That was one of the first things that
18 he said to me.
19    Q  All right. Let me stop you there for a
20 second.
21    A  Sure.

Page 170

1   Q   Apparently not.
2   A   That's why I made this for my own
3   consumption.
4   Q   Well, we'll just go forward.
5       Saturday, you're in waiting mode. Did
6   you call Ms. White again?
7   A   No.
8   Q   Did you call Mr. Pagones again?
9   A   I don't think -- no, I had no contact
10  with Mr. Pagones.
11  Q   My question -- I guess I appreciate
12  that no contact -- but did you attempt to have
13  contact? Did you call and leave messages?
14  A   No.
15  Q   Okay. Anything else you did with
16  regard to the 1622 property or your attempts to get
17  it on October 9th, other than wait for a response?
18  I'm sorry. It's Saturday, the 8th.
19  A   Saturday, okay.
20  Q   I'm doing it myself.
21  A   Saturday, the 8th, basically, I was

Page 171

1   planning -- I was planning as to -- I already had
2   the layout of the space. I actually -- I think I
3   went to IKEA on Saturday to shop for furniture,
4   just to get some general idea as to what I was
5   going to put in the space.
6       I mean, I just didn't see any possible
7   way that this -- I was not getting this space, so I
8   was just moving forward. I was going to use the
9   weekend as an opportunity to get ready, plus, you
10  know, whatever else I had going on.
11  Q   Okay. You didn't ask Mr. Pagones when
12  you met him on the 6th whether anyone else was
13  interested though, did you?
14  A   I was told no one else was interested.
15  Q   By Mr. Pagones?
16  A   By Barrett Anderson. That no one else
17  had toured the property, and he had been there the
18  whole entire time.
19  Q   My question was, did you ask
20  Mr. Pagones on October 6th whether anyone else was
21  interested?

Page 172

1   A   No, I didn't.
2   Q   Okay. And Mr. Pagones didn't make any
3   representation to you one way or another about
4   whether anybody else was interested?
5   A   No, he did not.
6   Q   All right. Sunday, October 9th, what
7   did you do, if anything, with regard to the 1622
8   property?
9   A   Not much that I can think of, other
10  than just waiting.
11  Q   Did you attempt to call Ms. White or
12  Mr. Pagones?
13  A   On Sunday? I doubt it. I don't think
14  so. Not that I can recall. I don't know the date.
15  I don't know what -- I guess, what, the 9th?
16  Q   It was a Sunday.
17  A   Sunday was the 9th, yeah.
18  Q   Yeah, what? Yeah, you didn't call, as
19  far as you can recall?
20  A   No, I didn't.
21  Q   Okay. Anything else you can recall you

Page 173

1   did with regard to the property? You indicated on
2   Saturday you think you went to IKEA for shopping.
3   Anything like that on Sunday?
4   A   No.
5   Q   All right. On Monday, October 10th,
6   what do you recall happening with regard to the
7   1622 property?
8   A   Monday is when everybody is back to
9   work -- you know, let's get this done. I was
10  expecting to try to get this signed off by, like,
11  first thing in the morning.
12      Mary White had the lease application,
13  all the information, my financials. I supplied
14  more than enough information for a final decision
15  to be made and for a lease to be signed so that I
16  could move on with my plan and start getting geared
17  up to move into the space.
18      I didn't hear anything back, so I
19  called John Pagones.
20  Q   Do you recall what time that was?
21  A   First thing in the morning. I don't

44 (Pages 170 to 173)

Page 174

1  know the exact time.
2      I asked for the status of my lease
3  being signed. He said, "Well, Mary White had a
4  question about the lease. She wanted to know what
5  was your intentions with the backyard."
6      Something -- once again, that question
7  came up. And I just remember thinking that of all
8  the information I have provided and all this -- I
9  mean, the checks, everything, why would that one
10 simple question hold her up from signing my lease.
11     And I said, "I really don't have any
12 intentions with the backyard, but if I get the
13 lower-level space, it would just be nice to have
14 outside space, you know, so if you're having a
15 function, people can walk outside." I didn't have
16 any big plans to do a garden or anything like that.
17     He said, "Okay. I'll get that
18 information back to her, and I'll get back to you."
19     The next call I got from him was,
20 "Well, I spoke with Mary White, and she says that
21 your lease has to be on the standard form."

Page 175

1  Q  Okay. Now, this is on Monday, the
2  10th?
3  A  Yes. I'm very sure it's still Monday,
4  the 10th.
5  Q  Okay. Mary White tells you it has to
6  be on the standard form?
7  A  Yes.
8      MR. SHAIBANI: John Pagones told you
9  that Mary White wanted you to have the lease on
10 the standard form, or did you talk to Mary
11 White directly?
12     BY MR. RANCK:
13 Q  Okay. I didn't understand that's what
14 you said. Was that your testimony?
15 A  John Pagones.
16 Q  John Pagones.
17 A  Yes.
18 Q  Okay. John Pagones said he spoke with
19 Mary White.
20 A  Right. I have only been on the phone
21 with Mary White one time, and that was that Friday

Page 176

1  when I was trying to alert her that I was having
2  some difficulty getting the information.
3  Q  All right.
4  A  So John Pagones is the person.
5  Q  I apologize for my confusion.
6      You called Pagones in the morning. He
7  said that Mary has a question about the backyard.
8  You basically said, "I have no plans."
9      He said, "I'll get back to you." He
10 got back to you later, or did you call him again?
11 A  He got back to me later.
12 Q  He got back to you and said, "Mary says
13 she needs your lease on the standard form."
14 A  Correct.
15 Q  Okay.
16 A  So here we go.
17 Q  What else did he say, anything else in
18 that conversation?
19 A  He said that she needs all the
20 information on a standard form, which -- this is
21 the interesting part -- which I have and I can fax

Page 177

1  to you as soon as I get off the phone.
2  Q  Okay.
3  A  And it struck me as the oddest thing
4  for him to say, given that I spent much time in his
5  office on that Friday -- on that Thursday, trying
6  to get a leasing application from him. He went
7  right to his computer, printed it out, and faxed me
8  over a Chatel application and a Chatel standard
9  lease for me to fill out.
10 Q  Okay. When he told you that Mary White
11 wanted the lease on the standard form, did he say
12 he needed an application too, do you recall,
13 because you just said he sent you the standard form
14 and an application.
15 A  Yes, he did.
16 Q  He mentioned the application before
17 too?
18 A  He sent both of them together.
19 Q  All right. Now, how long had you spent
20 with him on the Thursday? You said after you spent
21 all that time with him on Thursday. How long was

Page 274

1  Q  Did you consult with him about the way
2  you thought you were treated?
3  A  Your questions to me are like a fishing
4  expedition.  I have friends.  I'm very, very close
5  to my friends.  I'm very, very close to my family.
6  So I talk to my family, and I talk to my friends.
7      I don't necessarily talk to them about
8  the details of the case, but anyone who is close to
9  me knows that I'm going through this suit.
10     That doesn't mean they know details,
11 and it doesn't mean I sit down -- as a matter of
12 fact, that's probably only the two people who even
13 know that I'm in this mode of doing depositions.
14     So it's a very general question and
15 vague question, because I talk to people that know
16 I'm going through this, but we don't sit down and
17 plot and plan and talk about the details of the
18 case, no.
19  Q  Well, the reason I ask, Mr. Bratton, is
20 you, in your answers to interrogatories, identify
21 these persons with knowledge.  It's not a fishing

Page 275

1  expedition.
2      You have said as to Mr. Augello, "He
3  has personal knowledge pertaining to the chain of
4  events giving rise to the claim."  And I'm trying
5  to figure out what he has knowledge of from you?
6      MR. SHAIBANI:  Objection.  Asked and
7  answered about his knowledge.
8      BY MR. RANCK:
9  Q  How about Daniel Lee?
10 A  Daniel Lee's knowledge extends to the
11 fact that he was there that day I decided to draw
12 the layout.
13 Q  Okay.  Anything else that you know that
14 you told Mr. Lee about this?
15 A  That's about all the knowledge he has.
16 Q  Spanletti.  Anything else, other than
17 you said --
18 A  Just --
19 Q  Rothmel we have discussed.  This
20 person, Jeanette, is not notified in your answers
21 to interrogatories.  Why wasn't she identified?

Page 276

1  Was it just an oversight?
2  A  There's no reason for her to be
3  identified.  She's a -- she's a friend, and she
4  works with me.
5  Q  Okay.
6  A  And she's sitting in the office every
7  day, so she has been told not to discuss any issues
8  about this case or the lease with anyone that comes
9  in.
10 Q  You said that nothing really happened
11 on Friday the 14th, Saturday and Sunday, the 15th
12 and 16th, nor Monday the 17th, and that things then
13 picked up on October 18th when you heard from
14 Mr. Forester; is that right?
15 A  Yes.
16 Q  Did you first hear from him by phone
17 call or letter?
18 A  Phone call is the first thing I recall
19 receiving.
20 Q  Okay.  What did you and Mr. Forester
21 discuss in that first phone call?

Page 277

1  A  I stated earlier that he called me and
2  then started talking about he's here to set things
3  straight and that Chatel was terminated and was no
4  longer in the equation and that he was taking over.
5  Q  Mr. Bratton, I had just asked and you
6  had responded with regard to your first phone call
7  with Mr. Forester on October 18th.
8      Before I get farther into Mr.
9  Forester's involvement, can you tell me, what
10 involvement did you have with anyone at Chatel
11 after your phone call with Mr. Liverman on October
12 13th?  And that was the call in which you asked for
13 a press agent and lawyer's name.
14 A  I think that was about the extent of
15 it.
16 Q  So everything that happened thereafter
17 was interactions between you and Mr. Forester on
18 behalf of Ms. White?
19 A  I wouldn't say everything, but he was
20 the lead -- he was the lead person in charge to my
21 knowledge as of that point.

Page 278

1  Q  Okay. You had no interaction with
2  Chatel, so why don't we say that everything was you
3  and Mr. Forester on behalf of Ms. White?
4      MR. SHAIBANI: I object. For
5  clarification, are you referring to the period
6  through the end of October?
7      MR. RANCK: Yes. I'm sorry.
8      MR. SHAIBANI: Or the mediation
9  hearing?
10     MR. RANCK: No, no, no. Let me
11 clarify.
12     BY MR. RANCK:
13 Q  From the period October 13th to
14 October 31st, which was the date you ultimately
15 signed the lease with Ms. White, right?
16 A  Yes.
17 Q  All right. In that period of time, you
18 had no involvement or communication or interaction
19 with Chatel, right?
20 A  Not directly. Not that I can recall.
21 Q  Indirectly, did you?

Page 279

1  A  Well, they were still -- they were
2  still in the equation.
3  Q  Okay. How do you know that?
4  A  Well, because that's why I went to get
5  the keys for the property. All the property
6  management duties had never been stopped.
7  Q  But with all due respect, you're
8  ignoring the timeframe of the question, which is up
9  through October 31st, which is the day you signed
10 the lease.
11 A  Correct.
12 Q  After that, I understand they are the
13 property manager and you have had dealings with
14 them.
15     I'm asking specifically between October
16 13th and October 31st, to your knowledge, were they
17 involved at all in the leasing negotiation, et
18 cetera, of the property with you?
19 A  They didn't have direct communications
20 with me.
21 Q  You keep saying "direct." Do you know

Page 280

1  whether --
2  A  Because I don't know whether they were
3  involved behind the scenes working with John Gordon
4  Forester. I don't know who John Gordon Forester
5  was sharing this information with.
6      He said that Chatel was terminated. I
7  found out that that was not even true. So I don't
8  know who --
9  Q  That's why I'm asking, "To your
10 knowledge."
11 A  To my knowledge, I didn't have direct
12 conversations with Chatel until after I signed the
13 lease.
14 Q  Okay. And you were never told by
15 anybody that Chatel was involved -- again, during
16 that period of time, October 13th to the 31st,
17 you're not told that Chatel is somehow in the loop
18 or involved, correct? As far as you know, Chatel
19 is out of it?
20 A  That's what I was told.
21     (Whereupon, Bratton Deposition Exhibit

Page 281

1  No. 12 was marked for identification.)
2      BY MR. RANCK:
3  Q  Okay. If you can, look at Exhibit 12
4  please. Have you seen that letter before?
5  A  Yes.
6  Q  Can you identify it for the record?
7  A  It's a letter from John Gordon
8  Forester.
9  Q  Did you receive it on or about October
10 18th?
11 A  Yes.
12 Q  All right. Does the letter accurately
13 memorialize the conversation you had with
14 Mr. Forester that morning?
15     MR. SHAIBANI: Objection. The document
16 speaks for itself.
17     MR. RANCK: Mr. Shaibani, my question
18 wasn't what the letter says, okay? The
19 needless objections are just lengthening the
20 record and lengthening the deposition.
21     My question was not, what does the

Page 282

1  letter say.
2      My question is, does it accurately
3  memorialize the conversation he had? How the
4  letter can speak for itself in response to that
5  question is beyond me.
6      BY MR. RANCK:
7      Q  Mr. Bratton, does the letter accurately
8  memorialize your conversation with Mr. Forester?
9      A  No, it doesn't.
10     Q  All right. What parts of it are
11 inaccurate?
12     A  Well, my conversation with Mr. Forester
13 was more about being called a test case and that I
14 wasn't really interested in the property and how he
15 was -- he had informed me that Chatel was
16 terminated, that these -- and he told us about the
17 terms -- the new term of -- once again, one-third
18 taxes, it's now $200, a set amount of taxes, which
19 I don't know what -- until this day, I still don't
20 know where that number is coming from, because I
21 looked at the property taxes.

Page 283

1      And the -- he talked about being in the
2  name of the LLC was a new thing that wasn't in the
3  conversation, but he put that in the document.
4      Q  Okay. You have identified a couple
5  things that were discussed that aren't in the
6  letter.
7      Now, you have identified one that is in
8  the letter that you don't think was discussed.
9  This is the first time having you personally
10 guarantee the lease came up? At all points up to
11 this point in time, it was going to be Bratton,
12 LLC, right?
13     A  Yes.
14     Q  Okay. In the conversation, did you
15 discuss the first three sentences of that second
16 paragraph: "The premises which are available are
17 the first two floors, the rental, the taxes and no
18 right of first refusal." Was that all discussed in
19 your conversation?
20     A  Yes.
21     Q  Okay. Did he mention that they were

Page 284

1  going to require two years' tax returns?
2      A  Yes.
3      Q  Okay. So the letter accurately
4  memorializes --
5      A  No. Actually -- once again, that next
6  statement, which you didn't get to, I never heard
7  that mentioned ever.
8      Q  I was just referring to the tax-return
9  issue. He mentioned in the conversation that they
10 required two years' tax returns, and that's
11 accurately stated in the letter.
12     A  Okay.
13     Q  Correct?
14     A  But your question was about the
15 document. And in this document, that $425,000 was
16 never discussed with me.
17     Q  But he requested in the conversation
18 that you had two years' tax returns?
19     A  Yeah.
20     Q  And he reiterates that in the letter.
21     Did Chatel ever ask you to provide tax

Page 285

1  returns?
2      A  I don't recall.
3      Q  Okay. You never provided tax returns
4  to Chatel though, correct?
5      A  No, I didn't.
6      Q  The end of this letter indicates that
7  Ms. White was anxious to have a tenant in place by
8  November 1st. Do you see that?
9      A  Yes.
10     Q  You were anxious to be in by
11 November 1st as well, right?
12     A  Correct.
13         (Whereupon, Bratton Deposition Exhibit
14     No. 13 was marked for identification.
15         BY MR. RANCK:
16     Q  If you can look at what has been marked
17 as Exhibit 13, please. Tell me if you can identify
18 that for the record, please.
19     A  Yes. This is the letter I typed back
20 to John Gordon Forester.
21     Q  Okay. This is in response to your

72 (Pages 282 to 285)