**Capital Reporting Company**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3    - - - - - - - - - - - - - X

 4    JOHN BRATTON                :

 5        Plaintiff,             :

 6    vs.                        :  Case No.:

 7                               :  1:06CV00694

 8    CHATEL REAL ESTATE, INC., :

 9    et al                      :

10        Defendants.            :

11    - - - - - - - - - - - - - X

12                            Washington, D.C.

13                    Thursday, January 11, 2007

14    Deposition of:

15               THIERRY LIVERMAN

16    called for oral examination by counsel for

17    Plaintiff, pursuant to notice, at the offices

18    of Litigation Associate, PLLC, 1150 Connecticut

19    Avenue, N.W., Suite 900, Washington, D.C.,

20    before Jodi Scheffel, a Notary Public in and for

21    the District of Columbia, beginning at 10:20 a.m.,

22    when were present on behalf of the parties:
```

PLAINTIFF'S
EXHIBIT
6
ALL-STATE LEGAL®

# Capital Reporting Company

Page 10

1    MR. RANCK: Objection; foundation. Can
2  you identify what procedures you're talking about?
3    THE WITNESS: I don't understand the
4  question, really.
5    MR. SHAIBANI: Well, I can rephrase the
6  question.
7  BY MR. SHAIBANI:
8    Q  Did John Pagones violate Chatel's
9  policies and procedures in any way in the year
10  2005?
11    MR. RANCK: Objection; overly broad,
12  vague, speculation, foundation.
13    Go ahead and answer it, though.
14    A  Yes, all the agents do sooner or later.
15    Q  Could you elaborate on how he violated
16  those procedures and which ones specifically?
17    A  Well, for example, there's a procedure
18  for presenting leases. You should have some
19  things, you know, like checks and stuff like that.
20  John would try and say, well, I don't have a check
21  but this is a great guy, take his lease anyway.
22    Q  Other than that, were there instances

Page 11

1  when John Pagones violated Chatel's policies and
2  procedures in 2005?
3    MR. RANCK: Same objection.
4    A  I don't think so. He would do that
5  little trick again and again, trying to. See,
6  there's competition for rentals.
7    Q  When you mentioned that he would accept a
8  lease without a check, I guess I didn't quite
9  understand that response.
10    MR. RANCK: Let me just object and then
11  the witness can explain that's not what he said.
12  He didn't say he would accept a lease without a
13  check. That's not what he said.
14    MR. SHAIBANI: He would except a check
15  without a lease?
16    MR. RANCK: That's not what he said
17  either, but perhaps he can explain.
18    THE WITNESS: One of things we want to do
19  is to not take the property off the rental market
20  until we really have a rental, otherwise you're
21  not properly representing the owner. What we
22  worked out to do that, is that when you present a

Page 12

1  lease, you need a package with it. You need a
2  check for the first month. You need a check for
3  the deposit. You need a signed lease. You also
4  need a credit application. John, trying to beat
5  somebody else to the punch, would have, let's say,
6  three of those things but not four. That's the
7  kind of procedure he violated.
8  BY MR. SHAIBANI:
9    Q  Did other agents --
10    A  Or other things like we have rules that
11  the check should be a check that we can do
12  something with. For example, if it's written on a
13  California bank, it should be certified, difference
14  with a local bank. That being a sloppiness.
15    Q  Did John Pagones violate Chatel's
16  policies and procedures in any way, with respect to
17  John Bratton?
18    A  I'm not aware of it.
19    Q  Are you aware of the allegations in this
20  case?
21    A  Yes.
22    Q  Is it your position that John Pagones

Page 13

1  didn't violate Chatel's policies and procedures,
2  with respect to John Bratton?
3    MR. RANCK: Objection. Asked and
4  answered.
5    Answer it again.
6    A  I would answer it the same way; I'm not
7  aware of it.
8    Q  How long have you held a broker's
9  license?
10    A  Speaking from memory, about 25, 30 years.
11    Q  Are you also an attorney?
12    A  Yes, sir.
13    Q  Where did you attend law school?
14    A  Harvard.
15    Q  And are you licensed as a real estate
16  broker in Washington D.C., Maryland and Virginia?
17    A  No.
18    Q  Where are you licensed?
19    A  Washington and Virginia.
20    Q  Have you been licensed in both Washington
21  and Virginia for the length of time you previously
22  mentioned?

4 (Pages 10 to 13)

## Capital Reporting Company

Page 26

1  A  From me.
2  Q  Did John Pagones undergo training with
3  respect to the Fair Housing Act?
4  A  Yes.
5  Q  Did he undergo training with respect to
6  the D.C. Human Rights Act and the Civil Rights Act?
7  A  Yes.
8  Q  Can you describe what type of training he
9  had aside from continuing education courses?
10  A  We've had, once or twice, Richard Luchs,
11  who's an expert on the City on this, come in and
12  basically give us a seminar during the sales
13  meeting, which was Tuesday. He goes through the
14  law and he also tries to answer everyone's
15  questions and give them guidance.
16  Q  Are agents at Chatel required to review
17  and be knowledgeable about Chatel's Fair Housing
18  Manual?
19  A  Yes. They have to sign it, they have to
20  get it and they have to read it.
21  Q  What happens if an agent at Chatel
22  doesn't follow the guidelines set forth in Chatel's

Page 27

1  Fair Housing Manual?
2  MR. RANCK: Objection to the question on
3  the ground that it's way too vague. If you want to
4  point to a specific section of that big fat thing,
5  the Fair Housing Manual, and ask what happens if
6  someone violates a certain section, that's one
7  thing. I'm not quite certain that repercussions,
8  if there are any, are the same depending upon the
9  nature of some violation.
10  BY MR. SHAIBANI:
11  Q  Well, let's say if an agent at Chatel
12  misrepresents the availability of a property to a
13  prospective tenant, would that amount to a
14  violation of Chatel's Fair Housing Manual?
15  A  Say it again.
16  Q  If a real estate agent at Chatel
17  misrepresents the availability of a property, would
18  that amount to a violation of Chatel's Fair Housing
19  Manual?
20  A  Yes. It would be a violation of the
21  manual and the law.
22  Q  Would you agree that they would also be

Page 28

1  in violation of the Civil Rights Act and the D.C.
2  Human Rights Act?
3  MR. RANCK: Let me object on the ground
4  that he's not being held as a legal expert here.
5  If you can answer the question.
6  He did say violation of the manual and
7  the law.
8  He's breaking it down into certain
9  statutes now, if you know.
10  A  I was thinking particularly of the D.C.
11  Licensing Law. You're not supposed to represent a
12  property if you don't have it.
13  Q  Actually, my question referred to an
14  instance when the property is, in fact, available
15  but the agent tells a prospective tenant that it's
16  not available.
17  A  I would want to review the laws again.
18  MR. SHAIBANI: I would like to mark this
19  as Exhibit 1.
20  (Plaintiff's Exhibit No. 1 was
21  marked for identification.)
22  MR. RANCK: Off the record.

Page 29

1  (Discussion off the record.)
2  BY MR. SHAIBANI:
3  Q  If you could please turn to the page
4  designated as BRA247, which is page two of this
5  document.
6  A  247?
7  Q  Yes.
8  A  Isn't it page four? I see what you're
9  saying.
10  Q  At the bottom, if you would take a moment
11  to review the discussion under Subsection A, Fair
12  Housing Act.
13  A  It says, quote, it is unlawful to
14  represent a house or apartment that is unavailable
15  when, in fact, it is available.
16  Q  Would you also agree that it is unlawful
17  to refuse to rent or to negotiate for the rental of
18  a house or apartment or otherwise make housing
19  unavailable --
20  A  It says that, too.
21  Q  -- on the basis of race and personal
22  appearance?

8 (Pages 26 to 29)

## Capital Reporting Company

Page 62

1    Q    What if you learned independently that
2  the owner has lied to you about her property having
3  been leased?
4    A    If an owner lies --
5    MR. BOUSE:  Same objection.
6    MR. RANCK:  Let me object.
7    Go ahead.
8    THE WITNESS:  If an owner lies, we're
9  going to give the same response.  We're going to
10 say, we can't represent you, and then do the
11 cleanup that we have to.
12 BY MR. SHAIBANI:
13   Q    And that would entail withdrawing from
14 the agency agreement and withdrawing the listing
15 from the MRIS and documenting this withdrawal in a
16 certain way; is that correct.
17   A    Yes, since the listing agreement has to
18 be in writing.  Once you've said orally, you
19 certainly back that up with writing that says, you
20 know, it's ended.
21   Q    Do you recall what happened to the
22 listing agreement for Mary White's commercial

Page 63

1  property?
2    A    There really wasn't a listing agreement.
3  There's a property management agreement, which
4  includes in it the listing.
5    MR. RANCK:  You have that.
6    MR. SHAIBANI:  I believe we received the
7  agency agreement for the residential property, but
8  not the commercial.  At least that was your
9  position before.
10   MR. RANCK:  I think you misunderstood
11 what's been produced.  You have the document he's
12 referring to.  It's an exhibit in a deposition.
13 BY MR. SHAIBANI:
14   Q    Is it your testimony that you basically
15 had one agency agreement with Mary White for the
16 entire property consisting of both the commercial
17 and residential levels?
18   A    We have a management agreement, which I'd
19 like to see, and it says we will manage and rent
20 1622 Wisconsin.
21   Q    To your knowledge, did that agreement
22 specify what type of lease should be executed for

Page 64

1  the commercial property?
2    MR. RANCK:  Objection to form.
3    A    No.  I don't think it gets into that
4  level of detail.  Can you give me a copy of the
5  agreement?
6    Q    Yes, I'm sure we will.
7    Didn't the agreement state Chatel's lease
8  under the provision describing what type of lease
9  would be used for the exclusive rental agreement?
10   I would like to mark this as Exhibit 2.
11   (Plaintiff's Exhibit No. 2 was
12   marked for identification.)
13   This is the document that you're
14 referring to.
15   (Tenders document to witness.)
16   MR. RANCK:  Stefan, when you're done with
17 questions about this document or this area, if we
18 could take a short break.
19   MR. SHAIBANI:  Yes.
20 BY MR. SHAIBANI:
21   Q    The provision setting Chatel's lease
22 agreement is on page three under additional

Page 65

1  provisions?
2    A    Uh-huh.
3    Q    Did this refer to both the residential
4  and commercial units of Ms. White's property.
5    A    Yes.  But because Ms. White had a
6  license, we had to ask her something you don't of a
7  layperson; in other words, Mary, you have your
8  lease.  Do you want to use your lease or do you
9  want to use our lease?
10   Q    To your knowledge, did Ms. White request
11 that she use Chatel's lease for the commercial
12 units of her property?
13   MR. RANCK:  Read that back, please.
14   (The last question was read back by the
15 court reporter.)
16   A    Well, I think that when this was done, I
17 asked Mary whether she had a commercial lease and
18 she said she didn't.  We said, look, we'll use the
19 Chatel lease.
20   Q    At the time that you entered into this
21 agreement in June of '05, did Ms. White provide any
22 instructions to you other than what's here with

17 (Pages 62 to 65)

# Capital Reporting Company

Page 66

1  respect to leasing the commercial units of 1622
2  Wisconsin Avenue?
3     A  I remember only one and that is only that
4  this commercial space was her office.  In June it
5  wasn't available, whereas the residential apartment
6  upstairs was.  She said, well, obviously you're
7  going to have to wait until I've moved.
8     Q  Did she provide you with any other
9  documents or written instructions for leasing the
10 commercial units of her property?
11    A  I do not believe so.
12    Q  Did Barrett Anderson provide you with any
13 written instructions?
14    A  No.
15       MR. SHAIBANI:  Well, if you would like to
16 take a break, I think this may be a good time.
17       MR. RANCK:  Thank you.
18       (Recess taken.)
19 BY MR. SHAIBANI:
20    Q  Mr. Liverman, would you agree that it's
21 in the best interest of Chatel to lease a unit
22 that's on the market as soon as possible?

Page 67

1        MR. RANCK:  Objection; form and
2  foundation.
3     A  Well, when you're hired to lease
4  something, you don't get paid until you lease it.
5  The answer has to be yes.
6     Q  And is it also in the best interest of
7  the real estate agent who's handling the lease
8  transaction to try to lease a unit that's on the
9  market as soon as possible?
10    A  Yes, because the payment applies to them,
11 too.
12    Q  Would you then agree that if a
13 prospective tenant walks into Chatel and insists
14 that he sign a lease immediately, that he's
15 actually furthering Chatel's interest?
16       MR. RANCK:  Object to the foundation.
17 This is hypothetical.  It's got so many factors
18 that aren't being provided.  I mean, it certainly
19 can be adverse to anyone's interest to lease to the
20 first person that walks in for a whole host of
21 reasons.  I think you need to give him more facts
22 if you're going to ask him the hypothetical.

Page 68

1  BY MR. SHAIBANI:
2     Q  Well, let's say if the person is
3  financially qualified to sign a lease and he's
4  offered to lease it for the listed price, if he
5  insists that the lease be executed as soon as
6  possible, wouldn't that further Chatel's interest?
7        MR. RANCK:  Same objection.
8        You can answer, if you can.
9     A  What you're ignoring is that you also
10 want a deal that the owner likes.  The real
11 difference between commercial and residential is
12 that there are many more terms to be negotiated in
13 commercial than a residential.  Renting a
14 commercial is much more than just picking up a
15 form, filling in the blanks and being done.  The
16 owner has to agree and, you know, there is
17 traditional negotiations on both sides.  Both sides
18 have points.  Yes, the faster the process gets
19 wrapped up, the sooner there's a commission to
20 share.
21    Q  Did you receive a commission for
22 Mr. Bratton's leasing of the first floor level of

Page 69

1  Mary White's property.
2     A  Yes, we did.  We shared it per the rules,
3  including we did share it with John Bratton.
4        MR. RANCK:  I have an administrative or
5  housekeeping matter, since you asked the question
6  the way you did.  Mr. Liverman is here individually
7  and as a designee.  The question is, did you
8  receive a commission?  To the extent -- I'm not
9  going to interject every time.  He answered, yes,
10 we did.  I presume he means Chatel.  If you want a
11 distinction made, you're going to have to make it.
12       MR. SHAIBANI:  Yes.
13       MR. RANK:  Thank you.
14 BY MR. SHAIBANI:
15    Q  Going back to the negotiation of a
16 commercial lease, could you tell us what Mary White
17 informed you when she first requested to Chatel to
18 lease the commercial levels of her property?
19    A  I think I've answered that.  She told us
20 really only that she wanted -- may I have the
21 listing agreement -- she wanted a maximum lease of
22 two years and that she couldn't make the commercial

18 (Pages 66 to 69)

## Capital Reporting Company

Page 78

1    Q    Would you agree, then, that the property
2  was listed on the market from July 29, '05 through
3  October 6, '05 when John Bratton first walked in to
4  inquire about it?
5    A    Well, the document here shows that it
6  went on as we've talked, 29 July. It was still
7  there when John saw it, John Bratton.
8    Q    In fact, the property is still listed on
9  the MRIS as still being available as of
10  October 31 -- I'll get back to that question. You
11  don't need to answer it.
12    To your knowledge, did Ms. White inform
13  Chatel that she wanted separate tenants for each
14  level of her property at the time that she first
15  asked Chatel to list her property?
16    A    She certainly didn't say that to me.
17    Q    Did she say that to John Pagones, to your
18  knowledge?
19    A    No.
20    Q    To your knowledge, did Ms. White inform
21  Chatel that she wanted $200 worth of property taxes
22  to be inserted in the lease for the street level of

Page 79

1  her property, at the time that she first asked you
2  to list the property on the market?
3    MR. RANCK: I object.
4    A    Can you be more specific?
5    Q    When you first talked to her about the
6  leasing agreement for the commercial property --
7    A    Back in June?
8    Q    Yes -- did she ask you -- did she give
9  you instructions back then that I want 200 bucks a
10  month for property taxes as part of the lease
11  price?
12    MR. RANCK: Object.
13    A    No.
14  BY MR. SHAIBANI:
15    Q    Did she inform John Pagones of that?
16    A    I don't know.
17    Q    To your knowledge, did Ms. White --
18    A    Property tax is usually negotiated in a
19  commericial lease.
20    Q    Did Ms. White inform Chatel that she
21  didn't want the prospective tenant for the
22  commercial property to have the right of first

Page 80

1  refusal at the time that she first asked you to
2  list the property on the market?
3    MR. BOUSE: I object.
4    A    I don't think so. I don't think the
5  topic came up.
6    Q    Did she inform John Pagones of that?
7    A    I don't know. I don't think it says
8  anything about that.
9    Q    To your knowledge --
10    A    May I finish reading?
11    Q    Yes.
12    A    I don't see anything about that topic in
13  here.
14    Q    To your knowledge, did Ms. White inform
15  Chatel that she didn't want the prospective tenant
16  for the commercial property to have an option to
17  renew its lease at the time that she first asked
18  Chatel to lease her property?
19    MR. BOUSE: I object.
20    A    The topic didn't come up, no.
21    Q    Did she inform John Pagones of the same?
22    A    I don't know. Again, that's why there

Page 81

1  are negotiations over commercial leases that don't
2  take place over residential leases.
3    Q    To your knowledge, did Ms. White instruct
4  Chatel not to list her basement at the time that
5  she first asked Chatel to lease her property?
6    MR. RANCK: Object to the form.
7    MR. BOUSE: I object.
8    THE WITNESS: No. We went through the
9  property and got a tour from her. I think Barrett
10  was there and her sister, Janet Crick. She
11  explained that she didn't know when she would be
12  moving, and she was planning on moving stuff down
13  into the basement. There was somebody occupying
14  part of the space, but she couldn't be clear how
15  much of the space she would need or when. So the
16  impression that I walked away from on that day was,
17  you know, that would be worked out further down the
18  road.
19  BY MR. SHAIBANI:
20    Q    Could you tell us what she instructed
21  Chatel further down the road, with respect to
22  leasing her basement?

21 (Pages 78 to 81)

## Capital Reporting Company

Page 94

1  leasing the property?
2       MR. BOUSE: Object.
3    A  No.
4    Q  Would you agree that she didn't inform
5  Chatel that she didn't want to have her real estate
6  office occupying her property at 1622 Wisconsin
7  Avenue?
8       MR. BOUSE: I object.
9       MR. RANCK: Objection; calls for
10  speculation as to what she might have told somebody
11  else.
12       THE WITNESS: Could you repeat the
13  question? It's so if, if, if, that I'm having
14  trouble following.
15  BY MR. SHAIBANI:
16    Q  Ms. White didn't inform Chatel that she
17  preferred not to have a real estate office
18  occupying her commercial property?
19    A  Never told me that.
20    Q  In fact, the only limitation that she
21  placed on the occupation of the prospective tenant
22  at the time she asked Chatel to lease the property

Page 95

1  was no food establishment; is that correct?
2       MR. BOUSE: Object.
3       MR. RANCK: Objection; foundation.
4       THE WITNESS: I'm trying to remember
5  whether that came up in June.
6       MR. RANCK: Just so I can withdrew my
7  objection, can you specify, are you referring to
8  the nature of the business to be run out of the
9  property? Clearly there are all kinds of
10  limitations on the occupancy of the property. Your
11  question is, did she ever -- well, you can ask the
12  question -- did she ever put any limits on the use
13  of the commercial property except food service; is
14  that it?
15       MR. SHAIBANI: Yes.
16       THE WITNESS: Not to me.
17  BY MR. SHAIBANI:
18    Q  Did Ms. White inform you, at any time,
19  that she preferred not to lease her office to John
20  Bratton because he was a real estate broker and
21  intended to run a real estate agency at 1622
22  Wisconsin Avenue?

Page 96

1       MR. BOUSE: Objection.
2       MR. RANCK: Objection; speculation.
3       MR. SHAIBANI: I'm not sure when you
4  intend to take a lunch break. I could wait until
5  1:00 or do it now.
6       THE WITNESS: I think we should continue
7  on.
8       MR. SHAIBANI: I would like to distribute
9  this as Exhibit 6.
10       (Plaintiff's Exhibit No. 6 was
11       marked for identification.)
12       MR. SHAIBANI: This is Defendant Chatel's
13  Answers to Plaintiff's First Set of
14  Interrogatories.
15  BY MR. SHAIBANI:
16    Q  I would like to refer to one of the
17  questions here. Question number six, which is on
18  page six, if you could please review the response
19  here. I have a few questions about it. It carries
20  over to page seven.
21    A  Thank you.
22    Q  Did Ms. White inform you that a personal

Page 97

1  friend had given Roberta Medlin an extremely
2  favorable reference?
3    A  Yes, but it wasn't quite that way. What
4  she said is she had a friend in the accounting firm
5  that Mrs. Medlin's husband worked for and that the
6  information she was getting was that the husband,
7  if you will, was a first class person.
8    Q  Do you remember the name of the person
9  who worked at that accounting firm?
10    A  I was never told the name.
11    Q  What about the statement that she
12  preferred the property to be used as a jewelry
13  store rather than a real estate brokerage?
14    A  She liked the idea of another crafts
15  store. A lot of people in Georgetown feel that
16  way.
17    Q  Did she actually tell you that she
18  preferred the property to be used as a jewelry
19  store?
20    A  She used the words to that effect, yes.
21  She liked the idea of having a jewelry store.
22    Q  Did she tell you that Bratton Realty

25 (Pages 94 to 97)

# Capital Reporting Company

Page 98

1    presented competition to her?

2        A   Absolutely not.

3        Q   Did you assist counsel in drafting the

4    responses to these interrogatories?

5            MR. RANCK:  Let me interpose an

6    objection.  I'll stipulate that the drafting of the

7    interrogatories, as it always is, a combined effort

8    of counsel and client.

9            MR. SHAIBANI:  I'm not saying that it

10   isn't.  Are you asking, did he personally provide

11   information?  Is that your question?

12           MR. SHAIBANI:  Yes.

13           MR. RANCK:  I misunderstood it.

14   BY MR. SHAIBANI:

15       Q   Is your signature on page 17?

16       A   Uh-huh.

17       Q   Now, going back to the dates, I received

18   conflicting information.  According to Mr. Bratton,

19   he believes that the telephone conversation he had

20   with you when you told him the property that Mary

21   had selected Roberta Medlin occurred on the 11th of

22   October, which is a Tuesday evening.  In your

Page 99

1    responses here, you indicated that he called him on

2    the 13th of October when he told him that the

3    property is not available?

4        A   It says here the 12th.

5            MR. RANCK:  The very last line on page

6    seven.

7    BY MR. SHAIBANI:

8        Q   The 12th.  Was that around a Jewish

9    holiday, to your knowledge?

10       A   I believe it was the first day -- and I'm

11   not an expert in such religious matters, but I

12   believe it was the first day of Roshashuna and they

13   have restricted activities from sunset to sunset.

14   That's why John asked me to cover.

15       Q   Did you, in fact, call John Bratton on

16   the 12th of October to inform him that Ms. White

17   was selecting the other candidate?

18       A   Absolutely.

19       Q   Could you tell us what Ms. White actually

20   told you?  Did she specifically say that the

21   property has been leased to Roberta Medlin?

22           MR. BOUSE:  I object.

Page 100

1        A   No, she did not.

2        Q   What did she say specifically?

3        A   She said she wanted to go with Medlin.

4        Q   Did she tell you she had already

5    committed the property to Medlin?

6            MR. BOUSE:  I object.

7        A   No.

8        Q   Well, why, then, did you tell Mr. Bratton

9    on the 12th that Ms. White was selecting the other

10   candidate?

11       A   I think you're confusing the dates.  On

12   the 12th, I had the meeting with Mary as I

13   summarized here.  At the end of the meeting, it

14   becomes clear she's going to go with the other

15   candidate.  I said to Mary, as a courtesy, we

16   always need to tell the unfortunate candidates.

17   You know, for people who don't get it, we owe them

18   the courtesy of telling them right away.  That's

19   why I called right after the session with Mary.

20   She just made her decision.  I couldn't tell

21   before.

22       Q   Didn't she tell John Bratton that the

Page 101

1    property has been leased and this is just business?

2        A   I didn't tell him that the property was

3    leased.  I told him she was going with the other

4    candidate.

5        Q   But you did tell him, this is just

6    business?

7        A   I said, yes, it's a decision by the owner

8    and that's just business; in other words, I was

9    referring to the fact that reality in the real

10   estate business, you work for principal, the

11   principal is the owner.

12       Q   Don't you have to receive confirmation

13   that a lease has been signed before you inform a

14   prospective tenant that the property is gone?

15           MR. BOUSE:  Objection.

16           MR. RANCK:  Objection; mischaracterizes

17   his testimony and lacks foundation.

18           Answer if you can.

19       A   What I told John is, is that Mary was

20   going with the other candidate.  Obviously, the

21   lease -- they hadn't formalized whatever efforts

22   with Medlin.  There was no lease at that moment.

26 (Pages 98 to 101)

## Capital Reporting Company

Page 102

1  That's why I said, she's going with the other
2  candidate. As a courtesy to a member of the
3  public, I think you want to tell them that, you
4  know, one avenue is not going to work out, you've
5  got to go on. Why would you want to drag it out.
6  BY MR. SHAIBANI:
7      Q  Can you describe what else you discussed
8  with John Bratton on the 12th of October?
9      A  There was nothing else. John got very
10 irate and very mad very fast. I doubt it was a
11 conversation that lasted more than two minutes.
12     Q  What did he tell you in response?
13     A  He said that he wasn't going to take this
14 lying down and he would take this to a higher
15 level.
16     Q  I believe, in response to another
17 question here, you have a date of October 13th. If
18 you could please take a look at page 12,
19 Interrogatory No. 13, the last sentence, it says,
20 Defendant Liverman recalls a conversation with
21 Plaintiff on October 13, 2005 in which he indicated
22 that he felt he had been discriminated against and

Page 103

1  was taking it to another level.
2      A  Uh-huh. On the morning of the 13th, I
3  happened to be in the bookkeeping department. I
4  took a call from John when he made these statements
5  and he also asked who our counsel or legal counsel
6  was and who our public relations counsel was.
7  Since I was back there and didn't have access to my
8  Rolodex, I told him that the legal counsel was
9  Richard Luchs. I'm not actually sure whether I
10 gave him Richard's address at that time. I told
11 him we had no public relations counselor.
12     Q  Well, this conversation, did it take
13 place on the 12th or the 13th because you have --
14     A  Don't mix them up.
15     MR. RANCK: I'm sorry, what was the
16 question; because he has two what?
17 BY MR. SHAIBANI:
18     Q  Well, on the 12th, you mentioned you
19 called John Bratton.
20     A  No. I said, he called me.
21     MR. RANCK: I'm sorry. We're missing
22 each other now.

Page 104

1  BY MR. SHAIBANI:
2      Q  Did you have two separate conversations
3  then?
4      A  Yes.
5      MR. RANCK: On the 12th, he asked first,
6  you called Mr. Bratton after your meeting with
7  Ms. White. Now, he's asking about the 13th.
8  That's where things broke up. On the 13th, the
9  testimony was Bratton called Mr. Liverman. That's
10 exactly what it says in the Answers to
11 Interrogatories. Well, the answer says he recalls
12 a conversation. Mr. Liverman just testified he was
13 in the bookkeeping department and Bratton called
14 him. On the 12th, Mr. Liverman call Mr. Bratton
15 after the meeting with Ms. White. That's what the
16 interrogatories say and that's what the testimony
17 just was.
18 BY MR. SHAIBANI:
19     Q  The statement that he felt discriminated
20 against and was taking it to another level, was
21 that stated on the 12th or the 13th?
22     A  As the answer says, on the 13th.

Page 105

1      Q  When did you receive the administrative
2  complaint for discrimination?
3      A  I don't remember that. It probably was a
4  fair amount of time later.
5      Q  After your conversation with John Bratton
6  on the 13th, did you discuss his comments with
7  Ms. White?
8      A  Yes. I told her the substance of the
9  conversation and asked her whether she had gotten a
10 similar call.
11     Q  What did she say in response?
12     A  At that time, she said she hadn't gotten
13 a similar call.
14     Q  Did you inform Ms. White that Mr. Bratton
15 felt discriminated against and was taking it to
16 another level?
17     A  I'd tried to be as faithful as I could
18 be.
19     Q  How did she react to that?
20     A  I don't think she expressed any reaction
21 at the time.
22     Q  Did she inform you -- well, actually, can

27 (Pages 102 to 105)

## Capital Reporting Company

Page 110

1    Q    Wouldn't you have an obligation to inform
2    the prospective tenant, nonetheless, that what you
3    told him previously was not true any longer?
4         MR. RANCK:  Objection.
5         THE WITNESS:  Do I answer?
6         MR. RANCK:  If you can answer.  I think
7    it calls for a legal conclusion.
8         THE WITNESS:  The primary duty of an
9    agent is to be faithful to their principal.  The
10   principal was Mary.
11   BY MR. SHAIBANI:
12        Q    What if the principal engages in the
13   conduct that would be unlawful; wouldn't you have
14   to step away?
15        MR. RANCK:  Objection to the form of the
16   hypothetical, the lack of foundation, and the lack
17   of all the facts the witness would need to answer
18   the question.
19        MR. BOUSE:  I object.
20   BY MR. SHAIBANI:
21        Q    You mentioned previously that if somebody
22   tells you the property has been leased and that is

Page 111

1    not true, you would have to withdraw from the
2    listing because they had lied about the
3    availability of the property, which led you to get
4    involved in potential legal problems with the
5    prospective tenant who you told the property had
6    been leased.  What I want to know is, why didn't
7    you call Bratton?
8         A    Because that would have been a violation
9    of my duty to my principal, Mary White.
10        MR. RANCK:  Let me also object to the
11   question on the ground that it mischaracterizes the
12   prior testimony and it lacks foundation, because
13   you are now equating Ms. White telling Mr. Liverman
14   that Roberta Medlin is backing out with Mary White
15   having lied about whether the property was leased.
16        MR. SHAIBANI:  We have deposition
17   testimony from Roberta Medlin stating specifically
18   that Mary White did not make a verbal commitment to
19   her to lease the property.
20        MR. RANCK:  I know what the testimony is,
21   but that's not the question that you asked the
22   witness, Mr. Shaibani.

Page 112

1    BY MR. SHAIBANI:
2         Q    So basically your position is that after
3    you learned the property is not going to be leased
4    to Medlin, when you told Bratton two days before
5    that Mary White is going to lease it to Roberta
6    Medlin, you don't have to do anything at that point
7    afterwards.  I mean, once you find out --
8         A    That's not my testimony.  My testimony --
9         MR. RANCK:  That's fine.  That's not his
10   testimony.
11        Q    Well, what would you have had to do to --
12        A    I am waiting for my principal, Mary
13   White, to give me further instructions.
14        Q    Isn't it true that you did not withdraw
15   from the listing after you learned that Ms. Medlin
16   was not going to lease the property?
17        MR. BOUSE:  I object.  I don't understand
18   that question.
19   BY MR. SHAIBANI:
20        Q    You did not withdraw from the agency
21   agreement with Mary White after you learned that
22   Medlin was not leasing her property?

Page 113

1         MR. RANCK:  You can answer that question.
2         THE WITNESS:  The document speaks for
3    itself.  The listing is on the table.
4    BY MR. SHAIBANI:
5         Q    In fact, you continue to manage
6    Ms. White's property to this day; isn't that
7    correct?
8         A    The presidential apartment upstairs,
9    ground floor, yes.
10        MR. SHAIBANI:  I would like to designate
11   this as Exhibit 8.
12        (Plaintiff's Exhibit No. 8 was
13        marked for identification.)
14   BY MR. SHAIBANI:
15        Q    This is Chatel's and John Pagones'
16   Answers to Interrogatories and Requests for
17   production of Documents propounded by the D.C.
18   Office of Human Rights.
19        If you could please take a look at
20   question 11.
21        A    Uh-huh.
22        Q    Were there any other individuals, aside

29 (Pages 110 to 113)

## Capital Reporting Company

Page 118

1  witnesses we could get a hold of in our
2  investigation.
3      MR. SHAIBANI:  I don't see counsel's
4  name on this document.
5      MR. RANCK:  Counsel doesn't typically
6  have to sign the Interrogatory Answers under oath.
7      MR. SHAIBANI:  Let me rephrase the
8  question.
9  BY MR. SHAIBANI:
10     Q    Did you actually provide -- did you
11  instruct whoever drafted this response to
12  Interrogatory No. 6 of the OHR to specify that Mr.
13  Bratton's lease was very pro-tenant because it
14  included terms for an option to extend the term of
15  the lease and a right of first refusal?
16     MR. SHAIBANI:  I instruct you not to
17  answer any question that pertains to your
18  communications with counsel.
19     A    There's a clause in the lease, which
20  extends it and adds an additional year.  Whether or
21  not the owner has talked about it is clearly
22  pro-tenant, anti-landlord.  So whether or not Mary

Page 119

1  had raised it before, any lease you go through
2  representing someone, you say, make sure you read
3  this, make sure you read that.
4      Q    Does Chatel's commercial lease agreement
5  include, as one of the terms, a right of first
6  refusal?
7      A    There is a form that we sometimes use
8  that has that and has a lot of other things.  As
9  I've said -- I can't tell how many times --
10  commercial leases are always very carefully
11  negotiated and there are a lot of things in a form,
12  particularly in a commercial lease, that change,
13  get thrown out, get altered.  That's why it takes
14  much longer to put together a commercial lease than
15  a residential lease.  Putting together a commercial
16  lease is much more complicated than just filling in
17  the form.  As I think I've said, maybe a half dozen
18  times, that's one of the reasons I tell all of the
19  agents I have to be involved.
20     Q    Isn't it true that Chatel's boilerplate
21  commercial lease agreement includes a provision
22  allowing the lease to convert to a month-to-month

Page 120

1  lease as the expiration of its term?
2      A    That's D.C. law.
3      Q    Why is it that the lease drafted between
4  Ms. White and John Bratton has that provision
5  crossed out?
6      MR. RANCK:  The final lease?
7      MR. SHAIBANI:  Yes.
8      MR. RANCK:  Objection; calls for
9  speculation.
10     MR. BOUSE:  I object.
11     THE WITNESS:  I didn't prepare the final
12  lease.  I can't answer.
13  BY MR. SHAIBANI:
14     Q    Can you tell us who prepared it?
15     A    No, because I wasn't involved.  I could
16  guess, but you don't want me to guess.
17     Q    You weren't involved, as in Chatel wasn't
18  involved in drafting a lease, or you personally
19  were not involved at Chatel?
20     MR. RANCK:  Again, the final lease of
21  October 31st that's executed between Ms. White and
22  Mr. Bratton?  Is that what you're talking about?

Page 121

1      MR. SHAIBANI:  Yes.
2  BY MR. SHAIBANI:
3      Q    Wasn't there a fax sent specifically from
4  John Gordon Forester to Chatel stating that these
5  are the terms of the lease and those terms were to
6  exclude the right of first refusal and an option to
7  renew?
8      A    Well, the documents speak for themselves.
9  Gordon Forester first said, you know, here, I want
10  you to change this and do this.  And I said, John
11  or Gordon, make it easy.  Here's an electronic copy
12  of the lease.
13     Q    Is it your testimony that Chatel had no
14  involvement with the drafting of the final lease
15  between Mary White and John Bratton?
16     A    That's not my testimony.  My testimony
17  is, except for the limited involvement that I just
18  described, we had no other involvement.
19     MR. RANCK:  Maybe you can clarify whether
20  you mean drafting or negotiating the terms because
21  drafting, in some sense, implies typing what others
22  have said or, in this case, transmitting an

31 (Pages 118 to 121)

# Capital Reporting Company

Page 122

1  electronic document.
2      Q   Well, transmitting the electronic
3  document, I guess I want to find out if the
4  provisions that are crossed out on the boilerplate
5  Chatel commercial lease, if Chatel crossed those
6  provisions out in the final lease that was executed
7  between John Bratton and Mary White?
8      A   The answer, as it was a minute ago, is we
9  did not prepare the final lease, and therefore
10  anything struck out in there was not struck out by
11  us.
12      Q   Would you agree that Mary White crossed
13  those provisions out?
14      MR. RANCK:  Objection; speculation.
15      A   I do not know.
16      MR. RANCK:  He just said he wasn't
17  involved in that part of it.
18      Q   Did she ever tell you who prepared that
19  lease?
20      A   No, she did not.
21      Q   Did John Gordon Forester inform you who
22  prepared the lease?

Page 123

1      MR. RANCK:  Let me object --
2      A   Not in such words.
3      MR. RANCK:  -- let me object on the
4  ground the question is vague and the use of the
5  term compared.
6  BY MR. SHAIBANI:
7      Q   Drafted, crossed out the provisions.
8      A   You should know that years ago John or
9  Gordon -- what he goes by -- was with the law firm
10  that Richard Luchs is with and worked with him. He
11  was not a new name.
12      MR. RANCK:  I'm happy to have the witness
13  step out, if you want, Mr. Shaibani, while I
14  explain my problem with your question. My problem
15  is, you're using terms like drafting and prepared
16  and who struck out. The fact is, Mr. Bratton, as I
17  understand it, doesn't allege those things were
18  struck out before he signed it. He negotiated the
19  lease with Mr. Forester, is our understanding. The
20  lease was prepared in its final form and then
21  everybody, Mr. Bratton and his wife, signed it.
22      So my position would be, Mr. Bratton also

Page 124

1  prepared that lease.  Even though he didn't
2  physically type it up or perhaps it wasn't his pen
3  crossing out provisions, he agreed to the
4  provisions and was involved in the preparation of
5  the lease. Chatel was not involved in that.
6  That's the difficulty I'm having with the words
7  you're using.
8      MR. SHAIBANI:  Well, we know that John
9  had insisted on having the right of first refusal
10  and an option to renew --
11      MR. RANCK:  Apparently not.  Let's move
12  on with the deposition.
13      MR. SHAIBANI:  It was shoved down his
14  throat basically because he didn't have a choice.
15  That's why he was discriminated against.
16      Can we have the two leases, please?
17  BY MR. SHAIBANI:
18      Q   While we're waiting, could you please
19  describe what a right of first refusal is?
20      MR. RANCK:  Objection.
21      You can answer.
22      A   A provision in the lease or another

Page 125

1  document that says that someone can match some kind
2  of offer, which is presented by a third person or,
3  saying it another way, an owner cannot accept an
4  offer from a third person without coming back to
5  the person who has the right of first refusal who
6  votes basically up or down.
7      Q   Right of first refusal, would you agree
8  that the existing tenant who has that right is not
9  receiving any financial benefit in terms of the
10  transaction in the sense that he has to provide the
11  same price -- he has to match the price offered by
12  whoever else has made the offer in order to
13  purchase the property and exercise that right;
14  isn't that correct?
15      MR. RANCK:  Object to the form and
16  foundation of the question.
17      You can answer.
18      A   That's such a long statement.  I don't
19  know how to answer it. If you want to break it
20  down, please do.
21      Q   Isn't it correct that the tenant who has
22  the right of first refusal is obligated to match

32 (Pages 122 to 125)

# Capital Reporting Company

Page 134

1  I mean, I can't answer because you have so garbled
2  the time and chronology. We spent half an hour
3  getting it right. I would say this: Mary can't
4  object to something from John Bratton until it's on
5  a piece of paper from John Bratton.
6  BY MR. SHAIBANI:
7      Q  If she had instructed Chatel to use their
8  lease and that lease already includes a right of
9  first refusal in paragraph 41 --
10     MR. RANCK: There's no question pending.
11 BY MR. SHAIBANI:
12     Q  -- why didn't she provide this provision
13 to John Bratton?
14     A  Ask a simple question and I can answer
15 it. I'll be glad to answer.
16     MR. RANCK: Objection; argumentative,
17 speculative. It calls for speculation.
18 BY MR. SHAIBANI:
19     Q  Could you tell us who prepared the
20 commercial lease agreement set forth in Exhibit 9,
21 CH71?
22     MR. RANCK: Now, referring to the

Page 135

1  information that's been added to the form?
2      MR. SHAIBANI: Yes.
3      THE WITNESS: Probably me.
4  BY MR. SHAIBANI:
5      Q  Where did you obtain information to draft
6  these provisions?
7      A  From Roberta Medlin. On that Tuesday
8  which, I believe, was the 11th, I took a call from
9  Mary in the early afternoon saying this lady is
10 going to come and see you. She's seen the property
11 with me. We worked a lot out. Fifteen minutes
12 later, Roberta Medlin shows up with a copy of the
13 basic form with a lot of blanks filled in -- I
14 recognize the handwriting of Mary and, I think, she
15 also had another piece of paper in an envelope, but
16 I don't know -- with some very specific and unusual
17 terms which, I think, are the basis of what -- it's
18 page CH0079 -- what the two ladies had worked out
19 in terms of declaration and changes and things like
20 that.
21     Q  The additional provisions addendum was
22 brought to you by Roberta Medlin? Is that what

Page 136

1  you're testifying?
2      A  I was given, as I say, a piece of paper
3  or an envelope -- I can't be specific -- which
4  summarized some of their negotiations. I then
5  tried to, as I often do, put it into Peter Rabbit
6  English.
7      Q  Did you actually speak to Mary White
8  before you prepared this?
9      A  As I testified a minute ago, Mary called
10 me and said Roberta is going to come, write up what
11 she says.
12     Q  But she didn't --
13     A  She didn't give me the specifics. One of
14 the significant things is that, when Roberta came,
15 I could tell Mary's handwriting.
16     Q  Handwriting on?
17     A  On a form like this and this extra sheet
18 with these, if you will, special terms.
19     Q  Have you provided the Chatel Commercial
20 Agreement of Lease to Mary White before that?
21     A  Much before that.
22     Q  So she, in fact, drafted some of the

Page 137

1  terms of the unexecuted lease between Mary White
2  and Roberta Medlin; is that correct?
3      MR. BOUSE: I object.
4      MR. RANCK: Can you read that back,
5  please? I'm sorry, I was working and I missed the
6  question.
7      (The last question was read back by the
8  court reporter.)
9      MR. RANCK: Object. It's vague and it
10 calls for speculation.
11     You can answer.
12     THE WITNESS: I got a call from Mary
13 saying somebody is going to come down, treat her
14 well, et cetera. I, Mary, and this person just
15 met. Then, as I say, very promptly someone shows
16 up with a document with Mary's handwriting all
17 over.
18 BY MR. SHAIBANI:
19     Q  Following your conversation with Mary
20 White regarding Roberta Medlin coming to your
21 office to present this lease, did you send her a
22 copy of this Exhibit 9 for her to review?

35 (Pages 134 to 137)

## Capital Reporting Company

Page 150

1    A    I have no idea.

2    Q    Where would something like this be posted

3  for advertising purposes?

4    A    Well, it would be used several ways.

5  First, it would be in the front window. If an

6  agent wants to hand it out or something, they can

7  do that. This is residential. They use it as

8  something to hand out at an open house.

9    Q    Would it be posted on the windows outside

10  of the actual property?

11    A    I've never seen it done that way. It

12  could be.

13    Q    Will you agree that Chatel wouldn't

14  create the graphics and the information, Exhibit

15  12, if Mary White hadn't instructed it to lease her

16  basement at 1622 Wisconsin Avenue?

17      MR. BOUSE: I object.

18      MR. RANCK: I object to the form.

19      You can answer.

20      THE WITNESS: I don't know how to answer

21  that more than we talked about. I mean, the

22  information flows from the owner to the agent and

Page 151

1  from the agent to Hope, I'm going to guess, in this

2  case. I wasn't involved in the flow. I can talk

3  to you about general practice, if you will.

4  BY MR. SHAIBANI:

5    Q    As a general practice, Chatel wouldn't

6  create an advertisement for a property unless the

7  owner requested it to lease the property?

8    A    Yes.

9    Q    Would you agree that the same procedure

10  was followed in this case with respect to Exhibit

11  12?

12      MR. RANCK: Objection; speculation.

13      MR. BOUSE: I object.

14      MR. RANCK: You can answer.

15      THE WITNESS: You keep asking the

16  question. I'm talking about procedures. I was not

17  involved in the specifics here. You're asking me

18  to guess.

19      (Plaintiff's Exhibit No. 13

20      was marked for identification.)

21  BY MR. SHAIBANI:

22    Q    This is Exhibit 13. It's designated

Page 152

1  BRA205. It's a fax apparently from John Gordon

2  Forester to Chatel dated October 26th, '05. Do you

3  recognize this document?

4    A    I don't actually recognize it. Remember

5  I testified that on the first round, when Gordon

6  was involved, he asked me to make some changes.

7  This seems to be his instructions. I do remember

8  once he called me and I said, you know, Gordon

9  you're going so fast, give it to me in writing

10  after we get it right.

11    Q    His instructions --

12    A    Gordon is of the same generation as John

13  Pagones with the same natural ineptness with the

14  computer.

15    Q    Do you disagree with his statement in

16  here, that it is my understanding that you will

17  perform your form lease and send it to me for

18  negotiations with John Bratton?

19      MR. RANCK: I object. Are you asking

20  whether he disagrees that that was Mr. Forester's

21  understanding?

22      MR. SHAIBANI: No. If that's actually

Page 153

1  what happened.

2      THE WITNESS: First, I'm unclear which

3  part of the language you're looking at.

4  BY MR. SHAIBANI:

5    Q    The first sentence, it is my

6  understanding that you will prepare your form lease

7  and send it to me for negotiations with John

8  Bratton.

9    A    You're asking me what based on that

10  language?

11    Q    If this, in fact, happened.

12      MR. RANCK: I think what he's asking is,

13  is did you prepare a form lease with these terms

14  and forward it to him for negotiation with Bratton?

15    A    I already testified. The answer is, the

16  first round, yes.

17    Q    The first round, did you actually include

18  the terms listed here; the two-year lease without

19  an option for a third year on the street level, the

20  lower level is not available?

21    A    We were given instructions from an

22  attorney for a client, we usually follow them.

39 (Pages 150 to 153)

## Capital Reporting Company

Page 154

1　　Q　　Also the instruction that the landlord
2　will not grant the right of first refusal if the
3　building is sold within the term of the lease?
4　　A　　I think I've answered that question.
5　　Q　　That you followed the instructions?
6　　A　　I followed the instructions, yes.
7　　Q　　Also, the additional payment of 200 bucks
8　a month for real estate taxes?
9　　A　　It's in there, yes.
10　　Q　　Well, earlier, you mentioned that the
11　finalized lease between John Bratton and Mary
12　White, which we had distributed as Exhibit 10, you
13　mentioned that you didn't recall the crossing out
14　of paragraph 41?
15　　A　　This refreshes my recollection. All I
16　remember is, he asked me to review the first round.
17　I said, let's do it the easy way, you know.
18　　Q　　Are these instructions that John Gordon
19　Forester provided to you before you made your first
20　round of changes?
21　　A　　I believe so.
22　　Q　　So you did, in fact, cross out paragraph

Page 155

1　41 of the lease?
2　　A　　I testified, I followed the instructions.
3　　Q　　Was John Pagones fired from Chatel after
4　the Plaintiff filed this case with the District
5　Court?
6　　A　　No, sir. He's not an employee, by the
7　way.
8　　Q　　Could you explain the circumstances of
9　his departure?
10　　A　　He decided to retire.
11　　Q　　When did that take place?
12　　A　　Earlier this year, March or April. I
13　mean, not this year. I mean, 2006.
14　　Q　　Had the Plaintiff filed this case
15　already, at that time?
16　　A　　I believe so. I don't have fresh in mind
17　when the case was actually filed. We had gone
18　through the mediation.
19　　Q　　Was John Pagones your agent in October of
20　'05? Actually, by "your agent", I mean, Chatel's
21　agent?
22　　A　　He was an agent for the agency of Chatel.

Page 156

1　　Q　　What was the scope of his agency?
2　　A　　The normal scope of a real estate agent.
3　　Q　　Did that include negotiating and listing
4　and leasing properties?
5　　A　　Residential properties, yes.
6　　Q　　What about commercial properties?
7　　A　　As I've testified before, we have a
8　different approach on these, which involve more
9　interactional team effort.
10　　Q　　If John Pagones wasn't significantly
11　experienced in leasing commercial properties, why
12　did you decide to give Mary White's listing to him
13　and not somebody else?
14　　A　　Because he appears regularly and does a
15　lot of desk duty. In other words, you want someone
16　there in case someone calls, someone comes in to
17　show the property.
18　　Q　　But John Pagones wasn't showing Mary
19　White's property to the prospective tenants.
20　Barrett Anderson was; isn't that true?
21　　　　MR. RANCK: Objection; speculation,
22　assumes facts not in evidence.

Page 157

1　　A　　I think your statement is wrong. Various
2　people showed it; Barrett did some, John did some,
3　Mary clearly did some.
4　　Q　　Is it your position that John Pagones did
5　not exceed the scope of his agency with respect to
6　his interactions with Mr. Bratton?
7　　　　MR. RANCK: I object to form of the
8　question. It calls for a legal conclusion, I
9　think.
10　BY MR. SHAIBANI:
11　　Q　　Did John Pagones do something he wasn't
12　authorized to do in terms of his dealings with
13　Mr. Bratton?
14　　A　　I'm still having trouble understanding
15　the question but to the extent I do, no.
16　　Q　　In fact, wasn't John Pagones a real
17　estate agent at Chatel from May '67 to April of
18　'06, close to 39 years?
19　　A　　I wasn't there in '67. I have nothing
20　that contradicts that. The other date is as I've
21　testified; in other words, I'm not as strong on the
22　starting date as the ending date.

40 (Pages 154 to 157)

## Capital Reporting Company

Page 182

1  it's not the whole process.
2      Q   The question I have, if somebody is ready
3  to make a commitment to lease a property, why
4  wouldn't the real estate agent at Chatel provide
5  him with rental application so he can provide
6  Chatel with the information necessary to do that
7  credit check and everything else?
8          MR. RANCK:  Objection; asked and
9  answered.  It calls for speculation.
10         Go ahead.  You can answer it again.
11     A   As I understand, John expected to be
12 seeing Mr. Bratton again the next morning to give
13 him the commercial lease form and to give him
14 everything there.  I don't see why you want to
15 attach so much significance to one piece of paper.
16     Q   Did you ever have any discussions with
17 Hope Edwards concerning John Bratton?
18     A   No, sir.
19     Q   Would you agree that Roberta Medlin first
20 came to Chatel after John Bratton had gone to
21 Chatel to inquire about Mary White's property?
22         MR. BOUSE:  I object.

Page 183

1          MR. RANCK:  Say that again.  If Medlin
2  came after Bratton?
3          MR. SHAIBANI:  Yes.
4          THE WITNESS:  To my knowledge, Roberta
5  Medlin first came, as I've testified, after Mary
6  called me on Tuesday, the 11th.  Other people have
7  testified about when John Bratton first came.  I
8  think there's earlier dates.
9  BY MR. SHAIBANI:
10     Q   Could you describe that, Chatel's first
11 come first serve policy?
12     A   It is a policy designed to do several
13 things, not to take the property off the market
14 prematurely and do a disservice to the owner.
15 Also, to kind of avoid some kind of competition
16 between agents and be fair to the public.  You have
17 to read it with some experience of common sense.
18 If someone just shows and says I want the property
19 but is not legally bound, that really doesn't
20 start.  You have to get what we talked about before
21 in terms of a full application package.  It is
22 judged on that basis.

Page 184

1      Q   Yes, but isn't the first come first serve
2  policy also -- doesn't the first come first serve
3  policy of Chatel also require the real estate agent
4  to service the person who has come in first?
5          MR. RANCK:  I object to the form.
6          Can you answer.
7      A   I don't understand the question.
8          MR. SHAIBANI:  I would like to mark some
9  additional exhibits.
10         (Plaintiff's Exhibit Nos. 16 through 18
11         were marked for identification.)
12         MR. SHAIBANI:  Back on the record.
13 BY MR. SHAIBANI:
14     Q   If I can go back to the first come first
15 serve policy.  I believe your Fair Housing Manual,
16 Exhibit 1, page 11, if you would take a moment,
17 please, to review the two paragraphs underneath the
18 first come first serve.
19         Here basically it says, Chatel maintains
20 a first come first serve policy.  Bratton is one of
21 the first applicants who submits an application
22 five minutes before the second applicant for the

Page 185

1  same apartment.  The Credit Bureau first sends back
2  the credit report on the white applicant who
3  applied second and the report is good.  Because all
4  of the information was in hand, the resident
5  manager accepts the second (white applicant).
6          The resident manager explains to the
7  black applicant that the Credit Bureau did not send
8  his credit report back until the day after the
9  apartment was rented.  The black applicant sues.
10 Could a lawsuit have been prevented?  Probably.  If
11 the resident manager had used the first come first
12 serve policy, the lawsuit could have been avoided.
13 In this example, the resident manager should have
14 waited the extra day it usually takes to get the
15 credit report back.
16         Do you agree with this policy?
17     A   Yes, because the way I read it, it was a
18 procedure that was followed here.  In other words,
19 to get this package together, you have to recognize
20 that to some extent you're depending on the outside
21 world.  If the Credit Bureau is faster, or one or
22 the other, it would make sense to hold the two

47 (Pages 182 to 185)

# Capital Reporting Company

Page 186

1  until they, if you will, are both complete.
2       What was done here, was complete packages
3  were presented to the decision-maker who is Mary.
4  I would also point out, if you go back to the
5  first time John Bratton presented those papers
6  which, I believe, was Friday morning, what's the
7  first thing we did? We turned around, made a copy
8  and got them to Mary right away. She's the one who
9  came back and said, hey, I need more information.
10      Q   Was there any reason why you didn't run
11  John's credit report on that Friday?
12      A   I couldn't. I didn't have the power to.
13  The Fair Credit Reporting Act requires that I have
14  a signature from John Bratton. I did not have a
15  signature from John Bratton.
16      Q   Didn't he provide you with a rental
17  application, at that point?
18      A   No, sir, not on Friday.
19      Q   When did he provide you with the rental
20  application?
21      A   I would want to look at the paper trail,
22  but I think not sooner than the Monday. I do know

Page 187

1  that, you know, very shortly after we got it, we
2  processed it. I believe he got the rental
3  application on the 11th and got it back to us on
4  the 12th, which is the first time he had authority
5  per the Fair Credit Act to do it and did it
6  promptly.
7       Q   It took six days, then, from the date
8  that John Bratton first came to your office at
9  Chatel to run his credit report; is that correct?
10      MR. RANCK:   Objection to the
11  characterization that it took six days.
12  BY MR. SHAIBANI:
13      Q   Six days less from the time that John
14  first walked into your office?
15      A   My answer is that within several hours,
16  after giving us authority, it was run.
17      Q   If you would take a look at Exhibit 17,
18  which, I believe, is the credit report run for
19  Roberta Medlin was conducted on the 11th of
20  October?
21      A   That's correct.
22      Q   Will you agree that that's the day that

Page 188

1  she first came to Chatel's offices inquiring about
2  Mary White's property?
3       A   This could not be run if we didn't have
4  signed Fair Credit.
5       MR. RANCK:   Just a housekeeping matter,
6  the one that your colleague gave me, Exhibit 17,
7  says John Bratton on it. Is that not right or is
8  that --
9       THE WITNESS:   The numbers are reversed.
10      MR. SHAIBANI:   The ones in front of you
11  are the correct ones.
12      MR. RANCK:   Thank you. I just wanted to
13  make sure my records are clear.
14  BY MR. SHAIBANI:
15      Q   Since John Bratton came to Chatel's
16  office five days before Roberta Medlin asking about
17  Mary White's property, was your running Roberta
18  Medlin's credit report a day before John Bratton's
19  a violation of Chatel's first come first serve
20  policy?
21      A   I will answer this in several parts.
22  First, if you'll notice, the fair housing applies

Page 189

1  to residential. If you'll look at the facts here,
2  you'll see every time we got something from
3  someone, we try to process it as fast as possible.
4  We're following the instructions of the principal,
5  which is Mary White. I don't know the facts.
6  You'll have to look at the context. I just don't
7  see a violation of first come first serve. I do
8  see that, you know, based on the Friday submission
9  by John Bratton, it goes to Mary and she says it's
10  not good enough.
11      Q   Will you agree, then, that the reason why
12  you gave preferential treatment to Roberta Medlin
13  over John Bratton was because Mary White had
14  instructed you to do so?
15      MR. BOUSE:   I object.
16      MR. RANCK:   Objection; argumentative,
17  mischaracterizes his testimony, assumes facts not
18  in evidence, lacks foundation.
19      MR. BOUSE:   That is just wrong.
20      MR. RANCK:   You don't have to accept his
21  characterization that you gave preferential
22  treatment to anybody.

48 (Pages 186 to 189)

# Capital Reporting Company

Page 194

1  complete package and if any additional materials
2  need to be --
3      A   Knowing Mary, I know the first thing to
4  do was to get her her a copy. Did I keep a copy to
5  read it? Yes. I didn't think it good to read them
6  and then give them to Mary because that would delay
7  delivery to my principal.
8      Q   Do you know why Chatel sent the plumbing
9  invoice to Mr. Bratton?
10     A   Well, I believe, there was a time that
11 the toilet didn't work. Under the terms of
12 commercial lease, a tenant is responsible for that
13 expense. To me, this is the building. I would
14 refer to Exhibit 16, the first page is the
15 statement John Bratton as the tenant. The
16 supporting documentation, which is attached, are
17 two bills from a company called Stevens Plumbing.
18 And then the description goes on to say, 12/07,
19 furnish and install one new point of use of water,
20 hot water heater, under basin connected to existing
21 electrical water line.
22         And then there's another one dated, for

Page 195

1  whatever reason, 11/29/02 -- whatever that is --
2  called in for leak at the toilet. Discovered that
3  leak was coming from supply line between
4  instantaneous heater and basin faucet. Replace
5  supply line, recommend to replace heater. It is
6  not working okay.
7      Q   To your knowledge, was this plumbing
8  problem caused by John Bratton?
9      A   I don't know what caused it. I can only
10 go by what the servicing plumber says. He doesn't
11 tell me what caused it. I can only go by what the
12 service heat plumber says. He doesn't tell me what
13 caused it.
14     Q   Isn't the regular maintenance clause for
15 wear and tear supposed to be paid by the landlord
16 rather than the tenant?
17         MR. BOUSE: I object.
18         MR. RANCK: Objection. Mr. Shaibani, if
19 you would point the witness to the provisions in
20 the lease that you contend control this issue
21 because you know that the relationship between the
22 tenant and the landlord is controlled by the lease.

Page 196

1  So asking him whether the landlord should have been
2  responsible, he must refer to the lease. Can you
3  please provide him with the provision of the lease
4  you're referring to.
5          MR. SHAIBANI: That's not the question
6  I'm asking.
7  BY MR. SHAIBANI:
8      Q   The question is whether, under Chatel's
9  leases, the landlord is responsible to pay for wear
10 and tear maintenance costs?
11         MR. BOUSE: You just mentioned lease. I
12 object.
13         MR. RANCK: I object, too. I'd ask you
14 to proffer what relevance some other lease might
15 have to this situation. Why not look at the lease
16 governing the relationship between the parties.
17 BY MR. SHAIBANI:
18     Q   Well, where does it say in that lease
19 that wear and tear is covered by the tenant rather
20 than the landlord?
21         MR. RANCK: You're asking the question.
22 Read the lease. You're asking the question. If

Page 197

1  you want to point him to a provision in the lease
2  and ask him about it, please do.
3  BY MR. SHAIBANI:
4      Q   In your experience, has Chatel sent a
5  plumbing invoice for over $1,000 to a tenant for
6  properties that it manages when the plumbing defect
7  wasn't caused by a tenant?
8      A   We had followed the lease.
9      Q   Would you agree that no agreement was
10 ever executed between Roberta Medlin and Mary White
11 for the commercial property at 1622 Wisconsin
12 Avenue?
13     A   The information I had was that she was
14 approved.
15     Q   Did Mary White ultimately decide to lease
16 the street level of the property to John Bratton
17 only to conceal her discrimination?
18         MR. BOUSE: I object.
19         MR. RANCK: Objection.
20         THE WITNESS: I'm not going to answer
21 that question. It's false.
22 BY MR. SHAIBANI:

50 (Pages 194 to 197)

## Capital Reporting Company

Page 198

1  Q   Under Mr. Bratton's lease, at the
2  expiration of the lease term, which is two years,
3  Mr. Bratton asks to vacate the property; isn't that
4  correct?
5  A   Let me read some of the language.
6      MR. RANCK: Would you point the witness
7  to whatever provision you're referring to?
8  Q   The lease term and the cross-out of
9  paragraph 53.
10     MR. RANCK: Let me just object on the
11  ground that the document speaks for itself.
12     MR. BOUSE: What's the question?
13  BY MR. SHAIBANI:
14  Q   The question is, does John Bratton have
15  to vacate Mary White's property at the end of the
16  two-year lease?
17  A   Let me answer it this way: Paragraph
18  number one on page one provides for a two-year term
19  starting the 1st of November ending the 31st day of
20  October. I haven't had time to read this document
21  again today, but I'm not aware of any clause that
22  provides for an extension or renewal. The document

Page 199

1  speaks for itself.
2  Q   Off the top of your head, do you happen
3  to know which provision requires the tenant to pay
4  for the wear and tear?
5  A   Not off the top of my head. I can look
6  for it. Since you've asked, I think paragraph nine
7  on page two. I quote, agrees to keep the plumbing,
8  heating, air-conditioning, electrical systems
9  located on premises in good order and repair, to
10  make replacements thereto wherever said repair be
11  necessitated by ordinary wear or tear or otherwise.
12  I can go on, but I think the document speaks for
13  itself.
14  Q   To your knowledge, did the property have
15  proper plumbing at the time that it was delivered
16  to Mr. Bratton?
17  A   The best I can answer is, I'm not aware
18  of any problem.
19  Q   If the landlord wants to have her tenant
20  vacate the property after two years, what would you
21  conclude from that?
22     MR. RANCK: Objection; calls for

Page 200

1  speculation.
2  BY MR. SHAIBANI:
3  Q   You didn't mistakenly list the lower
4  level of Ms. White property; did you?
5      MR. BOUSE: I object.
6      MR. RANCK: Objection.
7      THE WITNESS: I think I've answered that
8  before, that John Pagones filed the MIRS listing
9  and he did that based on some information from
10  Mary, but I was not involved in the discussion.
11  BY MR. SHAIBANI:
12  Q   Well, Mary White claims in her Response
13  to OHR's Interrogatories -- I'm sorry, Plaintiff's
14  Interrogatories, she claims that the lower level of
15  the property was mistakenly listed by Chatel.
16  A   Since you're talking about meetings that
17  I never was a party to, I told you, I can't tell
18  you what I don't know. There seems to be a
19  difference of opinion between Mary and John
20  Pagones.
21  Q   Yes, but you were present when Ms. White
22  showed you and Patsy the property back in June of

Page 201

1  of '05. At that point, she took you to the
2  basement. He only mentioned that she wanted to
3  keep the back side of it. Isn't --
4      MR. BOUSE: I object. That's not what he
5  said. He said that he didn't know how much she
6  wanted to keep, as I understand his testimony.
7      THE WITNESS: Your statement,
8  Mr. Shabaini, is a gross mischaracterization of
9  what I said. I'll leave it there. You can refer
10  to the court reporter's transcript.
11  BY MR. SHAIBANI:
12  Q   Are you suggesting that Chatel mistakenly
13  listed Mary White's property?
14     MR. RANCK: Objection. He hasn't
15  suggested anything of that sort.
16  BY MR. SHAIBANI:
17  Q   The question pending then is, did Chatel
18  mistakenly list Mary White's basement?
19     MR. BOUSE: I object.
20  A   I cannot answer that question. I've
21  answered before that I do not -- I've told you
22  about my contacts with Mary. I told you they were

51 (Pages 198 to 201)

# Capital Reporting Company

Page 238

1  intended the prospective tenants to have?
2      A   No.
3      Q   Did she tell you that she wanted somebody
4  who has over $250,000 in cash in their bank
5  accounts?
6          MR. BOUSE:  I object.
7      A   I think I've answered and I've said
8  never.
9      Q   Did she inform Chatel that she wanted the
10  prospective tenant to own other properties in
11  Georgetown?
12         MR. BOUSE:  I object.
13     A   Never.
14     Q   Is it typical for a property owner to
15  require two years of income tax statements --
16  income tax returns and bank statements from
17  prospective tenants before leasing them a property
18  for two years.
19         MR. BOUSE:  I object.
20         MR. RANCK:  Objection to form.
21         You can answer.
22     A   In a commercial context, it's not

Page 239

1  unusual.  There's another important point here and
2  that is that John Bratton is self-employed.  In the
3  context where someone is self-employed, the
4  proposed landlord or lending institution -- you
5  learn from seeing how the banks do it -- they ask
6  for much more background because they want
7  independent verification since they can't call an
8  employer and say, so and so said this number, is it
9  true or false.  You have to get it from other
10  sources.
11     Q   Did Ms. White request Chatel to obtain
12  Roberta Medlin's income tax returns and bank
13  statements as part of her lease application?
14         MR. BOUSE:  I object.
15     A   Say your question again.
16     Q   Did Ms. White instruct Chatel to obtain
17  Roberta Medlin's bank statements and two years of
18  income tax returns?
19         MR. BOUSE:  I object.
20     A   No.  Roberta volunteered a lot.  The
21  question of tax returns came up in response to
22  which she said she would give it but, because her

Page 240

1  husband was with an accounting firm with offices
2  worldwide, she said it's a monstrous document, 150
3  pages.  That information was relayed to Mary.  She
4  said, I don't really need it.  I do remember that
5  in talking to Mary after that, I said, well, if
6  you're not going to get the tax returns from one
7  person, you shouldn't ask for it from the other.
8  We never asked John for his tax return, nor were we
9  given his tax return.
10     Q   What about his bank statements?
11     A   I don't think I've seen his bank
12  statements.
13         MR. SHAIBANI:
14         (Plaintiff's Exhibit Nos. 22 and 23.
15         were marked for identification.)
16  BY MR. SHAIBANI:
17     Q   I would like to distribute Exhibits 22
18  and 23.  These are bank statements for accounts
19  held by John Bratton.  These are dated October 7th
20  of '05 -- actually, excuse me, the date it was
21  printed was October 19th of '05.
22         If you could please take a look at the

Page 241

1  balance on the dates designated as October 18th.
2  Do you see that balance on $157,716?
3      A   I do.  I don't remember ever seeing this.
4  I would point out that this date is a date in which
5  Gordon Forester was doing things, not us.
6      Q   Yes, indeed.  Do you see the date of
7  October 11th where the same statement shows a
8  balance of $155,186?
9      A   Slow down.  Yes.
10     Q   Do you see the balance of --
11     A   There's a line for 10/18 and there's a
12  line for 10/11.
13     Q   The line for 10/11 and the balance being
14  155,186?
15     A   That's right.
16     Q   The next statement, do you see the
17  balance on the line across 10/18/05 --
18     A   Uh-huh.
19     Q   -- the balance being 114,015 bucks; the
20  line for 10/11, the balance being apparently
21  $81,566?
22     A   The document speaks for itself.  You're

61 (Pages 238 to 241)

## Capital Reporting Company

Page 250

1  BY MR. SHAIBANI:
2      Q   I just want to know if Roberta Medlin
3  submitted her application on the 11th of October
4  and who provided her with the rental application
5      A   Although, I have no specific
6  recollection, I think it was me because I don't
7  remember her coming down with this but with, you
8  know, as I've testified, a lease and term sheet, if
9  you will. This, as you can tell from the other, is
10 my filling in blanks. The rest is hers.
11     Q   Did John Bratton submit his final
12 application on the 11th as well?
13     A   Let's look at the document. That's what
14 the document states.
15     Q   Did anybody at Chatel assist John Bratton
16 with drafting this lease agreement?
17     A   I did not. Beyond that, I don't know.
18     (Plaintiff's Exhibit No. 25 was
19         marked for identification.)
20 BY MR. SHAIBANI:
21     Q   This is Exhibit 25. it's the GCAAR Rental
22 Application for John Bratton. It's dated

Page 251

1  October 10th of '05, actually --
2      MR. RANCK: But it has two fax lines
3  across the top indicating October 11th. Let's be
4  fair.
5  BY MR. SHAIBANI:
6      Q   Well, it looks like Mary White sent that
7  to Chatel at 11:00 a.m. on October 11th, '05; is
8  that correct?
9      A   Yes. The other indication higher up is
10 on the same day but at 1:50.
11     Q   Is it your position that you didn't
12 conduct John Bratton's credit check on the 11th
13 because you just received this at 11:00 a.m. on
14 that date?
15     MR. BOUSE: I object.
16     MR. RANCK: Objection; mischaracterizes
17 his testimony.
18     THE WITNESS: I'm not going to say it's
19 the date. I will say, as I've testified before, I
20 made sure, whenever we had rental applications,
21 particularly in this case, that it's processed very
22 quickly, very quickly meaning within two hours,

Page 252

1  three hours. You can't drop everything right away.
2  In the spirit of getting things to your principal,
3  you have to do it quickly.
4  BY MR. SHAIBANI:
5      Q   Is there anything that you would like to
6  add to your testimony concerning the conversation
7  you had with Mary White on the 12th of October
8  concerning the two lease applications?
9      MR. BOUSE: I object.
10     MR. RANCK: Objection to the vagueness of
11 the question. If you have some specific questions
12 to ask, go ahead. I think it's a little hard for
13 him to recall everything he's testified to. You
14 can't do it. So I think it's hard for him to do it
15 over a period of time.
16 BY MR. SHAIBANI:
17     Q   Did you advise Ms. White on October 11th
18 that she has to follow the civil rights laws in
19 determining who to lease the property to, that she
20 cannot base her decision on race or personal
21 appearance?
22     MR. RANCK: Your question said

Page 253

1  October 11th. Did you mean the 12th or the 11th?
2      MR. SHAIBANI: The 12th.
3      MR. RANCK: Can you ask it again, I'm
4  sorry.
5  BY MR. SHAIBANI:
6      Q   What did you say to Mary White on
7  October 11th with respect to her decision-making
8  for selecting the lease?
9      MR. BOUSE: I object.
10     MR. RANCK: I think you said the 11th
11 again.
12     MR. SHAIBANI: Apparently, there's a
13 discrepancy between the dates from what John is
14 telling us and what we're saying. We'll take the
15 12th as the date.
16     MR. BOUSE: I object to the 12th.
17     MR. RANCK: I think the question is, have
18 you spoke to Ms. White on the 12th about the
19 various applications and what did you tell her
20 about needing to comply with civil rights laws?
21     MR. BOUSE: I object.
22 BY MR. SHAIBANI:

64 (Pages 250 to 253)

## Capital Reporting Company

Page 254

1    Q    Did you inform her that she couldn't base
2  her decision on the basis of race and personal
3  appearance?
4        MR. BOUSE:  I object.
5    A    Mary asked me a question, which was
6  whether she had to take John.  I paused.  I knew it
7  was an important question.  I knew it should be
8  answered right.  After 30 seconds, I said, Mary, I
9  don't think you have to accept it.  I don't think
10  the law requires it.  You have to make absolutely
11  sure that your decision is based on objective
12  nondiscriminatory factors.  I said, tell me what
13  basis you're making your decision on.  That's what
14  led to the three comments there.  I said, come on,
15  let's agree, let's turn around.  We've got to call
16  John right away to be fair to him so, if he wants,
17  he can pursue his other alternative.
18    Q    Did you believe Mary White's proffered
19  reasons as to why she wanted to select Roberta
20  Medlin over John Bratton?
21        MR. BOUSE:  I object.
22        MR. RANCK:  I object, too.

Page 255

1        You can answer it, if can you.
2        THE WITNESS:  The answer is, yes.  I had
3  no reason to disbelieve her.
4  BY MR. SHAIBANI:
5    Q    Do you still believe those proffered
6  reasons?
7    A    Yes.  I don't see what -- well, yes.
8    Q    Could you tell us what Mary White
9  informed you after you told her that she didn't
10  have to select John, but she would have to base her
11  selection on objective factors?
12    A    I think I just testified I said, Mary,
13  what is the basis for your decision?  She gave
14  those three reasons.  We agreed that we should call
15  John right away.  We did that.  John was very, very
16  upset, if not more.  I reported that to Mary and
17  then we broke up.  It was in the evening.  It was
18  either 6:00, within a half hour.  It could be
19  either way, 5:30.  I think it was more like 6:30 or
20  something.  It was dark.  I remember that.
21    Q    Did you inform Ms. White of Mr. Bratton's
22  statement to you that he felt discriminated against

Page 256

1  and was going to take it to the next level?
2        MR. RANCK:  Objection; asked and
3  answered.
4        MR. BOUSE:  I object.
5        THE WITNESS:  Do I have to answer?
6        MR. RANCK:  You can answer it one more
7  time.
8        THE WITNESS:  Right after my conversation
9  with John Bratton, I turned around -- Mary is in
10  the same room -- I said, as closely as I could,
11  what John had told me.  The answer is yes.
12  BY MR. SHAIBANI:
13    Q    What did Ms. White say in response?
14        MR. BOUSE:  I object.
15        MR. RANCK:  Objection; asked and
16  answered.  With all due respect, do you sincerely
17  not recall asking him to give testimony on this
18  very same subject matter, these very same
19  questions?
20        MR. SHAIBANI:  I just want to make sure
21  that all the communications are being conveyed
22  since this is my one chance of getting all the

Page 257

1  information.
2        MR. RANCK:  But you're asking the same
3  question repeatedly.  As I've said in other
4  depositions, it's unfair after hours to go back and
5  ask the same question you asked earlier, perhaps
6  trying to get different testimony.  I object.  It's
7  asked and answered.  The record will speak for
8  itself.
9  BY MR. SHAIBANI:
10    Q    Would you agree that Mary White decided
11  to lease the property to John Bratton only after
12  she learned of his intent to sue her for
13  discrimination.
14        MR. BOUSE:  I object.
15  BY MR. SHAIBANI:
16    Q    I'm talking about the timing here.
17        MR. BOUSE:  I object.
18    A    That's not what your question asks.
19    Q    With respect to the timing of her
20  decision to lease the property to John Bratton, was
21  that after you informed her of his statement to you
22  that he felt discriminated against?

65 (Pages 254 to 257)

1         CERTIFICATE OF NOTARY PUBLIC

2         I, Jodi Scheffel, RPR, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me in

7    stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness, that

10   I am neither counsel for, related to, nor employed

11   by any of the parties to the action in which this

12   deposition was taken; and further, that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties hereto, nor financially, or

15   otherwise interested in the outcome of the action.

16

17                    Jodi Scheffel

18                    Notary Public in and for

19                    the District of Columbia

20

21   My commission expires:

22   August 31, 2011