## Capital Reporting Company

Page 1

1    STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3    _____

4    JOHN BRATTON,                    :

5                    Plaintiff, :

6            v                :  CASE NO:

7                          :  060694

8    CHATEL REAL ESTATE,              :

9                    Defendant :

10   _____

11

12                          Washington, D.C.

13              Thursday, February 1, 2007

14   Deposition of:

15            MARY WHITE

16   called for oral examination by counsel for

17   Plaintiff, pursuant to Notice, at the Law Offices

18   of Stefan Shaibani, 1150 Connecticut Avenue,

19   Northwest, Suite 900, Washington, D.C., before

20   Mary E. Warner of Capital Reporting, sworn by a

21   Notary Public in and for the District of Columbia,

22   beginning at 10:00 a.m.



## Capital Reporting Company

Page 6

1    P R O C E E D I N G S
2  WHEREUPON,
3         MARY WHITE
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6         EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. SHAIBANI:
8    Q  Ms. White?
9    A  Yes.
10   Q  My name is Stefan Shaibani. I represent
11 the Plaintiff in this case. I'm going to ask you
12 some questions today. And your Counsel may object
13 to them. If he decides to instruct you not to
14 respond to the question, if we could resolve it at
15 that point but if there's no instruction not to
16 respond to the question, you will be expect to
17 answer after the objections are raised. If at any
18 point you require me to repeat a question or
19 clarify something, just let me know.
20   A  Uh-huh.
21   Q  Could you tell us the name of the person
22 who supposedly provided a referal to Roberta

Page 7

1  Medlin?
2         MR. BOUSE: I object. We refuse to
3  answer that, for the reasons, I said in our
4  Answers to Interrogatories. We can take it up
5  with the Court later. If the Court agrees, we'll
6  provide a name and you can follow up with any
7  questions you want of Ms. White. All right?
8  BY MR. SHAIBANI:
9    Q  Are you saying that somebody in fact
10 provided an extremely favorable reference for
11 Roberta Medlin to you?
12        MR. BOUSE: I object. You can answer
13 that.
14        THE WITNESS: There is somebody that I
15 know who knows him, yes, who is a client of mine.
16 BY MR. SHAIBANI:
17   Q  And this client of yours knows Roberto
18 Medlin or her husband?
19   A  Primarily her husband.
20   Q  And what exactly did this person tell
21 you?
22   A  I don't think I --

Page 8

1         MR. BOUSE: You can tell him what he told
2  you.
3         THE WITNESS: I don't know that's right
4  because --
5         MR. BOUSE: I know what she's saying.
6  There wasn't a conversation, I take it?
7         THE WITNESS: No, there wasn't a
8  conversation.
9         MR. BOUSE: What Ms. White will tell you
10 if asked a proper question --
11        MR. SHAIBANI: I don't want you to coach
12 her.
13        MR. BOUSE: Then the answer is what I
14 just said. Next question. I was trying to help.
15 BY MR. SHAIBANI:
16   Q  There was no verbal conversation with
17 this person, then?
18   A  That's correct.
19   Q  And the so-called reference, was that
20 provided in writing then?
21   A  No.
22   Q  And it wasn't provided verbally?

Page 9

1    A  No.
2    Q  Okay. So there was no reference then,
3  isn't that correct?
4         MR. BOUSE: Objection.
5         MR. RANCK: Objection.
6         MR. BOUSE: You can answer.
7         THE WITNESS: That gets into --
8         MR. BOUSE: You can answer. Just answer
9  his question.
10        THE WITNESS: I don't know how to say yes
11 or no, though.
12        MR. BOUSE: Answer it and give an
13 explanation for it.
14        THE WITNESS: Mr. Medlin had recently
15 joined a firm. And someone in that firm had just
16 purchased a house from me. And I was privy to the
17 financial affairs of the firm. And that's as far
18 as I want to go because it's very personal.
19 BY MR. SHAIBANI:
20   Q  Yes, but a financial -- the financial
21 background for Mr. Medlin was not provided. You
22 were provided the financial background for your

3 (Pages 6 to 9)

# Capital Reporting Company

Page 14

1 she purchased. She was from Kansas City. They
2 were moving here. We discussed why they were
3 moving here. And we discussed the kind of
4 business she would have. She had a jewelry
5 business. She had on a piece of her jewelry, so
6 we talked about that.
7    Q  Did you at any point commit to lease your
8 property to Ms. Medlin?
9    A  No.
10   Q  And you mentioned that she first walked
11 into your office in the beginning of October. Do
12 you remember if it was before October 6th when
13 Mr. Bratton first came to visit the property?
14   A  I can look back in my notes and see
15 approximately what date it was. I'm not sure of
16 the exact date.
17   Q  Did Ms. Medlin come to visit the property
18 before October 11th when she went to Chatel?
19   A  Oh, yes. And I think she saw the
20 property before I met her as her second visit.
21   Q  Did Ms. Medlin contact you to make an
22 appointment before she walked into your office?

Page 15

1    A  No.
2    Q  I'm going to jump around a little bit.
3 Could you tell us how long you've been a broker, a
4 real estate broker?
5    A  Probably close to 30 years.
6    Q  And are you licensed in DC, Virginia and
7 Maryland?
8    A  Yes.
9    Q  Were you an agent with Chatel during your
10 career?
11   A  Yes.
12   Q  And do you remember the years when you
13 were affiliated with Chatel?
14   A  Late '60s.
15   Q  And did you go on to start your own real
16 estate brokerage after you left Chatel?
17   A  No, I went to the office of Michael
18 Sullivan Real Estate.
19   Q  I see. How long were you there for?
20   A  About four years.
21   Q  During your affiliation with Chatel, did
22 you come in contact with John Pagones?

Page 16

1    A  Yes.
2    Q  Could you describe your relationship with
3 him?
4       MR. BOUSE: While she worked at Chatel?
5       MR. SHAIBANI: Yes.
6       THE WITNESS: He was another agent in the
7 office.
8 BY MR. SHAIBANI:
9    Q  Did you work on deals together on a
10 regular basis?
11   A  I don't know if John and I ever were on
12 the same deal or not but we were in the same
13 office. And it was not a large office.
14   Q  Was Thierry Liverman at that office when
15 you were working for Chatel?
16   A  No, I don't think he was there then. I
17 think he was in school.
18   Q  And what about at the -- well, in October
19 of '05, I would say actually beginning from the
20 summer of '05 until the present time, how would
21 you describe your relationship with John Pagones?
22   A  I don't know how to describe it. I don't

Page 17

1 know how to answer that. It has to be more
2 specific, I guess.
3    Q  Are you friends or is it just a working
4 relationship?
5    A  It's a working relationship.
6    Q  Did you specifically request John Pagones
7 to be your agent?
8    A  No.
9    Q  Who did you contact at Chatel to list
10 your property?
11   A  Thierry Liverman.
12   Q  And did Thierry explain to you why he had
13 selected John Pagones to handle this transaction?
14   A  No.
15   Q  Did you at any time object to Thierry's
16 selection of John Pagones for your agent for
17 leasing the commercial space?
18   A  No.
19   Q  Were you satisfied with the way he had
20 done his duties in connection with the leasing of
21 the property?
22      MR. BOUSE: What period of time? All of

5 (Pages 14 to 17)

# Capital Reporting Company

Page 18

1 it?
2     MR. SHAIBANI: From July through October
3 of '05.
4     THE WITNESS: On a sliding scale of one
5 to ten, it's probably five or six.
6 BY MR. SHAIBANI:
7     Q   And what would you say was the -- well,
8 you mentioned five or six. But the four points
9 that he lost, what contributed to that in your
10 view?
11     A   I don't know how to explain it any more
12 than that.
13     Q   Did you think that John Pagones's
14 interaction with John Bratton in connection with
15 the leasing of your property was unacceptable or
16 improper in any way?
17     MR. BOUSE: I object, you're assuming
18 that she knew at that time of any action with John
19 Bratton, right?
20     MR. RANCK: I object on the basis of lack
21 of foundation.
22     MR. BOUSE: I'll permitted you to answer

Page 19

1 but I object. Go ahead.
2     THE WITNESS: I don't know anything about
3 it.
4 BY MR. SHAIBANI:
5     Q   You don't know anything about --
6     A   Now by having read the depositions, I
7 know something about it. I didn't know anything
8 about it at the time.
9     Q   Well, why did you decide to hire
10 Mr. Forester to represent you in leasing the
11 transaction if --
12     A   Because John wasn't in the office.
13     Q   Well, wasn't Thierry in the office at
14 that point?
15     A   Thierry was probably in the office but we
16 needed to expedite things and get it done and get
17 it done right. And Gordon has been my lawyer for
18 many years. And he's advised me on lots of leases
19 and contracts.
20     Q   I assume Mr. Forrester is sitting here?
21     MR. FORRESTER: He is. Nice to meet you.
22     MR. BOUSE: To my right.

Page 20

1     MR. SHAIBANI: Pleasure.
2 BY MR. SHAIBANI:
3     Q   Was there any reason aside from John
4 Pagones being away from the office in October of
5 '05 that led you to hire Mr. Forrester?
6     A   No.
7     Q   Have you used Mr. Forester to lease your
8 property at any point?
9     A   Yes.
10     Q   Aside from the leasing to Mr. Bratton,
11 that is?
12     A   Yes.
13     Q   Could you tell us when that occurred?
14     A   One of them occurred rather recently when
15 someone came forwarded and wanted to rent a part
16 of the lower floor. And I just referred them to
17 Gordon.
18     Q   What about before your leasing of the
19 property to John Bratton, had you used
20 Mr. Forrester to lease your commercial space at
21 any point?
22     MR. RANCK: Let me just object to the use

Page 21

1 of the term lease. Are you talking about have you
2 used him to participate in negotiations or
3 anything of that nature or do you mean actually
4 perform the real estate duties?
5     MR. SHAIBANI: To negotiate and executed
6 a lease.
7     MR. RANCK: To be involved in the
8 transaction. Okay.
9     THE WITNESS: To my recollection, there
10 weren't any others.
11 BY MR. SHAIBANI:
12     Q   Wasn't there a company occupying the
13 basement of the property?
14     A   They had been there for a very long time.
15     Q   And Mr. Forrester didn't negotiate that
16 lease with the Shoreline Designs, I gather?
17     A   Well, I'm not certain but I don't think
18 so.
19     Q   Do you know why had Shoreline Designs
20 vacated the property?
21     A   They moved from the area and I think they
22 closed their business but they moved from the

6 (Pages 18 to 21)

## Capital Reporting Company

Page 22

1  area.
2      Q   And was that in September of '05?
3      A   They gave notice the first of August and
4  vacated the end of August.
5      Q   And had their lease been expired at that
6  point?
7      A   No, they continued, renewed for a year.
8  It was just about time to redo it again.
9      Q   I see.  Did their lease convert to a
10  month to month at the end of the initial term?
11      A   No, we always had a new lease.
12      Q   And was that part of the negotiations in
13  terms of them renewing their lease?  I guess what
14  I'm trying to find if you agreed to give them an
15  option to renew their lease when they first moved
16  into the property or did they have to request that
17  at the end of their lease each time the period
18  ended?
19      A   I think I usually had to remind them that
20  the lease was terminating and we need to talk
21  about the following year or the coming here.
22      Q   I see.  When Shoreline Designs vacated

Page 23

1  the property, did you provide any instructions to
2  Barrett Anderson in terms of what you wanted to do
3  with the basement?
4      A   After they vacated, the place was a mess.
5  So, yes, he cleaned it up for me and got -- had a
6  dumpster -- you know, trash people come and get
7  all the stuff out.  They had been very heavy
8  smokers, so we had to paint it and get the carpet
9  out because I was not comfortable even going into
10  the space.
11      Q   And did you intend to lease the basement
12  at that point?
13      A   By the time all that was finished, it
14  would have been pretty much the end of September.
15  I think that -- I had -- by that time I was
16  affiliated with Washington Fine Properties, there
17  was a question about when I was going to have desk
18  space at Washington Fine Properties.  So I was
19  going to need to use that space for myself if the
20  upstairs rented.
21      Q   And by using the basement for yourself,
22  are you referring to the entire floor or did you

Page 24

1  intend to keep the backside of the basement?
2      A   Originally I thought I could get away
3  with just using the back space but Barrett
4  continually said, "You're going to need more than
5  that."  He was right, I did.
6      Q   What did you use the basement for in
7  September and October of '05?
8      A   As our office, the office of my -- I was
9  closing a 30 year business.  So there was a
10  process of closing the office down.
11      Q   Did you actually go to the basement on a
12  daily basis in September and October of '05?
13      A   I don't think it was necessarily a daily
14  basis but certainly very frequently.
15      Q   And did you have like a computer and a
16  desk set up in the basement?
17      A   Yes.
18      Q   Weren't you trying to sell your furniture
19  in September and October of '05?
20      A   There were some furniture that had been
21  on the street level that didn't really fit
22  downstairs, yes, so we tried to sell some of that.

Page 25

1  There was more furniture upstairs than we needed
2  downstairs, a slightly smaller space.
3      Q   Didn't you instruct Barrett Anderson to
4  negotiate a lease for the basement to a gentleman
5  who worked out of his home in Georgetown?
6      A   No, I think that's someone who also just
7  walked in and Barrett told me about it, but, no.
8  He was seeking us after us, we weren't looking for
9  him.
10      Q   Did you have any conversations with
11  Barrett Anderson over the phone about his attempts
12  to lease the property to this gentleman?
13      A   I was aware that this person existed,
14  yes.  And I would only have been aware of it by
15  conversation with Barrett.
16      Q   And how many times did Barrett talk to
17  you about this gentleman?
18      A   A few times because he was persistent
19  about wanting to rent it.
20      Q   And what did you tell him in response?
21      A   As it went on, it became more and more
22  apparent that I couldn't give the space up.

7 (Pages 22 to 25)

## Capital Reporting Company

Page 26

1    Q   And are you referring to the entire floor
2  or just the backside?
3    A   I missed a word there.
4    Q   The entire basement or the backside of
5  the basement?
6    A   Now or --
7    MR. BOUSE:  At that time.
8    THE WITNESS:  At that time he wanted the
9  back space.  He really wanted an address is what
10  he was looking for.  So he wanted to rent as small
11  as amount of space as possible to qualify him for
12  having an address.
13  BY MR. SHAIBANI:
14    Q   Did you inform Barrett Anderson you would
15  be willing to lease the front portion of the
16  basement to this gentleman?
17    A   No, we never talked about that, as far as
18  I can remember.
19    Q   Did you actually terminate Chatel to hire
20  John Gordon Forrester in connection with leasing
21  your commercial property to John Bratton?
22    A   No, Gordon worked with Chatel on the

Page 27

1  project.
2    Q   Are you aware that Mr. Forrester informed
3  John Bratton that Chatel had been terminated at
4  that point?
5    MR. BOUSE:  I object.
6    MR. RANCK:  Foundation.
7    MR. BOUSE:  You can answer, if you know.
8    THE WITNESS:  I don't know anything about
9  that.
10  BY MR. SHAIBANI:
11    Q   Could you tell us why you would hire a
12  real estate brokerage to lease your property and
13  paid them a commission, selected an attorney to do
14  the same job?
15    MR. BOUSE:  Is that the end of the
16  question?
17    MR. SHAIBANI:  Yes.
18    MR. BOUSE:  I object.  Didn't she answer
19  this before?  She told you why she got Gordon
20  involved, Mr. Forrester, rather for the record.
21  You can answer again.
22    THE WITNESS:  Yeah, unless I

Page 28

1  misunderstood the question.
2  BY MR. SHAIBANI:
3    Q   Well did you think in any way it's unfair
4  for you to pay a commission to Chatel and at the
5  same time to pay for your attorneys to negotiate
6  the same lease?
7    A   It seemed to be the most expedient way to
8  get things done.  John was the one who was really
9  supposedly handling everything and he wasn't
10  around.
11    Q   Did Thierry Liverman inform you that he
12  didn't have the time to take care of the lease
13  himself?
14    A   No, but he's a very busy man.  He runs
15  the office.
16    Q   And did he tell you that he couldn't find
17  anybody else to take over the lease after John
18  Pagones had gone on his religious leave?
19    A   No.
20    Q   Did you request Thierry to find another
21  agent to lease the property to John Bratton after
22  Mr. Pagones had left?

Page 29

1    A   No.
2    Q   Are you an attorney?
3    A   No.
4    Q   Have you gone to law school?
5    A   No.
6    Q   How many years did you -- well, when did
7  you work at the White House?
8    A   '60 until the end of -- '65, I left the
9  end of '65.
10    Q   And what was your position at the White
11  House?
12    A   During the Kennedy administration, I was
13  assistant to Theodore Sorensen, who was the
14  special counsel to the president.  During the
15  Johnson's administration I worked under Jack
16  Valenti and President Johnson.
17    Q   In what capacity?
18    A   Primarily worked -- well, the first thing
19  I did -- when you work for the President, you do
20  whatever he wants you to do but some of the
21  specific things was that after the -- you have to
22  go back to the events of November '63 and January

8 (Pages 26 to 29)

## Capital Reporting Company

Page 34

1     MR. BOUSE: Are you talking about when
2  she first was licensed or now or --
3     MR. SHAIBANI: Yes.
4     MR. BOUSE: When she was first licensed
5  30 years ago? Okay.
6     THE WITNESS: I don't know what that
7  requirement was then.
8  BY MR. SHAIBANI:
9     Q  But there was a two step process before
10  you could become a broker, you would first have to
11  become a sales agent and then --
12     A  And then you become a broker, yes, that's
13  always been the case.
14     Q  And would you say that real estate
15  brokers are more experienced by virtue of having
16  to conduct additional course work and training
17  before they could apply for that license?
18     MR. RANCK: Objection.
19     MR. BOUSE: Objection.
20     THE WITNESS: I don't know. We all take
21  the same classes.
22  BY MR. SHAIBANI:

Page 35

1     Q  To your knowledge, did Thierry Liverman
2  take his classes related to the Fair Housing Act
3  and the anti-discrimination laws?
4     A  There's no way I would know that.
5     Q  Have you ever reviewed Chatel's fair
6  housing manual?
7     A  No.
8     Q  Did Mary White Real Estate have a fair
9  housing manual of its own?
10     A  We had material that was supplied by the
11  board, yes, and by the DC real estate commission.
12     Q  And that material related to
13  anti-discrimination laws?
14     A  Yes.
15     Q  Did you review that material at any point
16  prior to October of '05?
17     A  Reviewed every two years in class.
18     Q  Would you say that you are were familiar
19  with the DC Human Rights Act and the Fair Housing
20  Laws governing anti-discrimination under the
21  context of real estate transactions?
22     A  Yes.

Page 36

1     Q  Were you familiar with these laws back in
2  October of '05?
3     A  Yes.
4     Q  Does Washington Fine Properties have a
5  fair housing manual of its own?
6     A  I don't think so.
7     Q  Does Washington Fine Properties have any
8  sort of manual relating to anti-discrimination
9  laws?
10     A  Manual? If there is one, I haven't seen
11  it. There could be but I haven't seen it.
12     Q  And you weren't supplied with that
13  manual, I gather, since you haven't seen it?
14     A  They have regular classes that -- we meet
15  once a week and certainly that's something that's
16  talked about at the meetings, not every meeting
17  but certainly some of them.
18     Q  Earlier you mentioned that you were
19  working at Chatel in the '60s. Do you remember
20  approximately how many years you were affiliated
21  with them?
22     A  I think I was affiliated with them for

Page 37

1  four years. Part of that time I was a part time
2  agent. I was also working for a law firm.
3     Q  In what capacity?
4     A  Administrative assistant or something
5  like that, office manager.
6     Q  Which law firm, if I may ask?
7     A  Stroock Laven.
8     Q  Did Chatel manage the 1622 Wisconsin
9  Avenue location prior to the summer of '05?
10     A  No.
11     Q  And did you select Thierry Liverman as
12  your broker for leasing the 1622 property because
13  Chatel also manages properties?
14     A  That was probably part of it.
15     Q  How long have you known Thierry Liverman
16  for?
17     A  A long time. I knew his mother -- his
18  mother had the job that he now has, so --
19     Q  And how would you describe your
20  relationship with Thierry Liverman?
21     A  I didn't hear the whole question.
22     Q  Sorry, how would you describe your whole

10 (Pages 34 to 37)

## Capital Reporting Company

Page 50

1 of rent.
2    Q  Were these instructions in writing or
3 verbal?
4    A  Verbal.
5    Q  And who did you give these instructions
6 to?
7    A  I remember us all just standing in the
8 office. I know Thierry was there. I believe John
9 was, Patsy Petty was there. We had already been
10 working together to rent the upstairs.
11    Q  This is when they came down to 1622
12 Wisconsin Avenue property to tour it and obtain
13 the keys from you back in the summer of '05?
14    A  Yes.
15    Q  And then from then until October 6 of '05
16 did your instructions change in any way?
17    A  No, I don't think so.
18    Q  Is it your testimony that when Thierry
19 Liverman and Patsy Petty and John Pagones came to
20 your office at 1622 Wisconsin Avenue in the summer
21 of '05, you actually instructed them that you
22 wanted three separate tenants for your property?

Page 51

1    A  Uh-huh.
2    MR. BOUSE:  Is that a yes?
3    THE WITNESS:  Yes, that was just a
4 renewed statement. We had already gone through
5 the exercise of talking about how we were going to
6 rent the upstairs.
7 BY MR. SHAIBANI:
8    Q  Did Barrett Anderson provide any
9 instructions to Chatel in connection with the
10 leasing of your property?
11    MR. RANCK:  Objection, speculation.
12    THE WITNESS:  That would not have been in
13 his duties.
14 BY MR. SHAIBANI:
15    Q  Didn't you ask him once to go down to
16 Chatel and inform John Pagones to flower up the
17 listing and the MIRS for your property?
18    A  I think we talked about the fact that the
19 description, maybe the ad they were running didn't
20 seem to have enough punch in it. To, you know --
21 and I think he talked to him about that.
22    Q  And when did that discussion take place,

Page 52

1 to your knowledge?
2    A  Well, it was -- oh dear. Probably in
3 maybe August.
4    Q  Would you say that from July through the
5 end of September of '05 there wasn't much traffic
6 and interest in your commercial property?
7    A  I think there was traffic but there were
8 some people who talked about wanting to -- before
9 the upstairs was rented, there were people who
10 talked about wanting to rent the street level and
11 live above the shop, so to speak. That was
12 presented to me a couple of times. And I said I
13 was not interested in that arrangement.
14    Q  Did anybody present you with a lease
15 offer from July?
16    A  No, it ended right there.
17    Q  I see. Just to be precise then from July
18 through the end of September or actually from July
19 through October 5th of '05, there were no offers
20 to presented to lease the commercial property?
21    A  There were no offers, that's correct.
22    Q  Wasn't John Bratton the first person to

Page 53

1 present an offer to lease the commercial unit of
2 your property?
3    MR. BOUSE:  Object. Go ahead.
4 BY MR. SHAIBANI:
5    Q  After it had been --
6    A  There seems to be some confusion as to
7 when Bobbi Medlin presented hers and John
8 presented his. They were all done at Chatel so I
9 don't really know about that.
10    Q  The property management agreement and
11 exclusive rental agreement that you signed with
12 Chatel, didn't you specify in there that the lease
13 you wanted to use for the commercial space was
14 Chatel's boiler plate lease agreement?
15    A  Yes.
16    Q  And I'm referring to the commercial lease
17 agreement?
18    A  Uh-huh.
19    Q  And did you have any intentions as to
20 whether you wanted Chatel's boiler plate lease to
21 be modified in any way at the time that you signed
22 the exclusive rental agreement?

14 (Pages 50 to 53)

## Capital Reporting Company

Page 54

1      MR. RANCK: I'm sorry I think I object.
2  Can you read that back first?
3    (Court reporter read back the last question)
4      MR. RANCK: I object as to lack of
5  foundation.
6      MR. BOUSE: I object also.
7      MR. RANCK: Unless you're going to show
8  the document. Because you haven't established
9  that she knows what the boiler plate agreement
10  says.
11      MR. BOUSE: Do you have it? Show it to
12  her. There's one of Chatel around here someplace.
13  Do you know what he's asking?
14      THE WITNESS: Yeah, I don't think we even
15  talked about it.
16      MR. BOUSE: You don't have to mark it,
17  unless you want to mark it.
18      MR. SHAIBANI: Yes, why don't I mark it
19  as Exhibit 1.
20      (White Exhibit No. 1.
21      was marked for identification).
22      MR. RANCK: What is that that's being --

Page 55

1      THE WITNESS: It's a property management
2  and exclusive rental agreement.
3      MR. BOUSE: It's not the commercial
4  lease.
5      THE WITNESS: For Maryland and
6  Washington, DC. I thought we were talking about
7  the lease.
8      MR. BOUSE: We were talking about the
9  lease.
10  BY MR. SHAIBANI:
11      Q  Do you recognize this document that's
12  been marked as Exhibit 1?
13      A  Yes, uh-huh.
14      Q  And is it your signature on the last page
15  of this document?
16      A  Yes.
17      Q  And do you see the date of June 2nd, '05?
18      A  Yes.
19      Q  Was that the date that you signed this
20  agreement?
21      A  I think so.
22      Q  Now going to the -- what's designated as

Page 56

1  page 3 CH 3 on this document. If you could please
2  take a look at paragraph 14, which is towards the
3  bottom of the page where it says, "additional
4  provisions."
5      MR. BOUSE: No. 4, you said?
6      MR. SHAIBANI: Yes, it's actually 14,
7  apparently.
8      MR. BOUSE: Yeah, 14.
9      THE WITNESS: The numbers are off on
10  here.
11      MR. BOUSE: Yeah. The number above it is
12  okay.
13      THE WITNESS: Doesn't it say Chatel's
14  lease?
15  BY MR. SHAIBANI:
16      Q  Yes, that's what I am asking. Is that
17  the instruction you gave to Chatel when you signed
18  this agreement?
19      A  Looks like it was what Thierry suggested
20  and I must have agreed by signing it.
21      Q  And when you signed this, did you have
22  any intentions to modify Chatel's lease in any way

Page 57

1  with respect to the commercial property?
2      A  That could happen, that's a possibility.
3      MR. RANCK: I object on lack of
4  foundation. She answered the question.
5      MR. BOUSE: Right.
6  BY MR. SHAIBANI:
7      Q  Did you tell Thierry Liverman that you
8  didn't want to have a right of first refusal and
9  option to renew to be a part of Chatel's lease for
10  the commercial space of the property at the time
11  that you signed this agreement on June 2nd of '05?
12      A  I don't know.
13      Q  What about afterwards, from June 2nd?
14      A  It was to be a two year lease. Where it
15  says one year, that was for the place upstairs.
16      Q  What were your --
17      A  This is one year for the listing, right?
18      MR. BOUSE: Right.
19      THE WITNESS: Maximum two years. I can't
20  read it.
21      MR. BOUSE: Two year, minimum one year.
22  Looking at paragraph 2.

15 (Pages 54 to 57)

## Capital Reporting Company

Page 58

1 THE WITNESS: Yes, number of occupants
2 two, yeah. Number of occupants two would be for
3 the number of occupants upstairs.
4 BY MR. SHAIBANI:
5 Q Do you recall having a conversation with
6 John Bratton after he presented his offer to lease
7 your property?
8 A I remember John calling me one evening
9 when I was with a client at Carpet Land or
10 something like that on Wisconsin Avenue. We were
11 picking out carpet for a listing which I had. And
12 he called and I couldn't talk because I was
13 already involved with a client and the salesperson
14 for the carpet and everything else.
15 Q And did you attempt to call him back at
16 any point afterwards?
17 A No, I think I suggested, "Call John, he's
18 handling that for me. I'm busy handling my
19 client," who was selling her home.
20 Q Didn't you inquire as to what John
21 Bratton wanted to do with the backyard of your
22 property after he presented his offer?

Page 59

1 A No.
2 Q You didn't tell John Pagones to find out
3 John Bratton's intentions with respect to the
4 backyard of the commercial property?
5 A I don't know how he's going to get from
6 the street level rental to the garden, so I
7 wondered about that, was he planning to put a
8 staircase on the back or what was he going to do.
9 Q Was the garden supposed to be part of the
10 leasing space for the street level of the
11 property?
12 A No, that goes with the lower level.
13 Q And did you plan to use the garden for
14 yourself?
15 A No, just something that's there.
16 Q Would you have leased the garden as part
17 of the basement level to the person who was going
18 to take the front portion of the basement?
19 MR. BOUSE: I object. Can you lease a
20 garden? I object. If you understand the
21 question, answer.
22 BY MR. SHAIBANI:

Page 60

1 Q Was the garden supposed to be part of the
2 lease for the basement in terms of the --
3 A It's the only part that it could be for,
4 would be for the lower level. And if it's going
5 to be part of their lease, then we have to get
6 into what they're going to do about taking care of
7 it.
8 Q Was Chatel your real estate agent in
9 October of '05 for the purpose of leasing the
10 commercial units of your property?
11 A Yes.
12 Q Was John Pagones your real estate agent
13 in October of '05 for the purpose of leasing the
14 commercial units of your property?
15 A He was the agent that Thierry Liverman
16 appointed.
17 Q And did you deal -- did John Pagones deal
18 directly with you in your capacity as the real
19 estate agent?
20 MR. BOUSE: Object, Pagones was the real
21 estate agent appointed by Thierry Liverman. You
22 can characterize it any way you want the question

Page 61

1 I object to it.
2 THE WITNESS: I think John occasionally
3 called me and I took his calls if I could.
4 BY MR. SHAIBANI:
5 Q And did you discuss with him what your
6 intentions were with respect to the property?
7 A That I wanted three tenants, yes, and
8 there were certain businesses I didn't want, yes.
9 Q Was there anything else you discussed
10 with John Pagones?
11 MR. RANCK: Objection.
12 MR. BOUSE: Objection.
13 MR. RANCK: I object to the form and
14 vagueness of the question.
15 MR. BOUSE: Right, I object.
16 BY MR. SHAIBANI:
17 Q Any other instructions that you provided
18 to John Pagones with respect to the leasing of
19 your commercial property in '05?
20 MR. RANCK: Same objection.
21 MR. BOUSE: Same objection.
22 THE WITNESS: I don't know. I don't know

16 (Pages 58 to 61)

## Capital Reporting Company

Page 70

1    Q   And do you recall the passage where they
2  say that this specific notation 12/48 in front of
3  the minimum/maximum lease was pursuant to your
4  instructions that you wanted to lease the property
5  for one to four years?
6        MR. BOUSE:  Show her the deposition.  I
7  object.
8  BY MR. SHAIBANI:
9    Q   You don't recall that passage?
10   A   No.
11       MR. BOUSE:  Can we take a break?
12       (Short break taken)
13  BY MR. SHAIBANI:
14   Q   Now that we've had the dispute resolved
15  by Judge Bates, I'm going to ask the question
16  regarding the reference you received for
17  Ms. Medlin.  Could you tell us if you in fact
18  received a reference for Roberto Medlin?
19       MR. BOUSE:  She already answered that.
20  The question is did she speak to the gentleman
21  about Roberta Medlin or did she simply review
22  documents about his financial wherewithal?  Do you

Page 71

1  understand that question, whether you spoke
2  directly to the gentleman about Mr. Medlin's
3  income or what he does with the business?
4        THE WITNESS:  Which I did not.
5        MR. FORRESTER:  She already answered
6  that.
7  BY MR. SHAIBANI:
8    Q   There was no extremely favorable
9  reference for Roberta Medlin?
10       MR. BOUSE:  I object, she's answered that
11  already.  Go ahead, you can answer.
12       THE WITNESS:  Not directly from the
13  person you're talking about.
14       MR. RANCK:  I'm sorry.
15       MR. BOUSE:  Not directly from the
16  individual we're talking about.
17  BY MR. SHAIBANI:
18   Q   And this reference was neither verbal nor
19  in writing, is that correct?
20       MR. BOUSE:  I object, go ahead.
21       THE WITNESS:  That's correct.
22  BY MR. SHAIBANI:

Page 72

1    Q   And can you tell us what documents you
2  reviewed which led to your --
3    A   When the client was purchasing the house,
4  part of the -- his offer would have been his
5  financial statement, which gave me knowledge of
6  the level of pay for that firm.
7    Q   And the financial statements are not for
8  Mr. or Mrs. Medlin, is that correct?
9    A   That's correct.
10   Q   Can you tell us the name of the person
11  whose financial records you reviewed?
12   A   I'd rather not.
13       MR. BOUSE:  That's not the order at this
14  point.  The order is to produce those financial
15  records.
16       MR. SHAIBANI:  Under protective order.
17       MR. BOUSE:  Under protective order.  I
18  will not allow her to testify to the name.  I've
19  instructed Ms. White while we were outside of the
20  Court's ruling.  And she is going to look for and
21  obtain those financial records and provide them to
22  me and I'll provide them to you with appropriate

Page 73

1  confidentiality statement.
2        THE WITNESS:  If they exist.
3        MR. BOUSE:  If they don't exist, I told
4  her she would have to give the name of the
5  individual.
6        MR. SHAIBANI:  For the record, I'm going
7  to preserve my right to depose this individual if
8  the records aren't produced and despite the
9  discovery cut off since you're not disclosing the
10  name and contact information today.
11       MR. BOUSE:  I understand Judge Bates'
12  ruling and I believe that is part of that ruling.
13  I won't agree to it at this point.  Basically if
14  the documents are there, the logical step would be
15  that you would be allowed to have that individual
16  identified and take his deposition.  And I would
17  agree if that's part of the Court's ruling that I
18  will not argue that it's beyond the discovery cut
19  off.  Okay?
20  BY MR. SHAIBANI:
21   Q   We were discussing the listing for the
22  1622 Wisconsin Avenue.  I'd like to know if in

19 (Pages 70 to 73)

## Capital Reporting Company

Page 70

1    Q   And do you recall the passage where they
2   say that this specific notation 12/48 in front of
3   the minimum/maximum lease was pursuant to your
4   instructions that you wanted to lease the property
5   for one to four years?
6        MR. BOUSE:  Show her the deposition.  I
7   object.
8   BY MR. SHAIBANI:
9    Q   You don't recall that passage?
10   A   No.
11       MR. BOUSE:  Can we take a break?
12       (Short break taken)
13   BY MR. SHAIBANI:
14   Q   Now that we've had the dispute resolved
15  by Judge Bates, I'm going to ask the question
16  regarding the reference you received for
17  Ms. Medlin.  Could you tell us if you in fact
18  received a reference for Roberto Medlin?
19       MR. BOUSE:  She already answered that.
20  The question is did she speak to the gentleman
21  about Roberta Medlin or did she simply review
22  documents about his financial wherewithal?  Do you

Page 71

1   understand that question, whether you spoke
2   directly to the gentleman about Mr. Medlin's
3   income or what he does with the business?
4        THE WITNESS:  Which I did not.
5        MR. FORRESTER:  She already answered
6   that.
7   BY MR. SHAIBANI:
8    Q   There was no extremely favorable
9   reference for Roberta Medlin?
10       MR. BOUSE:  I object, she's answered that
11  already.  Go ahead, you can answer.
12       THE WITNESS:  Not directly from the
13  person you're talking about.
14       MR. RANCK:  I'm sorry.
15       MR. BOUSE:  Not directly from the
16  individual we're talking about.
17  BY MR. SHAIBANI:
18   Q   And this reference was neither verbal nor
19  in writing, is that correct?
20       MR. BOUSE:  I object, go ahead.
21       THE WITNESS:  That's correct.
22  BY MR. SHAIBANI:

Page 72

1    Q   And can you tell us what documents you
2   reviewed which led to your --
3    A   When the client was purchasing the house,
4   part of the -- his offer would have been his
5   financial statement, which gave me knowledge of
6   the level of pay for that firm.
7    Q   And the financial statements are not for
8   Mr. or Mrs. Medlin, is that correct?
9    A   That's correct.
10   Q   Can you tell us the name of the person
11  whose financial records you reviewed?
12   A   I'd rather not.
13       MR. BOUSE:  That's not the order at this
14  point.  The order is to produce those financial
15  records.
16       MR. SHAIBANI:  Under protective order.
17       MR. BOUSE:  Under protective order.  I
18  will not allow her to testify to the name.  I've
19  instructed Ms. White while we were outside of the
20  Court's ruling.  And she is going to look for and
21  obtain those financial records and provide them to
22  me and I'll provide them to you with appropriate

Page 73

1   confidentiality statement.
2        THE WITNESS:  If they exist.
3        MR. BOUSE:  If they don't exist, I told
4   her she would have to give the name of the
5   individual.
6        MR. SHAIBANI:  For the record, I'm going
7   to preserve my right to depose this individual if
8   the records aren't produced and despite the
9   discovery cut off since you're not disclosing the
10  name and contact information today.
11       MR. BOUSE:  I understand Judge Bates'
12  ruling and I believe that is part of that ruling.
13  I won't agree to it at this point.  Basically if
14  the documents are there, the logical step would be
15  that you would be allowed to have that individual
16  identified and take his deposition.  And I would
17  agree if that's part of the Court's ruling that I
18  will not argue that it's beyond the discovery cut
19  off.  Okay?
20  BY MR. SHAIBANI:
21   Q   We were discussing the listing for the
22  1622 Wisconsin Avenue.  I'd like to know if in

19 (Pages 70 to 73)

## Capital Reporting Company

Page 94

1    Q   Are these comments written by John
2  Pagones, to your knowledge?
3    A   I have no idea what his handwriting looks
4  like.
5    Q   What about Thierry Liverman's?
6    A   I don't know his either.
7    Q   Under paragraph 7, "The common tenant
8  shall pay $200 each month as rent for his pro rata
9  share of the real estate taxes."  Did you write
10  that?
11    A   No.
12    Q   Did you instruct anyone at Chatel to
13  include that writing on this lease?
14    A   No.
15    Q   And did you instruct anybody at Chatel to
16  include that as a provision of the lease with
17  Mr. Bratton?
18    A   Pardon me?
19    Q   Did you instruct anybody at Chatel to
20  include the writing under paragraph 7 as a
21  provision to the lease with Mr. Bratton?
22    A   I think Thierry and I eventually

Page 95

1  discussed this lease.  And I said, "This
2  commercial lease, this isn't your commercial
3  lease.  It's not the Chatel's lease."
4    Q   Did you have a copy of Chatel's
5  commercial lease on October 6th of '05?
6    A   There was one that was given to me.
7  Whether I had it in front of me at that time, I
8  don't know.  It didn't look like this one.  It
9  said Chatel on top of it.
10    Q   And the X outs of paragraphs 21 and 27,
11  the commission and the performance, did you cross
12  those out, on the --
13    A   No, I didn't cross them out.
14    MR. RANCK:  Paragraphs, what was that?
15    MR. BOUSE:  21 and 27.
16    MR. RANCK:  Thank you.
17  BY MR. SHAIBANI:
18    Q   Did you instruct anyone at Chatel that
19  John Bratton specifically Bratton Real Estate,
20  Inc. was not to receive a commission for the lease
21  of your property?
22    A   Thierry and I might have talked about a

Page 96

1  commission, that was his decision to make.
2    Q   So you didn't tell Thierry that Bratton
3  is not going to get a commission for this
4  transaction?
5    A   There was always a question of whether
6  Bratton was representing himself or whether he was
7  represented by Chatel and how -- who was his --
8  was he representing himself or did he have an
9  agent.
10    Q   Didn't your attorney, Mr. Forrester, send
11  a fax to Chatel in which he instructed Chatel that
12  Bratton Realty was not to receive a commission for
13  this transaction?
14    A   Do you have a copy of that?
15    (White Exhibit No. 5
16    was marked for identification).
17  BY MR. SHAIBANI:
18    Q   I'd like to mark this as Exhibit 5.
19    MR. BOUSE:  Thank you.
20  BY MR. SHAIBANI:
21    Q   This is a fax dated October 26th, '05
22  from Mr. Forrester to Chatel.

Page 97

1    A   Well, there's no commission or fee to be
2  paid by Mr. Bratton.  It would appear it's my
3  understanding that he is then represented by
4  Chatel.
5    Q   Yes, but --
6    A   If he was not represented by Chatel, he
7  was representing himself, then he would get a
8  commission.  But I didn't think he was -- I
9  thought he was represented by Chatel.
10    Q   And is that why you inform your attorney
11  that --
12    A   If we had any discussion about it, that
13  would have been part of it.  That would have been
14  the reason.  It must have been something in the
15  Chatel lease that we were addressing here, their
16  boiler plate lease.
17    Q   And the instruction that the lease is
18  supposed to be for two years without an option for
19  a third year, did you provide those instructions
20  to Mr. Forrester?
21    A   It was to be a two year lease.  I might
22  have discussed adding that little clause, maybe we

25 (Pages 94 to 97)

## Capital Reporting Company

Page 98

1  just were trying to make it clear, two year, two
2  year means not three.
3      Q  And under that basis, the lease for two
4  years wasn't going to convert to a month to month
5  lease at the end of the two years, is that
6  correct?
7      A  Correct.
8      Q  And the lower level is not available, did
9  you provide that instruction to Mr. Forrester as
10  well?
11      A  If Mr. Bratton was going to have the
12  space, the street level space on November 1, I
13  would have to take the basement space. I had to
14  be somewhere. I either had to be street level or
15  lower level. There was no place else for me to
16  go. And we were a long ways from closing the
17  office.
18      Q  And the instruction there's an additional
19  payment of $200 each month for real estate taxes,
20  did you provide that information to Mr. Forrester?
21      A  Yes, that's a blank on the Chatel's
22  boiler plate lease, a blank to be filled in.

Page 99

1          (White Exhibit No. 6
2          was marked for identification).
3  BY MR. SHAIBANI:
4      Q  I'd like to distribute Exhibit 6.
5          MR. FORRESTER: Excuse me, I'm leaving, I
6  have an appointment.
7          (Discussion had off the record).
8          THE WITNESS: What are we looking at
9  here? There's no question on the table?
10          MR. BOUSE: I'm sorry, you can go ahead.
11  BY MR. SHAIBANI:
12      Q  Do you recognize this document?
13      A  Uh-huh.
14          MR. BOUSE: Yes?
15          THE WITNESS: Yes.
16          MR. BOUSE: Thank you.
17  BY MR. SHAIBANI:
18      Q  Is this a finalized lease between you and
19  Mr. Bratton for the --
20      A  This is the one we signed, isn't it?
21  Yes.
22      Q  Why did it take 24 days for John to sign

Page 100

1  this lease for the street level of your property?
2          MR. BOUSE: I object.
3          MR. RANCK: Objection.
4          THE WITNESS: Why did it take 24 days?
5  That's pretty normal for me with negotiations.
6  It's not the only thing that I was doing at that
7  period of time.
8  BY MR. SHAIBANI:
9      Q  Do you agree that based on this lease,
10  Mr. Bratton has to vacate your property at the end
11  of the two years?
12      A  Yes.
13          MR. RANCK: I'm going to -- well, strike
14  that.
15          MR. BOUSE: She's answered it. Go ahead.
16          THE WITNESS: It was a two year lease,
17  right.
18          MR. BOUSE: Yes was the answer.
19  BY MR. SHAIBANI:
20      Q  In other words, there there's no
21  conversion from month to month. Mr. Bratton has
22  to get out of that property at the end of the two

Page 101

1  years which would be November of '07?
2      A  That's what a two year lease means.
3      Q  And you agree that under this lease
4  Mr. Bratton does not get a right of first refusal?
5      A  Correct.
6      Q  And can you -- do you agree that
7  paragraph 41 of this lease is the right of first
8  refusal provision? It's on page 6 of the lease
9  towards the end of paragraph 41 where it says,
10  "Landlord hereby agrees that in the event of the
11  property which the lease premises is apart is
12  offered for sale during the term of the lease,
13  tenant shall be given five business days within
14  which to meet any price offered in writing for the
15  property or to match any signed contract of sale."
16      A  Yeah, that's correct. You asked me if
17  that was the right of first refusal paragraph?
18      Q  Yes.
19      A  That's my understanding, yes.
20      Q  Why did you decide not to give a right of
21  first refusal to John Bratton?
22          MR. BOUSE: Object. Go ahead.

26 (Pages 98 to 101)

## Capital Reporting Company

Page 114

1 BY MR. SHAIBANI:

2    Q Well, what exactly did you tell Thierry

3 Liverman on the 12th of October?

4    A "Let's negotiated this one first."

5    MR. BOUSE: This one meaning

6 Ms. Medlin's?

7    THE WITNESS: Ms. Medlin's.

8 BY MR. SHAIBANI:

9    Q What else did you say to him? Did you

10 tell him to inform Mr. Bratton to forget about

11 this property?

12    A No, whatever he did, he did. I don't

13 remember giving any instruction.

14    Q Would you agree that from October 6th

15 through October 11th, all of the lease proposals

16 submitted by Mr. Bratton were rejected by you?

17    A No, I won't agree to that, they weren't

18 rejected.

19    Q Did you --

20    A No, they were still -- they were agreed

21 to -- they always had terms in it I couldn't deal

22 with.

Page 115

1    Q Did you accept any leases from

2 Mr. Bratton from October 6th through October 11th?

3    A No, nor did I accept Ms. Medlin's.

4    Q And it was only on October 31st after 24

5 days had elapsed from the time that Mr. Bratton

6 first came to see your property that you finally

7 agreed to lease the street level to him?

8    MR. BOUSE: You want to say, "Ladies and

9 gentlemen of the jury" first before you ask that

10 question? It's an argument. Come on, Mr.

11 Shaibani, that's an argument. I object.

12    MR. RANCK: Object to the form.

13    MR. BOUSE: Do you know the date you

14 signed the lease with Mr. Bratton?

15    MR. SHAIBANI: That's not the question.

16    THE WITNESS: It says 31st, whatever it

17 is.

18    MR. BOUSE: Whatever it is. You can add

19 up the days.

20 BY MR. SHAIBANI:

21    Q Isn't it true that you didn't accept any

22 of the lease proposals submitted by Mr. Bratton

Page 116

1 from October 6th through October 11th?

2    MR. RANCK: Objection, asked and

3 answered.

4    MS. BOUSE: I object. Answer it again.

5    THE WITNESS: I didn't accept any of

6 them, no, they all had something wrong with them.

7 BY MR. SHAIBANI:

8    Q Could you describe what was wrong with

9 those leases?

10    A I think the right of first refusal was

11 always there. And I said I wouldn't take that. I

12 couldn't do it. I didn't want to and couldn't.

13    Q You mentioned that Mr. Bratton's lease

14 that was drafted on his own form contained pro

15 tenant terms. Could you tell us what made it pro

16 tenant?

17    A No, that was Thierry's remark, Thierry

18 said that.

19    Q And what provisions --

20    A So Thierry would know there were things

21 in the lease -- I'm not one who writes commercial

22 leases. Thierry would have said that there are

Page 117

1 certain things in there, either they shouldn't be

2 there or there are things that are not there that

3 should be there.

4    Q And what things? Can you tell us what

5 things were in there that shouldn't be there, the

6 provisions that were crossed out?

7    A We'd have to take the lease that we ended

8 up with. This one seems a lot longer than that

9 one. Thierry was my agent and he wanted certain

10 things in the lease.

11    MR. BOUSE: What the witness says,

12 compare Plaintiff's Exhibit 4 with Plaintiff's

13 Exhibit 7. I'm sorry, Plaintiff's -- I apologize,

14 6. Are you going on to a different topic? Do you

15 want to have lunch?

16    THE WITNESS: Yeah.

17    MR. RANCK: I --

18    THE WITNESS: Or something brought in.

19    MR. RANCK: Mr. Bratton seems to be

20 voicing some objection. I'm going to request

21 lunch. I've been sick this week. I have no

22 desire to sit here all day without eating

**30 (Pages 114 to 117)**

## Capital Reporting Company

Page 118

1 anything. When there's an appropriate time, we
2 can take a lunch break.
3      THE WITNESS: I think we've exhausted the
4 subject.
5      MR. RANCK: We certainly offer --
6      MR. BOUSE: Anymore on this line? If not
7 we can break for lunch.
8      (Short break taken)
9 BY MR. SHAIBANI:
10     Q  You mentioned a moment ago you didn't
11 want to give the right of first refusal to John
12 Bratton because you had the 1622 Wisconsin
13 property as part of your will.
14     MR. RANCK: Objection.
15     MR. BOUSE: That's not the only thing but
16 go ahead. I object. Finish your question. It
17 started out badly but go ahead.
18     THE WITNESS: Uh-huh.
19 BY MR. SHAIBANI:
20     Q  Actually if I may request that you
21 respond with yes or no otherwise our court
22 reporter cannot take it down.

Page 119

1      MR. BOUSE: She's been trying,
2 Mr. Shaibani.
3 BY MR. SHAIBANI:
4      Q  Now, why if your property isn't --
5 actually let me rephrase your question, if you
6 intend to convey your property as part of your
7 will, you don't want to sell it, isn't that
8 correct?
9      A  Yeah, that would be correct.
10     Q  And if you don't want to sell the
11 property, then why does it matter if a right of
12 first refusal is part of a lease or not?
13     MR. RANCK: Objection.
14     MR. BOUSE: You can answer.
15     MR. RANCK: Calls for speculation.
16     THE WITNESS: I don't want that to be a
17 problem for my estate. And there's already -- it
18 would already be a problem because we've got this
19 other tenant. We've got the residential tenant.
20 BY MR. SHAIBANI:
21     Q  But if you're not going to sell the
22 property, what difference does it make for the

Page 120

1 right of first refusal?
2      MR. BOUSE: Do you want to argue with
3 her? The answer is if she dies tomorrow and her
4 heirs want to sell the property, they can't
5 because of the right of first refusal.
6 BY MR. SHAIBANI:
7      Q  No, this lease is between you and
8 Mr. Bratton. It's not between your estate and
9 him.
10     MR. BOUSE: She's given her answer. And
11 you want to argue with her. She's not going to
12 answer the question.
13 BY MR. SHAIBANI:
14     Q  Are you suggesting that your estate is
15 bound by this lease?
16     A  I think they are bound by the law of the
17 District which requires the residential tenant to
18 have a right of first refusal and right that
19 cannot be waived. Now if you don't know that, I
20 don't know what to do.
21     MR. BOUSE: You don't have to do
22 anything. That is the law. Are we going to stop

Page 121

1 or everybody is going to smile at each other? Are
2 we stopping now for lunch?
3      MR. SHAIBANI: Sure. If you insist.
4      MR. BOUSE: I'm not insisting, Mr. Ranck
5 is insisting because he's sick.
6      MR. RANCK: I think it's the courtesy
7 thing to do to the witness, just like we've done
8 with every other witness.
9      MR. BOUSE: Right.
10     MR. SHAIBANI: I didn't say we're not
11 going to have a lunch break. I was trying to
12 figure out when would be the appropriate time to
13 do it. Since you have to have lunch now, maybe we
14 should then.
15     MR. RANCK: I don't have to, but I said,
16 Mr. Shaibani, was it an appropriate time. It's
17 your deposition.
18     MR. SHAIBANI: Should we take 45 minutes
19 then?
20     MR. BOUSE: Okay. That's fine.
21     MR. RANCK: Fine.
22     (Short break taken)

31 (Pages 118 to 121)

## Capital Reporting Company

Page 130

1    MR. BOUSE: Right.
2    THE WITNESS: Yeah.
3    MR. BOUSE: Go ahead, I'll permit you to
4  answer again.
5    THE WITNESS: Thierry basically made his
6  presentation to me. He had two leases to present
7  to his client. And so we talked about them. And
8  as I recall and as I stated before, I made the
9  decision to start the first negotiate with Roberta
10  who seemed to have the least number of serious
11  objections. It was all -- it all had to be
12  discussed.
13  BY MR. SHAIBANI:
14    Q   You had the least objections through
15  Roberta?
16    A   Well, we'd had a couple of things from
17  John and John Bratton. And they were always
18  repeated, they always said the right of first
19  refusal which I always say I wouldn't take. So
20  they kept coming back with the same thing I didn't
21  want to deal with, that I didn't want. So we'll
22  move on and see if this other person has -- she's

Page 131

1  going to insist on it, too. Maybe we don't rent
2  it, maybe we would find somebody else.
3    Q   At that meeting, did you inform
4  Mr. Liverman that you were going to go with
5  Ms. Medlin's lease offer?
6    MR. RANCK: Objection, asked and
7  answered.
8    MR. BOUSE: Objection, she has answered
9  that. I'll permit you to answer it one more time.
10    THE WITNESS: That I was going to see if
11  we could first negotiate, start the negotiation
12  with her, to see if we could work out a deal. If
13  we couldn't, maybe we couldn't but we'd see. John
14  was very aware that I didn't want the right of
15  first refusal because that had been going on for a
16  couple days.
17  BY MR. SHAIBANI:
18    Q   What was your basis for deciding to, in
19  your words, first negotiate with Roberta Medlin?
20    MR. BOUSE: Objection. Go ahead.
21    MR. RANCK: Objection.
22    THE WITNESS: I think we already had

Page 132

1  negotiations with John. We didn't seem to be
2  getting it cleared up. So then we moved on to
3  Roberta to see if there was hope in that one.
4  BY MR. SHAIBANI:
5    Q   Did you inform Mr. Liverman that you
6  preferred to have a tenant in the building who was
7  going to have a jewelry shop as opposed to a
8  potential competitor in real estate?
9    A   No, I think that somehow the words have
10  gotten put into my mouth there. I think it's
11  probably that I said it would be a good block to
12  have a craft type jewelry type store, it would fit
13  into the block. We already know that a real
14  estate office fits in the block. If it didn't
15  fit, I wouldn't have been there for all those
16  years.
17    Q   Which real estate office was on that
18  block?
19    A   My own.
20    Q   You said you were closing?
21    A   We already know it's a good block for a
22  real estate office. It's a good block for an up

Page 133

1  scale jewelry store. There were similar stores in
2  that block. There would be traffic there that
3  would be good for it.
4    Q   The issue of Mr. Bratton having a real
5  estate that would pose competition to you, that
6  wasn't a bases for your decision not to go with --
7    A   I don't know where that came from.
8  That's totally false.
9    Q   Okay.
10    A   I don't know how it got there. Words
11  have been put in my mouth.
12    MR. SHAIBANI: Can we please distribute
13  the responses to the first set of Interrogatories?
14    (White Exhibit No. 11
15    was marked for identification).
16  BY MR. SHAIBANI:
17    Q   This is Exhibit 11.
18    A   11.
19    Q   This is on page 4, the answer, I just
20  want to clarify, the sentence beginning with the
21  reason that Mary White wanted to lease the
22  property to Roberta Medlin because she approved of

34 (Pages 130 to 133)

## Capital Reporting Company

Page 134

1  the tenant in her building that was going to have
2  a jewelry shop as opposed to a potential
3  competitor in real estate?
4      A  I don't know where that -- that's not
5  correct.
6      Q  So you would agree that Bratton Realty
7  and --
8      A  The jewelry store were equally good
9  tenants.
10     Q  And Bratton Realty doesn't pose a
11 competition to you, would you agree with that?
12     A  No, no, there's lots of real estate
13 offices in Georgetown.
14     Q  And certainly Washington Fine Properties
15 in the class that it is, is not a competitor
16 with -- well, Bratton Realty is not a competitor
17 of Washington Fine Properties because they target
18 two different segments of the market, would you
19 agree with that?
20     MR. BOUSE:  I object, you can answer.
21     THE WITNESS:  You went through that dance
22 with Tom Anderson and I stand by Tom's answer.

Page 135

1  BY MR. SHAIBANI:
2      Q  And then on page 9 of this document, the
3  answer to question 7, the sentence in the middle
4  of paragraph beginning with, "Ms. White has
5  received an extremely favorable reference
6  concerning Ms. Medlin," that sentence would you
7  agree that that is --
8      A  I think we already discussed this.
9      MR. BOUSE:  Do you want to finish your
10 question?  You sort of stopped.
11     MR. SHAIBANI:  I want to know what her
12 thoughts are with respect to that sentence I read.
13     MR. BOUSE:  She answered that.  She
14 answered it from the beginning.  She answered it
15 in response to what the Judge said.  She's
16 answered it.
17 BY MR. SHAIBANI:
18     Q  Do you have anything to add to what you
19 said before?
20     A  No.
21     Q  As to why this sentence was drafted in
22 response to this set of Interrogatories?

Page 136

1      A  When was this done?  Nothing has a date
2  on it.
3      Q  The 15th of November.  Is your signature
4  on page 24 of this document?
5      A  Yes.
6      Q  So you didn't provide that --
7      A  Sometimes --
8      Q  The information Ms. White had received an
9  extremely favorable reference concerning
10 Ms. Medlin, that's not something you informed --
11     MR. BOUSE:  Now you're not even going to
12 go there, are you?
13     MR. SHAIBANI:  I want to know where this
14 came from.
15     MR. BOUSE:  And the information to supply
16 this information is not based solely on the
17 knowledge of the executing party but includes the
18 knowledge of the parties agents, representatives
19 and attorneys, unless privileged, okay?  If you're
20 going to ask her what she told me, she's not
21 answering that question.
22 BY MR. SHAIBANI:

Page 137

1      Q  Now, this idea about your moving into the
2  renovated office of Washington Fine Properties,
3  which comes up on page 10 in response to the
4  answer.  And also we discussed it at Mr. Tom
5  Anderson's deposition.  Would you agree that you
6  were free to use the offices of Washington Fine
7  Properties from July of '05 onwards?
8      A  Yes.
9      Q  And that one of the offices which you
10 were free to use was located in Georgetown during
11 that period?
12     A  The only one, yeah.
13     Q  And were you also free to use the New
14 Mexico address of Washington Fine Properties?
15     A  Yes.
16     Q  And did you regularly or -- strike that.
17 Did you go through the Georgetown office of
18 Washington Fine Properties from May 10th through
19 November of '05?
20     MR. BOUSE:  Object, go ahead.
21     THE WITNESS:  May 10, why do we --
22 what's -- that's the day I signed the independent

35 (Pages 134 to 137)

## Capital Reporting Company

Page 218

1  came, just tell him that.
2      THE WITNESS: Because did this come with
3  the lease?
4  BY MR. SHAIBANI:
5      Q  I don't believe so but I'm not here to
6  testify about that.
7      MR. BOUSE: If you don't know when you
8  received it, Mary, tell him.
9      THE WITNESS: No, I don't know when I
10  received it. It's dated the 7th. I don't know
11  that I received it on the 7th. I was in contact
12  with John. He was talking to me.
13  BY MR. SHAIBANI:
14      Q  John Pagones you mean?
15      A  John Pagones called.
16      Q  And my question is once you received this
17  letter, why didn't you call John Bratton to assist
18  him with leasing the property?
19      A  I wouldn't call John Bratton, I would
20  call John Pagones and ask him why he wasn't doing
21  his job.
22      Q  Didn't you have telephonic communications

Page 219

1  with Roberta Medlin? Did you ring her to attempt
2  to lease the property?
3      A  Roberta Medlin came to me personally,
4  walked into where I was and wanted to do a lease.
5  I told her to go to Chatel. I think she went down
6  there and John wasn't there, then she came back
7  and said nobody was there, he wasn't there, I'm
8  going out of town today. So I called to see who
9  was there, got Thierry. He said he'd see her. I
10  think this was part of the --
11      MR. BOUSE: No, there's no question
12  pending.
13  BY MR. SHAIBANI:
14      Q  Did you have the Chatel commercial
15  agreement of lease at your office in October of
16  '05?
17      A  I don't know.
18      Q  After you received Mr. Bratton's letter
19  dated October 7th, did you contact Chatel to
20  inquire as to why they weren't providing the
21  necessary information to John Bratton?
22      MR. BOUSE: I object.

Page 220

1      MR. RANCK: I object to this as well
2  based on the form of the question.
3      THE WITNESS: I have a feeling that I had
4  spoken with John Pagones before I got this letter
5  and that John had told me that he didn't have the
6  lease and he was getting it for him the next day.
7  It was in Thierry's computer.
8  BY MR. SHAIBANI:
9      Q  Yes, but he -- why didn't he submit that
10  to him the next day? It wasn't until the
11  following week?
12      MR. BOUSE: She's not going to answer
13  that.
14      MR. RANCK: Objection, calls for
15  speculation and lacks foundation.
16  BY MR. SHAIBANI:
17      Q  Could you please answer the question?
18      A  I don't know the answer to that.
19      Q  Were you aware that John Pagones was
20  aired on Date Line NBC as having falsely informed
21  a handicapped individual that he had no properties
22  available for lease in Georgetown?

Page 221

1      MR. BOUSE: Objection, when?
2      MR. SHAIBANI: In October of '05, were
3  you aware of this fact?
4      MR. BOUSE: I object.
5      MR. RANCK: I object, lack of foundation
6  and facts not in evidence.
7      THE WITNESS: I did not see that program
8  but I was aware that there was a problem.
9  BY MR. SHAIBANI:
10      Q  A problem relating to --
11      A  Some problem John had with somebody in a
12  wheelchair, that's all I know.
13      Q  And did that cause you to want to have
14  somebody else handle the leasing of your property?
15      A  No.
16      MR. BOUSE: I object.
17      THE WITNESS: Obviously not.
18  BY MR. SHAIBANI:
19      Q  Did you discuss that incident with
20  Chatel?
21      A  No.
22      Q  When was the first time that you reviewed

56 (Pages 218 to 221)

## Capital Reporting Company

Page 206

1 bigger job than I thought it was, I realized I was
2 going to need the space downstairs because I
3 couldn't move it anywhere else. I couldn't move
4 it to Washington Fine Properties, I couldn't move
5 it to my home. I didn't have a garage to put it
6 in.
7    MR. BOUSE: I refer you to the questions
8 you asked her concerning your Exhibit No. 11,
9 which is Interrogatory number 18 where she read to
10 you that she did not mistakenly list the lower
11 level apartment. She explained that to you.
12    MR. RANCK: And also the question is
13 referring to Exhibit No. 3, which is the MIRS
14 listing of the basement where you went through
15 similar questions.
16 BY MR. SHAIBANI:
17    Q  The basement of the property is designed
18 in a way that two different businesses could
19 occupy it, isn't that correct?
20    A  With some work that could be done.
21    Q  Why didn't you request Chatel to remove
22 the basement from the MIRS listings as an

Page 207

1 active -- as being held on active status if you
2 decided not to rent it?
3    A  I guess I forgot to tell them. I was
4 busy doing other things. They also knew what was
5 going on. They knew what was happening.
6    Q  And you sold your office furniture
7 because you didn't need it anymore, isn't that
8 correct?
9    A  Sold some of it.
10    Q  Were you mugged by an African American at
11 any point?
12    MR. BOUSE: What's the relevance? I
13 object. No, no, I'll tell you what, I'll let her
14 answer. You can answer, Ms. White.
15    THE WITNESS: I was attacked from behind
16 by a gang and they were African American.
17 BY MR. SHAIBANI:
18    Q  And when did that happen?
19    A  December of '87.
20    Q  And who was the perpetrators?
21    A  I have forgotten their names. There were
22 five or six black men.

Page 208

1    Q  Where did this happen?
2    A  It happened actually in front of almost
3 the Chatel office, right there on N Street. It
4 was about 20 feet west of the Chatel office.
5    Q  And did they actually physically hurt you
6 in any way?
7    A  Oh, big time.
8    Q  What did they do?
9    A  Well, I was knocked out enough to see the
10 white light and I flew over Georgetown.
11    MR. BOUSE: She thought she was going to
12 die.
13    THE WITNESS: It's quite an experience.
14    MR. SHAIBANI: Counsel, I urge you not to
15 testify.
16    MR. BOUSE: I was trying to interpret.
17 You can urge me.
18    THE WITNESS: My left arm was shattered,
19 twisted and broke. My left pelvic bone was
20 twisted and broke, later dislocated. I've had
21 five operations. I'm still in therapy.
22 BY MR. SHAIBANI:

Page 209

1    Q  Were the perpetrators prosecuted for this
2 crime?
3    A  No, they weren't. They were identified.
4 I identified all of them. But the police
5 department said the crime was not serious enough
6 to prosecute. And I asked what could happen to be
7 more serious, did I have to be killed? And they
8 said yes.
9    Q  Did this mugging incident cause you to
10 have a different perception on African Americans?
11    A  No, it caused me to have a different
12 perception on anybody walking behind me.
13    Q  Did the mugging cause you not to want to
14 engage in real estate deals with blacks?
15    A  No, I continued to have some dealings. I
16 had black clients.
17    Q  Have you ever leased your commercial
18 space to an African American?
19    A  Yes, Mr. Bratton.
20    Q  Aside from Mr. Bratton, that is?
21    A  No.
22    Q  Is it a violation of the MIRS rules not

53 (Pages 206 to 209)

# Capital Reporting Company

Page 218

1 came, just tell him that.
2 THE WITNESS: Because did this come with
3 the lease?
4 BY MR. SHAIBANI:
5 Q I don't believe so but I'm not here to
6 testify about that.
7 MR. BOUSE: If you don't know when you
8 received it, Mary, tell him.
9 THE WITNESS: No, I don't know when I
10 received it. It's dated the 7th. I don't know
11 that I received it on the 7th. I was in contact
12 with John. He was talking to me.
13 BY MR. SHAIBANI:
14 Q John Pagones you mean?
15 A John Pagones called.
16 Q And my question is once you received this
17 letter, why didn't you call John Bratton to assist
18 him with leasing the property?
19 A I wouldn't call John Bratton, I would
20 call John Pagones and ask him why he wasn't doing
21 his job.
22 Q Didn't you have telephonic communications

Page 219

1 with Roberta Medlin? Did you ring her to attempt
2 to lease the property?
3 A Roberta Medlin came to me personally,
4 walked into where I was and wanted to do a lease.
5 I told her to go to Chatel. I think she went down
6 there and John wasn't there, then she came back
7 and said nobody was there, he wasn't there, I'm
8 going out of town today. So I called to see who
9 was there, got Thierry. He said he'd see her. I
10 think this was part of the --
11 MR. BOUSE: No, there's no question
12 pending.
13 BY MR. SHAIBANI:
14 Q Did you have the Chatel commercial
15 agreement of lease at your office in October of
16 '05?
17 A I don't know.
18 Q After you received Mr. Bratton's letter
19 dated October 7th, did you contact Chatel to
20 inquire as to why they weren't providing the
21 necessary information to John Bratton?
22 MR. BOUSE: I object.

Page 220

1 MR. RANCK: I object to this as well
2 based on the form of the question.
3 THE WITNESS: I have a feeling that I had
4 spoken with John Pagones before I got this letter
5 and that John had told me that he didn't have the
6 lease and he was getting it for him the next day.
7 It was in Thierry's computer.
8 BY MR. SHAIBANI:
9 Q Yes, but he -- why didn't he submit that
10 to him the next day? It wasn't until the
11 following week?
12 MR. BOUSE: She's not going to answer
13 that.
14 MR. RANCK: Objection, calls for
15 speculation and lacks foundation.
16 BY MR. SHAIBANI:
17 Q Could you please answer the question?
18 A I don't know the answer to that.
19 Q Were you aware that John Pagones was
20 aired on Date Line NBC as having falsely informed
21 a handicapped individual that he had no properties
22 available for lease in Georgetown?

Page 221

1 MR. BOUSE: Objection, when?
2 MR. SHAIBANI: In October of '05, were
3 you aware of this fact?
4 MR. BOUSE: I object.
5 MR. RANCK: I object, lack of foundation
6 and facts not in evidence.
7 THE WITNESS: I did not see that program
8 but I was aware that there was a problem.
9 BY MR. SHAIBANI:
10 Q A problem relating to --
11 A Some problem John had with somebody in a
12 wheelchair, that's all I know.
13 Q And did that cause you to want to have
14 somebody else handle the leasing of your property?
15 A No.
16 MR. BOUSE: I object.
17 THE WITNESS: Obviously not.
18 BY MR. SHAIBANI:
19 Q Did you discuss that incident with
20 Chatel?
21 A No.
22 Q When was the first time that you reviewed

56 (Pages 218 to 221)

## Capital Reporting Company

Page 266

1 operating condition?

2     A  Well, we'd been using it right up until

3 the moment he occupied it, it was working.

4     Q  And when was the last time?

5     A  We didn't vacate until October 31st and

6 he took position November 1, 12 hour difference.

7     Q  When did you have a plumber come to

8 either maintain or repair the plumbing?

9     A  To repair what plumbing?

10     Q  The plumbing the -- for the street level

11 of the 1622 Wisconsin Avenue. Did somebody come

12 in to take a look at it prior to February of '06?

13     A  February of '06? I don't know. Was

14 there a plumbing problem? It was being managed by

15 Chatel at that time.

16     Q  Are you aware that the lease you signed

17 with Mr. Bratton requires you to warrant that the

18 plumbing is in good and operating condition?

19     A  Yes.

20     MR. BOUSE: I object, it says more than

21 that to it. It goes both ways.

22     THE WITNESS: Normal wear and tear.

Page 267

1 BY MR. SHAIBANI:

2     Q  Are you aware Chatel sent John Bratton a

3 plumbing invoice in the amount of $1,009?

4     MR. BOUSE: Are you aware at the time

5 that was sent?

6     THE WITNESS: Was that for him or for

7 upstairs?

8 BY MR. SHAIBANI:

9     Q  For the commercial unit?

10     A  There was a plumbing problem upstairs.

11     Q  The question is were you aware of that?

12     A  I don't know. Can I see the bill?

13     Q  Yes.

14     MR. SHAIBANI: What number are we?

15     MS. KEYVAN: 28.

16     (White Exhibit No. 28

17     was marked for identification).

18     THE WITNESS: The hot water heater under

19 the basement that wore out, I think. The next one

20 was also the same problem. Was it at the same

21 time? 11-29. One relates to the other. I think

22 that thing was wearing out.

Page 268

1     Q  Would you agree then that Mr. Bratton was

2 not the cause of the plumbing problem?

3     MR. BOUSE: I object.

4     THE WITNESS: Usually the plumber tells

5 who was responsible, what caused the problem.

6 BY MR. SHAIBANI:

7     Q  Did the plumber tell you that Mr. Bratton

8 was responsible for the --

9     A  They would talk to Chatel about this, not

10 me.

11     Q  Did Chatel inform you that they had sent

12 this plumbing invoice to Mr. Bratton?

13     A  They usually inform me by sending the

14 invoices way after the fact. Mr. Bratton didn't

15 pay for this, did he?

16     MR. BOUSE: No, he didn't.

17 BY MR. SHAIBANI:

18     Q  Would you agree that Mr. Bratton was

19 timely with his monthly rent payments?

20     MR. BOUSE: I object.

21     THE WITNESS: I don't get the -- I don't

22 know. They go to Chatel.

Page 269

1 BY MR. SHAIBANI:

2     Q  Did Chatel ever inform you that

3 Mr. Bratton had not paid his rent?

4     A  They told me that they didn't have a

5 check for -- I think it was for December.

6     Q  And did they tell you why they hadn't

7 received that check?

8     A  No, they didn't know why they hadn't

9 received it when they told me about it.

10     Q  Are you aware the address on the lease

11 that you signed with Mr. Bratton directs him to

12 send the monthly rent payments to a P.O. Box which

13 is where he sent his December payment?

14     MR. RANCK: Objection, mischaracterizes

15 the document.

16     MR. BOUSE: I object also. Do you know

17 one way or another?

18     THE WITNESS: No, I'd have to look at the

19 lease agreement.

20     THE VIDEOGRAPHER: Exhibit 6.

21     MR. RANCK: For the record, while they

22 are scrambling to look at it, it shows both a

68 (Pages 266 to 269)

## Capital Reporting Company

Page 274

1  Q  Was he a part owner of the house?
2  A  No.
3  Q  Was he a guardian, legal guardian?
4  A  No.
5  Q  Have there been any other complaints
6  against you?
7  A  We had one where we had a client from New
8  York who didn't like the way the Washington board
9  does real estate in the DC real estate in The
10  District of Columbia.  He wanted his hearing in
11  court because he thought we should do it the way
12  they do it in New York.  He gathered everyone
13  together and he spoke for one hour on why we
14  should do it differently, it should be done the
15  way it is in New York City.  He finished with his
16  speech and we adjourned.
17  Q  Have there been any civil actions file
18  against you in connection with your work as a real
19  estate broker?
20  A  No.
21  Q  Have you ever been accused of violating
22  the criminal laws?

Page 275

1  A  No.
2  Q  What type of lease -- I'll rephrase it.
3  How long of a lease did Natasha sign with you for
4  the second level of the property?
5  MR. BOUSE:  The residential level?
6  MR. SHAIBANI:  Yes.
7  THE WITNESS:  She had a one year and now
8  she's got another one year.
9  BY MR. SHAIBANI:
10  Q  Chatel still manages her property, is
11  that correct?
12  A  Yes.
13  Q  Since you joined Washington Fine
14  Properties in July of '05, where would you say
15  that you spend most of your time working, which
16  physical location?
17  A  Georgetown office.
18  Q  Do you spend any time working out of your
19  house?
20  A  A little.
21  Q  And you spend time on the road?
22  A  Oh, yes, big time.

Page 276

1  Q  Are you aware that Mr. Bratton has had to
2  maintain two different offices in DC since he
3  leased your property?
4  MR. RANCK:  I object.
5  MR. BOUSE:  I object.
6  MR. RANCK:  Form of the question,
7  foundation, the term has had to.
8  THE WITNESS:  Yeah, has had to?  In
9  addition to the one in Georgetown or is that one
10  of the two?
11  BY MR. SHAIBANI:
12  Q  Yes, in addition to the Georgetown office
13  do you know --
14  A  He's had two others?
15  Q  One other office, 1223 10th Street?
16  MR. RANCK:  Same objection.
17  THE WITNESS:  I think he had one when he
18  first came.  And he said he wanted to expand to
19  Georgetown.  I would assume he still has that one
20  if he's going to expand to Georgetown.
21  BY MR. SHAIBANI:
22  Q  And do you know that he has -- he

Page 277

1  actually owns the 1223 10th Street property?
2  MR. BOUSE:  Do you know that?
3  THE WITNESS:  No, 10th Street, Northwest
4  or --
5  BY MR. SHAIBANI:
6  Q  Yes, Logan Circle, isn't it?
7  MR. BRATTON:  Yeah.
8  BY MR. SHAIBANI:
9  Q  Are you aware that he hasn't leased that
10  property at 1223 10th Street to generate income
11  from it because he has to move out of your office
12  by November of '07?
13  MR. BOUSE:  I object.
14  MR. RANCK:  Objection, foundation.
15  MR. BOUSE:  Do you know anything about
16  that?
17  THE WITNESS:  No.
18  (White Exhibit No. 29
19  was marked for identification).
20  BY MR. SHAIBANI:
21  Q  This is a comparative listing rental
22  listing information for properties in Logan

70 (Pages 274 to 277)

**Capital Reporting Company**

Page 286

1          CERTIFICATE OF NOTARY PUBLIC

2          I, Mary E. Warner, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears

5    in the foregoing deposition was duly sworn by me;

6    that the testimony of said witness was taken by me

7    in stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness;

10   that I am neither counsel for, related to nor

11   employed by and of the parties to the action in

12   which this deposition was taken; and, further,

13   that I am not a relative or employee of any

14   counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in

16   the outcome of this action.

17          *Mary E. Warner*

18          MARY E. WARNER

19          Notary Public in and for

20          District of Columbia

21   My commission expires:

22   December 30, 2010