1     UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF COLUMBIA

3  JOHN BRATTON     *

4    Plaintiff   *

5  vs.        *  Case Number:

6  CHATEL REAL ESTATE, INC., * 1:06CV00694

7  et al.,      *

8    Defendants  *

9  *   *   *   *   *   *

10    THE DEPOSITION OF JOHN H. BRATTON

11    The Deposition of John H. Bratton, taken

12 in the above-captioned case on Friday, January 19,

13 2007, commencing at 10:00 a.m., at the law offices

14 of Eccleston & Wolf, 2001 S Street, Northwest,

15 Suite 310, Washington D.C. 20009, and reported by

16 Monique Kastner, Court Reporter and Notary Public.

17

18

19     EVANS REPORTING SERVICE
     Two North Charles Street, Suite 950
20     Baltimore, Maryland 21201
      (410) 727-7100
21      (800) 256-8410

PLAINTIFF'S
EXHIBIT
10
ALL-STATE LEGAL®

1        A    Yes.

2        Q    You have two locations; is that

3    correct?  Let me strike that.

4             Bratton Realty has two locations?

5        A    Bratton Realty has one primary

6    location, which is the Georgetown office, 1622

7    Wisconsin Avenue, the property in question.

8             However, I have held on to my previous

9    office, because of the discriminatory manner in

10   which I have been treated with this property.

11            So therefore, given that my -- all my

12   rights have been stricken from the lease, I have no

13   right to renew and I have no right to purchase.  I

14   have held on to my previous office in the event

15   that I will end up back there in November.

16       Q    What's that address?

17       A    1223 10th Street Northwest, Washington,

18   DC.

19       Q    1223?

20       A    Yes.

21       Q    For the purposes of this deposition, do

1          Q    As I understand it, when you became

2     interested in the 1622 property, that was for use

3     by Bratton Realty?

4          A    Correct.

5          Q    And at the time you became interested

6     in 1622 and were hoping to lease the property, what

7     was your intention with regard to the 1223

8     property?

9          A    To have both.  To have two offices for

10    a while until the other one got up and running.

11    Then the plan would be to either just have the one

12    location and then seek for another location in

13    downtown Silver Spring and then Clarington,

14    Virginia.  So my goal was to have a D.C. office, a

15    Maryland office and a Virginia office.

16         Q    Had you gotten deep enough into the

17    planning at that point to try to figure out how

18    long you thought you would maintain the two offices

19    before closing the 1223?

20         A    Not long.  I mean, the whole point was,

21    this was the beginning of the new change of Bratton

1    Realty.  The new change was going to be having

2    multiple locations.  That's the next step for

3    Bratton Realty.

4              The -- my siteman, which I showcased to

5    not only Brad Anderson and Hope and John Pagones

6    when we first met was that -- and that I was most

7    excited about -- was the goal was near, because I

8    had found the perfect space.  So, boom, D.C.  was

9    taken care of, the perfect space for D.C.

10             And then I already identified an area,

11   which was downtown Silver Spring, for my next

12   location.  And then the third location was going to

13   be Clarendon, Virginia.

14             So given the situation, the

15   discrimination, the blatant obstacles, the tedious

16   and ongoing lawsuit, I have had to put things on

17   the back burner.  So that's where I'm at right now.

18   I'm in a holding pattern until all this is

19   resolved.

20        Q    Do does Bratton Realty keep records as

21   to what sales or income are attributable to each of

 1   the two offices?

 2          A    No.  There's nothing separate at all.

 3          Q    Can you identify any loss that Bratton

 4   Realty has had -- strike that.

 5              One thing you have alleged in this case

 6   was that there was a delay in the processing of

 7   your lease proposal.

 8          A    Correct.

 9          Q    All right.  Can you identify any loss

10   that Bratton Realty has suffered as a result of

11   that delay?

12              MR. SHAIBANI:  Objection.

13              THE WITNESS:  As a result of -- which

14       delay are you referring to?  Are you referring

15       to the delay from the timeframe of which I

16       should have gotten the lease signed to the day

17       that I finally got the lease signed?

18              BY MR. RANCK:

19          Q    Yes.

20          A    Or are you taking about from when I

21   should have gotten the lease signed to right now,

1       as of today, how much time has been lost, how much

2       money has been lost as a result of wagering this

3       long-going case?

4              Q     Let me address both.

5                    First, I am asking about delay from the

6       time you think you should have gotten the lease

7       until the day, October 31st, 2005, that your lease

8       was ultimately signed.

9                    Can you identify any loss attributable

10      to that delay?

11             A     Yes, I can.

12             Q     Okay.  What is that?

13             A     I think it's written in one of my

14      documents somewhere.  All the clients that I was

15      working with at the time, I pretty much had to

16      abandon those clients, because I was 24/7 working

17      on getting this space.

18                   And as I saw what was happening to me,

19      I had to divert all my attention to resolving this

20      matter with this space.  And once the news was

21      delivered to me by Thierry Liverman that I did not

Page 79

1    get the space, knowing that it was blatant

2    discrimination, then my focus was to take action

3    against the injustice that was done.

4              So all the clients I was working with

5    at the time I lost out on.  I suffered from.  And I

6    think I put three or four clients.  I think Scott

7    Zimmerman was one.  I don't know the names off the

8    top of my head.

9         Q    Did other agents in your office, in

10   Bratton's office, take over those clients?

11        A    No.

12        Q    So you abandoned your clients so that

13   you could work your own deal?

14             MR. SHAIBANI:  Objection.

15             THE WITNESS:  I will never say I

16        abandoned a client to work my own deal.

17             BY MR. RANCK:

18        Q    Actually, you said your abandoned your

19   clients.  So I am asking you, did you abandon them?

20             MR. SHAIBANI:  Objection.  Asked and

21        answered.

 1          THE WITNESS:  Well, if you are using

 2     the word "abandon" as if I just ignored my

 3     clients, no, I did not just ignore my clients.

 4          BY MR. RANCK:

 5     Q    Okay.  So --

 6     A    There's a difference.  I don't know how

 7  you run your business, but the amount of service

 8  and attention that I would have been able to give

 9  to those clients was drastically different as a

10  result of me doing this case.

11          And the fact that I have clients is not

12  just vacation for me not taking care of issues,

13  such as this, especially when they're so blatant.

14     Q    Okay.  What happened to those, I think

15  you said, three or four clients?

16     A    Yes.

17     Q    Zimmerman and two or three others, what

18  happened to them?  Did they go somewhere else, to

19  another realtor?

20     A    They either waited and bought down the

21  road or -- I don't know off the top of my head.  I

1    would have to see the list.

2          Q    For any of those clients, did you have

3    contracts in place?

4          A    No.  We were in search of.

5          Q    In search.  Okay.  So presumably they

6    were looking to buy?

7          A    Either to buy or -- I think they were

8    all buyers.

9          Q    Okay.  So presumably you would have

10   found a property for them to purchase --

11         A    Correct.

12         Q    -- and Bratton Realty would have earned

13   its commission?

14         A    Correct.  For example, presumably, if

15   you were out sick for a month, presumably, you

16   would have done billable hours during that month

17   that you were out.  That's called opportunity cost.

18   The opportunity cost that you lost by not being

19   able to come into work, that's real money.  That's

20   real time.

21               The opportunity cost of me not being

1    able to focus on my business at hand, which I would

2    have been had not these actions been taken against

3    me.  I would have earned during that period, rather

4    than not earning.

5        Q    Do you know whether you or someone else

6    at Bratton Realty ultimately were able to represent

7    these clients in the purchase of their properties?

8        A    I have repeatedly told you, I don't

9    recall the names.

10       Q    Well, I guess I'm getting back to what

11   happened to the clients.  Do you know?  Did they go

12   to other realtors?  Did you tell them, "I can't

13   represent you anymore," and they went somewhere

14   else, or did someone else in your office take over

15   the representation?

16       A    Once again, if I knew the names, I

17   could tell you approximately what happened with

18   each one of those individuals.  I don't recall the

19   names.

20            I do recall at the time I wrote the

21   document that I was working with clients.  I don't

1              (Whereupon, a brief recess was taken.)

2              BY MR. RANCK:

3         Q    All right.  Mr. Bratton, at some point

4    you became interested in 1622 Wisconsin, correct?

5         A    Correct.

6         Q    And can you tell me if you recall what

7    date that first occurred?

8         A    October.  I think it was October the

9    6th, 2005.

10        Q    All right.  Did you see this property

11   listed on the MRIS or did you see the property

12   itself first?

13        A    I saw the property itself.

14        Q    All right.  So tell me how it came to

15   be that you saw the property.

16        A    Actually, I was on my way to tour

17   another property that I had toured previously.  I

18   was going back for my second visit.

19              I can't think of the name of the place,

20   but Feta was the owner of the shop.  And he had

21   just moved his business from one location to the

1  cold sweat, and it was not a hot day.  He turned

2  red, he became flustered and extremely nervous.  I

3  tried to ignore it, but it was very evident.  It

4  was very obvious.  He was very awkward in talking

5  with me, very on edge.

6           And so then he finally -- at this

7  point, he finally goes and sits behind the desk

8  that was back there.  And I -- and then I sit at

9  the desk, and I started asking him a couple

10  questions about the property.

11      Q    Okay.  Let me apologize and interrupt.

12           I asked you how did he respond, and you

13  described a bunch of physical characteristics --

14      A    That's a response to me.

15      Q    Okay.  Let me finish my question.

16           You described a bunch of physical

17  characteristics.  You didn't say that he verbalized

18  anything.  Did he say anything?

19      A    When I asked him about the property,

20  his response was at the same time of the things I

21  just described to you.  He said that -- he asked me

1    answer you as specifically as I can.

2            So as a real-estate agent, when someone

3    walks into your office and asks about a property,

4    our job is to serve the public.  It doesn't matter

5    whether you are young, old, Asian, black, short

6    tall, whatever.  You give people the same

7    treatment.

8            The treatment that I received was not

9    the treatment that would have been given to anyone

10   else.  A white person walking in that office would

11   not have been treated the way I was treated.

12           First of all, the reaction to me was so

13   blatant and obvious, followed by basic questions

14   that I asked about the property, about an

15   application and about a lease.  Information was

16   denied to me.  Information that he must have had,

17   had to have had.

18           It would have been absolutely

19   impossible to believe that he didn't have an

20   application, didn't know where to get an

21   application.  He didn't have a lease, didn't know

1     where to get a lease, didn't know any information

2     about the property as far as whether there's taxes

3     or anything of this.  He could not answer any of my

4     questions.  And this is his listing in the

5     computer.

6          Q    All right.  Well, let me --

7          A    That -- you put all that together,

8     along with the fact that even when I went to leave,

9     rather than him being excited about, you know,

10    "Well, I look forward to working with you to secure

11    this lease.  It's been on the market for 66 days,

12    and we have no one interested," nothing.  There was

13    no sign that that man ever wanted me to come back

14    into his office about this property again.

15         Q    Okay.  And you concluded on

16    October 6th, by the time you left, that he was

17    discriminating against you, rather than that he was

18    in idiot and rude and a jerk, right?

19              MR. SHAIBANI:  Objection.

20              BY MR. RANCK:

21         Q    Was that your conclusion?

Page 129

1    give you the answer that I think is appropriate.

2    I'm not going to give you a half an answer so you

3    can twist it.  I'm going to give you the full

4    answer.

5            So once again, my answer is, I have

6    been told a lot of things that have not been

7    correct.  A lot of things have been alluded to me

8    that have not been correct.

9            So, yes, at some point, I was told that

10   there was another person who had secured -- and I

11   will say, the way I was told, someone who had

12   signed a lease on the property, and that it was

13   gone and it was too late and it was not going to

14   change.  The decision had already been made.

15           We also know today that there was never

16   a leased sign on that property, other than the

17   lease that I signed.  So, yes, I was told that

18   someone else had signed a lease on the property by

19   the time I made these notes.

20       Q    Thank you.

21           (Whereupon, Bratton Deposition Exhibit

Page 218

1          Q    When Mr. Liverman told you weren't

2     getting the lease and explained to you someone else

3     was in the picture -- putting aside what exactly he

4     said -- your version is, he told you that someone

5     else has signed a lease.  He obviously testifies

6     differently, okay?

7               MR. SHAIBANI:  Objection.

8               BY MR. RANCK:

9          Q    But in that conversation, when you got

10    done with that conversation, did you believe that

11    there even was someone else in the picture, or did

12    you believe that Mr. Liverman and/or Ms. White had

13    just concocted this person in order to keep you

14    from getting the property?

15              MR. SHAIBANI:  Objection.

16              THE WITNESS:  I believe that after my

17         conversation with Thierry Liverman, that after

18         me -- as you can see from the many documents --

19         have worked so diligently for six days --

20         approximately six days at that point, that all

21         of a sudden a friend of a friend just comes out

1          of the blue and is able to see the property,

2          see Mary White, sign a lease and have a lease

3          ratified all in a matter of, like, one day, no,

4          that's not very believable to me that this

5          person just came out of the blue.

6                    Testimony has shown that that's not

7          believable, so -- as far as Ms. Medland has

8          never known anyone who knew Mary White.

9                    It was no friend of a friend, as they

10         told me on the phone.  There was no lease

11         signed, as they told me on the phone.  It was

12         not a done deal, as I was told on that very

13         same phone call.

14                   So, no, I do not believe the

15         information that I was given on the day that

16         Thierry Liverman called me.

17                   BY MR. RANCK:

18         Q    You have answered interrogatories in

19         the case, correct, written questions from the

20         defendants to you that you signed under oath,

21         correct?

Page 226

1    could we just not go with this person.

2           Well, I don't see any overwhelming

3    credentials of someone who didn't even know the

4    area, just moved to the area and didn't know

5    anything about Mary White, didn't have financial

6    documents together whatsoever.

7           The only thing she was required to do

8    was a credit report when I had to do two years of

9    taxes and more.  Where is this qualified, rock-star

10   person that they just could not refuse to do a

11   lease with.

12          So back to your question, John Forester

13   came into the picture when a whole week and a half

14   went by with nothing going on from Mary White's

15   side, and he calls me and says that he's calling me

16   on the behalf of Mary White.  Chatel has been

17   terminated, and that he is now going to take charge

18   of this situation.

19          Once again, he went right back to some

20   of the same terms of, I had to pay the taxes, I had

21   to pay one-third the utilities.

Page 256

1    bottom, "Wednesday the 12th, he" -- being Mr.

2    Pagones -- "then told me that I should call his

3    manager, Thierry Liverman, if I had any more

4    questions because he would be out for the Jewish

5    holiday."  Do you see where you wrote that?

6         A    Right.  That was just for that one day.

7         Q    Okay.  But you agree --

8         A    The day was almost already gone.

9         Q    Okay.  So this conversation you had

10   with Mr. Pagones was towards the end of the day?

11        A    Right.

12        Q    Okay.  And then --

13        A    Well, I don't know.  Towards the end of

14   him being at work, I guess.

15        Q    Okay.  Fair enough.

16             Then later Mr. Liverman called you and

17   told you that you weren't going to be getting the

18   lease.  I don't mean those words, but you weren't

19   going to be getting the lease, correct?

20        A    That's correct.

21        Q    Now, tell me what you contend he said

Page 257

1    in that conversation.

2         A    He basically called and said that he

3    was informing me that I didn't get the lease, that

4    John Pagones was out on a Jewish holiday, and

5    that's why he was calling.  He had heard from Mary

6    White that they secured another lease.  Another

7    lease was signed.

8              I then said that I found that hard to

9    believe, that I was the only person even interested

10   in the space, the only person looking at this

11   space.  According to Barry Anderson, I had been the

12   only person to even tour the space at that point.

13             And so I found it hard to believe that

14   all of a sudden somebody -- he says, "Well, you

15   know how these things go.  People just come up out

16   of the blue."

17             I said, "No, I don't know how these

18   things go where something just comes up out of the

19   blue after I have been working on this for over a

20   week and I am just now getting a final version of a

21   lease, but yet someone can just come out of the

Page 258

1  blue in one day and do everything and have it

2  accepted and signed off."

3          He then stated to me, "Well, it's a

4  done deal.  It's over.  It's a signed lease, and

5  you didn't get the property."

6          And that's when I informed him, "No.  I

7  know exactly what's going on.  I have tried to work

8  with this ever since the beginning, to ignore it

9  and move on.  I have been blatantly discriminated

10  against, and I will be filing an official

11  discrimination case."

12      Q   Do you have an understanding as to what

13  Barrett Anderson testified to in his deposition

14  with regard to other persons' interest in the

15  property?

16      A   I didn't attend Barrett's Anderson's

17  deposition.

18      Q   That wasn't my question.  My question

19  is, do you have an understanding as to what he

20  testified to?

21      A   I didn't read his deposition, as I

1          BY MR. RANCK:

2          Q    If you can, look at Exhibit 26 please.

3    This is a plumbing invoice and statement that you

4    received; is it not?

5          A    Yes.

6          Q    All right.  Do you contend that you

7    shouldn't have been responsible for repairing this

8    plumbing problem?

9          A    Absolutely.  The problem existed before

10   I ever took possession of the property.

11         Q    Do you know the first time you made a

12   complaint about the plumbing problem?

13         A    I don't remember the exact date, but it

14   was probably within 30 days of being in the office.

15   The carpet was -- everybody noticed that the carpet

16   was soaking wet, and there was no hot water.

17         Q    Okay.  Did you pay this invoice?

18         A    No, I did not pay this.

19         Q    Did Bratton Realty pay this invoice?

20         A    Shouldn't have.  I didn't give anybody

21   permission to pay it.

1          MR. SHAIBANI:  Well, if you would like,

2      I can identify them now.

3          MR. RANCK:  I guess, if you can have

4      your client leave the room.

5          MR. SHAIBANI:  Do you mind stepping out

6      for a minute?

7          THE WITNESS:  Sure.

8          (Whereupon, the witness left the

9      deposition room.)

10         MR. SHAIBANI:  It's nothing above what

11     was identified in the Rule 26 report anyhow.

12         MR. RANCK:  Bob, we'll knock off in

13     just a minute.  I'll just follow up on what you

14     do.

15         MR. SHAIBANI:  We're seeking the

16     emotional distress damages.  And the economic

17     damages are limited to lost rental income from

18     the 1223 property which he had to keep because

19     he has to move out of the 1622 Wisconsin Avenue

20     property.

21         MR. RANCK:  I'm sorry.  The lost rental

Page 345

1    income.  He could have rented it to someone

2    else.

3            MR. SHAIBANI:  Yes.  He wouldn't have

4    had to keep that -- two offices, basically, for

5    his real estate if he could extend his lease.

6    Where he is now he would only need to keep two

7    offices.

8            When he moves, he's going to have lost

9    business from the relocation because people

10   know where his office is located.

11           Basically, the visibility he lost and

12   relocation losses, then obviously the attorney

13   fees and cost of suit.

14           MR. RANCK:  Can you identify what that

15   is to date?  Do you know roughly?

16           MR. SHAIBANI:  It's close to 196,000, I

17   think, but I have to double-check that.

18           MR. BOUSE:  I've got to get higher

19   rates.

20           MR. SHAIBANI:  And then we're seeking

21   punitive damages as well.

Page 349

1    State of Maryland

2    City of Baltimore

3             I, Monique Kastner, a Notary Public of

4    the State of Florida, County of Duval, do hereby

5    certify that the within-named witness personally

6    appeared before me at the time and place herein set

7    out, and after having been first duly sworn by me,

8    according to law, was examined by counsel.

9             I further certify that the examination

10   was recorded stenographically by me, and that this

11   transcript is a true record of the proceedings.

12            I further certify that I am not of

13   counsel to any of the parties, nor an employee of

14   counsel, nor related to any of the parties, nor in

15   any way interested in the outcome of the action.

16            As witness my hand and seal this 31st

17   day of January, 2007.

18

19
                     Monique Kastner
20                   My Comission Expires 05-25-10

21