**Page 1**

```
 1      UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF COLUMBIA
 3
 4   -------------x
 5   JOHN BRATTON,           :
 6        Plaintiff,         :
 7   vs.              :Case No.: 1:06CV00694
 8   CHATEL REAL ESTATE, INC., :
 9   et al.,                :
10        Defendants.        :
11   -------------x
12
13
14        Continued Deposition of JOHN BRATTON
15             Washington, D.C.
16           Wednesday, January 24, 2007
17               11:34 a.m.
18
19
20   Job No.: 1 - 95673
21   Pages: 1 - 170
22   Reported by: Lisa Kirk
```

**Page 2**

```
 1        Deposition of JOHN BRATTON, held at the
 2   offices of:
 3        LITIGATION ASSOCIATE, PLLC
 4        Connecticut Building, Ninth Floor
 5        1150 Connecticut Avenue, NW
 6        Washington, D.C. 20036
 7        (202) 862-4335
 8
 ...
17        Pursuant to agreement, before Lisa Kirk,
18   Court Reporter and Notary Public in and for the
19   District of Columbia.
```

**Page 3**

```
 1           APPEARANCES
 2   ON BEHALF OF THE PLAINTIFF:
 3        STEFAN SHAIBANI, ESQ.
 4        Litigation Associate, PLLC
 5        Connecticut Building, Ninth Floor
 6        1150 Connecticut Avenue, NW
 7        Washington, D.C. 20036
 8        (202) 862-4335
 9
10        ALSO PRESENT: SHABNAM KEYVAN,
11        Only admitted in the State of Maryland and
12        practicing under the supervision of Stefan
13        Shaibani, licensed D.C. attorney.
14
15   ON BEHALF OF THE DEFENDANTS,
16   CHATEL REAL ESTATE and THIERRY LIVERMAN
17        MATTHEW A. RANCK, ESQ.
18        Eccleston and Wolf, P.C.
19        Suite 310
20        2001 S Street, N.W.
21        Washington, D.C. 20009-1125
22        (202) 857-1696
```

**Page 4**

```
 1      APPEARANCES CONTINUED
 2   ON BEHALF OF THE DEFENDANT, MARY WHITE
 3        ROBERT H. BOUSE, JR., ESQ.
 4        Anderson, Coe & King, LLP
 5        201 North Charles Street
 6        Suite 2000
 7        Baltimore, Maryland 21201
 8        (410) 752-1630
```

PLAINTIFF'S EXHIBIT 9

Case 1:06-cv-00694-JDB   Document 32-13   Filed 02/23/2007   Page 2 of 10
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

4 (Pages 13 to 16)

13

1  business." Was that an accurate description of what
2  you two talked about at that time?
3        A  That was probably part of it, but
4  Southeast has never been -- I never had an office in
5  Southeast and I was never looking for an office in
6  Southeast, but he could have just been confused by
7  that. My office was in Logan, Northeast.
8        Q  Do you have any indication that he didn't
9  pass on that description of you to Mrs. White?
10          MR. SHAIBANI: Objection for
11 clarification. What description?
12          BY MR. BOUSE:
13       Q  Description about him being -- enjoy
14 talking to him, being an entrepreneurial, looking to
15 open up a Georgetown office?
16          MR. SHAIBANI: Objection. Calls for
17 speculation and a general objection as well.
18          MR. BOUSE: Sure.
19          THE WITNESS: I stated previously that I
20 had a very good meeting with Barrett Anderson.
21 Barrett Anderson and I had a great tour of the
22 property. I had no issues. That's why I actually

14

1  end up bringing the lease and the application and my
2  two checks back to Barrett Anderson because I felt
3  comfortable that he would at least inform Mary White
4  that I had submitted an official lease and security
5  deposit and first month's rent.
6        BY MR. BOUSE:
7        Q  Now, after you left Mr. Anderson, in fact,
8  you were told to go down to Chatel Realty, is that
9  correct?
10       A  That is correct.
11       Q  And you did that?
12       A  Yes, I did.
13       Q  And you had your first meeting with Mr.
14 Pagones?
15       A  Correct.
16       Q  Do you have any facts to establish that
17 Mary White knew how you were treated by John Pagones,
18 according to your testimony, at Chatel Realty?
19          MR. SHAIBANI: Objection. Calls for
20 speculation, foundation, hearsay.
21          THE WITNESS: Yes, I do. Attached to my
22 letter, when I dropped off the checks and my lease

15

1  and application and my business card with my picture
2  on it, I also attached a letter directly to Mrs.
3  White, who I called as well by cell phone, to give
4  her a heads up that something was not going as it
5  should and there was improper activities going on
6  with her property and that this letter was to give
7  her a heads up to step in and set things straight and
8  that's why I put that cover letter, which I'm sure
9  you have a copy of it.
10          BY MR. BOUSE:
11       Q  I'm talking about, and I'll get to that in
12 a moment, I'm talking about the first time you walked
13 in and you described Mr. Pagones' reaction, as you
14 did in your testimony, to your appearance, do you
15 have any evidence that Mary White knew about that or,
16 in fact, told Mr. Pagones to act in that manner to
17 any Afro-American applicant?
18          MR. SHAIBANI: Objection. Calls for
19 speculation, foundation, hearsay.
20          You can answer.
21          THE WITNESS: I don't have any evidence of
22 what Mary White may have told John Pagones, but I do

16

1  know, and we have evidence on the earth, that John
2  Pagones told Mary White that I was an angry black man
3  and that I was going to be a problem and that's how I
4  was introduced to her, so she was very much aware of
5  my race, ethnicity right from the very start of this
6  process.
7        BY MR. BOUSE:
8        Q  Okay. The letter you wrote to Mary White
9  is a letter that was attached to the lease that you
10 delivered to Mr. Anderson the following day, October
11 7, 2005?
12       A  That is correct.
13       Q  Okay. Let me ask if you can identify
14 that.
15          MR. BOUSE: Let me give copies to
16 everybody. I take it that was not marked at the last
17 deposition? Can you mark this as --
18          MR. RANCK: The proposed lease was, but
19 not the letter.
20          MR. BOUSE: But not the letter, okay.
21          MR. RANCK: Why don't we mark it, Bob, if
22 it's okay with you, 28.

Case 1:06-cv-00694-JDB  Document 92-3  Filed 02/23/2007  Page 3 of 10
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

5 (Pages 17 to 20)

**17**

1  MR. BOUSE: Let's do that. I was going to
2  ask you what the next number was.
3  MR. RANCK: 28 is the next number.
4  (Bratton Deposition Exhibit No. 28 was
5  marked for identification and retained by Counsel.)
6  BY MR. BOUSE:
7  Q Well, it starts off by indicating that you
8  thought Mrs. White's assistant was a wonderful
9  individual, is that correct?
10  A That's correct.
11  Q Okay. Where do you indicate you had a
12  complaint against Mr. Pagones or that her property
13  was not being listed appropriately?
14  MR. SHAIBANI: Objection.
15  BY MR. BOUSE:
16  Q In this letter of November 7, 2005?
17  A Do you want me to read the letter?
18  Q Just tell me where you say that is
19  indicated to Miss White in this letter?
20  A Well, basically "I visited Mr. Pagones'
21  office with the intent to secure and sign a lease and
22  complete any desired application paperwork necessary.

**18**

1  Unfortunately," which is where I give her the
2  indication, "unfortunately after my visit I still do
3  not have the information I need to present you with a
4  lease or supporting documents."
5  Q You don't set forth what happened between
6  you and Mr. Pagones in this letter, do you?
7  A I didn't spell it out.
8  Q Okay.
9  A I didn't spell it out for a particular
10  reason, that I wasn't out looking for a fight. I
11  wasn't out looking to cause disruption between her
12  and the agent she hired. I was out to secure a lease
13  on the property. That was my number one goal, so
14  this betrayal of me of being this angry black man is
15  obviously not evident in anything that you've read
16  from documentation that's from me. This is my first
17  introduction to Mary White and is a very mild and
18  informative note and a very positive note, although
19  trying to get across the message that something is
20  not going as it should with this process.
21  Q Did you call Mary White on the 7th of
22  October, 2005?

**19**

1  A If that's Friday, yes.
2  Q Did you actually speak with her or did you
3  leave a message?
4  A I called twice and I spoke with -- I think
5  she answered the phone later towards the afternoon.
6  I don't know exactly what time it was. I tried to
7  explain to her a little bit about what was going on.
8  She didn't want to hear it. She said she didn't have
9  time to talk with me and that she would not be
10  speaking with me about this and that was it. That
11  was the end of the call. She terminated the call.
12  Q I'm sorry, are you finished? I don't want
13  to interrupt you.
14  A Yes.
15  Q You testified previously that you only
16  spoke to Mary White on one occasion?
17  A That was the one occasion.
18  Q Okay, look at your brain map. Do you have
19  a copy of your brain map in front of you?
20  A No, I don't.
21  MR. BOUSE: Do you have a copy of his
22  brain map?

**20**

1  MR. SHAIBANI: Unfortunately, no.
2  BY MR. BOUSE:
3  Q Let's share a copy of your brain map,
4  okay?
5  A Okay.
6  Q This is October the 7th. It says Mary and
7  then October the 10th, "spoke with Mary, spoke about
8  space. She stated Chatel in charge, bye". Does that
9  refresh your recollection as to when you may have
10  spoken with Mary White?
11  MR. SHAIBANI: Objection. The so-called
12  mind map was drafted by Mr. Bratton in preparation
13  for the deposition. It doesn't reflect the precise
14  dates of events.
15  MR. BOUSE: I'm just trying to refresh his
16  recollection, Mr. Shaibani. It's his map.
17  THE WITNESS: The only thing that's
18  different here is the date, the date of Monday.
19  Monday is the date that I actually talked to her, got
20  her on the phone. Friday is the date that I
21  attempted to call her. I attempted to call her on
22  Friday. I got no return. As a matter of fact I

**Page 21**

1  called Barrett Anderson. Barrett Anderson is the one
2  I spoke to on Friday. He informed me that Mary White
3  is getting all your messages. He doesn't understand
4  why she's not calling me back, but she's getting the
5  messages and so I gave it the weekend and so Monday
6  is actually when I got through and actually got her
7  on the phone and the only reason why I got her on the
8  phone, because I think I called from a different
9  phone so she wouldn't recognize the number.
10         BY MR. BOUSE:
11     Q  Well, you don't know that to be one way or
12  the other do you Mr. Bratton?
13     A  I'm quite certain that Mary White knew
14  that I was trying to reach her and it was confirmed
15  by Barrett Anderson that she was getting my messages,
16  so why it took five days for me to finally speak with
17  her when -- and Miss Medlin's case, as soon as Miss
18  Medlin called, the same day she was given a tour,
19  Miss White dropped everything she was doing to come
20  down --
21     Q  Mr. Bratton, do you know what she was
22  doing, what her schedule was, do you know where she

**Page 22**

1  was?
2     A  I think the process is that I'm still
3  speaking.
4         MR. SHAIBANI: Yes, I will object.
5         BY MR. BOUSE:
6     Q  Well, you're not responsive to my
7  question. If you want to give your closing argument,
8  we'll wait.
9     A  If you're asking me about my phone calls,
10  then I'm giving you information about my phone calls.
11  My phone calls is such that I've left messages for
12  Mary White with Barrett Anderson as well as directly
13  on her cell phone and she never returned any of my
14  phone calls and it was Monday not Friday, I was
15  mistaken of the day, Monday that I actually got her
16  on the phone, and it's sad that I had to track her
17  down to get her on the phone when with the other
18  person in this equation, a white female, instantly
19  got her on the phone, she instantly dropped what she
20  was doing, instantly gave her a tour the very same
21  day of the property and negotiated, started
22  negotiating a lease.

**Page 23**

1     Q  You finished?
2     A  Now I'm finished.
3     Q  Do you know what Mary White's schedule was
4  on October the 7th? Do you know if she was in town?
5  Do you know where she was?
6         MR. SHAIBANI: Objection, compound, calls
7  for speculation, foundation.
8         THE WITNESS: According to Barrett
9  Anderson she was in town. She was around. She was
10  available and she was in and out of the office area.
11         BY MR. BOUSE:
12     Q  Did Mr. Anderson tell you that?
13     A  Yes, he did.
14     Q  Okay. Did he also tell you that she got
15  the packet you dropped off on October the 7th?
16     A  He didn't tell me what day she got -- he
17  told me he gave the package to John Pagones, not Mary
18  White.
19     Q  So you don't know when Mary White got your
20  lease package, the letter dated October 7?
21         MR. SHAIBANI: Objection.
22         BY MR. BOUSE:

**Page 24**

1     Q  Correct?
2     A  According to the testimony of John Pagones
3  he delivered the package with, again, the additional
4  information I was an angry black man.
5     Q  Do you know whether or not Mary White was
6  home when he delivered the package?
7         MR. SHAIBANI: Objection.
8         THE WITNESS: I have no idea.
9         BY MR. BOUSE:
10     Q  You have no idea, okay. And it's not
11  usual for Mary White to say -- to have her property
12  listed with an agent, that Chatel Realty is handling
13  the lease when she spoke with you on the 10th?
14  There's nothing usual about that, is there?
15         MR. SHAIBANI: Objection.
16         THE WITNESS: There's a lot unusual about
17  if you have your property listed by a licensed agent
18  and they're supposed to be handling your property for
19  you and then all of the sudden when a candidate comes
20  in, all of the sudden you kick that agent completely
21  to the side and you jump in and you deal with
22  everything yourself, yes, that's highly unusual.

29

1 application and lease.
2    Q Why was that?
3    A Because I repeatedly asked for a
4 application and lease the very first day of this
5 process and I was denied those documents and so
6 therefore I created my own documents and wrote the
7 information in to the best of my ability with the
8 help of Jeff Augello and that was not acceptable to
9 them, so miraculously come Tuesday, the next day,
10 they -- Chatel had a lease and had an application
11 which they then faxed to me. This is something they
12 previously for five days could not seem to find to
13 get to me, after five days of business.
14    MR. RANCK: Off the record.
15    (Off the record.)
16    BY MR. BOUSE:
17    Q Did you have any conversation with Mr.
18 Pagones on the 10th?
19    A Yes, I did.
20    Q And what was that conversation?
21    A Basically I think the conversation was
22 that I was waiting for a signed lease and the only

30

1 thing Mr. Pagones could tell me at that point was
2 that he was waiting to hear back from Mary White.
3    Q Did Mr. Pagones ever have a conversation
4 to you -- with you to say in effect, John, if you
5 want to get this property, you're going to have to
6 sweetened the deal, do everything you can to sweeten
7 the deal?
8    MR. SHAIBANI: Objection.
9    THE WITNESS: Absolutely not.
10    BY MR. BOUSE:
11    Q And did he ever tell you to do everything
12 including taking the downstairs or the basement level
13 of 1622?
14    MR. SHAIBANI: Objection.
15    THE WITNESS: Absolutely not.
16    BY MR. BOUSE:
17    Q He never said that to you?
18    A No.
19    Q Let me show you --
20    MR. BOUSE: I'll have this marked as the
21 next. Is that 29?
22    MR. RANCK: Actually, is that the

31

1 application?
2    MR. BOUSE: That's the application. Has
3 that already been marked?
4    MR. RANCK: That's already marked.
5    MR. BOUSE: Thank you. I thought so. I
6 couldn't find it.
7    MR. RANCK: Number 8.
8    MR. BOUSE: Okay. So that's No. 8.
9    MR. RANCK: I have it. Do you want -- I
10 brought the originals from --
11    MR. BOUSE: No, that's all right. I got
12 it. This will be fine.
13    Do you have a copy of it Mr. Shaibani?
14    MR. SHAIBANI: It should be in here, yes.
15    MR. RANCK: Oh, I'm sorry, it's not No. 8.
16 It's No. 7 is the application.
17    BY MR. BOUSE:
18    Q Let me put that if front of you while he's
19 finding it. You have it in front of you?
20    A Yes.
21    Q You submitted this application on October
22 the 10th?

32

1    A Yes, I did.
2    Q And who did you give this to?
3    A I faxed it to John Pagones.
4    Q And did you also fax another copy of a
5 lease, a revisioned lease you had prepared
6 previously?
7    A Yes, I did. I'm sure I faxed it.
8    Q Okay.
9    A I have a total of seven different versions
10 of the lease, which is insane.
11    Q Now, did you do this because of something
12 Pagones said to you or you did this because you had
13 not heard back from Mary White?
14    A I did this because I toured the copy. I
15 did a layout of the property. I mapped out where I
16 would have my desks and the agents' desks and all my
17 other furniture and I also planned that if I had
18 guest people come in, like lenders, that I would have
19 space for them if I took the lower level space.
20    Plus, I was very excited about having
21 outside space and so the rear courtyard, if I took
22 the lower level space, I would have access to the

Case 1:06-cv-00694-JDB   Document 33-3   Filed 02/23/2007   Page 6 of 10
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

10 (Pages 37 to 40)

Page 37

he gave me this information, you know after the fact, when this is something -- you're asking me this like you scored some big find here, when this is all information that when I walk into someone's office and they're -- this may be funny to you, but, sir --
Q It's getting there.
A This is not funny at all to me.
Q Well, it's getting there. You don't know what I'm thinking.
MR. RANCK: Just for the record --
THE WITNESS: This process is a very simple and basic process, okay. If you're a listing agent, you have information on your property. I don't expect for him to know the exact square footage of the property and the average, you know, electric bill and stuff like that, but basic questions as to what a seller or what an owner wants in a lease, he should have had and he should have given that to me the very first day, so for me to be given this information piecemeal -- what you see is me being nice and cordial and friendly by saying, oh, thank you for giving me information that, hint, I should

Page 38

have had right from the very moment I sat in your office, but thank you for giving that information to me. I'm being cordial. I'm being nice, because once again, my goal is to lease the space. I'm not here for a fight. I'm here to lease the space.
BY MR. BOUSE:
Q Mr. Bratton, isn't it just at logical that Mr. Pagones's testimony was that when he spoke with you he said there was someone else interested in the property. He said if you want this property, you're going to have to sweeten the deal. He told you that you should make a two year lease and also that you should also add the lower level. Isn't it just as logical that he said that?
MR. SHAIBANI: Objection, if I may raise the objection. Foundation, calls for speculation, argumentative, assumes facts not in evidence.
THE WITNESS: No, it's not just as logical. What's logical is that this could have been done in a matter of an hour. If you look in my final version of my lease, there's all of about four write-ins in the final version of the lease, which it

Page 39

would have taken all of eight minutes to have done that. Why this process has taken 26 days instead, that defies logic. It defies logic because it was all based on discriminatory behavior and then it played out for the next 26 days. There's nothing logical about this whole process.
The conversation that I had with John Pagones, of course once again after he introduced me to your client as the angry black man, is not the friendly, I'm going to do everything to help John Bratton get this space, no, that's not the type of conversation John Pagones and I had, no.
BY MR. BOUSE:
Q Okay. Did I understand your testimony that you showed up with someone from your office to make your drawings on October the 10th of where you're going to place your furniture and how you're going to set up your office?
MR. SHAIBANI: Objection.
THE WITNESS: Yes, I did.
MR. BOUSE: I think this -- has this been marked. Again, I should know better, but I didn't

Page 40

check it out, the memo, the E-mail.
MR. RANCK: I believe so. Let me just check. What's the date of it?
MR. BOUSE: October 11.
MR. RANCK: No, I don't believe so.
BY MR. BOUSE:
Q Let me show that to you.
MR. BOUSE: I'm going to have this marked as 29.
(Bratton Deposition Exhibit No. 29 was marked for identification and retained by Counsel.)
MR. SHAIBANI: If I may make an objection on the record that this E-mail -- the response to this E-mail has not been produced in discovery and we have requested for it to be produced. You can proceed.
MR. BOUSE: Well, you're assuming there was a response to the E-mail. Do you know whether or not there was a response to the E-mail?
MR. SHAIBANI: (Nonresponsive).
MR. BOUSE: Okay.
BY MR. BOUSE:

**Page 53**

1  the point of the agent representing Mrs. White what
2  is the length of the lease that Mrs. White is looking
3  for and when that question, that basic question,
4  could not be answered by John Pagones, who has been a
5  licensed agent for over 30 years, working for Chatel
6  over 30 years, when that basic question could not be
7  answered I put in a year and I also stated that I am
8  flexible to change that because if Mrs. White is
9  looking for something higher, I would change it and
10 sure enough come Monday or Tuesday John Pagones said
11 oh, by the way, Mrs. White wants two years. What did
12 I do, I immediately initialed and signed the lease
13 that said two years.
14      Q So you were negotiating and your second
15 had it was for two years, right? Right?
16      MR. SHAIBANI: Objection.
17      THE WITNESS: I will correct you and say
18 negotiating, no. I am trying to find out what is the
19 terms of the lease that Mary White, the owner of the
20 property, is looking for. If I was given the proper
21 information to my questions by the licensed listing
22 agent, who is also associated broker for Chatel, then

**Page 54**

1  I would have had those questions right from the
2  beginning -- answers and I would have put it in the
3  initial lease, the very first draft. You fail to
4  understand that there was only a need for one draft
5  of this lease, one.
6       BY MR. BOUSE:
7       Q According to you.
8       A No, one.
9       Q According to you.
10      A According to anyone who is being treated
11 like a fair person walking into this business. Only
12 one lease needed to be executed. You tell me what
13 your client is --
14      Q Are you suggesting Mary White didn't have
15 a right to reject your lease?
16      A I am finishing my statement. You tell me
17 what your client wants in a lease, and I will give it
18 to you. I will put it in the lease. Does she want
19 two years, does she want three years. I would have
20 done the very first lease accordingly.
21      Q Are you suggesting that Mary White didn't
22 have a right to refuse your first release (sic) as

**Page 55**

1  you drafted it?
2       MR. SHAIBANI: Objection.
3       BY MR. BOUSE:
4       Q Do you understand the question?
5       A Yes, I understand the question and I will
6  repeat that Mrs. White does not have the right to
7  discriminate against me. When Mrs. White is told
8  upon receiving my first draft, as you referred to --
9  and she's handed my first draft with the comment of
10 this is John Bratton, he's a real estate broker, he's
11 an angry black man and if you don't choose him,
12 you're going to have trouble, you're going to have a
13 lawsuit because he's an angry black man. That's the
14 way I'm introduced to your client and your client
15 then takes that and does she say I cannot believe you
16 just said that or I cannot believe that you are
17 stigmatizing this person, because that is a violation
18 of law, that's what she should have told John
19 Pagones. No, instead she took the information, took
20 my application and she continued the discrimination.
21 She continued the pattern of behavior of
22 discriminating against John Bratton.

**Page 56**

1       Q Mr. Bratton, doesn't that indicate just
2  the opposite? She was told by Pagones -- if your
3  testimony is correct, she was told by Pagones you
4  were an angry black man and if she didn't lease to
5  you, she was going to be in trouble and she still
6  made a business decision, after reviewing both your
7  credit and Miss Medlin, and leased it to you after
8  Miss Medlin backed out. Doesn't that show just the
9  opposite of what you said?
10      MR. SHAIBANI: Objection. Calls for
11 speculation, assumes facts not in evidence,
12 foundation, argumentative.
13      THE WITNESS: Absolutely not, because she
14 does not engage in actively leasing the space to me
15 until after she found out that I officially filed a
16 lawsuit with the D.C. Office of Human Rights. That's
17 when all of the sudden she hired Mr. John Gordan
18 Forrester to come in and save the day and he starts
19 of his conversation by telling me well, I have fired
20 Chatel. Chatel is no longer in the picture. They
21 have been terminated. I am in charge of this now and
22 I'm going to -- I've been given permission to

**Page 65**

1   A -- either way you're pointing fingers at
2   --
3   Q -- do you want me to repeat the question?
4   A I don't have any evidence of what
5   conversations that Thierry Liverman may have had with
6   Miss White. How would I have evidence of a
7   conversation that Thierry Liverman had directly with
8   Mary White?
9   Q Do you know whether or not Mary White was
10  in the same room with Thierry Liverman when he had
11  that conversation with you?
12       MR. SHAIBANI: Objection.
13       THE WITNESS: I have no idea.
14       BY MR. BOUSE:
15  Q When was the first time you were contacted
16  by Mr. Forrester?
17  A October the 18th.
18  Q And what did he tell you when he first
19  contacted you?
20  A He told me that Chatel Real Estate was
21  terminated and that he was stepping in and he was
22  going to take care of the process from here on out

**Page 66**

1   and I began to give him an update as to what has
2   happened thus far. He cut me off from giving him an
3   update by saying none of that matters now. I'm here
4   and I'm going to set this straight and I said it's
5   not that simple. You need to understand what has --
6   the injustice and the discriminatory behavior which I
7   was treated and then he began to call me a test case.
8   Q Did he not simply ask you whether or not
9   you were trying to make this a test case?
10       MR. SHAIBANI: Objection.
11       THE WITNESS: No, he called me a test case
12  and what justification do he have for even suggesting
13  that I'm a test case? What, just because I'm an
14  African-American male with dreads, that means I can't
15  possibly be interested in leasing a space in
16  Georgetown. I can't possibly really want this space.
17  I'm just doing all this so I have a justification to
18  sue.
19       BY MR. BOUSE:
20  Q Do you know he's a member of the bar?
21  A Doesn't matter what he's a member of.
22  That doesn't change his behavior, doesn't change the

**Page 67**

1   fact that --
2   Q Was his behavior discriminatory towards
3   you?
4   A To call a person a test case just because
5   they are African-American, who is trying to lease
6   this space and your assumption is that the only
7   reason why I would want this space is to induce a
8   lawsuit or even worse I can't really be a real person
9   looking to lease, I'm just somebody who was sent out
10  by somebody to pose as somebody looking to lease. To
11  me that is just -- that is textbook definition of
12  discriminatory behavior, because you don't see me.
13  All you see it the color of my skin or my hair style
14  with dreads at the time. You didn't see an
15  individual with, you know, $250-some thousand in his
16  checking account at the time with a net worth of
17  roughly $2 million with properties all over the city.
18  You didn't see that person with a successful business
19  that he's been running for the past four years. All
20  you saw was a black male with dreads. That is
21  discriminatory behavior.
22  Q If Mr. Forrester said to you, what are you

**Page 68**

1   tying to do, make this a test case, would that be
2   discriminatory?
3       MR. SHAIBANI: Objection, calls for
4   speculation, assumes facts not in evidence,
5   foundation.
6       THE WITNESS: You're asking me a
7   hypothetical question?
8       BY MR. BOUSE:
9   Q I absolutely am. Would that be
10  discrimination if he said to you are you trying to
11  make this a test case?
12       MR. SHAIBANI: Same objections.
13       THE WITNESS: I don't know how to answer
14  that question because you're hypothetically saying,
15  you know, if he asked me something that he didn't ask
16  me. That's not what he asked me. He told me -- he
17  accused me of being a test case, so why not deal with
18  what was said versus the hypothetical, the what if?
19       BY MR. BOUSE:
20  Q Well, understand we only have what you
21  said. Mr. Forrester, who is a member of the bar, is
22  going to testify that he said are you trying to make

Page 69

1  this a test case, which is different than your
2  recollection. My question is based upon those two
3  different recollections, can you tell me if, in fact,
4  Mr. Forrester said to you are you trying to make this
5  a test case in a question form, is that
6  discriminatory in your mind?
7       MR. SHAIBANI: Objection, calls for
8  speculation, assumes facts not in evidence,
9  foundation, argumentative.
10      THE WITNESS: First of all, Mr. Forrester
11 being a lawyer and a member of the bar, he knows how
12 to change his words to make it sound much better in a
13 trial like this, so given that now his words may be
14 are you trying to make this a test case versus you're
15 just a test case, that's a slight difference of
16 wording, but the meaning is dramatic and what he said
17 to me is you're just a test case.
18      BY MR. BOUSE:
19      Q My question, again, was if he said and
20 asked in a question form, are you trying to make this
21 a test case, would that be discriminatory?
22      MR. SHAIBANI: Same objection, asked and

Page 70

1  answered --
2       MR. BOUSE: He hasn't answered it, Mr.
3  Shaibani.
4       MR. SHAIBANI: I'm instructing you not to
5  answer his question because it's being repeatedly
6  asked and answered.
7       BY MR. BOUSE:
8       Q Yes or no, let's start with yes or no?
9       A Yes, I still would consider that
10 discriminatory because if I was a white male sitting
11 there, you would not ask that question. If I was a
12 white female sitting there, you would not have asked
13 that question, so, yes, that's discriminatory.
14 There's no way that question would have came up, am I
15 just a test case, if I was a white male. Now, if I
16 was a person in the wheelchair like the other case
17 that John Pagones discriminated against, then, yes,
18 they may very well have asked that same question, are
19 you a test case, or if I was a Latino male sitting
20 there, then maybe asking that same question -- that
21 question may have came up, but that question would
22 not have come up if I was a white male looking to

Page 71

1  lease that space, the question of are you trying to
2  make this a test case would have never came up.
3       MR. RANCK: Can just the record reflect my
4  motion to strike his comments with regard to the
5  prior discrimination alleged against Mr. Pagones.
6       BY MR. BOUSE:
7       Q Did you file a complaint against Mr.
8  Forrester?
9       MR. SHAIBANI: Objection.
10      THE WITNESS: No, I did not file a
11 complaint against Mr. Forrester.
12      BY MR. BOUSE:
13      Q Now, did he tell you what happened to
14 Roberta Medlin in his initial conversation with you,
15 as to what happened with her interest in the property
16 of 1622?
17      A No, he didn't want to address Miss
18 Medline. His whole attitude was I'm the savior of
19 the day. I'm here to save the day and it doesn't
20 matter what happened before I came into the picture.
21 That was the arrogance of his initial introduction to
22 me.

Page 72

1       Q Did you ask him what happened to the lease
2  with Roberta Medlin?
3       A Yes, I did.
4       Q And what did he say?
5       A That's when he refused to get into what
6  happened prior to him getting into the picture.
7       Q Did he indicate to you that Mrs. White
8  wanted now to lease the property to you now that Miss
9  Medlin was not in the picture?
10      MR. SHAIBANI: Objection to the form.
11      THE WITNESS: No. What he said was that
12 Miss White has asked him to talk to me about
13 negotiating and possibly leasing the space to me. It
14 wasn't an absolute that I'm here to lease the space
15 to you. I'm here to work out -- I'm here to start,
16 to negotiate, which means I'm right back at the very
17 beginning again. A new person is coming in and I'm
18 going to start all over again and renegotiate a lease
19 with a new person, something that should have, once
20 again, been done October 6.
21      MR. SHAIBANI: If I may raise an objection
22 on the record that Mr. Bratton was deposed for over

**73**

1  six hours on the previous date and this deposition
2  was to commence at 10 a.m. today. We were waiting
3  here since 10 a.m. and it's now quarter to one. The
4  seven hour deposition limit has already been reached.
5  I'd like to ask how long more you have?
6      MR. BOUSE: It depends when your client
7  stops lecturing me every time I ask a question that
8  calls for a yes or no answer.
9      MR. RANCK: Let me join that comment by
10 noting that number one, I don't believe that the
11 deposition time was six hours on Friday. If you, as
12 you pointed out during one of the other -- Mr.
13 Liverman's depositions, you don't believe you take --
14 Mr. Shaibani, that you consider lunch and breaks and
15 whatnot and number two, the deposition has been
16 lengthened extraordinarily by your client's need to
17 ramble on and on and on and on, often without
18 answering the question asked and both defense counsel
19 have been very patient in allowing him to explain
20 whatever he wants, but we're forced to have to go
21 back and reask the question numerous times because we
22 never get the answer. We went through that just a

**74**

1  minute ago in response to one of Mr. Bouse's
2  questions, so I don't believe we're near the seven
3  hour limit.
4      THE WITNESS: Yes, we are.
5      MR. SHAIBANI: To respond to that I
6  believe the record will show when the breaks were
7  taken and we started the deposition on the previous
8  day at approximately 10:15 a.m. and it ended at
9  quarter past five. We had an hour of breaks. There
10 was definitely six hours of deposition time according
11 to my calculation and the reason for the delay of
12 today is attributed to defense counsel because they
13 couldn't make arrangements for the court reporter to
14 arrive on time and counsel was also late due to
15 traffic. We accommodated you based on a request that
16 you needed to pick up your family members from the
17 airport, but we're here today and we're not going to
18 have this deposition proceed for three hours. I
19 mean, if you have another half hour, I'll agree to
20 that, but after that we're going to call the judge.
21     MR. RANCK: I think all either of us is
22 asking for on our side is what Judge Bates (proper

**75**

1  noun subject to correction) always requires, and
2  that's everyone be reasonable. There was a problem
3  with the court reporter situation obviously, but
4  we're all humane and things like that happen.
5  Certainly there have been things of that nature on
6  both sides of the table in this case, so all we're
7  asking is that everyone is reasonable.
8      MR. BOUSE: And Mr. Shaibani, let me
9  assure you and your client I would have been finished
10 by now, but for the elongated answers that he feels
11 necessary to give.
12     THE WITNESS: Proper answers is a better
13 word for it.
14     MR. BOUSE: Well, whether they're proper
15 or not is for someone else to decide, Mr. Bratton.
16     So I have questions about negotiations
17 with -- I can tell you where I'm going so you are not
18 surprised and maybe he can focus in and answer my
19 questions about negotiations with Mr. Forrester and a
20 few other follow-up questions that you asked in other
21 depositions about Mrs. White and that's it.
22     MR. SHAIBANI: Let's try to streamline

**76**

1  this so we can all get out of here.
2      BY MR. BOUSE:
3      Q  I was asking you about what else did you
4  and Mr. Forrester talk about on the 18th that you can
5  recall?
6      A  Other than he's coming in to save the day
7  and I'm a test case and that the terms, the
8  additional terms of the lease, is now that I must pay
9  $200 a month in taxes as well as Mary White
10 absolutely will not give me first right of refusal,
11 no way, no how and that I have no right to extend my
12 lease beyond two years and no right to go a month to
13 month after that. These are basic rights, basic
14 rights that everyone has in a lease period, which I'm
15 denied.
16     Q  So he told you that right up front in his
17 first conversation with you, October the 18th?
18     A  He told me most of that and maybe the next
19 day one of those things may have been told to me the
20 next day, but for the most part...
21     Q  Did you terminate negotiations with him at
22 that time or did you continue on with trying to get