**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

JOHN BRATTON,                                )
                                             )
          Plaintiff,                         )
                                             )
          vs.                                )     Civil Action No. 06-694 (JDB)
                                             )
CHATEL REAL ESTATE, INC., *et al.*,          )
                                             )
          Defendants.                        )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT MARY WHITE'S FIRST
MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS**

Plaintiff, John Bratton, respectfully requests the Court to deny the First Motion for

Summary Judgment or, in the Alternative, to Dismiss filed by Mary White.  Defendant White's

motion for summary judgment rests upon three factual premises all of which are untrue:

(1) Bratton Realty, LLC was (or would have been) the contracting party to the lease agreement

executed with Mary White, (2) plaintiff is merely a guarantor to the lease agreement executed

with Mary White, and (3) plaintiff suffered no injuries distinct from that suffered by Bratton

Realty, LLC.  *See* Def.' Mot. Sum. J., at 4 ("because his role in signing was as a contracting

officer and personal guarantor of a corporate contract, any alleged injuries would have been to

the prospective tenant, Bratton Realty, and not Plaintiff in his individual capacity").  In the

absence of these faulty premises, defendant White's standing arguments have no merit.

As demonstrated below, defendant White's motion should be denied because John

Bratton, not Bratton Realty, LLC, is the party to the lease agreement executed with Mary White

on October 31, 2005 (*the only* lease executed between the parties).  This lease agreement

identifies John Bratton as the "TENANT."  Clearly, plaintiff possesses standing to pursue this

action pursuant to 42 U.S.C. §§ 1981 and 1982 because *he* is the party to the contract at issue, not Bratton Realty, LLC.

To the extent some of the economic damages in this case were suffered by plaintiff's business, Bratton Realty, LLC, plaintiff respectfully requests the Court's leave to file a Second Amended Complaint to add Bratton Realty, LLC as an additional plaintiff to this suit as set forth in Plaintiff's Second Motion for Leave to Amend.[1]

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

This action arises from Mary White's, Chatel Real Estate, Inc.'s, and Thierry Liverman's (collectively "defendants") unlawful discrimination in the terms and conditions of a lease for Georgetown office space given to plaintiff under the following circumstances, as a result of which plaintiff and his business suffered substantial economic and emotional damages:

**1.    John Pagones—Chatel's real estate agent who listed Mary White's Property on the MRIS—introduced the first lease drafted by John Bratton to Mary White by stating**:

| | |
|---|---|
| Pagones: | She asked me who the lease was from. |
| Q: | Could you elaborate on that, what you talked about with her? |
| A: | I told her it was a real estate office, and **it was an African-American. And I told her, be prepared for trouble.**[2] |

**2.    Defendants misrepresented the availability of the 1622 Wisconsin Avenue Property to Plaintiff on October 12, 2005.**  During her October 12 meeting with Thierry Liverman, Mary White asked him whether she "had" to accept John Bratton's lease.[3]  After the meeting,

---

[1] Plaintiff incorporates by reference the memorandum of points & authorities and the evidence submitted in support of his Second Motion for Leave to Amend, which will be filed on or before February 26, 2007.

[2] Exhibit 13, John Pagones Depo. Trans., November 20, 2006, pp. 53-54, lines 21-4.

[3] Exhibit 6, Thierry Liverman Depo. Trans., January 11, 2007, p. 253-54, lines 17-6; Exhibit 8, Mary White Depo. Trans., February 1, 2007, p. 171, lines 12-17 (in which Mary White admits to having asked Thierry Liverman whether she "had" to accept John Bratton's lease.)

Mr. Liverman telephonically informed John Bratton that the Property was no longer available, that it was already leased to someone else, that it was a done deal, and not to take it personally.[4] Mr. Liverman relayed this information to John Bratton even though there was no lease executed on the Property on October 12, 2005, and the only other potential tenant who expressed interest in the Property, Roberta Medlin, had not even entered into a verbal commitment with Mary White.[5] Mr. Liverman testified in his deposition that he was acting under instructions of his principal when he informed Mr. Bratton that Ms. White had leased the property to the other candidate and "that's just business."[6]

**3.    Mary White's purported justifications for rejecting John Bratton's five offers to lease the Property have all been refuted or withdrawn.**  There were three purported justifications to Mary White's decision to lease the property to Roberta Medlin.[7]  These are as follows:

> **(a)  Roberta Medlin was already a property owner in the area.**[8]  Nonetheless, John Bratton was also a property owner in the District of Columbia.  In fact, Mr. Bratton owned several properties in DC.

> **(b)  Mary White preferred the property to be leased to a jewelry store operator rather than to a potential competitor in the real estate industry.**[9]  In her responses to

---

[4] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2006, p. 129, lines 9-19; p. 218-219, lines 16-16; p. 256-258, lines 21-5.
[5] Exhibit 14, Roberta Medlin Depo. Trans., dated September 16, 2006, pp. 25-26, lines 14-4.
[6] Exhibit 6, pp. 100-101, lines 2-11.
[7] Exhibit 15, Defendant Mary White's Answers to Interrogatories and Responses to Request for Production of Documents Propounded by Plaintiff John Bratton, Response to Interrogatory # 7, p. 9 (which sets forth the three selection criteria for why she preferred leasing the Property to Roberta Medlin); See also Exhibit 16, Defendant Chatel Real Estate's and Thierry Liverman's Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory # 6, p. 7.
[8] *Id.*
[9] *See* Footnote 6, *supra*.

Plaintiff's First Set of Interrogatories, Ms. White claimed she wished to avoid having a tenant who would be a potential competitor in the real estate market.[10]  However, Ms. White subsequently stated in her deposition that she did not know where this information came from, and that her lawyers said it, not her.[11]  Further, Bratton Realty and Washington Fine Properties (where Ms. White joined in May 2005) are not competitors in the real estate market.  Washington Fine Properties predominantly handles the sale of multimillion dollar properties[12] and has listings for properties worth as much as $16.5 million.[13]  Bratton Realty, on the other hand, handles listings predominantly in the $400,000 - $600,000 range.[14]

**(c)  Mary White had purportedly received an "extremely favorable reference" for Roberta Medlin from a "personal friend."[15]**  In actuality, there never was a "personal friend" who provided an "extremely favorable reference" to Ms. White.  Roberta Medlin testified in her deposition that she did not know Mary White prior to October 2005 and that they had no mutual friends.[16]  Nor could Mary White identify in her deposition the person who purportedly gave her a favorable reference for Roberta Medlin.  Ms. White testified that the reference was neither verbal nor written![17]

---

[10] Exhibit 15, Defendant Mary White's Answers to Plaintiff's Interrogatories, Response to Int. # 4, p. 4.

[11] Exhibit 8, Mary White Depo. Trans., pp. 132-134, lines 5-22 (in which she claims these words were "put in her mouth").

[12] Exhibit 11, Thomas Anderson Depo. Trans., January 8, 2007, p.64-65, lines 11-7.

[13] Exhibit 11, p.65, lines 9-19.

[14] Exhibit 9, John Bratton Depo. Trans., January 24, 2007, p.95, lines 6-9.

[15] *See* Footnote 6, *supra.*

[16] Exhibit 14, Roberta Medlin Depo. Trans., dated September 26, 2006, pp. 11-14, lines 21-1.

[17] Exhibit 8, Mary White Depo. Trans., dated February 1, 2007, pp. 7-9, lines 9-11, pp. 70-72, lines 14-9.

**4.    Defendants discriminated against Plaintiff with respect to the terms and conditions of his lease.[18]**

(a)  **Plaintiff was denied a right of first refusal.**  The lease drafted by defendants for Roberta Medlin included a right of first refusal[19] even though Ms. Medlin never asked for it.[20]  The lease executed between Mary White and John Bratton, on the other hand, had the provision regarding a tenant's right of first refusal (¶41) crossed out[21] even though it was a boilerplate clause in Chatel's Commercial Agreement of Lease.

(b)  **Plaintiff was not allowed to convert his lease to month-to-month at the expiration of the two-year term.**  The lease drafted by defendants for Roberta Medlin included two provisions converting the lease to month-to-month at the expiration of the initial lease term (¶¶ 53 & 45).[22]  These same provisions were crossed out in John Bratton's lease agreement with Mary White.[23]

(c)  **Plaintiff was denied an option to renew his lease at the expiration of the two-year term.**  Defendants advertised the street-level of Mary White's property as available to the public for a lease term ranging from 12-48 months.[24]  The MRIS listing did not

---

[18] Exhibit 39, Chatel's Fair Housing Manual, p. 3.
[19] Exhibit 3, Chatel's Standard Commercial Lease Agreement between Roberta Medlin and Mary White, dated October 11, 2005, p. 6, ¶41, lines 10-12.
[20] Exhibit 14, Roberta Medlin Depo. Trans., p.44, lines 14-16.
[21] Exhibit 1, Chatel's Standard Commercial Lease Agreement between John Bratton and Mary White, dated October 31, 2005, p. 6, ¶41.
[22] Exhibit 3, at pp.6-7, ¶¶45 and 53.
[23] Exhibit 1, Commercial Lease Agreement between John Bratton and Mary White, Oct. 31, 2005, pp. 6-7, ¶¶45 and 53.
[24] Exhibit 4, MRIS Listing, Street-Level of the Property, October 6, 2005, p.2; See also John Pagones Depo. Trans., p. 75-76, lines 17-9 (in which he acknowledges that the 121/48 on the MRIS is a typographical error and should instead be 12/48, meaning the property was advertised as available for a lease term between 12 to 48 months);  Exhibit 8, Mary White Depo. Trans., February 1, 2007, pp. 63-63, lines 13-21(in which Mary White acknowledges that she provided the information for the MRIS listing to John Pagones and Chatel).

preclude the tenant's option to renew the lease,[25] and Mary White never informed Chatel when the property was first listed that she didn't want the prospective tenant to have an option to renew the lease.[26]  Nonetheless, John Bratton was informed that the street-level property was only available for a two-year term, without an option to renew.[27]  In fact, John Gordon Forester (Mary White's lawyer) instructed Chatel that the provision providing plaintiff with the option to renew the lease after his initial two-year term ended should be removed from Mr. Bratton's lease.[28]  There is no dispute that defendants wanted plaintiff to vacate the Property at the end of his two-year lease.[29]  As a result, plaintiff has to move his business when his lease expires in November 2007.

**(d) Plaintiff was required to pay $200 per month for real estate taxes; Roberta Medlin was not.**  Defendants demanded an additional $200 per month in real estate taxes be paid by John Bratton, even though the MRIS listings did not require this, and the lease drafted by defendants for Roberta Medlin did not require her to pay any property taxes.[30]

---

[25] Exhibit 4.

[26] Exhibit 6, at p. 80, lines 14-20; See also Exhibit 8, Mary White Depo. Trans., pp. 263-264, lines 16-1 (in which Mary White acknowledges that she never instructed Chatel that she didn't want potential tenants to have the option to renew, right of first refusal, and option to convert to month to month).

[27] Exhibits 19-21, John Gordon Forester's letters to John Bratton, dated October 18, 19 and 26, 2005.

[28] Exhibit 2, Facsimile from John Gordon Forester to Thierry Liverman, dated October 26, 2005.

[29] Exhibit 8, Mary White Depo. Trans., pp. 100-101; lines 9-2; See also Exhibit 6, Deposition Transcript of Thierry Liverman, pp. 198-199, lines 14-1 (in which they both admit that plaintiff must vacate the property after the 2-year lease term ends.)

[30] Compare Exhibit 1, ¶ 11 with Exhibit 3, ¶ 11; See Exhibit 8, Mary White Depo. Trans. p. 264, lines 2-6 (in which Mary White acknowledges that when she listed the Property, she did not submit anything in writing to Chatel indicating that the prospective tenant would have to pay $200 per month for property taxes).

**5.     John Bratton and Bratton Realty, LLC have suffered substantial economic damages as a result of defendants' discrimination**.

**(a) Lost Rental Revenue**

Because of the denial of the option to renew and right to convert the lease to month-to-month at the end of the two-year term, plaintiff has been forced to maintain two separate offices in DC—his previous office location at 1223 10th Street (which he owns), and the property he has leased from Mary White—since he has no choice but to vacate the 1622 Wisconsin Avenue Property at the expiration of his lease on October 31, 2007.[31]  As a result, John Bratton has been losing rental revenue that he could have generated from the 1223 10th Street Property in Logan Circle for over $1,600 per month during the two-year term of his lease with Mary White.[32]  These damages amount to over $38,400.

**(b) Relocation Costs**

Plaintiff will incur expenses as a result of having to move his office.  These expenses include moving costs, purchasing some new office furniture to fit the new office, equipment, new business cards for seven independent contractors and plaintiff, new letterhead, logos, marketing and advertising material, new telephone, DSL, and facsimile lines, new signage for property listings and banner for the office, and license transfer fees.[33]  These expenses will exceed $12,000.

---

[31] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p. 63, lines 5-15.
[32] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 132-134, lines 14-2.
[33] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 123-124, lines 7-13.

### (c)  Lost Profits and Loss of Goodwill

Bratton Realty, LLC will also suffer loss of goodwill and loss of future real estate sales volume as a result of having to move its business from 1622 Wisconsin Avenue in Georgetown, the location Mr. Bratton's customers associate his business with.[34] Mr. Bratton testified in his deposition that clients tend to gravitate more towards the Georgetown name and reputation[35] and the central location on Wisconsin Avenue draws numerous clientele and greater foot traffic through its visibility.[36]  Losing the Georgetown property and moving to a less prominent area will be a "major blow" to plaintiff's business, resulting in substantial loss of business deals and transactions amounting to tens of thousands of dollars per year.[37]  These damages would be applicable for over two years, since Mary White's property was advertised to the public as available for a 1 to 4-year lease, and plaintiff intended to occupy that space for the coming years.

**6.     Plaintiff was required to submit income tax returns and bank statements to financially qualify for the lease; Roberta Medlin was not**.  Under Mary White's instructions, John Gordon Forester demanded that Mr. Bratton submit two years of income tax returns and banks statements to financially qualify for the lease.[38]  Mr. Bratton had over $250,000 in his

---

[34] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, pp.344-345, lines 16-13.
[35] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 124-125, lines 15-1.
[36] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 126-127, lines 20-3.
[37] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 126-128, lines 20-16.
[38] Exhibit 19, John Gordon Forester's letter to John Bratton, dated October 18, 2005.

checking account and clean credit.[39]  In contrast, only a credit check was conducted on Roberta

Medlin,[40] who was also self-employed. [41]

**7.      Defendants refused to lease Mary White's basement to John Bratton even though**

**the basement was advertised to the public as available for lease**.[42]  A company used to lease

the basement of Mary White's property for several years until September 2005. When that

tenant's lease expired in September 2005, Mary White instructed her temporary office manager,

Barrett Anderson, to clean up the area and sell most of her office furniture on Craig's List.[43]

Soon thereafter, on September 23, 2005, Mary White instructed Chatel to list the basement of the

Property on the MRIS.[44]  Hope Edwards, the receptionist at Chatel, created the graphic designs

for both the street-level and basement of the Property.[45]  In late September through early October

2005, Mary White attempted to lease the basement of the Property to a white male who worked

---

[39] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 77-78, lines 17-17; See also
Exhibits 24-25, Bank of America Account Activity Pages for John Bratton's Bank Accounts,
dated October 19, 2005; See also Exhibit 18, National Registry Check on John Bratton, dated
October 12, 2005.

[40] Exhibit 14, page 39, lines 8-16 and page 40, lines 8-11 of Roberta Medlin Depo. (in which
Medlin admits that she was subject to a credit check and does not recall submitting any other
documents in connection with her financial background to Chatel or Mary White); See also
Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p. 226, lines 7-11; See also
Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, p. 78, lines 1-6.

[41] Exhibit 14, Roberta Medlin Depo. Trans, dated September 26, 2006, p. page 37, lines 5-22;
page 38, lines 1-22; page 39, lines 1-22; and page 40, lines 1-16, in which she admits that she
does not recall being required to submit any financial information to Chatel or Mary White when
she offered to lease the Property.

[42] Exhibit 5, MRIS Listing: Lower Level of the Property, Listing date: September 23, 2005
(October 6, 2005).

[43] Exhibit 12, Barrett Anderson Depo. Trans., dated November 16, 2006, p. 31, lines 14-19; pp.
133-134, lines 7-22; See also Exhibit 8, pp.23-24.

[44] See Footnote 41, supra.

[45] Exhibit 7, Hope Edwards Depo. Trans., pp. 37-38, lines 17-8; See also Exhibit 41, Promotional
Advertisement for the 1622 Wisconsin Ave. lower level commercial space.

out of his home in Georgetown.[46]  Nonetheless, when plaintiff attempted to lease the basement

of Mary White's property in October 2005, it suddenly became unavailable.[47]

**8.        Mary White's contention that she withdrew the listing for the basement because she**

**needed to use it as her own office until renovations on "her new office" at Washington Fine**

**Properties were complete is false**.[48]  Mary White signed an independent contractor agreement

with Washington Fine Properties on May 10, 2005 and was officially affiliated with them by no

later than July 2005 when her license was transferred there.[49]  After joining Washington Fine

Properties, Mary White had access to its offices located at 1101 30th Street[50] and 3201 New

Mexico Avenue,[51] which she used to attend meetings, handle business dealings and conduct

transactions.  Ms. White used Washington Fine Properties' offices in handling her first

transaction involving purchase of a property located at 1342 29th Street, which settled on June

---

[46] Exhibit 12, p. 19-21, lines 14-10 (in which he discusses Mary White's several interactions with
the unnamed male living in Georgetown who only wished to lease the back portion of the lower-
level of the Property.)

[47] Exhibit 19, Letter from John Gordon Forester to John Bratton dated October 18, 2005 (stating
that that only the first floor is available for rent); Exhibit 35, Letter from John Bratton to John
Gordon Forester's letter of October 19, 2005 (stating that "both units have been listed as
available for commercial lease on MRIS. . . .  the lower level for nearly 25 days" but the
basement is now unavailable to Mr. Bratton); Exhibit 21, Letter from John Gordon Forester to
John Bratton dated October 26, 2005 ("these are not new terms"); Exhibit 10, John Bratton
Depo. Trans., dated January 19, 2007, pp. 226-27, lines 12-8, (stating that the "the lower-level
space" is not "available for me to lease"), p. 92 lines 4-21; p. 108, lines 6-13; p. 155 lines 12-16.

[48] Exhibit 15, Defendant Mary White's Answers to Interrogatories and Responses to Request for
Production of Documents Propounded by Plaintiff John Bratton, Response to Interrogatory #8, p.
10; See also Exhibit 16, Defendants Chatel Real Estate's and Thierry Liverman's Answers to
Plaintiff's First Set of Interrogatories, Response to Interrogatory # 6, p. 7.

[49] Exhibit 28, Independent Contractor Agreement executed between Mary White and
Washington Fine Properties on May 10, 2005.

[50] Exhibit 11, Thomas Anderson Depo. Trans, p. 22, lines 10-17, (in which Mr. Anderson asserts
that Mary White would physically come to the 1101 30th Street location); See also Exhibit 8,
p.137, lines 1-12.

[51] Exhibit 11, pp. 46-50, lines 16-11; See also Exhibit 8, p. 137, lines 13-15.

20, 2005 for $659,000.[52]  She rarely, if ever, physically occupied or had use for the 1622

Wisconsin Avenue Property, which is why she wished to lease the basement of the Property in

September 2005.  Her decision not to rent the basement of the Property came only after John

Bratton offered to rent both levels of her Property.[53]  Indeed, Ms. White testified in her

deposition that she visited the basement of the Property only a dozen times from November 2005

through January 2007.

**9.      Defendants engaged in illegal steering by favoring a Georgetown resident to lease
the Property rather than Plaintiff, who did not reside in Georgetown.[54]**  One of the reasons

defendants preferred to lease the Property to Roberta Medlin rather than John Bratton was

because Ms. Medlin was already a property owner in Georgetown.[55]  Having an established

residence in Georgetown ultimately made Roberta Medlin the more attractive and "first-class"

candidate for leasing the property,[56] while John Bratton was perceived as a "second-class"

candidate.

---

[52] Exhibit 23, Letter from Gerald Dziecichowicz at Saul Ewing to Stefan Shaibani, dated October 5, 2006.

[53] Exhibit 21, Letter from John Gordon Forester to John Bratton, dated October 26, 2005 (claiming that lease was only available for the street level, this was not a new term and had been presented as such from the beginning.)  See also Exhibit 13, John Pagones Depo. Trans., dated November 20, 2006, p.24, lines 9-13 (in which Pagones admits that Mary White decision not to rent the lower-level of the Property was made after John Bratton inquired about the Property.)

[54] Exhibit 15, Defendant Mary White's Answers to Interrogatories and Responses to Request for Production of Documents Propounded by Plaintiff John Bratton, Response to Interrogatory # 7, p.9 (setting forth the first selection criteria for offering the lease to Roberta Medlin.  See also Exhibit 16, Defendants Chatel Real Estate's and Thierry Liverman's Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory # 8, p. 7 (which sets forth the first factor Mary White based her decision on.)

[55] *Id.*  Both defendants cite their first reason for choosing to lease the property to Roberta Medlin rather than John Bratton to be that Ms. Medlin was "already a property owner in the area."  See also Exhibit 8, Mary White Depo. Trans., pp. 13-14, lines 17-1.

[56] See Exhibit 6, Thierry Liverman Depo. Trans., dated January 11, 2007, p. 97, lines 3-7 (in which Mr. Liverman states that Mary White, based on second-hand information, believed Roberta Medlin's husband to be a "first class person.")

10.    **Defendants processed Roberta Medlin's application much faster than John Bratton's application, in violation of Chatel's First-Come, First-Served policy.**[57]

(a)    **John Bratton first visited and expressed serious interest in the 1622 Wisconsin Avenue Property on October 6, 2005.**[58]  Despite his repeated attempts to acquire a blank lease agreement, rental application and information from Chatel regarding the landlord's requirements for the lease, he was continually denied this information.[59]  Similarly, Mary White did not respond to Mr. Bratton's letter and telephone calls.[60]  Defendants' behavior continued for five days, as John Bratton attempted to draft five separate leases[61] without any aid from defendants.  Each lease he drafted from October 6 to October 11, 2005 was, in turn, rejected by defendants.[62]

(b)    **Roberta Medlin expressed interest in the Property on October 11, 2005,[63] five days after John Bratton had already visited and expressed serious interest in securing the Property.**  Mary White agreed to meet with Roberta Medlin, gave Ms. Medlin a personal tour of the property,[64] answered all of Ms. Medlin's questions regarding the lease, assisted her in drafting a lease, and immediately contacted Thierry

---

[57] Exhibit 39, Chatel's Fair Housing Manual.

[58] Exhibit 10, John Bratton's Depo. Trans., dated January 19, 2007, p. 89, lines 3-9.

[59] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p. 105-106, lines 8-5.

[60] Exhibit 8, Mary White Depo. Trans., p. 215, lines 14-18.  See also Exhibit 29.

[61] Exhibit 30, Signed Commercial Lease Agreement between John Bratton and Mary White, dated October 7, 2005; Exhibit 31, Signed Commercial Lease Agreement between John Bratton and Mary White, dated October 10, 2005; Exhibit 32-34, three different versions of Chatel's Standard Commercial Lease Agreement between John Bratton and Mary White, dated October 10, 2005.

[62] Exhibit 8, Mary White Depo. Trans., dated February 1, 2007, pp. 115, lines 1-3 (in which Mary White acknowledges having rejected each of John Bratton's five leases submitted from October 6 through October 11, 2005).

[63] See Exhibit 40, Email from Barrett Anderson to Mary White, re: 1622 Lease Level 1, dated October 11, 2005.

[64] Exhibit 14, Roberta Medlin Depo. Trans., dated September 26, 2006, pp. 34-35, lines 17-4.

Liverman at Chatel to meet with Ms. Medlin the same day.[65]  Defendants didn't run a credit check on John Bratton until October 12, 2005, six days after he initially visited the 1622 Wisconsin Avenue Property and expressed interest in acquiring a lease agreement for it,[66] yet they ran Roberta Medlin's credit check on October 11, 2005, the same day she visited the Property.[67]  Indeed, pursuant to Mary White's request, Chatel met with Roberta Medlin the first day she went to Chatel's office on October 11, 2005.  In this way, defendants violated Chatel's First-Come First-Served Policy.[68]

11.    **The only reason Defendants leased the Property to Plaintiff for a two-year term was because he had threatened to sue them for discrimination, and they wanted to conceal their discrimination and avoid a lawsuit**.  In his conversation with Thierry Liverman on October 12, 2005, Plaintiff informed Mr. Liverman he felt he had been discriminated against, that "he would take this to a higher level,"[69] and that he was going to file a complaint against defendants for discrimination.[70]  A few days after this news was relayed to Ms. White,[71] she hired her attorney, John Gordon Forester, to contact Plaintiff to commence "negotiating" the terms of the lease for the 1622 Wisconsin Avenue Property.[72]  Significantly, Mary White executed a lease with

---

[65] Exhibit 6, Thierry Liverman Depo. Trans., dated January 11, 2007 pp. 135-137, lines 7-2.

[66] Exhibit 18, National Registry Check on John Bratton, dated October 12, 2005.

[67] Exhibit 17, National Registry Check on Roberta Jean Medlin, dated October 11, 2005.

[68] Exhibit 39, Chatel's Fair Housing Manual.

[69] Exhibit 6, Thierry Liverman Depo. Trans., p. 102, lines 12-15.

[70] Exhibit 10, John Bratton Depo. Trans, January 19, 2007, p. 258, lines 3-11.

[71] Exhibit 6, pp. 102-105, lines 7-18.

[72] Exhibit 19, Letter from John Gordon Forester to John Bratton, dated October 18, 2005.  Mary White did not contact John Bratton upon learning that Roberta Medlin had withdrawn her offer on October 13, 2007.  Ms. White consistently shifts the blame to Chatel, claiming that "she had hired somebody else" to handle the affairs of her Property, and therefore she should not have been held accountable for any wrongdoing.  Exhibit 8, pp. 189-190.

plaintiff on October 31, 2005, approximately 11 days *after* plaintiff filed an administrative

complaint for discrimination against defendants at the DC Office of Human Rights.[73]

**12.     Mr. Forester accused plaintiff of being a "test case" for discrimination, because**

**plaintiff was an African-American with dreadlocks, stating he did not intend in good faith**

**to lease Georgetown office space and was simply looking to "induce a lawsuit."[74]**

**13.     Under Mary White's instructions, Mr. Forester demanded new and unfavorable**

**terms and conditions from John Bratton to dissuade him from leasing the Property.[75]**

Execution of the lease agreement between John Bratton and Mary White was contingent on John

Bratton's acceptance of her particular terms.   There was no negotiation between the parties, but

defendants' continuous demands for new terms and conditions from plaintiff.   Despite

Mr. Forester's involvement to "facilitate" the lease, it ultimately took 24 days for John Bratton to

execute the final lease from the date of his first offer on October 6, 2005.[76]   Drafting a lease for a

small office space should not take so long.   This was a property renting for $2,500 a month, not

the entire floor of a high-rise destined to be leased to a law firm for a decade.   Ultimately, despite

plaintiff's clear financial ability to lease the Property, it wasn't enough to outweigh the fact that

he was black and had dreadlocks, and therefore, his money was no good to defendants.

---

[73] Exhibit 43, Administrative Complaint for Discrimination Filed by John Bratton at the DC Office of Human Rights, dated October 19, 2005; Exhibit 6, Thierry Liverman Depo. Trans., January 11, 2007, p. 253-54, lines 17-6 (Ms. White asked Mr. Liverman on October 12, 2005 whether she "had to" accept Mr. Bratton's lease); Exhibit 8, Mary White Depo. Trans., February 1, 2007, p. 91 lines 7-16 (stating that John Pagones informed Ms. White on October 7, 2005 that one of Mr. Bratton's references was from the DC Corporation Counsel's Office); Exhibit 9, John Bratton Depo. Trans. January 24, 2007, pp.56-57, lines 13-5 (stating that Mary White did not "engage in actively leasing the space to me until after she found out that I officially filed a lawsuit with the D.C. Office of Human Rights").
[74] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 66-71, lines 8-2.
[75] Exhibit 19-21, Letters from John Gordon Forester to John Bratton, dated October 18, 19 and 26, 2005.
[76] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

**14.     John Pagones was previously involved in a discrimination suit which aired on Dateline-NBC in an Episode titled "No Way In," where he falsely stated to a person in a wheelchair inquiring about a property to lease in Georgetown:  "I have nothing in Georgetown."[77]**  It was later revealed in the Dateline-NBC episode that Chatel had several properties available in Georgetown on that day.  The Greater Housing Council of Washington, DC filed a discrimination suit against Chatel based on John Pagones' dishonest representation to the handicapped visitor.[78]  The case was subsequently settled, but the evidence speaks for itself.  Nonetheless, Mary White testified that she did not care about John Pagones' conduct as set forth in the Dateline NBC episode,[79] and on a scale of one to ten, she gave him a "5 or 6 out of 10" with respect to his dealings with John Bratton.[80]

**15.     Plaintiff is devastated by defendants' discriminatory treatment towards him.**

Defendants' racial discrimination towards plaintiff has taken a toll on his emotional well-being.  John Bratton now suffers from depression as a result and continues to battle the emotional trauma of the past 16 months on a daily basis.[81]

**16.     John Bratton is the tenant named on the lease executed with Mary White, not a guarantor.[82]**  The October 31, 2005 lease identifies Mr. Bratton as the "TENANT."  John Bratton is not a guarantor for Bratton Realty, LLC.  In fact, the name Bratton Realty, LLC does not appear anywhere on the October 31, 2005 lease signed with Mary White.  Ms. White testified

---

[77] Exhibit 38, DVD of Dateline-NBC Episode titled "No Way In" (filed manually).

[78] Exhibit 37, Washington Lawyers Committee for Civil Rights, Fair Housing Council of Greater Washington, p. 14.

[79] Exhibit 8, Mary White Depo. Trans., pp. 220-221, lines 19-20.

[80] Exhibit 8, Mary White Depo. Trans., pp. 17-18, lines 19-5.

[81] Exhibit 42.

[82] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

in her deposition that her Property was leased to John Bratton.[83]  Ms. White herself insisted that

Mr. Bratton be the tenant named on the lease, not Bratton Realty, LLC.[84]

17.    **Chatel's contention that it had no involvement with John Bratton after October 12, 2005 is contrary to evidence.[85]**

(a)    **Chatel was intimately involved with drafting the October 31, 2005 lease agreement executed between John Bratton and Mary White.  Indeed, Mary White's lawyer, John Gordon Forester, sent a fax to Chatel's Liverman on October 26, 2005, instructing him to draft a lease for John Bratton.[86]**  Mr. Forester asked Mr. Liverman to change the terms of Chatel's Commercial Agreement of Lease in drafting the final lease agreement for John Bratton.  Specifically, Mr. Forester informed Mr. Liverman to limit the duration of the lease to two years only, excluding the tenant's right of first refusal and option to renew the lease, and to remove the provision converting the lease to a month-to-month at the expiration of its term.  Chatel was further instructed to include an additional $200 per month in real estate taxes.[87]  Thierry Liverman testified in his deposition that he prepared Mr. Bratton's lease agreement incorporating the terms and conditions requested by Mr. Forester during "the first round" and transmitted a draft to Mr. Forester for further negotiations with John Bratton.[88]  Mr. Liverman further testified

---

[83] Exhibit 8, Mary White Depo. Trans., p. 99, lines 18-21; see also p. 115, lines 13- 17.

[84] Exhibit 2, Facsimile from John Gordon Forester to Thierry Liverman, dated October 26, 2005.

[85] See Defendants Chatel Real Estate, Inc and Thierry Liverman's First Motion for Summary Judgment, p. 5, ¶2, line 4.

[86] Exhibit 2; See also Exhibit 8, Mary White's Depo. Trans., pp. 96-98 (in which she admits she instructed Gordon Forester to request that Chatel draft the lease with the specified changes.)

[87] *See* Footnote 77, *supra*.

[88] Exhibit 6, p. 153-155, lines 5-2.

that the final lease executed between John Bratton and Mary White, containing the cross-outs, was drafted by Chatel.[89]

**(b)    Chatel was Mary White's broker when John Bratton signed the final lease agreement, and Chatel received a commission for the deal.[90]**

**(c)    Chatel was managing Mary White's Property when John Bratton signed the lease on October 31, 2005, and Chatel continues to manage the Property to this day.[91]**

**(d)    As part of its management of the Property, Chatel sent a $1,019 plumbing invoice to John Bratton months after he moved into the Property.[92]** Paragraph 9 of the lease agreement between Ms. White and Mr. Bratton warrants the plumbing system in the Property to be in good working order as of the date the tenant takes possession of the property.[93] The plumbing system at Ms. White's Property was problematic before John Bratton's move-in date, and it flooded his office within 30 days of when he moved in.[94] Neither Thierry Liverman or Mary White could identify John Bratton as being

---

[89] Exhibit 6, pp. 154-155; See also Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

[90] Exhibit 6, Thierry Liverman Depo. Trans., pp. 68-69, lines 21-2; See also Exhibit 8, Mary White Depo. Trans., pp.27-28, lines 11-10 (in which she admits that even though she hired Gordon Forester to facilitate negotiating the lease, she still paid Chatel a commission for leasing the Property.)

[91] Exhibit 6, p. 113, lines 5-9 (in which Mr. Liverman admits that Chatel continues to manage the street and upper-level of Mary White's property); Exhibit 8, p. 275, lines 2-12 (in which Mary White admits that Chatel still manages the 1622 Property)

[92] Exhibit 22, Plumbing Invoice issued by Chatel Real Estate, Inc. to John Bratton, dated 02/08/06; See also Exhibit 6, Thierry Liverman Depo. Trans., p. 194, lines 8-21; See also Exhibit 8, Mary White Depo. Trans. p. 266 lines 7-15 (in which she states that her property was being managed by Chatel during the time the plumbing invoice was sent out.)

[93] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005, ¶9, §b.

[94] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p.327, lines 6-16.

responsible for the plumbing defects.[95]  Nonetheless, Chatel sent a $1,019 plumbing invoice to John Bratton on February 18, 2006, as part of its management of Mary White's Property.

**(e) The October 31, 2005 lease executed between John Bratton and Mary White is on Chatel's form, and it specifically refers to Chatel as the broker that is to receive a commission for the deal.[96]**  Clearly, Chatel was involved in the leasing of Mary White's Property to John Bratton after October 12, 2005, despite Chatel's contentions to the contrary.

18.    **John Bratton wished to lease Mary White's Property for his own use as well as for Bratton Realty, LLC.**  Besides being a broker, John Bratton handles real estate development projects independent of Bratton Realty,[97] and the Georgetown space provided him with ample resources in pursuing these projects.  Mr. Bratton intended to lease the 1622 Wisconsin Avenue Property for both himself and Bratton Realty.[98]  Further, Bratton Realty, LLC is solely owned by John Bratton, and it has no employees.[99]

19.    **Bratton Realty, LLC has assigned its claims with respect to this action to John Bratton.[100]**

---

[95] Exhibit 6, p. 195, lines 7-13; See also Exhibit 8, pp. 266-268, lines 7-15.
[96] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.
[97] Exhibit 10, John Bratton Depo. Trans., January 19, 2007, pp. 70-72, lines 12-1 (in which he discusses his outside projects developing various properties.)
[98] Exhibit 10, John Bratton Depo. Trans.,p. 75, January 19, 2007, lines 1-4 (in which he states  he became interested in the 1622 property for use by Bratton Realty); see also p. 87, lines 12-13 (in which he states his plan was to use Georgetown as [his] D.C. office.); p.98-99, lines 20-7 (in which Bratton expresses how "perfect" the property was for his brokerage firm.)
[99] Exhibit 10, John Bratton Depo. Trans. January 19, 2007, p. 62, lines 11-15; see also p. 273, line 9; p. 99, line 8.
[100] Exhibit 44, Agreement of Assignment between Bratton Realty, LLC and John Bratton, dated February 27, 2007.

**ARGUMENT**

**I.    As The Party To The Lease Agreement Executed With Mary White, John Bratton Possesses Standing To Pursue His Civil Rights Claims Against Her**

Defendant White contends John Bratton "lacks standing to assert civil rights claims against Ms. White." Def.'s Mot. Sum. J., at 4. Defendant's motion rests upon the faulty premise that Bratton Realty, LLC, rather than John Bratton, was (or would have been) the party to the lease agreement executed with Mary White. This is not so.

John Bratton is named as the "TENANT" on *the only* lease agreement that was executed with Mary White. This agreement is dated October 31, 2005; was executed between plaintiff and Mary White; and makes no reference to Bratton Realty, LLC. As the party to the lease agreement executed with Ms. White, Mr. Bratton clearly possesses standing to pursue his discrimination claims against her.[101]  *See Domino's Pizza v. McDonald*, 546 U.S. 470, 126 S. Ct. 1250 (2006) ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as plaintiff has or would have rights under the existing or proposed contractual relationship.")

Indeed, if plaintiff, as *the party* to the contract executed with Mary White, lacks standing to pursue his civil rights claims against her pursuant to sections 1981 and 1982, no person or entity would have standing to pursue these claims. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (white male landlord had standing to pursue discrimination suit under

---

[101] *See also Jackson v. Birmingham Board of Education*, 544 U.S. 167, 180 (2005) (coach of girls' high-school basketball team had standing to pursue retaliation claim for sex discrimination inflicted on his team even though he was not the victim of the discrimination complained of).

section 1982 against corporation owning private park for expelling him after he assigned a

membership share and use rights in park to black person leasing his house).[102]

Defendant White's contentions to the contrary are based on a tortured reading of the

Supreme Court's decision in *Domino's Pizza* where the court held that section 1981 requires

"that the plaintiff be the person whose right to make and enforce contracts was impaired on

account of race." 126 S. Ct. at 1251. The plaintiff in *Domino's Pizza* was the sole shareholder

of JWM Investments, Inc., a corporation that had entered into several construction contracts with

Domino's Pizza. The court dismissed the plaintiff's complaint because he was not a party to any

of the contracts executed with Domino's. *Id.* at 1252. The court stated that the plaintiff

"lack[ed] any rights under an existing contractual relationship with the defendant" because he

was not privy to any of the contracts executed between his company and Domino's. *Id.* at 1247.

In contrast, here, John Bratton is *the party* to the lease agreement executed with Mary

White. This lease agreement identifies John Bratton as the "TENANT."[103] That this lease

agreement was executed on October 31, 2005 does not deprive plaintiff of standing to pursue his

claims against Ms. White. In short, plaintiff possesses standing to pursue his discrimination

claims against Mary White because he, not Bratton Realty, LLC, is the party to the lease

agreement executed with her. *See Domino's Pizza*, 126 S. Ct. at 1252 ("Section 1981 plaintiffs

---

[102] See also *America v. Preston*, 2006 WL 3178810, at *6 (D.D.C. 2006) (recognizing the standing of testers to sue under Title VII), *quoting from Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) ("A tester who has been the subject of a misrepresentation made unlawful under the Civil Rights Act has suffered injury in precisely the form the statute was intended to guard against . . . . That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury"); *Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority*, 239 F.R.D. 9, at 16-18 (D.D.C. 2006) (disability rights advocacy group had standing to assert claims on behalf of class against Washington Metropolitan Transit Authority for violations of the ADA arising from inadequate transit services).
[103] Exhibit 1 (introductory paragraph).

must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's").  Sections 1981 and 1982 clearly intended to provide relief to persons injured from discriminatory treatment at the hands of those with whom they entered into contracts.  *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("the test for prudential standing is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief").

Defendant's reliance upon *Gersman v. Group Health Association, Inc.*, 931 F.2d 1565 (D.C. Cir. 1991), *vacated and remanded,* 502 U.S. 1068, and *Guides, Ltd. v. Yarmouth Group Property Management, Inc.*, 295 F.3d 1065 (10th Cir. 2002), for the proposition that plaintiff lacks standing to pursue his civil rights claims against Ms. White, is misguided.  In *Guides*, the court held that the owner of a corporation lacked standing to pursue discrimination claims against a shopping center for its failure to extend a lease executed by the corporation.  The court explained:  "Foote alleged discrimination based on her race.  However, the party seeking to contract with the defendants and to lease property, and thus the direct victim of the discrimination, was Foote's corporation, Africa House, rather than Foote herself."  295 F.3d at 1072.  Similarly, in *Gersman*, the party to the contract at issue was a corporation, not its shareholder:  "It was CSI, and not Gersman, whose contract was terminated.  Gersman, as a shareholder, has no standing to bring claims for an injury suffered by CSI."  931 F.2d 1569.  These cases are clearly distinguishable from the case at hand because here, John Bratton, not Bratton Realty, LLC, is the party to the lease agreement executed with Mary White.

## II.    John Bratton Is Not A Guarantor, But The Tenant Named On The Lease Executed With Mary White

Defendant White next contends that John Bratton lacks standing because he is merely a "guarantor" to the lease executed with her.  Def.'s Mot. Sum. J., at 7.  Defendant's contention is

contrary to the express language of the lease she executed, which provides: "This agreement of lease made and entered into this 31st day of October 2005 by and between Mary White (hereinafter 'LANDLORD') and John Bratton (hereinafter 'TENANT')."[104]  Defendant cannot contort the express language of the contract to render plaintiff a "guarantor" to the lease when he is the tenant named on the lease.  Significantly, Bratton Realty, LLC is nowhere referenced in the October 31, 2005 lease executed with Mary White.  The undisputed facts thus indicate that John Bratton is the party to the lease, not its guarantor.

Contrary to defendant's contention, plaintiff did not agree to guarantee the lease.  Def.'s Mot. Sum. J., at 7.  Instead, he signed the lease under his own name acting under his individual capacity.  That plaintiff has been using Mary White's office for both himself and Bratton Realty, LLC does not render him devoid of standing.  Indeed, use of the Property should have no bearing on plaintiff's standing in this case because he is the tenant named on the lease.  Further, Ms. White's insistence upon plaintiff being named as the tenant on the lease should preclude her from arguing before this Court that plaintiff lacks standing to sue her.

Defendant's reliance upon *Shreeji Krupa, Inc. v. Leonardi Enterprises*, 2007 WL 178305 (N.D. Ill. 2007), is unavailing.  In *Krupa*, the court held that the plaintiff, Mehta, lacked standing to pursue discrimination claims against Leonardi Enterprises because Mehta was not a party to the contract at issue.  The court explained:  "Here, only Krupa had a contractual relationship with Leonardi, not Mehta. . . .  Mehta did not sign any documents guaranteeing the lease." *Id.* at * 3. *Labovitz v. Washington Times Corp.*, 900 F. Supp. 500 (D.D.C. 1995), also relied upon by defendant, is distinguishable.  *Lebovitz* involved a suit by shareholders of a corporation against its acquirer that had engaged in corporate mismanagement ultimately resulting in the

---

[104] Exhibit 1 (introductory paragraph).

corporation's bankruptcy.  900 F. Supp. 504.  *Lebovitz* was not a discrimination suit, and the court applied Delaware corporate law in resolving the case.  Significantly, the corporation injured in *Lebovitz* had maintained its own separate suit against the defendant in another court. The court held that "any claims for affirmative recovery for injuries to the value of the corporation must be brought by the corporation."  *Id.* at 506.  The instant case is clearly distinguishable from *Lebovitz* because Mr. Bratton is the tenant named on the lease executed with Ms. White.  Mr. Bratton is not the guarantor of Bratton Realty, LLC's debts.

### III.    John Bratton Has Suffered Injuries Distinct From Those Suffered By Bratton Realty, LLC

Defendant White next contends that "plaintiff here should be precluded from bringing suit because the alleged injury was not suffered individually."  Def.'s Mot. Sum. J., at 9.  As discussed above (*supra* 7-8), however, Mr. Bratton has suffered distinct economic damages, including $38,400 of lost rental revenue from having to maintain two separate offices in DC when he would have otherwise rented his Logan Circle property (which he owns) for $1,600 per month for the duration of his lease with Mary White.  This injury is suffered by John Bratton, not Bratton Realty, LLC.  Further, as discussed in Mr. Bratton's Affidavit, he has suffered significant emotional damages as a result of defendant's discrimination.  In his words, Mr. Bratton has become increasingly "depressed" and "devastated by defendants' actions and behavior."[105]  These damages are unique to Mr. Bratton, not Bratton Realty, LLC.

The economic damages suffered by Bratton Realty, LLC, on the other hand, include relocation expenses (amounting to over $12,000), and tens of thousands of lost profits and loss of good will from having to move the business from 1622 Wisconsin Avenue to a less prestigious location.

---

[105] Exhibit 42, Affidavit of John Bratton, ¶¶ 5-8.

As the party to the contract at issue, Mr. Bratton possesses standing to recover both the economic and emotional damages he has suffered as a result of Mary White's discrimination with respect to the terms and conditions of his lease. *See Bains LLC v. Arco Products Co.*, 405 F.3d 764, at 771 (9th Cir. 2005) ("Section 1981 extends its prohibition against racial discrimination in the making and enforcement of contracts to cover all phases and incidents of the contractual relationship, not just the termination of a contract"). The damages sought by plaintiff in this case are also recoverable under sections 1981 and 1982. *See Alexander v. City of Mikwaukee*, 474 F.3d 437, 450-452 (7th Cir. 2007) (economic damages were recoverable in white male police officers' civil rights action against city alleging racially discriminatory promotion practices); *Settlegoode v. Portland Public Schools*, 371 F.3d 503, at 509, 520 (9th Cir. 2004) (reinstating jury's award of $402,000 in economic damages to teacher in her civil rights action against school district alleging non-renewal of contract due to discrimination).

To the extent some of the economic damages in this case are suffered by Bratton Realty, LLC, plaintiff respectfully requests leave of Court to file a Second Amended Complaint to add Bratton Realty, LLC as an additional plaintiff.

**CONCLUSION**

For the above reasons, plaintiff respectfully requests the Court to deny Mary White's

First Motion for Summary Judgment or, in the Alternative, to Dismiss.

                                              Respectfully submitted,

Dated: February 27, 2007                      /s/ Stefan Shaibani
                                              Stefan Shaibani (Bar No. 490024)
                                              LITIGATION ASSOCIATE, PLLC
                                              1150 Connecticut Avenue, N.W.
                                              Suite 900
                                              Washington, DC 20036
                                              Tel:  (202) 862-4335
                                              Fax: (202) 828-4130

                                              *Attorney for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2007, I electronically filed "PLAINTIFF'S

OPPOSITION TO DEFENDANT MARY WHITE'S FIRST MOTION FOR SUMMARY

JUDGMENT OR, IN THE ALTERNATIVE, TO DISMISS," and that service was thus effected

upon defendants' counsels in accordance with Local Civil Rule 5.4(d).


<u>/s/ Stefan Shaibani</u>