**Capital Reporting Company**

Page 1

```
 1   STATES DISTRICT COURT
 2      FOR THE DISTRICT OF COLUMBIA
 3   _____           ORIGINAL
 4   JOHN BRATTON,                     :
 5             Plaintiff,              :
 6        v                            : CASE NO:
 7                                     : 060694
 8   CHATEL REAL ESTATE,               :
 9             Defendant               :
10   _____
11
12                                        Washington, D.C.
13                                   Thursday, February 1, 2007
14   Deposition of:
15                    MARY WHITE
16   called for oral examination by counsel for
17   Plaintiff, pursuant to Notice, at the Law Offices
18   of Stefan Shaibani, 1150 Connecticut Avenue,
19   Northwest, Suite 900, Washington, D.C., before
20   Mary E. Warner of Capital Reporting, sworn by a
21   Notary Public in and for the District of Columbia,
22   beginning at 10:00 a.m.
```

(866)448-DEPO
www.CapitalReportingCompany.com



PLAINTIFF'S EXHIBIT 8

**Capital Reporting Company**

Page 2

APPEARANCES

On Behalf of the Plaintiff:

    STEFAN SHAIBANI, ESQUIRE
    SHABNAM KEYVAN, ESQUIRE
    Litigation Associates, PPLC
    1150 Connecticut Avenue, NW, Suite 900
    Washington, D.C. 20036
    (202) 862-4335
    Stefan@litigationassociate.com

On Behalf of the Defendant Chatel Real Estate:

    MATTHEW A. RANCK, ESQUIRE, ESQUIRE
    Eccleston and Wolf
    2001 S. Street, NW, Suite 310
    Washington, DC 20009-1125
    (202) 857-1696
    Ranck@ewdc.com

Page 3

APPEARANCES (Continued)

On behalf of Defendant Mary White:

    GORDON FORESTER, ESQUIRE
    1742 N Street, NW
    Washington, DC
    (202) 293-3353

    ROBERT H. BOUSE, JR., ESQUIRE
    Anderson Coe King
    201 North Charles Street, Suite 2000
    Baltimore, MD 21201-4135
    (410) 752-1630
    Bouse@acklaw.com

ALSO PRESENT:

    John Bratton

Page 4

CONTENTS

| EXAMINATION BY | PAGE |
|---|---|
| Counsel for Plaintiff | 4 |

| MARY WHITE DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| 1 | Rental Agreement | 54 |
| 2 | Listing | 64 |
| 3 | MIRS Listing | 77 |
| 4 | Lease | 92 |
| 5 | Fax, 10/26/05 | 96 |
| 6 | Lease | 98 |
| 7 | Lease | 105 |
| 8 | Photos | 121 |
| 9 | Photos | 121 |
| 10 | E-mail, 10/11 | 126 |
| 11 | Interrogatories | 133 |
| 12 | Policies | 138 |
| 13 | Interrogatories | 165 |
| 14 | Electronic Business Card | 169 |
| 15 | MIRS Listing | 176 |
| 16 | Letter | 177 |

Page 5

| 17 | Letter | 177 |
|---|---|---|
| 18 | Interrogatories | 189 |
| 19 | Complaint | 200 |
| 20 | Fax, 10/11 | 213 |
| 21 | Letter | 216 |
| 22 | Lease | 230 |
| 23 | Lease | 230 |
| 24 | Lease | 230 |
| 25 | Fax, 10/13 | 252 |
| 26 | Letter, 10/19 | 258 |
| 27 | Letter | 259 |
| 28 | Plumbing Bill | 267 |
| 29 | Comparative Listing Rental | 278 |
| 30 | E-mail | 284 |

2 (Pages 2 to 5)

**Capital Reporting Company**

Page 6

```
1           PROCEEDINGS
2   WHEREUPON,
3              MARY WHITE
4   called as a witness, and having been first duly
5   sworn, was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR PLAINTIFF
7   BY MR. SHAIBANI:
8       Q   Ms. White?
9       A   Yes.
10      Q   My name is Stefan Shaibani. I represent
11  the Plaintiff in this case. I'm going to ask you
12  some questions today. And your Counsel may object
13  to them. If he decides to instruct you not to
14  respond to the question, if we could resolve it at
15  that point but if there's no instruction not to
16  respond to the question, you will be expect to
17  answer after the objections are raised. If at any
18  point you require me to repeat a question or
19  clarify something, just let me know.
20      A   Uh-huh.
21      Q   Could you tell us the name of the person
22  who supposedly provided a referal to Roberta
```

Page 7

```
1   Medlin?
2           MR. BOUSE: I object. We refuse to
3   answer that, for the reasons, I said in our
4   Answers to Interrogatories. We can take it up
5   with the Court later. If the Court agrees, we'll
6   provide a name and you can follow up with any
7   questions you want of Ms. White. All right?
8   BY MR. SHAIBANI:
9       Q   Are you saying that somebody in fact
10  provided an extremely favorable reference for
11  Roberta Medlin to you?
12          MR. BOUSE: I object. You can answer
13  that.
14          THE WITNESS: There is somebody that I
15  know who knows him, yes, who is a client of mine.
16  BY MR. SHAIBANI:
17      Q   And this client of yours knows Roberto
18  Medlin or her husband?
19      A   Primarily her husband.
20      Q   And what exactly did this person tell
21  you?
22      A   I don't think I --
```

Page 8

```
1           MR. BOUSE: You can tell him what he told
2   you.
3           THE WITNESS: I don't know that's right
4   because --
5           MR. BOUSE: I know what she's saying.
6   There wasn't a conversation, I take it?
7           THE WITNESS: No, there wasn't a
8   conversation.
9           MR. BOUSE: What Ms. White will tell you
10  if asked a proper question --
11          MR. SHAIBANI: I don't want you to coach
12  her.
13          MR. BOUSE: Then the answer is what I
14  just said. Next question. I was trying to help.
15  BY MR. SHAIBANI:
16      Q   There was no verbal conversation with
17  this person, then?
18      A   That's correct.
19      Q   And the so-called reference, was that
20  provided in writing then?
21      A   No.
22      Q   And it wasn't provided verbally?
```

Page 9

```
1       A   No.
2       Q   Okay. So there was no reference then,
3   isn't that correct?
4           MR. BOUSE: Objection.
5           MR. RANCK: Objection.
6           MR. BOUSE: You can answer.
7           THE WITNESS: That gets into --
8           MR. BOUSE: You can answer. Just answer
9   his question.
10          THE WITNESS: I don't know how to say yes
11  or no, though.
12          MR. BOUSE: Answer it and give an
13  explanation for it.
14          THE WITNESS: Mr. Medlin had recently
15  joined a firm. And someone in that firm had just
16  purchased a house from me. And I was privy to the
17  financial affairs of the firm. And that's as far
18  as I want to go because it's very personal.
19  BY MR. SHAIBANI:
20      Q   Yes, but a financial -- the financial
21  background for Mr. Medlin was not provided. You
22  were provided the financial background for your
```

3 (Pages 6 to 9)

Capital Reporting Company

Page 10

1  client with connection with the purchase or sale
2  of the house, isn't that correct?
3     A  They had just purchased a house in
4  Georgetown that I was very familiar with. And I
5  have some knowledge of what they paid for it and
6  what they plan to do with it. So that had just
7  been done. So they had gone through a clearance
8  in purchasing the house.
9     Q  And by they, you refer to Mr. Medlin?
10    A  Mr. and Mrs.
11    Q  You didn't represent Mr. Medlin in
12 connection with the purchase of his house in
13 Georgetown, did you?
14    A  No, another agent in Georgetown did.
15    Q  Was it an agent with Washington Fine
16 Properties?
17       MR. BOUSE: Mary, I know you anticipate
18 where Mr. Shaibani is going, let him finish
19 question before you answer because the court
20 reporter has difficulty taking that down.
21       THE WITNESS: Okay.
22       MR. BOUSE: Go ahead. I'm sorry.

Page 11

1  BY MR. SHAIBANI:
2     Q  Do you know how much Mr. Medlin put down
3  as his down payment for the house he purchased in
4  Georgetown?
5     A  No, I know what they paid for the house.
6     Q  Could it be possible that they put down
7  five percent only since it's their primary
8  residence?
9        MR. RANCK: Your question is it possible?
10       MR. BOUSE: I object, anything is
11 possible.
12       MR. RANCK: Calls for speculation.
13       MR. BOUSE: Answer if you know.
14       THE WITNESS: No.
15 BY MR. SHAIBANI:
16    Q  Wouldn't you agree just because somebody
17 buys an expensive house doesn't mean that they
18 actually put down a lot of money to purchase it,
19 they could have obtained a loan for 100 percent,
20 in fact, if it's their primary residence?
21       MR. BOUSE: Object, speculation,
22 argumentative. Go ahead, you can answer.

Page 12

1        THE WITNESS: Read it back.
2     (Court reporter read back the last question)
3        THE WITNESS: Unlikely at the price he
4  purchased the house.
5  BY MR. SHAIBANI:
6     Q  And what price was that?
7     A  200.
8     Q  Did you know Roberto Medlin before
9  October of 2005?
10    A  The first time I met her when she walked
11 into the office and I happened to be in the
12 office. And that was sometime around, I guess
13 very first of October, first part of October.
14    Q  And by your office, you're referring to
15 the 1622 Wisconsin Avenue location?
16    A  Yes.
17    Q  And did you give her a tour of the
18 property at that point?
19    A  I never left my chair but -- have you
20 been to the space?
21    Q  I haven't.
22    A  When you walk in the door, you see

Page 13

1  everything. It's a space twice or three times the
2  length of this.
3        MR. BOUSE: This being the conference
4  room, right?
5        THE WITNESS: This being the conference
6  room, yeah. It's all open. There's no
7  partitions.
8  BY MR. SHAIBANI:
9     Q  Well, did you --
10    A  So she would have seen everything when
11 she walked in.
12    Q  Did anybody show her the lower level of
13 the property at that point?
14    A  No, I didn't.
15    Q  Was Barrett Anderson there at that point?
16    A  Yes, he was there.
17    Q  Can you tell me what you discussed with
18 Ms. Medlin?
19    A  We discussed the fact that she has just
20 purchased a house in Georgetown. And so it was
21 nice to meet the person that I knew had purchased
22 the house there. I was familiar with the house

**Capital Reporting Company**

Page 14

```
 1  she purchased. She was from Kansas City. They
 2  were moving here. We discussed why they were
 3  moving here. And we discussed the kind of
 4  business she would have. She had a jewelry
 5  business. She had on a piece of her jewelry, so
 6  we talked about that.
 7      Q   Did you at any point commit to lease your
 8  property to Ms. Medlin?
 9      A   No.
10      Q   And you mentioned that she first walked
11  into your office in the beginning of October. Do
12  you remember if it was before October 6th when
13  Mr. Bratton first came to visit the property?
14      A   I can look back in my notes and see
15  approximately what date it was. I'm not sure of
16  the exact date.
17      Q   Did Ms. Medlin come to visit the property
18  before October 11th when she went to Chatel?
19      A   Oh, yes. And I think she saw the
20  property before I met her as her second visit.
21      Q   Did Ms. Medlin contact you to make an
22  appointment before she walked into your office?
```

Page 15

```
 1      A   No.
 2      Q   I'm going to jump around a little bit.
 3  Could you tell us how long you've been a broker, a
 4  real estate broker?
 5      A   Probably close to 30 years.
 6      Q   And are you licensed in DC, Virginia and
 7  Maryland?
 8      A   Yes.
 9      Q   Were you an agent with Chatel during your
10  career?
11      A   Yes.
12      Q   And do you remember the years when you
13  were affiliated with Chatel?
14      A   Late '60s.
15      Q   And did you go on to start your own real
16  estate brokerage after you left Chatel?
17      A   No, I went to the office of Michael
18  Sullivan Real Estate.
19      Q   I see. How long were you there for?
20      A   About four years.
21      Q   During your affiliation with Chatel, did
22  you come in contact with John Pagones?
```

Page 16

```
 1      A   Yes.
 2      Q   Could you describe your relationship with
 3  him?
 4          MR. BOUSE: While she worked at Chatel?
 5          MR. SHAIBANI: Yes.
 6          THE WITNESS: He was another agent in the
 7  office.
 8  BY MR. SHAIBANI:
 9      Q   Did you work on deals together on a
10  regular basis?
11      A   I don't know if John and I ever were on
12  the same deal or not but we were in the same
13  office. And it was not a large office.
14      Q   Was Thierry Liverman at that office when
15  you were working for Chatel?
16      A   No, I don't think he was there then. I
17  think he was in school.
18      Q   And what about at the -- well, in October
19  of '05, I would say actually beginning from the
20  summer of '05 until the present time, how would
21  you describe your relationship with John Pagones?
22      A   I don't know how to describe it. I don't
```

Page 17

```
 1  know how to answer that. It has to be more
 2  specific, I guess.
 3      Q   Are you friends or is it just a working
 4  relationship?
 5      A   It's a working relationship.
 6      Q   Did you specifically request John Pagones
 7  to be your agent?
 8      A   No.
 9      Q   Who did you contact at Chatel to list
10  your property?
11      A   Thierry Liverman.
12      Q   And did Thierry explain to you why he had
13  selected John Pagones to handle this transaction?
14      A   No.
15      Q   Did you at any time object to Thierry's
16  selection of John Pagones for your agent for
17  leasing the commercial space?
18      A   No.
19      Q   Were you satisfied with the way he had
20  done his duties in connection with the leasing of
21  the property?
22          MR. BOUSE: What period of time? All of
```

**Capital Reporting Company**

Page 18

1  it?
2        MR. SHAIBANI: From July through October
3  of '05.
4        THE WITNESS: On a sliding scale of one
5  to ten, it's probably five or six.
6  BY MR. SHAIBANI:
7     Q  And what would you say was the -- well,
8  you mentioned five or six. But the four points
9  that he lost, what contributed to that in your
10 view?
11    A  I don't know how to explain it any more
12 than that.
13    Q  Did you think that John Pagones's
14 interaction with John Bratton in connection with
15 the leasing of your property was unacceptable or
16 improper in any way?
17       MR. BOUSE: I object, you're assuming
18 that she knew at that time of any action with John
19 Bratton, right?
20       MR. RANCK: I object on the basis of lack
21 of foundation.
22       MR. BOUSE: I'll permitted you to answer

Page 19

1  but I object. Go ahead.
2        THE WITNESS: I don't know anything about
3  it.
4  BY MR. SHAIBANI:
5     Q  You don't know anything about --
6     A  Now by having read the depositions, I
7  know something about it. I didn't know anything
8  about it at the time.
9     Q  Well, why did you decide to hire
10 Mr. Forester to represent you in leasing the
11 transaction if --
12    A  Because John wasn't in the office.
13    Q  Well, wasn't Thierry in the office at
14 that point?
15    A  Thierry was probably in the office but we
16 needed to expedite things and get it done and get
17 it done right. And Gordon has been my lawyer for
18 many years. And he's advised me on lots of leases
19 and contracts.
20    Q  I assume Mr. Forrester is sitting here?
21       MR. FORRESTER: He is. Nice to meet you.
22       MR. BOUSE: To my right.

Page 20

1        MR. SHAIBANI: Pleasure.
2  BY MR. SHAIBANI:
3     Q  Was there any reason aside from John
4  Pagones being away from the office in October of
5  '05 that led you to hire Mr. Forrester?
6     A  No.
7     Q  Have you used Mr. Forester to lease your
8  property at any point?
9     A  Yes.
10    Q  Aside from the leasing to Mr. Bratton,
11 that is?
12    A  Yes.
13    Q  Could you tell us when that occurred?
14    A  One of them occurred rather recently when
15 someone came forwarded and wanted to rent a part
16 of the lower floor. And I just referred them to
17 Gordon.
18    Q  What about before your leasing of the
19 property to John Bratton, had you used
20 Mr. Forrester to lease your commercial space at
21 any point?
22       MR. RANCK: Let me just object to the use

Page 21

1  of the term lease. Are you talking about have you
2  used him to participate in negotiations or
3  anything of that nature or do you mean actually
4  perform the real estate duties?
5        MR. SHAIBANI: To negotiate and executed
6  a lease.
7        MR. RANCK: To be involved in the
8  transaction. Okay.
9        THE WITNESS: To my recollection, there
10 weren't any others.
11 BY MR. SHAIBANI:
12    Q  Wasn't there a company occupying the
13 basement of the property?
14    A  They had been there for a very long time.
15    Q  And Mr. Forrester didn't negotiate that
16 lease with the Shoreline Designs, I gather?
17    A  Well, I'm not certain but I don't think
18 so.
19    Q  Do you know why had Shoreline Designs
20 vacated the property?
21    A  They moved from the area and I think they
22 closed their business but they moved from the

**Capital Reporting Company**

Page 22

1  area.
2    Q  And was that in September of '05?
3    A  They gave notice the first of August and
4  vacated the end of August.
5    Q  And had their lease been expired at that
6  point?
7    A  No, they continued, renewed for a year.
8  It was just about time to redo it again.
9    Q  I see. Did their lease convert to a
10 month to month at the end of the initial term?
11   A  No, we always had a new lease.
12   Q  And was that part of the negotiations in
13 terms of them renewing their lease? I guess what
14 I'm trying to find if you agreed to give them an
15 option to renew their lease when they first moved
16 into the property or did they have to request that
17 at the end of their lease each time the period
18 ended?
19   A  I think I usually had to remind them that
20 the lease was terminating and we need to talk
21 about the following year or the coming here.
22   Q  I see. When Shoreline Designs vacated

Page 23

1  the property, did you provide any instructions to
2  Barrett Anderson in terms of what you wanted to do
3  with the basement?
4    A  After they vacated, the place was a mess.
5  So, yes, he cleaned it up for me and got -- had a
6  dumpster -- you know, trash people come and get
7  all the stuff out. They had been very heavy
8  smokers, so we had to paint it and get the carpet
9  out because I was not comfortable even going into
10 the space.
11   Q  And did you intend to lease the basement
12 at that point?
13   A  By the time all that was finished, it
14 would have been pretty much the end of September.
15 I think that -- I had -- by that time I was
16 affiliated with Washington Fine Properties, there
17 was a question about when I was going to have desk
18 space at Washington Fine Properties. So I was
19 going to need to use that space for myself if the
20 upstairs rented.
21   Q  And by using the basement for yourself,
22 are you referring to the entire floor or did you

Page 24

1  intend to keep the backside of the basement?
2    A  Originally I thought I could get away
3  with just using the back space but Barrett
4  continually said, "You're going to need more than
5  that." He was right, I did.
6    Q  What did you use the basement for in
7  September and October of '05?
8    A  As our office, the office of my -- I was
9  closing a 30 year business. So there was a
10 process of closing the office down.
11   Q  Did you actually go to the basement on a
12 daily basis in September and October of '05?
13   A  I don't think it was necessarily a daily
14 basis but certainly very frequently.
15   Q  And did you have like a computer and a
16 desk set up in the basement?
17   A  Yes.
18   Q  Weren't you trying to sell your furniture
19 in September and October of '05?
20   A  There were some furniture that had been
21 on the street level that didn't really fit
22 downstairs, yes, so we tried to sell some of that.

Page 25

1  There was more furniture upstairs than we needed
2  downstairs, a slightly smaller space.
3    Q  Didn't you instruct Barrett Anderson to
4  negotiate a lease for the basement to a gentleman
5  who worked out of his home in Georgetown?
6    A  No, I think that's someone who also just
7  walked in and Barrett told me about it, but, no.
8  He was seeking us after us, we weren't looking for
9  him.
10   Q  Did you have any conversations with
11 Barrett Anderson over the phone about his attempts
12 to lease the property to this gentleman?
13   A  I was aware that this person existed,
14 yes. And I would only have been aware of it by
15 conversation with Barrett.
16   Q  And how many times did Barrett talk to
17 you about this gentleman?
18   A  A few times because he was persistent
19 about wanting to rent it.
20   Q  And what did you tell him in response?
21   A  As it went on, it became more and more
22 apparent that I couldn't give the space up.

7 (Pages 22 to 25)

Capital Reporting Company

Page 26

1  Q  And are you referring to the entire floor
2  or just the backside?
3  A  I missed a word there.
4  Q  The entire basement or the backside of
5  the basement?
6  A  Now or --
7     MR. BOUSE:  At that time.
8     THE WITNESS:  At that time he wanted the
9  back space.  He really wanted an address is what
10 he was looking for.  So he wanted to rent as small
11 as amount of space as possible to qualify him for
12 having an address.
13 BY MR. SHAIBANI:
14 Q  Did you inform Barrett Anderson you would
15 be willing to lease the front portion of the
16 basement to this gentleman?
17 A  No, we never talked about that, as far as
18 I can remember.
19 Q  Did you actually terminate Chatel to hire
20 John Gordon Forrester in connection with leasing
21 your commercial property to John Bratton?
22 A  No, Gordon worked with Chatel on the

Page 27

1  project.
2  Q  Are you aware that Mr. Forrester informed
3  John Bratton that Chatel had been terminated at
4  that point?
5     MR. BOUSE:  I object.
6     MR. RANCK:  Foundation.
7     MR. BOUSE:  You can answer, if you know.
8     THE WITNESS:  I don't know anything about
9  that.
10 BY MR. SHAIBANI:
11 Q  Could you tell us why you would hire a
12 real estate brokerage to lease your property and
13 paid them a commission, selected an attorney to do
14 the same job?
15    MR. BOUSE:  Is that the end of the
16 question?
17    MR. SHAIBANI:  Yes.
18    MR. BOUSE:  I object.  Didn't she answer
19 this before?  She told you why she got Gordon
20 involved, Mr. Forrester, rather for the record.
21 You can answer again.
22    THE WITNESS:  Yeah, unless I

Page 28

1  misunderstood the question.
2  BY MR. SHAIBANI:
3  Q  Well did you think in any way it's unfair
4  for you to pay a commission to Chatel and at the
5  same time to pay for your attorneys to negotiate
6  the same lease?
7  A  It seemed to be the most expedient way to
8  get things done.  John was the one who was really
9  supposedly handling everything and he wasn't
10 around.
11 Q  Did Thierry Liverman inform you that he
12 didn't have the time to take care of the lease
13 himself?
14 A  No, but he's a very busy man.  He runs
15 the office.
16 Q  And did he tell you that he couldn't find
17 anybody else to take over the lease after John
18 Pagones had gone on his religious leave?
19 A  No.
20 Q  Did you request Thierry to find another
21 agent to lease the property to John Bratton after
22 Mr. Pagones had left?

Page 29

1  A  No.
2  Q  Are you an attorney?
3  A  No.
4  Q  Have you gone to law school?
5  A  No.
6  Q  How many years did you -- well, when did
7  you work at the White House?
8  A  '60 until the end of -- '65, I left the
9  end of '65.
10 Q  And what was your position at the White
11 House?
12 A  During the Kennedy administration, I was
13 assistant to Theodore Sorensen, who was the
14 special counsel to the president.  During the
15 Johnson's administration I worked under Jack
16 Valenti and President Johnson.
17 Q  In what capacity?
18 A  Primarily worked -- well, the first thing
19 I did -- when you work for the President, you do
20 whatever he wants you to do but some of the
21 specific things was that after the -- you have to
22 go back to the events of November '63 and January

**Capital Reporting Company**

Page 30

1  after we had done the -- submitted the budget and
2  a couple of other things, which the President is
3  doing right now. Then Johnson who had not planned
4  to run for President found he was running for
5  President he assigned me to the campaign for the
6  duration of the campaign.
7      Q  Could you tell us about your educational
8  background?
9      A  High school graduate and a college
10 graduate.
11     Q  From which university?
12     A  Saint Mary's College, Notre Dame,
13 Indiana. Saint Mary's is all spelled out.
14     Q  How long have you owned the 1622
15 Wisconsin Avenue property?
16     A  A long time. I don't know how long.
17 Long time.
18     Q  Did you occupy the street level of that
19 property as the office location for Mary White
20 Real Estate?
21     A  Yes.
22     Q  And how long were you occupying that

Page 31

1  location as your office?
2      A  Well, we first occupied the space
3  upstairs. We were upstairs for 10 or 15 years
4  probably. And then the stairs got to be a bit
5  much for us, a steep set of stairs and we moved
6  downstairs for a long period of time.
7      Q  And by upstairs, do you mean the
8  residential unit on the second floor?
9      A  Uh-huh.
10     Q  Did you undergo training related to the
11 DC Human Rights Act and the Fair Housing Laws in
12 connection with your continuing education or
13 obtaining a real estate brokerage license?
14     A  Yes.
15     Q  And how many hours of training did you
16 have in this area?
17     A  Whatever was required by the board.
18     Q  Is that on an annual basis?
19     A  I think it's every two years your license
20 is renewed so you complete your education during
21 that two year period.
22     Q  And did you ever take classes with Tom

Page 32

1  Lynch?
2      A  Yes.
3      Q  Do you recall the dates of these classes?
4      A  Most recent one was about two weeks ago.
5      Q  Did you have any discussions with Tom
6  Lynch about this case?
7      A  No.
8      Q  Why did you decide to take that class
9  with Tom Lynch two weeks ago?
10     A  Because it was the only one that the
11 board was offering in a DC location.
12     Q  I see.
13     A  Otherwise they have us go out to Silver
14 Springs.
15     Q  And did Mr. Tom Anderson or Dana Landry
16 advise you to take that class?
17     A  No. They just advise us to take a class.
18 We have to keep our license up to date.
19     Q  But did they advise you to take a class
20 relating to the Fair Housing Laws and
21 anti-discrimination?
22     A  That's required.

Page 33

1      Q  I guess what I'm trying to get at after
2  we took Mr. Anderson's deposition, which was
3  approximately a month ago, was it after that point
4  that the office at Washington Fine Properties
5  requested you take this class?
6          MR. BOUSE: Objection. She answered
7  that. She said it's mandatory.
8          MR. RANCK: Objection, mischaracterizes
9  her testimony.
10         THE WITNESS: Yes, it's mandatory.
11 BY MR. SHAIBANI:
12     Q  Do you know if John Pagones had training
13 related -- relating to the Fair Housing Act and
14 the DC Human Rights Act?
15         MR. FORRESTER: Oh, God.
16         MR. BOUSE: Go ahead, if you know.
17         THE WITNESS: If he's a licensed agent,
18 he certainly would have had it, I assume he is.
19 BY MR. SHAIBANI:
20     Q  Did you in fact have to have
21 approximately 240 hours of classes to be eligible
22 to have a brokerage license?

**Capital Reporting Company**

Page 34

1  MR. BOUSE: Are you talking about when
2  she first was licensed or now or --
3  MR. SHAIBANI: Yes.
4  MR. BOUSE: When she was first licensed
5  30 years ago? Okay.
6  THE WITNESS: I don't know what that
7  requirement was then.
8  BY MR. SHAIBANI:
9  Q  But there was a two step process before
10 you could become a broker, you would first have to
11 become a sales agent and then --
12 A  And then you become a broker, yes, that's
13 always been the case.
14 Q  And would you say that real estate
15 brokers are more experienced by virtue of having
16 to conduct additional course work and training
17 before they could apply for that license?
18 MR. RANCK: Objection.
19 MR. BOUSE: Objection.
20 THE WITNESS: I don't know. We all take
21 the same classes.
22 BY MR. SHAIBANI:

Page 35

1  Q  To your knowledge, did Thierry Liverman
2  take his classes related to the Fair Housing Act
3  and the anti-discrimination laws?
4  A  There's no way I would know that.
5  Q  Have you ever reviewed Chatel's fair
6  housing manual?
7  A  No.
8  Q  Did Mary White Real Estate have a fair
9  housing manual of its own?
10 A  We had material that was supplied by the
11 board, yes, and by the DC real estate commission.
12 Q  And that material related to
13 anti-discrimination laws?
14 A  Yes.
15 Q  Did you review that material at any point
16 prior to October of '05?
17 A  Reviewed every two years in class.
18 Q  Would you say that you are were familiar
19 with the DC Human Rights Act and the Fair Housing
20 Laws governing anti-discrimination under the
21 context of real estate transactions?
22 A  Yes.

Page 36

1  Q  Were you familiar with these laws back in
2  October of '05?
3  A  Yes.
4  Q  Does Washington Fine Properties have a
5  fair housing manual of its own?
6  A  I don't think so.
7  Q  Does Washington Fine Properties have any
8  sort of manual relating to anti-discrimination
9  laws?
10 A  Manual? If there is one, I haven't seen
11 it. There could be but I haven't seen it.
12 Q  And you weren't supplied with that
13 manual, I gather, since you haven't seen it?
14 A  They have regular classes that -- we meet
15 once a week and certainly that's something that's
16 talked about at the meetings, not every meeting
17 but certainly some of them.
18 Q  Earlier you mentioned that you were
19 working at Chatel in the '60s. Do you remember
20 approximately how many years you were affiliated
21 with them?
22 A  I think I was affiliated with them for

Page 37

1  four years. Part of that time I was a part time
2  agent. I was also working for a law firm.
3  Q  In what capacity?
4  A  Administrative assistant or something
5  like that, office manager.
6  Q  Which law firm, if I may ask?
7  A  Stroock Laven.
8  Q  Did Chatel manage the 1622 Wisconsin
9  Avenue location prior to the summer of '05?
10 A  No.
11 Q  And did you select Thierry Liverman as
12 your broker for leasing the 1622 property because
13 Chatel also manages properties?
14 A  That was probably part of it.
15 Q  How long have you known Thierry Liverman
16 for?
17 A  A long time. I knew his mother -- his
18 mother had the job that he now has, so --
19 Q  And how would you describe your
20 relationship with Thierry Liverman?
21 A  I didn't hear the whole question.
22 Q  Sorry, how would you describe your whole

10 (Pages 34 to 37)

Capital Reporting Company

Page 38
1  relationship with Thierry Liverman back in --
2  well, from the summer of '05 through October '05?
3      A   It's a professional relationship.
4      Q   Would you say that you trusted him?
5      A   Yes.
6      Q   And has that relationship changed in any
7  way since October of '05?
8      A   No.
9      Q   Were you close with Thierry Liverman's
10 mother when --
11     A   She was my first broker.
12     Q   How many lease transactions have you
13 handled in your capacity as a real estate broker?
14         MR. BOUSE:  Past history or past year?
15 I'm sorry, I didn't hear you.
16 BY MR. SHAIBANI:
17     Q   In your capacity as a real estate
18 broker --
19         MR. BOUSE:  Forever?
20         MR. FORRESTER:  30 years?
21         MR. BOUSE:  That's why I'm asking.
22         THE WITNESS:  I don't know.

Page 39
1          MR. BOUSE:  If you have an estimate, if
2  you don't have an estimate, tell him so.
3          THE WITNESS:  At one point we had about a
4  dozen properties in residential management
5  ourselves.  Things change.
6  BY MR. SHAIBANI:
7      Q   Would you --
8      A   So we wrote leases on -- they were
9  primarily residential leases.
10     Q   And would the leases that you wrote was
11 through Mary White Real Estate, I gather?
12     A   Yes.
13     Q   And would you estimate the total number
14 of those leases to be over 100?
15     A   No.
16     Q   How many years were you managing those 12
17 properties?
18     A   Probably 15.
19     Q   15 years.
20     A   And gradually they sold off.  We managed
21 properties only for people who we had sold the
22 property to and then they were usually transferred

Page 40
1  overseas so then we managed it for them while they
2  were overseas.  We never solicited management
3  business.
4      Q   And to your knowledge, did the tenants
5  for those 12 properties renew their leases for
6  several years or were their new tenants?
7      A   No, I think there were new tenants.
8      Q   How many commercial leases have you
9  handled throughout your career as a broker?
10     A   Very few.
11     Q   And does that include your own office?
12     A   It would only be our office.
13     Q   What about commercial sales, do you have
14 any experience with that?
15     A   I've sold a few commercial properties.
16     Q   Would you say that the leasing of your
17 office space at 1622 Wisconsin Avenue doesn't
18 require a whole lot more knowledge than the
19 leasing of the residential unit in the same
20 building?
21         MR. BOUSE:  Object.
22         MR. RANCK:  Objection.

Page 41
1          MR. BOUSE:  How in the world -- you can
2  answer.  I object.
3          THE WITNESS:  Well, there's different
4  laws.  There's different latitudes, yeah.  The
5  District has gotten much more involved in telling
6  us how to do our business over the years.
7  BY MR. SHAIBANI:
8      Q   But that involvement is limited to
9  residential properties, isn't it?
10     A   No, not necessarily.
11     Q   Would you say it's more difficult to
12 lease your commercial property than the
13 residential unit that you own in the same
14 building?
15         MR. RANCK:  Objection to the form, vague.
16         MR. BOUSE:  I object, relevance.  Mary,
17 go ahead and answer, if you can, if you think
18 they're different.
19         THE WITNESS:  They're different.
20 BY MR. SHAIBANI:
21     Q   Do you consider yourself qualified to
22 lease a commercial unit such as the one you owned?

11 (Pages 38 to 41)

**Capital Reporting Company**

Page 42

1  MR. BOUSE: I object. Go ahead.
2  THE WITNESS: I would with prefer to work
3  with someone who was a professional doing it
4  because the District laws are constantly changing
5  on this.
6  BY MR. SHAIBANI:
7  Q   And is that why you decided to hire
8  Thierry Liverman to lease your property?
9  A   I suppose it's one of the reasons.
10  Q   Were you satisfied with Thierry
11  Liverman's performance in leasing your property?
12  MR. BOUSE: I object. Relevance. Go
13  ahead. You can answer.
14  MR. RANCK: Let me object on foundation
15  as well and vague. I don't know what performance,
16  what aspect he's talking about but if you can
17  answer the question.
18  THE WITNESS: I don't know how to answer
19  that.
20  MR. BOUSE: Okay.
21  BY MR. SHAIBANI:
22  Q   Did he do a good job in leasing your

Page 43

1  property or did he do such a lousy job that you
2  had to find somebody else to take care of it for
3  you?
4  MR. BOUSE: I object, she's already
5  answered the reasons why she got Gordon involved,
6  if that's what you're referring to. Now you want
7  her to grade Thierry Liverman?
8  MR. SHAIBANI: Yes.
9  MR. BOUSE: If you can answer it, you
10  can.
11  MR. RANCK: Let me object on asked and
12  answered and argumentative and lack of foundation.
13  BY MR. SHAIBANI:
14  Q   From a scale of one to ten, how would you
15  grade Thierry Liverman's performance in leasing
16  your property?
17  MR. BOUSE: I object for the same reasons
18  stated before. Go ahead, Mary, if you can.
19  THE WITNESS: It was pretty good. Could
20  probably have been better but it was all right.
21  BY MR. SHAIBANI:
22  Q   And your assessment also applies to the

Page 44

1  leasing of the property to John Bratton?
2  A   Yeah.
3  Q   To your knowledge does Chatel engage in a
4  large volume of lease transactions as part of its
5  business?
6  A   Yes.
7  Q   And does Chatel also engage in the
8  leasing of commercial properties as part of its
9  business?
10  A   I thought they did more of it than I
11  guess they do.
12  Q   Do you believe that Chatel's agents and
13  their broker have the requisite expertise and
14  knowledge to handle commercial lease transactions?
15  MR. RANCK: Objection, foundation,
16  speculation.
17  MR. BOUSE: I object.
18  THE WITNESS: I would think so.
19  BY MR. SHAIBANI:
20  Q   Did you enter an exclusive agency
21  agreement with Chatel when you decided to lease
22  the 1622 Wisconsin Avenue property?

Page 45

1  A   That was my understanding of it.
2  Q   And would that type of agreement require
3  you to pay them a commission even if you found a
4  tenant yourself?
5  A   Yes.
6  Q   And would you have less incentive to go
7  out to find a tenant on your own then since you
8  have to give them a commission anyhow?
9  A   I wasn't in the business of renting my
10  space. I hired somebody to handle that.
11  Q   I see. So you would say that you didn't
12  take an active role in having Roberta Medlin lease
13  your office space?
14  A   Correct.
15  Q   Do you know what happened to the
16  exclusive rental agreement that you signed with
17  Chatel for the commercial property?
18  A   No.
19  Q   Were there two separate agreements, one
20  for the residential unit and one for the
21  commercial?
22  A   I would think so, but I am not certain of

12 (Pages 42 to 45)

## Capital Reporting Company

Page 46
1  of that. It could have all been wrapped up into
2  one.
3      Q  Did you maintain a file relating to the
4  1622 Wisconsin Avenue property when you were
5  closing down your office?
6         MR. BOUSE: A file of what? What are you
7  talking about? Just leasing of it or everything?
8         MR. SHAIBANI: Yes.
9         MR. BOUSE: Just the leasing of it?
10        THE WITNESS: No.
11 BY MR. SHAIBANI:
12     Q  You didn't keep track of the tenants who
13 had leased the property and those who were
14 interested in leasing it? What type of
15 documentation did you maintain in connection with
16 the leasing of your property?
17     A  I don't know what you mean. I don't know
18 what you want.
19     Q  Well, Barrett Anderson mentioned there
20 was apparently a file relating to this 1622
21 Wisconsin property. I wanted to know what the
22 contents of that file is.

Page 47
1      A  It was probably all of the things we were
2  doing to close the office. We had errors and
3  omissions insurance that Barrett was doing and it
4  was something in process so that was part of it.
5  There were other things that we had to do to close
6  the business. I'm sure he had a file on all of
7  that. That would have been his file. That's what
8  he was hired to do.
9      Q  And what did Barrett Anderson do with
10 that file?
11     A  I have no idea.
12     Q  Did you instruct him to discard documents
13 in that file?
14     A  No.
15     Q  Did you instruct Barrett Anderson to get
16 rid of various documents in your office in
17 connection with the closing of your office?
18     A  No, they are probably around someplace.
19 I don't know where.
20        MR. BOUSE: He meant documents not
21 referring to this lease but documents about your
22 business, is that what you meant?

Page 48
1         THE WITNESS: The financial side of the
2  business? I don't know what you're talking about.
3  BY MR. SHAIBANI:
4      Q  No specifics. Were there documents that
5  were shredded or discarded as part of the closing
6  of your office?
7      A  We went through all of our real estate
8  files for 30 years and we did destroy or shred or
9  whatever you want to call it, parts of contracts
10 that were no longer relevant. We went through and
11 kept only a settlement sheet and if we had a plat,
12 if the survey, was there. Everything else we
13 threw away.
14     Q  And does that include documents relating
15 to the 1622 Wisconsin Avenue property as well?
16     A  I don't know. I think those are probably
17 still around someplace but I don't know where.
18 That was still ongoing. But I was just speaking
19 of before cases that were closed.
20     Q  I see. Could you tell us what
21 instructions you provided to Chatel when you hired
22 them to lease the commercial units of your

Page 49
1  property?
2      A  Well, we first dealt with them on renting
3  the residential part. And then before that was
4  rented, I made the decision to join Washington
5  Fine Properties. So we were going to be closing
6  the office. And I need the question again, I sort
7  of lost track of it.
8      Q  The instructions that you gave to Chatel
9  when you hired them to lease your property.
10     A  I'd like three tenants is one of the
11 things we talked about. That goes all the way
12 back to Thierry's mother and her advice on how to,
13 you know, remodel the building. So I have three
14 tenants. And there are certain businesses that I
15 did not want because I knew that the building
16 wasn't equipped to handle them, mostly those have
17 to do with something like a beauty salon or food
18 or nails, those kinds of things.
19     Q  Were there any other instructions?
20     A  I don't think so.
21     Q  And --
22     A  We probably talked about rent, the amount

13 (Pages 46 to 49)

## Capital Reporting Company

Page 50
1  of rent.
2  Q  Were these instructions in writing or
3  verbal?
4  A  Verbal.
5  Q  And who did you give these instructions
6  to?
7  A  I remember us all just standing in the
8  office. I know Thierry was there. I believe John
9  was, Patsy Petty was there. We had already been
10 working together to rent the upstairs.
11 Q  This is when they came down to 1622
12 Wisconsin Avenue property to tour it and obtain
13 the keys from you back in the summer of '05?
14 A  Yes.
15 Q  And then from then until October 6 of '05
16 did your instructions change in any way?
17 A  No, I don't think so.
18 Q  Is it your testimony that when Thierry
19 Liverman and Patsy Petty and John Pagones came to
20 your office at 1622 Wisconsin Avenue in the summer
21 of '05, you actually instructed them that you
22 wanted three separate tenants for your property?

Page 51
1  A  Uh-huh.
2     MR. BOUSE: Is that a yes?
3     THE WITNESS: Yes, that was just a
4  renewed statement. We had already gone through
5  the exercise of talking about how we were going to
6  rent the upstairs.
7  BY MR. SHAIBANI:
8  Q  Did Barrett Anderson provide any
9  instructions to Chatel in connection with the
10 leasing of your property?
11    MR. RANCK: Objection, speculation.
12    THE WITNESS: That would not have been in
13 his duties.
14 BY MR. SHAIBANI:
15 Q  Didn't you ask him once to go down to
16 Chatel and inform John Pagones to flower up the
17 listing and the MIRS for your property?
18 A  I think we talked about the fact that the
19 description, maybe the ad they were running didn't
20 seem to have enough punch in it. To, you know --
21 and I think he talked to him about that.
22 Q  And when did that discussion take place,

Page 52
1  to your knowledge?
2  A  Well, it was -- oh dear. Probably in
3  maybe August.
4  Q  Would you say that from July through the
5  end of September of '05 there wasn't much traffic
6  and interest in your commercial property?
7  A  I think there was traffic but there were
8  some people who talked about wanting to -- before
9  the upstairs was rented, there were people who
10 talked about wanting to rent the street level and
11 live above the shop, so to speak. That was
12 presented to me a couple of times. And I said I
13 was not interested in that arrangement.
14 Q  Did anybody present you with a lease
15 offer from July?
16 A  No, it ended right there.
17 Q  I see. Just to be precise then from July
18 through the end of September or actually from July
19 through October 5th of '05, there were no offers
20 to presented to lease the commercial property?
21 A  There were no offers, that's correct.
22 Q  Wasn't John Bratton the first person to

Page 53
1  present an offer to lease the commercial unit of
2  your property?
3     MR. BOUSE: Object. Go ahead.
4  BY MR. SHAIBANI:
5  Q  After it had been --
6  A  There seems to be some confusion as to
7  when Bobbi Medlin presented hers and John
8  presented his. They were all done at Chatel so I
9  don't really know about that.
10 Q  The property management agreement and
11 exclusive rental agreement that you signed with
12 Chatel, didn't you specify in there that the lease
13 you wanted to use for the commercial space was
14 Chatel's boiler plate lease agreement?
15 A  Yes.
16 Q  And I'm referring to the commercial lease
17 agreement?
18 A  Uh-huh.
19 Q  And did you have any intentions as to
20 whether you wanted Chatel's boiler plate lease to
21 be modified in any way at the time that you signed
22 the exclusive rental agreement?

14 (Pages 50 to 53)