**Capital Reporting Company**

Page 54

1  MR. RANCK: I'm sorry I think I object.
2  Can you read that back first?
3  (Court reporter read back the last question)
4  MR. RANCK: I object as to lack of
5  foundation.
6  MR. BOUSE: I object also.
7  MR. RANCK: Unless you're going to show
8  the document. Because you haven't established
9  that she knows what the boiler plate agreement
10 says.
11  MR. BOUSE: Do you have it? Show it to
12 her. There's one of Chatel around here someplace.
13 Do you know what he's asking?
14  THE WITNESS: Yeah, I don't think we even
15 talked about it.
16  MR. BOUSE: You don't have to mark it,
17 unless you want to mark it.
18  MR. SHAIBANI: Yes, why don't I mark it
19 as Exhibit 1.
20  (White Exhibit No. 1.
21  was marked for identification).
22  MR. RANCK: What is that that's being --

Page 55

1  THE WITNESS: It's a property management
2  and exclusive rental agreement.
3  MR. BOUSE: It's not the commercial
4  lease.
5  THE WITNESS: For Maryland and
6  Washington, DC. I thought we were talking about
7  the lease.
8  MR. BOUSE: We were talking about the
9  lease.
10 BY MR. SHAIBANI:
11  Q  Do you recognize this document that's
12 been marked as Exhibit 1?
13  A  Yes, uh-huh.
14  Q  And is it your signature on the last page
15 of this document?
16  A  Yes.
17  Q  And do you see the date of June 2nd, '05?
18  A  Yes.
19  Q  Was that the date that you signed this
20 agreement?
21  A  I think so.
22  Q  Now going to the -- what's designated as

Page 56

1  page 3 CH 3 on this document. If you could please
2  take a look at paragraph 14, which is towards the
3  bottom of the page where it says, "additional
4  provisions."
5  MR. BOUSE: No. 4, you said?
6  MR. SHAIBANI: Yes, it's actually 14,
7  apparently.
8  MR. BOUSE: Yeah, 14.
9  THE WITNESS: The numbers are off on
10 here.
11  MR. BOUSE: Yeah. The number above it is
12 okay.
13  THE WITNESS: Doesn't it say Chatel's
14 lease?
15 BY MR. SHAIBANI:
16  Q  Yes, that's what I am asking. Is that
17 the instruction you gave to Chatel when you signed
18 this agreement?
19  A  Looks like it was what Thierry suggested
20 and I must have agreed by signing it.
21  Q  And when you signed this, did you have
22 any intentions to modify Chatel's lease in any way

Page 57

1  with respect to the commercial property?
2  A  That could happen, that's a possibility.
3  MR. RANCK: I object on lack of
4  foundation. She answered the question.
5  MR. BOUSE: Right.
6  BY MR. SHAIBANI:
7  Q  Did you tell Thierry Liverman that you
8  didn't want to have a right of first refusal and
9  option to renew to be a part of Chatel's lease for
10 the commercial space of the property at the time
11 that you signed this agreement on June 2nd of '05?
12  A  I don't know.
13  Q  What about afterwards, from June 2nd?
14  A  It was to be a two year lease. Where it
15 says one year, that was for the place upstairs.
16  Q  What were your --
17  A  This is one year for the listing, right?
18  MR. BOUSE: Right.
19  THE WITNESS: Maximum two years. I can't
20 read it.
21  MR. BOUSE: Two year, minimum one year.
22 Looking at paragraph 2.

15 (Pages 54 to 57)

Capital Reporting Company

Page 58

1  THE WITNESS: Yes, number of occupants
2  two, yeah. Number of occupants two would be for
3  the number of occupants upstairs.
4  BY MR. SHAIBANI:
5    Q  Do you recall having a conversation with
6  John Bratton after he presented his offer to lease
7  your property?
8    A  I remember John calling me one evening
9  when I was with a client at Carpet Land or
10 something like that on Wisconsin Avenue. We were
11 picking out carpet for a listing which I had. And
12 he called and I couldn't talk because I was
13 already involved with a client and the salesperson
14 for the carpet and everything else.
15   Q  And did you attempt to call him back at
16 any point afterwards?
17   A  No, I think I suggested, "Call John, he's
18 handling that for me. I'm busy handling my
19 client," who was selling her home.
20   Q  Didn't you inquire as to what John
21 Bratton wanted to do with the backyard of your
22 property after he presented his offer?

Page 59

1    A  No.
2    Q  You didn't tell John Pagones to find out
3  John Bratton's intentions with respect to the
4  backyard of the commercial property?
5    A  I don't know how he's going to get from
6  the street level rental to the garden, so I
7  wondered about that, was he planning to put a
8  staircase on the back or what was he going to do.
9    Q  Was the garden supposed to be part of the
10 leasing space for the street level of the
11 property?
12   A  No, that goes with the lower level.
13   Q  And did you plan to use the garden for
14 yourself?
15   A  No, just something that's there.
16   Q  Would you have leased the garden as part
17 of the basement level to the person who was going
18 to take the front portion of the basement?
19      MR. BOUSE: I object. Can you lease a
20 garden? I object. If you understand the
21 question, answer.
22 BY MR. SHAIBANI:

Page 60

1    Q  Was the garden supposed to be part of the
2  lease for the basement in terms of the --
3    A  It's the only part that it could be for,
4  would be for the lower level. And if it's going
5  to be part of their lease, then we have to get
6  into what they're going to do about taking care of
7  it.
8    Q  Was Chatel your real estate agent in
9  October of '05 for the purpose of leasing the
10 commercial units of your property?
11   A  Yes.
12   Q  Was John Pagones your real estate agent
13 in October of '05 for the purpose of leasing the
14 commercial units of your property?
15   A  He was the agent that Thierry Liverman
16 appointed.
17   Q  And did you deal -- did John Pagones deal
18 directly with you in your capacity as the real
19 estate agent?
20      MR. BOUSE: Object, Pagones was the real
21 estate agent appointed by Thierry Liverman. You
22 can characterize it any way you want the question

Page 61

1  I object to it.
2       THE WITNESS: I think John occasionally
3  called me and I took his calls if I could.
4  BY MR. SHAIBANI:
5    Q  And did you discuss with him what your
6  intentions were with respect to the property?
7    A  That I wanted three tenants, yes, and
8  there were certain businesses I didn't want, yes.
9    Q  Was there anything else you discussed
10 with John Pagones?
11      MR. RANCK: Objection.
12      MR. BOUSE: Objection.
13      MR. RANCK: I object to the form and
14 vagueness of the question.
15      MR. BOUSE: Right, I object.
16 BY MR. SHAIBANI:
17   Q  Any other instructions that you provided
18 to John Pagones with respect to the leasing of
19 your commercial property in '05?
20      MR. RANCK: Same objection.
21      MR. BOUSE: Same objection.
22      THE WITNESS: I don't know. I don't know

**Capital Reporting Company**

Page 62

1  what you're talking about.
2  BY MR. SHAIBANI:
3      Q  Did you tell John Pagones that you didn't
4  want to have the tenant for the commercial
5  property to have a right of first refusal and an
6  option to renew their lease?
7      A  That came up when we got into the
8  negotiation of a lease.
9      Q  And --
10     A  I had stated in here, I wanted a two year
11 lease, period.
12     Q  And this discussion that you had with
13 Chatel occurred after John Bratton presented his
14 offer to lease the property, isn't that correct?
15         MR. BOUSE:  I object.  Go ahead.
16         THE WITNESS:  The original instruction
17 was a two year lease.  We certainly talked about
18 it again.  It was always a two years lease.
19 BY MR. SHAIBANI:
20     Q  Yes, but the instructions that you gave
21 were also to use the Chatel lease and that lease
22 has a right of first refusal as one of its

Page 63

1  provisions and it converts to a month to month,
2  doesn't it?
3         MR. BOUSE:  I object she already said
4  there were going to be changes when she negotiated
5  the lease.  She already testified to that.  It's
6  argumentative.
7         MR. RANCK:  And I object, too.  You're
8  mischaracterizing the testimony and the evidence.
9  Your prior question even used the term boiler
10 plate.  And the witness did say modifications were
11 certainly possible.
12 BY MR. SHAIBANI:
13     Q  Didn't the MIRS -- I'll rephrase the
14 question actually.  Did you provide the
15 information to John Pagones or Chatel to create
16 the MIRS listings for the commercial units of your
17 property?
18     A  I'd say probably yes and no.  When John
19 and Thierry and Patsy were in the building, we
20 talked about the building.  We had no further
21 discussion about it.
22     Q  Did you review the MIRS listing?

Page 64

1      A  Not immediately.
2      Q  How many days did it --
3      A  Sometime later.
4      Q  Was it like less than a month?
5      A  When did it start?
6      Q  Why don't I pass this to you as Exhibit
7  2?
8         (White Exhibit No. 2
9         was marked for identification).
10        MR. BOUSE:  Thank you.
11        THE WITNESS:  It doesn't say when it
12 started.
13        MR. BOUSE:  I'm trying to find it.
14        THE WITNESS:  Days on the market 66.
15 What day was this run, do you know?
16 BY MR. SHAIBANI:
17     Q  The list date apparently July 29th of
18 '05, its on the third page.
19     A  You wanted to know --
20     Q  Yes, I wanted to know how many days after
21 the listing was posted -- well, I guess my
22 question is when did you review this listing after

Page 65

1  it was posted on the MIRS?
2      A  I don't know.
3      Q  Was it within a month?
4      A  We tried to figure out when it started.
5  And I don't think --
6         MR. BOUSE:  There's a listing right back
7  here.  I don't know if this helps you or not.
8         THE WITNESS:  Listing, oh, July 29th.
9         MR. BOUSE:  You tell me.
10        THE WITNESS:  I thought it was listed
11 prior to that.
12        MR. RANCK:  I would just ask the witness
13 not to guess or speculate in response to the
14 question, if you have a reasonable estimate as to
15 when you reviewed the listing, that's obviously
16 fair game.
17        THE WITNESS:  No, I don't.
18 BY MR. SHAIBANI:
19     Q  By September of '05, did you review this
20 listing?
21     A  I said I don't know when I did.
22     Q  Well, a moment ago you mentioned that you

17 (Pages 62 to 65)

Capital Reporting Company

Page 66

1  had instructed Barrett Anderson to tell John
2  Pagones to flower up the listing?
3      A   I think it was the ad in the paper, not
4  the listing.
5      Q   By October of '05 did you review this
6  listing by October 5th of '05?
7         MR. BOUSE:  I object, she said she
8  doesn't know.
9         THE WITNESS:  I don't know.
10        MR. BOUSE:  It's funny that she doesn't
11 know?
12        THE WITNESS:  I was really pretty busy at
13 this time.
14 BY MR. SHAIBANI:
15    Q   Do you typically allow your real estate
16 agents to create a listing without reviewing it or
17 consulting with them as to the contents?
18        MR. BOUSE:  I object.
19        MR. RANCK:  Objection.
20        THE WITNESS:  Well, I know myself when I
21 enter something in, I don't go back to my sellers
22 and go over it with them.  We talk about it

Page 67

1  beforehand but then I have leeway to fill in the
2  blanks.
3  BY MR. SHAIBANI:
4      Q   And is that the process that took place
5  with respect to this listing --
6      A   I don't know.
7      Q   -- that you gave the information to John
8  Pagones and he then put it up?
9      A   I don't know what information are you
10 talking about?
11    Q   Well, I was going to go over that with
12 you.  Let's start with the remark section.
13 "Entire first floor all renovated.  685 square
14 feet.  Near shops and transportation.  Great for a
15 consultant or office.  To show, if front door is
16 not open and office is not open, use the lockbox
17 near the front door, the lock box in the rear.
18 Front lockbox is for the lower unit."
19    A   That sounds like it's all John's
20 language.
21    Q   Going back to the bottom of the page, the
22 security deposit, $2,500, it's under financial

Page 68

1  information on the second page, did you provide
2  that information to John Pagones, the $2,500?
3      A   Security deposit is usually one month's
4  rent, so, I don't know whether I did or whether
5  John did but that's normal.
6      Q   What about the list price that's on the
7  first page?
8      A   We would have certainly discussed the
9  list price take probably with Thierry.
10    Q   If you could look at the second page
11 under financial information, the middle column
12 where it says dates available 9-1-05, did you
13 provide that information to Chatel?
14    A   That's possible it was mentioned to them.
15 I think they came to see me in May, the end of
16 May.  And at the end of May, I certainly was
17 hopeful that I was going to be in Washington Fine
18 Properties office by the first of September.  I
19 think they were hopeful I would be too.
20    Q   What about the minimum maximum lease
21 which is beneath the date available?
22    A   I have no idea.  I've said two years on

Page 69

1  here.  I don't know where he got that.
2      Q   The 12 -- is the 12 a typo, it should be
3  12 slash 48?
4      A   I don't know.
5      Q   Are you testifying that Chatel made up
6  the number 48?
7         MR. BOUSE:  Objection, she did not
8  testify to that.  I object.
9         MR. RANCK:  I object to the form of the
10 question.
11        MR. BOUSE:  She's answered the question.
12 Her agreement with Chatel says two years, that's
13 what she testified to.
14        MR. RANCK:  Foundation and argumentative.
15 BY MR. SHAIBANI:
16    Q   My question is though did Chatel make up
17 the number 48 on this listing?
18    A   You'll have to ask them, I don't know.
19    Q   Well, have you reviewed their deposition
20 transcripts, the transcripts for the deposition of
21 John Pagones and Thierry Liverman?
22    A   I read them once.

Capital Reporting Company

Page 70

1  Q  And do you recall the passage where they
2  say that this specific notation 12/48 in front of
3  the minimum/maximum lease was pursuant to your
4  instructions that you wanted to lease the property
5  for one to four years?
6      MR. BOUSE:  Show her the deposition.  I
7  object.
8  BY MR. SHAIBANI:
9  Q  You don't recall that passage?
10 A  No.
11     MR. BOUSE:  Can we take a break?
12     (Short break taken)
13 BY MR. SHAIBANI:
14 Q  Now that we've had the dispute resolved
15 by Judge Bates, I'm going to ask the question
16 regarding the reference you received for
17 Ms. Medlin.  Could you tell us if you in fact
18 received a reference for Roberto Medlin?
19     MR. BOUSE:  She already answered that.
20 The question is did she speak to the gentleman
21 about Roberta Medlin or did she simply review
22 documents about his financial wherewithal?  Do you

Page 71

1  understand that question, whether you spoke
2  directly to the gentleman about Mr. Medlin's
3  income or what he does with the business?
4      THE WITNESS:  Which I did not.
5      MR. FORRESTER:  She already answered
6  that.
7  BY MR. SHAIBANI:
8  Q  There was no extremely favorable
9  reference for Roberta Medlin?
10     MR. BOUSE:  I object, she's answered that
11 already.  Go ahead, you can answer.
12     THE WITNESS:  Not directly from the
13 person you're talking about.
14     MR. RANCK:  I'm sorry.
15     MR. BOUSE:  Not directly from the
16 individual we're talking about.
17 BY MR. SHAIBANI:
18 Q  And this reference was neither verbal nor
19 in writing, is that correct?
20     MR. BOUSE:  I object, go ahead.
21     THE WITNESS:  That's correct.
22 BY MR. SHAIBANI:

Page 72

1  Q  And can you tell us what documents you
2  reviewed which led to your --
3  A  When the client was purchasing the house,
4  part of the -- his offer would have been his
5  financial statement, which gave me knowledge of
6  the level of pay for that firm.
7  Q  And the financial statements are not for
8  Mr. or Mrs. Medlin, is that correct?
9  A  That's correct.
10 Q  Can you tell us the name of the person
11 whose financial records you reviewed?
12 A  I'd rather not.
13     MR. BOUSE:  That's not the order at this
14 point.  The order is to produce those financial
15 records.
16     MR. SHAIBANI:  Under protective order.
17     MR. BOUSE:  Under protective order.  I
18 will not allow her to testify to the name.  I've
19 instructed Ms. White while we were outside of the
20 Court's ruling.  And she is going to look for and
21 obtain those financial records and provide them to
22 me and I'll provide them to you with appropriate

Page 73

1  confidentiality statement.
2      THE WITNESS:  If they exist.
3      MR. BOUSE:  If they don't exist, I told
4  her she would have to give the name of the
5  individual.
6      MR. SHAIBANI:  For the record, I'm going
7  to preserve my right to depose this individual if
8  the records aren't produced and despite the
9  discovery cut off since you're not disclosing the
10 name and contact information today.
11     MR. BOUSE:  I understand Judge Bates'
12 ruling and I believe that is part of that ruling.
13 I won't agree to it at this point.  Basically if
14 the documents are there, the logical step would be
15 that you would be allowed to have that individual
16 identified and take his deposition.  And I would
17 agree if that's part of the Court's ruling that I
18 will not argue that it's beyond the discovery cut
19 off.  Okay?
20 BY MR. SHAIBANI:
21 Q  We were discussing the listing for the
22 1622 Wisconsin Avenue.  I'd like to know if in

19 (Pages 70 to 73)

Capital Reporting Company

### Page 74

1  your opinion as a broker if it's a violation of
2  the applicable laws and regulations and rules
3  governing access to the MIRS system to put false
4  information in an MIRS listing?
5      MR. BOUSE: Don't answer that.
6      MR. RANCK: I object.
7      MR. BOUSE: She's not answering a legal
8  conclusion that you want her to make upon a
9  hypothetical fact. Next question.
10     MR. SHAIBANI: What's your basis for --
11     MR. BOUSE: You're asking her to give a
12 legal opinion as to something is legal or illegal
13 based on a hypothetical fact there's some false
14 statement in the MIRS which she already testified
15 to that she didn't put together. I'm instructing
16 her not to answer the question.
17     MR. SHAIBANI: This is not a legal
18 question. I'm asking if the MIRS rules require
19 owners and agents to put accurate information in
20 the MIRS listing.
21 BY MR. SHAIBANI:
22     Q  Can they put false information in an MIRS

### Page 75

1  listing without violating the MIRS rules?
2      MR. BOUSE: I object. Do you have an
3  MIRS rule to show her?
4      MR. SHAIBANI: Yes, I have it right here.
5  She knows the MIRS rules because she's a broker.
6      MR. BOUSE: You assume that. She's not
7  answering the question. Next question.
8      MR. SHAIBANI: Counsel, if you are going
9  to instruct her not to answer this question, which
10 is directly relevant to this case, and I can point
11 to the relevance as -- the question here is where
12 did the minimum/maximum lease term come from,
13 12/48, one to four years.
14     MR. BOUSE: She's testified to that
15 already.
16     MR. SHAIBANI: No, she did not testify to
17 that.
18     MR. BOUSE: Do you want to read it back?
19 She testified that she doesn't know where that --
20 and you questioned her didn't Pagones and somebody
21 else say that. She said I don't know if they did
22 or not.

### Page 76

1      MR. FORRESTER: You asked did Chatel make
2  it up.
3      MR. BOUSE: Gordon, you can't say
4  anything.
5      MR. RANCK: Let me object to the question
6  on the ground that it does call for a legal
7  conclusion and the form and foundation of the
8  supposed hypothetical are severely lacking.
9      MR. SHAIBANI: Severely lacking, that's
10 it?
11     MR. RANCK: They are, Mr. Shaibani,
12 you're asking -- I'm not going to educated you on
13 why. That's my objection.
14 BY MR. SHAIBANI:
15     Q  Is it your testimony this minimum/maximum
16 lease term 12 to 48 months in the listing, the
17 1622 Wisconsin Avenue street level property, was
18 essentially made up by Chatel?
19     MR. RANCK: Objection.
20     MR. BOUSE: Object to the term made up.
21     MR. RANCK: Calls for speculation.
22     MR. BOUSE: You can answer the question

### Page 77

1  again about where that came from.
2      THE WITNESS: I don't know where it came
3  from except I never would have suggested a lease
4  of 48 months. That's too long a period when
5  you're dealing with a moving market for taxes and
6  everything else.
7      (White Exhibit No. 3
8      was marked for identification).
9  BY MR. SHAIBANI:
10     Q  I'd like to distribute Exhibit 3. This
11 is the MIRS listing for the lower level of the
12 1622 Wisconsin Avenue property. Do you recognize
13 this document?
14     A  I don't think I've seen this before.
15     Q  Do you recognize the address 1622
16 Wisconsin Avenue on the top?
17     A  Uh-huh, yes.
18     Q  And what about the list price of $1,000
19 on the first page, do you recognize that?
20     A  Is the $1,000 for the whole floor or a
21 portion of the floor?
22     MR. BOUSE: If you don't know --

Capital Reporting Company

Page 78

1    THE WITNESS: I don't know.
2    BY MR. SHAIBANI:
3    Q  Is that the price that you instructed
4    Chatel to list your basement for, $1,000 a month?
5    A  It would have been more than that but it
6    could be this is just the back room. As I recall,
7    the man who wanted to rent the back room was
8    offering $1,000.
9    Q  And on the second page, do you see the
10   dates available being 9-23-05?
11   A  When was this written or entered or
12   whatever? That's a weird date, 9-23.
13      MR. RANCK: Again, as with previous
14   depositions, it doesn't appear that this document
15   is complete.
16      THE WITNESS: Available 9-23 seems to be
17   a date --
18      MR. BOUSE: Wait for a question.
19   BY MR. SHAIBANI:
20   Q  Did you instruct Chatel to list your
21   basement as being available for rent on the MIRS
22   starting from September 23rd of '05?

Page 79

1    A  It's possible that the painting and the
2    carpet and all the work was completed by 9-23 so
3    that it was vacant at that time and clean. That's
4    possible. However, by that time I would have
5    known that I still wasn't -- I didn't still have
6    space at Washington Fine Properties. There's two
7    things going on there. The Washington Fine
8    Properties move in date was sort of always like a
9    moving target.
10   Q  Why did you have Chatel list your
11   basement for rent if you didn't want to rent it?
12   A  I think if we're talking about September
13   23rd, I think at that particular date everything
14   in the building was going to be vacant and
15   something needed to get rented. If we look at
16   Natasha's lease, that one was just about getting
17   wrapped up. It took a long time to get it wrapped
18   up.
19      MR. BOUSE: Natasha is who?
20      THE WITNESS: Natasha is the tenant on
21   the top floor. I had to rent something. Once
22   hers was rented, then the pressure to rent

Page 80

1    something else would have been reduced.
2    BY MR. SHAIBANI:
3    Q  What about the minimum/maximum lease term
4    12/36?
5    A  Once again, I would never agree to a 36
6    month lease.
7    Q  What was your instruction to Chatel with
8    respect to the term of the lease for the basement?
9    A  I don't know.
10   Q  Did you provide a key for both the
11   basement and the suite level of your property to
12   Chatel?
13   A  I think Barrett gave them a key.
14   Q  And were there separate lock boxes
15   containing keys to both the basement and the
16   street level of the property in October --
17   A  I think so.
18      MR. BOUSE: Let him finish.
19   BY MR. SHAIBANI:
20   Q  Would you characterize John Pagones to be
21   a competent real estate agent?
22      MR. RANCK: Objection.

Page 81

1       MR. BOUSE: I object. You can answer.
2       THE WITNESS: Yes.
3    BY MR. SHAIBANI:
4    Q  And would you agree that in October of
5    '05, he was a competent real estate agent in
6    connection with his interactions with John
7    Bratton?
8       MR. RANCK: Objection.
9       MR. BOUSE: I object to that. How does
10   she know? When he first came in or throughout the
11   whole process?
12      MR. SHAIBANI: Throughout the whole
13   process.
14      MR. BOUSE: If you know, I object.
15      MR. RANCK: I object, lack of foundation.
16      THE WITNESS: Yeah, lack of foundation.
17   I'm not present for that so I don't know.
18   BY MR. SHAIBANI:
19   Q  Yes, but to your knowledge from what you
20   learned of his dealings with John Bratton, would
21   you characterize him to be a competent agent in
22   October of '05?

21 (Pages 78 to 81)

**Capital Reporting Company**

Page 82

1    MR. RANCK: Objection, lack of
2 foundation. And if you can clarify whether you're
3 talking about Mr. Bratton's version of their
4 interactions or Mr. Pagones' version of their
5 interactions or Mr. Anderson's version or
6 Mr. Liverman's testimony regarding that or what
7 you're talking about?
8    MR. SHAIBANI: I'm talking about what she
9 believes to be the interaction between John
10 Pagones and John Bratton.
11 BY MR. SHAIBANI:
12   Q   Based on what you believe to be the true
13 interactions between John Pagones and John Bratton
14 in October of '05, would you characterize John
15 Pagones to be a competent real estate agent?
16    MR. RANCK: I object.
17    MR. BOUSE: I'll permit what she knew
18 about the transactions as they occurred, not from
19 what she read in all these depositions in this
20 case. I'm not going to permit her to answer that
21 question. If the question is limited to what she
22 knew when Mr. Bratton came in and spoke with

Page 83

1 Mr. Pagones, I'll permit her to answer it. I'm
2 not going to let her comment on the credibility of
3 the various witnesses when she read through
4 depositions and maybe part of the depositions, if
5 that's what you're asking her.
6    MR. SHAIBANI: That's not what I'm asking
7 her. I'm asking her what she learned throughout
8 the process in October of '05. I haven't
9 referenced any deposition transcripts.
10    MR. RANCK: Are you asking at any time
11 throughout the process in October of '05 did
12 information come to her that caused her to
13 question his competence? Is that what you're
14 trying to ask?
15    MR. SHAIBANI: That's part of it, yes.
16    MR. RANCK: I'll help you this time but
17 not next time.
18    THE WITNESS: The answer to that is no.
19 BY MR. SHAIBANI:
20   Q   And would you agree that because
21 Mr. Pagones held an associate brokers license in
22 DC, Maryland and Virginia and had been a real

Page 84

1 estate agent for approximately 39 years, he had
2 the requisite skills to lease the commercial
3 levels of your property?
4    MR. RANCK: Objection, foundation.
5    MR. BOUSE: I object. You can answer the
6 question.
7    MR. RANCK: Speculation.
8    THE WITNESS: I think that Mr. Liverman
9 appointed him. I would have to go back. Thierry
10 thought so. I'm not going to overrule Thierry
11 Liverman.
12 BY MR. SHAIBANI:
13   Q   And are you aware that John Pagones
14 handled over 100 lease transactions in his career
15 as a real estate agent?
16    MR. BOUSE: I object. Go ahead.
17    MR. RANCK: Let me object and ask for you
18 to clarify what type of lease transactions you're
19 talking about as I believe that's a material
20 aspect of the case here.
21    MR. SHAIBANI: Both residential and
22 commercial leases.

Page 85

1    MR. RANCK: Then I'm going to object on
2 lack of foundation.
3    MR. BOUSE: I object. If you know.
4    THE WITNESS: I think he was busy renting
5 residential apartments in Georgetown.
6 BY MR. SHAIBANI:
7   Q   And would his income in '05 being
8 $124,690 signify to you anything about his skills
9 as a real estate agent?
10    MR. RANCK: Objection.
11    MR. BOUSE: Objection.
12    THE WITNESS: No.
13 BY MR. SHAIBANI:
14   Q   Would you agree that John Pagones was a
15 successful real estate agent at Chatel in '05?
16    MR. RANCK: Objection.
17    MR. BOUSE: I object.
18    MR. RANCK: Foundation, speculation.
19    MR. BOUSE: What's the meaning of
20 successful? I object.
21    THE WITNESS: That's my question, what's
22 the meaning of successful?

22 (Pages 82 to 85)

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 86

1  BY MR. SHAIBANI:
2    Q  In your book, agents at Chatel if someone
3  is making $124,000 a year, is he success?
4        MR. RANCK:  Same objection.
5        THE WITNESS:  I have no idea.
6  BY MR. SHAIBANI:
7    Q  Would you say that John Pagones had
8  particular expertise with leasing properties in
9  Georgetown?
10       MR. BOUSE:  I object, if you know.
11       THE WITNESS:  He did them, I know that.
12 BY MR. SHAIBANI:
13   Q  Would you agree that if Mr. Liverman
14 didn't think that John Pagones could handle
15 leasing your property at 1622 Wisconsin Avenue, he
16 wouldn't have appointed him?
17       MR. RANCK:  Objection, speculation.
18       MR. BOUSE:  Objection, how would she know
19 that?  I object.  Do you have any idea?
20       THE WITNESS:  No.
21 BY MR. SHAIBANI:
22   Q  Could you tell us what happened after

Page 87

1  John Pagones delivered John Bratton's lease
2  application packet to you on the 7th of October?
3    A  Delivered it what, where and when?
4    Q  Well, I'll rephrase the question.  Did
5  anyone at Chatel deliver John Bratton's lease
6  application to you?
7    A  I don't know.
8    Q  You never received John Bratton's lease
9  applications in October?
10       MR. RANCK:  Objection, that wasn't her
11 answer.  You know that wasn't her answer.
12       MR. BOUSE:  She said she doesn't know.
13       MR. SHAIBANI:  That's not the point.  I'm
14 asking a follow up question.  What's that have to
15 do with it?
16       MR. RANCK:  I object to the form of the
17 question.
18       MR. BOUSE:  What was the question?
19 BY MR. SHAIBANI:
20   Q  On October 7th, did you receive a lease
21 application packet from John Pagones for
22 Mr. Bratton?

Page 88

1    A  I don't know.
2    Q  Did you have a conversation with
3  Mr. Pagones relating to John Bratton on October
4  7th?
5    A  There was a call from John that there was
6  some -- a lease from somebody, yes.
7    Q  And did Mr. Pagones indicate that lease
8  was from Mr. Bratton during that conversation?
9    A  I don't know.  I don't think there was
10 anybody else at the time.  I don't know that he
11 said that.
12   Q  What exactly did Mr. Pagones tell you
13 during that telephone conversation?
14   A  I have no idea.
15   Q  Didn't he tell you that it's from an
16 African American, be prepared for trouble?
17   A  No.
18   Q  No, you don't remember or, no, he did not
19 say that?
20   A  No, he did not say that.
21   Q  Well, what did he say then?  How did he
22 introduce Mr. Bratton?

Page 89

1        MR. BOUSE:  You're assuming he introduced
2  Mr. Bratton.  He said there was a lease, that's
3  what was said.
4  BY MR. SHAIBANI:
5    Q  Do you recall the name Mr. Bratton was
6  mentioned to you or not?
7    A  I don't know who mentioned Mr. Bratton's
8  name first, whether it was Barrett or whether it
9  was John.
10       MR. BOUSE:  Objection.
11       THE WITNESS:  So I don't know.
12 BY MR. SHAIBANI:
13   Q  Have you reviewed John Pagones'
14 deposition transcript?
15   A  I've read it.
16   Q  Do you remember the portion where he says
17 that he delivered John Bratton's lease application
18 packets to you on October 7 and then had a
19 telephone conversation with you shortly thereafter
20 where he said, "It's from an African American.  Be
21 prepared for trouble"?
22       MR. BOUSE:  I object, do you remember

23 (Pages 86 to 89)

## Capital Reporting Company

Page 90

1  that?
2       MR. RANCK: Objection.
3       THE WITNESS: No, I do not remember that.
4  And by delivering -- he didn't hand it to me,
5  that's for sure. He might have put something in
6  my mail slot but he didn't hand me anything.
7  BY MR. SHAIBANI:
8    Q  Here it is, this is what Mr. Pagones
9  testified at his deposition --
10      MR. BOUSE: Excuse me, what page?
11      MR. SHAIBANI: Page 54.
12 BY MR. SHAIBANI:
13   Q  "I told her it was a real estate office.
14 And it was an African American. And I told her be
15 prepared for trouble."
16      MR. BOUSE: Do you want to read the next
17 sentence to her?
18      MR. SHAIBANI: No.
19 BY MR. SHAIBANI:
20   Q  Do you recall hearing that from John
21 Pagones on October 7th over the phone?
22   A  No, I don't remember that.

Page 91

1    Q  Can you tell us what you remember in
2  terms of what John Pagones told you over the phone
3  on October 7th, with respect to Mr. Bratton?
4       MR. RANCK: Objection, asked and
5  answered.
6       MR. BOUSE: A couple times. I object.
7  One more time, if you think you can remember what
8  Mr. Pagones said to you.
9       THE WITNESS: I remember him saying
10 something to me about the references, one of them
11 came from the corporation counsel's office.
12 BY MR. SHAIBANI:
13   Q  The references for John Bratton?
14   A  Yes, one of his references was from the
15 corporation counsel's office. That's what he told
16 me.
17   Q  What else did he say?
18   A  I don't remember anything else. Maybe he
19 said other things but that's the only thing I
20 remember.
21   Q  Can you tell us what you responded to --
22 what did you tell him in response?

Page 92

1    A  "I'll look at the lease. When I have
2  time I'll look at it."
3    Q  And once you looked at the lease, what
4  was your impression at that point?
5       MR. BOUSE: I object.
6       MR. RANCK: I object, vague.
7       THE WITNESS: What date was this? You're
8  talking about what day?
9       MR. BOUSE: The question was, was the
10 lease presented on October the 7th.
11      THE WITNESS: If it was delivered, I
12 didn't even look at my mail on the 7th.
13      MR. BOUSE: He's going to show you the
14 lease, Mary.
15      (White Exhibit No. 4
16      was marked for identification).
17 BY MR. SHAIBANI:
18   Q  I'd like to distribute this as Exhibit 4.
19   A  It was without --
20      MR. BOUSE: Wait for a question.
21      MR. RANCK: Let me interpose -- well, I
22 guess I can't yet. I'll wait for a question.

Page 93

1  BY MR. SHAIBANI:
2    Q  Do you recognize this document?
3    A  Well, I don't recall these Xs before.
4    Q  Could you please turn to the -- actually
5  on the first page, the cross outs of paragraphs 1B
6  and 1C, did you cross out those paragraphs when
7  you received this lease?
8    A  No.
9    Q  On the second page, the Xs next to
10 paragraphs 4 and 7, did you put those Xs there?
11   A  No.
12   Q  Is it your handwriting under paragraph 4
13 where it says, "Consent will not be granted for
14 any beauty salon, barber shop or nail salon"?
15   A  No.
16   Q  That's not your handwriting?
17   A  No, nowhere near it.
18   Q  Did you instruct anybody to write that on
19 this lease?
20   A  No, those would have been things I would
21 have said to Thierry and John when we listed the
22 property.

24 (Pages 90 to 93)

## Capital Reporting Company

Page 94

1   Q   Are these comments written by John
2   Pagones, to your knowledge?
3   A   I have no idea what his handwriting looks
4   like.
5   Q   What about Thierry Liverman's?
6   A   I don't know his either.
7   Q   Under paragraph 7, "The common tenant
8   shall pay $200 each month as rent for his pro rata
9   share of the real estate taxes." Did you write
10  that?
11  A   No.
12  Q   Did you instruct anyone at Chatel to
13  include that writing on this lease?
14  A   No.
15  Q   And did you instruct anybody at Chatel to
16  include that as a provision of the lease with
17  Mr. Bratton?
18  A   Pardon me?
19  Q   Did you instruct anybody at Chatel to
20  include the writing under paragraph 7 as a
21  provision to the lease with Mr. Bratton?
22  A   I think Thierry and I eventually

Page 95

1   discussed this lease. And I said, "This
2   commercial lease, this isn't your commercial
3   lease. It's not the Chatel's lease."
4   Q   Did you have a copy of Chatel's
5   commercial lease on October 6th of '05?
6   A   There was one that was given to me.
7   Whether I had it in front of me at that time, I
8   don't know. It didn't look like this one. It
9   said Chatel on top of it.
10  Q   And the X outs of paragraphs 21 and 27,
11  the commission and the performance, did you cross
12  those out, on the --
13  A   No, I didn't cross them out.
14      MR. RANCK: Paragraphs, what was that?
15      MR. BOUSE: 21 and 27.
16      MR. RANCK: Thank you.
17  BY MR. SHAIBANI:
18  Q   Did you instruct anyone at Chatel that
19  John Bratton specifically Bratton Real Estate,
20  Inc. was not to receive a commission for the lease
21  of your property?
22  A   Thierry and I might have talked about a

Page 96

1   commission, that was his decision to make.
2   Q   So you didn't tell Thierry that Bratton
3   is not going to get a commission for this
4   transaction?
5   A   There was always a question of whether
6   Bratton was representing himself or whether he was
7   represented by Chatel and how -- who was his --
8   was he representing himself or did he have an
9   agent.
10  Q   Didn't your attorney, Mr. Forrester, send
11  a fax to Chatel in which he instructed Chatel that
12  Bratton Realty was not to receive a commission for
13  this transaction?
14  A   Do you have a copy of that?
15      (White Exhibit No. 5
16      was marked for identification).
17  BY MR. SHAIBANI:
18  Q   I'd like to mark this as Exhibit 5.
19      MR. BOUSE: Thank you.
20  BY MR. SHAIBANI:
21  Q   This is a fax dated October 26th, '05
22  from Mr. Forrester to Chatel.

Page 97

1   A   Well, there's no commission or fee to be
2   paid by Mr. Bratton. It would appear it's my
3   understanding that he is then represented by
4   Chatel.
5   Q   Yes, but --
6   A   If he was not represented by Chatel, he
7   was representing himself, then he would get a
8   commission. But I didn't think he was -- I
9   thought he was represented by Chatel.
10  Q   And is that why you inform your attorney
11  that --
12  A   If we had any discussion about it, that
13  would have been part of it. That would have been
14  the reason. It must have been something in the
15  Chatel lease that we were addressing here, their
16  boiler plate lease.
17  Q   And the instruction that the lease is
18  supposed to be for two years without an option for
19  a third year, did you provide those instructions
20  to Mr. Forrester?
21  A   It was to be a two year lease. I might
22  have discussed adding that little clause, maybe we

25 (Pages 94 to 97)

**Capital Reporting Company**

Page 98

1  just were trying to make it clear, two year, two
2  year means not three.
3      Q   And under that basis, the lease for two
4  years wasn't going to convert to a month to month
5  lease at the end of the two years, is that
6  correct?
7      A   Correct.
8      Q   And the lower level is not available, did
9  you provide that instruction to Mr. Forrester as
10 well?
11     A   If Mr. Bratton was going to have the
12 space, the street level space on November 1, I
13 would have to take the basement space. I had to
14 be somewhere. I either had to be street level or
15 lower level. There was no place else for me to
16 go. And we were a long ways from closing the
17 office.
18     Q   And the instruction there's an additional
19 payment of $200 each month for real estate taxes,
20 did you provide that information to Mr. Forrester?
21     A   Yes, that's a blank on the Chatel's
22 boiler plate lease, a blank to be filled in.

Page 99

1           (White Exhibit No. 6
2           was marked for identification).
3  BY MR. SHAIBANI:
4      Q   I'd like to distribute Exhibit 6.
5          MR. FORRESTER: Excuse me, I'm leaving, I
6  have an appointment.
7          (Discussion had off the record).
8          THE WITNESS: What are we looking at
9  here? There's no question on the table?
10         MR. BOUSE: I'm sorry, you can go ahead.
11 BY MR. SHAIBANI:
12     Q   Do you recognize this document?
13     A   Uh-huh.
14         MR. BOUSE: Yes?
15         THE WITNESS: Yes.
16         MR. BOUSE: Thank you.
17 BY MR. SHAIBANI:
18     Q   Is this a finalized lease between you and
19 Mr. Bratton for the --
20     A   This is the one we signed, isn't it?
21 Yes.
22     Q   Why did it take 24 days for John to sign

Page 100

1  this lease for the street level of your property?
2          MR. BOUSE: I object.
3          MR. RANCK: Objection.
4          THE WITNESS: Why did it take 24 days?
5  That's pretty normal for me with negotiations.
6  It's not the only thing that I was doing at that
7  period of time.
8  BY MR. SHAIBANI:
9      Q   Do you agree that based on this lease,
10 Mr. Bratton has to vacate your property at the end
11 of the two years?
12     A   Yes.
13         MR. RANCK: I'm going to -- well, strike
14 that.
15         MR. BOUSE: She's answered it. Go ahead.
16         THE WITNESS: It was a two year lease,
17 right.
18         MR. BOUSE: Yes was the answer.
19 BY MR. SHAIBANI:
20     Q   In other words, there there's no
21 conversion from month to month. Mr. Bratton has
22 to get out of that property at the end of the two

Page 101

1  years which would be November of '07?
2      A   That's what a two year lease means.
3      Q   And you agree that under this lease
4  Mr. Bratton does not get a right of first refusal?
5      A   Correct.
6      Q   And can you -- do you agree that
7  paragraph 41 of this lease is the right of first
8  refusal provision? It's on page 6 of the lease
9  towards the end of paragraph 41 where it says,
10 "Landlord hereby agrees that in the event of the
11 property which the lease premises is apart is
12 offered for sale during the term of the lease,
13 tenant shall be given five business days within
14 which to meet any price offered in writing for the
15 property or to match any signed contract of sale."
16     A   Yeah, that's correct. You asked me if
17 that was the right of first refusal paragraph?
18     Q   Yes.
19     A   That's my understanding, yes.
20     Q   Why did you decide not to give a right of
21 first refusal to John Bratton?
22         MR. BOUSE: Object. Go ahead.

26 (Pages 98 to 101)

Capital Reporting Company

Page 102

1   THE WITNESS: There are various reasons.
2   One is that the building is in my will and it's
3   designated to go to certain people. And if I
4   should die and he's there, that's the way it goes,
5   it doesn't go at the end of it. It goes to a
6   member, someone I'm leaving it to. Number two,
7   the tenant upstairs, the residential lease by law
8   has the right of first refusal, a right that she
9   cannot waive. I can't give two rights of first
10  refusal. The commercial right of first refusal is
11  not something required by law. It's required in a
12  residential, not in a commercial. I can't give
13  the same thing to two different tenants.
14  BY MR. SHAIBANI:
15    Q  Is it your testimony 1622 Wisconsin has
16  to be sold all as one property?
17    A  Yeah, it has one lot number and square
18  number, yeah.
19    Q  And what about the conversion to month to
20  month, was there any reason why you didn't want
21  Mr. Bratton to have his lease convert to a month
22  to month at the end of the two years?

Page 103

1     MR. BOUSE: I object.
2     THE WITNESS: I suppose we could enter
3   into negotiation for a new lease but I don't want
4   to go month to month. None of my leases are month
5   to month.
6   BY MR. SHAIBANI:
7     Q  Isn't it true that you can give a right
8   of first refusal to different people if they were
9   to present offers that would be -- one would be
10  higher by the other even if it's a dollar?
11    A  Now say that again. There's no way I can
12  grant a right of first refusal?
13    MR. RANCK: I object to the form of the
14  question.
15    MR. BOUSE: You're not answering the
16  question. Do you want to reask the question or do
17  you want to stand on that?
18  BY MR. SHAIBANI:
19    Q  I want to know, couldn't you give a right
20  of first refusal to two different tenants and
21  basically structure it in a way that the person
22  making the offer to match can have his offer

Page 104

1   increased by a dollar, so that you wouldn't have
2   two offers for the same price, basically, to
3   select from?
4     MR. RANCK: I object to the form of the
5   question because I don't understand what you're --
6     MR. BOUSE: I object also.
7   BY MR. SHAIBANI:
8     Q  In DC what law, which you mentioned, does
9   not give you the right of first refusal?
10    A  What?
11    Q  What law precludes you from giving the
12  right of first refusal to two different tenants?
13    MR. RANCK: Objection, mischaracterizes
14  her testimony.
15    MR. BOUSE: Don't answer that.
16    MR. RANCK: It did mischaracterize her
17  testimony. It's not at all what she said.
18    MR. SHAIBANI: She said I can't give a
19  right of first refusal to two different people.
20    MR. RANCK: That may be what she said,
21  but that's not what you just asked.
22    MR. BOUSE: No.

Page 105

1     MR. SHAIBANI: That's okay. We can have
2   Tom discuss that, I'm sure. Can we get the other
3   lease?
4     MR. BOUSE: Are you done with this one?
5     MR. SHAIBANI: For now, yes.
6     (White Exhibit No. 7
7     was marked for identification).
8   BY MR. SHAIBANI:
9     Q  I'd like to distribute Exhibit 7. Do you
10  recognize this document?
11    A  Yes.
12    Q  Did you have any role in the filling of
13  the blanks in this document?
14    A  I do remember that Ms. Medlin did come to
15  me at where I was at, my open house, and wanted to
16  know what to do with this. I think she had to
17  have gotten it from Chatel. Evidently they didn't
18  help her fill it out. She came to me. I said,
19  "Fill out the address and so forth and go back to
20  them and have them show you how to do the rest of
21  it."
22    Q  Didn't you contact Thierry Liverman to

27 (Pages 102 to 105)

## Capital Reporting Company

Page 106

1  let him know that Roberta Medlin was going to come
2  to see him and he should assist her with preparing
3  this lease?
4      A   I don't remember that. It's possible. I
5  think John was not in the office and so we had to
6  figure out if she went back to Chatel, who should
7  she see. I probably sent her to John to begin
8  with. She came back and said, "He's not there, so
9  who is there?" So I called Thierry to find out
10 who was there.
11     Q   Can you tell us why you did not refuse to
12 give a right of first refusal to Roberta Medlin in
13 this lease?
14         MR. BOUSE: I object, that assumes
15 that's -- assumes that she didn't -- she did give
16 a right of first refusal to Roberta Medlin.
17         MR. RANCK: I object as well.
18         THE WITNESS: This was a preliminary
19 document. This was presented to me by Thierry.
20 This was the first time I had seen it. There's
21 certain things we have to negotiate here. She's
22 added a list here on page -- doesn't have a page

Page 107

1  number, additional provisions, which obviously are
2  items that have to be negotiated.
3  BY MR. SHAIBANI:
4      Q   And those provisions, didn't you
5  negotiate them with her before this was drafted,
6  the addendum?
7      A   No, I remember she asked about some of
8  them but I didn't make any decision. I don't
9  think there's anything in here that --
10     Q   Why is it that this lease for Roberta
11 Medlin converts to month to month at the end of
12 the two years but the lease for Mr. Bratton
13 doesn't?
14     A   This lease is not finalized. This is a
15 draft presented to me for negotiation.
16     Q   And what was your response to
17 Mr. Liverman after you received this draft?
18     A   That perhaps we should negotiate it.
19     Q   And what provisions did you intend to
20 negotiate in this lease?
21         MR. BOUSE: I object. Go ahead.
22         THE WITNESS: Lots of them.

Page 108

1  BY MR. SHAIBANI:
2      Q   Well, could you go over some of them?
3      A   Right of first refusal would be one.
4  Going beyond -- I think was hers a one year lease
5  or two? One year lease. No, maybe this is two
6  year, two year, I guess. And then these
7  conditions that she's got on the back. Some of
8  these things were things that were scheduled, like
9  the exterior painting of the building was
10 scheduled for early November. We were waiting for
11 the city to complete its work on Wisconsin Avenue.
12 And once the work was completed, then we would be
13 able to paint. She obviously wanted to paint the
14 entryway and hallway. We would have to talk about
15 how she would paint it. Changing the interior
16 lights, we certainly would talk about that. The
17 signage is really controlled by DC. Take out
18 certainly anything that has to do with sublease
19 would really have to be talked about, basically I
20 don't allow sublets at all. And the awning, I
21 remember she asked about an awning. That's
22 controlled by the city.

Page 109

1      Q   Did you intend to cross out the
2  provisions in this lease relating to the
3  conversion to month to month?
4      A   Yes, and once again, right of first
5  refusal wouldn't work.
6      Q   And did you actually give those
7  instructions to Thierry Liverman to cross out the
8  right of first refusal and the month to month
9  provision for the Medlin lease?
10     A   Before this was prepared or after it was
11 prepared?
12     Q   Either before or after?
13     A   Not before.
14     Q   What about afterwards?
15     A   When we were negotiating, we might have.
16 We never got to that point because she withdrew.
17     Q   Well, do you remember a date that she
18 withdrew her offer?
19     A   No, I don't. I would like to know that
20 but I don't. I don't even remember how I learned
21 it. It wasn't a phone call from her that I do
22 know.

28 (Pages 106 to 109)

Capital Reporting Company

Page 110
1   Q   Did Chatel -- somebody from Chatel call
2   you to say that --
3   A   I assume so, but they could have called
4   Barrett and Barrett could have told me. I don't
5   know.
6   Q   Now, this lease, which is dated October
7   11th, do you agree this was drafted on the 11th of
8   October?
9        MR. BOUSE:   I object, she said she didn't
10  see it. Do you know? I object.
11       THE WITNESS:   What was the day that I met
12  with Thierry and we reviewed the leases?
13  BY MR. SHAIBANI:
14  Q   Perhaps this check will refresh your
15  memory, the last page here dated 10-11.
16  A   So it was before the 11th, I guess. It
17  would have been right around there, 11th or 12th.
18  I think Thierry or somebody in one of those
19  depositions thinks it's the 12th we met. Maybe we
20  met the 11th. I don't know.
21  Q   Yes, but what I'm trying to find out, was
22  this lease presented to you on the 11th of

Page 111
1   October?
2   A   It was presented to me on the evening
3   that Thierry and I met at the office with
4   Bratton's lease. And I never saw it before that.
5   Q   And you mentioned that you were
6   negotiating this lease?
7   A   It would need to be negotiated.
8   Q   Okay. Well, if this lease needed to be
9   negotiated, why did you inform Chatel that it was
10  a done deal with Roberta Medlin?
11  A   I didn't.
12  Q   Why did you inform Chatel to tell
13  Mr. Bratton that the property has been leased?
14  A   I didn't.
15  Q   Why did Chatel inform Mr. Bratton that
16  the property had been leased?
17       MR. RANCK:   Let me object to the lack of
18  foundation.
19       MR. SHAIBANI:   Come on, this is in the
20  deposition transcript of Mr. Liverman. Lack of
21  foundation is a lousy objection if you ask me.
22       MR. RANCK:   I appreciate your opinion,

Page 112
1   Mr. Shaibani, but you're mischaracterizing
2   Mr. Liverman's deposition, if you're saying that's
3   what Mr. Liverman told Mr. Bratton. That's not
4   what the evidence shows, it's not in the answer to
5   Interrogatories. That's not what the record and
6   evidence will show.
7   BY MR. SHAIBANI:
8   Q   Is it your testimony that nobody informed
9   Mr. Bratton that the property was no longer
10  available?
11       MR. RANCK:   Let me object on speculation
12  and ask if you would ask the witness an
13  appropriate question like does she know what
14  Mr. Bratton was advised.
15       MR. SHAIBANI:   That's not the question.
16       MR. RANCK:   Let me object on speculation.
17       MR. BOUSE:   I haven't heard the question
18  yet, so I haven't raised an objection or
19  instruction yet. Go ahead, I don't know what the
20  question is at this point.
21  BY MR. SHAIBANI:
22  Q   Why did Chatel inform Mr. Bratton that it

Page 113
1   was a done deal, that the property had been
2   leased?
3        MR. RANCK:   Objection, lack of
4   foundation.
5        THE WITNESS:   I don't know. I don't know
6   that he did.
7        MR. BOUSE:   She answered, "I don't know.
8   I don't know that he did," so --
9        THE WITNESS:   I was not privy to that
10  conversation.
11  BY MR. SHAIBANI:
12  Q   And you are testifying that you didn't
13  inform Mr. Liverman that you had a done deal with
14  Roberta Medlin --
15       MR. BOUSE:   I object.
16  BY MR. SHAIBANI:
17  Q   -- on the 12th of October when you met
18  with him?
19       MR. BOUSE:   You can answer.
20       THE WITNESS:   No, he knew that I had -- I
21  didn't -- there were things that had to be
22  discussed.

29 (Pages 110 to 113)

## Capital Reporting Company

Page 114
1  BY MR. SHAIBANI:
2     Q  Well, what exactly did you tell Thierry
3  Liverman on the 12th of October?
4     A  "Let's negotiated this one first."
5        MR. BOUSE:  This one meaning
6  Ms. Medlin's?
7        THE WITNESS:  Ms. Medlin's.
8  BY MR. SHAIBANI:
9     Q  What else did you say to him?  Did you
10 tell him to inform Mr. Bratton to forget about
11 this property?
12    A  No, whatever he did, he did.  I don't
13 remember giving any instruction.
14    Q  Would you agree that from October 6th
15 through October 11th, all of the lease proposals
16 submitted by Mr. Bratton were rejected by you?
17    A  No, I won't agree to that, they weren't
18 rejected.
19    Q  Did you --
20    A  No, they were still -- they were agreed
21 to -- they always had terms in it I couldn't deal
22 with.

Page 115
1     Q  Did you accept any leases from
2  Mr. Bratton from October 6th through October 11th?
3     A  No, nor did I accept Ms. Medlin's.
4     Q  And it was only on October 31st after 24
5  days had elapsed from the time that Mr. Bratton
6  first came to see your property that you finally
7  agreed to lease the street level to him?
8        MR. BOUSE:  You want to say, "Ladies and
9  gentlemen of the jury" first before you ask that
10 question?  It's an argument.  Come on, Mr.
11 Shaibani, that's an argument.  I object.
12       MR. RANCK:  Object to the form.
13       MR. BOUSE:  Do you know the date you
14 signed the lease with Mr. Bratton?
15       MR. SHAIBANI:  That's not the question.
16       THE WITNESS:  It says 31st, whatever it
17 is.
18       MR. BOUSE:  Whatever it is.  You can add
19 up the days.
20 BY MR. SHAIBANI:
21    Q  Isn't it true that you didn't accept any
22 of the lease proposals submitted by Mr. Bratton

Page 116
1  from October 6th through October 11th?
2        MR. RANCK:  Objection, asked and
3  answered.
4        MS. BOUSE:  I object.  Answer it again.
5        THE WITNESS:  I didn't accept any of
6  them, no, they all had something wrong with them.
7  BY MR. SHAIBANI:
8     Q  Could you describe what was wrong with
9  those leases?
10    A  I think the right of first refusal was
11 always there.  And I said I wouldn't take that.  I
12 couldn't do it.  I didn't want to and couldn't.
13    Q  You mentioned that Mr. Bratton's lease
14 that was drafted on his own form contained pro
15 tenant terms.  Could you tell us what made it pro
16 tenant?
17    A  No, that was Thierry's remark, Thierry
18 said that.
19    Q  And what provisions --
20    A  So Thierry would know there were things
21 in the lease -- I'm not one who writes commercial
22 leases.  Thierry would have said that there are

Page 117
1  certain things in there, either they shouldn't be
2  there or there are things that are not there that
3  should be there.
4     Q  And what things?  Can you tell us what
5  things were in there that shouldn't be there, the
6  provisions that were crossed out?
7     A  We'd have to take the lease that we ended
8  up with.  This one seems a lot longer than that
9  one.  Thierry was my agent and he wanted certain
10 things in the lease.
11       MR. BOUSE:  What the witness says,
12 compare Plaintiff's Exhibit 4 with Plaintiff's
13 Exhibit 7.  I'm sorry, Plaintiff's -- I apologize,
14 6.  Are you going on to a different topic?  Do you
15 want to have lunch?
16       THE WITNESS:  Yeah.
17       MR. RANCK:  I --
18       THE WITNESS:  Or something brought in.
19       MR. RANCK:  Mr. Bratton seems to be
20 voicing some objection.  I'm going to request
21 lunch.  I've been sick this week.  I have no
22 desire to sit here all day without eating

30 (Pages 114 to 117)