Capital Reporting Company

Page 174

1  far.
2      Q  Isn't it true that the only financial
3  qualifications that was conducted with respect to
4  Roberta Medlin was her credit check and her
5  submission of the rental application?
6          MR. BOUSE: I object, she just answered
7  that question.
8          MR. RANCK: And it mischaracterizes and
9  ignores her prior testimony about other financial
10 information she had about Ms. Medlin.
11 BY MR. SHAIBANI:
12     Q  Could you please answer the question?
13         MR. BOUSE: Read the question back.
14 (Court reporter read back the last question)
15         MR. BOUSE: I object, you can answer.
16         THE WITNESS: There was that and also the
17 proof that she did indeed purchase the house, she
18 told me she did.
19 BY MR. SHAIBANI:
20     Q  Did she actually provide you with
21 documents to show that she had purchased the house
22 or was it just her --

Page 175

1      A  It was available in the records.
2      Q  You actually went into the MIRS records
3  to find out if her name was on the deed for the
4  property that she said she owned?
5      A  I knew she had been the purchaser of that
6  property. Yes, we knew that.
7      Q  How did you know that, if I may ask?
8      A  That's how we know a lot of things in
9  real estate in Georgetown. We know who buys the
10 property before -- we know.
11     Q  It was a word of mouth and it wasn't any
12 documents that were submitted to you?
13     A  She said she bought it, we knew someone
14 from Kansas City bought it. This woman came in,
15 she tells us she was from Kansas City. She told
16 us her agent. And we knew that was the agent that
17 made the sale.
18     Q  Weren't you aware that Mr. Bratton owned
19 several properties in Washington, DC at the time
20 he inquired about the availability of your
21 commercial property?
22     A  I knew there was a credit sheet that

Page 176

1  listed a lot of properties. I had a hard time
2  reading as to what he owned and what has been
3  sold. There was no way of telling what the loans
4  were against those properties. So I don't know
5  whether they were owned outright or --
6          (White Exhibit No. 15
7          was marked for identification).
8  BY MR. SHAIBANI:
9      Q  This is Exhibit 15. Is this the --
10     A  This is one that was presented.
11         MR. BOUSE: Wait, wait until everyone
12 gets it and he asks a question.
13         MR. RANCK: Bear with me one minute.
14 BY MR. SHAIBANI:
15     Q  Did you have access to the MIRS to enter
16 the addresses for these properties to verify
17 whether Mr. Bratton owned them and how much of a
18 mortgage lien stood against them?
19     A  I would think the MIRS says what the
20 mortgage lien is against them. I don't know these
21 were all listed. Seems to me I did try to find
22 some of them but I couldn't. This is also not the

Page 177

1  first or not the only sheet that was presented to
2  me. There's another one.
3      Q  Would you agree that someone who has
4  $180,000 -- I'm sorry, would you agree that
5  someone has $250,000 in their bank accounts is
6  making over $200,000 a year as their net income
7  and owns several properties with equity over a
8  million dollars would financially qualify to lease
9  your commercial property for $2,500 a month?
10         MR. BOUSE: I object. You can answer.
11         MR. RANCK: Objection.
12         THE WITNESS: We don't have anything here
13 as to what the debts were. This says banking
14 account 180, not 250.
15         MR. SHAIBANI: Do you have the bank
16 statements here?
17         THE WITNESS: What were the debts on
18 these?
19         (White Exhibit Nos. 16 & 17
20         was marked for identification).
21 BY MR. SHAIBANI:
22     Q  These are Exhibits 16 and 17. Do you

Capital Reporting Company

Page 178

1 recognize these documents
2    A  No, I've never seen these before.
3    Q  Didn't Mr. Forrester at any time inform
4 you that he had received Mr. Bratton's bank
5 account statements?
6    A  He told me that he checked his credit.
7 He may have gotten these but he didn't show them
8 to me. This is also -- isn't this later and this
9 is the end of October and this comes in -- when do
10 I get this?
11       MR. BOUSE: I don't know. Wait for a
12 question, Mary.
13       THE WITNESS: This is October 6th. And
14 this is October 19th.
15 BY MR. SHAIBANI:
16    Q  Why did you wait five days from the time
17 that Roberta Medlin withdrew her offer to have
18 Mr. Forrester contact John Bratton?
19       MR. RANCK: Objection.
20       MR. BOUSE: I object.
21       MR. RANCK: Foundation, assumes facts not
22 in evidence.

Page 179

1       THE WITNESS: What facts do you have for
2 that?
3 BY MR. SHAIBANI:
4    Q  Mr. Forrester's letter to John Bratton
5 the first letter is dated the 18th of October.
6       MR. BOUSE: Well, you're asking when she
7 met with Gordon rather than assume that's the
8 first time that they met was on the day of the
9 letter.
10 BY MR. SHAIBANI:
11    Q  How many days --
12    A  You're also telling me -- what date did
13 Ms. Medlin withdraw?
14    Q  That was my question to you before but
15 apparently you don't remember that.
16       MR. RANCK: Let me just object on the
17 grounds that that was not the question before.
18 The question before was why did you wait five
19 days --
20       MR. BOUSE: She meant previously in
21 earlier questioning.
22       THE WITNESS: What five days are we

Page 180

1 talking about, I guess? Is that better?
2       MR. BOUSE: She said she didn't know when
3 Roberta met with --
4       THE WITNESS: So how -- what five days
5 are we talking about?
6 BY MR. SHAIBANI:
7    Q  From the 13th until the 18th of October.
8    A  And you're saying that Gordon had no
9 contact with Bratton between the 13th and the
10 18th?
11       MR. RANCK: Let me object again on
12 foundation. Can we start over with the question?
13 I'm not sure what the question is.
14       MR. BOUSE: Mary, wait until he asks a
15 question.
16       THE WITNESS: I can only answer with a
17 question. It doesn't make sense.
18 BY MR. SHAIBANI:
19    Q  When you were sitting down with Thierry
20 Liverman on the evening of October 12th to discuss
21 the two lease applications for Mr. Bratton and
22 Roberta Medlin, why did you decide to go with

Page 181

1 Ms. Medlin's lease without doing the financial
2 qualifications?
3       MR. BOUSE: Objection, she's already
4 answered that question.
5       MR. SHAIBANI: I don't think so.
6       MR. BOUSE: I think she has.
7 BY MR. SHAIBANI:
8    Q  Why didn't you request the tax returns
9 and bank statements from her at that time before
10 you made that decision to proceed with her
11 negotiations first?
12    A  Because we didn't get that far.
13       MR. BOUSE: Say it again.
14 BY MR. SHAIBANI:
15    Q  Isn't it true you decided to go with
16 Ms. Medlin's lease because you didn't trust
17 Mr. Bratton to rent your property because he's
18 black?
19       MR. BOUSE: I object. Don't answer that.
20       MR. RANCK: I object too.
21       MR. BOUSE: Next question.
22       MR. SHAIBANI: There's no basis to

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 182

1  instruct her to not answer that question.
2      MR. BOUSE: That's not a question. How
3  about the tone? How about the content?
4      MR. SHAIBANI: She can read it back
5  without any tone. It's on the record.
6      MR. BOUSE: Next question.
7      MR. SHAIBANI: I need an answer to this
8  question, Counsel. It goes to the crux of the
9  case.
10  (Court reporter read back the last question)
11      MR. BOUSE: Go ahead. You can answer,
12  Mary.
13      THE WITNESS: No.
14      MR. BOUSE: Thank you. The answer is no.
15  BY MR. SHAIBANI:
16    Q  Could you tell us about the leasing of
17  your basement to the new tenant?
18      MR. BOUSE: What do you want to know?
19  You ask a specific question.
20      MR. SHAIBANI: I'd like to know what kind
21  of lease she signed.
22      THE WITNESS: She signed a one year

Page 183

1  lease.
2  BY MR. SHAIBANI:
3    Q  Was it on Chatel's lease?
4    A  Yes.
5    Q  And did she --
6      MR. BOUSE: For the tenant for the
7  basement.
8      THE WITNESS: Gordon did it.
9  BY MR. SHAIBANI:
10    Q  Did you cross out the provisions in her
11  lease relating to conversion to month to month at
12  the end of the one year?
13    A  I would have to take another look at her
14  lease, but, yes, my belief is that is correct. I
15  don't have it with me right now.
16    Q  What about paragraph 41, the right of
17  first refusal?
18    A  Yes, that also.
19    Q  That was crossed out as well?
20    A  Uh-huh.
21    Q  And did she have any restrictions with
22  respect to using the garden?

Page 184

1    A  The garden is not mentioned, that's my
2  recollection, it's not mentioned.
3    Q  What is the occupation of the lady who's
4  leasing your basement?
5    A  Crafts, I think would be the best way to
6  describe it. I don't remember how she described
7  it. It was her own business but it's crafts.
8    Q  What type of financial documents did you
9  request from her to qualify her for leasing the --
10    A  Gordon had all of her income tax returns
11  because she's self-employed. I didn't see them
12  but he got them. He was receiving them.
13    Q  And can you tell us the name and
14  telephone number of this lady, the tenant for your
15  basement?
16      MR. BOUSE: You can tell the name.
17      THE WITNESS: I don't have her last name.
18      MR. BOUSE: We gave them in answers.
19      THE WITNESS: I gave it someplace.
20      MR. BOUSE: Hold on.
21      THE WITNESS: It might be in my telephone
22  book.

Page 185

1      MR. BOUSE: In her answer to your second
2  sentence, Soraya Chemaly, C-h-e-m-a-l-y.
3      THE WITNESS: It sounds like it.
4      MR. BOUSE: Soraya, S-o-r-a-y-a,
5  C-h-e-m-a-l-y, is the information I was provided.
6      MR. SHAIBANI: Do you have her contact
7  information?
8      MR. BOUSE: 1622 Wisconsin Avenue, we've
9  given it to you. Why are you laughing about that?
10  BY MR. SHAIBANI:
11    Q  Is she --
12    A  Yeah, she's there.
13    Q  That's the address we got for another
14  witness who had long departed from the location.
15      MR. BOUSE: We can only give you the
16  address we have.
17  BY MR. SHAIBANI:
18    Q  Could you tell us the name of your
19  previous office manager before Barrett Anderson
20  was hired to close down your office?
21    A  Jan Click, C-l-i-c-k.
22    Q  And do you have her telephone number?

47 (Pages 182 to 185)

**Capital Reporting Company**

Page 186

1   A   No.
2   Q   If you would like to look in your
3   phonebook or cell phone to obtain it?
4   A   I do not have it. I have not had any
5   contact with her over six months.
6   Q   Do you know her address?
7   A   No, I don't know where she is.
8   Q   Did you send her salary -- her pay checks
9   by mail or was it handed to her? The question
10  is --
11  A   She wrote out her own check. She did the
12  payroll. Monthly payroll, is that what you mean?
13  Q   Yes.
14  A   She wrote out the checks herself.
15  Q   Is there a record as to where those
16  checks were mailed to?
17  A   They weren't mailed, she took them.
18  Q   Do you have a copy of her job
19  application?
20  A   I doubt it. She worked for me for a long
21  time. It was quite a while ago.
22  Q   Why did she decide to leave your

Page 187

1   employment.
2       MR. BOUSE: I object.
3       THE WITNESS: She didn't want to be a
4   part of closing the office.
5   BY MR. SHAIBANI:
6   Q   Was she involved in any way with respect
7   to leasing the commercial units of your property?
8   A   With these leases you mean or -- what are
9   you getting at?
10      MR. BOUSE: At what point in time?
11  BY MR. SHAIBANI:
12  Q   From July on wards when the property was
13  listed, what was the extent of --
14  A   No, she wasn't working for me then. She
15  left in May.
16  Q   Okay. So she had no contact with Chatel
17  with respect to leasing the commercial units of
18  your property?
19  A   That's correct.
20  Q   Did you have any communications with
21  Barrett Anderson since the administrative
22  complaint was filed at the DC Office of Human

Page 188

1   Rights?
2   A   Which is that, now?
3       MR. BOUSE: What's the date?
4       MR. SHAIBANI: October 19th of '05.
5       MR. BOUSE: Have you had any
6   communication with Barrett since October 19th,
7   '05?
8       THE WITNESS: Just to tell him that he
9   was going to receive a subpoena from you, which I
10  guess he already knew.
11  BY MR. SHAIBANI:
12  Q   And did you discuss the substance of the
13  case in any way?
14  A   No.
15  Q   What about Thierry Liverman from October
16  19th onwards, did you have any discussions with
17  Thierry Liverman regarding this case?
18  A   No.
19  Q   What about John Pagones?
20  A   No.
21      MR. SHAIBANI: Could we take a short
22  break?

Page 189

1       (Short break taken)
2       MR. SHAIBANI: Can we distribute Exhibit
3   18?
4       (White Exhibit No. 18
5       was marked for identification).
6   BY MR. SHAIBANI:
7   Q   Ms. White, you mentioned that you wanted
8   to lease your property as soon as possible in
9   October of '05. Now the question is after
10  Ms. Medlin withdrew her offer on the 13th of
11  October, why didn't --
12  A   Is that the date she withdrew?
13      MR. BOUSE: For the purpose of his
14  question, assume it's the 13th.
15      MR. SHAIBANI: Yes.
16  BY MR. SHAIBANI:
17  Q   Why didn't you contact John Bratton
18  yourself to try to lease your property?
19  A   I had hired somebody else to do it. I
20  don't believe in being my own real estate agent
21  just as I don't recommend a lawyer being his own
22  lawyer, that's somebody else's -- just like I just

48 (Pages 186 to 189)

Page 190

1 rented the basement but I didn't do it, I had John
2 Gordon Forrester do it.
3    Q  Isn't it unusual for a landlord to hire
4 an attorney to lease her property?
5       MR. BOUSE: I object.
6       MR. RANCK: Objection, speculation.
7       MR. BOUSE: Foundation, relevance.
8 BY MR. SHAIBANI:
9    Q  In your experience as a real estate
10 broker --
11    A  It's the way I do it. Okay?
12       MR. BOUSE: Sure.
13 BY MR. SHAIBANI:
14    Q  And since you wanted to rent the property
15 as soon as possible, why did it take from the 18th
16 of October when Mr. Forrester first contacted Mr.
17 Bratton until October 31st for a lease to be
18 executed? Why did it take 13 days?
19       MR. BOUSE: I object, if you know.
20 BY MR. SHAIBANI:
21    Q  After your returning contact with
22 Mr. Bratton to lease that property --

Page 191

1       MR. BOUSE: I object.
2       THE WITNESS: I think that's a question
3 for Gordon to answer.
4       MR. BOUSE: Okay.
5 BY MR. SHAIBANI:
6    Q  -- did you in fact instruct him that you
7 wanted to lease your property as soon as possible?
8    A  Uh-huh.
9       MR. BOUSE: Yes?
10      THE WITNESS: Yes.
11 BY MR. SHAIBANI:
12    Q  Okay. I'd like you to please turn to
13 page 7 of this document marked as Exhibit 18,
14 Chatel's response it to Plaintiff's first set of
15 Interrogatories. The last paragraph here it says
16 the last sentence actually it says, "On the
17 instruction of Ms. White, Thierry Liverman called
18 John Bratton on 5:30 on October 12th and told him
19 that Ms. White was selecting the other candidate."
20 The words I want to emphasize is "was selecting
21 the other candidate." Did you actually instruct
22 Mr. Liverman to call Mr. Bratton and tell him you

Page 192

1 were selecting the other candidate?
2       MR. BOUSE: I object. You can answer.
3       THE WITNESS: No, I think that's a
4 decision Mr. Liverman made.
5 BY MR. SHAIBANI:
6    Q  The decision to call Mr. Bratton?
7    A  At that precise moment, I think it was.
8    Q  What about the decision to tell him that
9 you were selecting the other candidate?
10   A  That was --
11      MR. RANCK: Let me interpose an objection
12 here on foundation and evidence and speculation
13 because your question assumes this is exactly what
14 Mr. Liverman told Mr. Bratton. If we assume
15 Mr. Liverman said Ms. White is selecting another
16 candidate, then your question is fair but I'm not
17 sure all the evidence there is in this record as
18 to what was said.
19      MR. BOUSE: I object. You can answer,
20 Mary.
21      THE WITNESS: I don't know what he said
22 to John because the call was not taken in my

Page 193

1 presence. The call wasn't made in my presence.
2 BY MR. SHAIBANI:
3    Q  The question is did you instruct him to
4 inform Mr. Bratton that you were selecting the
5 other candidate?
6    A  No, I told him, let's work this other one
7 first and so he made his own leap to the next
8 point.
9    Q  And why is it that you met directly with
10 Ms. Medlin but not Mr. Bratton even though he had
11 called you and sent you a letter?
12      MR. BOUSE: I object. Go ahead.
13      THE WITNESS: Ms. Medlin happened to walk
14 into the office I was there. If Bratton had
15 walked into the office when I was there, that
16 would have been fine. She just happened to walk
17 in. There was no appointment. I happened to be
18 there. There's nothing sinister about it at all.
19 BY MR. SHAIBANI:
20   Q  Did you give preferential treatment to
21 Ms. Medlin compared to Mr. Bratton in connection
22 with your leasing your property?

## Capital Reporting Company

Page 194

1  A  In what way?
2  Q  By making -- well, by making yourself
3  available by informing Chatel to process her
4  application more quickly?
5      MR. BOUSE:  Objection, there's no
6  evidence she ever said to process her,
7  Ms. Medlin's application, more quickly.  I don't
8  know where that came from.
9  BY MR. SHAIBANI:
10  Q  Well, Mr. Liverman testified he got a
11  call from Ms. White, apparently stating that I
12  have this candidate coming in with a lease and
13  then on the same day her lease was drafted and --
14  A  I think she was leaving town that day,
15  wasn't she?
16     MR. RANCK:  I respectfully suggest
17  there's no question pending.  Counsel can argue
18  what the witness has testified to.
19  BY MR. SHAIBANI:
20  Q  Is it your testimony that you didn't give
21  preferential treatment to Roberta Medlin in
22  connection with leasing your property?

Page 195

1  A  I don't think I did.  That seems to be
2  what you're saying.  No.
3  Q  Now, on page 7 of Chatel's response to
4  Plaintiff's Interrogatories, if you look at the
5  last a paragraph --
6  A  Page 7 you said?
7  Q  Yes, the sentence before what we were
8  reading and, again, Ms. White asserted that there
9  were three basis for her decision.  The third
10  basis again I'm going to ask you a question with
11  respect to the word here, "A personal friend had
12  given an extremely favorable reference for
13  Ms. Medlin."  You mentioned earlier that there was
14  a client of yours for whom you conducted a real
15  estate transaction.  Was this client a personal
16  friend of yours?
17  A  They were friends of mine.  I don't know
18  whether it's personal.  Friends.
19     MR. BOUSE:  That's all right.  You've
20  answered the question.
21  BY MR. SHAIBANI:
22  Q  And how long have you known this person?

Page 196

1  A  A couple years.
2  Q  What was the circumstance in your -- how
3  did you --
4  A  We had mutual friends, let me put it that
5  way, to begin with.  And they wanted to buy a
6  particular kind of house in Georgetown.  We
7  maintained a contact over a period of a couple
8  years until we found the right house.
9  Q  Isn't it true that the only limitation
10  you instructed Chatel with respect to the leasing
11  of your property, was that the tenant should not
12  be a food establishment, the only limitation in
13  terms of the job of the tenant, the type of
14  business that the tenant was going to be
15  operating, the only type of business that you said
16  you would not lease your property to when you
17  first listed the commercial units, was no food
18  establishment, isn't that correct?
19     MR. RANCK:  I object to the form.
20     THE WITNESS:  No, there were more.
21     MR. BOUSE:  Objection.  Go ahead.
22     THE WITNESS:  There was the food and the

Page 197

1  beauty parlor and I think a nail salon.
2  BY MR. SHAIBANI:
3  Q  But a real estate brokerage was not among
4  these --
5  A  No, no.
6  Q  -- categories?
7  A  No, the ones I object to would require
8  certain work being done to the building.  I knew
9  that, there was no point getting started with it
10  because I wasn't going to allow the work to be
11  done that that kind of business would require.
12  Let's just not get into it.
13  Q  You mentioned the type of business that
14  the recent tenant for the basement is operating is
15  a crafts shop?
16  A  It's a craft business.  She makes things
17  and she sells them.  I think it's an Internet
18  business, I should say, I think.
19  Q  Interesting.
20  A  It's a very today business, shall we say.
21  Q  Is she renting the entire basement or
22  just a portion?

50 (Pages 194 to 197)

**Capital Reporting Company**

Page 198

1  A  No, just a small portion, the back part.
2  Q  The back spot?
3  A  About one third of the space.
4  Q  Are you intending to lease the other part
5  of the basement to somebody else?
6  A  I have no plans for the rest of it. I'm
7  using it. I have things there. I still go there.
8  Q  If you could please take a look at the
9  exhibit that was passed out earlier, your response
10  to Plaintiff's first set of Interrogatories.
11      MR. SHAIBANI: What number was that?
12      MS. KEYVAN: I think it was 11.
13  BY MR. SHAIBANI:
14  Q  Exhibit 11.
15  A  There it is.
16      MR. BOUSE: She has it, Mr. Shaibani.
17  BY MR. SHAIBANI:
18  Q  Why is it that you stated here that
19  Chatel mistakenly listed the lower level of your
20  property?
21      MR. RANCK: What are you referring to,
22  please?

Page 199

1      MR. BOUSE: Yeah, which one again?
2      MR. RANCK: On this 30 page document.
3      MR. SHAIBANI: It's number 18 which is on
4  page 18. And the answer is on page, follows on
5  page 19 and says, "Defendant Mary White indicates
6  that Chatel and John Pagones" --
7      MR. RANCK: "Did not mistakenly list," is
8  that the part you're referring to?
9      MR. SHAIBANI: Yes, I guess I'm mixing up
10  the documents here. Is it true that the basement
11  of your property was not mistakenly listed by
12  Chatel?
13      THE WITNESS: Let's see --
14      MR. BOUSE: Read your answer.
15      THE WITNESS: Yeah, this was always kind
16  of a -- I think we talked about this before, a bit
17  of a moving target because I was trying to move
18  over to Washington Fine Properties. They wanted
19  me to move over there but they weren't ready. The
20  construction took two or three times longer than
21  they expected. And it took me much more longer to
22  move out of Mary White Real Estate, Inc. than I

Page 200

1  thought it would.
2  BY MR. SHAIBANI:
3  Q  Okay. Well, in response to Plaintiff's
4  first amended complaint in paragraph 24, you've
5  stated that the lower level was mistakenly listed?
6      MR. RANCK: May we --
7      THE WITNESS: Which one are we on?
8  BY MR. SHAIBANI:
9  Q  It's actually another exhibit.
10      (White Exhibit No. 19
11      was marked for identification).
12      MR. RANCK: Are you intending to show the
13  witness the first amended complaint to which she's
14  answering because I think in fairness in order to
15  take her answer in context, we need to see what
16  the allegation she's answering was.
17      MR. SHAIBANI: I'm not planning on doing
18  that right now. I just want to know if this
19  statement, the lower level was mistakenly listed,
20  that's --
21      MR. RANCK: With all due respect, I
22  object because I can't tell what that's referring

Page 201

1  to, if it's referring to what should have been
2  pulled off at some point but wasn't, which you've
3  made an issue of or if it's mistakenly listed from
4  the beginning. Your office is right here, I'm
5  sure you could easily grab the first amended
6  complaint.
7      (Short break taken)
8      THE WITNESS: Are we talking about the
9  listing specifically provided? What did you want
10  us to look at a here?
11  BY MR. SHAIBANI:
12  Q  It's paragraph 24, your statement here
13  the lower level was mistakenly listed.
14      MR. RANCK: Objection, mischaracterizes
15  the document you've given to her.
16      MR. SHAIBANI: The document I've given to
17  her is the complaint. Her response, I didn't
18  draft. It doesn't mischaracterize my complaint in
19  any way.
20      MR. RANCK: It does, but you've given her
21  also her answer and said mistakenly listed and
22  that's not what her answer says.

51 (Pages 198 to 201)

Capital Reporting Company

Page 202

1  MR. SHAIBANI: That's what her answer
2  says.
3  MR. RANCK: Would you read it into the
4  record, please, and read the entire sentence
5  Mr. Shaibani and what you've omitted is
6  significant.
7  MR. BOUSE: Thank you or shall I read it
8  into the record. I have it in front of me.
9  MR. SHAIBANI: "Defendant admits the
10  allegations of paragraph 24 but states that the
11  lower level was mistakenly listed."
12  MR. RANCK: And then it continues.
13  You're leaving off purposefully five words.
14  "Mistakenly listed as stated in this paragraph,"
15  not mistakenly listed, period, mistakenly listed
16  as alleged in that paragraph in your complaint.
17  All I'm asking, when you read something into the
18  record from a document, you read the entire
19  sentence because you're changing the meaning.
20  MR. BOUSE: So what's the question?
21  BY MR. SHAIBANI:
22  Q  The question is why did you say that the

Page 203

1  basement was mistakenly listed?
2  MR. RANCK: "As stated in this
3  paragraph."
4  MR. BOUSE: And I refer you to her
5  previous answer when you asked her about the
6  Interrogatories.
7  MR. SHAIBANI: The basement, my paragraph
8  24 in the complaint doesn't say anything about the
9  basement being mistakenly listed, Counsel.
10  MR. RANCK: No, Mr. Shaibani, I'm sorry
11  to belabor the record, this is important because
12  it's a recurring problem. The allegations in your
13  complaint gives details about the basement listing
14  of the answer of Ms. White says it was mistakenly
15  listed as stated in your paragraph of the
16  complaint.
17  MR. SHAIBANI: There is no paragraph in
18  the complaint that says that, Counsel. You
19  haven't read the complaint, obviously.
20  MR. RANCK: I just looked at it,
21  Mr. Shaibani. What it says the lower level was
22  mistakenly listed as stated in this paragraph.

Page 204

1  MR. SHAIBANI: Have you read the
2  paragraph that's referenced it? It doesn't say
3  anything about the basement being mistakenly
4  listed, paragraph 24 of the complaint, not the
5  answer.
6  MR. RANCK: Paragraph 24 references the
7  basement listing. Ms. White has answered it was
8  mistakenly listed as alleged in the paragraph of
9  the complaint, not that you said it was mistakenly
10  listed, some of what you allege in the complaint
11  is a not correct is what I think she's saying.
12  MR. BOUSE: She admitted to the
13  allegation to 24 except she said --
14  BY MR. SHAIBANI:
15  Q  I'll rephrase the question. Was the
16  basement mistakenly listed by Chatel? That's the
17  question.
18  MR. RANCK: Objection.
19  MR. SHAIBANI: With your objection,
20  you're wasting my time here.
21  MR. RANCK: Ask an appropriate question.
22  MR. BOUSE: Answer it again.

Page 205

1  THE WITNESS: It was listed for a brief
2  time, yes.
3  BY MR. SHAIBANI:
4  Q  It was the listed for a brief time?
5  A  For a brief time.
6  Q  That's not the question. The question
7  was the basement mistakenly listed by Chatel, not
8  whether it's listed at all.
9  MR. BOUSE: She answered that.
10  MR. SHAIBANI: No, she hasn't?
11  MR. BOUSE: She has, if you go back and
12  read it.
13  BY MR. SHAIBANI:
14  Q  Please answer it again.
15  A  We talked about the fact that at one time
16  the entire building was vacant or about to be
17  vacant and something had to get rented. And so
18  for a very short time nothing was rented. Then
19  the residential part was rented. So the pressure
20  to get something rented was reduced. And then
21  when it became obvious that I wouldn't be able to
22  move as quickly as I thought and the move was a

Page 206

1  bigger job than I thought it was, I realized I was
2  going to need the space downstairs because I
3  couldn't move it anywhere else. I couldn't move
4  it to Washington Fine Properties, I couldn't move
5  it to my home. I didn't have a garage to put it
6  in.
7      MR. BOUSE: I refer you to the questions
8  you asked her concerning your Exhibit No. 11,
9  which is Interrogatory number 18 where she read to
10 you that she did not mistakenly list the lower
11 level apartment. She explained that to you.
12     MR. RANCK: And also the question is
13 referring to Exhibit No. 3, which is the MIRS
14 listing of the basement where you went through
15 similar questions.
16 BY MR. SHAIBANI:
17   Q  The basement of the property is designed
18 in a way that two different businesses could
19 occupy it, isn't that correct?
20   A  With some work that could be done.
21   Q  Why didn't you request Chatel to remove
22 the basement from the MIRS listings as an

Page 207

1  active -- as being held on active status if you
2  decided not to rent it?
3    A  I guess I forgot to tell them. I was
4  busy doing other things. They also knew what was
5  going on. They knew what was happening.
6    Q  And you sold your office furniture
7  because you didn't need it anymore, isn't that
8  correct?
9    A  Sold some of it.
10   Q  Were you mugged by an African American at
11 any point?
12     MR. BOUSE: What's the relevance? I
13 object. No, no, I'll tell you what, I'll let her
14 answer. You can answer, Ms. White.
15     THE WITNESS: I was attacked from behind
16 by a gang and they were African American.
17 BY MR. SHAIBANI:
18   Q  And when did that happen?
19   A  December of '87.
20   Q  And who was the perpetrators?
21   A  I have forgotten their names. There were
22 five or six black men.

Page 208

1    Q  Where did this happen?
2    A  It happened actually in front of almost
3  the Chatel office, right there on N Street. It
4  was about 20 feet west of the Chatel office.
5    Q  And did they actually physically hurt you
6  in any way?
7    A  Oh, big time.
8    Q  What did they do?
9    A  Well, I was knocked out enough to see the
10 white light and I flew over Georgetown.
11     MR. BOUSE: She thought she was going to
12 die.
13     THE WITNESS: It's quite an experience.
14     MR. SHAIBANI: Counsel, I urge you not to
15 testify.
16     MR. BOUSE: I was trying to interpret.
17 You can urge me.
18     THE WITNESS: My left arm was shattered,
19 twisted and broke. My left pelvic bone was
20 twisted and broke, later dislocated. I've had
21 five operations. I'm still in therapy.
22 BY MR. SHAIBANI:

Page 209

1    Q  Were the perpetrators prosecuted for this
2  crime?
3    A  No, they weren't. They were identified.
4  I identified all of them. But the police
5  department said the crime was not serious enough
6  to prosecute. And I asked what could happen to be
7  more serious, did I have to be killed? And they
8  said yes.
9    Q  Did this mugging incident cause you to
10 have a different perception on African Americans?
11   A  No, it caused me to have a different
12 perception on anybody walking behind me.
13   Q  Did the mugging cause you not to want to
14 engage in real estate deals with blacks?
15   A  No, I continued to have some dealings. I
16 had black clients.
17   Q  Have you ever leased your commercial
18 space to an African American?
19   A  Yes, Mr. Bratton.
20   Q  Aside from Mr. Bratton, that is?
21   A  No.
22   Q  Is it a violation of the MIRS rules not

**Capital Reporting Company**

Page 210

1  to change the status of properties when they're no
2  longer available?
3       MR. RANCK: Objection to the form of the
4  question.
5       MR. BOUSE: I object.
6       THE WITNESS: I think they want us to
7  change them. There's a certain period to change
8  them. And if they are not changed within that
9  period, they give a fine.
10 BY MR. SHAIBANI:
11    Q  Why is it that John Pagones did not
12 provide a blank rental application to John Bratton
13 on the 6th of October?
14      MR. BOUSE: I object.
15      THE WITNESS: That's something for John
16 to answer.
17 BY MR. SHAIBANI:
18    Q  Did you -- I'll rephrase the question.
19 Was there any reason why you didn't inform Chatel
20 to assist Mr. Bratton with his lease application
21 from October 6th through the 11th?
22      MR. BOUSE: I object, this assumes --

Page 211

1  assumes she knew.
2  BY MR. SHAIBANI:
3     Q  Did you actually call him to tell him,
4  "Hey, I want you to help this guy out to lease the
5  property"?
6       MR. BOUSE: I object.
7       THE WITNESS: They were working on it.
8  Wasn't John out of the office during some of that
9  time, too? Wasn't there a Saturday and a Sunday
10 and a holy day, whatever you call it? So it was
11 6th through 7th.
12 BY MR. SHAIBANI:
13    Q  I believe after the 11th.
14    A  They would have been closed the 8th, 9th
15 and 10th.
16    Q  To your knowledge, does Chatel maintain
17 blank commercial lease agreements on its computers
18 or its forums closet?
19      MR. BOUSE: I object.
20      THE WITNESS: I think Thierry testified
21 he has them on his computer.
22 BY MR. SHAIBANI:

Page 212

1     Q  Would you agree that a blank rental
2  application could be obtained from the GCAR
3  website?
4     A  Commercial? What kind of --
5     Q  Rental application.
6     A  Commercial application?
7     Q  Well, the rental application that you
8  provided to Mr. Bratton, which I believe was the
9  residential one.
10    A  The reason I say that because I think
11 that a commercial rental was not available in 2005
12 but I believe it is available now. It was made
13 available sometime in 2006.
14    Q  But the residential rental was
15 available --
16    A  The residential was available but they
17 hadn't gotten it.
18    Q  Did Mr. Bratton send you his rental
19 application directly or was it submitted to you
20 through Chatel?
21      MR. BOUSE: I object. You already
22 answered that. Go ahead.

Page 213

1       THE WITNESS: Seems like it's a double
2  question but --
3  BY MR. SHAIBANI:
4     Q  Well, I guess what I want to know, did
5  you actually fax Mr. Bratton's rental application
6  to Chatel on the 11th of October?
7     A  I didn't. I did not.
8     Q  Why is it that Chatel conducted the
9  credit check on Roberta Medlin before John
10 Bratton?
11    A  I think Thierry addressed that in his
12 deposition.
13      (White Exhibit No. 20
14      was marked for identification).
15 BY MR. SHAIBANI:
16    Q  I'd like to distribute Exhibit 20. If
17 you could please take a look at the rental
18 application, there's a fax line on the top, it
19 says from Mary White, Inc., dated October 11th at
20 11:00 a.m. I wanted to know if you had faxed this
21 to Chatel?
22    A  I didn't but maybe Barrett did.

54 (Pages 210 to 213)

Capital Reporting Company

Page 214
1   Q  Would it be improper for Chatel to have
2  conducted a credit check on Roberta Medlin before
3  John Bratton since he inquired about the property?
4   A  I don't know when --
5      MR. RANCK:  Objection to the form of the
6  question.
7      MR. BOUSE:  I object.
8      MR. RANCK:  And vague, the word improper.
9      THE WITNESS:  I think I saw that
10 addressed in Thierry's deposition.  I don't know
11 what they're doing.
12 BY MR. SHAIBANI:
13  Q  Did you inform Chatel to process Roberta
14 Medlin's application in a more expeditious manner
15 than John Bratton's?
16     MR. BOUSE:  I object.
17     THE WITNESS:  Haven't we been through
18 that before?
19     MR. BOUSE:  Answer it again.
20     THE WITNESS:  No.
21 BY MR. SHAIBANI:
22  Q  Do you find it strange here that Chatel

Page 215
1  didn't have a blank commercial lease on file on
2  the 6th of October when John Bratton requested one
3  from John Pagones?
4      MR. BOUSE:  I object.
5      MR. RANCK:  Objection, lack of
6  foundation, mischaracterizes prior testimony.
7      MR. BOUSE:  Go ahead, Mary.  I object.
8      THE WITNESS:  I don't know.
9  BY MR. SHAIBANI:
10  Q  When you spoke to Mr. Bratton on the
11 phone, did you recognize from his voice that he's
12 African American?  And this is the first time you
13 talked to him over the phone?
14  A  No, it was pretty brief as I recall.  I
15 was pretty distracted.
16  Q  Why is it that you didn't call him back?
17  A  Because I asked him to call John Pagones,
18 because he was handling the rental of the space.
19  Q  What about after receiving Mr. Bratton's
20 letter to you where he indicated that John Pagones
21 wasn't assisting him in this process?
22     MR. BOUSE:  I object, that's a total

Page 216
1  mischaracterization of the letter.  I think she's
2  testified she never seen the letter.
3  BY MR. SHAIBANI:
4   Q  Didn't you receive a letter from John
5  Bratton in October?
6      MR. RANCK:  She can obviously answer
7  whether she received the letter.
8      MR. BOUSE:  Do you recall receiving the
9  letter?
10     MR. RANCK:  If we're going to get the
11 letter out, why don't we show the letter?
12     THE WITNESS:  I don't recall any letter.
13     MR. BOUSE:  Her answer was she doesn't
14 recall any letter complaining about John Pagones.
15     (White Exhibit No. 21
16     was marked for identification).
17 BY MR. SHAIBANI:
18  Q  This Exhibit 21, did you receive this
19 letter from John Bratton in October of '05?
20     MR. BOUSE:  Take a look at it, Mary, see
21 if you've ever seen it before.
22     THE WITNESS:  I think I've seen it in the

Page 217
1  papers presented to me but not in the beginning.
2  So he came to the office and Barrett directed him
3  to John Pagones.  I still don't have the
4  information I needed.  So did the lease come with
5  this?  Is this part of the lease?
6      MR. RANCK:  What's the question pending?
7      MR. BOUSE:  What's the question?
8  BY MR. SHAIBANI:
9   Q  The question is after you received this
10 letter, why didn't you call John Bratton to assist
11 him with leasing your property?
12     MR. BOUSE:  I object.
13 BY MR. SHAIBANI:
14  Q  And I point to the statement in the
15 letter, the first paragraph, the last sentence it
16 says, "Unfortunately, after my visit, I still
17 didn't have the information I needed to present
18 you with a lease or supporting documents."  Why
19 didn't you call him after you received this
20 letter?
21  A  Why did this letter come?
22     MR. BOUSE:  If you don't know when it

55 (Pages 214 to 217)

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 218

1  came, just tell him that.
2      THE WITNESS: Because did this come with
3  the lease?
4  BY MR. SHAIBANI:
5      Q  I don't believe so but I'm not here to
6  testify about that.
7      MR. BOUSE: If you don't know when you
8  received it, Mary, tell him.
9      THE WITNESS: No, I don't know when I
10 received it. It's dated the 7th. I don't know
11 that I received it on the 7th. I was in contact
12 with John. He was talking to me.
13 BY MR. SHAIBANI:
14     Q  John Pagones you mean?
15     A  John Pagones called.
16     Q  And my question is once you received this
17 letter, why didn't you call John Bratton to assist
18 him with leasing the property?
19     A  I wouldn't call John Bratton, I would
20 call John Pagones and ask him why he wasn't doing
21 his job.
22     Q  Didn't you have telephonic communications

Page 219

1  with Roberta Medlin? Did you ring her to attempt
2  to lease the property?
3      A  Roberta Medlin came to me personally,
4  walked into where I was and wanted to do a lease.
5  I told her to go to Chatel. I think she went down
6  there and John wasn't there, then she came back
7  and said nobody was there, he wasn't there, I'm
8  going out of town today. So I called to see who
9  was there, got Thierry. He said he'd see her. I
10 think this was part of the --
11     MR. BOUSE: No, there's no question
12 pending.
13 BY MR. SHAIBANI:
14     Q  Did you have the Chatel commercial
15 agreement of lease at your office in October of
16 '05?
17     A  I don't know.
18     Q  After you received Mr. Bratton's letter
19 dated October 7th, did you contact Chatel to
20 inquire as to why they weren't providing the
21 necessary information to John Bratton?
22     MR. BOUSE: I object.

Page 220

1      MR. RANCK: I object to this as well
2  based on the form of the question.
3      THE WITNESS: I have a feeling that I had
4  spoken with John Pagones before I got this letter
5  and that John had told me that he didn't have the
6  lease and he was getting it for him the next day.
7  It was in Thierry's computer.
8  BY MR. SHAIBANI:
9      Q  Yes, but he -- why didn't he submit that
10 to him the next day? It wasn't until the
11 following week?
12     MR. BOUSE: She's not going to answer
13 that.
14     MR. RANCK: Objection, calls for
15 speculation and lacks foundation.
16 BY MR. SHAIBANI:
17     Q  Could you please answer the question?
18     A  I don't know the answer to that.
19     Q  Were you aware that John Pagones was
20 aired on Date Line NBC as having falsely informed
21 a handicapped individual that he had no properties
22 available for lease in Georgetown?

Page 221

1      MR. BOUSE: Objection, when?
2      MR. SHAIBANI: In October of '05, were
3  you aware of this fact?
4      MR. BOUSE: I object.
5      MR. RANCK: I object, lack of foundation
6  and facts not in evidence.
7      THE WITNESS: I did not see that program
8  but I was aware that there was a problem.
9  BY MR. SHAIBANI:
10     Q  A problem relating to --
11     A  Some problem John had with somebody in a
12 wheelchair, that's all I know.
13     Q  And did that cause you to want to have
14 somebody else handle the leasing of your property?
15     A  No.
16     MR. BOUSE: I object.
17     THE WITNESS: Obviously not.
18 BY MR. SHAIBANI:
19     Q  Did you discuss that incident with
20 Chatel?
21     A  No.
22     Q  When was the first time that you reviewed

56 (Pages 218 to 221)

Capital Reporting Company

Page 222

1  the application packet submitted to you by John
2  Bratton containing his rental application, lease
3  and two checks for $5,000?
4      A  The first time I reviewed everything was
5  when I sat down with Thierry that evening. What
6  evening did you say it was?
7        MR. BOUSE: October 12th.
8        THE WITNESS: John and I had some
9  conversation about it prior to that? First time
10 everything was reviewed was then.
11 BY MR. SHAIBANI:
12     Q  Would you agree that Roberta Medlin never
13 signed a lease with you for the 1622 property?
14     A  That's correct, yes.
15     Q  Do you know why John Pagones contacted
16 John Bratton on the 10th of October to ask him
17 what his intentions were with respect to the
18 backyard of your property?
19        MR. BOUSE: I object.
20        THE WITNESS: No.
21 BY MR. SHAIBANI:
22     Q  Did you instruct John Pagones --

Page 223

1      A  Didn't you ask this before?
2        MR. BOUSE: He did. Go ahead. Go ahead,
3  Mr. Shaibani.
4  BY MR. SHAIBANI:
5      Q  Did you instruct John Pagones to question
6  Mr. Bratton as to what he wanted to do with the
7  backyard of your property?
8        MR. BOUSE: Didn't she answer that just a
9  little while ago? I object. Go ahead. Answer it
10 again.
11        THE WITNESS: I think I wondered what he
12 wanted it for, how was he going to get to it.
13 BY MR. SHAIBANI:
14     Q  Wasn't he -- wasn't his offer for the
15 street level initially?
16     A  Yeah, and the street level has no way to
17 get to the garden. I couldn't see how he was
18 going to use it. How was he going to get to it?
19 What did he want it for?
20     Q  Why would the backyard have any relevance
21 to Mr. Bratton's --
22        MR. RANCK: Objection, calls for

Page 224

1  speculation.
2        MR. BOUSE: I object.
3  BY MR. SHAIBANI:
4      Q  Did Mr. Bratton inform you he wanted the
5  backyard for himself?
6      A  No, I --
7        MR. BOUSE: That's it, you just said no.
8  BY MR. SHAIBANI:
9      Q  Did you get that?
10        MR. BOUSE: She said no.
11 BY MR. SHAIBANI:
12     Q  My question is if he didn't say he wanted
13 the back yard for himself, then why would --
14     A  You're saying something came up about the
15 garden. If it did I would want to know why. I
16 would want to know why it came up.
17     Q  Isn't it true that you informed Chatel
18 that you were not going to accept any of the lease
19 proposals submitted by John Bratton from the 7th
20 until the 11th of October?
21     A  Not going to accept any?
22        MR. BOUSE: When, what are you talking

Page 225

1  about?
2  BY MR. SHAIBANI:
3      Q  From October 7 to October 11, the various
4  lease agreements submitted by John Bratton, didn't
5  you tell Chatel that you were not going to accept
6  any of those?
7      A  They all contained items I couldn't
8  handle, that I couldn't deal with.
9      Q  Can we go over some of these items if we
10 may?
11        MR. BOUSE: Didn't we go over them?
12 Right of first refusal, she said that ten times.
13        MR. SHAIBANI: Aside from that, there are
14 many things that are the subject.
15 BY MR. SHAIBANI:
16     Q  I'll rephrase the question. Aside from
17 the right of first refusal, was there anything
18 else?
19     A  Wasn't there something about more than a
20 two year lease?
21        MR. BOUSE: Why don't you show it to her
22 then?

57 (Pages 222 to 225)

**Capital Reporting Company**

Page 226

1  BY MR. SHAIBANI:
2     Q  Other than the right of first refusal and
3  the option to renew the lease, were there any
4  other --
5     A  I'd have to look at it to be sure there
6  weren't any others. Those were two big ones.
7     MR. RANCK: I have to object to the
8  question as being vague and compound as much as we
9  know there were multiple different versions
10 submitted that are not identical with each other.
11    THE WITNESS: Would you mind if I open
12 the door to get a little air circulation?
13    MR. BOUSE: Thank you. We'll take a few
14 minute.
15    (Short break taken)
16 BY MR. SHAIBANI:
17    Q  Ms. White, wouldn't you agree that the
18 reason John Bratton had submitted multiple
19 versions of the lease agreement was because John
20 Pagones was not giving him the information as to
21 what you wanted in the lease for him to draft one
22 lease instead of multiple versions?

Page 227

1     MR. BOUSE: I object.
2     MR. RANCK: Objection foundation,
3  speculation.
4     THE WITNESS: I don't know. Didn't he
5  get a lease from Chatel? Didn't they finally give
6  him one? I thought they had one on Friday for
7  him.
8  BY MR. SHAIBANI:
9     Q  Yes, but that's besides the point. I
10 guess what --
11    A  They just had one lease.
12    Q  Yes, but John Pagones wasn't giving
13 Mr. Bratton the information.
14    A  He didn't have it the day he went.
15    MR. BOUSE: I object. He's talking about
16 two different things. Her answer was I don't
17 know.
18    MR. SHAIBANI: No, I don't think she
19 understood the question properly.
20 BY MR. SHAIBANI:
21    Q  My question is not why Mr. Bratton wasn't
22 given the commercial lease agreement, why wasn't

Page 228

1  he given the information that he wanted to be
2  included in the lease agreement so he wouldn't
3  have to submit multiple versions of it?
4     MR. RANCK: Objection, foundation.
5     MR. BOUSE: I object. Do you know?
6     THE WITNESS: No.
7  BY MR. SHAIBANI:
8     Q  Is it your position that you informed
9  John Pagones or anyone at Chatel that there were
10 certain things you wanted in the lease agreement
11 which they should have conveyed to Mr. Bratton and
12 did not do so?
13    MR. RANCK: I object. I don't understand
14 the question.
15    MR. BOUSE: I object.
16    THE WITNESS: I don't know what you're
17 talking about with that statement.
18 BY MR. SHAIBANI:
19    Q  Were there certain provisions that you
20 had informed Chatel to include in the lease?
21    A  When did I inform Chatel?
22    Q  Well, when you --

Page 229

1     A  Are you talking about no nail place, no
2  food place? What are we talking about?
3     Q  Provisions that would be pertinent to
4  Mr. Bratton's leasing of the property?
5     A  They wouldn't be pertinent to
6  Mr. Bratton, they would be pertinent to anybody
7  who rented the space, because there's a listing or
8  management or something said a two year lease, for
9  instance, so, yes, they were told that.
10    Q  Why didn't Chatel convey that information
11 to Mr. Bratton?
12    MR. BOUSE: I object, how could she know
13 that?
14    MR. RANCK: Objection, foundation,
15 assumes facts not in evidence.
16    MR. BOUSE: Do you know.
17    THE WITNESS: No, how would I know that?
18    (White Exhibit No. 22
19 was marked for identification).
20    THE WITNESS: Is this the one that
21 Thierry also presented to me?
22    MR. BOUSE: Wait for a question.

58 (Pages 226 to 229)

**Capital Reporting Company**

Page 230

1  MR. RANCK: No guessing.
2  MR. BOUSE: Take a look at it. When he
3  asks the question -- just take a look at them.
4  BY MR. SHAIBANI:
5  Q   Would you agree that the MIRS listing for
6  these properties didn't indicate that the tenant
7  would have no right of first refusal or an option
8  to renew the lease?
9  MR. BOUSE: I object. Go ahead.
10  THE WITNESS: It didn't say that. I
11  don't think the MIRS listings would say that.
12  BY MR. SHAIBANI:
13  Q   Would you also agree that the
14  requirements of having a no right of first refusal
15  or an option to renew the lease were not conveyed
16  by John Pagones, Mr. Bratton, from October 6th to
17  October 11th?
18  MR. BOUSE: I object.
19  MR. RANCK: Objection, speculation, lack
20  of foundation.
21  MR. BOUSE: Do you know?
22  THE WITNESS: I think he would have

Page 231

1  conveyed it by that time but I'm not certain about
2  that.
3  BY MR. SHAIBANI:
4  Q   Well, didn't you say that you in fact
5  reviewed Mr. Bratton's lease application for the
6  first time on the 12th of October when you were
7  sitting with Mr. Liverman?
8  A   Uh-huh.
9  Q   So you wouldn't have gone to --
10  A   But he was conveying things to me over
11  the telephone, whenever he could get ahold of me.
12  Q   And during that conversation, did you
13  actually inform John Pagones that you would not
14  want to provide a right of first refusal or an
15  option to renew the lease through the prospective
16  tenant?
17  A   Well, I think that's something that they
18  should have asked me and them being authorities on
19  renting commercial properties would have known it
20  would be impossible to grant it.
21  Q   Looking at these three exhibits which we
22  passed out numbers 20 to 24, other than the right

Page 232

1  of first refusal and the option to extend the
2  lease, are there any other provisions here which
3  you can point out that would not be acceptable to
4  you?
5  A   Well, you've got --
6  MR. RANCK: Wait, let me object. And I
7  think it's based on tense. The question was that
8  would not be acceptable to you. I presume you
9  mean back in October of 2005?
10  BY MR. SHAIBANI:
11  Q   Yes, when these documents was submitted
12  to you?
13  MR. RANCK: All right. I'm going to
14  object on lack of foundation. It's been
15  established.
16  MR. SHAIBANI: I'll rephrase the
17  question.
18  BY MR. SHAIBANI:
19  Q   Did you ever receive these three
20  documents, 22 through 24?
21  A   I think someplace along the line I've
22  seen this. I think Thierry had it when we met on

Page 233

1  the 13th. I think he said there were several
2  submitted. And I think this one was originally
3  going to be $2,500 and it was rewritten to be
4  $3,500. And there was something about the checks.
5  That was all the things that he talked about that
6  evening when we met. See, this one has got the
7  lower level here, that would have been acceptable
8  because I want three tenants or four, if possible.
9  Q   Okay. The question pending is other than
10  the right of first refusal and the option to renew
11  and you mentioned the basement issue, are there
12  any other provisions in these exhibits, numbers 22
13  to 24 --
14  A   I don't know what this is, two years and
15  ending on the something --
16  MR. BOUSE: She's having difficulty
17  reading 22.
18  THE WITNESS: On the something day of
19  October 2007 or 2008. It's hard to tell what that
20  is.
21  MR. RANCK: Let me interpose an objection
22  to the form of the question. What I think you're

**Capital Reporting Company**

Page 234

1 asking is a form of a hypothetical that I don't
2 believe is answerable and lacks foundation.
3     THE WITNESS: Two-thirds of the
4 utilities --
5     MR. BOUSE: She's pointing out the
6 two-thirds of the utilities, also.
7     MR. RANCK: Mr. Shaibani my problem is
8 I'm not sure you even established which, if any,
9 which of these or all of them she has ever seen or
10 submitted to her.
11     MR. BOUSE: At the time in October.
12     MR. RANCK: Maybe that's --
13 BY MR. SHAIBANI:
14   Q That's a question I asked a moment ago.
15     MR. RANCK: You were asking --
16 BY MR. SHAIBANI:
17   Q Did you receive --
18     MR. RANCK: I'm sorry, go ahead.
19     THE WITNESS: I think this may very well
20 have been among the papers that Thierry had with
21 him when we met on, what was the date, when he
22 wrote the final --

Page 235

1     MR. BOUSE: Referring to Exhibit No. 22.
2     THE WITNESS: When we met on the 12th.
3     MR. BOUSE: Let me ask you, did you ever
4 see 23 and 24? Maybe that's one way to get to it.
5     THE WITNESS: This one is in John's
6 handwriting, right?
7     MR. BOUSE: I have no idea. I think it
8 is.
9     THE WITNESS: October 10th? These are
10 the same things, aren't they?
11     MR. BOUSE: That's why -- unless you sit
12 down and read them all, it's almost impossible to
13 answer that question.
14     THE WITNESS: This one is not the same.
15     MR. BOUSE: Do you want her to take the
16 time and go in another room and read them?
17     THE WITNESS: This one has --
18     MR. BOUSE: Hold it, don't say anything
19 until I get a response. Do you want her to sit
20 down and read all of these?
21 BY MR. SHAIBANI:
22   Q No, my question is -- well, first of all,

Page 236

1 I just want to know which one of these lease
2 applications did you actually receive?
3     MR. BOUSE: If you know.
4     MR. RANCK: Bearing in mind for the
5 witness that I believe all three of the documents
6 are different.
7     THE WITNESS: That's a good question. I
8 don't know.
9     MR. SHAIBANI: Yes, that's why there are
10 three separate exhibits.
11     MR. RANCK: I know, I don't know if that
12 was clear to her previously the way they were
13 provided to her.
14     THE WITNESS: No, I don't know the answer
15 to that.
16 BY MR. SHAIBANI:
17   Q Okay.
18   A You asked if there was anything else and
19 there is this one about the utilities. I don't
20 know where these two-thirds come from and so
21 forth.
22     MR. BOUSE: You've answered the question.

Page 237

1 BY MR. SHAIBANI:
2   Q Would you agree that if you had actually
3 met with John Bratton initially to answer his
4 questions, he wouldn't have had to submit so many
5 versions of the lease agreement?
6     MR. RANCK: Objection.
7     MR. BOUSE: I object. You can answer the
8 question. I guess the question is why didn't you
9 return his call?
10     THE WITNESS: Because I hired somebody to
11 do that for me.
12 BY MR. SHAIBANI:
13   Q Would you agree with me if Chatel sat
14 down with John Bratton to answer his questions
15 initially, he wouldn't have had to submit so many
16 versions of the lease agreement?
17     MR. RANCK: Objection, speculation,
18 foundation.
19     MR. BOUSE: I object.
20     THE WITNESS: Maybe they did.
21 BY MR. SHAIBANI:
22   Q Mr. Liverman testified in his deposition

60 (Pages 234 to 237)

**Capital Reporting Company**

Page 238

1  that when Roberta Medlin came to his office on the
2  11th, you had already presented a lease on her
3  behalf to Chatel, is that correct?
4      MR. BOUSE: I object, show me where.
5      THE WITNESS: I think Chatel had given --
6  she had been to the office and Chatel gave her a
7  blank lease.
8  BY MR. SHAIBANI:
9  Q  And did you have any role in --
10  A  And then she came to me and said, "What
11  do I do with this?" And I said, "You fill it out
12  and John Pagones should help you fill it out."
13  And I think she said he wasn't there.
14  Q  Did you actually help her with filling
15  out the lease before she --
16  A  In the very beginning I showed her how
17  you fill in a couple of the blank, first couple
18  lines so she got the idea. She didn't come to my
19  office. She came to where I was having the open
20  house for brokers.
21  Q  How many times did you speak to Roberta
22  Medlin from the 6th to the 11th of October?

Page 239

1  A  I only saw her that one day on the 11th.
2  Q  Are you familiar with Chatel's first come
3  first serve policy?
4  A  I read it in the deposition. That's the
5  only time I was familiar with it.
6  Q  And would you agree that that policy
7  requires Chatel to attend to the offers presented
8  by a candidate before a second candidate comes in?
9      MR. RANCK: Objection.
10      MR. BOUSE: I object. Do you know?
11      MR. RANCK: Form and foundation.
12      THE WITNESS: The way I interpreted it in
13  the deposition the policy is primarily to keep
14  agents from competing with each other.
15  BY MR. SHAIBANI:
16  Q  Was there a first come first serve policy
17  at Chatel while you were working there?
18  A  I don't remember. I think that's
19  something that was developed in the law after
20  1980.
21  Q  Did you instruct Chatel to run a credit
22  check on Roberta Medlin before John Bratton?

Page 240

1  A  No, I didn't instruct them to run a
2  credit check on anybody. That was part of their
3  job.
4  Q  Would you agree that you didn't instruct
5  Chatel to inform Mr. Bratton that he was required
6  to fill out Chatel's boiler plate commercial lease
7  agreement until several days after he expressed an
8  interest on your property?
9      MR. BOUSE: I object. Do you understand
10  the question?
11      THE WITNESS: No, I don't understand the
12  question.
13      MR. BOUSE: I didn't understand the
14  question.
15  BY MR. SHAIBANI:
16  Q  You didn't inform Chatel to tell
17  Mr. Bratton that he had to submit his offer --
18  A  Thierry and I had a conversation on the
19  phone. And Thierry said that it should be that
20  the first lease he submitted which was not on a
21  Chatel form, I should only deal with ones on the
22  Chatel commercial form.

Page 241

1  Q  And that was on the 12th of October?
2  A  I think that was probably --
3      MR. RANCK: Objection, no foundation.
4      MR. BOUSE: Objection. Go ahead.
5      THE WITNESS: That was more like Monday
6  the 9th, if that was the day they were open.
7  Whatever the first day that they were open, 9th or
8  10th.
9  BY MR. SHAIBANI:
10  Q  If a property owner requests that his or
11  her real estate agent conduct an illegal act,
12  would that require the broker to terminate the
13  agency agreement?
14      MR. BOUSE: I object. I mean --
15  BY MR. SHAIBANI:
16  Q  I'll rephrase the question.
17      MR. BOUSE: Yeah.
18  BY MR. SHAIBANI:
19  Q  If a property owner instructs his broker,
20  "I'm not going to lease my property to an African
21  American," would that statement require the broker
22  to terminate the agency agreement?

61 (Pages 238 to 241)

Page 242

1  MR. BOUSE: I object. Go ahead.
2  MR. RANCK: Object to the form.
3  THE WITNESS: It would not be terminated
4  from the agency but there would be a reprimand of
5  some kind.
6  BY MR. SHAIBANI:
7  Q  Would you agree if a property owner
8  informs his real estate broker that he wants the
9  terms of the lease to be different based on the
10 race of a candidate, that would require the broker
11 to terminate the agency agreement?
12 MR. RANCK: Objection to the form.
13 MR. BOUSE: I object.
14 THE WITNESS: Not the agency but dealing
15 with that person, the client. I've actually had
16 clients demand that.
17 BY MR. SHAIBANI:
18 Q  And what do you do in response?
19 A  Told them I couldn't represent them.
20 Q  Did Mr. Liverman discuss his conversation
21 with John Bratton on the 12th -- his conversations
22 with John Bratton on the 12th and 13th of October,

Page 243

1  did he discuss that with you?
2  A  Mr. Liverman had conversations with
3  Bratton on the 12th and 13th? And then did he
4  discuss those with me?
5  MR. BOUSE: Those with you.
6  THE WITNESS: Is that right?
7  MR. BOUSE: That's the question.
8  MR. RANCK: Can -- I don't want to
9  interpose. I'm not sure the witness is tying the
10 dates as counsel who have been in all these
11 depositions may be. So perhaps the substance of
12 the conversation might be helpful for --
13 BY MR. SHAIBANI:
14 Q  That's what I'd like to ask you actually,
15 did Mr. Liverman communicate with you after your
16 meeting on October 12th about what Mr. Bratton had
17 told him over the phone?
18 A  He told me that he was upset.
19 Q  Did he say anything else?
20 A  No.
21 Q  Did he inform you that Mr. Bratton had
22 threatened to file a discrimination suit against

Page 244

1  you and Chatel?
2  A  No.
3  Q  Did Mr. Liverman tell you that he
4  informed Mr. Bratton that this was just business?
5  A  No, but that sounds like a phrase he
6  might use.
7  Q  Did Mr. Liverman inform you that
8  Mr. Bratton had told him he was going to take it
9  to the next level?
10 A  No.
11 Q  Would you agree that by mid October you
12 had received notice of Mr. Bratton's intent to
13 file a discrimination claim against you and
14 Chatel?
15 MR. BOUSE: I object.
16 THE WITNESS: I don't think we got that
17 notice until sometime in November.
18 BY MR. SHAIBANI:
19 Q  I'm not talking about the notice like the
20 formal complaint that was filed with the Office of
21 Human Rights, but the verbal notice that
22 Mr. Bratton gave to Thierry Liverman?

Page 245

1  MR. BOUSE: She's already answered no to
2  that. You asked that same question just two
3  seconds ago.
4  MR. RANCK: Objection, lack of
5  foundation.
6  MR. BOUSE: Did Thierry Liverman ever
7  tell you there was going to be a discrimination in
8  any of the conversations you had with him?
9  THE WITNESS: No.
10 MR. BOUSE: That's what I thought you
11 said.
12 BY MR. SHAIBANI:
13 Q  Did you inform Mr. Liverman during your
14 meeting that Ms. Medlin's husband worked at an
15 accounting firm and that he was a first-class
16 person?
17 A  I think I might have informed him that he
18 worked for an accounting firm. I'm not sure I did
19 the second part. I knew he worked for an
20 accounting firm.
21 Q  And did you perceive Mr. Bratton to be a
22 second class person?

62 (Pages 242 to 245)