**Capital Reporting Company**

Page 246

1  MR. BOUSE: I object.
2  THE WITNESS: No, no.
3  MR. BOUSE: How about third, fourth,
4  fifth?
5  THE WITNESS: No.
6  MR. BOUSE: Seventh.
7  THE WITNESS: That's not in my
8  vocabulary.
9  BY MR. SHAIBANI:
10  Q The answer was no. Did Barrett Anderson
11  inform you in October of '05 that Mr. Bratton
12  intended to sue you for discrimination?
13  MR. BOUSE: I object.
14  THE WITNESS: Seems to me that Barrett
15  had some kind of a conversation on the stoop or
16  something with John and that John was upset
17  about -- he was making sort of -- who knew whether
18  they were substantial or not. I think Barrett
19  enjoyed his banter with John Bratton, not with
20  John Pagones but with John Bratton.
21  BY MR. SHAIBANI:
22  Q Isn't it true that you decided to lease

Page 247

1  your property to John Bratton only after you
2  learned of his intent to sue you for
3  discrimination?
4  A No.
5  MR. BOUSE: I object.
6  THE WITNESS: No.
7  BY MR. SHAIBANI:
8  Q When did you receive a copy of the
9  complaint from the Office of Human Rights?
10  A Some time in November, the 9th sticks in
11  my head but I'm not sure that's the correct date.
12  Q How did you feel about Mr. Bratton having
13  long hair with dread locks?
14  MR. BOUSE: When?
15  MR. SHAIBANI: In October of '05.
16  THE WITNESS: How do I feel?
17  BY MR. SHAIBANI:
18  Q Yes, how did that appearance come across?
19  What was your first impression of Mr. Bratton's
20  appearance?
21  A The first time I saw Mr. Bratton was not
22  in October but December.

Page 248

1  Q But didn't you see his photograph at that
2  point?
3  A No.
4  Q In October?
5  A No.
6  Q And what was your impression of
7  Mr. Bratton when you first saw him?
8  MR. BOUSE: When?
9  BY MR. SHAIBANI:
10  Q In December or whenever she saw him?
11  A The first time I would see him was in
12  December and he --
13  MR. BOUSE: How is that relevant for
14  anything? He's leasing the property, he's there.
15  THE WITNESS: His presence was
16  interesting. He was well put together, I would
17  say. I was told he was supposed to be young and
18  energetic, a little feisty. So, yeah, he was --
19  it all came across positively.
20  BY MR. SHAIBANI:
21  Q By October 12th would you agree that you
22  knew Mr. Bratton was African American?

Page 249

1  A I think that's probably true. October
2  12th or October 13th when Thierry and I met? That
3  would be a more correct date to say.
4  Q Did you receive any communications from
5  Roberta Medlin after Chatel faxed a commercial
6  lease agreement to her at her home in Kansas City?
7  MR. RANCK: Objection.
8  THE WITNESS: She and I spoke on the
9  telephone that particular evening because I asked
10  her about some of those conditions to the
11  contract. And by that time she had a few more.
12  And so we just agreed to talk later.
13  BY MR. SHAIBANI:
14  Q What happened afterwards?
15  A She withdrew before we had another
16  conversation.
17  Q Did she explain to you why she was
18  withdrawing her offer?
19  A No, I never talked to her after that. I
20  don't know why she withdrew. I have my ideas.
21  She never said.
22  Q Isn't it true that you rejected

63 (Pages 246 to 249)

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 250

1  Mr. Bratton's offer to lease your property on the
2  12th of October the day before you had even faxed
3  the draft of the unsigned lease agreement to
4  Roberta Medlin?
5      MR. BOUSE: Objection, she said she never
6  faxed it to her.
7      MR. RANCK: Asked and answered.
8  BY MR. SHAIBANI:
9      Q  Isn't it true that you rejected John
10 Bratton's offer to lease your property on October
11 12th of '05 a day before Chatel had even faxed a
12 draft of the unsigned lease agreement to Roberta
13 Medlin?
14     MR. BOUSE: What was the date of the fax
15 by -- you contend the fax by Chatel to Roberta
16 Medlin, what is the date of that?
17     MR. SHAIBANI: The 13th.
18     MR. RANCK: I object to the
19 mischaracterization of the witness's prior
20 testimony.
21     MR. BOUSE: Do you know the answer? I
22 object.

Page 251

1      THE WITNESS: No.
2      MR. BOUSE: The answer is no.
3  BY MR. SHAIBANI:
4      Q  No, as in you don't know the answer?
5      A  We reviewed the leases on the 13th.
6      Q  I'm sorry?
7      A  It looks like I must have reviewed three
8  applications on the 13th. I don't know what I'm
9  dealing with here. Did these come to me on
10 different days or what? I don't know.
11     Q  My question is you rejected these
12 applications on the 12th, didn't you?
13     MR. RANCK: I object. The question has
14 been asked and answered as to whether the witness
15 rejected Mr. Bratton's applications. And you're
16 mischaracterizing what her testimony is.
17     THE WITNESS: That's correct. Not
18 rejected but there were things in them that were
19 not acceptable, let's put them that way.
20 Repeatedly the same objections appeared in each
21 one.
22 BY MR. SHAIBANI:

Page 252

1      Q  When Roberta Medlin withdrew her offer on
2  the 13th of October, did you inform Chatel to
3  contact Mr. Bratton?
4      A  I don't think we knew when she withdrew
5  her offer.
6      (White Exhibit No. 25
7      was marked for identification).
8  BY MR. SHAIBANI:
9      Q  This is Exhibit 25. This is a fax sent
10 by Chatel to Kansas City on the 13th of October?
11     MR. RANCK: Well, for the record this is
12 not a fax sent by Chatel, this is a record from
13 the fax machine of a fax sent by Chatel.
14     MR. SHAIBANI: Yes, thank you for your
15 clarification.
16 BY MR. SHAIBANI:
17     Q  Does this refresh your memory as to when
18 you had that conversation with Roberta Medlin?
19     MR. BOUSE: What's in the fax? I object.
20 Does this refreshes your recollection about
21 anything?
22     THE WITNESS: No.

Page 253

1      MR. BOUSE: Okay.
2      THE WITNESS: What did they fax to her?
3  BY MR. SHAIBANI:
4      Q  The lease agreement, which she then
5  afterwards she withdrew her offer.
6      MR. BOUSE: So what's the question?
7  BY MR. SHAIBANI:
8      Q  The question is did you instruct
9  Mr. Liverman to contact John Bratton to tell him
10 that the property is now available after Roberta
11 Medlin withdrew her offer?
12     A  I don't think this is withdrawing her
13 offer, is it?
14     Q  No, that's not withdrawing her offer.
15 That's the fax of the lease agreement. It was
16 after that?
17     MR. RANCK: Previously Mr. Shaibani asked
18 whether you -- he asked when Roberta Medlin
19 withdrew her offer on the 13th, did you inform
20 Chatel to contact Mr. Bratton?
21     THE WITNESS: No, I didn't.
22     MR. RANCK: Your response was you don't

**Capital Reporting Company**

Page 254

1  know what day she withdrew. His question now is
2  when she withdrew, did you ask Chatel to call
3  Bratton?
4      THE WITNESS: No, I think I asked Gordon
5  to call him.
6      MR. BOUSE: That's been your testimony
7  about five hours ago.
8      THE WITNESS: I probably told Chatel I
9  was going to do that. That's what I did.
10 BY MR. SHAIBANI:
11     Q  Did you explain to Thierry Liverman why
12 you were going to have Mr. Forrester do this?
13     A  I may have told him that I was doing it.
14 I may not have told him I was doing it. I don't
15 know. I probably told him and he knew that Gordon
16 was my attorney.
17     Q  Did you review any of the letters that
18 were sent by Mr. Forrester to John Bratton in
19 October of '05?
20     A  No, copies of them were sent to me. I
21 can't say I reviewed them. Do you mean reviewing
22 them by before they are sent out? No, I did not.

Page 255

1      Q  What about after they were sent out, did
2  you --
3      A  I think I saw them, that was all.
4      Q  Did those letters strike you in any way
5  as being unpleasant?
6      A  No, that he was trying to get the job
7  done.
8      Q  The tone of the letters didn't suggest to
9  you that Mr. Forrester was being condescending to
10 Mr. Bratton?
11     A  No.
12     MR. BOUSE: I object.
13     MR. SHAIBANI: Objection.
14     THE WITNESS: No.
15     MR. BOUSE: The answer was no.
16 BY MR. SHAIBANI:
17     Q  Isn't it true that you instructed Chatel
18 to withdraw from the negotiations relating to
19 Mr. Bratton's lease once Mr. Forrester became
20 involved?
21     A  No, because they were still involved.
22 Forrester and Thierry Liverman were talking.

Page 256

1      Q  But Forrester was supposed to take the
2  lead in taking care of --
3      A  He was supposed to take the lead, that is
4  correct.
5      Q  Is that because you were afraid that
6  Mr. Bratton was going to sue you?
7      MR. BOUSE: I object.
8      THE WITNESS: No, it was time to have a
9  lawyer do this whole thing and get it done. Maybe
10 I was concerned that it was taking too long.
11 Maybe I was. I guess I was.
12 BY MR. SHAIBANI:
13     Q  If you thought it was taking too long,
14 why didn't you tell John Forrester to have this
15 lease --
16     A  He was moving --
17     Q  Are you done?
18     A  I think he had times when he couldn't get
19 ahold of John.
20     Q  It took from the 18th of October until
21 the 31st to do it?
22     A  You'll have to ask Mr. Forrester. I'm

Page 257

1  certain during that time there were some days when
2  he didn't get back to him. I think that's in the
3  correspondence.
4      Q  Would you agree that your decision not to
5  lease the basement occurred only after Mr. Bratton
6  expressed an interest in leasing your property on
7  the 6th of October?
8      MR. BOUSE: I object.
9      THE WITNESS: Probably not the 6th but as
10 it became more obvious that he was a serious
11 candidate for it and he had to have it on the 1st
12 of November. The only way to deliver on the 1st
13 of November was I was going to have to get out of
14 there. In other words, I was occupying the space
15 he wanted.
16 BY MR. SHAIBANI:
17     Q  And why is it that the lower level
18 continued to be listed on the MIRS until November
19 1st of '05?
20     MR. BOUSE: Hadn't she answered that?
21     THE WITNESS: Just --
22     MR. BOUSE: Do you know why the MIRS was

65 (Pages 254 to 257)

Page 258

1  listed?
2  THE WITNESS: No, just didn't get done.
3  MR. BOUSE: Okay.
4  MR. SHAIBANI: Can we have that letter
5  from John Gordon Forrester?
6  BY MR. SHAIBANI:
7  Q  Do you agree that John Bratton was
8  financially qualified to lease your property in
9  October of '05?
10  A  I think Gordon came to that conclusion
11  and that was his job to let me know about that.
12  Q  And did you agree with that conclusion?
13  A  Uh-huh.
14  (White Exhibit No. 26
15  was marked for identification).
16  BY MR. SHAIBANI:
17  Q  This is Exhibit 26. Did you approve of
18  Mr. Forrester's letter dated October 19th to
19  Mr. Bratton?
20  MR. BOUSE: Wait a minute approve when
21  before it went out? Did you see this before it
22  went out?

Page 259

1  THE WITNESS: No.
2  MR. BOUSE: Okay. Next question.
3  BY MR. SHAIBANI:
4  Q  The instructions that were -- I think you
5  already discussed this, that's fine. Why is it
6  that Mr. Forrester has the No. 76,000 and 146,000
7  on the first line, which are contrary to the
8  income tax returns submitted by Mr. Bratton?
9  MR. BOUSE: How would she know? I
10  object. Do you know why?
11  THE WITNESS: No, I've never seen the
12  schedule C. Schedule C for 2003, I haven't seen
13  it.
14  (White Exhibit No. 27
15  was marked for identification).
16  BY MR. SHAIBANI:
17  Q  Do you recall receiving a letter from
18  Mr. Forrester which was actually sent to John
19  Bratton, Exhibit 27? At the end of the first
20  paragraph he says, "These are not new terms.
21  These are the terms presented to you from the very
22  beginning." And the terms that he's referring to

Page 260

1  are two year lease without a third year option,
2  lease of the street floor only and no right of
3  first refusal.
4  MR. BOUSE: What's the question? The
5  document speaks for itself.
6  BY MR. SHAIBANI:
7  Q  The question, is what Mr. Forrester
8  characterizes here as not being new terms. His
9  statement that these are not new terms is not
10  accurate, it's inconsistent with the MIRS listing,
11  is that not correct?
12  MR. BOUSE: Don't answer. What's the
13  question?
14  BY MR. SHAIBANI:
15  Q  The question is the MIRS listings contain
16  different information from --
17  MR. BOUSE: That's argument,
18  Mr. Shaibani.
19  BY MR. SHAIBANI:
20  Q  -- from what Mr. Forrester claims here to
21  be the terms that were there from the beginning?
22  MR. BOUSE: The words are

Page 261

1  Mr. Forrester's, these are not new terms, you can
2  ask him that.
3  BY MR. SHAIBANI:
4  Q  Did Mr. Forrester inform you that he
5  received a voice mail from John Bratton on October
6  20th?
7  MR. BOUSE: Are you done? Is that the
8  question?
9  MR. SHAIBANI: (Nods head).
10  THE WITNESS: I don't know.
11  MR. BOUSE: Okay.
12  BY MR. SHAIBANI:
13  Q  Did Mr. Forrester send you all his
14  communications with John Bratton in October of
15  '05?
16  MR. RANCK: Objection, speculation.
17  MR. BOUSE: I object.
18  THE WITNESS: I assume he did. I'm not
19  positive.
20  BY MR. SHAIBANI:
21  Q  Would you agree that Roberta Medlin's
22  lease agreement contains different, more favorable

66 (Pages 258 to 261)

Page 262

1  terms than the lease agreement signed by John
2  Bratton?
3      MR. BOUSE: Mr. Shaibani, you know she's
4  already testified that that lease --
5      MR. SHAIBANI: Counsel, I'm not asking
6  you that question.
7      MR. BOUSE: Then I'm not permitting her
8  to answer it for the fifth time. She's not
9  answering the question.
10     MR. SHAIBANI: Why is that?
11     MR. BOUSE: You asked it five times, she
12 answered it five times.
13     MR. SHAIBANI: I haven't asked that
14 question.
15     MR. BOUSE: You did. What is wrong with
16 you? You have.
17     MR. SHAIBANI: No, I haven't.
18     MR. BOUSE: Mr. Shaibani, just because
19 you say it, it isn't so. Read it back. I'll wait
20 here and go back to the time that she was still
21 negotiating the leases with Ms. Medlin. My God
22 you got that answer five times.

Page 263

1      MR. SHAIBANI: That's your answer but a
2  more favorable terms, that's my question and that
3  hasn't been answered.
4      MR. BOUSE: It has, she says there's
5  still negotiation. It wasn't a signed lease. She
6  said it five times. Don't answer the question.
7  Sorry, I'm getting frustrated, I apologize.
8      MR. SHAIBANI: We sat down while you were
9  deposing John Bratton for two days asking the same
10 questions over and over many times.
11     MR. BOUSE: I thought I did very good.
12     MR. SHAIBANI: It's frustrating.
13     MR. BOUSE: I apologize. I said I
14 apologized for raising my voice.
15 BY MR. SHAIBANI:
16   Q  Is there anything in writing that you
17 provided to Chatel indicating that before October
18 6th, is there anything in writing that you
19 presented to Chatel to indicate that you were not
20 going to give an option to renew conversion month
21 to month or the right of first refusal for the
22 street level of the property?

Page 264

1   A  No.
2   Q  Is there anything in writing prior to
3  October 6th from you to Chatel indicating that the
4  prospective tenant would have to pay 200 bucks a
5  month for property taxes?
6   A  Nothing in writing.
7   Q  Are you aware that John Gordon Forrester
8  told John Bratton that he was a test case for
9  discrimination?
10     MR. BOUSE: I object.
11     MR. RANCK: Objection, foundation.
12     THE WITNESS: I read that in the
13 depositions.
14 BY MR. SHAIBANI:
15   Q  Did Mr. Forrester actually inform you of
16 that statement?
17     MR. BOUSE: When it was made or after it
18 was made?
19     MR. SHAIBANI: After it was made.
20     MR. BOUSE: I object.
21     THE WITNESS: After it was made, I think
22 so, someplace along the line. I've heard it a

Page 265

1  couple of times that he said that.
2  BY MR. SHAIBANI:
3   Q  And how did you react to him making that
4  statement?
5   A  I didn't.
6   Q  I'm sorry?
7   A  I didn't.
8   Q  Was John Pagones fired from Chatel after
9  this case was filed, at the District Court?
10  A  I don't believe so.
11  Q  Did John Pagones have a problem walking
12 up stairs in October of '05?
13  A  Yes.
14  Q  And what was the cause for that?
15  A  It was a knee problem.
16  Q  Did you fix the plumbing at the street
17 level of the 1622 Wisconsin Avenue property prior
18 to leasing it to Mr. Bratton?
19  A  What plumbing problem?
20  Q  Did you actually have somebody inspect
21 the plumbing at the street level of the property
22 in October of '05 to determine if it's in

Page 266

1  operating condition?
2    A  Well, we'd been using it right up until
3  the moment he occupied it, it was working.
4    Q  And when was the last time?
5    A  We didn't vacate until October 31st and
6  he took position November 1, 12 hour difference.
7    Q  When did you have a plumber come to
8  either maintain or repair the plumbing?
9    A  To repair what plumbing?
10   Q  The plumbing the -- for the street level
11 of the 1622 Wisconsin Avenue. Did somebody come
12 in to take a look at it prior to February of '06?
13   A  February of '06? I don't know. Was
14 there a plumbing problem? It was being managed by
15 Chatel at that time.
16   Q  Are you aware that the lease you signed
17 with Mr. Bratton requires you to warrant that the
18 plumbing is in good and operating condition?
19   A  Yes.
20      MR. BOUSE: I object, it says more than
21 that to it. It goes both ways.
22      THE WITNESS: Normal wear and tear.

Page 267

1  BY MR. SHAIBANI:
2    Q  Are you aware Chatel sent John Bratton a
3  plumbing invoice in the amount of $1,009?
4      MR. BOUSE: Are you aware at the time
5  that was sent?
6      THE WITNESS: Was that for him or for
7  upstairs?
8  BY MR. SHAIBANI:
9    Q  For the commercial unit?
10   A  There was a plumbing problem upstairs.
11   Q  The question is were you aware of that?
12   A  I don't know. Can I see the bill?
13   Q  Yes.
14     MR. SHAIBANI: What number are we?
15     MS. KEYVAN: 28.
16     (White Exhibit No. 28
17     was marked for identification).
18     THE WITNESS: The hot water heater under
19 the basement that wore out, I think. The next one
20 was also the same problem. Was it at the same
21 time? 11-29. One relates to the other. I think
22 that thing was wearing out.

Page 268

1    Q  Would you agree then that Mr. Bratton was
2  not the cause of the plumbing problem?
3      MR. BOUSE: I object.
4      THE WITNESS: Usually the plumber tells
5  who was responsible, what caused the problem.
6  BY MR. SHAIBANI:
7    Q  Did the plumber tell you that Mr. Bratton
8  was responsible for the --
9    A  They would talk to Chatel about this, not
10 me.
11   Q  Did Chatel inform you that they had sent
12 this plumbing invoice to Mr. Bratton?
13   A  They usually inform me by sending the
14 invoices way after the fact. Mr. Bratton didn't
15 pay for this, did he?
16     MR. BOUSE: No, he didn't.
17 BY MR. SHAIBANI:
18   Q  Would you agree that Mr. Bratton was
19 timely with his monthly rent payments?
20     MR. BOUSE: I object.
21     THE WITNESS: I don't get the -- I don't
22 know. They go to Chatel.

Page 269

1  BY MR. SHAIBANI:
2    Q  Did Chatel ever inform you that
3  Mr. Bratton had not paid his rent?
4    A  They told me that they didn't have a
5  check for -- I think it was for December.
6    Q  And did they tell you why they hadn't
7  received that check?
8    A  No, they didn't know why they hadn't
9  received it when they told me about it.
10   Q  Are you aware the address on the lease
11 that you signed with Mr. Bratton directs him to
12 send the monthly rent payments to a P.O. Box which
13 is where he sent his December payment?
14     MR. RANCK: Objection, mischaracterizes
15 the document.
16     MR. BOUSE: I object also. Do you know
17 one way or another?
18     THE WITNESS: No, I'd have to look at the
19 lease agreement.
20     THE VIDEOGRAPHER: Exhibit 6.
21     MR. RANCK: For the record, while they
22 are scrambling to look at it, it shows both a

Page 270

1  street address and a P.O. Box.
2      THE WITNESS: That would be up to Chatel.
3  They give him two addresses. You mean to send the
4  check?
5      MR. RANCK: No, it gives a streets
6  address and a P.O. Box. All is one address.
7  BY MR. SHAIBANI:
8    Q  Did Chatel subsequently inform you that
9  they received the check for December?
10   A  They told me it was straightened out.
11   Q  Cleared up?
12   A  Cleared up, in other words, uh-huh.
13   Q  And has Mr. Bratton been timely since
14 December of '05 in terms of his rent payments?
15   A  As far as I know.
16   Q  Has Mr. Bratton caused any other problems
17 with respect to -- I'll rephrase the question.
18 Has Mr. Bratton caused any problems with respect
19 to his being your tenant since he rented the
20 property?
21   A  I don't think so.
22      MR. RANCK: I'm going to object on

Page 271

1  relevance.
2      MR. BOUSE: Do you want to tell us
3  something that we don't know?
4  BY MR. SHAIBANI:
5    Q  Were you trying to lease the basement to
6  a gallery across the street?
7    A  That's part of the same person that
8  rented. There were two people. In the end only
9  one rented it.
10   Q  When did these negotiations begin with
11 the gallery?
12   A  Probably October/November.
13   Q  Of '06?
14   A  Uh-huh.
15   Q  Did you delete e-mails relating to the
16 1622 Wisconsin Avenue property at Mr. Bratton's
17 attempt to lease it from November through the
18 present?
19   A  No, no.
20   Q  Have you ever received an ethics
21 complaint from the GCAR?
22      MR. BOUSE: I'm sorry, what?

Page 272

1      THE WITNESS: An ethics complaint?
2  BY MR. SHAIBANI:
3    Q  Yes, have you received one from the GCAR?
4      MR. BOUSE: GCAR, okay, I object.
5      THE WITNESS: There was a complaint. I'm
6  trying to think if it was an ethics complaint or
7  not. Did you have something specific?
8  BY MR. SHAIBANI:
9    Q  What was the allegation in that
10 complaint?
11     MR. RANCK: Well --
12     MR. BOUSE: I object. Go ahead. You can
13 answer. Tell him.
14     THE WITNESS: I'm wondering if you have
15 something specific you want to talk about?
16     MR. BOUSE: You ask her, she'll answer
17 it.
18 BY MR. SHAIBANI:
19   Q  I wanted to know if you received an ethic
20 complaint from the GCAR in your capacity as a real
21 estate broker?
22     MR. RANCK: Mr. Shaibani, are you asking

Page 273

1  for information that may be confidential? I think
2  you need to be more specific with your questions
3  because you might be asking for information that
4  might be confidential under certain rules and
5  regulations. I don't know the answer to this
6  question.
7      MR. BOUSE: I don't know the answer
8  either.
9  BY MR. SHAIBANI:
10   Q  What was the allegation in the ethics
11 complaint you received?
12     MR. BOUSE: She said she doesn't know if
13 it's an ethics complaint.
14     THE WITNESS: If you tell me what you
15 want to talk about, I'll let you know.
16 BY MR. SHAIBANI:
17   Q  What was the complaint that you've
18 received, the one you referenced a moment ago?
19   A  There was one from a son of a seller.
20 And the son objected to my allowing his mother to
21 sell her house but she had perfect right to sell
22 her house.

**Capital Reporting Company**

Page 274

1  Q  Was he a part owner of the house?
2  A  No.
3  Q  Was he a guardian, legal guardian?
4  A  No.
5  Q  Have there been any other complaints
6  against you?
7  A  We had one where we had a client from New
8  York who didn't like the way the Washington board
9  does real estate in the DC real estate in The
10 District of Columbia.  He wanted his hearing in
11 court because he thought we should do it the way
12 they do it in New York.  He gathered everyone
13 together and he spoke for one hour on why we
14 should do it differently, it should be done the
15 way it is in New York City.  He finished with his
16 speech and we adjourned.
17 Q  Have there been any civil actions file
18 against you in connection with your work as a real
19 estate broker?
20 A  No.
21 Q  Have you ever been accused of violating
22 the criminal laws?

Page 275

1  A  No.
2  Q  What type of lease -- I'll rephrase it.
3  How long of a lease did Natasha sign with you for
4  the second level of the property?
5     MR. BOUSE:  The residential level?
6     MR. SHAIBANI:  Yes.
7     THE WITNESS:  She had a one year and now
8  she's got another one year.
9  BY MR. SHAIBANI:
10 Q  Chatel still manages her property, is
11 that correct?
12 A  Yes.
13 Q  Since you joined Washington Fine
14 Properties in July of '05, where would you say
15 that you spend most of your time working, which
16 physical location?
17 A  Georgetown office.
18 Q  Do you spend any time working out of your
19 house?
20 A  A little.
21 Q  And you spend time on the road?
22 A  Oh, yes, big time.

Page 276

1  Q  Are you aware that Mr. Bratton has had to
2  maintain two different offices in DC since he
3  leased your property?
4     MR. RANCK:  I object.
5     MR. BOUSE:  I object.
6     MR. RANCK:  Form of the question,
7  foundation, the term has had to.
8     THE WITNESS:  Yeah, has had to?  In
9  addition to the one in Georgetown or is that one
10 of the two?
11 BY MR. SHAIBANI:
12 Q  Yes, in addition to the Georgetown office
13 do you know --
14 A  He's had two others?
15 Q  One other office, 1223 10th Street?
16    MR. RANCK:  Same objection.
17    THE WITNESS:  I think he had one when he
18 first came.  And he said he wanted to expand to
19 Georgetown.  I would assume he still has that one
20 if he's going to expand to Georgetown.
21 BY MR. SHAIBANI:
22 Q  And do you know that he has -- he

Page 277

1  actually owns the 1223 10th Street property?
2     MR. BOUSE:  Do you know that?
3     THE WITNESS:  No, 10th Street, Northwest
4  or --
5  BY MR. SHAIBANI:
6  Q  Yes, Logan Circle, isn't it?
7     MR. BRATTON:  Yeah.
8  BY MR. SHAIBANI:
9  Q  Are you aware that he hasn't leased that
10 property at 1223 10th Street to generate income
11 from it because he has to move out of your office
12 by November of '07?
13    MR. BOUSE:  I object.
14    MR. RANCK:  Objection, foundation.
15    MR. BOUSE:  Do you know anything about
16 that?
17    THE WITNESS:  No.
18    (White Exhibit No. 29
19    was marked for identification).
20 BY MR. SHAIBANI:
21 Q  This is a comparative listing rental
22 listing information for properties in Logan

70 (Pages 274 to 277)

**Capital Reporting Company**

Page 278

1  Circle.  Do you have any reason to disagree with
2  the average list price and the average sold price
3  for leased properties being $1,576 and $1,587 per
4  month?
5      A  I can't answer that off the top of my
6  head.
7          MR. RANCK:  Objection.
8          THE WITNESS:  Are these on the market
9  now?
10  BY MR. SHAIBANI:
11     Q  Some of them are.  Some have been rented.
12     A  So what the purpose here?
13     Q  The question is I want to know as a real
14  estate broker how much does a one bedroom property
15  in Logan Circle cost to rent per month?
16         MR. BOUSE:  What's the relevance to this
17  case?
18         MR. SHAIBANI:  The relevance goes to
19  damages, counsel, which you've asked the Plaintiff
20  many questions about.
21         MR. BOUSE:  You've got an expert, don't
22  you?

Page 279

1          MR. SHAIBANI:  I'm entitled to know her
2  opinion.
3          MR. BOUSE:  Do you know the rental?
4          MR. RANCK:  I object on relevance.
5          MR. BOUSE:  I object also.
6          THE WITNESS:  I would have to know a
7  little bit more about them than this.  Are these
8  buildings new or old, renovated or unrenovated?  I
9  can see they look like they are all one bedroom
10  one bath.
11         MR. RANCK:  Let me also object on lack of
12  foundation.
13  BY MR. SHAIBANI:
14     Q  Would you agree that a property owner is
15  not going to agree to sell his commercial property
16  to Mr. Bratton at this time because his lease with
17  you is until November of '07 and somebody is not
18  going to want to wait until then to sell their
19  property that's on the market?
20         MR. BOUSE:  I object, we'll let him out
21  of the lease today.
22         MR. RANCK:  Objection, foundation.

Page 280

1          MR. BOUSE:  What would that do to your
2  damages?
3          MR. SHAIBANI:  Counsel, you're
4  testifying.  I urge you not to testify.
5          MR. BOUSE:  It's an improper question.
6          MR. RANCK:  Mr. Shaibani, I object on
7  speculation.  You're asking her to know what's in
8  the mind of somebody --
9          MR. BOUSE:  Some unidentified person.
10         MR. RANCK:  -- a perspective purchaser
11  that we have no idea what their plans are.
12         MR. BOUSE:  Who may want to stay there
13  until Mr. Bratton's lease is over, for crying out
14  loud.  It's pure -- can you answer that question?
15         THE WITNESS:  Huh-huh, no.
16  BY MR. SHAIBANI:
17     Q  Do you agree that a real estate office
18  located in Georgetown has a certain prestige
19  associated with it by virtue of being located in
20  Georgetown?
21     A  More than an office on Logan Circle?
22         MR. BOUSE:  I object.

Page 281

1  BY MR. SHAIBANI:
2      Q  Yes.
3      A  Logan Circle is pretty pricey these days,
4  pretty prestigious.
5      Q  Is Georgetown more prestigious than Logan
6  Circle?
7          MR. BOUSE:  I object.
8          MR. RANCK:  Objection.
9          THE WITNESS:  It's in the eye of the
10  beholder, I think.
11  BY MR. SHAIBANI:
12     Q  Would a real estate office located in
13  Georgetown generate more deals because of its
14  location than offices located outside of
15  Georgetown?
16         MR. BOUSE:  How is that not pure
17  speculation?  Depending upon who's running it.
18         THE WITNESS:  How large an office it is.
19         MR. RANCK:  And foundation, speculation
20  and foundation.
21         MR. BOUSE:  I object.
22         THE WITNESS:  Their knowledge of the

**Capital Reporting Company**

Page 282

1  area. The right office in Logan Circle could do
2  very well. And some of them do.
3  BY MR. SHAIBANI:
4      Q   And you agree in November of '07
5  Mr. Bratton has to vacate your property?
6      A   Right.
7      Q   Did you purchase liability insurance
8  policy through Hartford?
9          MR. BOUSE: What's the relevance of that?
10 You know insurance is not permitted. I will
11 produce the pile if you ever get it. I produced
12 what the limits are.
13         MR. RANCK: I object on the grounds of
14 relevance, whether there's insurance has
15 absolutely no relevance to any fact matter in the
16 case.
17 BY MR. SHAIBANI:
18     Q   Do you have a copy of the policy obtained
19 through Hartford?
20         MR. BOUSE: Do you have a copy?
21         THE WITNESS: I may at home.
22         MR. BOUSE: If you have it, you'll have

Page 283

1  to give it to me and I'll give it to him.
2          THE WITNESS: I'll have to look. They
3  are not very good at giving the whole policy.
4          MR. BOUSE: Whatever you have, give it to
5  me.
6  BY MR. SHAIBANI:
7      Q   What is your deductible for the policy?
8      A   I don't know.
9          MR. RANCK: Objection, relevance.
10         MR. BOUSE: She doesn't know.
11         (Discussion had off the record).
12 BY MR. SHAIBANI:
13     Q   Have you ever had any complaints for
14 discrimination filed against you?
15     A   No.
16     Q   Other than this one I gather?
17     A   That's correct.
18     Q   And I'm referring to complaints filed at
19 the DC Office of Human Rights and complaints filed
20 through the Courts?
21     A   Any and all, no.
22         (White Exhibit No. 30

Page 284

1  was marked for identification).
2  BY MR. SHAIBANI:
3      Q   This is Exhibit No. 30, it's an e-mail
4  you sent to Patsy Petty. Do you recognize it? Do
5  you recognize this e-mail?
6      A   Uh-huh.
7      Q   Can you explain why you stated here that
8  Mr. Bratton is a challenge?
9      A   Well, evidently she's having trouble
10 understanding whether he's paid the rent or not.
11 And I was asked to investigate this by Thierry
12 Liverman as a result of the mediation hearing
13 because the rent wasn't paid when we met at the
14 mediation hearing. Thierry asked me to be in
15 touch with Patsy the next day about it.
16     Q   And this is the incident related to the
17 check being mailed to the P.O. Box?
18     A   I think so. That's the only check I know
19 of that was a problem. We had our mediation some
20 time after the 8th of December, 9th of December.
21     Q   Have you produced all the e-mails you
22 distributed or received from people other than

Page 285

1  your attorneys in this case?
2      A   (Nods head).
3          MR. BOUSE: Indicating yes.
4          THE WITNESS: I didn't have a computer at
5  that time. There was one at the office but I'm
6  not very computer literate. I got my computer
7  after this.
8  BY MR. SHAIBANI:
9      Q   The e-mail sent to you from Barrett
10 Anderson on the 11th was sent to your computer at
11 your office?
12     A   Yeah, we were just getting one at my
13 house. That could well have been the first
14 e-mail.
15         MR. SHAIBANI: That's all the questions I
16 have for now. It if they have follow-up
17 questions, I may have a couple other things.
18         MR. RANCK: I have no questions.
19         MR. BOUSE: Mary, I would suggest you
20 read and sign this deposition. We won't waive it.
21 (Whereupon, at 5:07 p.m., the Deposition of
22 MARY WHITE was concluded.)

72 (Pages 282 to 285)

## Capital Reporting Company

Page 286

1  CERTIFICATE OF NOTARY PUBLIC
2  I, Mary E. Warner, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by me
7  in stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness;
10 that I am neither counsel for, related to nor
11 employed by and of the parties to the action in
12 which this deposition was taken; and, further,
13 that I am not a relative or employee of any
14 counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in
16 the outcome of this action.
17
18         MARY E. WARNER
19         Notary Public in and for
20         District of Columbia
21 My commission expires:
22 December 30, 2010

Page 287

1  ACKNOWLEDGMENT OF DEPONENT
2
3  I, MARY WHITE, do hereby acknowledge I have
4  read and examined the foregoing pages of
5  testimony, and the same is a true, correct and
6  complete transcription of the testimony given by
7  me and any changes or corrections, if any, appear
8  in the attached errata sheet signed by me.
9
10
11
12
13
14
15
16
17
18
19
20
21  _____  _____
22     Signature              Date

Page 288

1  Capital Reporting Company
2  1821 Jefferson Place, NW, 3rd Floor
3  Washington, DC 20036
4  (202) 857-3376
5
6         E R R A T A   S H E E T
7  Case Name: JOHN BRATTON V CHATEL REAL ESTATE
8  Witness Name: MARY WHITE
9  Deposition Date: February 1, 2007
10 _____
11 Page No.  Line No.    Change
12
13
14
15
16
17
18
19
20
21 _____  _____
22    Signature              Date

Page 289

1  ROBERT H. BOUSE, JR., ESQUIRE
2  Anderson Coe King
3  201 North Charles Street, Suite 2000
4  Baltimore, MD 21201-4135
5  IN RE: JOHN BRATTON V CHATEL REAL ESTATE
6  Dear Mr. Bouse:
7     Enclosed please find your copy of the
8  deposition of MARY WHITE, along with the original
9  signature page. As agreed, you will be
10 responsible for contacting the witness regarding
11 signature.
12    Within 30 days of receipt, please forward
13 errata sheet and original signed signature page to
14 the counsel for Opposing Counsel.
15    If you have any questions, please do not
16 hesitate to call. Thank you.
17 Yours,
18
19 MARY E. WARNER
20 Reporter/Notary
21
22 CC: OPPOSING COUNSEL

73 (Pages 286 to 289)

Page 286

1    CERTIFICATE OF NOTARY PUBLIC

2        I, Mary E. Warner, the officer before whom

3    the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears

5    in the foregoing deposition was duly sworn by me;

6    that the testimony of said witness was taken by me

7    in stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness;

10   that I am neither counsel for, related to nor

11   employed by and of the parties to the action in

12   which this deposition was taken; and, further,

13   that I am not a relative or employee of any

14   counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in

16   the outcome of this action.

17           *Mary E. Warner* (signature)

18           MARY E. WARNER

19           Notary Public in and for

20           District of Columbia

21   My commission expires:

22   December 30, 2010