Case 1:06-cv-00694-JDB   Document 54-16   Filed 02/27/2007   Page 1 of 12
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

20 (Pages 77 to 80)

Page 77

1  the lease for 1622 Wisconsin Avenue?
2      MR. SHAIBANI: Objection to the form.
3      THE WITNESS: I continued on to try to get
4  the space. I wouldn't necessarily consider it
5  negotiation because there was no negotiating. That
6  was what Miss Mary White was dictating by way of her
7  lawyer and that was it. That was not negotiating.
8  There was not one point that was negotiated. She
9  dictated as to what she wants. She changed what she
10 wanted repeatedly as time went by to make it more and
11 more difficult for me to still want the space and I'm
12 sure they were quite surprised that come the very end
13 of all these added items being tacked on to what I
14 had to do to get the space I still went for the
15 space.
16     BY MR. BOUSE:
17     Q  Did at that time Mr. Forrester indicate to
18 you that he would need your income tax returns for
19 two years, 2003, 2004?
20     MR. SHAIBANI: Objection.
21     BY MR. BOUSE:
22     Q  At that time?

Page 78

1     A  Yes, he requested my taxes at that time,
2  something that was not requested of Miss Medlin at
3  all. Nothing, other than a credit report was
4  requested of Miss Medlin, but, yes, I had to submit
5  my taxes as well as my bank statements as well as
6  information about my sales and income.
7     Q  Did Mr. Forrester indicate to you the
8  reasons why he was requesting your income tax for
9  those two years?
10    A  Because he wanted financial information to
11 see if I could afford the space, which is $2,500 a
12 month given that they weren't going to let me have
13 both spaces. My checking account alone clearly
14 showed them -- I mean $250,000 sitting in your
15 checking account clearly shows you that you can
16 afford to pay $2,500 a month in rent, but, no, he
17 wanted my full taxes for two years.
18    MR. BOUSE: Let me mark this.
19    (Bratton Deposition Exhibit No. 31 was
20 marked for identification and retained by Counsel.)
21    BY MR. BOUSE:
22    Q  Can you tell me based upon your review of

Page 79

1  that what your income was for 2003 and 2004?
2     A  Based on this?
3     Q  Yes?
4     MR. SHAIBANI: If I may object on the
5  basis of one of the tax returns is incomplete and the
6  documents speak for themselves.
7     You can answer the question.
8     MR. BOUSE: I got just what I got from you
9  I guess. I didn't get it from anybody else.
10    THE WITNESS: Okay.
11    BY MR. BOUSE:
12    Q  I asked what it shows.
13    A  What it shows?
14    Q  Yeah, your income?
15    A  My net, after everything is deducted for
16 2003, $205,706. My net, which is after everything is
17 deducted, in 2004 is $197,155. Of course this is
18 after over approximately 100 and some thousand
19 dollars worth of deductions because I've owned
20 multiple properties that I have renovated in each one
21 of these year periods, so my gross income, as I put
22 it, is drastically higher than what my net is.

Page 80

1     In addition to this you did pass me this
2  letter that says approximate gross income revenue for
3  2005 was to be $450,000. If you look at -- well, I
4  don't know if you have the next page, the document
5  that shows of the properties that I renovated and
6  sold earned over 300 -- over upper $200,000 in
7  income, plus my regular salary from sales and
8  commissions at Bratton Realty.
9     Q  Did you indicate it something higher than
10 that in any application or anything you sent to
11 either Chatel or to Mr. Forrester or Mary White?
12    MR. SHAIBANI: Objection.
13    THE WITNESS: No. It was pretty much
14 right on point as to approximal with my gross income.
15 What Mr. John Gordan Forrester chose to do is he
16 chose to look at net versus gross. I'm talking
17 gross. He's talking net. The pure fact of net is
18 obviously going to be a lot less than gross,
19 especially when you're self-employed, especially when
20 you're doing development projects, which you get to
21 write-off most of your construction cost.
22    BY MR. BOUSE:

**Page 93**

my clients and my demographics of my clients are all over the place. I am very, very comfortable being a minority and I don't walk around looking to be discriminated or get my feathers ruffled over being -- because this is life, but what has --

BY MR. BOUSE:

Q So you will agree that everything that happens to you isn't discriminatory? It can be a mistake, it can be an honest mistake, it can be something that has nothing to do with the color of your skin or your religion or anything else?

MR. SHAIBANI: Objection, vagueness.

THE WITNESS: I'm not referring to this. There's a reason why I'm filing a suit against this versus filing a suit -- I was asked in a previous deposition about, you know, ever filing discrimination cases before. There's a reason why this is my first case. There's a reason why this is my first time going to trial. It's because this is not your everyday just coincidence and just happening and it's just a fluke. No, this is blatant discrimination to the core.

**Page 94**

BY MR. BOUSE:

Q But my point is there's been an allegation raised in answer to interrogatories and that's why I'm asking the question. The question is you will agree with me that the rent issue and the hot water heater issue is not discriminatory? I believe you said yes, you agree with that. You don't believe that was necessarily continued discrimination against you, isn't that correct, sir?

MR. SHAIBANI: Objection.

BY MR. BOUSE:

Q Yes or no?

A I thought I answered that.

Q I thought you did too, but I want to be sure, yes or no?

A Yes.

Q Does Bratton Realty list properties for sale for prices over a million dollars?

A Yes.

Q And you wouldn't turn down -- if I came to you and asked you to sell my house for a million, $500,000, you wouldn't say your company is not

**Page 95**

capable of listing and selling that house at that amount of money?

MR. SHAIBANI: Objection.

BY MR. BOUSE:

Q Would you?

A I would say that most of my properties are not a million dollars. My niche, most of my niche market is between 400, 500, $600,000 price range, some $800,000 price range. Occasionally every once in a while -- I got a million dollar listing in Reston. I get a million dollar listing in Logan every once in a blue moon, but --

Q You don't turn them down?

A Why would I turn them down?

Q All right. Now, let me ask you this, what facts do you have that Mary White didn't want to lease the basement property to you because she would have to share a bathroom with you?

MR. SHAIBANI: Objection.

THE WITNESS: I don't even know where that question comes from. I never even --

BY MR. BOUSE:

**Page 96**

Q Let me tell you where that question comes from, Mr. Bratton, so you understand. Mr. Shaibani asked every witness in this case -- and he puts it in this way, "isn't it a fact that Mary White didn't lease that property to John Bratton because she didn't want to share a bathroom with him," that's how the question is asked.

MR. SHAIBANI: I object to what my questions were. I had submitted --

MR. RANCK: We objected to them too.

MR. BOUSE: Yeah, we objected too I think.

MR. SHAIBANI: That's not how -- my question is out of context. I had submitted the leasing information, which said on there that the bathroom will have to be shared for the basement, and that's why I had asked that question. It --

BY MR. BOUSE:

Q Do you have any evidence that Mary White didn't lease you that property because she didn't want to share a bathroom with you?

MR. SHAIBANI: Objection to the form.

THE WITNESS: No, I have no evidence of --

Case 1:06-cv-00694-JDB  Document 54-16  Filed 02/27/2007  Page 3 of 12
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

25 (Pages 97 to 100)

Page 97

1  BY MR. BOUSE:
2  Q  Okay. Do you have any facts that Mary
3  White didn't want to lease you 1622 because she was
4  mugged by an African-American?
5      MR. SHAIBANI: Objection.
6      THE WITNESS: Say that again.
7  BY MR. BOUSE:
8  Q  Yeah, do you have any evidence that Mary
9  White didn't want to lease the 1622 property to you
10 because she was mugged by an African-American?
11 A  No.
12     MR. BOUSE: All right, I have no further
13 questions. Thank you, sir.
14     MR. RANCK: I have a couple of follow-ups
15 on his, but it is just a couple.
16     EXAMINATION BY COUNSEL FOR DEFENDANTS,
17     CHATEL REAL ESTATE AND THIERRY LIVERMAN
18     BY MR. RANCK:
19 Q  One thing that was left open after the
20 first day, Mr. Bratton, was I thought you were going
21 to check as to the amount of rent Bratton Realty, LLC
22 pays you individually for the 1223 property?

Page 98

1  A  And I checked into that and my accountant
2  -- and I don't pay myself because he said the way the
3  taxes work is I would be double paying taxes, so he
4  said it was better for me to not charge myself for
5  taxes. I have charged myself previously for taxes
6  and --
7  Q  You mean for rent?
8  A  I mean I've charged myself previously for
9  rent about three years ago, but then he suggested
10 that I would just create more of a tax burden for
11 myself, that it was better for me not to pay myself
12 taxes and pay taxes -- whatever, double whatever it's
13 called, so I was trying to get a copy of those checks
14 that I paid, but I think it was roughly in the range
15 of $1,600 a month and that's why I brought you this
16 printout of a current comps because the true issue is
17 that space would be rented to a residential client,
18 not a commercial client, so that's a more accurate
19 estimate of what the basement costs, because only I
20 can use it as commercial space because I have a
21 master business license for the basement and you can
22 only get that if it's owner occupied, but prior to

Page 99

1  leasing my office there I've rent it to a residential
2  tenant and that's what I was going to do after moving
3  my office out.
4  Q  So right now Bratton Realty, LLC operates
5  in that space rent free, correct?
6      MR. SHAIBANI: Objection.
7      THE WITNESS:
8  A  No. I am the company. That would be just
9  like saying I work for free because I don't pay
10 myself out of -- I don't write a check to John
11 Bratton every month and say, John Bratton, here is
12 $15,000 for you for this month. I don't do that. I
13 just, you know, when I need money I reallocate money
14 to myself, but I don't pay myself on a monthly basis,
15 just like I don't pay the rent on a monthly basis, so
16 that don't mean it's free.
17     BY MR. RANCK:
18 Q  With regard to your first meeting with Mr.
19 Pagones on October 6, what you've described as an
20 unpleasant encounter for various reasons, is it fair
21 to say that when you left that you would expect Mr.
22 Pagones to know that you were upset at the encounter?

Page 100

1  A  No, just the opposite.
2  Q  So you left without giving him any
3  indication that you were upset or disappointed or
4  anything, is that right?
5      MR. SHAIBANI: Objection.
6      THE WITNESS: My whole point of going
7  there was to -- here we go again. You can't get an
8  answer like that out of me without me -- my whole
9  point of going there was to get the lease. I don't
10 think you really grasp what I'm saying. My point was
11 to secure the lease. I was in a great mood. I found
12 this amazing space that was perfect for me. I was in
13 a great mood. I go down there in a great mood. When
14 I saw what was going on right before my very eyes I
15 still stayed positive because it would have done me
16 no good to have gone negative and went down the same
17 path of negativity with him, so that's why you see me
18 with seven different versions of the lease, because I
19 was going to just be cordial and do -- I did a lot of
20 yes, okay, then, all right, we'll change that, okay,
21 we'll change that, okay, we'll change that, okay,
22 we'll change that too. That's how we got to seven

**109**

1  there in the lobby with you. I mean, so for her to
2  act like she didn't know I was a black male is just
3  like -- was absurd and sitting there and then you
4  guys also talked about the fact that you were
5  complaining that I damaged the property.
6      Q  Have you ever received a letter --
7      A  No.
8      Q  -- or notice that you're going to have to
9  pay or your security deposit is not going to refunded
10 because of the alleged, open quotes, damaged
11 property, closed quotes?
12     A  No, I have not received a letter, no.
13         MR. BOUSE: Okay, thank you.
14         MR. SHAIBANI: Can we take a short break
15 for five minutes?
16         MR. BOUSE: Absolutely.
17             (Off the record.)
18         EXAMINATION BY COUNSEL FOR PLAINTIFF
19         BY MR. SHAIBANI:
20     Q  Mr. Bratton, there were references made in
21 the deposition last week that you didn't remember the
22 course of events leading up to this case. Would you

**110**

1  say that your memory of the events leading to this
2  case is complete and accurate, at least with respect
3  to the significant issues?
4          MR. RANCK: Objection.
5          MR. BOUSE: I object.
6          THE WITNESS: Yes.
7          BY MR. SHAIBANI:
8      Q  Could you tell us when you filed the
9  original complaint?
10     A  I think I filed it on the 19th or
11 somewhere around -- I think it was the morning of the
12 19th is when I filed it. It took me a couple days to
13 get an appointment.
14     Q  And the October 19 date that appears on
15 the signature page for the Office of Human Rights
16 complaint, that's when you executed and filed it, is
17 that correct?
18     A  Correct.
19     Q  And there were a couple of typed pages
20 attached to the original complaint, which we received
21 last week as an exhibit. You didn't type those
22 pages, is that correct?

**111**

1      A  No. That's -- I guess that's -- I didn't
2  know what to expect of the process. I didn't know
3  whether I was just going down and having a counseling
4  session or what, but they had me fill out the
5  paperwork, which you've seen, my handwritten
6  information, filling out a form they have and then I
7  think one page, I had some writing, but what you
8  used, I guess last week, that document was typed up
9  by them and I guess mailed out to all of us.
10     Q  Now, you mentioned that you file the tax
11 return for yourself so that Bratton Realty, LLC
12 essentially -- the tax return that's filed for the
13 business is under your name and Social Security
14 number?
15     A  Yes.
16     Q  And is that a scheduled 1040 that you file
17 as a self-employed individual, including all the
18 revenues and costs associated with Bratton Realty?
19     A  Yes. All the agents get a 1040 based on
20 their commissions and then all of my transactions is
21 just listed under John Bratton. It's not under
22 Bratton Realty. It's under my name, because I have

**112**

1  no employees I can do that.
2      Q  But your independent contractors, real
3  estate agents, they receive a 1099 Form for
4  independent contracting, it's not a 1040?
5      A  Yes, I'm sorry, 1040 is for me. 1099 is
6  for a different agent, independent contractors.
7      Q  Now, there was a question raised earlier
8  about the service medals that you received for the
9  military and could you tell us how many service
10 medals exist for the military, approximately?
11     A  Well, I mean there's like thousands of
12 different medals you can get from the military. I
13 mean, you have -- any time you look at the news now
14 you see a general, you know, in uniform, you see his
15 whole chest covered with these different colored
16 ribbons. Each one of those ribbons is a different
17 medal, so I mean there's thousands of different
18 medals that you can have.
19     Q  And would it be reasonable to expect
20 somebody to remember the names of each of those
21 medals that they received in the military?
22     A  Well, some people in the military are

113
1 really, really, like, you know, totally into every,
2 you know, award and they could probably name every
3 last one of their awards and when they got them. I
4 mean, being an officer during desert storm I received
5 these four awards, but the exact names of them,
6 sorry, I still can't tell you. I know one of them
7 was the Southeast Asian Service Medal. One was just
8 a service medal. One was a National Armed Forces
9 Medal and then the fourth one, I'm completely blank
10 on what the official name of the medal is, but I know
11 one of them is a really, really nice one. They have
12 the Kuwaiti flag and the Saudi flag and I think
13 that's the one that was Southeast Asia, but I can't
14 remember names.
15     Q  Now, in the deposition last week you
16 mentioned that Bratton Realty, LLC doesn't maintain
17 commercial leases on file. Is that because Bratton
18 Realty does not conduct commercial lease
19 transactions?
20     MR. RANCK: Objection, mischaracterizes.
21     THE WITNESS: No. Well, I've never done a
22 commercial lease transaction as far as my -- as far

114
1 as the business side I've done a commercial
2 transaction, which was the sale of a commercial space
3 out in Takoma Park and then some carriage houses,
4 that was a C2A, so some people say it's commercial.
5 Some people say it's not commercial, but, you know,
6 that's just a sales -- that's the same sales contract
7 that you would use for any -- no different.
8     BY MR. SHAIBANI:
9     Q  So essentially you haven't done any
10 commercial lease transactions while you owned and
11 operated Bratton Realty, is that correct?
12     A  No.
13     Q  When you first went to Chatel's offices in
14 October 6 did you see John Pagones go to another
15 level of the building at any time?
16     A  Well, I don't know what you mean exactly
17 by level, but --
18     Q  Did he go up and down the stairs or was
19 he...
20     A  Well, the way the office is situated you
21 come in and where Hope Edwards desk is is like in the
22 center of the building and it's kind of like

115
1 recessed, if I remember correctly, it's recessed down
2 or the area where John Pagones came from was
3 elevated, but there was a difference in the level
4 there and so what I witnessed with him is looking not
5 only in the area where the desk was where I was
6 standing, but he went around the corner and I don't
7 know weather there's -- weather he went up steps or
8 whatever. He went around the corner out of sight
9 looking for supposedly application and a blank lease
10 and then he came back in and he looked into a cabinet
11 and then he came back to the desk and once again said
12 he had no application or lease.
13     Q  Did you see Pagones go to Mr. Liverman's
14 office at Chatel on October 6?
15     A  No.
16     Q  And did you see him ask Mr. Liverman for a
17 commercial lease?
18     A  No.
19     Q  Did you see him ask anybody else for a
20 commercial lease at Chatel's offices?
21     A  No.
22     Q  Who told you that someone else had signed

116
1 a lease for the 1622 Wisconsin Avenue property?
2     A  Thierry Liverman.
3     Q  And when was that information conveyed to
4 you?
5     A  Approximately 6:30 p.m. on the 12th.
6     Q  And didn't he tell you that this was just
7 business?
8     MR. RANCK: Objection, leading.
9     THE WITNESS: He told me that the fact
10 that I didn't get the property, this is just the way
11 things go in this business. You know how it goes
12 when all of the sudden someone just comes out of the
13 blue and gets the place over you and I responded back
14 to him, no, I do not know how this goes. This is not
15 the way business goes because I don't discriminate
16 against people, so I do not know what you mean by
17 this is just how it goes, so that was -- if that's
18 what you're referring to.
19     BY MR. SHAIBANI:
20     Q  And did he also tell you that the property
21 is gone?
22     A  Yes.

Case 1:06-cv-00694-JDB  Document 34-16  Filed 02/27/2007  Page 6 of 12
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

30 (Pages 117 to 120)

**117**

1   MR. RANCK: Objection, leading.
2   MR. BOUSE: Object.
3   BY MR. SHAIBANI:
4   Q  Did he tell you that Mary White had signed
5   a lease on the property?
6   MR. BOUSE: I object.
7   MR. RANCK: Objection, leading.
8   THE WITNESS: I don't know if he used the
9   word signed, but he said that the property was
10  rented. It's a done deal. The -- Mary White has
11  already chosen and finalized the lease with -- he
12  didn't say -- I mean, it's kind of hard to talk after
13  the fact, but back then I had no idea who the person
14  was, so I can't say Miss Medlin, but I had no idea
15  who it was. I just knew it was somebody else that
16  she's supposed to sign the lease with and it was a
17  done deal and my lease was terminated -- well, not
18  terminated, but declined, and it was not changing
19  because it was already done. It was a done deal.
20  BY MR. SHAIBANI:
21  Q  Did he identify this other person who had
22  supposedly leased the property?

**118**

1   A  No. The only thing he said about the
2   other person was that it was a friend of a friend of
3   Mary White and that's how she knew about the property
4   and that's why Mary White felt more comfortable going
5   with her, because she was a friend of a friend and
6   that's all he said about her. I didn't know her
7   name. I didn't know what type of business it was or
8   anything.
9   Q  You mentioned that you submitted your
10  lease application to Barrett Anderson on October 7,
11  which was then subsequently delivered to John
12  Pagones. The application packet that you submitted,
13  did it contain your electronic business card, which
14  we had distributed earlier?
15  MR. SHAIBANI: Let's mark this as Exhibit
16  32.
17  (Bratton Deposition Exhibit No. 32 was
18  marked for identification and retained by Counsel.)
19  BY MR. SHAIBANI:
20  Q  Was this electronic business card one of
21  -- attached to the application packet that you
22  submitted to Barrett Anderson on October 7?

**119**

1   A  Yes, it was. Actually, to be correct the
2   way I submitted was a traditional card along with the
3   business card and I do it back to back like that
4   (indicating).
5   Q  And the electronic business card obviously
6   has your photograph?
7   A  Yes.
8   Q  Showing that you had dreadlocks, is that
9   correct?
10  A  Correct.
11  Q  When you requested a commission for the
12  transaction with Mary White do you recall receiving a
13  letter at some point indicating that you were not
14  going to receive a commission for the lease
15  transaction?
16  A  I don't recall receiving a letter. I
17  really -- the way the commission worked out, I don't
18  remember much discussion at all about the commission
19  other than I know at some point someone -- I was told
20  that, yes, I'm getting the commission, but I don't
21  remember a letter about the commission.
22  Q  But isn't it true that initially the

**120**

1   commission was -- they didn't -- they weren't going
2   to give you the commission initially, you had to
3   insist upon it, isn't that correct?
4   MR. BOUSE: I object.
5   MR. RANCK: Objection, leading.
6   MR. BOUSE: Come on, Mr. Shaibani. Why
7   don't you just tell him the answer. I object.
8   MR. RANCK: Objection, leading.
9   THE WITNESS: I don't recall the
10  commission because it just wasn't -- I mean, I wasn't
11  there to fight over the commission. I was more
12  interested in what would have happened to me as far
13  as the discrimination. The commission was something
14  that came after, you know, I got the space. I was
15  very much like emersed in setting up and getting off
16  and running because all the delays. You know, I
17  should have had three weeks to prepare to set my
18  office up and instead once I got the space I was in a
19  constant panic to order phone service, so all those
20  things I was totally -- I was swamped with, but I do
21  recall at some point not receiving the check, but I
22  don't remember whether I wrote a letter or whether

Case 1:06-cv-00694-JDB   Document 34-16   Filed 02/27/2007   Page 7 of 12
CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

31 (Pages 121 to 124)

Page 121

1  someone sent me a letter or something. I don't
2  remember how the commission part came up.
3      BY MR. SHAIBANI:
4      Q  You mentioned previously that you wanted
5  to have an option to renew the lease, a right of
6  first refusal and a provision of the lease, which
7  would convert to month to month after the expiration
8  of the lease term, is that correct?
9      A  That's correct.
10     Q  So the statement that you made in your
11 last deposition, that "I didn't care about the lease
12 term," did you say that because you expected the
13 lease term to convert to month to month at the
14 expiration of it and because you wanted to have an
15 option to renew the lease?
16     MR. RANCK: Objection, leading.
17     MR. BOUSE: I object.
18     THE WITNESS: Well, I mean, if I
19 understand the question, the reason why I say -- if
20 the focus on the fact that I said I didn't care, my
21 explanation is that what I meant by I didn't care is
22 that I didn't care if Mary White -- if Mary White

Page 122

1  wanted, you know, one year for the initial lease and
2  then I go month to month after the one year and then
3  -- and have first right of refusal or whether she
4  want two years and then the same or three years and
5  the same, I was totally flexible. That was not a
6  deal killer for me and so I didn't care, I just
7  wanted to know what the answer was. If she was
8  looking for two years, which apparently that's what
9  it turned out that she said she was -- according to
10 John Pagones she was looking for two years, and
11 that's why, once again, one of my changes is changing
12 it to two years, because it didn't matter to me
13 whether I start off with two years or three years
14 because, one, I automatically have first right of
15 refusal to purchase the property if she put it up for
16 sale or, two, I automatically have a right to go
17 month to month. That is just standard, basic
18 leasing. You automatically go month to month after
19 your lease expires and so it didn't matter to me
20 whether I started off with a two-year term versus a
21 one year lease period.
22     BY MR. SHAIBANI:

Page 123

1      Q  And, in fact, you didn't want to vacate
2  the property after the two years, you wanted to keep
3  the same address for your business, isn't that
4  correct?
5      MR. BOUSE: I object.
6      MR. RANCK: Objection, leading.
7      THE WITNESS: That's correct. I mean,
8  there's a lot of cost in marketing. When you're a
9  small business, such as I am, marketing is a huge
10 cost and so for me to -- brochures, I mean really at
11 this point I have not even been able to do the type
12 of brochures I -- I had a whole vision for this.
13 Back to this (indicating), you know, I had a whole
14 vision as to what I was going to do and my hands are
15 tied because I don't know whether I'm going to be in
16 this -- well, I pretty much know that I'm not going
17 to be in the space. Come October 31 of 2007 of this
18 year I will no longer be in that space, so why, you
19 know -- so all this marketing brochures with the
20 address on it and all this stuff I was going to do
21 geared towards, you know, there's a really neat
22 community called Bookhill, which I had all kinds of

Page 124

1  plans of how to make Bookhill like this interesting
2  part of town, which is what all my neighbors are
3  trying to do, and I couldn't even gear my website and
4  all the stuff like that towards, you know, this
5  Bookhill, you know, small business, you know, section
6  of Georgetown concept because I would have to redo
7  everything when I change to a new address.
8      It's very expensive to change brochures
9  and business cards and letterheads and all kinds of
10 stuff like that when you change locations, so, yeah,
11 the longer you stay, the more it's worth it to do all
12 the marketing stuff, so of course I would love to
13 stay there long term.
14     BY MR. SHAIBANI:
15     Q  And aren't you generating additional
16 business from being on 1622 Wisconsin Avenue?
17     MR. RANCK: Object, leading.
18     MR. BOUSE: I object.
19     THE WITNESS: Well, face it, it's been a
20 tough eight months in real estate, you know, industry
21 -- industry wide, but aside from the overall
22 industry, overall market being down, yes, it's such

Page 125

1  an easy sale. I mean, this concept goes back to, you
2  know, it may sound corny, but when I was a little
3  kid, you know, I always knew if you have a business
4  in Georgetown, then you have made it. You have
5  arrived and you can go anywhere across the country
6  and say my office is in Georgetown and you have
7  instant credibility. People instantly know where
8  you're talking about and they know that, you know, if
9  they know nothing else about your business, the
10 assumption is that, wow, must be doing pretty well if
11 your office is in Georgetown. I know the power of
12 the name Georgetown. I know the prestige that the
13 name Georgetown -- starting from the Kennedys on and
14 so I knew it was very important to have that address
15 and to have a Wisconsin Avenue address on top of
16 being in Georgetown, I mean, I'm a smart enough
17 business man to know I know exactly the power of my
18 agents and myself being able to say, well, my office
19 is in Georgetown. You know, to bring clients to the
20 Georgetown office is very, very impressive, so.
21        BY MR. SHAIBANI:
22     Q And wouldn't you agree that as a result of

Page 126

1  having to move your office from Georgetown at the end
2  of the two year lease you're going to lose a certain
3  amount of business?
4        MR. RANCK: Objection.
5        MR. BOUSE: I object.
6        MR. RANCK: Leading, speculation.
7        THE WITNESS:
8     A Well, first of all, my intentions are to
9  try to find a place to buy right there in the same
10 area because I want to stay in that same area. I
11 would like to stay right on that same block, so I've
12 been watching the market and so hopefully, God
13 willing, hopefully it works out. I'm a believer that
14 something -- I will somehow find a space to stay in
15 the 1600 block of Wisconsin Avenue or definitely stay
16 in Georgetown, but it's hard because no one wants to
17 sell -- commercial space is hard to come by and so
18 it's tough. I don't know if something is going to
19 come up, but that's my goal is to stay there.
20        If I have to leave there, then, yes, to me
21 it's a major blow to not have the Georgetown address,
22 especially not to have the Wisconsin Avenue address,

Page 127

1  the foot traffic, the whole, you know, just being in
2  the midst of Georgetown is very, very good for my
3  business.
4        BY MR. SHAIBANI:
5     Q How much business per month would you
6  anticipate losing from having to move out of your
7  1622 Wisconsin Avenue office?
8        MR. BOUSE: I object to leading and
9  speculative.
10       MR. RANCK: Objection, same thing,
11 foundation.
12       THE WITNESS: Well, I would have to say
13 that we're looking at -- just having that location
14 versus not having that location, being over in Logan,
15 where I was or somewhere else outside Georgetown, on
16 a monthly basis I would say that would probably lose
17 me at least one transaction, so I would say one
18 transaction a month.
19       BY MR. SHAIBANI:
20    Q I'm sorry, are you referring to sales
21 transactions or rentals?
22    A One sales transaction of mine. My average

Page 128

1  transaction is probably like $575,000 or $600,000 a
2  month, three percent commission, that's what, what's
3  the math, you're looking at $18,000 a month.
4     Q Are you referring to deals that you would
5  conduct by yourself as a broker?
6     A That's just me.
7     Q You're not referring to deals that your
8  independent contractor agents would construct?
9     A No.
10       MR. BOUSE: I object.
11       BY MR. SHAIBANI:
12    Q So you would lose 18,000 a month from your
13 own deals as a result of having to move out of 1622
14 Wisconsin Avenue, is that correct?
15       MR. BOUSE: I object.
16       THE WITNESS: Yes.
17       MR. RANCK: Objection, speculation.
18       BY MR. SHAIBANI:
19    Q And therefore you would want to stay at
20 that address if they had not discriminated against
21 you for the four years, isn't that correct?
22       MR. BOUSE: I object.

CONTINUED DEPOSITION OF JOHN BRATTON
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007

33 (Pages 129 to 132)

---

Page 129

1    MR. RANCK: Objection.
2    THE WITNESS: Am I speaking too soon?
3    MR. RANCK: I would appreciate it, despite
4  what your lawyer says, Mr. Bratton, if you would
5  pause after his questioning to give us an opportunity
6  to interpose an objection.
7    You don't have a problem with that, do
8  you, Mr. Shaibani?
9    MR. SHAIBANI: No at all. That's what I'm
10 trying to get across.
11   THE WITNESS: I'm sorry, could you repeat
12 the last question?
13   MR. SHAIBANI: Could you please repeat the
14 question.
15   (Question repeated by the Reporter.)
16   MR. RANCK: Same objections.
17   MR. BOUSE: Same objection.
18   THE WITNESS: Well, first of all, right in
19 the listing agreement it has 48 months and she's
20 totally opened to frayed (phonetic) months, so I
21 don't even understand how we even got to a point
22 where I'm being required to move out after only 24

Page 130

1  months, but given that I am, that additional two
2  years, yeah, that -- to me that's like lost
3  opportunity of having the space, a space that anyone
4  else not being discriminated against would have the
5  option to at the bare minimum, that 48 months, if not
6  more, so, yes, I would definitely have -- would love
7  to have stayed, you know, much, much longer and to
8  even purchase the building given first of right
9  refusal, you know.
10   BY MR. SHAIBANI:
11   Q Now, going back to the rental value of the
12 1223 property that you own, which you've had to
13 maintain.
14   A Yes.
15   Q Even though you are also leasing 1622
16 Wisconsin Avenue. I'd like to distribute this
17 exhibit, Exhibit 33. Could you explain to us what
18 that is?
19   A I just basically went and printed out just
20 the middle of the road, one bedroom rentals in the
21 general area of where my office was that I would have
22 released to rent out to a residential tenant. The

Page 131

1  way my house is set up, it's a four-level house and I
2  rent the main house for 3,500 a month and then I
3  would be renting the basement for approximately 16,
4  17, 1,800 a month, so basically this is showing the
5  comps of just roughly what a one bedroom apartment
6  would rent for with parking, because there's a
7  parking space that comes with the --
8    Q Would you have rented the 1223 address
9  from November of '05 until now if you had been given
10 the option to renew your lease or a month to month
11 conversion future in your lease with 1622 Wisconsin
12 Avenue?
13   MR. BOUSE: I object.
14   MR. RANCK: I object as well.
15   THE WITNESS: Well, not necessarily
16 November, but clearly I would say -- clearly by
17 January 1 I would have been out and want to rent that
18 to a residential tenant, you know, to -- I mean,
19 because what's the point of holding on to that space.
20 The big issue is that I must have an office in D.C.
21 because, you know, D.C. is the base of my business
22 and I don't have to have an office in Virginia or

Page 132

1  Maryland. I just have to have, you know, an escrow
2  account in a bank that's in Maryland, Virginia, so my
3  fear is that if I let go of this space knowing that
4  what I'm dealing with here, then what happens when I
5  can't find a space in Georgetown come this November
6  and I have to go somewhere else, you know, then at
7  least I have this to come back to. It's a fallback.
8  I can't afford to put myself in a position where I
9  don't have this space to go back to and so in light
10 of this fight, in light of everything that's going
11 on, I need to have a fallback and this is my safety
12 net.
13   BY MR. SHAIBANI:
14   Q How much rental income are you losing as a
15 result of having to maintain two separate offices in
16 D.C.?
17   MR. RANCK: Objection.
18   MR. BOUSE: I object.
19   THE WITNESS: Roughly 1,600 to $1,700 a
20 month.
21   BY MR. SHAIBANI:
22   Q And would you agree that you would have

133

1 rented the 1223 property for the duration that you
2 are leasing the 1622 Wisconsin Avenue property?
3     A  Sure.
4         MR. BOUSE:  I object.
5         MR. RANCK:  Objection, leading and
6 speculative.
7         THE WITNESS:  Surely I would have leased
8 the space to a residential tenant upon moving.  I
9 mean, as it is basically all of the furniture that I
10 had over there I relocated to the Georgetown
11 location.  The only things that I really left over
12 there was just stuff that just like didn't fit or
13 didn't go with the, you know, I'm all about color, so
14 didn't go with the look, sorry, but that's just me.
15 It didn't go with the look, so I left that stuff
16 there to be either given away or any agent that
17 wanted to take it for their own home office, so it's
18 really just kind of wasted space sitting there, but
19 the flip side of it is if I put a residential tenant
20 in there, residential tenants have rights and so then
21 they would assume all the rights of being a tenant
22 and so it would have been a big legal mess if I had

134

1 to at the last minute move back into that space and
2 get rid of a tenant out of that space.
3         BY MR. SHAIBANI:
4     Q  Now, when Mr. Forrester contacted you to
5 supposedly negotiate a lease between you and Mary
6 White didn't he, in fact, demand more than two years
7 of your tax returns to financially qualify you for
8 the property, for leasing the property?
9         MR. BOUSE:  I object.
10        MR. RANCK:  Objection, leading.
11        MR. SHAIBANI:  I'll rephrase the question.
12        BY MR. SHAIBANI:
13    Q  How many years of tax returns initially
14 did Mr. Forrester demand you to produce in order to
15 financially qualify for the 1622 Wisconsin Avenue
16 property?
17        MR. BOUSE:  I object.
18        THE WITNESS:  I don't know the exact
19 number of years, but it was definitely more than two
20 years.  The two years was a compromise and I just
21 couldn't believe that he was asking for so much
22 information.  He wanted the full tax, like the full

135

1 schedules and everything like that and it was over
2 three years and I just said that's absolutely insane,
3 there's no reason and so I submitted -- that's when I
4 contacted my accountant and had him do that letter
5 hoping that would put an end to it all and then I
6 just submitted the two years worth of information,
7 but it was just overkill to ask for that much
8 information to afford a $2,500 a month space.
9         BY MR. SHAIBANI:
10    Q  Are you aware that Mary White sent an
11 E-mail to Patsy Petty referring to you as a challenge
12 because she didn't receive the rent payment for
13 December of '05?
14        MR. BOUSE:  I object.  That's a total
15 mischaracterization of what the E-mails say.
16        MR. RANCK:  I have to say I join that
17 objection and also object on the basis of the
18 question is leading.
19        THE WITNESS:  I remember reading the
20 E-mail and I was very offended by the fact that it
21 was -- it was like this, you know, behind the scenes
22 you know, saga of isn't that John Bratton a pill to

136

1 work with.  I don't remember exactly what the E-mails
2 say.  I remember glancing.  Once again, I glanced
3 through some of the documents and I remember reading
4 the E-mail from Patsy to Mary White or from Mary
5 White to Patsy suggesting that I was difficult and a
6 problem and much to deal with, yes, I remember that.
7         MR. BOUSE:  Move to strike.
8         BY MR. SHAIBANI:
9     Q  Do you consider Bratton Realty to be a
10 competitor to Washington Fine Properties?
11        MR. BOUSE:  I object.
12        THE WITNESS:  Now, that really goes back
13 to me bringing this thing in that says "the future
14 belongs to those who believe in the beauty of their
15 dreams," and that would be a dream.  For me to be
16 competition for Washington Fine Properties, who just
17 kind of like kicked Sotheby's to the curb because
18 they're so well established.  They got such a big
19 reputation that they didn't even need Sotheby's, who
20 is now with, Tutt, Taylor and Rankin, who it would be
21 a dream just to be in the ballpark with tuck tile and
22 rankle, not alone Washington Fine Properties, so, no,

Page 137

1  I am a little, small brokerage just trying to make
2  good transactions and bring people business and bring
3  people together. That's my logo, but for anyone to
4  remotely put me in the category with Washington Fine
5  Properties is just absurd.
6       BY MR. SHAIBANI:
7       Q What percentage of your real estate sales
8  transactions are over a million dollars?
9       MR. BOUSE: Object.
10      THE WITNESS: What percentage?
11      BY MR. SHAIBANI:
12      Q Yes, and let's have the years in '05 and
13 '06?
14      A I would have to say in '05 maybe six
15 percent.
16      Q And what about '06?
17      A I don't even know if I did a million
18 dollar transaction in '06, maybe one transaction.
19      Q Which would be what percentage of the
20 total sales transactions?
21      MR. RANCK: Objection to the form.
22      MR. BOUSE: I've given up.

Page 138

1       THE WITNESS: Maybe six, five percent of
2  the business.
3       BY MR. SHAIBANI:
4       Q And isn't it true, to your knowledge, that
5  Washington Fine Properties primarily engages in the
6  sale of multiple million dollar properties?
7       MR. RANCK: Objection, leading.
8       MR. BOUSE: I object.
9       THE WITNESS: Well, that's the whole
10 reputation of Washington Fine Properties. The same
11 week that all this started in October Washington Fine
12 Properties did this big add in the Georgetowner and
13 it took the whole back page, cover page of the
14 Georgetowner and it was about I would say 70, it
15 looks like it was about 60 or 70 sales agents. Every
16 last one of them were white and it was this huge
17 picture of all the agents that work for their company
18 and how they do all kinds of business in all the
19 uptown neighborhoods and stuff like that, so, yeah,
20 their average business is well into the millions.
21 They do like five and $6 million transaction. That's
22 just one transaction. I wish I could get my hands on

Page 139

1  just a $2 million transaction just once, so it's not
2  even -- I mean, I'm striving, but, no, I'm not even
3  --
4       BY MR. SHAIBANI:
5       Q And wouldn't you agree that Mary White and
6  Bratton Realty are not competitors?
7       MR. RANCK: Objection, leading.
8       MR. BOUSE: I object.
9       BY MR. SHAIBANI:
10      Q -- in the real estate industry?
11      MR. BOUSE: I object.
12      MR. RANCK: Objection, leading.
13      THE WITNESS: We are not competitors.
14      BY MR. SHAIBANI:
15      Q Now, I have another question with respect
16 to the letter that John Gordan Forrester sent you,
17 which was previously distributed as an exhibit. I
18 believe it's Exhibit 15. Mr. Forrester says that a
19 schedule C for '03 indicates a net income of $76,868
20 and $146,739 for '04, a long way from the 425,000,
21 which you represented. Based on your review of your
22 income tax filings for '03 and '04, wouldn't you

Page 140

1  agree that the numbers referred in Mr. Forrester's
2  letter, 76,000 and 146,000, are, in fact, incorrect?
3       A Yes.
4       MR. BOUSE: I object.
5       MR. RANCK: Objection.
6       BY MR. SHAIBANI:
7       Q Wasn't your --
8       MR. RANCK: Objection. Can I interpose an
9  objection since your client is not pausing?
10 Objection, leading.
11      MR. BOUSE: I also object.
12      MR. SHAIBANI: This is a deposition. You
13 can object to leading in trial obviously.
14      MR. RANCK: You understand that this is
15 your own client. Every question you've asked just
16 about is a leading one and you're not permitted to do
17 that and if I want to preserve my objections, I need
18 to do it now, Mr. Shaibani.
19      MR. SHAIBANI: By all means.
20      I don't have any other questions.
21      MR. RANCK: I actually have some follow up
22 based on Mr. Shaibani's exam.

**165**

1  work with or deal with without being discriminatory?
2      MR. SHAIBANI: Objection, vague.
3      THE WITNESS: I don't understand the
4  question.
5      BY MR. BOUSE:
6      Q  Yeah, have you ever said to somebody in
7  your business that client is difficult to deal with
8  or is difficult to work with without saying it's
9  because that individual is white or Afro-American or
10 Latino?
11     MR. SHAIBANI: Objection, relevance.
12     BY MR. BOUSE:
13     Q  You understand my question, don't you?
14     A  No.
15     Q  Well, you know, there was an E-mail from
16 Mary White that said he is difficult or isn't he
17 difficult. I'm saying have you ever in your business
18 said someone is difficult without meaning it in a
19 racial tone?
20     MR. SHAIBANI: Objection, relevance,
21 vague.
22     THE WITNESS: Should I answer that?

**166**

1      MR. SHAIBANI: If you can.
2      THE WITNESS: I'm sure that there's ways
3  of saying that somebody is difficult without it being
4  a racial thing.
5      MR. BOUSE: All right, I have nothing
6  else. Thank you.
7      MR. SHAIBANI: That's it.
8
9      (Bratton Deposition Exhibit No. 33 was
10 marked for identification and retained by Counsel.)
11
12     (The deposition of JOHN BRATTON, was
13 concluded at 2:33 p.m.)
14
15 (The following Acknowledgment of Deponent page is
16 included in the event the witness chooses to read and
17 sign the transcript.)

**167**

1      ACKNOWLEDGEMENT OF DEPONENT
2      I, JOHN BRATTON, do hereby acknowledge that I
3  have read and examined the foregoing testimony, and
4  the same is a true, correct, and complete
5  transcription of the testimony given by me and any
6  corrections appear on the attached Errata sheet
7  signed by me.
8
9
10
11 _____   _____
12 (DATE)            (SIGNATURE)

**168**

1      CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2      I, Lisa Kirk, commissioned as Lisa Kirk,
3  the officer before whom the foregoing proceedings
4  were taken, do hereby certify that the foregoing
5  transcript is a true and correct record of the
6  proceedings; that said proceedings were taken by me
7  stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 29th Day of
14 January, 2007.
15
16 My commission expires:
17 October 31, 2011
18
19
20 _____
21 NOTARY PUBLIC IN AND FOR THE
22 DISTRICT OF COLUMBIA