Page 1

1                UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3    JOHN BRATTON                    *

4           Plaintiff               *

5    vs.                            *    Case Number:

6    CHATEL REAL ESTATE, INC.,      *    1:06CV00694

7    et al.,                        *

8           Defendants              *

9    *        *        *        *        *        *

10           THE DEPOSITION OF JOHN H. BRATTON

11           The Deposition of John H. Bratton, taken

12   in the above-captioned case on Friday, January 19,

13   2007, commencing at 10:00 a.m., at the law offices

14   of Eccleston & Wolf, 2001 S Street, Northwest,

15   Suite 310, Washington D.C. 20009, and reported by

16   Monique Kastner, Court Reporter and Notary Public.

17

18

19                EVANS REPORTING SERVICE
20        Two North Charles Street, Suite 950
              Baltimore, Maryland 21201
                   (410) 727-7100
21                 (800) 256-8410

PLAINTIFF'S
EXHIBIT
10
ALL-STATE LEGAL®

1    my legal fees for even coming after me, so cases

2    like that.

3         Q    All right.  As I understand your

4    testimony, you have been now involved in real

5    estate for about five years; is that right?

6         A    Six years.

7         Q    Six years.

8              All right.  When was Bratton Realty

9    incorporated or organized, formed?

10         A    April the 1st, 2001.

11         Q    You're the sole owner of Bratton

12    Realty?

13         A    Yes.

14         Q    And how many employees does it have?

15         A    I have no employees.

16         Q    All right.  How many agents does it

17    have, does it use?

18         A    Seven agents.

19         Q    They're all independent contractors?

20         A    Yes.

21         Q    Are you the only broker?

1          A    Yes.

2          Q    You have two locations; is that

3     correct?  Let me strike that.

4               Bratton Realty has two locations?

5          A    Bratton Realty has one primary

6     location, which is the Georgetown office, 1622

7     Wisconsin Avenue, the property in question.

8               However, I have held on to my previous

9     office, because of the discriminatory manner in

10    which I have been treated with this property.

11              So therefore, given that my -- all my

12    rights have been stricken from the lease, I have no

13    right to renew and I have no right to purchase.  I

14    have held on to my previous office in the event

15    that I will end up back there in November.

16         Q    What's that address?

17         A    1223 10th Street Northwest, Washington,

18    DC.

19         Q    1223?

20         A    Yes.

21         Q    For the purposes of this deposition, do

Page 70

1   instruct you not to on relevance.

2       A   I have approximately $700,000 worth of

3   equity.

4       Q   Can you tell me, other than the 1622

5   property, what is the last time you personally have

6   been involved in a leasing transaction?

7       A   Once again, you have to be more

8   specific.  Me personally, or Bratton Realty as a

9   company?

10      Q   Actually, I said you personally.

11      A   Probably about a year ago.

12          Okay.  Once again, for clarity, are you

13  talking about business through Bratton Realty, even

14  though it's my personal transaction, or are you

15  just talking about period, everything?  Like the

16  stuff I do personally, that's not part of Bratton

17  Realty.  I do development.  I do projects.

18      Q   Okay.

19      A   I'm a landlord.  My primary residence

20  is leased out.  Are you referring to that, or are

21  you referring to transactions which went through

1   the normal chain of the document flow that we're

2   here --

3        Q   I understand your question.  Let me

4   break it down.

5            You also are into development, you

6   said.

7        A   Yes.

8        Q   What sorts of property development do

9   you do?

10       A   I take an old house.  I rebuild it,

11  redesign it, and either rent it out, become a

12  landlord or I sell it.

13       Q   Okay.  Now, when you renovate it, do

14  you renovate it yourself personally, or do you

15  contract that work out?

16       A   I have done both.

17       Q   All right.  When you contract it out,

18  you enter into contracts with a general contractor

19  or various subs?

20       A   No.  I basically -- I just do more of a

21  friendship type of negotiation, and that's the way

Page 72

1    we have done our projects.

2           Q    Okay.  Have you developed any

3    commercial property?

4           A    No.

5           Q    Of the one or two commercial sales you

6    have been involved in -- you personally -- when

7    were they, roughly?

8           A    Tacoma Park was roughly four years ago.

9    It was one of my transactions, my first year as a

10   broker.  And the other one was, I think, the year

11   before that.  So one maybe three and a half, four

12   years ago, the other one about four years ago.

13          Q    Okay.  Does Bratton Realty still

14   operate out of both locations?

15          A    There's office space at both locations,

16   yes.

17          Q    Do people actually use --

18          A    I use both locations.

19          Q    How about the other agents?

20          A    They like the Georgetown location.

21          Q    Do they ever use the other one, as far

Page 75

1          Q    As I understand it, when you became

2    interested in the 1622 property, that was for use

3    by Bratton Realty?

4          A    Correct.

5          Q    And at the time you became interested

6    in 1622 and were hoping to lease the property, what

7    was your intention with regard to the 1223

8    property?

9          A    To have both.  To have two offices for

10   a while until the other one got up and running.

11   Then the plan would be to either just have the one

12   location and then seek for another location in

13   downtown Silver Spring and then Clarington,

14   Virginia.  So my goal was to have a D.C. office, a

15   Maryland office and a Virginia office.

16         Q    Had you gotten deep enough into the

17   planning at that point to try to figure out how

18   long you thought you would maintain the two offices

19   before closing the 1223?

20         A    Not long.  I mean, the whole point was,

21   this was the beginning of the new change of Bratton

1    Realty.   The new change was going to be having

2    multiple locations.   That's the next step for

3    Bratton Realty.

4              The -- my siteman, which I showcased to

5    not only Brad Anderson and Hope and John Pagones

6    when we first met was that -- and that I was most

7    excited about -- was the goal was near, because I

8    had found the perfect space.   So, boom, D.C.   was

9    taken care of, the perfect space for D.C.

10             And then I already identified an area,

11   which was downtown Silver Spring, for my next

12   location.   And then the third location was going to

13   be Clarendon, Virginia.

14             So given the situation, the

15   discrimination, the blatant obstacles, the tedious

16   and ongoing lawsuit, I have had to put things on

17   the back burner.   So that's where I'm at right now.

18   I'm in a holding pattern until all this is

19   resolved.

20        Q    Do does Bratton Realty keep records as

21   to what sales or income are attributable to each of

Page 77

1     the two offices?

2            A    No.   There's nothing separate at all.

3            Q    Can you identify any loss that Bratton

4     Realty has had -- strike that.

5                One thing you have alleged in this case

6     was that there was a delay in the processing of

7     your lease proposal.

8            A    Correct.

9            Q    All right.   Can you identify any loss

10    that Bratton Realty has suffered as a result of

11    that delay?

12               MR. SHAIBANI:   Objection.

13               THE WITNESS:  As a result of -- which

14        delay are you referring to?  Are you referring

15        to the delay from the timeframe of which I

16        should have gotten the lease signed to the day

17        that I finally got the lease signed?

18               BY MR. RANCK:

19           Q    Yes.

20           A    Or are you taking about from when I

21    should have gotten the lease signed to right now,

1       as of today, how much time has been lost, how much

2       money has been lost as a result of wagering this

3       long-going case?

4              Q    Let me address both.

5                   First, I am asking about delay from the

6       time you think you should have gotten the lease

7       until the day, October 31st, 2005, that your lease

8       was ultimately signed.

9                   Can you identify any loss attributable

10      to that delay?

11             A    Yes, I can.

12             Q    Okay.  What is that?

13             A    I think it's written in one of my

14      documents somewhere.  All the clients that I was

15      working with at the time, I pretty much had to

16      abandon those clients, because I was 24/7 working

17      on getting this space.

18                  And as I saw what was happening to me,

19      I had to divert all my attention to resolving this

20      matter with this space.  And once the news was

21      delivered to me by Thierry Liverman that I did not

1    get the space, knowing that it was blatant

2    discrimination, then my focus was to take action

3    against the injustice that was done.

4              So all the clients I was working with

5    at the time I lost out on.  I suffered from.  And I

6    think I put three or four clients.  I think Scott

7    Zimmerman was one.  I don't know the names off the

8    top of my head.

9         Q    Did other agents in your office, in

10   Bratton's office, take over those clients?

11        A    No.

12        Q    So you abandoned your clients so that

13   you could work your own deal?

14             MR. SHAIBANI:  Objection.

15             THE WITNESS:  I will never say I

16        abandoned a client to work my own deal.

17             BY MR. RANCK:

18        Q    Actually, you said your abandoned your

19   clients.  So I am asking you, did you abandon them?

20             MR. SHAIBANI:  Objection.  Asked and

21        answered.

Page 80

```
 1              THE WITNESS:  Well, if you are using
 2        the word "abandon" as if I just ignored my
 3        clients, no, I did not just ignore my clients.
 4              BY MR. RANCK:
 5        Q    Okay.  So --
 6        A    There's a difference.  I don't know how
 7   you run your business, but the amount of service
 8   and attention that I would have been able to give
 9   to those clients was drastically different as a
10   result of me doing this case.
11              And the fact that I have clients is not
12   just vacation for me not taking care of issues,
13   such as this, especially when they're so blatant.
14        Q    Okay.  What happened to those, I think
15   you said, three or four clients?
16        A    Yes.
17        Q    Zimmerman and two or three others, what
18   happened to them?  Did they go somewhere else, to
19   another realtor?
20        A    They either waited and bought down the
21   road or -- I don't know off the top of my head.  I
```

Page 81

1    would have to see the list.

2           Q    For any of those clients, did you have

3    contracts in place?

4           A    No.  We were in search of.

5           Q    In search.  Okay.  So presumably they

6    were looking to buy?

7           A    Either to buy or -- I think they were

8    all buyers.

9           Q    Okay.  So presumably you would have

10   found a property for them to purchase --

11          A    Correct.

12          Q    -- and Bratton Realty would have earned

13   its commission?

14          A    Correct.  For example, presumably, if

15   you were out sick for a month, presumably, you

16   would have done billable hours during that month

17   that you were out.  That's called opportunity cost.

18   The opportunity cost that you lost by not being

19   able to come into work, that's real money.  That's

20   real time.

21               The opportunity cost of me not being

1    able to focus on my business at hand, which I would

2    have been had not these actions been taken against

3    me.  I would have earned during that period, rather

4    than not earning.

5         Q    Do you know whether you or someone else

6    at Bratton Realty ultimately were able to represent

7    these clients in the purchase of their properties?

8         A    I have repeatedly told you, I don't

9    recall the names.

10        Q    Well, I guess I'm getting back to what

11   happened to the clients.  Do you know?  Did they go

12   to other realtors?  Did you tell them, "I can't

13   represent you anymore," and they went somewhere

14   else, or did someone else in your office take over

15   the representation?

16        A    Once again, if I knew the names, I

17   could tell you approximately what happened with

18   each one of those individuals.  I don't recall the

19   names.

20             I do recall at the time I wrote the

21   document that I was working with clients.  I don't