clear, are you referring to the commercial level or the residential levels that's at 1223?

MR. RANCK: He can't sell part of it.

BY MR. RANCK:

Q My question is --

A Actually, I can.

Q Had you gotten everything you wanted in the 1622 lease, your plan -- is this correct? I'm asking you, was it your plan to stop using the 1223 property for Bratton Realty's operations, but to keep that property because you owned it anyway?

A No. My plan was to use Georgetown as my D.C. office.

Q As Bratton's D.C. office?

A As Bratton Realty's D.C. office, which I stated earlier, and then to open up an office in downtown Silver Springs and then Clarendon, Virginia. That was my plan.

Q My question is, what did your plan conceive of with respect to the use of 1223 10th Street? What were you going to do with that

(Whereupon, a brief recess was taken.)

BY MR. RANCK:

Q All right. Mr. Bratton, at some point you became interested in 1622 Wisconsin, correct?

A Correct.

Q And can you tell me if you recall what date that first occurred?

A October. I think it was October the 6th, 2005.

Q All right. Did you see this property listed on the MRIS or did you see the property itself first?

A I saw the property itself.

Q All right. So tell me how it came to be that you saw the property.

A Actually, I was on my way to tour another property that I had toured previously. I was going back for my second visit.

I can't think of the name of the place, but Feta was the owner of the shop. And he had just moved his business from one location to the

other, and I was going to move into his old location, but it was not at the street level and it was pretty small and it was kind of damp.

Fortunately for me, he was running about 20 minutes late, and so I paced up and down the street a little bit killing time. I happened to see two lockboxes on the fence of Mary White's property and a sign in the window that said "For lease."

Q When you say "Mary White's property," you mean 1622?

A Correct.

Q All right. Once you saw the sign and the lock boxes, what did you do?

A I walked in and spoke with Barrett Anderson, asked him about the property, which he gave me a little information, gave me a tour, gave me a tour or the main level, gave me a tour of the lower level. And he gave me a tour of the backyard and a tour of the alley and a long explanation about what Mary White was doing with the space,

that she wanted to lease both spaces.

They were both available. No one had even been there to look at the place in the past several weeks. So he didn't think I had any competition whatsoever on the space, but he told me that I had to go talk with John Pagones in order to get more information. He just said that he was the office manager for Mary White.

Q So he didn't mention that anyone else had recently inquired about the property?

A He said that no -- as long as he's been there, no one has really expressed any interest in leasing the property, and he was there to shut down the office for Mary White.

Q And you said you did not review his deposition, right?

A No.

Q Are you familiar with his testimony about when Roberta Medland came in?

A No.

Q When you went into the space that first

time and met Mr. Anderson, what did you express to him as to what part of the property you were interested in?

A Well, I was interested in the whole property when I first went in.

Q The street level and the basement?

A I am -- he showed me both properties. The tour entailed both properties as if it was one.

Q Did you understand at that time that there were two separate spaces?

A Yes.

Q The street level and the basement?

A Yes.

Q Okay. You saw two different lock boxes?

A Yes.

Q Okay. And you expressed to him a potential interest in both of the spaces at that point?

A Yes. I wanted information on both of the spaces, but I primarily was interested in the

ever told me her name.

Q You didn't know her name at the time?

A No. I didn't know her name at the time.

Q All right. And what happened after you mentioned Mr. Pagones' name?

A She then said, "Have a seat" or "Hold on a moment," and she went to the back and she got -- she told John that I was out there. She came back to her desk, sat down and said, "He'll be right with you."

Q Okay. And then he came out?

A I wouldn't say he came out. I would say he came to the area. He never came up to me. He never came within handshaking distance of me, so I then had to walk to him. He was talking to me from a distance. So I walked towards him, towards the back area behind Hope's desk and told him why I was there.

Q Okay. And what did you tell him?

A I told him that I just toured the

property. I told him I was a real-estate agent and a broker, and I was thinking about putting my brokerage firm here in Georgetown. That's the perfect fit, exact same size I'm looking for. It's street level, exactly what I was looking for, and that I was interested in doing an application to lease.

Q Okay. Did you indicate to him that you were only interested in the street level or did you specify the street level? Did you say the whole property? What do you recall about that?

A I spoke about the street level.

Q Okay. Why didn't you mention anything about the basement level at that time?

A There was no need to mention anything about the basement. I was asking about the whole property, but I specifically said that I just toured the main level, which is what I'm most interested in.

Q Okay. And what was his response?

A His response was -- he broke out into a

cold sweat, and it was not a hot day. He turned red, he became flustered and extremely nervous. I tried to ignore it, but it was very evident. It was very obvious. He was very awkward in talking with me, very on edge.

And so then he finally -- at this point, he finally goes and sits behind the desk that was back there. And I -- and then I sit at the desk, and I started asking him a couple questions about the property.

Q Okay. Let me apologize and interrupt.

I asked you how did he respond, and you described a bunch of physical characteristics --

A That's a response to me.

Q Okay. Let me finish my question.

You described a bunch of physical characteristics. You didn't say that he verbalized anything. Did he say anything?

A When I asked him about the property, his response was at the same time of the things I just described to you. He said that -- he asked me

answer you as specifically as I can.

So as a real-estate agent, when someone walks into your office and asks about a property, our job is to serve the public. It doesn't matter whether you are young, old, Asian, black, short tall, whatever. You give people the same treatment.

The treatment that I received was not the treatment that would have been given to anyone else. A white person walking in that office would not have been treated the way I was treated.

First of all, the reaction to me was so blatant and obvious, followed by basic questions that I asked about the property, about an application and about a lease. Information was denied to me. Information that he must have had, had to have had.

It would have been absolutely impossible to believe that he didn't have an application, didn't know where to get an application. He didn't have a lease, didn't know

where to get a lease, didn't know any information about the property as far as whether there's taxes or anything of this. He could not answer any of my questions. And this is his listing in the computer.

Q All right. Well, let me --

A That -- you put all that together, along with the fact that even when I went to leave, rather than him being excited about, you know, "Well, I look forward to working with you to secure this lease. It's been on the market for 66 days, and we have no one interested," nothing. There was no sign that that man ever wanted me to come back into his office about this property again.

Q Okay. And you concluded on October 6th, by the time you left, that he was discriminating against you, rather than that he was in idiot and rude and a jerk, right?

MR. SHAIBANI: Objection.

BY MR. RANCK:

Q Was that your conclusion?

A I asked him about the backyard.

Q And tell me how he responded.

A Well, I asked him about the backyard. He didn't even know there was a backyard. He says, "Well, I don't know anything about the backyard."

I said, "Well, there's a courtyard on the lower level. I would like to know if I lease the lower level as well as the main space, would I have access to using the backyard," because to me, that's golden. I imagined the functions I could host and have it outside. You know, that would be wonderful. He couldn't answer any questions about the backyard.

I asked him about the lower-level space, and how was Mary White going to get in and out of that little corner of the space that she wanted.

He couldn't answer any questions about the space. He just knew that she wanted the back section of the lower-level space.

Q Okay. How did you find out Mary White

A That's not my conclusion, because he could be all of the above.

Q Okay. All right. But you concluded, by the time you left, that he was discriminating against you?

A Correct.

Q Okay. All right. Now, I want to get into the details which you were just offering me so I can ask the specific questions since you don't like general questions.

A Sure.

Q He sat down behind a desk and asked how you got into the property.

A That was one of the questions.

Q All right. All you told him that Barrett Anderson had given you a tour.

A Correct.

Q All right. Tell me what else you asked Mr. Pagones in that meeting. You said he could not answer any of your questions. Tell me everything you asked him.

give you the answer that I think is appropriate. I'm not going to give you a half an answer so you can twist it. I'm going to give you the full answer.

So once again, my answer is, I have been told a lot of things that have not been correct. A lot of things have been alluded to me that have not been correct.

So, yes, at some point, I was told that there was another person who had secured -- and I will say, the way I was told, someone who had signed a lease on the property, and that it was gone and it was too late and it was not going to change. The decision had already been made.

We also know today that there was never a leased sign on that property, other than the lease that I signed. So, yes, I was told that someone else had signed a lease on the property by the time I made these notes.

Q Thank you.

(Whereupon, Bratton Deposition Exhibit

person. What can I say?

Q Did you tour the property again when you dropped --

A Yes, I did. I toured the property. I mapped a layout of the entire property, every single inch. I measured exactly where all my furniture was going to go. I laid out what colors I was going to use on each wall, the whole layout and design of the office, of which point at that time I discovered that, wow, I can use a little bit more space.

I then modified my lease and changed it to add both the main-level space and the lower-level space, because I really wanted that outside space. I'm an outside person. So I modified the lease to incorporate both levels.

Q Okay. What else did you do -- strike that.

You dropped the lease off to Mr. Anderson that morning, Friday morning, the 7th, and you toured the property. How long a tour was that?