1      Q   When Mr. Liverman told you weren't
2  getting the lease and explained to you someone else
3  was in the picture -- putting aside what exactly he
4  said -- your version is, he told you that someone
5  else has signed a lease. He obviously testifies
6  differently, okay?
7           MR. SHAIBANI: Objection.
8           BY MR. RANCK:
9      Q   But in that conversation, when you got
10 done with that conversation, did you believe that
11 there even was someone else in the picture, or did
12 you believe that Mr. Liverman and/or Ms. White had
13 just concocted this person in order to keep you
14 from getting the property?
15          MR. SHAIBANI: Objection.
16          THE WITNESS: I believe that after my
17    conversation with Thierry Liverman, that after
18    me -- as you can see from the many documents --
19    have worked so diligently for six days --
20    approximately six days at that point, that all
21    of a sudden a friend of a friend just comes out

Page 219

1    of the blue and is able to see the property,
2    see Mary White, sign a lease and have a lease
3    ratified all in a matter of, like, one day, no,
4    that's not very believable to me that this
5    person just came out of the blue.
6         Testimony has shown that that's not
7    believable, so -- as far as Ms. Medland has
8    never known anyone who knew Mary White.
9         It was no friend of a friend, as they
10   told me on the phone. There was no lease
11   signed, as they told me on the phone. It was
12   not a done deal, as I was told on that very
13   same phone call.
14        So, no, I do not believe the
15   information that I was given on the day that
16   Thierry Liverman called me.
17        BY MR. RANCK:
18   Q    You have answered interrogatories in
19   the case, correct, written questions from the
20   defendants to you that you signed under oath,
21   correct?

1   could we just not go with this person.

2           Well, I don't see any overwhelming

3   credentials of someone who didn't even know the

4   area, just moved to the area and didn't know

5   anything about Mary White, didn't have financial

6   documents together whatsoever.

7           The only thing she was required to do

8   was a credit report when I had to do two years of

9   taxes and more.  Where is this qualified, rock-star

10  person that they just could not refuse to do a

11  lease with.

12          So back to your question, John Forester

13  came into the picture when a whole week and a half

14  went by with nothing going on from Mary White's

15  side, and he calls me and says that he's calling me

16  on the behalf of Mary White.  Chatel has been

17  terminated, and that he is now going to take charge

18  of this situation.

19          Once again, he went right back to some

20  of the same terms of, I had to pay the taxes, I had

21  to pay one-third the utilities.

Page 227

1    Oh, and by the way, the lower-level
2  space is not available for me to lease.  Then, on
3  top of that, on top of the $200 taxes.  I will not
4  get first right of refusal or an option to go month
5  to month after the lease expired.
6        Those are the things that I'm pointing
7  out of how things had changed and things had been
8  added on as time has gone by.
9        MR. RANCK:  I'm sorry.  Can you read
10    back about the last -- not that whole answer,
11    because it went on for quite awhile, but the
12    last five or six lines.
13        (Whereupon, the preceding answer was
14    read back by the reporter.)
15        BY MR. RANCK:
16    Q   Okay.  That's what I wanted to ask you
17  about, because your answer is confusing me, and I'm
18  sure it's me.
19        You said, "on top of that."  You're
20  pointing out things that had been added and how
21  things had changed.

```
 1   bottom, "Wednesday the 12th, he" -- being Mr.
 2   Pagones -- "then told me that I should call his
 3   manager, Thierry Liverman, if I had any more
 4   questions because he would be out for the Jewish
 5   holiday."  Do you see where you wrote that?
 6         A    Right.  That was just for that one day.
 7         Q    Okay.  But you agree --
 8         A    The day was almost already gone.
 9         Q    Okay.  So this conversation you had
10   with Mr. Pagones was towards the end of the day?
11         A    Right.
12         Q    Okay.  And then --
13         A    Well, I don't know.  Towards the end of
14   him being at work, I guess.
15         Q    Okay.  Fair enough.
16              Then later Mr. Liverman called you and
17   told you that you weren't going to be getting the
18   lease.  I don't mean those words, but you weren't
19   going to be getting the lease, correct?
20         A    That's correct.
21         Q    Now, tell me what you contend he said
```

1  in that conversation.

2      A   He basically called and said that he
3  was informing me that I didn't get the lease, that
4  John Pagones was out on a Jewish holiday, and
5  that's why he was calling.  He had heard from Mary
6  White that they secured another lease.  Another
7  lease was signed.

8          I then said that I found that hard to
9  believe, that I was the only person even interested
10 in the space, the only person looking at this
11 space.  According to Barry Anderson, I had been the
12 only person to even tour the space at that point.

13         And so I found it hard to believe that
14 all of a sudden somebody -- he says, "Well, you
15 know how these things go.  People just come up out
16 of the blue."

17         I said, "No, I don't know how these
18 things go where something just comes up out of the
19 blue after I have been working on this for over a
20 week and I am just now getting a final version of a
21 lease, but yet someone can just come out of the

1   blue in one day and do everything and have it

2   accepted and signed off."

3           He then stated to me, "Well, it's a

4   done deal. It's over. It's a signed lease, and

5   you didn't get the property."

6           And that's when I informed him, "No. I

7   know exactly what's going on. I have tried to work

8   with this ever since the beginning, to ignore it

9   and move on. I have been blatantly discriminated

10  against, and I will be filing an official

11  discrimination case."

12      Q   Do you have an understanding as to what

13  Barrett Anderson testified to in his deposition

14  with regard to other persons' interest in the

15  property?

16      A   I didn't attend Barrett's Anderson's

17  deposition.

18      Q   That wasn't my question. My question

19  is, do you have an understanding as to what he

20  testified to?

21      A   I didn't read his deposition, as I

phone?

A   No.

Q   So he heard your end?

A   He heard my end.

Q   Okay. How about Jeanette Dumbrel, is that what you said?

A   Dumbrel.

Q   She's an employee of Bratton Realty?

A   I don't have any employees.

Q   She's an agent at Bratton Realty?

A   She's an independent agent, yes.

Q   Anyone else? Your answers to interrogatories identify Jeff Augello. Have we discussed everything he knows about this as far as you can recall?

A   Jeff Augello knows -- he's the one -- that's the same person who drafted up the commercial lease.

Q   That's what I mean. He wasn't involved after that, right?

A   Not necessary.

1          BY MR. RANCK:

2     Q    If you can, look at Exhibit 26 please.
3  This is a plumbing invoice and statement that you
4  received; is it not?

5     A    Yes.

6     Q    All right. Do you contend that you
7  shouldn't have been responsible for repairing this
8  plumbing problem?

9     A    Absolutely. The problem existed before
10 I ever took possession of the property.

11    Q    Do you know the first time you made a
12 complaint about the plumbing problem?

13    A    I don't remember the exact date, but it
14 was probably within 30 days of being in the office.
15 The carpet was -- everybody noticed that the carpet
16 was soaking wet, and there was no hot water.

17    Q    Okay. Did you pay this invoice?
18    A    No, I did not pay this.
19    Q    Did Bratton Realty pay this invoice?
20    A    Shouldn't have. I didn't give anybody
21 permission to pay it.

Page 344

1   MR. SHAIBANI:  Well, if you would like,
2   I can identify them now.
3   MR. RANCK:  I guess, if you can have
4   your client leave the room.
5   MR. SHAIBANI:  Do you mind stepping out
6   for a minute?
7   THE WITNESS:  Sure.
8   (Whereupon, the witness left the
9   deposition room.)
10  MR. SHAIBANI:  It's nothing above what
11  was identified in the Rule 26 report anyhow.
12  MR. RANCK:  Bob, we'll knock off in
13  just a minute.  I'll just follow up on what you
14  do.
15  MR. SHAIBANI:  We're seeking the
16  emotional distress damages.  And the economic
17  damages are limited to lost rental income from
18  the 1223 property which he had to keep because
19  he has to move out of the 1622 Wisconsin Avenue
20  property.
21  MR. RANCK:  I'm sorry.  The lost rental

1  income. He could have rented it to someone
2  else.
3          MR. SHAIBANI: Yes. He wouldn't have
4  had to keep that -- two offices, basically, for
5  his real estate if he could extend his lease.
6  Where he is now he would only need to keep two
7  offices.
8          When he moves, he's going to have lost
9  business from the relocation because people
10 know where his office is located.
11         Basically, the visibility he lost and
12 relocation losses, then obviously the attorney
13 fees and cost of suit.
14         MR. RANCK: Can you identify what that
15 is to date? Do you know roughly?
16         MR. SHAIBANI: It's close to 196,000, I
17 think, but I have to double-check that.
18         MR. BOUSE: I've got to get higher
19 rates.
20         MR. SHAIBANI: And then we're seeking
21 punitive damages as well.

1   State of Maryland

2   City of Baltimore

3             I, Monique Kastner, a Notary Public of

4   the State of Florida, County of Duval, do hereby

5   certify that the within-named witness personally

6   appeared before me at the time and place herein set

7   out, and after having been first duly sworn by me,

8   according to law, was examined by counsel.

9             I further certify that the examination

10  was recorded stenographically by me, and that this

11  transcript is a true record of the proceedings.

12            I further certify that I am not of

13  counsel to any of the parties, nor an employee of

14  counsel, nor related to any of the parties, nor in

15  any way interested in the outcome of the action.

16            As witness my hand and seal this 31st

17  day of January, 2007.

18

19
                    Monique Kastner
20                  My Comission Expires 05-25-10

21