Capital Reporting Company

<pre>
                                                    Page 1
1              UNITED STATES DISTRICT COURT
                 FOR DISTRICT OF COLUMBIA
2

3   -------------------------------x

4   JOHN BRATTON,                   )
                                    )
5              Plaintiff,           )
                                    )
6        -vs-                       )  Civil Action No.
                                    )  06-0694(JDB)
7   CHATEL REAL ESTATE, INC.,       )
    et al.,                         )
8                                   )
               Defendants.          )
9   -------------------------------x

10              Monday, January 8, 2007

11                    Washington, DC

12  Deposition of:

13

14              THOMAS B. ANDERSON

15  called for examination by counsel for the

16  Plaintiff, pursuant to notice, held at the

17  offices of Litigation Associate, PLLC, 1150

18  Connecticut Avenue, NW, Suite 900, Washington,

19  DC 20036, beginning at 3:12 p.m., before Bonnie

20  Marcus Olachea, a notary public in and for the

21  District of Columbia, when were present on

22  behalf of the respective parties:
</pre>



(866) 448 - DEPO
www.CapitalReportingCompany.com

Page 22

1    Q.  The question is, did you actually
2  physically relocate your office from 1110 30th
3  Place to 2624 P Street in November of 2005?
4       MR. BOUSE:  I object.  Go ahead.
5       THE WITNESS:  I can't -- I'm sorry,
6  I'm not -- we did renovate another office,
7  another structure and moved -- we were moving to
8  that structure in November 2005.
9  BY MR. SHAIBANI:
10   Q.  Did Mary white actually use the
11  facility located at 1101 30th Place from July of
12  '05 until Washington Fine Properties relocated
13  to the 2624 P Street location?
14   A.  Yes.
15   Q.  And how often did she physically come
16  into the 1101 30th Place location?
17   A.  From time to time.
18   Q.  Did you speak to her when she would
19  come to that office on a regular basis?
20      MR. SCHAUFELBERGER:  I'm sorry.  He
21  just said from time to time and you just
22  characterized it as regular basis.  I don't

Page 23

1  think they match up quite well.  I'm going to
2  object to the form as mischaracterizing the
3  witness's testimony.
4  BY MR. SHAIBANI:
5    Q.  Did Mary actually come to the location
6  at least once a week from July of '05 until
7  November of '05?
8       MR. SCHAUFELBERGER:  I object.  Lack
9  of foundation.  Answer if you can answer.
10      MR. BOUSE:  I'm also objecting.
11      THE WITNESS:  Well, the answer is, is
12  she definitely was an agent of our firm, but I
13  didn't keep track of if it was once a week or
14  twice a week.  I do remember she was actually
15  traveling at one point, so I wouldn't want to be
16  incorrect and say there was anything other than
17  the fact that she was an agent of our firm and
18  she could come to the office when she wanted.
19      I don't remember exactly what actually
20  did take place.
21  BY MR. SHAIBANI:
22   Q.  But for the duration that she wasn't

Page 24

1  traveling, to your knowledge did she use the
2  1101 30th Place facility at least once a week?
3       MR. BOUSE:  Object.  Says he doesn't
4  know.
5       THE WITNESS:  Right.  Like I said I
6  don't really know.  If I'm under oath I'm going
7  to tell what I know and I didn't keep track.
8  BY MR. SHAIBANI:
9    Q.  From July to November of '05 did Mary
10  White list any properties for sale through your
11  office?
12      MR. SCHAUFELBERGER:  Okay, two things.
13  First of all when you say July you're talking
14  the July 21st date.  Is that what you intend to
15  be referring to?
16      MR. SHAIBANI:  (Nodding.)
17      MR. SCHAUFELBERGER:  I want to make
18  that clear.  I will let him answer that question
19  whether from -- what, July 21st to November?
20      MR. SHAIBANI:  Yes.
21      MR. SCHAUFELBERGER:  Okay.  You can
22  answer that question.  Just whether she listed

Page 25

1  any properties that you know of for Washington
2  Fine Properties from July 21st to November.
3       THE WITNESS:  I don't know.
4  BY MR. SHAIBANI:
5    Q.  Did she represent any buyers in the
6  purchase of a property through Washington Fine
7  Properties from July 21st '05 to November '05?
8       MR. BOUSE:  Objection.
9       THE WITNESS:  I don't know.
10 BY MR. SHAIBANI:
11   Q.  Where would you be able to obtain that
12  information?
13   A.  When someone represents a buyer --
14      MR. SCHAUFELBERGER:  Actually let me
15  just object.  I'm going to object.  I think we
16  talked about this earlier that we were not going
17  to get into Mary White's real estate
18  transactions at Washington Fine Properties
19  because of our previously noted objections and
20  I'm going to stand by those objections.
21      We noted those in correspondence to
22  you.  We're not going to give information

Page 30

1    And Exhibit 4 was a FedEx airbill from
2 Washington Fine Properties to the real estate
3 licensing department.
4    MR. BOUSE: All right.
5    MR. SHAIBANI: No question pending now
6 is -- well, no question is pending but I am
7 going to ask a question about Exhibit 5, which
8 is a letter from Saul Ewing to my office, dated
9 October 5 of '06.
10 BY MR. SHAIBANI:
11    Q. The second paragraph of this letter
12 where it states -- I'm going to read this
13 paragraph.
14    "In response to your document request
15 please note that WFP objects to disclosing any
16 confidential information responsive to Request
17 Number 4 which relates to Mary White's first
18 transaction with WFP. Without waiving that
19 objection however WFP states that Ms. White's
20 first transaction with WFP settled on June 20th
21 of 2005. The property was located at 1342 29th
22 Street and it was sold for $659,000."

Page 31

1    Do you have any reason to believe that
2 the statement that Ms. White's first transaction
3 with WFP settled on June 20, '05 is inaccurate?
4    THE WITNESS: Could I ask a question?
5    (Discussion off the record.)
6    MR. SCHAUFELBERGER: Sure. I would
7 correct it. I'd go through that in its
8 entirety. Just explain the entire scenario.
9    THE WITNESS: As I understand it the
10 property at 1342 29th Street closed prior to
11 Mary's license being activated through us on
12 July 21. And other agents in our firm were paid
13 prior to that date in our firm.
14    Mary's being paid on that transaction
15 took place on the date of the -- her license
16 being effective with us to the real estate
17 board, which therefore I understand was
18 approximately about July 21.
19 BY MR. SHAIBANI:
20    Q. Would you agree that Mary was using
21 WFP's facility at 1101 30th Place to consummate,
22 prepare for, or conduct this property

Page 32

1 transaction, 1342 29th Street, Northwest?
2    MR. SCHAUFELBERGER: Object to the
3 form; lack of foundation. If you know you can
4 answer.
5    THE WITNESS: Just in trying to be
6 helpful, agents can close, can represent a
7 buyer, can close a transaction. They can do
8 many things at any time. And they may choose to
9 come to an office or they may not.
10    This transaction did close. It
11 involved I know another agent in our firm. I'm
12 not sure whether or not -- whether she did it at
13 the 30th Street location or not, whether or not
14 it has any relevance, because the properties can
15 -- an agent --
16    As I mentioned earlier an agent can
17 choose -- their licensed with our firm. But
18 whether they choose to use our office daily,
19 regularly or not at all, it's really their --
20 that's what an independent contractor chooses to
21 do.
22    So there's no question that she's

Page 33

1 licensed with the firm. But where she did it
2 and how she's using our offices it isn't
3 something that we keep track of.
4    MR. SCHAUFELBERGER: Well, and you're
5 talking about after July 21st, '05. There's no
6 question she was licensed with your firm?
7    THE WITNESS: No question.
8    MR. SCHAUFELBERGER: Okay. But in
9 terms of the settlement date she wasn't even
10 licensed with your firm.
11    THE WITNESS: Prior to that date the
12 only thing I know is that it's a property that
13 another agent in our firm had closed. As of
14 July 21st, Mary was then paid. And I don't know
15 to what extent her participation was, but that's
16 when we effectively started to do business,
17 transact business with her.
18 BY MR. SHAIBANI:
19    Q. Was she representing the buyer or the
20 seller for this transaction?
21    A. I don't know.
22    Q. Who is the agent who was also involved

Page 46

```
 1       And I thought this might be helpful to
 2  explain that because then she doesn't -- then no
 3  one would say they don't prefer to do business
 4  at my office, because I've already told them
 5  there's a limited capacity that we can do in the
 6  office. And until our offices on P Street were
 7  opened, we wouldn't be able to handle all of the
 8  activity that normally they would have and that
 9  I was going to have at the P Street office in
10  November.
11  BY MR. SHAIBANI:
12       Q. Did you hold meetings at the 1101 30th
13  Place location?
14       A. No.
15       Q. Where were your weekly meetings held?
16       A. Our weekly meetings are held up at the
17  Chef's Jeff's Restaurant on New Mexico Avenue in
18  a private back room for all of our offices.
19       Q. Did Mary White attend those meetings
20  from July 21, '05 through November of '05?
21       A. Yes.
22       Q. Did you personally attend all of those
```

Page 47

```
 1  meetings?
 2       A. Did she?
 3       Q. Did you?
 4       A. I don't know if I did, every one, but
 5  they take place on Thursday and therefore
 6  99 percent of them. If I missed one I wouldn't
 7  want to say the wrong thing.
 8       Q. To your knowledge did Mary White
 9  attend most of those meetings from July 21 of
10  '05 through November of '05?
11       MR. BOUSE: I object. You've already
12  answered that.
13       THE WITNESS: I can't -- could never
14  remember, particularly as I know that's summer
15  months and people travel and I don't know. We
16  have many agents.
17       MR. SCHAUFELBERGER: I've given you a
18  lot of leeway here. Let's move on to a specific
19  category, Stefan.
20  BY MR. SHAIBANI:
21       Q. How long did you maintain the 1101
22  30th Street location as your office?
```

Page 48

```
 1       MR. SCHAUFELBERGER: Well, didn't we
 2  testify about that when we were talking about
 3  the change of address form? Do you mean how
 4  much earlier or what are you asking?
 5  BY MR. SHAIBANI:
 6       Q. The start date of occupation of those
 7  premises I'm unclear because apparently you
 8  mentioned something about the 30th Street being
 9  a temporary executive office suite location; is
10  that correct?
11       A. Yes.
12       Q. And how long were you keeping that
13  office?
14       A. As I'm under oath I don't remember
15  when it started. I'd have to go back to that
16  file.
17       Q. Was it more than 6 months?
18       A. I think it was shorter than that, but
19  I'd have to go back and look at the file. I
20  can't remember.
21       Q. Was it more than 3 months?
22       A. I really would have to look at the
```

Page 49

```
 1  dates.
 2       Q. What about your New Mexico Avenue
 3  location, how long have you been occupying that
 4  location?
 5       A. 8 years.
 6       Q. Did Mary White ever come to that
 7  location to conduct business from July 21st, '05
 8  through November of '05?
 9       MR. SCHAUFELBERGER: Objection; lack
10  of foundation. Even though I think this is
11  skirting the edge if you know you can tell him.
12       THE WITNESS: I don't know.
13  BY MR. SHAIBANI:
14       Q. Could she have used that office during
15  that period after she became affiliated with
16  Washington Fine Properties?
17       MR. SCHAUFELBERGER: Objection; calls
18  for speculation as to whether she could have.
19  He's already said he doesn't know.
20  BY MR. SHAIBANI:
21       Q. Yes. But the question is, could she
22  walk in that office or is there a policy that
```

13 (Pages 46 to 49)

Page 50

1 would preclude her from using the New Mexico
2 Avenue location?
3     MR. SCHAUFELBERGER: You mean
4 hypothetically if she had wanted to and then if
5 she had walked in to do something, does he know
6 whether she could have used that?
7     MR. SHAIBANI: Yes.
8     MR. SCHAUFELBERGER: Object to the
9 form. You can answer if you know.
10     THE WITNESS: She could come in the
11 office and use the office.
12 BY MR. SHAIBANI:
13   Q. How long -- I'll rephrase the
14 question.
15     Aside from the 3201 New Mexico Avenue
16 location did you have another office in
17 Washington, DC prior to occupying the P Street
18 location, another permanent office?
19     MR. SCHAUFELBERGER: I'm sorry. What
20 are you getting at? I mean we've gone back and
21 forth about the 30th Place office. Do you want
22 to ignore that?

Page 51

1 You mean other than the 30th Street, P
2 Street, and New Mexico, is there another office
3 in DC? Is that what you're trying to get at?
4     MR. SHAIBANI: I want to find out if
5 there was another Georgetown office prior to
6 occupation of the P Street, aside from the 30th
7 Street addition.
8     THE WITNESS: There was not another
9 office.
10     (Anderson Deposition Exhibit Number 6 was
11     marked for identification and attached to
12     the transcript.)
13 BY MR. SHAIBANI:
14   Q. This is Exhibit 6. It's a license
15 issued by the DC Real Estate Commission to
16 Washington Fine Properties for its 1101 30th
17 Street location. And it's got the issue date of
18 March 1, 2005 and the expiration date of
19 February 28, 2007.
20     Do you recognize this document?
21   A. Yes.
22   Q. Looking at the issue date of this

Page 52

1 document, March 1, '05, would you agree that
2 that's the date that you first began occupying
3 the 1101 30th Street location?
4     MR. SCHAUFELBERGER: I'm going to
5 object to the form. I don't think the two
6 necessarily correlate, but you can answer to the
7 extent you can.
8     THE WITNESS: I don't know if that was
9 the date that we started. I only know that we
10 got the license in order to do business down
11 there.
12 BY MR. SHAIBANI:
13   Q. Did you get the license before you
14 moved into the premises or afterwards?
15   A. Again, I don't know. I'd have to look
16 at our lease to find out when we moved in. But
17 I know that we would get the license before we
18 were going to be able to do business there.
19   Q. Would you agree from the time that the
20 license was issued until the time that you moved
21 out of the 1101 30th Street location 8 months
22 lapsed?

Page 53

1     MR. SCHAUFELBERGER: 8 months?
2     MR. SHAIBANI: Yes.
3     THE WITNESS: Approximately.
4 BY MR. SHAIBANI:
5   Q. Would you also agree that you were
6 occupying 1101 30th Street location for the
7 larger part of the 8-month period?
8   A. For the larger part.
9   Q. Did Mary White ever discuss with you
10 her interactions with John Bratton?
11   A. No.
12   Q. Did she ever inform you of the
13 pendency of this action, this lawsuit?
14     MR. BOUSE: I object. Go ahead.
15     MR. SCHAUFELBERGER: Let me just pause
16 for a second. Again, that's not on your list.
17     (Discussion off the record.)
18     MR. SCHAUFELBERGER: I'm going to tell
19 you, Stefan, I mean I'm not concerned with much
20 of this but, you know, you really need to -- why
21 don't you keep the notice and let's go through
22 this because this has taken longer already than

Capital Reporting Company

Page 62

1  answer this may resolve the remaining issues.
2  To your knowledge based on your opinion are
3  Washington Fine Properties and Bratton Realty
4  competitors in the real estate industry?
5      MR. SCHAUFELBERGER: I'm going to
6  object to the extent you're asking for his
7  opinion. You can answer whether or not you know
8  the answer to that question.
9      MR. REUHS: I'm going to object;
10 foundation.
11     MR. BOUSE: Object.
12     THE WITNESS: Can you restate the
13 question?
14 BY MR. SHAIBANI:
15   Q. To your knowledge is Washington Fine
16 Properties a competitor with Bratton Realty?
17     MR. BOUSE: I object.
18     THE WITNESS: To my knowledge it's
19 really yes and no. If you want me to clarify
20 that I will but --
21 BY MR. SHAIBANI:
22   Q. Yes, please.

Page 63

1    A. Well, in my day-to-day business that
2  we are doing I'm not familiar with Bratton
3  Realty, so that is the no. Any real estate
4  company that's doing business and wants to do
5  business in our market is and can be a
6  competitor, and a more formidable competitor
7  based on one day to the next as to what they do
8  and how they position themselves.
9      So it would be rather -- I could leave
10 it like that.
11   Q. Would you agree that the bread and
12 butter for Washington Fine Properties is the
13 sale of multimillion dollar properties?
14   A. No. Sorry, no.
15     MR. SCHAUFELBERGER: Sure. No, I
16 didn't understand the words.
17     THE WITNESS: Bread and butter.
18 BY MR. SHAIBANI:
19   Q. Actually I'll rephrase the question.
20 Does Washington Fine Properties regularly list
21 multimillion dollar properties for sale?
22     MR. SCHAUFELBERGER: Now tell me what

Page 64

1  this relates to again. What category is this
2  under?
3      MR. SHAIBANI: The competition issue.
4      MR. SCHAUFELBERGER: Does Bratton
5  Realty list multimillion dollar properties?
6      MR. SHAIBANI: No. I can stipulate to
7  that. I mean I have the list of the sales in
8  '05 which we can distribute.
9      MR. SCHAUFELBERGER: We don't care.
10 We're just trying to figure out what you're
11 talking about. Okay, you want to know if
12 Washington Fine Properties regularly lists
13 multimillion dollar properties for sale?
14     MR. SHAIBANI: Yes.
15     MR. SCHAUFELBERGER: And you're not
16 saying exclusively multimillion properties. You
17 just mean among the portfolio of properties
18 being listed, correct?
19     MR. SHAIBANI: Yes.
20     MR. SCHAUFELBERGER: I'll allow you to
21 answer that.
22     MR. REUHS: Object to form. Regularly

Page 65

1  is vague.
2      MR. BOUSE: I object.
3      MR. SCHAUFELBERGER: Subject to the
4  qualification you can answer.
5      THE WITNESS: I guess my answer would
6  be is that we do list million dollar plus
7  properties.
8  BY MR. SHAIBANI:
9    Q. Do you currently list the property
10 worth as much as sixteen and a half million
11 dollars?
12     MR. SCHAUFELBERGER: Guess it kind of
13 depends on the sale, doesn't it?
14     MR. SHAIBANI: Yes.
15     THE WITNESS: You mean do we have a
16 listing?
17 BY MR. SHAIBANI:
18   Q. Yes.
19   A. Yes, we do.
20   Q. And do you have a listing for
21 fifteen million dollars, also in McLean,
22 Virginia?

(866) 448 - DEPO
www.CapitalReportingCompany.com

Page 70

1  Let's move this along or I'm going to shut it
2  down because obviously they don't just sell
3  properties in McLean. And I don't know about
4  your office.
5        MR. SHAIBANI: Well, this is in DC.
6  Its showing all of the DC listings, and we have
7  Alexandria here and Chevy chase.
8        MR. REUHS: I guess ultimately where
9  are we going with these? They speak for
10 themselves clearly.
11 BY MR. SHAIBANI:
12    Q. The question pending is, do you
13 recognize the property listings in Exhibits 8
14 through 12 as being properties listed by
15 Washington Fine Properties?
16       MR. SCHAUFELBERGER: Now understand
17 this question doesn't ask you to just take on
18 faith that because he's given you a document
19 those are Washington Fine Properties. He's
20 asking from your independent recollection
21 whether you know whether or not all these
22 properties have been listed by Washington Fine

Page 71

1  Properties.
2        Do you understand the distinction,
3  Tom?
4        THE WITNESS: Yeah.
5        MR. SCHAUFELBERGER: And if you
6  recognize some but not others.
7        THE WITNESS: I recognize the majority
8  of these properties as being listed with us.
9  BY MR. SHAIBANI:
10    Q. Would you agree that most of these
11 properties are priced over a million dollars?
12       MR. BOUSE: Objection.
13       MR. REUHS: Object. The documents
14 speak for themselves.
15       MR. SCHAUFELBERGER: Why don't you ask
16 him if a lot of them do, because I don't want
17 him adding them all up and --
18 BY MR. SHAIBANI:
19    Q. Are a lot of these properties listed
20 for over one million dollars?
21    A. Yes.
22    Q. Is that the type of business that

Page 72

1  Washington Fine Properties regularly engages in,
2  the sale of properties worth over a million
3  dollars?
4        MR. BOUSE: Objection.
5        THE WITNESS: It is one of the areas
6  of the market that we do focus on.
7  BY MR. SHAIBANI:
8     Q. Do you engage in leasing properties as
9  part of your business?
10    A. We have. It's not one of our focuses.
11    Q. Now I have a few questions about the
12 independent contractor agreement which we
13 distributed I believe as Exhibit 1.
14       MR. SCHAUFELBERGER: Tell me how much
15 more you have because that's not a -- I don't
16 think that falls fairly within any of the
17 categories. What are you asking about?
18       MR. SHAIBANI: I'd like to ask some
19 questions relating to Pages 5 and 6 -- excuse
20 me, 5 through 7 of the independent contractor
21 agreement.
22       MR. SCHAUFELBERGER: Well, I don't --

Page 73

1  no. I'm not going to allow him to testify about
2  the independent contractor agreement. That's
3  not in any category.
4        MR. SHAIBANI: Well, first of all
5  these are documents that your client has
6  produced and I am entitled to question
7  Mr. Anderson about them.
8        MR. SCHAUFELBERGER: No. I'm afraid
9  you're not.
10       MR. SHAIBANI: What is the basis for
11 your instruction not to respond to questions
12 about documents from Washington Fine Properties
13 that were recently produced to us?
14       MR. SCHAUFELBERGER: Well, there's
15 something called the Rules of Civil Procedure.
16 You noticed this deposition under a rule of
17 civil procedure, 30(b)(6) for a corporate
18 designee to talk about specific enumerated
19 categories.
20       And this is not one of those
21 specifically enumerated categories. In fact,
22 you know, it has nothing to do, frankly, that I

19 (Pages 70 to 73)

Page 78

1   MR. SHAIBANI: Yes.
2   MR. SCHAUFELBERGER: No follow-up
3   questions?
4   MR. SHAIBANI: Right.
5   MR. SCHAUFELBERGER: No further
6   notices, no further discovery?
7   MR. REUHS: It's just, yes or no, is
8   it your policy?
9   MR. SCHAUFELBERGER: Do you want to
10  look at 20A and B?
11  THE WITNESS: Um-hmm.
12  MR. REUHS: For the record let me just
13  state my objection. He's already identified
14  this as an independent contract of Washington
15  Fine Properties and the document does speak for
16  itself.
17  MR. BOUSE: Same objection.
18  THE WITNESS: Okay.
19  MR. SCHAUFELBERGER: As an
20  accommodation and under our agreement, Stefan, I
21  will allow him to answer the 2 questions that
22  will close out a good portion of this deposition

Page 79

1   at least. Go ahead.
2   BY MR. SHAIBANI:
3   Q. The question is, is it the policy of
4   Washington Fine Properties, which precludes its
5   agents and brokers from, A, refusing to show
6   rent, negotiate for the sale or rental of or
7   otherwise making unavailable or denying a
8   dwelling to any person because of race, color,
9   religion, sex, familial status, national origin
10  or handicapped condition?
11  A. Yes.
12  Q. And is it the policy of Washington
13  Fine Properties to preclude its agents and
14  brokers from discriminating against any person
15  in terms, conditions, privileges of a rental or
16  in the provision of services of facilities in
17  connection therewith because of race, color,
18  religion, sex, familial status, national origin
19  or handicapped condition?
20  A. Yes.
21  MR. SCHAUFELBERGER: Do you have any?
22  MR. REUHS: Let me just ask one

Page 80

1   question. I just wanted to clarify one thing.
2   EXAMINATION BY COUNSEL FOR DEFENDANTS
3   CHATEL REAL ESTATE AND THIERRY LIVERMAN
4   BY MR. REUHS:
5   Q. And you've probably answered this but
6   I just want to clarify, during the time when you
7   were in the so-called temporary office, you
8   know, the office at 1101 30th Place, was it your
9   testimony that -- I think you called them the
10  facilities there or the resources there were
11  less than what was in the eventually renovated
12  office?
13  THE WITNESS: Yes.
14  MR. REUHS: That's all I have.
15  MR. SCHAUFELBERGER: Bob, do you have
16  anything?
17  MR. BOUSE: I have no questions. I
18  want a copy. Will the exhibits be attached to
19  the deposition?
20  (Discussion off the record.)
21  MR. SCHAUFELBERGER: We will read and
22  sign.

Page 81

1   (Whereupon, the deposition was
2   concluded at 4:40 p.m., and signature was
3   reserved.)
4   *   *   *   *   *   *

21 (Pages 78 to 81)

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2           I, Bonnie Marcus Olachea, the officer

 3   before whom the foregoing deposition was taken,

 4   do hereby certify that the witness whose

 5   testimony appears in the foregoing deposition

 6   was duly sworn by me; that the testimony of said

 7   witness was taken by me in stenotype and

 8   thereafter reduced to typewriting under my

 9   direction; that said deposition is a true record

10   of the testimony given by said witness; that I

11   am neither counsel for, related to, nor employed

12   by any of the parties to the action in which

13   this deposition was taken; and, further, that I

14   am not a relative or employee of any attorney or

15   counsel employed by the parties hereto, nor

16   financially or otherwise interested in the

17   outcome of the action.

18                _____
                  Bonnie Marcus Olachea
19                Notary Public in and for
                  The District of Columbia
20
     My Commission Expires:
21   July 31, 2007

22
```