## Capital Reporting Company

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3    ------------------------------:
     JOHN BRATTON,                 :
4                                  :
          Plaintiff,              :
5                                  :
          v.                       :   Case No.:
6                                  :   0694(JDB)
     CHATEL REAL ESTATE, INC.,     :
7    THIERRY LIVERMAN and          :
     MARY WHITE,                   :
8                                  :
          Defendants.             :
9    ------------------------------:

10
                              Washington, D.C.
11                            November 16th, 2006

12   Deposition of:

13             E. BARRETT ANDERSON,

14        Called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the offices of

16   Litigation Association, PLLC, 1150 Connecticut Avenue,

17   N.W., 9th Floor, Washington, D.C., beginning at 10:47 AM

18   10:50 a.m, before Teague Gibson of Capital Reporting, a

19   Notary Public.

20

21

22
```



## Capital Reporting Company

Page 10

1 really to me and I was kind of out of the loop on
2 really how that stuff went on. In fact I wasn't
3 even aware that Mary had put it on the market until
4 people started coming in. Basically the way I
5 presented it and that was my way of doing it was the
6 fact that both spaces were available. If you're
7 interested in a space you're interested in the first
8 level or the second level.
9        Mary did say that she wanted to reserve,
10 she wanted to keep the back space in the lower level
11 as a office and I had one fellow he never came in
12 either, he just called. He lived in Georgetown and
13 had an office in his house and wanted to rent the
14 lower level and then he said, well, I really want
15 the back space. I'm saying this because I -- he was
16 ready to rent the back space and Mary wouldn't -- I
17 actually asked her one time, I said you really don't
18 want to rent this.
19    Q    Can you distinguish what you mean by --
20    MR. BOUSE: Let him finish that thought first
21 then you can elaborate.
22    A    This fellow was interested in renting the

Page 11

1 back half of the lower level and Mary was going back
2 and forth, how much do you want for the back half
3 and how much this or I was asking those questions so
4 I could talk to this fellow and we came up with a
5 figure and all this sort of thing and I actually --
6 he was willing to rent it but Mary wouldn't rent it
7 and I said you really don't want to rent this. She
8 really didn't want to rent it, that's my opinion.
9    Q    And by it you mean?
10    A    She was doing it -- I think she was
11 offering the lower level, and this is my opinion,
12 she was offering the lower level on a basis that if
13 somebody would take the upper level -- it's all
14 conjecture on my part. She really didn't want to
15 rent it.
16    Q    I'm trying to distinguish what you mean by
17 the back half of the basement?
18    A    The basement was laid out or lower level
19 was laid out in two areas that were separated by
20 a -- it had a hallway in the middle of it but it was
21 separated by a bathroom or a powder room and a
22 utility closet. So there was like an office in the

Page 12

1 back and then there was a front portion that had a
2 window out to the street and then you walk down the
3 stairs.
4    Q    How large was the front portion of the
5 basement?
6    A    It was I guess 800 square feet maybe,
7 that's a wild guess.
8    Q    And would you say that the way the
9 basement was designed it was essentially two
10 separate -- it could have housed two separate
11 offices, one in the back side and one in the front
12 side of the basement?
13    MR. BOUSE: I object.
14    Q    Is that correct?
15    A    Actually you'd have to do some work to
16 separate the two. There was a hallway going back
17 between the two, you'd have to put up doors or put
18 up that sort of thing and then you -- well, you did
19 have access to the back through that other door.
20    Q    When you learned that the basement was
21 posted on the MRIS for lease, I'm referring to the
22 basement at 1622 Wisconsin Avenue property, did you

Page 13

1 understand that it was the front portion of the
2 basement that was offered for lease?
3    A    Yes.
4    Q    If I may distribute Exhibit 1 of this
5 deposition which is BRA 158.
6        (Anderson Exhibit No. 1 was marked)
7    Q    Do you recognize the address listed under
8 the Metropolitan Regional Information Systems, Inc.?
9    A    Yes, I do.
10    Q    And it says 1622 Wisconsin Avenue. Well,
11 Wisconsin, N.W., Washington, D.C. is that the space
12 that is owned by Ms. White?
13    A    I believe she is the owner, yes.
14    Q    Do you see where it says list price
15 halfway down on the right side of the page, list
16 price 1,000?
17    A    Yes, I do.
18    Q    Was that the price for the basement, the
19 rental price per month for the basement unit of this
20 property?
21    MR. RANCK: Objection.
22    MR. BOUSE: Objection, if you know.

4 (Pages 10 to 13)

## Capital Reporting Company

Page 18

1  rental in October of 2005?
2      MR. BOUSE: Objection.
3      MR. RANCK: Objection for the reasons
4  previously stated.
5      A   What I'm looking for right now is that
6  there's a date on this.
7      Q   The date on the first page on the top
8  right side October 6, '05?
9      MR. RANCK: Your question?
10     A   I think the right answer to this is the
11  fact that I was not aware that the property was put
12  in the MRS until such time that people started
13  coming in and looking at it where John Pagones from
14  Chatel had either sent people down or people just
15  started walking in. So I was not aware of the
16  timing of when Mary put the property on, I think
17  that's what you're getting at.
18     Q   Did Ms. White ever ask you to attempt the
19  lease the front portion of the lower level of the
20  1622 Wisconsin Avenue property to a gentleman while
21  you were working for Ms. White?
22     MR. BOUSE: I object. He's testified he didn't

Page 19

1  lease anything for her. He was showing the property
2  and part of his duties were closing down her
3  business. I object to the mischaracterization of
4  his testimony.
5      A   Those were my duties was to close down the
6  business and handle whatever things happened. If
7  somebody came in to look at it I would show them
8  around and I showed them the apartment. I talked to
9  Mary about that and she said fine, you can show --
10  she didn't object to my showing and what my question
11  was not that I talked to her, I said why isn't
12  Pagones showing this stuff, that was my question
13  because that really wasn't my function to do that.
14     Q   But moments ago you mentioned there was a
15  gentleman who lived in Georgetown and worked from
16  his home and he wanted to lease the basement level
17  of the property. Is that what you mentioned
18  previously, we can go back?
19     A   He wanted to lease the back half.
20     Q   And did Ms. White tell you that she was
21  willing to lease the front half of the basement to
22  this gentleman?

Page 20

1      MR. BOUSE: I object.
2      A   No, because she was -- he wasn't
3  interested in the front.
4      Q   What did Ms. White tell you with respect
5  to this gentleman's interests in the basement level
6  of the property?
7      MR. BOUSE: I object.
8      A   She had me contact him a couple times and
9  on the -- or I was really initiating the thing and I
10  thought he was interested and I thought I'd be doing
11  something for Mary but he was only interested in the
12  back. So we talked about what rent she wanted for
13  the back. She wanted to reserve a portion of that
14  floor for a office outside her home, that was her
15  intention, and that flip flopped back and forth and
16  it was really a -- I think it was really a situation
17  where -- this was later, I don't know what later is,
18  but -- actually, like I said, if anybody had
19  interest in the bottom half other than this
20  gentleman we weren't able to rent it to him because
21  there was some problems with his access to that
22  portion of the property. And the way he wanted to

Page 21

1  get in and out was off of, I believe, 33rd Street
2  and the street just west of that and there was some
3  problems with the access, whether there was really
4  legal access or whether it was just neighborly
5  goodness that people were able to use it and that's
6  how that thing ended up. I said we can't rent it to
7  you because I'm not -- I said I don't think we're
8  going to be able to rent it to you because I'm not
9  sure that you'll able to get in and out.
10     Q   What was the regular entrance to the
11  basement?
12     A   In what structure?
13     Q   How could somebody enter the basement
14  level of that property?
15     A   You can get into -- the main or front
16  entrance would be off of Wisconsin Avenue. You go
17  into the entrance at 1622 and there's a flight of
18  stairs down to the lower level and a flight of
19  stairs up to the street level and then a door off of
20  that foyer type of thing that leads up to an
21  apartment on the third floor and for the lower level
22  and those are the only accesses that they have

6 (Pages 18 to 21)

## Capital Reporting Company

Page 30

1    Q   If I may pass out Exhibit 2.
2       (Anderson Exhibit No. 2 was marked)
3    Q   Do you see halfway down the page where it
4  says under the address box it says 1622 Wisconsin?
5    A   Yeah.
6    Q   And underneath the owner do you see where
7  it says White on the same line?
8    A   Right.
9    Q   And then under tenant it says Giddins.  Do
10 you remember what that person might be?
11   A   Yes, that's the young woman that rented
12 the apartment upstairs, Natasha Giddins.
13   Q   Do you recall if Ms. White had problems
14 with this tenant?
15   MR. BOUSE: I object.  What's the relevance of
16 that? I object.  Totally irrelevant.
17   MR. RANCK:  Calls for speculation.
18   MR. BOUSE: And I don't know what you mean by
19 problems.
20   A   Nothing major.
21   Q   Did she consider this tenant to be a good
22 tenant?

Page 31

1    MR. BOUSE: I object.
2    MR. RANCK:  Objection, speculation.
3    A   She paid her bills.  That's a good tenant.
4    Q   Did this tenant complain about various
5  things to Ms. White to your knowledge?
6    MR. BOUSE: I object.
7    A   She did have some complaints, yes.
8    Q   How did Ms. White react to those
9  complaints?
10   MR. BOUSE: I object.
11   A   That wasn't Ms. White's purview or
12 responsibility.  It was Chatel's responsibility to
13 react to those complaints.
14   Q   When the tenant for the basement vacated
15 the property in September of '05, did Ms. White
16 provide you with any instructions about what to do
17 with the basement?
18   A   Just to clean it up because they left it
19 as a mess.
20   Q   Did she say what she wanted to do with the
21 basement after you would clean it up?
22   A   No, but that came through the fact that

Page 32

1  people started coming in and looking at it.
2    Q   How many candidates came to look asking
3  questions about the basement?
4    MR. BOUSE: I object.
5    A   Well, nobody actually came in and asked me
6  about the basement.
7    Q   Were there telephone calls made to you
8  about the basement aside from the Georgetown
9  gentleman who worked from his home?
10   A   No.  As I said earlier, I presented both
11 spaces as being available because they, in my
12 estimation, they were or would be available, but
13 that was a marketing technique on my part.  So if I
14 could get the top and the front part of the bottom
15 put together then that would be a good thing.
16   Q   Did Ms. White ever ask you to contact John
17 Pagones about the property?
18   A   Yes.
19   Q   And do you remember why she had asked you
20 to contact John Pagones?
21   A   She wanted me to go and have him reword
22 some of the verbiage that he put into the MLS

Page 33

1  because -- not that the verbiage was inaccurate but
2  the verbiage was not very -- wasn't very attractive.
3    Q   Do you recall when you had this
4  conversation with John Pagones?
5    A   Not exactly.  I know I had the
6  conversation with him.
7    Q   Exhibit 3, which is the MRIS listing for
8  the street level of the property.
9       (Anderson Exhibit No. 3 was marked)
10   MR. BOUSE: Can we stop here?
11      (Off the record)
12 BY MR. SHAIBANI:
13   Q   Going back to your conversation with John
14 Pagones.  Do you remember which listing on the MRIS
15 Ms. White wanted to be rephrased?
16   A   The street level.
17   Q   What did she want to change in that
18 listing, do you remember?
19   A   She just wanted it flowered up.  She
20 wanted the directions changed.  What's in the
21 listing are the bare facts of what's there and
22 there's nothing incorrect about those, but it wasn't

9 (Pages 30 to 33)

# Capital Reporting Company

Page 130

1  Q   What about in the market when you were a
2  real estate agent?
3     A   I can come in and print this thing out to
4  you and by the time I carried it over to you those
5  balances could be nothing.  But anyway that's
6  neither here nor there, but this doesn't -- unless
7  tied with other things, history and that sort of
8  stuff, it's not -- this means absolutely nothing.
9     Q   Including a clean credit report, it would
10 still mean nothing?
11    MR. BOUSE:  I object.
12    A   It's conjecture on my part and based on
13 what my decision would be in this instance and not,
14 as I say, I'm not familiar with the Washington
15 market and what the conditions are that determine
16 that type of affirmative response to a report in
17 Washington.
18    Q   Did you ever have any communications with
19 Mary White prior to this deposition over the last
20 six months?
21    A   Yes.
22    Q   Could you tell us the substance of your

Page 131

1  conversation?
2     A   She called and asked me when I started
3  working for her.
4     Q   Did she tell you anything else?
5     A   No.
6     Q   Were you contacted by any of the attorneys
7  in this room about this case?
8     A   I was.
9     Q   Could you tell us who you talked to?
10    A   Mr. Bouse.
11    Q   And could you tell us what you talked
12 about?
13    A   He gave me somewhat of a deposition going
14 over, what the -- he asked me questions, the same as
15 you're asking me questions.
16    Q   What else did you talk about?
17    A   That's what we talked about.
18    Q   He asked you some questions.  What did he
19 ask you?
20    A   Basically the same questions, not same
21 wording, but same questions you're asking.
22    Q   Did he tell you that you could help Mary

Page 132

1  White by --
2     A   No.
3     Q   -- responding in a certain way?
4     MR. BOUSE:  Are you accusing me of committing
5  perjury, put that on the record, we'll go to the Bar
6  Association, go ahead.
7     Q   I'm asking a question.  I don't know what
8  you guys talked about.  I'm not accusing you of
9  anything?
10    A   It is on the record and he did not.  He
11 was very careful to not to do that based on some
12 questions that I asked him and he wouldn't answer.
13    Q   What about Mary White, did she ask you to
14 respond to inquiries in a certain way that would
15 help her?
16    A   No, if you knew Mary White you wouldn't be
17 asking the question.
18    Q   Well, I don't know her.
19    A   I know.
20    Q   Did you talk to Chatel's counsel about
21 this case?
22    A   Never talked this Chatel's counsel.  Well,

Page 133

1  other than this morning, yes.  And about the case,
2  no.
3     Q   Describe to counsel your conversation with
4  me before this deposition, we had one substantive
5  conversation and a couple other times that you've
6  called?
7     A   Right.  I called you up around the, I
8  think it was the 18th of October, because I had
9  looked through all my papers and/or stuff that I had
10 at home and I didn't come up with anything but a
11 series of pictures of office equipment that I had
12 taken to as part of my job to put on Craig's List to
13 sell, attempt to sell the office equipment.  The
14 other thing was I told you about a conversation that
15 I had with John Bratton on the stoop telling him
16 that my conjecture on this thing was he was barking
17 up the wrong tree and that it wasn't a matter of --
18 in my opinion a matter of discrimination but a
19 matter of which I said before a matter of
20 incompetence.
21    Q   The photographs?
22    A   He was looking at -- basically my point

34 (Pages 130 to 133)

# Capital Reporting Company

Page 134

1  was that he was on the wrong track.
2     Q   The photographs that you attempted to
3  e-mail to me, could you tell us the office equipment
4  you mentioned, you tried to sell that on Craig's
5  List, when did this attempted sale occur?
6     A   That happened in the -- at the latter
7  parts of October and into November and into
8  December, they were out there pretty much all that
9  time.
10     Q   In 2005?
11     A   Yes.
12     Q   Were you able to sell the equipment?
13     A   A good majority of it, yes.
14     Q   What kind of equipment?
15     A   They had some desks that were putty
16  colored laminated office -- standard office desks
17  and file cabinets and a big
18  receptionist type desk that I was hoping we could
19  leave in the office but Mr. Bratton said he didn't
20  want it and I don't know why anybody would have
21  bought it myself but that's what they had.  So I was
22  able to sell that and there was a refrigerator,

Page 135

1  there was an office chair.
2     Q   Was this from the street level of the
3  property or lower level?
4     A   Street level predominantly.  I moved all
5  that stuff out and downstairs when I -- or I cleaned
6  out as much -- I cleaned out the whole street level
7  prior to November 1st that he moved in and the
8  morning of November 1st was the computer and the
9  telephone were still up in the office.  I left them
10  sitting on a file cabinet.
11     Q   Do you know who the prior tenant of the
12  street level of 1622 Wisconsin Avenue property, who
13  was the prior tenant?
14     A   Street level?  Mary White, Incorporated,
15  the realtor.
16     Q   So there was no other tenant after she
17  decided to close down her business?
18     A   Not on the street level, or to my
19  knowledge on the lower level.  Which level are you
20  referring to?
21     Q   I thought you said there was a company in
22  the lower level that vacated the property in

Page 136

1  September?
2     A   In September.
3     MR. SHAIBANI:  Those are my questions, if you
4  have follow-up questions I may have some other
5  questions.  I'm done with my questions for you,
6  thank you for coming here.
7  BY MR. RANCK:
8     Q   I do have a few.  Mr. Anderson, as I met
9  you in the lobby this morning and introduced myself
10  I represent Chatel.  Are you still planning to
11  e-mail those pictures to Mr. Shaibani?
12     A   I hoped he would say he doesn't want them.
13     MR. RANCK:  Mr. Shaibani?
14     MR. SHAIBANI:  I didn't receive them, they must
15  have bounced back.
16     MR. RANCK:  If you get them if we could get
17  copies.
18     MR. SHAIBANI:  Sure.
19     MR. BOUSE:  Do you still want them I guess is
20  the question?
21     A   They're office desks and refrigerators and
22  that's all they are.

Page 137

1     MR. SHAIBANI:  If you'd like to send them that
2  would be nice but I'm not going to take up your
3  time.
4     A   I don't want to send them so I won't be
5  sending them.
6     MR. SHAIBANI:  That's fine.
7  BY MR. RANCK:
8     Q   Mr. Anderson, during when you and I
9  returned from the lunch break you and Mr. Shaibani
10  were talking outside the building, was that having
11  anything to do with the case or your testimony up to
12  that point in time or just small talk, idle
13  chitchat?
14     A   Yes and no.  It was idle chitchat in
15  relation to the case.  I was trying to get an idea
16  of whether I was giving the -- whether he was
17  getting the answers not necessarily that he wanted
18  or how -- I was just trying to get a flavor for how
19  the deposition was going because I have a very fuzzy
20  feeling that any real value is coming out of the
21  answers that I have given him and I think basically
22  they're wrong in their supposition in the first

35 (Pages 134 to 137)

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2         I, TEAGUE GIBSON, the officer before whom

 3    the foregoing deposition was taken, do hereby

 4    certify that the witness whose testimony appears in

 5    the foregoing deposition was duly sworn by me; that

 6    the testimony of said witness was taken by me in

 7    stenotypy and thereafter reduced to typewriting

 8    under my direction; that said deposition is a true

 9    record of the testimony given by said witness; that

10    I am neither counsel for, related to, nor employed

11    by and of the parties to the action in which this

12    deposition was taken; and, further, that I am not a

13    relative or employee of any counsel or attorney

14    employed by the parties hereto, nor financially or

15    otherwise interested in the outcome of this action.

16

17                        Teague _____

18                        Teague Gibson
                          Notary Public in and for
19                        the District of Columbia

20

21
      My commission expires:
22    June 14, 2010
```