Capital Reporting Company

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3    -------------------------------:
      JOHN BRATTON,                  :
 4                                   :
              Plaintiff,             :
 5                                   :
         vs.                         : Case No.:
 6                                   :1:06CV00694
      CHATEL REAL ESTATE, INC.,      :
 7    et al.,                        :
              Defendants.            :
 8    -------------------------------:
                              Washington, DC
 9
                         Monday, November 20, 2006
10
      Deposition of:
11                 JOHN PAGONES,
12    called for oral examination by counsel for
13    the Plaintiff, pursuant to notice, at
14    1150 Connecticut Avenue, NW, Washington, DC,
15    before Lohna Esteb of Capital Reporting Company, a
16    Notary Public in and for the District of Columbia,
17    beginning at 10:40 a.m. when were present on
18    behalf of the respective parties:
19
20
21
22
```


PLAINTIFF'S EXHIBIT 13

Capital Reporting Company

Page 10

1  yourself experienced?
2  A  I'm able to do it. I'm not sure how much
3  experience is experience, sir.
4      MR. RANCK: Let me object to the form on
5  the grounds it's vague.
6  BY MR. SHAIBANI:
7  Q  I'm asking your personal opinion as to
8  your skills as a real estate broker.
9      MR. RANCK: I object to the form and the
10 vague use of the term experienced. If you would
11 like to define that, it might help him.
12 BY MR. SHAIBANI:
13 Q  Well, would you consider yourself to have
14 the skills necessary to lease commercial units?
15 A  Yes.
16 Q  And did you have the requisite skill at
17 the time that Mary White hired you to lease her
18 property at 1622 Wisconsin Avenue?
19 A  Yes.
20 Q  In October of 2005, did you work at
21 Chatel's Georgetown office?
22 A  Yes.

Page 11

1  Q  Was there any time during your tenure at
2  Chatel that you did not work at the Georgetown
3  office?
4  A  Only the Georgetown office.
5  Q  And could you tell us who your supervisor
6  is at Chatel; or was, that is?
7  A  The owner.
8  Q  The owner, is he Thierry Liverman?
9  A  Thierry.
10 Q  Was there anybody else at Chatel who
11 supervised your activities?
12 A  No.
13 Q  Where did you obtain the brokerage
14 licenses to conduct real estate transactions?
15    And I mean which states? Was it in
16 Washington only, or --
17 A  No, I had three: Maryland, D.C. and
18 Virginia.
19 Q  When did you obtain the --
20 A  One broker's license in D.C.; agents in
21 the other two.
22 Q  I see. Would you say because you had a

Page 12

1  broker's license you were more familiar with the
2  D.C. real estate laws and transactions than with
3  the Maryland and Virginia laws and transactions?
4      MR. RANCK: Objection to form.
5      You can answer.
6      THE WITNESS: I think I knew them all.
7  BY MR. SHAIBANI:
8  Q  Were you required to take additional
9  classes to be able to obtain the brokerage license
10 in D.C.?
11 A  Each year, whether you're an agent or
12 not, you have to re-up, or it may now be two years.
13 I'm not sure; but, yes.
14 Q  When did you obtain the brokerage license
15 in D.C.?
16 A  I can't remember. Ten years, fifteen,
17 I'm not sure.
18 Q  Could you tell us your annual sales
19 volume in 2005?
20 A  I can't remember. Something around -- I
21 can't remember. I think my total salary was
22 somewhere around 50,000.

Page 13

1  Q  In 2005?
2  A  I think. I can't remember.
3  Q  Could we see the exhibit with the listing
4  of the salaries?
5      I would like to distribute Exhibit 1 of
6  this deposition.
7      (Pagones Exhibit No. 1 was marked for
8      identification)
9  BY MR. SHAIBANI:
10 Q  Mr. Pagones, do you recognize the
11 document distributed as Exhibit 1, Plaintiff's
12 Exhibit 1?
13 A  It says No. 1?
14 Q  Yes.
15 A  Yes.
16 Q  Do you see in towards the middle of the
17 page where it states "John Pagones"?
18 A  Yes.
19 Q  On the right side, it says 124,690.
20 A  Okay.
21 Q  Is that your 1099 income for 2005?
22 A  I presume it is.

4 (Pages 10 to 13)

Capital Reporting Company

Page 18
1  of this?
2      A  I did.
3      Q  Could tell us where you obtained the
4  information to input this, the remark section?
5      A  By looking at the property and asking
6  Mary White how many square feet it was.
7      Q  Did you ask Mary White if she wanted to
8  lease the lower level of the 1622 Wisconsin Avenue
9  before you entered this information in the MRIS?
10     A  I believe it was in the listing contract.
11     Q  Do you have a copy of the listing
12 contract?
13     A  I don't.
14     Q  Do you know what happened to it?
15     A  I gave everything to the office. We tried
16 to get it from the office, and they couldn't find,
17 it sometime ago.
18        (Pagones Exhibit No. 4 was marked for
19        identification)
20 BY MR. SHAIBANI:
21     Q  If I could distribute another exhibit
22 now. I think we are at No. 4.

Page 19
1      Do you recognize this document?
2      A  Yes.
3      Q  Is this the listing contract for the 1622
4  Wisconsin Avenue property, the office space?
5      A  I believe this is for the upstairs
6  apartment.
7      Q  For the residential unit?
8      A  Yes.
9      Q  Would the listing agreement be a similar
10 document with different information filled in for
11 the office space?
12     A  I believe it may have been. I believe it
13 may have been, but I'm not sure. I can't remember.
14        Excuse me. Can I mention something?
15     Q  Please.
16        MR. RANCK: Wait for a question. If you
17 think you need to add something to make your answer
18 fully responsive, then go ahead. But don't respond
19 if --
20        THE WITNESS: The apartment came before
21 the other part was put for rent.
22 BY MR. SHAIBANI:

Page 20
1      Q  Did you lease the apartment yourself?
2      A  I personally leased the apartment.
3      Q  To a lady named Natasha?
4      A  Yes.
5      Q  That occurred before you listed the
6  office space?
7      A  That's my recollection.
8      Q  Going back to Exhibit 3, you mentioned
9  you obtained information for the remark section
10 from looking at the property and speaking to Mary
11 White, is that correct?
12     A  The remarks? Yes, that's correct.
13     Q  What about the rest of the information on
14 this document, the entire three pages?
15     A  What about it?
16     Q  Did you obtain the information from Mary
17 White?
18     A  Yes.
19     Q  Including the list price?
20     A  I left the list price -- I put the list
21 price at the top, 1,000 a month.
22     Q  And you obtained the list price from Mary

Page 21
1  White?
2      A  Yes.
3      Q  Do you recall the exact date when you
4  received this information from Mary White?
5      A  I do not.
6      Q  Was it before you created this listing?
7      A  Created which listing?
8      Q  The listing in Exhibit 3 for the lower
9  level.
10     A  Before.
11     Q  And now I would like to -- I would like
12 to ask you if the -- in the remark section, it says
13 the second sentence, it says:
14        "Share bathroom with rear tenant, vacant."
15     A  Wait a minute. Share tenant?
16        Oh. Excuse me. I'm wrong.
17        This is for the lower floor only. The
18 lower floor, not the upstairs.
19     Q  Yes, I believe that's what you said.
20     A  I didn't think I said that. Okay. This
21 is for the lower floor.
22     Q  Yes. Thank you for the clarification.

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1    The sentence saying, "Share bathroom with
2 rear tenant," I just want to make sure where you
3 obtained that information from.
4    A    From Mary White.
5    Q    Was she willing to lease the lower level
6 even though it entailed sharing the bathroom with
7 the rear tenant?
8    MR. BOUSE: I object.
9    MR. RANCK: Objection. Calls for
10 speculation.
11    You can answer.
12    THE WITNESS: The question again?
13 BY MR. SHAIBANI:
14    Q    Was Mary White willing to lease the lower
15 level of the 1622 Wisconsin Avenue property even
16 though it entailed sharing the bathroom with the
17 rear tenant?
18    A    Yes, that's why I put it in here.
19    MR. BOUSE: Same objection. Go ahead.
20 BY MR. SHAIBANI:
21    Q    Did you place a lock box for the basement
22 unit outside the property?

Page 23

1    A    Yes.
2    Q    Did it have a separate key to enter the
3 lower level?
4    A    Yes.
5    Q    Did you place a lock box outside the 1622
6 Wisconsin Avenue property for the street level of
7 the property?
8    A    Yes.
9    Q    Did that contain a separate key for the
10 street level?
11    A    Yes.
12    Q    And just to be clear, does street level
13 and the lower levels require separate keys to open
14 the door, is that correct?
15    A    Two separate doors. Two separate keys.
16    Q    Okay. Did Mary White ever tell you that
17 she did not want to lease the lower level unit of
18 1622 Wisconsin Avenue property after you created
19 this listing?
20    A    Later. Later, she did.
21    Q    Do you recall the circumstances of that?
22    A    She just called and said she had changed

Page 24

1 her mind and didn't want to rent it anymore.
2    Q    And did she tell you why?
3    A    No. Oh, let me think a moment.
4    (Pause)
5    No, she just said -- I think -- I can't
6 recall. I can't recall. I think she wanted to
7 keep it for an office, that's sort of in my
8 background, but I can't remember.
9    Q    Was Mary White's statement to you, she
10 didn't want to lease the lower level, was that
11 statement made after Mr. Bratton inquired about the
12 property?
13    A    Yes.
14    Q    Do you recall how many days after?
15    A    I do not.
16    Q    Did you withdraw this listing from the
17 MRIS after Mary White, after she informed you she
18 didn't want to lease the basement?
19    A    I did at some point. I can't remember
20 what point.
21    Q    Was that after October of '05?
22    MR. RANCK: Objection.

Page 25

1    THE WITNESS: Probably.
2 BY MR. SHAIBANI:
3    Q    I have a couple other questions with
4 respect to the listing agreement.
5    Can you ever list a property for rent
6 without the owner's signature on the listing
7 agreement?
8    A    No.
9    Q    Is your office required to keep the
10 records of all listings for a certain period of
11 time?
12    A    I don't know what the office policy is.
13    Q    Does the real estate licensing commission
14 require Chatel to maintain records for five years
15 after a transaction has been conducted?
16    A    I can't answer that question. I don't
17 know.
18    Q    Does Chatel maintain a file for each
19 property that it leases?
20    A    Yes.
21    Q    And does that file contain the listing
22 agreement?

7 (Pages 22 to 25)

Page 34

1    A    The listed price.
2    Q    Yes. Aside from that, what else did she
3    tell you?
4    A    Security deposit. I think that's all.
5    Q    Did she tell you she did not want the
6    street level of the property to be used for a food
7    establishment?
8    A    Yes, she said she didn't want food.
9    Q    Did she tell you she didn't want the
10   street level of the property to be used for a nail
11   or hair salon?
12   A    No.
13   Q    Did she tell you that she didn't want to
14   use the street level of the property for a real
15   estate brokerage office?
16   A    No.
17   Q    What about the lower level of the
18   property, did she tell you she didn't want any
19   specific type of business to lease the lower level?
20   A    She didn't want food. That was the only
21   restriction.
22   Q    So she did not say she didn't want to

Page 35

1    lease the lower level as a real estate brokerage
2    office?
3    A    Never mentioned it.
4    Q    Okay. Do you recall if the listing
5    contract for this property contained any
6    handwritten notes from Mary White as to what she
7    wanted?
8    A    Not that I recall.
9    Q    Did Barrett Anderson ever send you
10   anything in writing relating to the listing of the
11   property on the MRIS?
12   A    No.
13   Q    Did you ever meet with Barrett Anderson
14   to discuss the listing of this property?
15   A    No.
16   Q    I gather he never came to your office at
17   Chatel to say, "Can you flower up the remark
18   section on this listing"?
19   A    I dealt with Mary on listing the
20   property. He came in to say something like that,
21   but I don't deal -- I only deal with principles on
22   properties. That's my mandate, not anyone else.

Page 36

1    Q    I see. What did you tell Mr. Anderson
2    after he came to your office?
3    A    I told him that I know what I'm doing.
4    Q    Do you recall what he asked you when he
5    came to your office?
6    A    He talked about aspects of marketing, but
7    I can't remember exactly.
8    Q    Do you recall if this was in September of
9    '05?
10   A    I can't remember dates, sir.
11   Q    But it was after the property had been
12   listed on the MRIS, is that correct?
13   A    I wouldn't have had any reason to talk to
14   him before.
15   Q    Do you recall the name of Mary White's
16   office manager?
17   A    It was a woman. Jan -- Jan something or
18   other. I can't remember her name.
19   Q    Do you happen to know her telephone
20   number?
21   A    Same as the office, Mary White's office.
22   Q    Did she have a cell phone number?

Page 37

1    A    I wouldn't know it. Only dealt with Mary
2    White's office.
3    Q    Did the Jan lady ever provide you with
4    information relating to this property prior to your
5    listing of it?
6    A    No.
7    Q    What about after the listing, did she
8    instruct you to do anything?
9    A    No.
10   Q    Would it be accurate to say that the
11   information you obtained for leasing and listing
12   this property came from Mary White as well as your
13   own knowledge?
14       MR. BOUSE: I object.
15       THE WITNESS: Yes.
16   BY MR. SHAIBANI:
17   Q    Do you recall Mr. Bratton ever coming to
18   your office to inquire about the 1622 Wisconsin
19   Avenue property?
20   A    Yes.
21   Q    Could you tell us your interaction with
22   Mr. Bratton, what you talked about at the time when

10 (Pages 34 to 37)

**Page 50**

1  Q   Is it offensive for a real estate broker
2  to obtain information about a property that's been
3  listed on the MRIS?
4  A   Not at all.
5  Q   Could a real estate broker lease a
6  property that's been listed on the MRIS for
7  himself?
8  A   Absolutely.
9  Q   If I may pass out Exhibit 7.
10         (Pagones Exhibit No. 7 was marked for
11         identification)
12 BY MR. SHAIBANI:
13 Q   Do you recognize this document?
14 A   No.
15 Q   Do you see on the top where it says
16 "GCAAR Rental Application"?
17 A   Yes.
18 Q   Do you recognize this form in general as
19 opposed to --
20 A   Yes.
21 Q   -- what's been filled out?
22 A   Yes.

**Page 51**

1  Q   Is this a form that Chatel maintains at
2  its offices in its forms closet?
3  A   No.
4  Q   Is this --
5  A   Wait a minute.  For rental application.
6  Let me think a moment.
7         (Pause)
8         I believe it is.  I believe it is.
9  Q   Is this form also available on the
10 computers at Chatel?
11 A   I'm sure it is.
12 Q   Could you tell us whether you spoke to
13 Mary White after John Bratton first came to your
14 office to inquire about the office space?
15         MR. RANCK:  Objection to form.
16         THE WITNESS:  No.
17 BY MR. SHAIBANI:
18 Q   When did you speak to Mary White after
19 you talked to John Bratton first?
20 A   When the lease came in, it was in an
21 envelope.  I went downstairs to talk -- to give it
22 to the property manager.  Thierry was there.  And I

**Page 52**

1  told Thierry, because the property manager was
2  right next door, that we have a lease.
3         He says, "John, we already have a lease."
4         I said, "Huh?"
5         He said, "Yes, Mary White got her own
6  lease."
7         So I said, "Here's the lease.  You take
8  care of it."
9  Q   Did you talk to Mary White after you
10 received this lease from Mr. Bratton?
11 A   I called her up and told her.
12 Q   And do you recall when you made that
13 call?
14 A   When I had the lease.
15 Q   And was that the next day after
16 Mr. Bratton first came to your office?
17 A   I can't remember how -- it was either a
18 day or two -- I'm not sure.  But when he -- the
19 lease came in, we were timely, as we are always
20 timely.
21 Q   In conveying information to Ms. White,
22 that is?

**Page 53**

1  A   I took the lease to Mrs. White, who lives
2  around the corner from my office one block.  And
3  then I called her up.
4  Q   And could you tell us what you talked
5  about?
6  A   I told her that we had a lease on the
7  property.
8  Q   Did you have any other documents to take
9  to her aside from the lease?
10 A   No.
11 Q   Was the first month's check and security
12 deposit enclosed in the packet you took to Ms.
13 White?
14 A   I don't know what was in it.  It was
15 sealed.
16 Q   Was a rental application enclosed within
17 the documents that you took to Ms. White?
18 A   The envelope was sealed.
19 Q   And after you told Ms. White, "We have a
20 lease on the property," what did she tell you?
21 A   She asked me who the lease was from.
22 Q   Could you elaborate on that, what you

Page 54

1  talked about with her?
2     A   I told her it was a real estate office,
3  and it was an African-American. And I told her, "Be
4  prepared for trouble."
5     Q   Be prepared for trouble? Could tell us
6  why you said that?
7     A   Because John had been very -- what I've
8  been telling you -- John was very rude to me. In a
9  way -- well, not threatening, but he was very rude
10 and loud. And I told her about that. I said,
11 "Mary, you better" -- I said, "You better take this
12 guy or you are going to have a discrimination
13 suit."
14    Q   Is there anything else you talked about?
15    A   No.
16    Q   What did Ms. White tell you in response?
17    A   She said, "I'll look at the lease."
18    Q   Did she tell you that she had any
19 preference for leasing the space to a white
20 candidate?
21    A   She never mentioned color.
22    Q   Did she mention any preference in terms

Page 55

1  of the personal appearance of the candidate?
2     A   She never saw John Bratton as far as I
3  know. I don't know. I don't think she saw him.
4     Q   Did you inform Ms. White that Mr. Bratton
5  had long hair with dreadlocks?
6     A   Certainly not.
7     Q   Did you inform her of Mr. Bratton's
8  personal appearance --
9     A   Certainly not.
10       MR. RANCK: Let him finish his question
11 before you answer.
12       THE WITNESS: I thought he was finished.
13 BY MR. SHAIBANI:
14    Q   Would you say that John Bratton was
15 acting as a typical black man when he first saw
16 you?
17       MR. RANCK: Object to the question.
18       THE WITNESS: That's nonsense.
19       MR. BOUSE: Objection, vague and --
20       MR. RANCK: Can you define what you mean
21 by typical black man, Counsel? Can you define what
22 you mean by typical black man?

Page 56

1  Counsel?
2        MR. SHAIBANI: I'm asking the witness --
3        MR. RANCK: Well, I need you to define
4  what typical black man means, unless you're
5  withdrawing the question, because the witness
6  doesn't understand what that means I don't think.
7        MR. BRATTON: His definition of typical.
8        MR. SHAIBANI: Let's please --
9        MR. RANCK: If you can define what
10 characteristics you're attributing to a typical
11 black man for the witness, I'm sure he'll be happy
12 to answer the question.
13       MR. SHAIBANI: No, I'm asking the witness
14 how would you --
15 BY MR. SHAIBANI:
16    Q   How would you define an African-American?
17 What personal attributes would you give to an
18 African-American? Because you told Ms. White that
19 we have an African-American. I just want to know,
20 you know, you said, "Be prepared for trouble," so
21 why --
22       THE WITNESS: Huh-uh, that wasn't the

Page 57

1  reason for trouble.
2        MR. RANCK: Objection. Asked and
3  answered.
4        He already explained the basis for his
5  comment that that was -- to expect trouble was
6  based on Mr. Bratton's behavior. All right.
7        So if you want to define what you mean by
8  typical black man, I'm sure he'll be happy to
9  answer.
10       MR. BOUSE: I would like to hear that,
11 too.
12       (Pagones Exhibit No. 8 was marked for
13       identification)
14 BY MR. SHAIBANI:
15    Q   I would like to distribute Exhibit 8.
16    A   Yes.
17    Q   Do you recognize this photograph?
18    A   It's the first time I saw it.
19    Q   Do you recognize the person in this
20 photograph?
21    A   It sort of looks like John Bratton.
22    Q   Do you recall if Mr. Bratton had long

15 (Pages 54 to 57)

Page 74

1  I don't recall her mentioning it. I
2  can't recall.
3    Q  The provisions that are set forth in this
4  fax, do you recall if Ms. White instructed you to
5  create a listing or to have a prospective tenant
6  who would have to abide by these provisions here,
7  Exhibit 13?
8       MR. RANCK: Objection. Compound and
9  vague.
10      MR. BOUSE: Objection.
11      MR. SHAIBANI: Withdrawn. That's fine.
12  Let's go to the next exhibit.
13  BY MR. SHAIBANI:
14    Q  Did Ms. White ever tell you that she did
15  not want the tenant for the office space to have a
16  lease that would be longer than two years?
17      MR. BOUSE: I object.
18      THE WITNESS: I can't recall.
19  BY MR. SHAIBANI:
20    Q  If you can take a look at the listing
21  created on the MRIS, which I passed out as --
22    A  You have it here?

Page 75

1    Q  Yes -- I believe it's exhibit --
2    A  Three?
3    Q  Yes.
4      MR. RANCK: Five.
5      THE WITNESS: Five?
6      MR. RANCK: Look at six. It is six.
7  Look at six.
8      MR. SHAIBANI: Yes, that's the one.
9  BY MR. SHAIBANI:
10    Q  If you would take a look at this. On the
11  second page of --
12    A  No. 6?
13    Q  Yes. Do you see under "Financial
14  Information" towards the end of the page in the
15  middle column --
16    A  Yeah.
17    Q  -- do you see where it says "minimum
18  slash maximum"?
19    A  Yes.
20    Q  It says, "colon 121 slash 48"?
21    A  Right.
22    Q  Is the 121 a typographical mistake?

Page 76

1    A  It should not have been there. Twelve
2  months.
3    Q  Does that mean the property was available
4  for a lease that would last between 12 to 48
5  months?
6    A  Yes.
7    Q  That's the instruction you received from
8  Mary White?
9    A  Yes.
10    Q  What about the basement level of the
11  property?
12    A  What about it?
13    Q  How long a lease did Mary White say a
14  prospective tenant could have for the lower level?
15    A  I'm not sure we talked about it. I may
16  have put something in there, but I'm not sure we
17  talked about it. I probably did -- if it was
18  there, I did it on my own, but I'm not sure.
19    Q  Exhibit 3, if you could take a look at
20  it, please.
21    A  She was interested in getting the
22  upstairs rented first.

Page 77

1    Q  Do you remember when you created the
2  listing for the basement level?
3    A  Whenever it says in the computer. It has
4  the date there.
5    Q  September 23, '05. Does that ring a
6  bell?
7    A  It says what it says.
8    Q  Exhibit 3 under "Financial Information",
9  which is on the second page of the document --
10    A  Three?
11    Q  Yes.
12    A  Second page?
13    Q  Yes.
14      Do you see where it says, "min/max lease
15  colon 12" --
16    A  12, 36.
17    Q  To your knowledge, did Ms. White want to
18  lease the lower level space for a term lasting
19  between 12 to 36 months?
20    A  I think so.
21      MR. RANCK: Object.
22      MR. BOUSE: Objection. Speculation.

20 (Pages 74 to 77)

Page 226

1  That is, if she could come up because she
2  was supposed to come up the week before -- I never
3  told you this -- but she couldn't, and sent the
4  girls up.
5      MR. RANCK:  That's all I have.
6      (Whereupon, at 4:00 p.m., the
7      Deposition of JOHN PAGONES
8      was concluded.)

Page 227

1        CERTIFICATE OF NOTARY PUBLIC
2      I, LOHNA ESTEB, the officer before whom the
3  foregoing deposition was taken, do hereby certify
4  that the witness whose testimony appears in the
5  foregoing deposition was duly sworn by me; that the
6  testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10 I am neither counsel for, related to, nor employed
11 by and of the parties to the action in which this
12 deposition was taken; and, further, that I am not a
13 relative or employee of any counsel or attorney
14 employed by the parties hereto, nor financially or
15 otherwise interested in the outcome of this action.

19            LOHNA ESTEB
              Notary Public in and for the
20            District of Columbia
21
    My commission expires: 9/30/07
22

Page 228

1  ACKNOWLEDGEMENT OF DEPONENT
2
3    I, JOHN PAGONES, do hereby acknowledge I
4  have read and examined the foregoing pages of
5  testimony, and the same is a true, correct and
6  complete transcription of the testimony given by me,
7  and any changes or corrections, if any, appear
8  in the attached errata sheet signed by me.

19 Date            JOHN PAGONES

Page 229

1  Matthew A. Ranck, Esq.
   Eccleston and Wolf
2  Suite 310
   2001 S Street, NW
3  Washington, DC 20009-1125
4
5  IN RE: BRATTON V. CHATEL et al.
6  Dear Mr. Ranck,
7     Enclosed please find your copy of the
   deposition of JOHN PAGONES, along with the
8  original signature page. As agreed, you will
9  be responsible for contacting the witness
10 regarding signature.
11    Within 30 days of receipt, please forward
12 errata sheet and original signed signature page to
13 counsel for Plaintiffs, and Defendant Mary White.
14    If you have any questions, please do not
15 hesitate to call. Thank you.
16 Yours,
17
   Lohna Esteb
18 Reporter/Notary
19
20 cc: Mr. Shaibani; Mr. Bouse.
21
22