**Capital Reporting Company**

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    ----------------------------------:

 4    JOHN BRATTON,

 5              Plaintiff

 6       v.                              Civil Action

 7                                       No. 06-0694(JDB)

 8    CHATEL REAL ESTATE, INC., et al.,

 9       Defendants

10    ----------------------------------:

11                                Washington, D.C.

12                                Tuesday, September 26, 2006

13    Deposition of:

14              ROBERTA JEAN MEDLIN

15    called for oral examination by counsel for

16    Plaintiff, pursuant to notice, at the Law Offices

17    of Litigation Associate, PLLC, 1150 Connecticut

18    Avenue, N.W., Suite 900, Washington, D.C., 20036,

19    before Patricia A. Edwards of Capital Reporting, a

20    Notary Public in and for the District of Columbia,

21    beginning at 10:12 a.m., when were present on

22    behalf of the respective parties:
```

866.448.DEPO
www.CapitalReportingCompany.com


PLAINTIFF'S EXHIBIT 14

**Capital Reporting Company**

Page 10

1  MR. BOUSE: I object. She said
2  she
3  didn't -- he didn't tell her who she was. I
4  object.
5  MR. RANCK: Same objection. Also
6  leading.
7  THE WITNESS: I don't recall.
8  This is a very insignificant moment in my life,
9  so I'm sorry. I'm not going to remember a lot
10  of details for you.
11  BY MR. SHAIBANI:
12  Q  Yes. When you went to the
13  property on 1622 Wisconsin Avenue, do you
14  recall if that was on October 11, 2005?
15  A  No.
16  Q  Was it before October 2005?
17  A  I really don't remember. It was
18  one of many, many, many, many places I looked
19  at.
20  Q  So what you're telling us is the
21  first time you spoke to Mary White was after
22  you saw the for rent sign and walked into the

Page 11

1  property; is that correct?
2  A  Yes. That's correct.
3  Q  That you remember clearly?
4  A  Yes.
5  Q  Okay. So is it reasonable to
6  state then that Mary White did not contact you
7  at
8  any time before you walked into that office?
9  A  That is correct.
10  Q  And Chatel did not contact you
11  before you walked into that office on 1622
12  Wisconsin Avenue?
13  A  That is correct.
14  Q  Chatel did not solicit you for the
15  property before you walked in there; is that
16  correct?
17  A  That is correct.
18  Q  And Mary White did not solicit you
19  for the property before you walked in there?
20  A  That is correct.
21  Q  Okay. Now, you did not know Mary
22  White prior to walking into that property; is

Page 12

1  that correct?
2  A  That is correct.
3  Q  And the first time you ever heard
4  her name was when Barrett Anderson told you who
5  the owner was; is that correct?
6  A  That was correct.
7  Q  Did your husband know Mary White
8  before you walked into the property on 1622
9  Wisconsin Avenue?
10  A  No.
11  MR. BOUSE: Objection. Never mind.
12  BY MR. SHAIBANI:
13  Q  And your husband is Matthew
14  Medlin; is that correct?
15  A  That's correct.
16  Q  Did anybody refer you to Mary
17  White?
18  A  No.
19  Q  Nobody made a recommendation to
20  Mary White about you; is that correct?
21  MR. RANCK: Objection.
22  MR. BOUSE: I object.

Page 13

1  MR. RANCK: I don't know how she
2  can know --
3  MR. SHAIBANI: You can state your
4  objections, but she will have to respond to the
5  question. You know, that's fine.
6  BY MR. SHAIBANI:
7  Q  I want to ask the question again.
8  A  Okay.
9  Q  Did anybody refer you to Mary
10  White for leasing the property?
11  MR. BOUSE: Same objection.
12  THE WITNESS: No.
13  BY MR. SHAIBANI:
14  Q  So the first time you ever learned
15  of Mary White is when you walked down the street
16  on Wisconsin Avenue, saw the for rent sign and
17  went into the office?
18  A  Correct.
19  Q  Okay. And your husband, Matthew
20  Medlin, never met Mary White prior to that
21  event when you walked in there; is that
22  correct?

4 (Pages 10 to 13)

Capital Reporting Company

Page 22

1  MR. BOUSE: Objection. That's not
2  what she said.
3  BY MR. SHAIBANI:
4      Q   Was this lease typed -- drafted
5  without your knowledge?
6      MR. RANCK: Objection.
7      THE WITNESS: I don't know what
8  you mean by that.
9  BY MR. SHAIBANI:
10     Q   Why would Chatel draft a lease
11 with your name on it?
12     A   Why would they do something?
13     Q   Yes.
14     MR. RANCK: Objection. Calls for
15 speculation. You can answer.
16     THE WITNESS: What are you trying
17 to get to? If you could just ask me without
18 the legalese. Just drop the legalese, ask me
19 straight out what you want to know and I'll
20 tell you.
21 BY MR. SHAIBANI:
22     Q   I'm asking if you discussed the

Page 23

1  terms of your lease with Chatel?
2      A   No, I did not.
3      Q   So Chatel basically drafted a
4  lease agreement for you without having any
5  discussions with you, is that what you're
6  saying?
7      MR. RANCK: Objection.
8      MR. BOUSE: I object. I think the
9  problem is the word terms. I mean did she
10 discuss the rent? Did she discuss other
11 things?
12     MR. SHAIBANI: Well, the terms of
13 the lease --
14     MR. BOUSE: I think she's confused
15 by your question. I object.
16     MR. RANCK: I agree.
17     MR. BRATTON: I don't think the
18 question is confusing at all. I think it's
19 very straightforward.
20     MR. RANCK: Mr. Bratton, with all
21 due respect, I don't believe it's appropriate
22 for parties to be heard at a deposition. That's

Page 24

1  what your counsel here is for. But I think
2  that is what's causing -- we can go off the
3  record and talk about it outside the witnesses'
4  presence if you'd like, Mr. Shaibani. But I
5  think that's what's causing the problem is
6  you're referring to terms in a nine-page, 59
7  paragraph legal document and the witness
8  doesn't understand what you're trying to ask
9  her. Which terms?
10 BY MR. SHAIBANI:
11     Q   Let's start with the duration of
12 the lease. It says November 1st to October 30,
13 2007. November 1, 2005 to October 30, 2007.
14 The duration of the lease is for two years. Did
15 you discuss the length of the lease with
16 Chatel?
17     A   No. I did not have much
18 discussion with Chatel at all.
19     Q   Did you have any discussions with
20 Mary White about this?
21     A   Yes.
22     Q   Well, what did you discuss with

Page 25

1  her?
2      A   We discussed leasing this property
3  on Wisconsin, but, as you can see, there were
4  many blanks. So I was waiting from Mary White,
5  vis-a-vis Chatel, to come to me with -- filling
6  in the blanks.
7      Q   Which blanks are you referring to?
8      A   The pricing. Additional rent,
9  number 11, et cetera. I also, under no time,
10 felt like this was a done deal. I was leaving
11 town. That day or the next day leaving town
12 and they were to get back to me. But at no
13 time did I feel that I was the only applicant.
14     Q   Is it your understanding that you
15 never reached a verbal agreement with Mary
16 White for leasing this property?
17     A   Absolutely correct.
18     Q   And that's why you did not sign a
19 lease agreement with her for the property; is
20 that correct?
21     A   Because we were not -- because we
22 -- that's not in all why. I mean, one, she did

7 (Pages 22 to 25)

Page 26

1  not make a commitment to me.
2     Q   In terms of leasing the property?
3  Is that the commitment you're referring to?
4     A   Yes. Yes.
5     Q   So at no time she said I'm going
6  to lease this space to you, but all we have to
7  do
8  is to draft the agreement?
9     A   She did say she would -- she said
10 she was not ready yet to make a commitment.
11    Q   And this was -- was it on the day
12 that you executed this check? Do you recall?
13    A   No. This was when -- I do
14 remember. This was when I was back in Kansas
15 City and I spoke with Mary White on the
16 telephone.
17    Q   Was that after you executed this
18 check?
19    A   Yes.
20    Q   How many days after, do you
21 remember?
22    A   No.

Page 27

1     Q   Was it a day after?
2     A   Not long. It wasn't long. Days.
3  Some days. Not a month.
4     Q   Could it have been two days?
5     MR. RANCK: Objection. The
6  witness should be told that she shouldn't guess
7  or speculate. If she has a reasonable --
8     THE WITNESS: Okay.
9     MR. BOUSE: I object also.
10    MR. RANCK: -- a reasonable
11 estimate you can give, which I think you've
12 done by saying days, but don't guess or
13 speculate.
14 BY MR. SHAIBANI:
15    Q   How is it that you spoke to Mary
16 White about the proposed lease for the property
17 without going through Chatel?
18    A   Well, as I explained, I actually
19 met with Mary White personally in her office
20 on Wisconsin. The place that's now for rent or
21 in question; correct? But she said I'm in the
22 middle of some business and I'm going to have

Page 28

1  Chatel Company represent me.
2     MR. BOUSE: I'm sorry, Ms. Medlin,
3  I didn't hear the last part of that.
4     THE WITNESS: She explained that
5  -- I met with Mary White personally, but I only
6  met with Chatel once. Because she explained
7  that she was in the middle of some business
8  transition and she was going to have Chatel
9  represent her on this transaction.
10    MR. BOUSE: Okay. Thank you.
11 BY MR. SHAIBANI:
12    Q   Do you recall signing any document
13 that would establish and agreement between you
14 and Mary White for leasing the property?
15    A   The lease application. I applied.
16 I never signed a lease agreement, no.
17    Q   And, therefore, you have no verbal
18 agreements with Mary White for leasing the
19 property either; is that correct?
20    MR. RANCK: Object to the form.
21    MR. BOUSE: Object.
22 BY MR. SHAIBANI:

Page 29

1     Q   Did you have a verbal agreement
2  with Mary White for leasing the property?
3     A   As in a final agreement?
4     Q   Yes.
5     A   No.
6     Q   Going back to your meeting with
7  Mary White, could you describe how you got an
8  appointment with her?
9     A   When I walked into the office and
10 this gentleman, Barrett, was there -- somehow
11 he must have told her I was interested in the
12 place or perhaps I called again. Whatever it
13 was, right away I came back to that place on
14 Wisconsin and met with her.
15    Q   And this was within a short time
16 frame?
17    A   A short time frame.
18    Q   The same day would you say?
19    A   I don't know. A couple of days
20 maybe. A very short time frame.
21    Q   Could you tell us what you
22 discussed with Mary White during your meetings?

8 (Pages 26 to 29)

Page 30

1    A   She asked me what type of business
2  I was going to have, why I came to be in
3  Washington, D.C. when I told her I was new in
4  town and looking for a place. We talked about
5  an approximate cost per month, but that didn't
6  include other expenses that were yet to be
7  determined.
8    Q   And the cost that you agreed to,
9  do you recall what that cost was per month?
10 The monthly rent for the property?
11   A   Well, that was the problem. It
12 was going to be -- other expenses were going to
13 be added in, so I never had a total figure.
14 But I didn't know exactly what all the expenses
15 were going to be and I did not know the amounts
16 of those other expenses.
17   Q   Could you tell us why you decided
18 not to lease this property?
19   A   I -- the second time I had contact
20 with Chatel, I phoned them. I don't recall the
21 person I spoke with. I phoned Chatel from
22 Kansas City and said I don't believe our timing

Page 31

1  is syncing up, meaning my timing and Mary
2  White's timing, and I'm moving forward, meaning
3  I am going to search for another place to rent.
4  Because we couldn't come to an agreement for
5  the total amount. And that's why I did not
6  sign the lease.
7    Q   Would it be accurate to say that
8  you voluntarily withdrew your offer to lease
9  the property?
10   A   That's accurate.
11   Q   I'm going to pass exhibits number
12 11 -- if you could -- thank you. This is a
13 document that's got Chatel's logo on it and
14 handwritten notes by someone and it has a
15 photocopy of the check dated October 11, 2005
16 drafted by Ms. Medlin to Chatel Real Estate.
17   (The document referred to was
18   marked for identification as
19   Medlin Deposition Exhibit
20   No. 11.)
21 BY MR. SHAIBANI:
22   Q   Do you recognize this document?

Page 32

1    A   No. I don't remember it. Was it
2  a fax?
3    Q   Well, that's what I'd like to ask
4  you. I don't see a fax note anywhere on this
5  document.
6    A   With all due respect, this was an
7  extremely very busy, busy time for us. We have
8  properties in Seattle, property in Kansas City,
9  then we were buying properties here, and we
10 were doing a lot of transactions. For a
11 transaction that never came -- that never
12 provided fruit for me, I'm having great
13 difficulty in remembering things that no longer
14 meant anything to me. Do you understand?
15   Q   We appreciate your patience, but
16 we still have to continue with our questions to
17 --
18   A   So when I say it doesn't remember,
19 it doesn't mean I think it's true or I think
20 it's not true. I just -- I don't remember this
21 -- no.
22   Q   You don't remember ever receiving

Page 33

1  this document, is that what you're saying?
2    A   It's just because I don't
3  remember. I asked you if it was a fax. If it
4  was a fax, it would have been fax'd to my
5  husband and
6  maybe I never would have seen it. I don't
7  know. But, yes, that's my check and, yes, it's
8  void.
9    Q   Do you remember somebody by the
10 name of Patsy Petty?
11   A   I met a woman at Chatel once for
12 about 15 minutes a year ago. I don't know what
13 he name was.
14   Q   Did she inform you that she was
15 the office manager for Chatel?
16   A   I have no recollection.
17   Q   Could you read this note on
18 Exhibit No. 11? The handwritten note.
19   A   Yes. Hi, Bobby. So sorry the
20 lease didn't work out. Best of luck to you in
21 new business. I know you will be a success.
22 Regards, Patsy. Patsy Petty.

9 (Pages 30 to 33)

Page 34

1   Q   Now that you've read the note, do
2   you recall if you ever received this document?
3   A   Are you badgering me?
4   Q   Not at all. I'm just trying to
5   see if reading this note would refresh your
6   memory of receiving such a note ever.
7   A   What do you think? Since I've
8   already answered the question.
9   Q   Please answer it again.
10  A   Ask it again.
11  Q   Do you ever recall receiving this
12  document, Exhibit No. 11 --
13  A   No.
14  Q   -- the handwritten note which has
15  the photocopy of your check crossed out on it?
16  A   No.
17  Q   Thank you. Could you tell us if
18  you toured the property located at 1622
19  Wisconsin Avenue?
20  A   Yes.
21  Q   Who was there when you toured the
22  property?

Page 35

1   A   Mary White.
2   Q   She personally showed you the
3   property; is that correct?
4   A   Yes.
5   Q   Did you ever meet with a gentleman
6   at Chatel?
7   A   Yes.
8   Q   Do you recall his name?
9   A   No.
10  Q   Thierry Liverman? Does that ring
11  a bell?
12  A   I don't know.
13  Q   What was the substance of your
14  discussion with the gentleman you met at
15  Chatel?
16  A   I signed a rental application, I
17  left a check, as we've seen in these documents,
18  and the condition -- it was basically a place
19  holder, if you will. It was not to be cashed
20  unless we reached an agreement. And I left it
21  there because I was out of town.
22  Q   And was this before --

Page 36

1   A   I was going out of town.
2   Q   Was your meeting with the
3   gentleman at Chatel before you toured the
4   property with Mary White?
5   A   I don't think so. No, it was
6   after.
7   Q   Do you recall if you discussed the
8   duration of the lease with this gentleman?
9   A   We didn't discuss much.
10  Q   Essentially what you did was just
11  submit some documents to him then, is that what
12  you're saying?
13  A   Yes.
14  Q   Okay. So --
15  A   He was rather busy that day with
16  something else -- it would appear. I wasn't
17  there very long.
18  Q   And he's the person you submitted
19  your check to dated October 11th; is that
20  correct?
21  A   Yes. But I also met a woman that
22  day.

Page 37

1   Q   At Chatel?
2   A   There was a man and a woman. A
3   very brief period of time, we had a very brief
4   exchange.
5   Q   Did Mary White ever require you to
6   submit your income tax returns for the years
7   2003 and 2004 in connection with leasing the
8   property?
9   A   I don't think so.
10  Q   Did she require you to submit your
11  bank statements at the time you went to lease
12  the property?
13  A   I don't recall what the
14  application stated. It asked about some credit
15  things, I don't recall exactly what it said.
16  Q   But Mary White didn't require you
17  to submit your checking or savings account
18  statements to her; is that correct?
19  MR. BOUSE: I'll object. That's
20  not what she said. I object.
21  MR. RANCK: Same objection.
22  BY MR. SHAIBANI:

10 (Pages 34 to 37)

Page 38

1    Q   Did Mary White ever require you to
2  submit bank statements to her as part of your
3  application to lease the property?
4    MR. BOUSE: I object.
5    THE WITNESS: Not at that point,
6  at least. I don't recall giving any bank
7  statements.
8  BY MR. SHAIBANI:
9    Q   Did -- now, I'm just going to
10 rephrase these questions. Did Chatel ever
11 require you to submit your income tax returns
12 for the years 2003 and 2004?
13   A   I don't recall doing that.
14   Q   Did Chatel ever require you to
15 submit your bank statements in connection with
16 leasing the property?
17   A   I don't recall doing that.
18   Q   So essentially the only inquiry
19 into your financial background by Chatel was
20 the credit check?
21   MR. RANCK: Objection. It
22 mischaracterizes the testimony.

Page 39

1  BY MR. SHAIBANI:
2    Q   Could you please respond?
3    A   I'm sorry?
4    Q   What types of financial documents
5  did Mary White require you to submit in
6  connection with leasing the property?
7    MR. BOUSE: I object.
8    THE WITNESS: If I am recalling
9  this correctly, I believe that I signed a
10 release for her to check my credit -- my joint
11 credit with my husband.
12 BY MR. SHAIBANI:
13   Q   And that's the only thing that she
14 required you to do in connection with your
15 establishing your financial background? Your
16 ability to pay for a lease.
17   MR. RANCK: Objection.
18   MR. BOUSE: I object to that.
19 That's not what she said. I object.
20   THE WITNESS: As far as checking
21 my ability to pay for the lease, because we had
22 a conversation about who I was and who my

Page 40

1  husband is, she knew where he worked and his
2  status, and so she probably had a good idea
3  that we were able to pay the rent easily. And
4  then she asked for a credit check. And I do
5  not recall giving her any other documents at
6  that time.
7  BY MR. SHAIBANI:
8    Q   Do you recall giving her any other
9  documents relating to your financial background
10 after that discussion you had with her?
11   A   No. I don't recall that, no.
12   Q   What about documents submitted to
13 Chatel? Do you recall ever giving any
14 financial documents to Chatel after you spoke
15 to Mary White?
16   A   I don't think that I did.
17   Q   Could you please pass Exhibit No.
18 10?
19   (The document referred to was
20 marked for identification as
21 Medlin Deposition Exhibit
22 No. 10.)

Page 41

1  BY MR. SHAIBANI:
2    Q   Ms. Medlin, I'm going to pass you
3  Plaintiff's Exhibit No. 18.
4    (The document referred to was
5  marked for identification as
6  Medlin Deposition Exhibit
7  No. 18.)
8  BY MR. SHAIBANI:
9    Q   This is the GCAAR rental
10 application bearing your signature. Do you
11 recognize your signature on page three?
12   A   Yes.
13   Q   And is that your initial as well
14 on the bottom of the page?
15   A   Yes.
16   Q   Did you date this application
17 yourself --
18   A   Yes.
19   Q   -- October 11, 2005?
20   A   Yes.
21   Q   And your check is also dated
22 October 11, 2005?

11 (Pages 38 to 41)

Capital Reporting Company

Page 42

1    A   Yes.
2    Q   Now, would you say, having looked
3 at this document, that October 11th was the
4 first day you negotiated this lease with Mary
5 White?
6    MR. RANCK: Object to the form.
7    MR. BOUSE: Object.
8    THE WITNESS: If it wasn't that
9 first day, it was very, very close to that.
10 There was not a lot of time lapse in here.
11 BY MR. SHAIBANI:
12   Q   And would this refresh your memory
13 as to when you withdrew your offer to lease the
14 property?
15   A   It was shortly thereafter.
16   Q   Was it more than a day after?
17   MR. RANCK: Objection. Asked and
18 answered.
19   THE WITNESS: I'm not sure. It
20 was a very short time frame from beginning to
21 end.
22 BY MR. SHAIBANI:

Page 43

1    Q   Would you say that it was more
2 than 48 hours?
3    MR. RANCK: Same objection.
4    MR. BOUSE: Same objection.
5    THE WITNESS: More than 48? Or
6 less? I don't know, we were traveling. I don't
7 know.
8 BY MR. SHAIBANI:
9    Q   Do you recall how many days you
10 were in D.C. when you visited the property on
11 Wisconsin Avenue?
12   A   No. As stated previously, we were
13 back and forth, back and forth, back and forth
14 between Kansas City and D.C.
15   Q   If I may ask another question, in
16 terms of your withdrawal of your offer to lease
17 the property, was it more than three days after
18 you submitted the rental application?
19   MR. BOUSE: Object.
20   MR. RANCK: Objection. Asked and
21 answered several times.
22   THE WITNESS: I don't remember.

Page 44

1 Just ask me what you want to know.
2 BY MR. SHAIBANI:
3    Q   Do you recall in your negotiations
4 with Mary White if you discussed what would
5 happen after the term of the lease expires?
6    A   You mean if I had received the
7 property?
8    Q   Yes. In negotiating your offer to
9 lease the property, did you discuss what would
10 happen if -- let's say if the lease were for
11 two years, what would happen afterwards?
12   A   I don't think we ever got that
13 far, no. I don't -- no, I don't remember that.
14   Q   And do you recall having any
15 discussions about a right of first refusal?
16   A   I don't recall.
17   Q   Do you know what a right of first
18 refusal is?
19   A   Yes.
20   Q   You weren't interested in
21 purchasing the property during the -- if it
22 were to go on the market during the term of the

Page 45

1 lease? Do you recall that?
2    MR. BOUSE: I object.
3    MR. RANCK: Objection to the form
4 of the question.
5    THE WITNESS: Did I express that,
6 is that what you're asking me?
7 BY MR. SHAIBANI:
8    Q   Did you ever have any discussions
9 about right of first refusal?
10   MR. RANCK: Objection. Asked and
11 answered.
12   MR. BOUSE: I object.
13   MR. RANCK: She just said she
14 doesn't recall not 45 seconds ago.
15 BY MR. SHAIBANI:
16   Q   You had no discussions then about
17 what would happen if the property were to go on
18 sale during the term of the lease?
19   A   If it would go on sale during the
20 term of the lease? No, we did not have that
21 discussion.
22   Q   Did you intend to lease a space

Page 46

1 where you wouldn't have to move your business
2 after the expiration of the lease? When you
3 went to look for a property, I guess in your --
4 as one of the things you were looking for in a
5 property, did you intend to obtain a lease
6 where you wouldn't have to move your business
7 after the expiration of the lease term?
8      A   I didn't think about it at that
9 time.
10     Q   Would you have preferred to have a
11 lease which wouldn't require you to relocate
12 after the expiration?
13     MR. BOUSE: Objection.
14     MR. RANCK: Objection.
15     THE WITNESS: Do I prefer to move?
16 I don't know what you want. I really would
17 like to know where all of this is going. It
18 just seems like too much legalese crap. Ask me
19 what you want to know. I'm really tired of
20 this. Ask me what you want to know in plain
21 English terms and I will tell you the truth.
22 BY MR. SHAIBANI:

Page 47

1      Q   Did Mary White inform you that you
2 would have to pay a portion of the property
3 taxes if you were to lease this space?
4      A   I believe that we just touched on
5 that and, as you can see in the application or
6 the blanks in the rental agreement, which I did
7 not sign, that it's not in there.
8      Q   And she didn't verbally inform you
9 how much she was going to ask you pay for
10 property taxes?
11     MR. BOUSE: I object.
12     THE WITNESS: I don't recall in
13 any detail about that.
14 BY MR. SHAIBANI:
15     Q   Do you recall what you did after
16 you withdrew your offer to lease the 1622
17 Wisconsin Avenue property?
18     A   In general?
19     Q   Yes.
20     A   In general, in regard to renting
21 other property? Is that what you're asking me?
22     Q   Yes.

Page 48

1      A   I went to another property owner
2 at 2613 P Street and told her I was interested
3 in renting that property.
4      Q   Was this the same day that you
5 withdrew your offer for the Wisconsin Avenue
6 property?
7      A   No. No. I was in Kansas City.
8      Q   Your withdrawal of the offer then
9 was over the telephone; is that correct?
10     A   Yes. To Chatel.
11     Q   And you informed -- do you recall
12 who you spoke to at Chatel when you withdrew
13 your offer?
14     A   No.
15     Q   Was it a man or a woman?
16     A   I can't be sure.
17     Q   Could you tell us how long it took
18 for you to sign a lease agreement for the 2613
19 P Street location?
20     A   A very short time.
21     Q   Was it 24 hours or 48 hours?
22     A   I don't know. I don't know.

Page 49

1      Q   Was it a month?
2      A   No.
3      Q   Was it a week?
4      A   I don't know.
5      Q   So it was somewhere between -- it
6 was less than a week essentially? Would that
7 be accurate to say?
8      MR. BOUSE: Objection.
9      MR. RANCK: Objection.
10     MR. BOUSE: She said she don't
11 know and you said a week or a month.
12     MR. SHAIBANI: Well, a very short
13 period. I'm trying to see what, in your view,
14 is a very short period of time.
15     MR. RANCK: But, Mr. -- you asked
16 her was it less than a month, she said she
17 didn't know. You asked was it less than a
18 week, she said she didn't know. And your next
19 question was then is it fair to say it was less
20 than a week when she just said she didn't know.
21 I think you're -- I don't understand why
22 you're doing this to the witness. She's come

13 (Pages 46 to 49)

Page 50

1 here, she's not a party to the case, and
2 you're, in my view, harassing and badgering
3 her.
4    MR. SHAIBANI:  You've noted your
5 objections for a lengthy period.  Let's get on
6 with remaining questions on this deposition.
7    MR. RANCK:  Mr. Shaibani, one rule
8 we are going to have, or else this deposition's
9 going to go on all day, is I'm going to finish
10 what I'm saying without you cutting me off and
11 interrupting me.  That's not courteous, nor is
12 it professional.  If you have something to say
13 when I'm done, you may say it, but you
14 shouldn't cut me off and I'll do you the
15 courtesy of not cutting you off.  So I think
16 you should ask the witness a question and when
17 she says she doesn't know, we don't then ask a
18 question that directly contradicts what we
19 said.  That's my objection.
20 BY MR. SHAIBANI:
21    Q   Okay.  Now, I'm going to ask this
22 question again.  What is a very short period of

Page 51

1 time in your view for signing of lease?
2    MR. BOUSE:  I object.
3    MR. RANCK:  Object to the form.
4    THE WITNESS:  It's relative.  BY
5 MR. SHAIBANI:
6    Q   It wouldn't be 24 days, would it?
7    A   I don't --
8    MR. RANCK:  Objection.
9    THE WITNESS:  -- know.  Now are
10 you asking me to explain the 2613 P Street
11 transaction?
12 BY MR. SHAIBANI:
13    Q   Yes.  Yes, I am.
14    MR. RANCK:  Objection.  Relevancy.
15    THE WITNESS:  I knew about the
16 2613 P Street property for rent at the same
17 time that I knew the Wisconsin place for rent.
18 As I knew many places for rent.  This is why I
19 can't remember all of your details.  I knew
20 about those two about the same time.  Exactly
21 the same time?  No.  Exactly seven days?  I
22 don't know.  Exactly 21 days?  I don't know.

Page 52

1 Exactly 34 days?  I don't know.  Exactly 24
2 hours?  I don't know.
3 BY MR. SHAIBANI:
4    Q   When did you sign a lease
5 agreement for the 2613 P Street?
6    A   I don't know.  I did not bring
7 that document with me.
8    Q   If you were to go back home and
9 look at that, would you be able to inform us
10 later?
11    A   It was sometime in October, I
12 believe.  Sometime in October.  Of 2005.
13    Q   Okay.  Did the landlord at the
14 2613 P Street require you to submit tax returns
15 or bank statements?
16    MR. BOUSE:  Object to the
17 relevance.
18    THE WITNESS:  I paid her the
19 entire rent in advance.
20 BY MR. SHAIBANI:
21    Q   For how long did you lease the
22 property?

Page 53

1    A   One year.
2    Q   And do you recall what the lease
3 says -- what happens after the year was up?
4    A   At 2613?
5    Q   Yes.
6    A   I have no rights.  I have no
7 rights after the year.  The agreement is for
8 one year.
9    Q   Does that require you to relocate
10 or --
11    A   It could, yes.
12    Q   Would you be able to stay there if
13 you wanted to after the one year was up?
14    A   I don't know.
15    Q   You never discussed that with your
16 landlord?
17    A   No.  One year.
18    Q   How did you find out about that
19 property, the 2613 P Street?
20    A   Craig's List.
21    Q   Okay.  Now I just have a couple of
22 other questions about this subpoena that was

14 (Pages 50 to 53)

Page 54

1  served on you.
2      A   Uh-huh.
3      Q   We had asked for some documents.
4  I'm going to distribute this subpoena here.
5  This is Plaintiff's Exhibit No. 1.
6      (The document referred to was
7  marked for identification as Medlin Deposition
8  Exhibit No. 1.)
9  BY MR. SHAIBANI:
10     Q   Do you recognize this document?
11     A   I do.
12     Q   Could you turn to page five of
13  this document?
14     A   Yes.
15     MR. RANCK:  Page five of the
16  document or page five of the production that's
17  attached to the subpoena?
18     MR. SHAIBANI:  Page five of the
19  request for production of documents that's
20  attached to the subpoena.
21  BY MR. SHAIBANI:
22     Q   If you could take a moment to

Page 55

1  review pages five and six?
2      A   All right.
3      Q   Do you have any of these
4  documents?
5      A   I have none of these documents.
6      Q   Could you tell us what you did
7  with them?
8      A   No.
9      Q   Do you mean that you don't
10  remember what you did with them or that you --
11     A   I do not remember what I did with
12  the documents.
13     Q   Okay.
14     A   I most likely threw them away.  If
15  I had them in the first place.  There was no e-
16  mail in regard to request number five.  There
17  was never any e-mail.  You actually have all
18  the -- any documents that I would have had are
19  here in your documents.
20     Q   Yes.  Going back to the lease that
21  we passed out -- what was the exhibit number
22  for the lease agreement that's unsigned?

Page 56

1      MR. BOUSE:  Seven.
2  BY MR. SHAIBANI:
3      Q   Exhibit No. 7.
4      A   Uh-huh.
5      Q   Do you recall ever receiving a
6  lease agreement from Mary White or Chatel?
7      A   This lease agreement?  Yes.
8      Q   You received this lease agreement,
9  is that what your position?
10     A   I received a lease agreement, yes.
11     Q   And did it have your name typed
12  on it?
13     A   Yes, I would say it probably did.
14     Q   Who gave you that lease agreement?
15     MR. RANCK:  I'm sorry.  Can you
16  clarify whether when you say who gave you that
17  lease agreement, are you referring specifically
18  to Exhibit No. 7 or are you referring to when
19  --
20     MR. SHAIBANI:  A lease agreement.
21     MR. RANCK:  So whoever gave you --
22  who gave you whatever lease agreement --

Page 57

1      MR. SHAIBANI:  Yes.
2      THE WITNESS:  I recall receiving a
3  lease agreement via fax in Kansas City.  I --
4  but it wasn't signed, nor did I sign it.
5  BY MR. SHAIBANI:
6      Q   Was that fax sent from Chatel or
7  Mary White?
8      A   I couldn't recall.
9      Q   The agreement that was fax'd to
10  you when you were in Kansas City, do you recall
11  how you reacted to it after you received it?
12     A   Yes.  I looked at it, saw there
13  was blanks where there was money concerned, and
14  I realized I could not sign it.
15     Q   And is that when you contacted
16  Chatel to inform them that you were no longer
17  interested in leasing the property?
18     A   Yes, that is correct.
19     Q   Was it on the same day that you
20  received the fax?
21     A   It was that day or the next day.
22     MR. SHAIBANI:  Thank you.  I have

15 (Pages

**Capital Reporting Company**

Page 66

1  Q  Okay. Who is Tim Hanan?
2  A  Tim Hanan happened to be the only
3  person I knew in Georgetown I think that day.
4  He was our real estate agent when we purchased
5  our house on 29th Street.
6  Q  Okay. And how about Randall
7  Hagner?
8  A  That's the name of the company.
9  Of Tim Hanan.
10  Q  Okay, I'm sorry. Bear with me one
11  second, please. Would you mark this as Exhibit
12  No. B, please?
13  (The document referred to was
14  marked for identification as
15  Medlin Deposition Exhibit No. B.)
16  BY MR. RANCK:
17  Q  Ms. Medlin, would you take a look
18  at what's been marked as Medlin Exhibit No. B?
19  A  Yes.
20  Q  Can you identify that document?
21  First let me ask you, have you ever seen that
22  document before? Do you recall?

Page 67

1  A  I recall this one.
2  Q  Okay. And can you identify it for
3  the record, please?
4  A  This is a commercial agreement of
5  leased space between Mary White and blank.
6  Q  What do you recall about this
7  document?
8  A  The reason I recall it is because
9  under number seven, utilities and additional
10  rent, it says TBD, which I read to be to be
11  determined.
12  Q  Okay.
13  A  And I remember that.
14  Q  How about paragraph 11?
15  A  Additional rent to cover real
16  estate taxes, also blank, TBD.
17  Q  To you recall that?
18  A  I'm recalling that.
19  Q  Can you identify whose writing
20  this is
21  filling out the blanks on this document?
22  A  I do not know the writing.

Page 68

1  Q  Do you have any -- look at this
2  document, it's the one you testified about
3  earlier. It comes with blanks to be filled in
4  on the various draft leases that were shown to
5  you.
6  A  Yes.
7  Q  Do you have any specific
8  recollection that the payment of a portion of
9  the property taxes was something Ms. White was
10  interested in?
11  A  Yes.
12  Q  Mr. Shaibani showed you Exhibit
13  No. 9, which is a copy of your $7,500.00 check.
14  A  Yes. Uh-huh.
15  Q  Did you have any recollection as
16  to why you made that check out for $7,500.00?
17  A  It was a good faith check that I
18  was showing interest. Serious interest and
19  wanting to enter into an agreement. But why
20  was it that exact amount?
21  Q  No. I mean do you recall how much
22  was required to be given as a deposit?

Page 69

1  A  I'm certain that I was directed to
2  give that amount.
3  Q  Now, you referenced your husband
4  in your testimony earlier. Where did your
5  husband work in the fall of 2005?
6  A  He works for an accounting firm
7  called KPMG.
8  Q  You just answered in the present
9  tense, he works. Did he work there in 2005 as
10  well?
11  A  Yes. Yes, he did.
12  Q  The same office and everything?
13  A  Well --
14  Q  Well, I mean has he switched jobs
15  since 2005?
16  A  No.
17  Q  Is he an accountant?
18  A  Yes.
19  Q  Is he a partner at KPMG?
20  A  Yes.
21  Q  Were you ever advised as to
22  whether Ms. White knew any of the partners a

18 (Pages 66 to 69)

Page 70

1  KPMG?
2      A   In a conversation I had with Mary
3  White -- in a casual conversation, when she
4  asked where my husband was employed, she said
5  that she knew somebody who also worked in this
6  international firm. But I don't recall the
7  name and I don't know who it was.
8      Q   Did your husband ever advise you
9  that one of his colleagues had spoken to Mary
10 White about the two of you?
11     A   No.
12     Q   Bear with me a minute, please.
13 Now, I think you testified that you received a
14 draft of the lease by fax while you were in
15 Kansas City; correct?
16     A   That's right. Yes.
17     Q   And is it fair to say that you're
18 unable to determine whether or not Exhibit No.
19 7 is, in fact, the same lease that you received
20 by fax because --
21     MR. SHAIBANI: Objection.
22 Leading. Compound.

Page 71

1      MR. RANCK: May I at least finish
2  my question? BY MR. RANCK:
3      Q   Is it fair to say that you cannot
4  determine whether Exhibit No. 7 is the same
5  lease you received by fax in as much as you
6  didn't retain what you received by fax, so you
7  have nothing to compare it to; is that
8  correct?
9      MR. SHAIBANI: Objection.
10 Foundation. BY MR. RANCK:
11     Q   Is that fair?
12     A   Is it fair to say I'm not sure if
13 this is exactly the same one?
14     Q   If Exhibit No. 7 is exactly the
15 same one.
16     A   Which? This one?
17     Q   Correct.
18     A   I would -- I'm sorry, could you
19 ask me again?
20     Q   Sure.
21     A   None of my exhibits are marked
22 with any numbers, so I don't really know.

Page 72

1      Q   They have a sticker on the bottom.
2      A   Oh, excuse me. All right. Go
3  ahead. I'm ready.
4      Q   Can you say that Exhibit No. 7 is
5  or is not exactly the same draft you received
6  by fax when you were in Kansas City?
7      A   I no longer have the draft.
8      Q   So you're unable to say if it's
9  exactly the same one?
10     A   I couldn't say for certain.
11     Q   Okay. When you received this --
12 whatever draft lease you received by fax --
13     A   Okay.
14     Q   When you received that document,
15 did you have any discussions with Mary White at
16 that time? Around that time about the draft
17 document?
18     A   Yes, I did.
19     Q   And did she -- and I'm not putting
20 words in her mouth, but -- essentially convey
21 to you that the property was yours if you
22 wanted it, if the two of you could work out

Page 73

1  these remaining terms? The blanks that still
2  needed to be filled in?
3      A   She didn't say it's yours if you
4  want it. I could tell we were -- we were in a
5  serious negotiation, but I felt like there was
6  somebody else in line ahead of me, so to speak.
7  And I asked her if she -- if I signed it, was
8  she then making a commitment. Could she make a
9  commitment at that moment? The answer was no,
10 she could not at that moment make a commitment.
11     Q   Did you recall anything further
12 about the discussion at that time with Ms.
13 White?
14     A   Just that I was -- I was concerned
15 about blanks when it had to do with money.
16     Q   Is that the reason that she convey
17 to you -- is that the reason she couldn't make
18 a commitment, because those blanks hadn't been
19 worked out?
20     A   I have to say that I felt that
21 there was something she wasn't saying. And
22 that's just a feeling. That there was --

19

Page 74

1  I said, I didn't feel like I was first in line.
2      Q   Okay.
3      A   And for my own benefit -- this is
4  more than what you're asking, but I have to
5  tell you all, for my own benefit, I felt like
6  if we don't have a deal, then a bird in the
7  hand is worth two in the bush. And I went down
8  to 2613, so to speak -- I went to that one in
9  my mind -- I was in Kansas City, but I decided
10 I'm going to try to secure the 2613 space
11 because I knew that landlord was ready to make
12 a commitment.
13     Q   So is it fair to say that you were
14 worried that if you made a commitment with Mary
15 White, you might lose the property anyway?
16     A   That's fair. Yes, that's what I
17 thought.
18     Q   When you called -- why then did
19 you call Chatel? My understand from what you
20 testified before was that you notified Chatel
21 that you were withdrawing your application?
22     A   That's correct.

Page 75

1      Q   So were things still up in the air
2  with Ms. White after you got off the phone with
3  her?
4      A   Probably as far as Mary was
5  concerned. I said I really -- I needed to have
6  those blanks filled in or I didn't -- I could
7  not sign anything with blanks. And after some
8  consideration and thought, I thought I don't
9  know what is transpiring with the Mary White
10 transaction. I did not know. I had feelings
11 that probably, with Georgetown being
12 competitive, that there was probably other
13 people ahead in line for this property. She
14 did not say it. She didn't say there was, she
15 didn't say there wasn't, but I really got the
16 feeling that she'd say yes, if she could. I
17 guess. I don't know. But I tired of this
18 transaction and I thought I could lose it, so
19 I decided to try and secure another property.
20     Q   Did Mr. Anderson, Barrett
21 Anderson, ever indicate to you anyone else had
22 an interest in the property? Anyone else had

Page 76

1  looked at the property?
2      A   He may have. Like I said, my
3  conversation with Barrett was light, friendly.
4  I wasn't speaking with him as an agent for Mary
5  White.
6      Q   Okay. When you -- having now
7  discussed your discussions with Mary White, do
8  you recall how long it was before you called
9  Chatel and formally withdrew your application?
10 You had said before days. Within a matter of
11 days?
12     A   Yes. It was a very short time.
13     Q   And do you have any further
14 recollection of your discussion with whoever it
15 was at Chatel regarding your withdrawal of the
16 application? Or the blanks or anything else?
17     A   I think we -- I was a little
18 frustrated because I didn't know why I couldn't
19 get to yes on this negotiation. And after
20 listening to me today, you probably know
21 why. But the point is I didn't want to say
22 that really. I called Chatel and said our

Page 77

1  timing isn't syncing up, I'm moving forward.
2      Q   Bear with me one second, please.
3  Do you recall, in terms of the other properties
4  that you knew were available, had you put in
5  applications at any of those other properties
6  by the time that you had put in an application
7  for Ms. White's property?
8      A   No. Just inquiries.
9      Q   Just inquiries?
10     A   Telephone inquiries.
11     Q   You had made contact with either
12 the owners or the realtors for those other
13 properties?
14     A   Yes.
15 MR. RANCK: Ms. Medlin, I believe
16 that's all I have. Mr. Bouse, representing
17 Mary White, may or may not have questions.
18 MR. BOUSE: I just have a couple
19 real fast ones. I'm not -- as you can tell, it
20 took me three hours to get here, so I'm not
21 that familiar with the Washington, D.C. area.
22 EXAMINATION BY COUNSEL FOR DEFENDANT, MARY WHITE

20 (Pages 74 to 77)

Page 78

BY MR. BOUSE:
Q How far is 2613 P Street from the property Mary White was offering through Chatel in Wisconsin Avenue?
A Five blocks maybe. Six blocks.
Q So it was pretty close in area?
A Yes.
Q What is the rent you're paying at --
A $1,800.00 a month.
Q So the rent was less than what was being quoted to you by Mary White on Wisconsin?
A Yes, actually.
Q Now, you may not recall -- I was returning your call. Do you remember that now?
A I remember calling someone, yes, at your firm.
Q Sure. Did you tell me anything different than what you've said here under oath today? In fact, we didn't talk about the case very much, did we?
A No. No. I said that Shaibani's

Page 79

office had asked me for documents and I was a little concerned because I hadn't retained any documents and I didn't know what trouble that would bring me. And I asked -- I said can your office send me the documents that -- in question.
Q And that was about the extent of our conversation?
A Yes, it was.
MR. BOUSE: I have no further questions. Thank you.
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. SHAIBANI:
Q If I may just follow-up with a couple of questions. Ms. Medlin, when you received the letter from my office --
A On the 12th?
Q Yes. You mentioned that you were worried about something? Is that correct?
A I didn't say I was worried. The word was harassed. I think that's Matt's word, but I think it was good.

Page 80

MR. RANCK: Threatened I think was the word --
THE WITNESS: Yes. Thank you. BY MR. SHAIBANI:
Q Did you feel threatened after you spoke to me about this letter and this subpoena that was served --
A You're asking if I felt the letter was threatening? Yes, I do.
Q But after you spoke to me on the telephone about the subpoena, did you still feel threatened?
A I did not feel threatened. Do you recall that I said I hope that you would not file a frivolous lawsuit and drag me into this unnecessarily?
Q Yes. And what did I respond to you?
A You said you worked for the Justice Department previously and you wouldn't do that.
Q Now, in terms of your -- you

Page 81

mentioned that somebody directed you to give a check for $7,500.00?
A Uh-huh.
Q Do you recall why they requested such an amount?
A Such an amount? No.
Q On Medlin Exhibit No. B, do you see the amount of rent being listed as $2,500.00 per month?
A Yes.
Q And so the amount that you submitted for $7,500.00, that was supposed to cover the first month's rent, the last month's rent and a security deposit?
A It may have. I wrote that check with the intention of showing my good faith in pursuing coming to an agreement.
Q Do you recall where you were when you wrote the check?
A I wrote that check in the office of Chatel.
Q Someone from Chatel then informed

21 (Pages 78 to 81)

Page 83

```
 1            CERTIFICATE OF NOTARY PUBLIC

 2   I, PATRICIA A. EDWARDS, the officer before whom

 3   the foregoing deposition was taken, do hereby

 4   certify that the witness whose testimony

 5   appears in the foregoing deposition was duly

 6   sworn by me; that the testimony of said witness

 7   was taken by me in stenotype and thereafter

 8   reduced to typewriting under my direction; that

 9   said deposition is a true record of the

10   testimony given by said witness; that I am

11   neither counsel for, related to, nor employed

12   by and of the parties to the action in which

13   this deposition was taken; and, further, that I

14   am not a relative or employee of any counsel or

15   attorney employed by the parties hereto, nor

16   financially or otherwise interested in the

17   outcome of this action.
                                 PATRICIA A. EDWARDS
18

19           Notary Public in and for the

20                District of Columbia

21   My commission expires: January 1, 2010

22
```