## Capital Reporting Company

Page 114

1  BY MR. SHAIBANI:
2     Q  Well, what exactly did you tell Thierry
3  Liverman on the 12th of October?
4     A  "Let's negotiated this one first."
5        MR. BOUSE:  This one meaning
6  Ms. Medlin's?
7        THE WITNESS:  Ms. Medlin's.
8  BY MR. SHAIBANI:
9     Q  What else did you say to him?  Did you
10 tell him to inform Mr. Bratton to forget about
11 this property?
12    A  No, whatever he did, he did.  I don't
13 remember giving any instruction.
14    Q  Would you agree that from October 6th
15 through October 11th, all of the lease proposals
16 submitted by Mr. Bratton were rejected by you?
17    A  No, I won't agree to that, they weren't
18 rejected.
19    Q  Did you --
20    A  No, they were still -- they were agreed
21 to -- they always had terms in it I couldn't deal
22 with.

Page 115

1     Q  Did you accept any leases from
2  Mr. Bratton from October 6th through October 11th?
3     A  No, nor did I accept Ms. Medlin's.
4     Q  And it was only on October 31st after 24
5  days had elapsed from the time that Mr. Bratton
6  first came to see your property that you finally
7  agreed to lease the street level to him?
8        MR. BOUSE:  You want to say, "Ladies and
9  gentlemen of the jury" first before you ask that
10 question?  It's an argument.  Come on, Mr.
11 Shaibani, that's an argument.  I object.
12       MR. RANCK:  Object to the form.
13       MR. BOUSE:  Do you know the date you
14 signed the lease with Mr. Bratton?
15       MR. SHAIBANI:  That's not the question.
16       THE WITNESS:  It says 31st, whatever it
17 is.
18       MR. BOUSE:  Whatever it is.  You can add
19 up the days.
20 BY MR. SHAIBANI:
21    Q  Isn't it true that you didn't accept any
22 of the lease proposals submitted by Mr. Bratton

Page 116

1  from October 6th through October 11th?
2        MR. RANCK:  Objection, asked and
3  answered.
4        MS. BOUSE:  I object.  Answer it again.
5        THE WITNESS:  I didn't accept any of
6  them, no, they all had something wrong with them.
7  BY MR. SHAIBANI:
8     Q  Could you describe what was wrong with
9  those leases?
10    A  I think the right of first refusal was
11 always there.  And I said I wouldn't take that.  I
12 couldn't do it.  I didn't want to and couldn't.
13    Q  You mentioned that Mr. Bratton's lease
14 that was drafted on his own form contained pro
15 tenant terms.  Could you tell us what made it pro
16 tenant?
17    A  No, that was Thierry's remark, Thierry
18 said that.
19    Q  And what provisions --
20    A  So Thierry would know there were things
21 in the lease -- I'm not one who writes commercial
22 leases.  Thierry would have said that there are

Page 117

1  certain things in there, either they shouldn't be
2  there or there are things that are not there that
3  should be there.
4     Q  And what things?  Can you tell us what
5  things were in there that shouldn't be there, the
6  provisions that were crossed out?
7     A  We'd have to take the lease that we ended
8  up with.  This one seems a lot longer than that
9  one.  Thierry was my agent and he wanted certain
10 things in the lease.
11       MR. BOUSE:  What the witness says,
12 compare Plaintiff's Exhibit 4 with Plaintiff's
13 Exhibit 7.  I'm sorry, Plaintiff's -- I apologize,
14 6.  Are you going on to a different topic?  Do you
15 want to have lunch?
16       THE WITNESS:  Yeah.
17       MR. RANCK:  I --
18       THE WITNESS:  Or something brought in.
19       MR. RANCK:  Mr. Bratton seems to be
20 voicing some objection.  I'm going to request
21 lunch.  I've been sick this week.  I have no
22 desire to sit here all day without eating

## Capital Reporting Company

Page 118

1  anything. When there's an appropriate time, we
2  can take a lunch break.
3      THE WITNESS: I think we've exhausted the
4  subject.
5      MR. RANCK: We certainly offer --
6      MR. BOUSE: Anymore on this line? If not
7  we can break for lunch.
8      (Short break taken)
9  BY MR. SHAIBANI:
10   Q  You mentioned a moment ago you didn't
11 want to give the right of first refusal to John
12 Bratton because you had the 1622 Wisconsin
13 property as part of your will.
14     MR. RANCK: Objection.
15     MR. BOUSE: That's not the only thing but
16 go ahead. I object. Finish your question. It
17 started out badly but go ahead.
18     THE WITNESS: Uh-huh.
19 BY MR. SHAIBANI:
20   Q  Actually if I may request that you
21 respond with yes or no otherwise our court
22 reporter cannot take it down.

Page 119

1      MR. BOUSE: She's been trying,
2  Mr. Shaibani.
3  BY MR. SHAIBANI:
4    Q  Now, why if your property isn't --
5  actually let me rephrase your question, if you
6  intend to convey your property as part of your
7  will, you don't want to sell it, isn't that
8  correct?
9    A  Yeah, that would be correct.
10   Q  And if you don't want to sell the
11 property, then why does it matter if a right of
12 first refusal is part of a lease or not?
13     MR. RANCK: Objection.
14     MR. BOUSE: You can answer.
15     MR. RANCK: Calls for speculation.
16     THE WITNESS: I don't want that to be a
17 problem for my estate. And there's already -- it
18 would already be a problem because we've got this
19 other tenant. We've got the residential tenant.
20 BY MR. SHAIBANI:
21   Q  But if you're not going to sell the
22 property, what difference does it make for the

Page 120

1  right of first refusal?
2      MR. BOUSE: Do you want to argue with
3  her? The answer is if she dies tomorrow and her
4  heirs want to sell the property, they can't
5  because of the right of first refusal.
6  BY MR. SHAIBANI:
7    Q  No, this lease is between you and
8  Mr. Bratton. It's not between your estate and
9  him.
10     MR. BOUSE: She's given her answer. And
11 you want to argue with her. She's not going to
12 answer the question.
13 BY MR. SHAIBANI:
14   Q  Are you suggesting that your estate is
15 bound by this lease?
16   A  I think they are bound by the law of the
17 District which requires the residential tenant to
18 have a right of first refusal and right that
19 cannot be waived. Now if you don't know that, I
20 don't know what to do.
21     MR. BOUSE: You don't have to do
22 anything. That is the law. Are we going to stop

Page 121

1  or everybody is going to smile at each other? Are
2  we stopping now for lunch?
3      MR. SHAIBANI: Sure. If you insist.
4      MR. BOUSE: I'm not insisting, Mr. Ranck
5  is insisting because he's sick.
6      MR. RANCK: I think it's the courtesy
7  thing to do to the witness, just like we've done
8  with every other witness.
9      MR. BOUSE: Right.
10     MR. SHAIBANI: I didn't say we're not
11 going to have a lunch break. I was trying to
12 figure out when would be the appropriate time to
13 do it. Since you have to have lunch now, maybe we
14 should then.
15     MR. RANCK: I don't have to, but I said,
16 Mr. Shaibani, was it an appropriate time. It's
17 your deposition.
18     MR. SHAIBANI: Should we take 45 minutes
19 then?
20     MR. BOUSE: Okay. That's fine.
21     MR. RANCK: Fine.
22     (Short break taken)

31 (Pages 118 to 121)

Page 122

1  (White Exhibit Nos. 8 & 9
2  was marked for identification).
3  BY MR. SHAIBANI:
4  Q  Ms. White, I'm going to pass out two
5  other exhibits. Do you recognize this document?
6  MR. BOUSE: They're photographs, Matt, of
7  the property. He didn't have one yet, I thought
8  while you asked the question I'll --
9  MR. RANCK: Did you mark these?
10  THE WITNESS: They're primarily a
11  photograph of the property next door.
12  MR. RANCK: Shaibani, have you marked
13  these?
14  MR. SHAIBANI: Yeah.
15  MR. BOUSE: 9 is 156 and 8 is 157, Matt.
16  MR. RANCK: Thank you.
17  MR. BOUSE: I'm sorry, Shaibani, go
18  ahead. The question is, do you recognize these?
19  THE WITNESS: Yeah, I guess that tree has
20  died, that's what throws me off. The tree is not
21  there anymore.
22  MR. RANCK: The historical society didn't

Page 123

1  make you maintain the tree?
2  THE WITNESS: On the other side of this
3  building is a pizza thing or something. And the
4  truck delivery guy kept hitting the tree and they
5  eventually killed it.
6  BY MR. SHAIBANI:
7  Q  Did you --
8  A  Where were these?
9  Q  I'm sorry?
10  A  He's going to explain?
11  MR. BOUSE: He's going to ask you if you
12  recognize them.
13  BY MR. SHAIBANI:
14  Q  Yes, that's the question, pending, do you
15  recognize these two exhibits, 8 and 9?
16  A  No, never seen them before.
17  Q  Did anyone at Chatel tell you that they
18  created these graphic designs for your property as
19  part of their marketing?
20  A  Huh-huh.
21  MR. BOUSE: You have to say no.
22  THE WITNESS: No.

Page 124

1  BY MR. SHAIBANI:
2  Q  Do you know where the information at the
3  bottom of these documents was obtained from, "The
4  entire first floor. Perfect for a consultant's
5  office. About 685 square feet. Available
6  immediately. $2,500 a month plus utilities"?
7  That's for the one marked CH 157.
8  A  No.
9  Q  You didn't provide that information to
10  Chatel?
11  A  No, no, I don't know where it all came
12  from. A dollar sign in front of the square
13  footage, certainly not. I think that's in the
14  square footage is probably listed on the tax
15  records.
16  Q  And what about the other Exhibit CH 156,
17  did you provide the information to Chatel at the
18  bottom of the form, "Office commercial space.
19  Approximately 400 square feet. Share bathroom.
20  Available immediately. $1,000 a month plus
21  utilities"?
22  A  Picture window in front? No, there

Page 125

1  really isn't a picture window, there is a
2  bathroom. It's very confusing, isn't it?
3  Q  Did you provide the information about
4  sharing the bathroom in the basement to Chatel?
5  A  No, but there is one bathroom on the
6  lower level. There's one bathroom on each floor.
7  Half on the first floor, half on the lower, full
8  bath on the top.
9  Q  Did you actually use the bathroom
10  yourself for the lower level from --
11  A  Yeah, from November and December, yes.
12  Q  And was that part of the decision making
13  process on whether to rent the basement, the fact
14  that the bathroom was shared?
15  A  No, I don't know why they would even make
16  an issue of this. This had to have been taken a
17  long time ago. It looks like the apartment is
18  still for rent. They still have the sign in the
19  window. I don't know. Where did you say these
20  were?
21  Q  Well, I'm asking you actually. I don't
22  want to testify.

Capital Reporting Company

Page 126

1  MR. BOUSE: That's okay. You've answered
2  the question.
3  BY MR. SHAIBANI:
4  Q  Do you recall receiving an e-mail from
5  Barrett Anderson on the 11th of October where he
6  stated that Roberta Medlin and John Bratton --
7  A  Let me see that. Actually I think this
8  is something I submitted.
9     (White Exhibit No. 10
10    was marked for identification).
11    MR. BOUSE: Do you want to pass those
12 around? This is No. 10. Thank you.
13    THE WITNESS: This went out the 11th. I
14 have seen this before.
15 BY MR. SHAIBANI:
16   Q  And in this e-mail where Barrett Anderson
17 indicates that both Roberta Medlin and John
18 Bratton are interested in the property. And this
19 is dated October 11th. Did you receive this
20 e-mail on that date on the 11th of October?
21   A  Probably, but it would have come into --
22 let's see, October 11th. I'm trying to think if I

Page 127

1  had my computer set up at home at that time.
2  Doesn't mean I looked at my e-mail every day.
3  That was my e-mail address.
4     Q  What was your response to Barrett
5  Anderson's e-mail?
6     A  I don't think there was any response.
7     Q  You mean there was no written response?
8     A  I don't think so.
9     Q  What about a verbal response, did you
10 talk to him over the phone to --
11    A  Talk with Barrett over the phone?
12    Q  Yes, after you received this e-mail in
13 response to who you wanted to rent the property
14 to?
15    A  Well, he must have sent it to me because
16 he's not able to get me. It's almost 11:00 in the
17 morning on a Tuesday. I don't know. I probably
18 spoke to him sometime that day.
19    Q  Do you recall what you told him?
20    A  No.
21    Q  Did you express an interest in renting
22 the property to Roberta Medlin before pursuing

Page 128

1  the -- well --
2     A  Go ahead, finish.
3     Q  Did you express a preference for renting
4  your property to Roberta Medlin after you received
5  this e-mail from Barrett Anderson?
6     A  No.
7     Q  Now going back to the conversation that
8  you had with Thierry Liverman on the 12th of
9  October you mentioned that you discussed the --
10 you discussed the offers. And could you tell us
11 the substance of your discussions with Mr.
12 Liverman on the 12th of October when you went to
13 Chatel's office?
14    A  That's been established? Is that what
15 happened?
16    MR. RANCK: No, let me object on the
17 basis of foundation.
18 BY MR. SHAIBANI:
19    Q  Did you meet with Thierry Liverman on
20 October 12th at Chatel's office?
21    A  I don't know whether it was the 11th or
22 the 12th. We certainly did meet someplace along

Page 129

1  that line, late in the day.
2     Q  And do you recall the substance of your
3  conversations with Mr. Liverman?
4     A  He had both of the -- what do you call
5  these, lease --
6     MR. BOUSE: The applications.
7     THE WITNESS: The applications, yeah.
8  And we talked about them.
9  BY MR. SHAIBANI:
10    Q  The applications from Mr. Bratton and
11 Roberta Medlin that is?
12    A  Uh-huh, didn't we go over this before?
13    MR. BOUSE: He's asking you -- I don't
14 think he went into -- if you permit me -- the
15 conversations as best you can recall with
16 Mr. Liverman about your decision making process, I
17 think is what he's asking.
18    MR. RANCK: Just for the record,
19 obviously she did testify a little bit earlier
20 about this meeting and what was discussed so
21 anything she says now is obviously supplementation
22 of that response, I suppose.

33 (Pages 126 to 129)

Page 130

1  MR. BOUSE: Right.
2  THE WITNESS: Yeah.
3  MR. BOUSE: Go ahead, I'll permit you to
4  answer again.
5  THE WITNESS: Thierry basically made his
6  presentation to me. He had two leases to present
7  to his client. And so we talked about them. And
8  as I recall and as I stated before, I made the
9  decision to start the first negotiate with Roberta
10 who seemed to have the least number of serious
11 objections. It was all -- it all had to be
12 discussed.
13 BY MR. SHAIBANI:
14   Q  You had the least objections through
15 Roberta?
16   A  Well, we'd had a couple of things from
17 John and John Bratton. And they were always
18 repeated, they always said the right of first
19 refusal which I always say I wouldn't take. So
20 they kept coming back with the same thing I didn't
21 want to deal with, that I didn't want. So we'll
22 move on and see if this other person has -- she's

Page 131

1  going to insist on it, too. Maybe we don't rent
2  it, maybe we would find somebody else.
3    Q  At that meeting, did you inform
4  Mr. Liverman that you were going to go with
5  Ms. Medlin's lease offer?
6    MR. RANCK: Objection, asked and
7  answered.
8    MR. BOUSE: Objection, she has answered
9  that. I'll permit you to answer it one more time.
10   THE WITNESS: That I was going to see if
11 we could first negotiate, start the negotiation
12 with her, to see if we could work out a deal. If
13 we couldn't, maybe we couldn't but we'd see. John
14 was very aware that I didn't want the right of
15 first refusal because that had been going on for a
16 couple days.
17 BY MR. SHAIBANI:
18   Q  What was your basis for deciding to, in
19 your words, first negotiate with Roberta Medlin?
20   MR. BOUSE: Objection. Go ahead.
21   MR. RANCK: Objection.
22   THE WITNESS: I think we already had

Page 132

1  negotiations with John. We didn't seem to be
2  getting it cleared up. So then we moved on to
3  Roberta to see if there was hope in that one.
4  BY MR. SHAIBANI:
5    Q  Did you inform Mr. Liverman that you
6  preferred to have a tenant in the building who was
7  going to have a jewelry shop as opposed to a
8  potential competitor in real estate?
9    A  No, I think that somehow the words have
10 gotten put into my mouth there. I think it's
11 probably that I said it would be a good block to
12 have a craft type jewelry type store, it would fit
13 into the block. We already know that a real
14 estate office fits in the block. If it didn't
15 fit, I wouldn't have been there for all those
16 years.
17   Q  Which real estate office was on that
18 block?
19   A  My own.
20   Q  You said you were closing?
21   A  We already know it's a good block for a
22 real estate office. It's a good block for an up

Page 133

1  scale jewelry store. There were similar stores in
2  that block. There would be traffic there that
3  would be good for it.
4    Q  The issue of Mr. Bratton having a real
5  estate that would pose competition to you, that
6  wasn't a bases for your decision not to go with --
7    A  I don't know where that came from.
8  That's totally false.
9    Q  Okay.
10   A  I don't know how it got there. Words
11 have been put in my mouth.
12   MR. SHAIBANI: Can we please distribute
13 the responses to the first set of Interrogatories?
14   (White Exhibit No. 11
15   was marked for identification).
16 BY MR. SHAIBANI:
17   Q  This is Exhibit 11.
18   A  11.
19   Q  This is on page 4, the answer, I just
20 want to clarify, the sentence beginning with the
21 reason that Mary White wanted to lease the
22 property to Roberta Medlin because she approved of

Capital Reporting Company

Page 134
1  the tenant in her building that was going to have
2  a jewelry shop as opposed to a potential
3  competitor in real estate?
4      A  I don't know where that -- that's not
5  correct.
6      Q  So you would agree that Bratton Realty
7  and --
8      A  The jewelry store were equally good
9  tenants.
10     Q  And Bratton Realty doesn't pose a
11 competition to you, would you agree with that?
12     A  No, no, there's lots of real estate
13 offices in Georgetown.
14     Q  And certainly Washington Fine Properties
15 in the class that it is, is not a competitor
16 with -- well, Bratton Realty is not a competitor
17 of Washington Fine Properties because they target
18 two different segments of the market, would you
19 agree with that?
20        MR. BOUSE:  I object, you can answer.
21        THE WITNESS:  You went through that dance
22 with Tom Anderson and I stand by Tom's answer.

Page 135
1  BY MR. SHAIBANI:
2      Q  And then on page 9 of this document, the
3  answer to question 7, the sentence in the middle
4  of paragraph beginning with, "Ms. White has
5  received an extremely favorable reference
6  concerning Ms. Medlin," that sentence would you
7  agree that that is --
8      A  I think we already discussed this.
9         MR. BOUSE:  Do you want to finish your
10 question?  You sort of stopped.
11        MR. SHAIBANI:  I want to know what her
12 thoughts are with respect to that sentence I read.
13        MR. BOUSE:  She answered that.  She
14 answered it from the beginning.  She answered it
15 in response to what the Judge said.  She's
16 answered it.
17 BY MR. SHAIBANI:
18     Q  Do you have anything to add to what you
19 said before?
20     A  No.
21     Q  As to why this sentence was drafted in
22 response to this set of Interrogatories?

Page 136
1      A  When was this done?  Nothing has a date
2  on it.
3      Q  The 15th of November.  Is your signature
4  on page 24 of this document?
5      A  Yes.
6      Q  So you didn't provide that --
7      A  Sometimes --
8      Q  The information Ms. White had received an
9  extremely favorable reference concerning
10 Ms. Medlin, that's not something you informed --
11        MR. BOUSE:  Now you're not even going to
12 go there, are you?
13        MR. SHAIBANI:  I want to know where this
14 came from.
15        MR. BOUSE:  And the information to supply
16 this information is not based solely on the
17 knowledge of the executing party but includes the
18 knowledge of the parties agents, representatives
19 and attorneys, unless privileged, okay?  If you're
20 going to ask her what she told me, she's not
21 answering that question.
22 BY MR. SHAIBANI:

Page 137
1      Q  Now, this idea about your moving into the
2  renovated office of Washington Fine Properties,
3  which comes up on page 10 in response to the
4  answer.  And also we discussed it at Mr. Tom
5  Anderson's deposition.  Would you agree that you
6  were free to use the offices of Washington Fine
7  Properties from July of '05 onwards?
8      A  Yes.
9      Q  And that one of the offices which you
10 were free to use was located in Georgetown during
11 that period?
12     A  The only one, yeah.
13     Q  And were you also free to use the New
14 Mexico address of Washington Fine Properties?
15     A  Yes.
16     Q  And did you regularly or -- strike that.
17 Did you go through the Georgetown office of
18 Washington Fine Properties from May 10th through
19 November of '05?
20        MR. BOUSE:  Object, go ahead.
21        THE WITNESS:  May 10, why do we --
22 what's -- that's the day I signed the independent

35 (Pages 134 to 137)

Page 138
1  contractor's agreement.
2  BY MR. SHAIBANI:
3      Q  Yes.
4      A  I would think that I didn't have a key at
5  that time.
6          (White Exhibit No. 12
7          was marked for identification).
8          THE WITNESS:  Yeah, I guess I could
9  certainly go by.  I wouldn't go by unless someone
10 was there as I'm trying to find out the movement
11 of how I would move my operation.  I had a good
12 sized office I had to close down and that takes
13 time.  They agreed to grant me that time.  That
14 was one of my condition of joining them.
15 BY MR. SHAIBANI:
16     Q  And did you actually -- now just to
17 clarify, you didn't have your own office at
18 Washington Fine Properties.  Offices were
19 basically shared among the various real estate
20 agents?
21     A  And still are.
22     Q  So there wasn't a separate office for you

Page 139
1  to physically move your belongings to?
2      A  That's correct, there was a room
3  something like this and there were like four desks
4  in there -- three desks, one computer.
5      Q  So essentially your decision to keep the
6  basement was not in any way related to your
7  affiliation with Washington Fine Properties?
8          MR. BOUSE:  I object.
9  BY MR. SHAIBANI:
10     Q  Would you agree with that?
11     A  No, I can't.  I don't agree with that.
12     Q  Can you explain why if you weren't
13 physically moving your belongings to Washington
14 Fine Properties and you were free to use their
15 offices from, you know, whether you want to say
16 May 10th or July of '05 onwards, why -- what does
17 your basement have to do with the renovation of
18 Washington Fine Properties office?
19         MR. BOUSE:  I object.  Go ahead.  You can
20 answer.
21         THE WITNESS:  I could go over to the 30th
22 Street office if I needed supplies that

Page 140
1  particularly related to Washington Fine Properties
2  material.  I didn't have any of their stationery,
3  any of the things that I would need to do that
4  work.  In fact, I didn't really even know how to
5  do the computer at that point.  If I wanted to, I
6  would go over and Mark would help me with the
7  computer who was the office manager.  The
8  Wisconsin Avenue office was necessary because I
9  had an entire office that had to be disassembled
10 and there was still going to be a Mary White, Inc.
11 And there had to be a place for that.  Maybe that
12 place would be at 1622.  I didn't know where it
13 was going to be.  That was a possibility.
14 BY MR. SHAIBANI:
15     Q  When you say that there's to be a Mary
16 White Real Estate, Inc., could that --
17         MR. BOUSE:  Were you finished?
18         THE WITNESS:  He gets it mixed up.
19 BY MR. SHAIBANI:
20     Q  I'm sorry.
21     A  Mary White, Inc. and Mary White Real
22 Estate, they are different.

Page 141
1          MR. RANCK:  What her answer was,
2  Mr. Shaibani, Mary White, Inc. was still going to
3  exist.  Your follow up question was Mary White
4  Real Estate, Inc.  And that's what --
5          THE WITNESS:  My brokers license was
6  moved.
7  BY MR. SHAIBANI:
8      Q  What is Mary White, Inc.?  That's the
9  first time I've heard of that corporation?
10         MR. RANCK:  It's not her fault, though.
11         THE WITNESS:  It's -- I have a
12 corporation for my business, it's things other
13 than real estate but there's a business.
14 BY MR. SHAIBANI:
15     Q  Okay.  And what kind of business do you
16 operate under the Mary White, Inc., name?
17     A  I don't see why I --
18         MR. BOUSE:  You can answer that.
19         THE WITNESS:  I don't know --
20         MR. BOUSE:  Just generally.
21         THE WITNESS:  It's just general.  Maybe
22 some people have an office at home.  I really