Capital Reporting Company

Page 142

1  didn't want an office at home. In other words, I
2  was going to have things there rather than at my
3  house.
4  BY MR. SHAIBANI:
5     Q  Why did you lease your basement to the
6  new tenant then?
7     A  That was just done in the last month and
8  what happened was that in this interim period, I
9  had to have some surgery. And I had a total knee
10  replacement and I was not able to do that as
11  nicely as I would like to be able to. You're
12  seeing me walk around here today pretty well.
13  That's a new event.
14     Q  Congratulations.
15       MR. BOUSE: We've talked about that. You
16  are doing pretty well.
17       THE WITNESS: Yeah, but there was a long
18  period when I wasn't able to walk very well.
19  BY MR. SHAIBANI:
20     Q  I'm still unclear as to what Mary White,
21  Inc., what type of business does it engage in? Is
22  it like a sale of products or does it have

Page 143

1  anything to do with real estate?
2     A  No.
3     Q  It's not a corporation that owns the 1622
4  Wisconsin Avenue property either?
5     A  No, 1622 is owned by me personally.
6     Q  Okay. Can you tell us what Mary White,
7  Inc. is?
8     A  My accountant could probably tell you.
9       MR. BOUSE: I think you'd have to tell
10  him. Just generally.
11       THE WITNESS: Just generally, it's
12  everything that might have to do with me
13  personally or business wise, things that you
14  wouldn't keep in your office, real estate office,
15  you have to have another place to have business
16  things that go on.
17  BY MR. SHAIBANI:
18     Q  Is that a corporation that's actually
19  incorporated under --
20     A  Under Mary White, Inc., it's a
21  corporation, yes.
22     Q  And you filed a certificate of

Page 144

1  incorporation with DC?
2     A  Yes.
3       MR. BOUSE: Let him finish, you're
4  talking over him, Mary.
5  BY MR. SHAIBANI:
6     Q  Now your brokers license was in fact
7  transferred from Mary White Real Estate, Inc. to
8  Washington Fine Properties on July 27, '05, wasn't
9  it?
10     A  I noticed that in Tom's -- I don't think
11  it's the 27th. Wasn't it the 21st?
12     Q  Yes.
13     A  It was supposed to have been earlier. In
14  my recollection, that somehow or other the board
15  didn't get the papers and they ask that it be
16  resubmitted. I think they got -- I have three
17  brokers license. They were all submitted. One,
18  maybe two went through but one didn't just because
19  I don't know they lost the papers I guess. I know
20  Maryland went through right away. I'm not sure
21  Virginia did. And DC was the last one. It had to
22  go before three different boards.

Page 145

1     Q  From November 1st of '05 until the
2  present day, can you tell us approximately how
3  often you used the basement of the 1622 Wisconsin
4  Avenue property?
5     A  I probably used it about a dozen times.
6     Q  And was for purposes of storage or to
7  conduct business?
8     A  Both. Did you say between November
9  and --
10       MR. BOUSE: Present time.
11       MR. RANCK: November '05.
12       THE WITNESS: November '05?
13  BY MR. SHAIBANI:
14     Q  Yes.
15       MR. BOUSE: Right.
16       THE WITNESS: Well, more than that. I
17  was thinking just this past November. Excuse me.
18  So it was more than a dozen times. There was
19  certainly a period when I couldn't go there
20  because it meant parking the car a block away,
21  walking down the hill and so forth. I couldn't do
22  that.

Capital Reporting Company

Page 146

1  BY MR. SHAIBANI:
2     Q  Isn't it true that you in fact conducted
3  a transaction with Washington Fine Properties on
4  June 20th of '05 for the property located at 1342
5  29th Street?
6     MR. RANCK:  I object.
7     MR. BOUSE:  I object.  You can answer,
8  yes or no.
9     THE WITNESS:  I was offered a listing and
10 I just simply wasn't going to take it because I
11 had a lot of things going on.  And I was going to
12 be out of town part of the time.  And I mention
13 that to Jamie Piva and Michael Sullivan, I was not
14 going to take the listing.  They said, "Take the
15 listing and we'll handle it.  Give it to us and
16 we'll handle it for you."
17 BY MR. SHAIBANI:
18    Q  And did you receive a referral fee for
19 that?
20    A  Yeah.
21    Q  And that was paid on July 21st?
22    A  I don't know when it was paid.  I think

Page 147

1  that the listing agent was Michael and Jammie,
2  Michael Sullivan and Jammie Piva.
3     Q  The transfer of your license to
4  Washington was that a transfer from Mary White,
5  Inc. to Washington Fine Properties or Mary White
6  Real Estate, Inc.?
7     A  No, I think it was Mary White, Inc. was
8  the holder of office.
9     Q  Mary White, Inc. is the corporation
10 that's registered with DC and the Real Estate
11 Commission held your brokers license with?
12    A  And the brokers license has been removed
13 from there and delivered to Washington Fine
14 Properties.
15    Q  Okay.  Did you go to the weekly sales
16 meetings at Washington Fine Properties from July
17 21st through November of '05?
18    A  July 21st, '05.
19    MR. BOUSE:  July 21st, '05 through
20 November 1st, '05 is the question.
21    THE WITNESS:  Probably, yeah, uh-huh,
22 when I was in town I did.

Page 148

1  BY MR. SHAIBANI:
2     Q  And when did you -- did you consider
3  yourself to be affiliated formally with Washington
4  Fine Properties?
5     MR. BOUSE:  I object.  Go ahead.
6     THE WITNESS:  Right around the end of
7  June, I think.  There was -- I signed that paper
8  on May 10th.  There was supposed to be a 90 day
9  period that I had to clear up the office.  I had
10 June, July and August, but I had it done before
11 that most of it.  I had agents and they wanted to
12 give them a certain period of time to transfer
13 their license.  I think they all had their license
14 transferred by the middle of June.
15 BY MR. SHAIBANI:
16    Q  And from the time that your license was
17 transferred to Washington Fine Properties, did you
18 consider yourself to have an obligation to follow
19 the policies and procedures of Washington Fine
20 Properties?
21    A  Yes.
22    MR. BOUSE:  With reference to?  With

Page 149

1  reference to what?
2     MR. SHAIBANI:  With reference to real
3  estate transactions.
4     MR. BOUSE:  I object.
5     THE WITNESS:  Unless we had negotiated
6  something different but basically, yes.
7  BY MR. SHAIBANI:
8     Q  Would you agree then in October of '05
9  you were obligated to follow the office policies
10 and procedures of Washington Fine Properties even
11 with respect to the leasing of your own property?
12    MR. BOUSE:  I object.  Go ahead.
13    THE WITNESS:  As long as we hadn't
14 negotiated some other arrangement.
15 BY MR. SHAIBANI:
16    Q  And had you negotiated another
17 arrangement for the leasing of your office?
18    A  Yeah, they were -- we certainly talked
19 about how I was going to clean up and get out of
20 there and that meant that I had to lease it.  They
21 don't have per se a commercial leasing department.
22    Q  I guess what I'm trying to find out even

(866)448-DEPO
www.CapitalReportingCompany.com

Page 150

1  if you had Chatel lease your office space, because
2  you were affiliated with Washington Fine
3  Properties in October of '05, you would have had
4  to follow their own policies and procedures, isn't
5  that correct?
6        MR. BOUSE: I object.
7        MR. RANCK: Let me object, just I find
8  the question very vague and request that you
9  specify what policies and procedures you're
10 talking about.
11       MR. BOUSE: Yeah.
12 BY MR. SHAIBANI:
13    Q  Let's start with the policies and
14 procedures set forth in the independent contractor
15 agreement?
16       MR. BOUSE: Okay.
17 BY MR. SHAIBANI:
18    Q  Were you bound by these policies in
19 October of '05?
20       MR. RANCK: Which --
21       MR. BOUSE: Which one are you talking
22 about? Which paragraph?

Page 151

1        MR. SHAIBANI: Well, they have anti-trust
2  policy, they have anti-discrimination policies and
3  procedures. And these are pages 4 and 5 and also
4  carry over to page 6.
5        MR. SHAIBANI: Did we mark this as an
6  exhibit?
7        MS. KEYVAN: Yes, it's 12.
8        MR. BOUSE: 12. So the question is did
9  she have to comply with these in the leasing of
10 property by Chatel, is that the question?
11       THE WITNESS: Yes, in leasing your own
12 property in October of '05, were you nonetheless
13 bound to follow the anti-discrimination policies
14 and procedures of Washington Fine Properties set
15 forth on pages 5 and 6 of Exhibit 12.
16       MR. BOUSE: I object.
17       MR. RANCK: I object as well.
18       MR. BOUSE: You left out being leased by
19 Chatel, by the way.
20       MR. RANCK: I object on the basis that
21 your question is vague and compound.
22       MR. BOUSE: Yeah.

Page 152

1  BY MR. SHAIBANI:
2     Q  I'm sorry, could you please answer the
3  question?
4     A  Washington Fine Properties did not have a
5  commercial leasing department. So I had to go
6  elsewhere.
7     Q  Yes, but that's not my question. My
8  question is with respect to leasing your own
9  property in October of '05, were you bound to
10 follow the policies --
11    A  Unless I had an exception from them, I
12 would say. And they knew that I had --
13       MR. RANCK: And I'm going to object on
14 the ground that the document speaks for itself.
15       MR. BOUSE: Yeah, I object.
16       THE WITNESS: I mean, I wasn't hiding
17 anything from them. The property had to be
18 leased. They couldn't do -- very few people in
19 Georgetown do commercial leases.
20 BY MR. SHAIBANI:
21    Q  Would you agree then that because you
22 were an agent of Washington Fine Properties in

Page 153

1  October of '05, you had to follow the
2  anti-discrimination policies and procedures of
3  Washington Fine Properties with respect to the
4  leasing of your own property and I'm going to
5  point out the subparagraphs here, paragraph 2 --
6  excuse me, paragraph 20 A, B, C, D, E and F. And
7  if you'd like to take a moment to review these.
8        MR. RANCK: I'm going to make the same
9  objection that the document speaks for itself.
10       MR. BOUSE: I object.
11       MR. RANCK: And it's compound.
12       THE WITNESS: I don't have anything to
13 add to that. It seems to be pretty
14 straightforward there.
15 BY MR. SHAIBANI:
16    Q  Why don't I rephrase the question? And
17 with respect to leasing your own property to John
18 Bratton in October of '05, do you agree that you
19 had to follow paragraph 20 A of the
20 anti-discrimination policies and procedures of
21 Washington Fine Properties, which precludes an
22 agent to refuse to show, rent, negotiate for the

39 (Pages 150 to 153)

Capital Reporting Company

Page 154

1 sale or rental of or otherwise make unavailable or
2 deny a dwelling to any person because of race,
3 color, religion, sex, female status, national
4 origin or handicapped condition?
5    A   That's correct.
6       MR. RANCK: I object.
7       MR. BOUSE: I object to whether or not
8 she had to obey that because there was a contract
9 at Washington Fine Properties.
10       MR. RANCK: Mr. Shaibani, may I have a
11 continuing objection to all of these on the
12 grounds that the document speaks for itself, then
13 I don't have to keep interjecting?
14       MR. SHAIBANI: Sure.
15 BY MR. SHAIBANI:
16    Q   I'm sorry, could you please respond?
17    A   I don't have anything to say. It speaks
18 for itself.
19    Q   Are you saying that you didn't have to
20 follow the policy set forth in paragraph 20 A of
21 this document?
22       MR. BOUSE: That's not what she just

Page 155

1 said. She said the document speaks for itself.
2       MR. SHAIBANI: That's what you said.
3       MR. RANCK: Could we maybe go off the
4 record to shorten this or clarify it and maybe we
5 can step out. I don't want to make Ms. White to
6 step up. We need the court reporter, though.
7       THE WITNESS: You want me to go out?
8       MR. RANCK: I just want to put my
9 objection on record so it's clear. Let the record
10 reflect she's leaving the room. And I guess my
11 confusion, Mr. Shaibani, is whether your -- your
12 questions seems to imply that by virtue of this
13 contract she signed with Washington Fine
14 Properties she has to abide by its policies and
15 procedures in connection with personal business
16 unrelated to her efforts as a sales agent which is
17 what this document defines her as.
18       MR. SHAIBANI: Yes, that's my position,
19 absolutely.
20       MR. RANCK: I think you're asking her to
21 interpret the document which speaks for itself and
22 probably says in it whether it applies to her and

Page 156

1 her personal business. If you're asking whether
2 she has to abide by the laws against
3 discrimination generally as a property owner, then
4 I'm sure she can answer that question regardless
5 of whether Washington Fine Properties had a policy
6 or procedure in place with regard to something or
7 not. My question is and I guess, can you show me
8 where in this agreement it says that somebody who
9 happens to be a sales agent at Washington Fine
10 Properties must abide by all of its internal
11 policies and procedures when conducting their own
12 personal business unrelated to acting as a sales
13 agent for Washington Fine Properties? If it does
14 say that, then it speaks for itself. If it
15 doesn't say that, I think it's unfair for you to
16 put a nine page document in front of the witness
17 and expect her to answer a question like that.
18       MR. BOUSE: I think that's our confusion,
19 Mr. Shaibani. You're asking her the question and
20 she's trying to figure out.
21       MR. BRATTON: It's automatically.
22       MR. RANCK: That's your opinion,

Page 157

1 Mr. Bratton.
2       MR. SHAIBANI: We don't want you on the
3 record of the deposition. I know the question I'm
4 asking is straightforward and she says she
5 doesn't --
6       MR. BOUSE: She's saying the document
7 speaks for itself. If the document says she's
8 bound by it, she's bound by it, that's what her
9 answer is.
10       MR. RANCK: She's agreeing to be bound by
11 whatever the document says. I'm guessing and I
12 don't know because I don't represent her that when
13 presented with this nine page agreement she
14 consulted with legal counsel about its meaning,
15 very likely and came to an understanding then.
16 But to ask her now two years later almost, I think
17 it's fair to say it speaks for itself. But that's
18 my -- it's your deposition, if you want to keep
19 her, obviously you can. I just wanted do go on
20 the record.
21       MR. BOUSE: That's how she answered it.
22 If that's her answer, we're not going to go too

40 (Pages 154 to 157)

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 158

1  much longer with it.
2       (Witness returns)
3  BY MR. SHAIBANI:
4       Q  Ms. White, does this agreement in Exhibit
5  12, the Washington Fine Properties independent
6  contractor agreement, does it require you to
7  follow Washington Fine Properties
8  anti-discrimination policies with respect to
9  leasing your own commercial property?
10          MR. BOUSE: I object again for the same
11  reasons. She already said that the document
12  speaks for itself. I'll permit you to answer one
13  more time if you can.
14          THE WITNESS: I don't know what I could
15  add to it. I wasn't operating in the dark.
16  Washington Fine Properties knew I had to rent that
17  property. And they didn't have anybody in the
18  office who could handle it.
19  BY MR. SHAIBANI:
20       Q  That's not really my question. I'm not
21  saying whether you had to rent your office through
22  Washington Fine Properties. I'm saying if you

Page 159

1  were renting your property through Chatel, would
2  you still be bound by the anti-discrimination
3  policies of WFP?
4           MR. BOUSE: I object, she's already
5  answered that, the document speaks for itself. Do
6  you have anything to add to that?
7           THE WITNESS: No.
8           MR. BOUSE: Next question.
9           MR. SHAIBANI: I think you're coaching
10  your witness, Counsel. That's not her -- you
11  didn't let her answer the question initially. And
12  you interrupted and this is what we're left with
13  on the record, an objection from Counsel turning
14  into testimony of the witness.
15          MR. BOUSE: Okay, if you think so. I
16  disagree. Next question.
17  BY MR. SHAIBANI:
18       Q  What will happen if you were to violate
19  the anti-discrimination policies of this
20  independent contract of agreement with respect to
21  the sale of your own property -- with respect to
22  the leasing of your own property?

Page 160

1           MR. RANCK: Objection, lack of
2  foundation, assumes facts not in evidence.
3           MR. BOUSE: I object. Same reasons.
4           THE WITNESS: I don't think there's
5  anything in here that states what the punishment
6  is, is there? If that's what you're looking for.
7  BY MR. SHAIBANI:
8       Q  It's on page 6 in bold, "You should
9  understand any violation of our
10  anti-discrimination policy and procedures" --
11       A  "Up to and including discharged." Okay.
12  So it could include discharge.
13       Q  And did you actually receive the two
14  documents referenced in the last paragraph here,
15  paragraph 21 of this document, sales associate
16  acknowledges that he/she has received the
17  opportunity to review the Washington Fine
18  Properties policies and procedures manual, the
19  terms for housing policy and procedures manual and
20  the sales associate commission and understanding."
21       A  What line is that?
22          MR. BOUSE: 21.

Page 161

1           THE WITNESS: I probably did.
2       The question is did she receive those
3  documents referred to in paragraph 21?
4           THE WITNESS: I must have. They wouldn't
5  slip up on something like that. I'm sure I did.
6  BY MR. SHAIBANI:
7       Q  Isn't it true that by being a licensed
8  real estate broker in DC, you're bound by DC
9  anti-discrimination laws even in the sale or
10  leasing of your own personal property?
11       A  Yes, that's spelled out in there.
12       Q  Could you tell us what your -- the
13  average property that you sell, how much it's
14  worth.
15          MR. BOUSE: I object. What's the
16  relevance of that?
17          MR. SHAIBANI: Are you objecting on
18  relevance grounds? It goes to your defense to
19  competition and these Interrogatories.
20          MR. BOUSE: She already said now that's
21  not so. You don't want her to refute that
22  testimony. She said that was a mistake and it

41 (Pages 158 to 161)

Page 162

1  already has real estate in there. She already
2  testify to that. What's the relevance?
3      MR. SHAIBANI: The relevance is you
4  change your story at every stage of the case.
5      MR. BOUSE: That's something you can
6  argue, Mr. Shaibani. Based upon her testimony
7  that she didn't consider Mr. Bratton competition,
8  I'm not permitting her to answer that question.
9      MR. SHAIBANI: I'll hold you to that at a
10 trial then.
11     MR. BOUSE: Okay. You can.
12     THE WITNESS: I think I said I would go
13 by Tom's answers.
14     MR. BOUSE: Whatever Tom answered.
15 BY MR. SHAIBANI:
16   Q  In October of '05, was Barrett Anderson
17 your temporary office manager?
18   A  No, he was hired for the purposes of
19 closing the office. He was an independent
20 contractor.
21   Q  And isn't it true that you didn't pay his
22 salary for the month of January of '06?

Page 163

1   A  I didn't hear the first part of your
2  sentence.
3   Q  Isn't it true that you did not pay him
4  his salary for the month of January '06 while he
5  was working for you?
6   A  Where does that question come from?
7      MR. BOUSE: Yeah, I don't know. Did you
8  pay a salary as far as you know?
9      THE WITNESS: No, his employment ended on
10 December 31st.
11 BY MR. SHAIBANI:
12   Q  Are you saying that he didn't physically
13 work at --
14   A  I think he did a few more things because
15 he took some time off in December. He was paid
16 for working every day in December but there were
17 days when he didn't work. He did, I think, come
18 in and do some work but I didn't supervise him.
19 He had a certain amount of work to be completed.
20 We had agreed on a salary for that.
21   Q  Did Barrett Anderson have any duties
22 relating to the leasing of your property?

Page 164

1   A  No.
2   Q  He didn't show the property to
3  prospective tenants?
4   A  He took it upon himself to do that when
5  people walked into the office. It wasn't the case
6  of showing it, it was right there.
7   Q  He didn't have any contacts with Chatel
8  relating to the leasing of property?
9      MR. RANCK: Objection.
10     MR. BOUSE: Objection, if you know.
11     MR. RANCK: Objection, mischaracterizes
12 her prior testimony.
13     THE WITNESS: I don't think so. What
14 kind of relationship are you talking about?
15 BY MR. SHAIBANI:
16   Q  Did you have him call Chatel to tell them
17 you want to do this or that with the property or
18 you want them to --
19   A  Didn't we already discuss this morning
20 about the fact that we thought maybe the ad could
21 be improved a little bit?
22   Q  Was that the only communication that he

Page 165

1  had with Chatel?
2   A  I'm not aware of anything else but he
3  could have at least trying to be helpful. He was
4  trying to be helpful, but his job was to close the
5  office.
6      (White Exhibit No. 13
7      was marked for identification).
8  BY MR. SHAIBANI:
9   Q  This is Exhibit 13, your responses to the
10 Office of Human Rights Interrogatories.
11   A  The contract --
12     MR. BOUSE: Which number are you talking
13 about?
14     THE WITNESS: Answer to 5, he was a
15 contract employee to close the office.
16 BY MR. SHAIBANI:
17   Q  Yes, in response to question 5, "Identify
18 the officers, agents and employees whose duties
19 included day to day operation of the business
20 entity." Your answer was, "Mary White, Inc. has
21 only one employee at the present time, his name is
22 E. Barrett Anderson. He's a contracting employee

Page 166

1  and a temporary office manager at 1622 Wisconsin
2  Avenue."
3      A   He was a contract employee hired for the
4  purpose of closing the office. I don't know maybe
5  you took that as a temporary office manager. I
6  don't consider him that.
7      Q   Is your signature on the last page?
8      A   Yes.
9      Q   And didn't you write this response
10 yourself?
11         MR. BOUSE: I object, I don't know.
12         THE WITNESS: That is an error.
13         MR. BOUSE: Were you represented by
14 counsel in this?
15         MR. RANCK: Yes, let me say for the
16 record of the people in this room of counsel, I'm
17 the only one that was involved at the Office of
18 Human Rights stage. And Ms. White was represented
19 by counsel, not me, at some point in that
20 proceeding. I can't speak to whether she was
21 represented by counsel in connection with this
22 document but certainly I would caution the witness

Page 167

1  with regard to privilege since Mr. Bouse wasn't
2  involved.
3  BY MR. SHAIBANI:
4      Q   The question was did you draft these
5  responses yourself?
6         MR. BOUSE: I object. Do you know if
7  Gordon was involved?
8         THE WITNESS: I think Gordon was
9  involved, uh-huh. By my description, my
10 identification of his duties, Gordon might have
11 come to that conclusion to give him that title.
12 It wasn't the title I gave him.
13 BY MR. SHAIBANI:
14     Q   Did you supply -- I'm sorry, is it your
15 testimony that John Gordon Forrester drafted these
16 responses?
17     A   I don't know how this got done. I really
18 don't. I did sign it. Is there anything else in
19 this document that you object to?
20     Q   On the first page -- I'm not objecting to
21 anything. I'm just trying to find out who
22 supplied the response to these.

Page 168

1         MR. BOUSE: She's answered that. Go
2  ahead, next question.
3  BY MR. SHAIBANI:
4      Q   On the first page in response to the
5  first question where it says, "Mary White, Inc. is
6  a corporation organized and qualified to do
7  business in the District of Columbia," you
8  mentioned previously that Mary White, Inc. held
9  your real estate brokers license until it was
10 transferred to Washington Fine Properties. And
11 Mary White, Inc. is also listed here as the
12 business involved with the leasing of the
13 property.
14         MR. BOUSE: No, that's not what the
15 question says.
16         THE WITNESS: It doesn't say that.
17 BY MR. SHAIBANI:
18     Q   Why is Mary White, Inc. here as opposed
19 to Mary White Real Estate?
20         MR. BOUSE: I object. If you know.
21         THE WITNESS: The answer is on behalf of
22 Mary White, Inc. The business structure -- must

Page 169

1  have some kind of form that had to be filled out.
2         MR. BOUSE: If you don't know, Mary, just
3  say, "I don't know."
4         THE WITNESS: I don't know.
5  BY MR. SHAIBANI:
6      Q   In response to question 6 which is on
7  this second page of the document BRA 188, you see
8  where it says in your answer you're saying the
9  second sentence, "I've never seen the complainant
10 and did not know that he is African American until
11 sometime on or about October 12th." Do you still
12 stand by --
13     A   Where is it?
14         MR. BOUSE: No. 6. Give her a second.
15         THE WITNESS: That's true.
16 BY MR. SHAIBANI:
17     Q   Isn't it true that you received
18 Mr. Bratton's electronic business card, which I'd
19 like to distribute as Exhibit 14 here.
20         (White Exhibit No. 14
21         was marked for identification).
22         THE WITNESS: No, the first time I saw

## Capital Reporting Company

Page 170

1 that was yesterday. I didn't know what you were
2 talking about in the depositions. I saw that
3 referred to. I didn't know what it was.
4    Q And didn't Barrett Anderson give
5 Mr. Bratton's business card, didn't he leave it at
6 your office as part of the mail that was coming in
7 on the 6th of October?
8    A I don't think so. I never saw it.
9    Q Didn't John Pagones inform you that
10 Mr. Bratton was African American on October 7th?
11    MR. BOUSE: Objection, she already
12 answered that question. Go ahead.
13    THE WITNESS: I've already answered it.
14    MR. BOUSE: You can answer it again,
15 Mary.
16    THE WITNESS: Did John Pagones? No.
17 Give me the question again.
18 BY MR. SHAIBANI:
19    Q Didn't John Pagones inform you on October
20 7th --
21    A No.
22    Q -- that John Bratton was African

Page 171

1 American?
2    A No, I told you my recollection of that
3 conversation is he told me to note who the
4 character references were.
5    Q And how did you find out that Mr. Bratton
6 was African American then?
7    A I don't remember.
8    Q Was it through your discussions with
9 Thierry Liverman on the 12th of October in the
10 evening?
11    A I just don't know.
12    Q Didn't you in fact ask Mr. Liverman in
13 your meeting on October 12th whether you had to
14 accept Mr. Bratton's lease in order not to be
15 sued?
16    A That's possible. I might have asked
17 that. I don't know. John had evidently implied
18 that, are you saying? The only thing he told me
19 was the character. He wanted to be sure I was
20 free to work with either one.
21    Q Why would you ask that question?
22    A I guess when you get two leases, you want

Page 172

1 to know what you have to deal with, how does he as
2 the presenting agent or broker want me to handle
3 these.
4    Q Did you at any point believe that John
5 Bratton couldn't afford to rent your property?
6    A I think that what John's net worth was
7 something that kept changing so we just had to be
8 sure that it was accurate. It just kept changing.
9    Q Did you request two years of income tax
10 returns and bank statements from Mr. Bratton
11 because you wanted to find out if he would
12 financially qualify for renting your property?
13    A Well, I think when he signed the
14 permission to do a credit check, it said if he was
15 self-employed, bank statements and income tax
16 statements would be provided.
17    Q How many years of tax returns did you
18 request from Mr. Bratton?
19    A That would be up to Gordon Forrester's
20 recommendation.
21    Q Do you recall what his recommendation
22 was?

Page 173

1    A No.
2    Q Why is it that you didn't require two
3 years of income tax returns and bank statements
4 from Roberta Medlin?
5    A How do you know I didn't?
6    MR. BOUSE: I object.
7 BY MR. SHAIBANI:
8    Q Did you?
9    A We didn't get that far with hers.
10    Q Did you request it from her, though?
11    A Did she fill out the same credit report?
12 If she did, she would have agreed to and we'd be
13 able to ask for it. I'd have to look at her
14 application she filled out. It was the same one
15 John filled out. We have the right to ask for
16 them.
17    Q I know you have the right to ask for them
18 but did you actually ask her to submit you those
19 documents in order to financially qualify for the
20 lease?
21    A If we got further along in the
22 negotiations, we would have. We didn't get that

44 (Pages 170 to 173)