```
0001
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3    ------------------------------------X
 4    JOHN BRATTON,                        :
 5                 Plaintiff               :
 6         v.                              :   Case No.:
 7    CHATEL REAL ESTATE, INC., et al.,    :   1:06CV00694
 8                 Defendants              :
 9    ------------------------------------X
10
11             Deposition of THOMAS J. LYNCH
12                    Washington, D.C.
13                Friday, February 9, 2007
14                       1:25 p.m.
15    Job No.: 1-96264
16    Pages 1 - 211
17    Reported by:  Lynn Schindler
18
19
20
21
22
```

```
0030
 1      Q    Does it matter for the purpose of your
 2   opinions what the defendants, what their explanation
 3   is for the things that Mr. Bratton accuses them of?
 4           MR. SHAIBANI:  Same objection.
 5      A    I wasn't privy to the depositions of the
 6   defendants prior to the 20th of October, with the
 7   exception of Roberta Medlin's deposition.
 8   BY MR. RANCK:
 9      Q    That doesn't answer my question, with all
10   due respect.  The question is without regard to
11   whether you were privy to them, does what they say,
12   does their explanation for the allegations leveled at
13   them, does that matter to you in the formation of your
14   opinions?
15      A    If I think I understand what you're saying,
16   it does.
17      Q    You see in Exhibit 2, where it in the first
18   paragraph, the last sentence of the first paragraph,
19   can you read that to yourself, please?  Actually, for
20   Mr. Bouse's benefit, if you would read that aloud,
21   that would probably be helpful to him.
22           MR. BOUSE:  What are you asking him to read
```

```
0031
 1  from, Matt?  I'm sorry.
 2           MR. RANCK:  The September 12 letter, Exhibit
 3  2.
 4           MR. BOUSE:  I don't have that, okay.
 5           MR. RANCK:  That's why I'm asking him to
 6  read it for you, Bob.
 7       A   You want me to read the --
 8  BY MR. RANCK:
 9       Q   The last sentence in the first paragraph.
10       A   The last sentence of the first paragraph.
11  You will be asked to render an expert opinion whether
12  the defendants' conduct in this case with respect to
13  leasing Georgetown office space to John Bratton
14  amounted to discrimination, a violation of the civil
15  rights act and the District of Columbia human rights
16  act.
17       Q   Okay.  Does that in a general sense
18  accurately capture of nature of your opinions in this
19  case?
20       A   I believe it does.
21       Q   Okay.  Can I have this back, please?  Can
22  you give me a little bit of background on your -- the
```

```
0070
 1   reflected on this -- in your handwritten notes on the
 2   September 22 letter that says 2.5 hours?
 3       A    Yeah, I write on papers in front of me or
 4   envelopes.
 5       Q    Okay.
 6       A    I was 2.5 hours working on this document in
 7   Mr. Shaibani's office.
 8       Q    So you came here and met with him?
 9       A    That is correct.
10       Q    And prepared it together.  Did you tell
11   Mr. Shaibani what to put in the report, or did he put
12   things in the report himself?
13            MR. SHAIBANI:  I'll make an objection on the
14   basis of asked and answered to the extent it's a joint
15   product of counsel and Tom Lynch.
16            MR. RANCK:  You can make that objection, but
17   I'm going to find out who contributed what to this
18   report.
19   BY MR. RANCK:
20       Q    So my question is is did you put everything
21   in that report in there, or was that put in there by
22   Mr. Shaibani, and then you later agreed to it?
```

```
0071
 1            MR. SHAIBANI:  I'm going to instruct him not
 2    to respond to the way you phrased the question,
 3    because it's highly misleading basically.
 4            MR. RANCK:  I don't see why it's misleading.
 5    The witness can answer the question as to whether you
 6    told him everything to put in the report.
 7    BY MR. RANCK:
 8       Q    Did you tell Mr. Shaibani what to put in the
 9    report, or did he prepare the report prior to you all
10    even getting together?
11            MR. SHAIBANI:  Again, as I said, this was a
12    joint product of counsel and Tom Lynch, and whether we
13    had discussions and I typed something, then he looked
14    at it, he submitted another his comments, and I
15    revised it again.  This is a going back and forth
16    project.  It's not -- you cannot say if I presented
17    something and he signed off on it.  If that's your
18    question, I would say that's clearly not what
19    happened.
20            MR. RANCK:  Well, here's -- I'd like an
21    answer to my last question.
22    BY MR. RANCK:
```

```
0072
 1      Q    Can you answer my question?
 2           MR. BOUSE:  Why don't we swear Mr. Shaibani
 3   in since he just testified.
 4           MR. RANCK:  He may get his chance.
 5   BY MR. RANCK:
 6      Q    But can you answer my last question?
 7      A    Would you just -- somebody repeat the
 8   question.
 9      Q    Well, let me -- I'll start over, because I
10   am going to walk through this.  All of the documents
11   or notes or what have you that you prepared with
12   regard to your participation in this case, none of
13   them indicate any substantive discussion between you
14   and Mr. Shaibani prior to October 12 when you said you
15   had this meeting.  Okay?  You've got six hours, it
16   looks like, reviewing a package and two hours
17   reviewing Ms. Medlin's deposition.  Am I interpreting
18   your notes right?
19      A    I think they're pretty self-explanatory.
20      Q    Am I interpreting them right?
21      A    Correct?
22      Q    So it does not appear that you had
```

0073

```
 1   substantive conversations with Mr. Shaibani prior to
 2   the genesis of this draft report Exhibit 3; correct?
 3           MR. SHAIBANI:  Objection.  Asked and
 4   answered in the beginning of the deposition when we
 5   first talked, and what we talked about.
 6   BY MR. RANCK:
 7       Q    You can answer.
 8       A    As I said earlier, we spoke in general about
 9   these things.  I didn't put all the footnotes in here.
10   The footnotes reference the documents.
11       Q    Was that document, Exhibit 3, in some form
12   prepared when you arrived for your meeting with
13   Mr. Shaibani?
14       A    It was.
15       Q    Can you tell me how much of that document
16   was prepared when you arrived for your meeting with
17   Mr. Shaibani?
18           MR. SHAIBANI:  Are you asking him to read
19   the whole report?
20           MR. RANCK:  He can look at whatever he
21   wants.  I want to know how much of that you prepared,
22   and how much came from this expert witness.  That's
```

```
0074
 1   exactly what I want to know.
 2          MR. SHAIBANI:  And as I said before, this
 3   was a joint product of counsel and Tom Lynch.
 4   BY MR. RANCK:
 5      Q   Mr. Lynch, my question is is how much of
 6   that report was put together before you got here on
 7   October 12?
 8      A   I'd say a goodly amount of it.  Yeah.
 9      Q   Almost the entire thing?
10      A   A very large, large portion of the report or
11   the elements of the report.  I can't say, you know, I
12   don't have a copy -- I don't have a copy of changes
13   and wordsmithing and other things that I added in
14   here.  I don't know how these two compare.  I know I
15   was reading a Word document.  I have a copy of this in
16   both Word and a PDF file.
17      Q   You got a copy of it in Word from
18   Mr. Shaibani.
19      A   Correct.
20      Q   And a PDF from him.
21      A   Correct.
22      Q   After your meeting on the 12th.
```

```
0075
 1      A    Correct.
 2      Q    All right.  What changes do you recall were
 3   made to the draft report at your meeting on the 12th?
 4      A    I don't recall.
 5      Q    Do you recall any substantive changes that
 6   you asked be made to that draft report?
 7           MR. SHAIBANI:  Objection.  Asked and
 8   answered.  If you want to convert the two documents
 9   and see what the changes are, that's how you can
10   arrive at your answer.  I mean, this is -- it's been
11   months before -- since these were drafted.  How do you
12   expect him to point out which words to change on which
13   page right now?
14           MR. RANCK:  Most experts will recall when
15   counsel prepares a report, and they have to ask for
16   something to be changed.  They recall it, Mr.
17   Shaibani.
18   BY MR. RANCK:
19      Q    Mr. Lynch, my question is what substantive
20   changes did you ask or require be made to the draft
21   report that Mr. Shaibani prepared before you got here
22   on the 12th of October?
```

```
0076
 1      A    As best as I can remember, the changes I
 2   would have asked for would have been the deal with
 3   phraseology or perhaps the connection of more in --
 4   something more in keeping with my interpretation of
 5   the D.C. human right act and how it applies, and what,
 6   you know, what's my understanding of protected
 7   classes.  It was more --
 8      Q    Is it fair to say, and I'm asking you this
 9   question, not Mr. Shaibani.  Is it fair to say that he
10   prepared your report, and you signed off on it?
11           MR. SHAIBANI:  Objection --
12   BY MR. RANCK:
13      Q    -- with some changes to phraseology?
14           MR. SHAIBANI:  -- objection.
15   Mischaracterizes prior testimony.  Asked and answered.
16   BY MR. RANCK:
17      Q    You can answer.
18      A    No, I believe, and I've said to you I can't
19   pinpoint exactly there, but I would say some of the
20   changes I suggested would have to be considered
21   substantial because there were changes more than just
22   the -- we're not just talking about wordsmithing.
```

```
0077
 1      Q    But the interpretation of the law, those are
 2   changes you made.  Did you ask him to change any
 3   conclusions?
 4           MR. SHAIBANI:  I'll object on vagueness.
 5   What conclusions are you referring to?  The last page
 6   that's captioned conclusion?
 7   BY MR. RANCK:
 8      Q    Did you ask him to change any conclusions or
 9   opinions?
10      A    No, I don't think we asked to change
11   opinions fundamentally or conclusions fundamentally.
12      Q    Did you ask him to add or eliminate any of
13   the substantive factual assumptions contained in the
14   report?
15           MR. SHAIBANI: Objection.  Asked and
16   answered.
17      A    I would say we were substantially in
18   agreement as to the nature of the report.
19   BY MR. RANCK:
20      Q    Well, you were substantially in agreement
21   with the nature of the report he prepared, the draft;
22   correct?
```

```
0078
 1      A    That's correct, and that's not in any shape
 2   or form unusual in an expert witness situation.
 3      Q    I would beg to differ, but I guess people
 4   can have different opinions on that.  Bear with me one
 5   second, please.  Do you have any notes or changes to
 6   the draft or anything of that nature on your computer
 7   with regard to what he e-mailed you?
 8      A    No.
 9      Q    Okay.  All right.  Let's take a look at
10   what's been marked as Exhibit 4.
11           MR. RANCK:  Bob, Exhibit 4 is the final
12   report that was filed?
13           MR. BOUSE:  Okay, thanks.
14           MR. RANCK:  Although we'll have witness
15   confirm that, but just so the record's clear, I
16   discussed this with Mr. Shaibani off the record and
17   he's okay with this.  Exhibit 4 contains an unsigned
18   page 27, that is, there's a signature line, but no
19   signature.  Mr. Shaibani had provided separately the
20   signature, Mr. Lynch's actual signature, so what we've
21   done is just appended -- there are two page 27s.
22           MR. BOUSE:  I've got that.
```

```
0131
 1   opinion that Mr. Liverman in conveying that message to
 2   Mr. Bratton was engaged in unlawful racial
 3   discrimination or discrimination based upon
 4   Mr. Bratton's personal appearance, is that your
 5   testimony?
 6         MR. SHAIBANI:  Objection.  Assumes facts not
 7   evidence, mischaracterizes the record, calls for
 8   speculation.
 9      A    If, in fact, the property was not under
10   contract with Roberta Medlin, then his
11   characterization of what actually was going on was
12   saying something was unavailable when, in fact, it was
13   still available, and that is one of the principal
14   no-nos as far as dealing with human rights and fair
15   dealing with respect to the D.C. Human Rights Act.
16   BY MR. RANCK:
17      Q    Do you have an opinion, because you said a
18   minute ago, well, more like three or four minutes ago,
19   and I quote, I can't get into the mind.
20      A    I think she has to quote it.
21      Q    I can't get into the mind of Chatel.  And my
22   question is are you prepared to testify in federal
```

0132

1   court that Thierry Liverman, when he had that
2   conversation, assuming that conversation with John
3   Bratton, that he was motivated by racism?
4           MR. SHAIBANI:  Objection.  Assumes facts not
5   in evidence, calls for speculation, mischaracterizes
6   the record.
7   BY MR. RANCK:
8       Q   Is that going to be your testimony,
9   Mr. Lynch?
10      A   My testimony will be that he participated in
11  a prohibited activity under the D.C. human rights act.
12      Q   And you can't say whether it's motivated by
13  racial animus, discrimination based on Mr. Bratton's
14  personal appearance, or just sloppy realtoring by
15  Mr. Liverman; can you?
16          MR. SHAIBANI:  Same objections.
17      A   When someone who -- when the issue of race
18  and personal appearance and any one of those other
19  issues come up, when someone engages in a prohibited
20  activity, the perception of discrimination is just as
21  much a cause of action as actually doing it, and
22  that's the way it is.

```
0236
 1     A    Well, it's clear that the fair housing
 2  manual addresses the protected classes of the 68 laws
 3  amended.  It does refer to the Civil Rights Act of
 4  1866, which says race is a protected class, which is
 5  the first protected class.
 6     Q    Would you agree with me that the fair
 7  housing manual is for residential transactions;
 8  correct?
 9          MR. SHAIBANI:  I will object to that
10  question to the extent that it mischaracterizes the
11  document.
12     A    I think it's a misnomer to think that --
13  personally, I don't care for the word fair housing to
14  describe the way real estate agents have to conduct
15  their business in the District of Columbia as compared
16  to other jurisdictions.  Fair housing is just one
17  element of the D.C. Human Rights Act, and I think the
18  two are adjoined at the hip.  And that's why it's
19  important.
20  BY MR. RANCK:
21     Q    I'm not asking for whether the Fair Housing
22  Act, which, as amended or expanded, may comprise a
```

```
0237
 1   commercial transaction or may involve commercial
 2   transactions.  I'm asking specifically about Chatel's
 3   fair housing manual.
 4           MR. SHAIBANI:  I'd like to raise the same
 5   objection.  The document speaks for itself, and your
 6   interpretation of it mischaracterizes the document.
 7   BY MR. RANCK:
 8       Q   Okay.  Well, do you understand my question,
 9   Mr. Lynch?
10       A   I understand your question.
11       Q   Do you think Chatel violated its own fair
12   housing manual?
13       A   I think they did insofar as they violated
14   elements of the 1866 civil rights law and the D.C.
15   Human Rights Act of 1977, as amended.
16       Q   Okay. Can you turn to page BRA 246 of the
17   fair housing manual?  That the version you have, with
18   the BRA numbers?
19       A   Correct.
20       Q   And before I go through this series of
21   questions, I do want to make sure you understand.  I'm
22   not asking whether the spirit of the Fair Housing Act
```

```
0308
 1   could please turn to page 2 of Chatel's fair housing
 2   manual, which is designated by BRA 247?
 3       A    Okay.
 4       Q    At the bottom of the page, do you see where
 5   it says it is unlawful to represent a house or
 6   apartment as unavailable when, in fact, it is
 7   available?
 8       A    Correct.
 9       Q    Do you believe that misrepresentation about
10   the availability of a property is a violation of the
11   civil rights act and the D.C. Human Rights Act if that
12   misrepresentation is based on the race of the
13   applicant --
14            MR. RANCK:  Objection.
15       Q    With respect to a commercial property?
16            MR. RANCK:  Objection.  Calls for a legal
17   conclusion.
18            MR. BOUSE:  Objection.
19       A    I would offer that saying that the property
20   is unavailable that, in fact, is not unavailable on
21   basis of race would be a violation of both the 1866
22   civil rights law as well as the D.C. Human Rights Act
```

```
0309
 1   of 1977, as amended.
 2   BY MR. SHAIBANI:
 3       Q    And do you see at the bottom of page 2 of
 4   Chatel's fair housing manual, where it says it is
 5   unlawful to refuse to rent or to negotiate for the
 6   rental of a house or apartment or otherwise make
 7   housing available?  Do you believe that this provision
 8   applies to commercial property?
 9            MR. RANCK:  Objection to the form and calls
10   for a legal conclusion.
11            MR. BOUSE:  I object.
12       A    It certainly does under the D.C. Human
13   Rights Act of 1977, as amended.
14   BY MR. SHAIBANI:
15       Q    And the next page, on page 3, do you see
16   where it says it is unlawful to discriminate in the
17   terms and conditions for renting a house or apartment?
18   Do you believe that it's a violation of the civil
19   rights act and the D.C. Human Rights Act to
20   discriminate in the terms and conditions for renting a
21   commercial property?
22       A    I do.
```

```
0310
 1      Q    And do you believe that Chatel violated its
 2   fair housing manual by misrepresenting the
 3   availability of Mary White's property to John Bratton
 4   by refusing to provide him the same level of services
 5   as that provided to Roberta Medlin?
 6           MR. RANCK:  Objection to form.
 7           MR. BOUSE:  Object.
 8      A    I believe, as I think I said earlier, it
 9   does in the sense that the fair housing manual, which
10   we had a great discussion today about housing -- that
11   the fair housing manual does reference the 1866 law
12   and the D.C. Human Rights Act, and to that extent, it
13   is an issue.
14   BY MR. SHAIBANI:
15      Q    Is it a violation of the standards and
16   regulations of the real estate profession to inform a
17   prospective candidate that they would be better off
18   renting property in another location?  For instance,
19   to tell him instead of looking for office space in
20   Georgetown, why don't you look for office space in the
21   northeast of Washington, D.C.  Would that be
22   discriminatory?
```