Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------X

JOHN BRATTON,                       :

    Plaintiff                       :

v.                                  :  Case No.:

CHATEL REAL ESTATE, INC., et al.,   :  1:06CV00694

    Defendants                      :

------------------------------------X

Deposition of THOMAS J. LYNCH

Washington, D.C.

Friday, February 9, 2007

1:25 p.m.

Job No.: 1-96264

Pages 1 - 211

Reported by: Lynn Schindler

EXHIBIT 2

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

7852bbcd-ae9c-4c2f-93ef-0f4dda0abe40

Page 22

1  A  Never.
2  Q  Ever failed to qualify?
3  A  Never.
4  Q  Ever been sued yourself?
5  A  No.
6  Q  Ever had your company, any company that you
7  were -- had an ownership interest sued as a result of
8  any transaction that you were involved in?
9  A  No.
10 Q  Any disciplinary or ethical or licensing
11 complaints filed against you?
12    MR. SHAIBANI: Objection.
13 A  None.
14 BY MR. RANCK:
15 Q  Thank you. When was your first involvement
16 in this case?
17 A  I would say prior to the date of that letter
18 was the --
19 Q  Let me show you what's been marked as
20 Exhibit 2, if I could, please. Can you identify that
21 for the record?
22 A  Yes. This is a letter from Mr. Shaibani to

Page 23

1  me basically saying that they would like to retain my
2  services in this particular case, Bratton v. Chatel
3  Real Estate, Inc.
4  Q  And that's dated September 12?
5  A  That's correct.
6  Q  Did you have conversations with Mr. Shaibani
7  about the case prior to receiving that letter?
8  A  I did.
9  Q  Okay. Do you recall the nature or substance
10 of the conversations?
11    MR. SHAIBANI: Objection.
12 A  Sorry. I'm sometimes too fast.
13 BY MR. RANCK:
14 Q  You can go, you can answer.
15 A  Yeah. The nature of the conversation was
16 pretty much the same as the conversation that I'd have
17 with any attorney who was talking to a prospective
18 expert witness, a few minutes of recitation of the
19 facts of the case, and my more or less immediate
20 reaction to the case as to whether or not -- as to how
21 I read the case, and obviously the first read of my
22 part, not literally reading, but reading based on the

Page 24

1  recitation of facts of the case from the attorney, I
2  would take a general position, and we had that
3  conversation, and then I sent to Mr. Shaibani my CV
4  and my rate schedule, and he responded, I suspect a
5  few days later on the 12th with this letter, and then
6  the package arrived around the 22nd.
7  Q  What is your rate schedule?
8  A  $125 per hour for consultation reading.
9  $175 an hour for depositions with four-hour minimums,
10 $2,000 per day for a court appearance, and expenses
11 beyond 20 miles.
12 Q  All right. Now, getting back to your
13 conversation with Mr. Shaibani prior to receiving
14 Exhibit 2, can you tell me, do you recall the
15 substance of his summation of the facts that he gave
16 you?
17    MR. SHAIBANI: Objection.
18    MR. RANCK: Basis.
19    MR. SHAIBANI: I'm just making a general
20 objection to preserve it for trial.
21    MR. RANCK: Well, what's the basis of it
22 though, I'm asking?

Page 25

1     MR. SHAIBANI: It would be a joint mediation
2  privilege objection.
3     MR. RANCK: What you told the expert is
4  privileged?
5     MR. SHAIBANI: Well, if the expert is part
6  of the team, I believe that could qualify under joint
7  litigation privilege.
8     MR. RANCK: Okay.
9  BY MR. RANCK:
10 Q  You can answer the question.
11    MR. BOUSE: I didn't -- he trailed off.
12 That his response, the team --
13    MR. RANCK: That it could qualify under a
14 joint litigation privilege, and I said okay, and told
15 the witness he could answer.
16    MR. BOUSE: All right.
17    THE WITNESS: I would say the conversation
18 that Mr. Shaibani and I had are pretty much the issues
19 that are recited throughout the case, the situation
20 with respect to Mr. Bratton attempting to lease the
21 property at 1622 Wisconsin Avenue, Northwest; the fact
22 that there was another potential lessee; there was

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 26

1  apparent difficulty on the part of Mr. Bratton to be
2  able to get the Chatel organization to create a lease
3  for him, so he started preparing his own.
4      Mr. Bratton felt that the delay in doing
5  the actual lease and the possibility of the talk
6  about another lease being accepted in place of
7  his, he felt that he was being discriminated
8  against, and I said it certainly sounds very, very
9  plausible and reasonable that we have a case of
10 discrimination here based on his race and other
11 protected interests under the D.C. Human Rights
12 Act of 1977 as amended, specifically personal
13 appearance. And that was pretty much our
14 discussion of the facts of the case.
15     Obviously, when you discuss it with an
16 attorney who's going to hire you as an expert
17 witness, you hear the facts of the case as
18 presented -- as they were presented by
19 Mr. Shaibani, and I said that bears out. I have
20 no problem saying that I have a reasonable belief
21 that there was an issue here.
22 BY MR. RANCK:

Page 27

1   Q  Did you just say if that bears out?
2   A  I said when you have a discussion, you get
3  hired, obviously there's a big difference between
4  going through a ton of material and having a brief
5  conversation.
6   Q  Sure. But did you tell him if that bears
7  out --
8   A  I can't say that I -- I can't say that I
9  said that. What I'm saying is, when I have been asked
10 to be an expert witness, and I've been told the facts
11 and I said well, based on what you told me,
12 everything's okay, and then I review things and I'm
13 saying, you know, I don't think this is quite the way
14 I understood you to present it, and I am not
15 comfortable with it, and I said, you know, I really
16 don't want to do this case. I will demur in this
17 case.
18  Q  Did you ask him any questions during that
19 conversation that you recall that might have been
20 pertinent to your immediate reaction?
21  A  I suspect I did. I mean, it was an
22 interactive conversation, but, exactly what I said,

Page 28

1  what I didn't say, I would ask probably more questions
2  if the presentation of the facts were less coherent
3  than they apparently were that day, because I don't
4  suspect I asked an awful lot of questions. Based on
5  what you've told me --
6   Q  Did you take any notes of that conversation?
7   A  You know, I might have, but probably very
8  sketchy. I do a lot better listening than trying to
9  write.
10  Q  You didn't maintain those? If you took
11 them, you don't have them anymore; is that fair?
12  A  That's quite possible I don't have any more.
13 It's quite possible.
14  Q  If you do, I just ask you provide them to
15 Mr. Shaibani so we can get them if you're not sure.
16 Did you ask him -- do you recall asking him what the
17 defendant's explanations for their alleged conduct
18 was?
19  A  I don't specifically recall that. No, I
20 don't. I mean, I'd be guessing now as to what I said,
21 but I don't recall specifically saying something like
22 that.

Page 29

1   Q  With regard to your opinions that you intend
2  to offer in this case, are the defendants'
3  explanations to the allegations leveled at them by
4  Mr. Bratton, are they pertinent to your evaluation?
5      MR. SHAIBANI: I'm going to object on
6  vagueness grounds.
7  BY MR. RANCK:
8   Q  You can answer.
9   A  Just repeat the question, please.
10  Q  With regard to the opinions you intend to
11 offer in this case, are the defendants' explanations
12 as to their alleged conduct pertinent to those
13 opinions, to your evaluation?
14     MR. SHAIBANI: Same objection. I guess I'm
15 trying to find out are you referring to what Mr.
16 Bratton told him, or what he drew from reading his
17 deposition and the documents in the case?
18     MR. RANCK: None of that. That wasn't my
19 question at all.
20     THE WITNESS: Well, then clarify your
21 question.
22 BY MR. RANCK:

8 (Pages 26 to 29)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

7852bbcd-ae9c-4c2f-93ef-0f4dda0abe40

Page 66

1  after two years, then giving Mr. Bratton an option for
2  a third year, that would hinder her ability to sell
3  the property; would it not?
4      MR. SHAIBANI: Objection. Calls for
5  speculation. Mischaracterizes the record.
6   A  I don't believe it necessarily has to.
7  BY MR. RANCK:
8   Q  Why is that? Why is --
9   A  Well, it depends on who the purchaser is.
10  Q  Assume the purchaser wanted to purchase the
11 property and move in immediately, take over --
12  A  That's a different question.
13  Q  Well, that's my question.
14  A  Well, but that's not the way it was
15 presented.
16 BY MR. RANCK:
17  Q  Well, maybe not the way it was interpreted.
18  A  No, it was not the way it was presented,
19 because you asked in a very general sense, you said to
20 interfere with her ability to sell, and I said not
21 necessarily so. it would depend on who the purchaser
22 was. That's very clear.

Page 67

1   Q  So you agree there are circumstances in
2  which it would interfere with her ability to sell?
3      MR. SHAIBANI: Same objections.
4   A  I do, just as I would feel that it would be
5  beneficial as well. Could be beneficial as well.
6  BY MR. RANCK:
7   Q  But that gets back to the -- that's for the
8  owner-lessor to decide; right? What's in their
9  interest, his or her own interest; correct?
10  A  I would think any party to a contract,
11 lessor, lessee, is looking for his or her best
12 interest.
13  Q  And there's nothing discriminatory about, as
14 a general matter, about not giving a commercial lessee
15 an option for an additional year after the end of the
16 original term; is that right?
17     MR. SHAIBANI: Objection. Calls for
18 speculation. Mischaracterizes the record.
19  A  Not offering an extension for reasons other
20 than trying to avoid working with a protected class is
21 not a problem.
22 BY MR. RANCK:

Page 68

1   Q  All right. Let me hand you what's been
2  marked as Exhibit 3, which I've not looked at yet
3  today. I received it here at the deposition. If you
4  can identify that for me.
5   A  I would say Exhibit 3 is my list of my
6  opinions, some credentials, a list of documents that I
7  reviewed prior to.
8   Q  Okay. That Exhibit 3 on the front page
9  bears a stamp that says draft. Do you see that?
10  A  Okay.
11  Q  And I believe, perhaps you can confirm it,
12 but I believe Mr. Shaibani is representing that that's
13 a draft of your report.
14     MR. RANCK: Is that true, Mr. Shaibani?
15     MR. SHAIBANI: Yes. I stamped draft on it
16 to make that clear.
17     MR. RANCK: To distinguish it from the
18 actual report?
19     MR. SHAIBANI: From the final version, yes.
20 BY MR. RANCK:
21  Q  Did you review the draft that's represented
22 by Exhibit 3?

Page 69

1   A  I did.
2   Q  You reviewed a draft before you signed the
3  final report; correct?
4   A  I reviewed a draft, and I reviewed the final
5  report before I signed it.
6   Q  Whose computer does that draft exist on?
7  Did you type that?
8   A  No, I did not.
9   Q  Who typed that, to your knowledge?
10     MR. SHAIBANI: I'm going to make an
11 objection here. And we'll stipulate that this was a
12 joint product of counsel and Tom Lynch, and as well as
13 discussions with my staff.
14 BY MR. RANCK:
15  Q  Okay. So Mr. Shaibani and/or his staff
16 typed that report; correct?
17  A  Yes, because you can't afford me to type
18 something.
19  Q  Do you recall when you discussed that with
20 him? And I'm --
21  A  Yes, the 12th of October.
22  Q  October 12. All right. Is that what's

Page 70

1   reflected on this -- in your handwritten notes on the
2   September 22 letter that says 2.5 hours?
3       A   Yeah, I write on papers in front of me or
4   envelopes.
5       Q   Okay.
6       A   I was 2.5 hours working on this document in
7   Mr. Shaibani's office.
8       Q   So you came here and met with him?
9       A   That is correct.
10      Q   And prepared it together. Did you tell
11  Mr. Shaibani what to put in the report, or did he put
12  things in the report himself?
13          MR. SHAIBANI:  I'll make an objection on the
14  basis of asked and answered to the extent it's a joint
15  product of counsel and Tom Lynch.
16          MR. RANCK:  You can make that objection, but
17  I'm going to find out who contributed what to this
18  report.
19  BY MR. RANCK:
20      Q   So my question is is did you put everything
21  in that report in there, or was that put in there by
22  Mr. Shaibani, and then you later agreed to it?

Page 71

1           MR. SHAIBANI:  I'm going to instruct him not
2   to respond to the way you phrased the question,
3   because it's highly misleading basically.
4           MR. RANCK:  I don't see why it's misleading.
5   The witness can answer the question as to whether you
6   told him everything to put in the report.
7   BY MR. RANCK:
8       Q   Did you tell Mr. Shaibani what to put in the
9   report, or did he prepare the report prior to you all
10  even getting together?
11          MR. SHAIBANI:  Again, as I said, this was a
12  joint product of counsel and Tom Lynch, and whether we
13  had discussions and I typed something, then he looked
14  at it, he submitted another his comments, and I
15  revised it again.  This is a going back and forth
16  project.  It's not -- you cannot say if I presented
17  something and he signed off on it.  If that's your
18  question, I would say that's clearly not what
19  happened.
20          MR. RANCK:  Well, here's -- I'd like an
21  answer to my last question.
22  BY MR. RANCK:

Page 72

1       Q   Can you answer my question?
2           MR. BOUSE:  Why don't we swear Mr. Shaibani
3   in since he just testified.
4           MR. RANCK:  He may get his chance.
5   BY MR. RANCK:
6       Q   But can you answer my last question?
7       A   Would you just -- somebody repeat the
8   question.
9       Q   Well, let me -- I'll start over, because I
10  am going to walk through this.  All of the documents
11  or notes or what have you that you prepared with
12  regard to your participation in this case, none of
13  them indicate any substantive discussion between you
14  and Mr. Shaibani prior to October 12 when you said you
15  had this meeting.  Okay?  You've got six hours, it
16  looks like, reviewing a package and two hours
17  reviewing Ms. Medlin's deposition.  Am I interpreting
18  your notes right?
19      A   I think they're pretty self-explanatory.
20      Q   Am I interpreting them right?
21      A   Correct?
22      Q   So it does not appear that you had

Page 73

1   substantive conversations with Mr. Shaibani prior to
2   the genesis of this draft report Exhibit 3; correct?
3           MR. SHAIBANI:  Objection.  Asked and
4   answered in the beginning of the deposition when we
5   first talked, and what we talked about.
6   BY MR. RANCK:
7       Q   You can answer.
8       A   As I said earlier, we spoke in general about
9   these things.  I didn't put all the footnotes in here.
10  The footnotes reference the documents.
11      Q   Was that document, Exhibit 3, in some form
12  prepared when you arrived for your meeting with
13  Mr. Shaibani?
14      A   It was.
15      Q   Can you tell me how much of that document
16  was prepared when you arrived for your meeting with
17  Mr. Shaibani?
18          MR. SHAIBANI:  Are you asking him to read
19  the whole report?
20          MR. RANCK:  He can look at whatever he
21  wants.  I want to know how much of that you prepared,
22  and how much came from this expert witness.  That's

Page 74

1 exactly what I want to know.
2     MR. SHAIBANI: And as I said before, this
3 was a joint product of counsel and Tom Lynch.
4 BY MR. RANCK:
5    Q  Mr. Lynch, my question is is how much of
6 that report was put together before you got here on
7 October 12?
8    A  I'd say a goodly amount of it. Yeah.
9    Q  Almost the entire thing?
10    A  A very large, large portion of the report or
11 the elements of the report. I can't say, you know, I
12 don't have a copy -- I don't have a copy of changes
13 and wordsmithing and other things that I added in
14 here. I don't know how these two compare. I know I
15 was reading a Word document. I have a copy of this in
16 both Word and a PDF file.
17    Q  You got a copy of it in Word from
18 Mr. Shaibani.
19    A  Correct.
20    Q  And a PDF from him.
21    A  Correct.
22    Q  After your meeting on the 12th.

Page 75

1    A  Correct.
2    Q  All right. What changes do you recall were
3 made to the draft report at your meeting on the 12th?
4    A  I don't recall.
5    Q  Do you recall any substantive changes that
6 you asked be made to that draft report?
7     MR. SHAIBANI: Objection. Asked and
8 answered. If you want to convert the two documents
9 and see what the changes are, that's how you can
10 arrive at your answer. I mean, this is -- it's been
11 months before -- since these were drafted. How do you
12 expect him to point out which words to change on which
13 page right now?
14     MR. RANCK: Most experts will recall when
15 counsel prepares a report, and they have to ask for
16 something to be changed. They recall it, Mr.
17 Shaibani.
18 BY MR. RANCK:
19    Q  Mr. Lynch, my question is what substantive
20 changes did you ask or require be made to the draft
21 report that Mr. Shaibani prepared before you got here
22 on the 12th of October?

Page 76

1    A  As best as I can remember, the changes I
2 would have asked for would have been the deal with
3 phraseology or perhaps the connection of more in --
4 something more in keeping with my interpretation of
5 the D.C. human right act and how it applies, and what,
6 you know, what's my understanding of protected
7 classes. It was more --
8    Q  Is it fair to say, and I'm asking you this
9 question, not Mr. Shaibani. Is it fair to say that he
10 prepared your report, and you signed off on it?
11     MR. SHAIBANI: Objection --
12 BY MR. RANCK:
13    Q  -- with some changes to phraseology?
14     MR. SHAIBANI: -- objection.
15 Mischaracterizes prior testimony. Asked and answered.
16 BY MR. RANCK:
17    Q  You can answer.
18    A  No, I believe, and I've said to you I can't
19 pinpoint exactly there, but I would say some of the
20 changes I suggested would have to be considered
21 substantial because there were changes more than just
22 the -- we're not just talking about wordsmithing.

Page 77

1    Q  But the interpretation of the law, those are
2 changes you made. Did you ask him to change any
3 conclusions?
4     MR. SHAIBANI: I'll object on vagueness.
5 What conclusions are you referring to? The last page
6 that's captioned conclusion?
7 BY MR. RANCK:
8    Q  Did you ask him to change any conclusions or
9 opinions?
10    A  No, I don't think we asked to change
11 opinions fundamentally or conclusions fundamentally.
12    Q  Did you ask him to add or eliminate any of
13 the substantive factual assumptions contained in the
14 report?
15     MR. SHAIBANI: Objection. Asked and
16 answered.
17    A  I would say we were substantially in
18 agreement as to the nature of the report.
19 BY MR. RANCK:
20    Q  Well, you were substantially in agreement
21 with the nature of the report he prepared, the draft;
22 correct?

Page 130

1  Q  He could -- well, he could have been more
2  specific and perhaps accurate, but based on the
3  information he had, that's arguable, but he could have
4  been more specific with him; correct?
5       MR. SHAIBANI:  Same objections.
6  A  Not to make my answer sound difficult, were
7  you talking about -- I think you're combining and
8  making equal, it's an accepted deal with the other
9  party versus we're negotiating.  And those are two
10 very different circumstances that require a different
11 response on the part of --
12 BY MR. RANCK:
13 Q  Do you believe --
14 A  In other words, if I don't tell someone that
15 you're out, it's gone, sorry, it's just business,
16 that's way it is, they chose the other people, when,
17 in fact, they hadn't chosen the other people, that's a
18 mischaracterization of what's really happening.
19 Q  My hypothetical is is that he -- that
20 Mr. Liverman said she's going with another candidate.
21 Now, my question to you is there are any number of --
22 assuming that that conversation occurred, is it your

Page 131

1  opinion that Mr. Liverman in conveying that message to
2  Mr. Bratton was engaged in unlawful racial
3  discrimination or discrimination based upon
4  Mr. Bratton's personal appearance, is that your
5  testimony?
6       MR. SHAIBANI:  Objection.  Assumes facts not
7  evidence, mischaracterizes the record, calls for
8  speculation.
9  A  If, in fact, the property was not under
10 contract with Roberta Medlin, then his
11 characterization of what actually was going on was
12 saying something was unavailable when, in fact, it was
13 still available, and that is one of the principal
14 no-nos as far as dealing with human rights and fair
15 dealing with respect to the D.C. Human Rights Act.
16 BY MR. RANCK:
17 Q  Do you have an opinion, because you said a
18 minute ago, well, more like three or four minutes ago,
19 and I quote, I can't get into the mind.
20 A  I think she has to quote it.
21 Q  I can't get into the mind of Chatel.  And my
22 question is are you prepared to testify in federal

Page 132

1  court that Thierry Liverman, when he had that
2  conversation, assuming that conversation with John
3  Bratton, that he was motivated by racism?
4       MR. SHAIBANI:  Objection.  Assumes facts not
5  in evidence, calls for speculation, mischaracterizes
6  the record.
7  BY MR. RANCK:
8  Q  Is that going to be your testimony,
9  Mr. Lynch?
10 A  My testimony will be that he participated in
11 a prohibited activity under the D.C. human rights act.
12 Q  And you can't say whether it's motivated by
13 racial animus, discrimination based on Mr. Bratton's
14 personal appearance, or just sloppy realtoring by
15 Mr. Liverman; can you?
16      MR. SHAIBANI:  Same objections.
17 A  When someone who -- when the issue of race
18 and personal appearance and any one of those other
19 issues come up, when someone engages in a prohibited
20 activity, the perception of discrimination is just as
21 much a cause of action as actually doing it, and
22 that's the way it is.

Page 133

1  BY MR. RANCK:
2  Q  Okay.  A cause of action.  It can provide a
3  prospective tenant candidate like Bratton Realty a
4  cause of action; right?
5  A  Correct.
6  Q  But because they can state a claim for
7  discrimination, that doesn't mean that there was
8  actually discrimination; right?
9       MR. SHAIBANI:  Same objections.
10 A  And it doesn't prevent me from giving an
11 opinion that I believe there was discrimination based
12 on what occurred.
13 BY MR. RANCK:
14 Q  But you -- all right.  But you -- would you
15 agree with me that you are -- you're testifying as to
16 Chatel's motivation, the reason that they said --
17 A  Only because you're trying to get me to
18 testify to the motivation.
19 Q  No, I'm trying to ask.  To me, when you're
20 testifying as to that someone did something, they were
21 motivated by racial animus; right?
22 A  Uh-huh.

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 138

1  Act of 1997 and the first paragraph said it is the
2  intent of the council is to put an end to
3  discrimination in the District of Columbia save for
4  personal issues. In other words, discriminating
5  against people because they belong to a group. If I
6  have lousy financing, I don't get the loan, that's not
7  considered discrimination.
8  BY MR. RANCK:
9      Q   Would you look at the last line on page 5 of
10 your report, please?
11     A   Okay.
12     Q   You say that, and I'm going to use, what do
13 you call, an ellipsis? Defendants in the last
14 paragraph, defendants stripped John Bratton of these
15 rights, and then referring down to the last line, when
16 they requested financial information, paren, income
17 tax returns and bank statements, not requested of a
18 white prospective tenant. Do you see that?
19     A   Correct.
20     Q   Are you of the opinion that Chatel stripped
21 Mr. Bratton of some right or discriminated against him
22 when they did this?

Page 139

1      MR. SHAIBANI: I'll object again on the
2  basis that this is only reading a portion of a
3  sentence and not its entirety.
4      A   Chatel was the agent of Mary White. Maybe
5  someone else can separate what was Chatel's idea and
6  what was White's idea and so on and so forth, what
7  they did with respect to the other prospective lessee,
8  and what they requested of Mr. Bratton, the additional
9  terms and conditions that we call, you know, barriers.
10 I'm focusing on this as well on the same thing.
11 BY MR. RANCK:
12     Q   The financial. Do you have any information
13 that Chatel requested Mr. Bratton's tax returns? Or
14 do you know who requested them?
15     A   It matters not to me right now whether Mary
16 White requested them or Chatel requested them. The
17 fact of the matter is, I think, in terms of the
18 negotiating with John Bratton, Mary White and Chatel
19 as client and agent were joined at the hip.
20     Q   Do you know when the tax returns were
21 requested? I mean, it's -- let me cut through it.
22 It's 4:10 on a Friday. Let me shorten it a little

Page 140

1  bit. Gordon Forester, Mary White's attorney requested
2  Mr. Bratton's tax returns; correct?
3      A   Correct.
4      Q   Mr. Bratton testified that by the time
5  Gordon Forester got involved, Chatel was out of the
6  picture; right?
7      MR. SHAIBANI: That's -- I'm objecting on
8  the basis that it mischaracterizes the deposition
9  testimony and the record.
10 BY MR. RANCK:
11     Q   Well, isn't that your understanding, Mr.
12 Lynch?
13     A   My understanding is that Chatel was never
14 entirely out of the picture. Their documents were
15 being used, they still had it listed, they were still
16 agents for that property. That property was still a
17 listed property is my understanding.
18     Q   What facts do you have, or tell me all the
19 facts you have as to what Chatel's involvement in this
20 transaction was after October the 13th.
21     MR. SHAIBANI: I'll object on the basis that
22 the record speaks for itself.

Page 141

1      A   Regardless of, regardless of, what's his
2  name, Gordon Forester's involvement, it's not unusual
3  that a prospective lessee or lessor ask one's personal
4  attorney to get involved in the lease. It doesn't
5  take Chatel entirely out of the picture, because they
6  are still agents.
7  BY MR. RANCK:
8      Q   If something happened against -- if
9  something happened to Mr. Bratton after Chatel --
10 after October 13, when Chatel was no longer dealing
11 with Mr. Bratton, if somebody at Gordon Forester did
12 something that Mr. Bratton alleges is discriminatory,
13 is it your opinion that Chatel is somehow responsible
14 for that, that that conduct becomes conduct of Chatel?
15     MR. SHAIBANI: Objection.
16     A   I don't know what communications and
17 conversations Forester might have had, but I would say
18 it certainly lessens Chatel's issues.
19 BY MR. RANCK:
20     Q   Tell me what discriminatory acts Chatel
21 engaged in after October 13 in your opinion.
22     A   I think they did the most significant damage

36 (Pages 138 to 141)

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 174

1  Mr. Bratton.
2    Q  Do the various statutes, 1981 and 2 and the
3  fair housing, the D.C. versions of those statutes that
4  we're dealing with in this case, do they prohibit
5  discriminatory conduct, or conduct that can be
6  perceived as discriminatory?
7        MR. SHAIBANI: Objection. Calls for a legal
8  conclusion, and I'm instructing him not to answer that
9  question.
10       MR. BOUSE: How can you do that? He's not
11 your client.
12       MR. SHAIBANI: Yes. This is it a legal
13 conclusion, and you cannot -- the instructions from
14 the court will advise the jury what's required to
15 prove the case, not Mr. Lynch's testimony, doesn't say
16 anything about appearance versus reality.
17       MR. RANCK: Are you then prepared to
18 withdraw all of the portions of your expert's report
19 where he lays out what the law is and what's
20 prohibited?
21       MR. SHAIBANI: No. Those portions cite
22 specific statutes and most of them are COSIF.

Page 175

1  BY MR. RANCK:
2    Q  All right. I'm asking you as a real estate
3  professional your understanding. I'm not asking you
4  what the law does, I'm asking as a real estate
5  professional, is it your understanding that these acts
6  prohibit you as a real estate professional from
7  engaging in discriminatory conduct or conduct that
8  might be perceived as discriminatory?
9    A  I think it's both.
10   Q  How does one avoid -- so you believe that as
11 a -- strike that.
12       You believe as a real estate professional
13 you are prohibited from engaging in conduct that
14 someone might perceive as discriminatory.
15   A  I believe that one can -- one can engage in
16 activity that someone else may well perceive as being
17 discriminatory, and whether it is or not, I still have
18 to defend myself against that perception.
19   Q  Okay. Do you agree that that is exceedingly
20 broad and open-ended, I guess, in terms of exposing
21 the real estate professional to suit, discipline,
22 because we can't control how others perceive our

Page 176

1  conduct? Do you agree with that statement?
2        MR. SHAIBANI: Objection.
3    A  It's exceedingly broad, it's exceedingly
4  dangerous. It's inherently risky to be in this
5  business under those circumstances, and others, and
6  that's why companies will have policies and
7  procedures, documentation, documentation, knowing full
8  well that you may be faced with the situation of
9  disproving the claim by showing that you didn't do it.
10 BY MR. RANCK:
11   Q  Okay. It's --
12   A  And that's complicated.
13   Q  It's exceedingly dangerous and everything
14 you said because you could have to defend yourself
15 from allegations that you discriminated based upon the
16 other person's perception of what happened; right?
17   A  Absolutely.
18   Q  Even if their perception is wrong.
19       MR. SHAIBANI: Objection.
20   A  Correct.
21 BY MR. RANCK:
22   Q  So would you agree with me that -- well --

Page 177

1  would you agree with me that often the perceptions by
2  the people that think they're discriminated against
3  are wrong?
4        MR. SHAIBANI: Objection. Relevance. Calls
5  for speculation. Assumes facts not in evidence.
6    A  I don't think I can answer to a
7  quantitative. I certainly there's a qualitative
8  affirmative.
9  BY MR. RANCK:
10   Q  You teach courses in this area; correct?
11   A  I do.
12   Q  And part of the purpose of your teaching the
13 courses is to educate real estate professionals as to
14 how to avoid claims such as this; correct?
15   A  Correct.
16   Q  And is part of your curriculum or your --
17 the lecture, the course materials, do you explain or
18 try to make clear to your students, whoever you're
19 teaching, that their conduct can be misperceived, and
20 that's why they need to make an extra step to protect
21 themselves?
22   A  Absolutely.

45 (Pages 174 to 177)