DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------------------X
JOHN BRATTON,                       :
      Plaintiff              :
  v.                                :   Case No.:
CHATEL REAL ESTATE, INC., et al.,   :   1:06CV00694
      Defendants             :
------------------------------------X

Deposition of THOMAS J. LYNCH

Washington, D.C.

Friday, February 9, 2007

1:25 p.m.

Job No.: 1-96264

Pages 1 - 211

Reported by: Lynn Schindler



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

7852bbcd-ae9c-4c2f-93ef-0f4dda0abe40

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 66

1  after two years, then giving Mr. Bratton an option for
2  a third year, that would hinder her ability to sell
3  the property; would it not?
4        MR. SHAIBANI: Objection. Calls for
5  speculation. Mischaracterizes the record.
6     A  I don't believe it necessarily has to.
7  BY MR. RANCK:
8     Q  Why is that? Why is --
9     A  Well, it depends on who the purchaser is.
10    Q  Assume the purchaser wanted to purchase the
11 property and move in immediately, take over --
12    A  That's a different question.
13    Q  Well, that's my question.
14    A  Well, but that's not the way it was
15 presented.
16 BY MR. RANCK:
17    Q  Well, maybe not the way it was interpreted.
18    A  No, it was not the way it was presented,
19 because you asked in a very general sense, you said to
20 interfere with her ability to sell, and I said not
21 necessarily so. it would depend on who the purchaser
22 was. That's very clear.

Page 67

1     Q  So you agree there are circumstances in
2  which it would interfere with her ability to sell?
3        MR. SHAIBANI: Same objections.
4     A  I do, just as I would feel that it would be
5  beneficial as well. Could be beneficial as well.
6  BY MR. RANCK:
7     Q  But that gets back to the -- that's for the
8  owner-lessor to decide; right? What's in their
9  interest, his or her own interest; correct?
10    A  I would think any party to a contract,
11 lessor, lessee, is looking for his or her best
12 interest.
13    Q  And there's nothing discriminatory about, as
14 a general matter, about not giving a commercial lessee
15 an option for an additional year after the end of the
16 original term; is that right?
17       MR. SHAIBANI: Objection. Calls for
18 speculation. Mischaracterizes the record.
19    A  Not offering an extension for reasons other
20 than trying to avoid working with a protected class is
21 not a problem.
22 BY MR. RANCK:

Page 68

1     Q  All right. Let me hand you what's been
2  marked as Exhibit 3, which I've not looked at yet
3  today. I received it here at the deposition. If you
4  can identify that for me.
5     A  I would say Exhibit 3 is my list of my
6  opinions, some credentials, a list of documents that I
7  reviewed prior to.
8     Q  Okay. That Exhibit 3 on the front page
9  bears a stamp that says draft. Do you see that?
10    A  Okay.
11    Q  And I believe, perhaps you can confirm it,
12 but I believe Mr. Shaibani is representing that that's
13 a draft of your report.
14       MR. RANCK: Is that true, Mr. Shaibani?
15       MR. SHAIBANI: Yes. I stamped draft on it
16 to make that clear.
17       MR. RANCK: To distinguish it from the
18 actual report?
19       MR. SHAIBANI: From the final version, yes
20 BY MR. RANCK:
21    Q  Did you review the draft that's represented
22 by Exhibit 3?

Page 69

1     A  I did.
2     Q  You reviewed a draft before you signed the
3  final report; correct?
4     A  I reviewed a draft, and I reviewed the final
5  report before I signed it.
6     Q  Whose computer does that draft exist on?
7  Did you type that?
8     A  No, I did not.
9     Q  Who typed that, to your knowledge?
10       MR. SHAIBANI: I'm going to make an
11 objection here. And we'll stipulate that this was a
12 joint product of counsel and Tom Lynch, and as well as
13 discussions with my staff.
14 BY MR. RANCK:
15    Q  Okay. So Mr. Shaibani and/or his staff
16 typed that report; correct?
17    A  Yes, because you can't afford me to type
18 something.
19    Q  Do you recall when you discussed that with
20 him? And I'm --
21    A  Yes, the 12th of October.
22    Q  October 12. All right. Is that what's

Page 70

1 reflected on this -- in your handwritten notes on the
2 September 22 letter that says 2.5 hours?
3   A   Yeah, I write on papers in front of me or
4 envelopes.
5   Q   Okay.
6   A   I was 2.5 hours working on this document in
7 Mr. Shaibani's office.
8   Q   So you came here and met with him?
9   A   That is correct.
10  Q   And prepared it together. Did you tell
11 Mr. Shaibani what to put in the report, or did he put
12 things in the report himself?
13      MR. SHAIBANI: I'll make an objection on the
14 basis of asked and answered to the extent it's a joint
15 product of counsel and Tom Lynch.
16      MR. RANCK: You can make that objection, but
17 I'm going to find out who contributed what to this
18 report.
19 BY MR. RANCK:
20  Q   So my question is is did you put everything
21 in that report in there, or was that put in there by
22 Mr. Shaibani, and then you later agreed to it?

Page 71

1       MR. SHAIBANI: I'm going to instruct him not
2 to respond to the way you phrased the question,
3 because it's highly misleading basically.
4       MR. RANCK: I don't see why it's misleading.
5 The witness can answer the question as to whether you
6 told him everything to put in the report.
7 BY MR. RANCK:
8   Q   Did you tell Mr. Shaibani what to put in the
9 report, or did he prepare the report prior to you all
10 even getting together?
11      MR. SHAIBANI: Again, as I said, this was a
12 joint product of counsel and Tom Lynch, and whether we
13 had discussions and I typed something, then he looked
14 at it, he submitted another his comments, and I
15 revised it again. This is a going back and forth
16 project. It's not -- you cannot say if I presented
17 something and he signed off on it. If that's your
18 question, I would say that's clearly not what
19 happened.
20      MR. RANCK: Well, here's -- I'd like an
21 answer to my last question.
22 BY MR. RANCK:

Page 72

1   Q   Can you answer my question?
2       MR. BOUSE: Why don't we swear Mr. Shaibani
3 in since he just testified.
4       MR. RANCK: He may get his chance.
5 BY MR. RANCK:
6   Q   But can you answer my last question?
7   A   Would you just -- somebody repeat the
8 question.
9   Q   Well, let me -- I'll start over, because I
10 am going to walk through this. All of the documents
11 or notes or what have you that you prepared with
12 regard to your participation in this case, none of
13 them indicate any substantive discussion between you
14 and Mr. Shaibani prior to October 12 when you said you
15 had this meeting. Okay? You've got six hours, it
16 looks like, reviewing a package and two hours
17 reviewing Ms. Medlin's deposition. Am I interpreting
18 your notes right?
19  A   I think they're pretty self-explanatory.
20  Q   Am I interpreting them right?
21  A   Correct?
22  Q   So it does not appear that you had

Page 73

1 substantive conversations with Mr. Shaibani prior to
2 the genesis of this draft report Exhibit 3; correct?
3       MR. SHAIBANI: Objection. Asked and
4 answered in the beginning of the deposition when we
5 first talked, and what we talked about.
6 BY MR. RANCK:
7   Q   You can answer.
8   A   As I said earlier, we spoke in general about
9 these things. I didn't put all the footnotes in here.
10 The footnotes reference the documents.
11  Q   Was that document, Exhibit 3, in some form
12 prepared when you arrived for your meeting with
13 Mr. Shaibani?
14  A   It was.
15  Q   Can you tell me how much of that document
16 was prepared when you arrived for your meeting with
17 Mr. Shaibani?
18      MR. SHAIBANI: Are you asking him to read
19 the whole report?
20      MR. RANCK: He can look at whatever he
21 wants. I want to know how much of that you prepared,
22 and how much came from this expert witness. That's

Page 74

1  exactly what I want to know.
2      MR. SHAIBANI: And as I said before, this
3  was a joint product of counsel and Tom Lynch.
4  BY MR. RANCK:
5      Q   Mr. Lynch, my question is is how much of
6  that report was put together before you got here on
7  October 12?
8      A   I'd say a goodly amount of it. Yeah.
9      Q   Almost the entire thing?
10     A   A very large, large portion of the report or
11 the elements of the report. I can't say, you know, I
12 don't have a copy -- I don't have a copy of changes
13 and wordsmithing and other things that I added in
14 here. I don't know how these two compare. I know I
15 was reading a Word document. I have a copy of this in
16 both Word and a PDF file.
17     Q   You got a copy of it in Word from
18 Mr. Shaibani.
19     A   Correct.
20     Q   And a PDF from him.
21     A   Correct.
22     Q   After your meeting on the 12th.

Page 75

1      A   Correct.
2      Q   All right. What changes do you recall were
3  made to the draft report at your meeting on the 12th?
4      A   I don't recall.
5      Q   Do you recall any substantive changes that
6  you asked be made to that draft report?
7      MR. SHAIBANI: Objection. Asked and
8  answered. If you want to convert the two documents
9  and see what the changes are, that's how you can
10 arrive at your answer. I mean, this is -- it's been
11 months before -- since these were drafted. How do you
12 expect him to point out which words to change on which
13 page right now?
14     MR. RANCK: Most experts will recall when
15 counsel prepares a report, and they have to ask for
16 something to be changed. They recall it, Mr.
17 Shaibani.
18 BY MR. RANCK:
19     Q   Mr. Lynch, my question is what substantive
20 changes did you ask or require be made to the draft
21 report that Mr. Shaibani prepared before you got here
22 on the 12th of October?

Page 76

1      A   As best as I can remember, the changes I
2  would have asked for would have been the deal with
3  phraseology or perhaps the connection of more in --
4  something more in keeping with my interpretation of
5  the D.C. human right act and how it applies, and what,
6  you know, what's my understanding of protected
7  classes. It was more --
8      Q   Is it fair to say, and I'm asking you this
9  question, not Mr. Shaibani. Is it fair to say that he
10 prepared your report, and you signed off on it?
11     MR. SHAIBANI: Objection --
12 BY MR. RANCK:
13     Q   -- with some changes to phraseology?
14     MR. SHAIBANI: -- objection.
15 Mischaracterizes prior testimony. Asked and answered.
16 BY MR. RANCK:
17     Q   You can answer.
18     A   No, I believe, and I've said to you I can't
19 pinpoint exactly there, but I would say some of the
20 changes I suggested would have to be considered
21 substantial because there were changes more than just
22 the -- we're not just talking about wordsmithing.

Page 77

1      Q   But the interpretation of the law, those are
2  changes you made. Did you ask him to change any
3  conclusions?
4      MR. SHAIBANI: I'll object on vagueness.
5  What conclusions are you referring to? The last page
6  that's captioned conclusion?
7  BY MR. RANCK:
8      Q   Did you ask him to change any conclusions or
9  opinions?
10     A   No, I don't think we asked to change
11 opinions fundamentally or conclusions fundamentally.
12     Q   Did you ask him to add or eliminate any of
13 the substantive factual assumptions contained in the
14 report?
15     MR. SHAIBANI: Objection. Asked and
16 answered.
17     A   I would say we were substantially in
18 agreement as to the nature of the report.
19 BY MR. RANCK:
20     Q   Well, you were substantially in agreement
21 with the nature of the report he prepared, the draft;
22 correct?

Page 190

1  on this point or that point. He was clearly getting
2  the message that Pagones didn't know very much at all
3  about this property, so I see Bratton starting the
4  ball rolling somewhere to elicit some sort of a
5  response that would give a lot more predictable
6  direction than is just being given by a guy who says I
7  really don't know much about it.
8    Q  Okay. I want to ask just one other thing,
9  and then we can break for the day. Let me show you,
10 can you just identify for the record Exhibits 5 and 6,
11 please?
12   A  Exhibit 5 are some notes that I took --
13 wrote down in preparation for today's deposition in a
14 face-to-face with Mr. Bratton, and a conference call
15 with counsel to review the issues rather than sit back
16 and reread all this stuff.
17   Q  Okay.
18   A  That's 5. 6 is the, I would call it, the
19 delivery letter from Mr. Shaibani to me of all the
20 documents in my large binder here that were assembled
21 and organized for my review prior to getting together
22 for the opinion.

Page 191

1    Q  Okay. We can put these aside or put them on
2  the side. Looking at -- can you get your copy of
3  Exhibit 5 out? It's the notes. You should have your
4  original back.
5    A  I should. Exactly where I put it is --
6    Q  I saw Mr. Shaibani give it to you.
7    A  It's called hidden under the book.
8    Q  And you have written at the top economic
9  damages, and then you have written on the left-hand
10 margin economic damages again, and you discuss some
11 issues here. Those pertain to Mr. Bratton. That
12 information is coming from Mr. Bratton; is that right,
13 on what he claims his economic damages are?
14   A  Well, he obviously has a claim of economic
15 damages. The question -- what I was talking about him
16 saying I have -- I understand that as I wrote it down
17 here, those are probably more my words than anything
18 else, the panache and the cachet for Georgetown having
19 been operating out of offices in Georgetown myself for
20 a long, long time. Having to move is an issue. It's
21 a problem. I mean, and it's being -- saying, you
22 know, Georgetown as your office as compared to

Page 192

1  somewhere else.
2    Q  These issues have nothing to do with the
3  question of whether he was discriminated against;
4  correct?
5       MR. SHAIBANI: Objection. The damages
6  obviously relate to his claim. They follow from it.
7       MR. RANCK: That's not the -- really wasn't
8  what I was asking for in the question.
9  BY MR. RANCK:
10   Q  I mean, these issues don't have anything to
11 do with whether he was discriminated. These issues
12 pertain to what damages assuming --
13   A  No, I don't think they have to deal with
14 whether he was discriminated against. It's the effect
15 of the discrimination is what I'm talking about.
16   Q  Okay. Now, I don't see anywhere in your
17 report anything concerning damages, any effect of
18 damages. Is that a fair assessment?
19   A  Fair assessment.
20   Q  I don't believe you were designated to
21 testify to any of that, so I'm not going to --
22      MR. SHAIBANI: Objection. That's not --

Page 193

1       MR. RANCK: You show me where in the report
2  he discusses the opinions on damages?
3       MR. SHAIBANI: His designation is not
4  limited to liabilities. I can tell you that.
5       MR. RANCK: Can you tell me in his report,
6  Mr. Shaibani? Point me to where he had -- offers
7  opinions?
8       MR. SHAIBANI: I don't have to submit any
9  expert report to have an expert testify. What makes
10 you think that I can submit an expert report on
11 liability but somehow be precluded from having the
12 expert testify on damages? I mean, this is the
13 deposition. You can ask him about the damages.
14      MR. RANCK: Bob, did you get that? Bob?
15      MR. BOUSE: I did.
16      MR. RANCK: That doesn't comport with my
17 understanding of the federal rules and the requirement
18 that we get a report from the expert, but.
19      MR. SHAIBANI: You don't have to get a
20 report from an expert. It could just be a designation
21 of an expert without the report.
22      THE COURT REPORTER: Doesn't Rule 26 require

Page 194

1  a report prepared -- signed by the expert?
2  　　　MR. SHAIBANI: If there is a report. I
3  don't believe there are experts required to file a
4  report.
5  　　　MR. RANCK: You don't think in federal court
6  an expert is required -- there's not required to be an
7  expert report?
8  　　　MR. SHAIBANI: I don't believe that the
9  expert report has to cover every single issue that the
10 expert is going testify about.
11 　　　MR. RANCK: Okay. Well, we'll see about
12 that. I am specifically not going to question this
13 expert with regard to opinions on damages because they
14 were not previously disclosed, and I can't be taken by
15 surprise at a deposition, not even given this document
16 before the deposition.
17 　　　MR. SHAIBANI: What document?
18 　　　MR. RANCK: The document Exhibit 5. Other
19 than before the day of the deposition as I arrived
20 here.
21 　　　My position, Bob, and I don't know if
22 you can hear me, or join this, is I object, and

Page 195

1  will move to strike and disallow any testimony by
2  this witness with regard to damages as not being
3  previously, that's the word, previously disclosed
4  and certainly not referenced in the report that's
5  been provided.
6  　　　MR. BOUSE: And I will join that objection
7  on behalf of Mary White.
8  　　　MR. SHAIBANI: I will raise that at the
9  status conference that you have a second day of
10 deposition, and this is your chance now to prepare for
11 the damages questions if you're going to have any --
12 　　　MR. RANCK: I don't think so.
13 　　　MR. SHAIBANI: -- and I will most certainly
14 be -- have -- asking questions about damages at trial.
15 So you can't claim there was a surprise here. You're
16 having a second opportunity to depose Mr. Lynch on
17 Monday.
18 　　　MR. RANCK: No, I'm not. No, I'm not. It's
19 not a second --
20 　　　MR. SHAIBANI: Yes, you are.
21 　　　MR. RANCK: No, I'm not.
22 BY MR. RANCK:

Page 196

1  　　Q  All right. Going on. Halfway down the
2  page, you have the word liability. Do you see that?
3  　　A  Yes.
4  　　Q  No. 1 is under there is terms and conditions
5  of lease Medlin versus Bratton -- 24 days? Did I read
6  that right?
7  　　A  Right.
8  　　Q  And above Medlin is one or two days;
9  correct?
10 　　A  Correct.
11 　　Q  Why do you say one or two days? That's from
12 the time Ms. Medlin went to Chatel until what?
13 　　A  I'm saying that Medlin has a -- prepares or
14 has a lease prepared on the 11th that goes into a very
15 formal mode, and the client is told that the other
16 lease is taken, so, I mean, he finally got a lease
17 negotiated 24 days later.
18 　　Q  Did you see that Mary White said that she
19 would haven't agreed to a bunch of the terms in
20 Ms. Medlin's proposed lease, so that wasn't final?
21 They hadn't negotiated those terms yet? Did you see
22 that?

Page 197

1  　　A  Yeah, I saw that, but I have a hard time
2  with the agent of Mary White preparing a lease that
3  she pretty much put together supposedly with Medlin
4  and saying I'm not prepared to accept this. I mean,
5  all of those terms and conditions and the addendum
6  page in that lease for Medlin --
7  　　Q  So you think Mary White is lying?
8  　　A  I think it's quite possible.
9  　　　MR. SHAIBANI: Object --
10 　　　MR. BOUSE: I object. You're passing on the
11 veracity of my client. I don't think an expert can do
12 that. And Mr. Bratton is telling the complete truth.
13 　　　MR. RANCK: Yeah.
14 BY MR. RANCK:
15 　　Q  The one to two days over Medlin also ignores
16 her having come into the office previously; right?
17 　　　MR. SHAIBANI: Objection. The office of
18 Chatel versus the office of Mary White.
19 BY MR. RANCK:
20 　　Q  I'm sorry. That's a fair objection. It's
21 getting late, and I'm getting tired. The one to two
22 days --