**Capital Reporting Company**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF COLUMBIA
 3    ------------------------------:
      JOHN BRATTON,                 :
 4                                  :
          Plaintiff,                :
 5                                  :
          v.                        :  Case No.:
 6                                  :  0694(JDB)
      CHATEL REAL ESTATE, INC.,     :
 7    THIERRY LIVERMAN and          :
      MARY WHITE,                   :
 8                                  :
          Defendants.               :
 9                                  :
      ------------------------------:
10
                                        Washington, D.C.
11                                      November 16th, 2006

12    Deposition of:

13              E. BARRETT ANDERSON,

14         Called for oral examination by counsel for

15    Plaintiff, pursuant to notice, at the offices of

16    Litigation Association, PLLC, 1150 Connecticut Avenue,

17    N.W., 9th Floor, Washington, D.C., beginning at 10:47 AM

18    10:50 a.m, before Teague Gibson of Capital Reporting, a

19    Notary Public.

20

21

22
```

(866) 448 - DEPO
www.CapitalReportingCompany.com



PLAINTIFF'S EXHIBIT 12

Page 2

1  APPEARANCES
2  ON BEHALF OF THE PLAINTIFF:
3      STEFAN SHAIBANI, ESQ.
4      Litigation Association, PLLC
5      1150 Connecticut Avenue, N.W.
6      9th Floor
7      Washington, D.C. 20036
8      (202) 277-8892
9  ON BEHALF OF THE DEFENDANT:
10     ROBERT H. BOUSE, JR., ESQ.
11     Anderson Coe & King, LLP
12     201 North Charles Street, Suite 2000
13     Baltimore, MD 21201
14     (410) 752-1630
15 ON BEHALF OF THE DEFENDANT:
16     MATTHEW A. RANCK, ESQ.
17     Eccleston and Wolf
18     2001 S Street, N.W., Suite 310
19     Washington, D.C. 20009-1125
20     (202) 857-1696
21
22

Page 3

1          CONTENTS
2  EXAMINATION BY:              PAGE
3  MR. SHAIBANI                  4
4  MR. RANCK                   136
5  ANDERSON DEPOSITION EXHIBITS:   PAGE:
6   1   BRA 158           13
7   2   Lease             30
8   3   MRIS Listing      33
9   4   Photograph        50
10  5   Copy of Checks    58
11  6   E-mail to Mary White   72
12  13  BRA 342           74
13  14  Rental Application    75
14  12  E-mail to Ms. Petty   84
15  15  Lease             86
16  16  Lease             86
17  17  CH 299            94
18  19  Copy of Flier    117
19  20  Bank Statement   127
20  21  Bank Statement   127
21      (Exhibits retained by counsel)
22

Page 4

1           PROCEEDINGS
2  WHEREUPON:
3
4       E. BARRETT ANDERSON,
5  called for examination, having been duly sworn to
6  tell the truth, the whole truth and nothing but the
7       truth, testified as follows:
8
9       EXAMINATION BY COUNSEL FOR PLAINTIFF
10
11 BY MR. SHAIBANI:
12     Q  Mr. Anderson, thanks for coming this
13 morning.  Could you tell us your official title when
14 you were working for Mary White?
15     A  I don't think I can.  I didn't really have
16 a title.  My purpose was to help her, assist her in
17 closing down her office.  We never got to the point
18 of having a title.
19     Q  Did she ever refer to you as her office
20 manager?
21     A  Not to me.
22     MR. RANCK:  Mr. Shaibani, I'm sorry to

Page 5

1  interrupt.  The witness had asked before we went on
2  the record indicated that this was the first time he
3  had been through a deposition and asked if someone
4  could walk him through the process.  Can we on or
5  off the record let him know what's going to happen
6  so he has some level of comfort?
7       (Off the record)
8  BY MR. SHAIBANI:
9      Q  I was asking about your position while you
10 were working for Mary White.  Did you ever refer to
11 yourself as her temporary office manager?
12     A  My recollection -- I don't believe I did.
13 No.  My recollection on that is the fact that I --
14 anybody that I talked to I went on the basis that I
15 was helping her to close down her brokerage.
16     Q  Did you tell John Bratton that you were
17 Mary White's office manager?
18     A  I don't believe so.
19     Q  As part of your responsibilities you
20 mentioned you were helping her with closing down the
21 office, were there other tasks that you were
22 conducting?

Page 6

1  A  I was paying current bills that came in,
2  but that was all part of closing down her office.
3  Q  Were you --
4  A  Can I give you some background on how I
5  got to be employed?
6  Q  Yes.
7  A  Well, Mary switched or decided, the way I
8  understand the situation, she decided to close down
9  her brokerage and go to work with another broker in
10 the Washington area called Washington Fine
11 Properties was the name of it.  When she announced
12 that to her staff the woman who was her office
13 manager gave her two weeks notice she related that
14 to my sister who was a very good friend of hers and
15 my sister knew that I had done some real estate and
16 basically I'm retired now.  And so she said, well,
17 maybe Barrett can help you close down your office.
18     So I -- Helen Marie called me and I called
19 Mary and we made an arrangement that I would help
20 her close down her office because her employee
21 actually quit.  And I believe the, as I recall, Mary
22 was -- that would have been around the first of June

Page 7

1  that the woman was leaving and Mary had a trip to
2  somewhere, Europe, Italy, somewhere like that, and
3  she was in a bind.
4  Q  And this is June '05?
5  A  Yes.
6  Q  When did you start working for Mary White?
7  A  About a week before that.
8  Q  In May of 2005?
9  A  Yes.
10 Q  Could you elaborate on the types of things
11 that you worked on while you were working for Mary
12 White?
13 A  I cleaned out her files, stripped her
14 files down, answered her telephone calls, answered
15 her phone or the phone and did worked on some
16 insurance things where she had to do it.  I did some
17 communication with the women that were prior agents
18 of Mary's in helping them to get whatever they
19 needed to get done through the real estate board to
20 switch from one office to another and I did whatever
21 there was to do.
22 Q  Was part of your job responsibility giving

Page 8

1  tours to prospective candidates of the property
2  located at 1622 Wisconsin Avenue?
3  A  No, I did do that though.  I did whatever
4  there was to do.
5  Q  Could you tell us who you gave a tour to
6  for the 1622 Wisconsin Avenue property?
7  A  I gave one obviously to John Bratton.  He
8  came in.  I gave one to anybody that came in.  There
9  were four or five people.
10 Q  Do you recall anyone else?
11 A  I don't know that I could recall their
12 names.  It was a cross dresser came in to look at it
13 at one time which was a little bit of a shock to me,
14 but she was looking for the apartment upstairs which
15 had already been rented.  There were at least two
16 young couples that came in that were looking at the
17 space and then I talked on the phone quite a few
18 times with a gal from Florida, Miami, Florida, that
19 wanted to put up a purse shop in the space.  And
20 actually somebody wanted to put a massage parlor or
21 something like that.  Then there was the woman who
22 wanted to put a jewelry store in there, and in fact

Page 9

1  she was interested in the place or I got the
2  impression she was interested in it and ended up
3  coming back and talking to Mary about it.
4  Q  The two couples, were they interested in
5  the apartment on the second floor?
6  A  No, no, they were interested in it as a
7  retail space.
8  Q  Was that for the street level or the
9  basement or both?
10 A  Well, the street level I would presume and
11 anybody that came in I told that -- I didn't really
12 have any real estate agency, that I wasn't a realtor
13 and wasn't representing them or Mary or anybody else
14 on the thing and because I didn't have a license or
15 hadn't brought my license from Illinois over to
16 Maryland or Washington, D.C.  What was your question
17 again?
18 Q  Do you recall if the two couples were
19 interested in the basement level of the property?
20 A  The one woman that was from I believe
21 Miami, I just talked to her on the phone and she was
22 interested in both spaces and the bottom space was

Capital Reporting Company

Page 10

1  really to me and I was kind of out of the loop on
2  really how that stuff went on. In fact I wasn't
3  even aware that Mary had put it on the market until
4  people started coming in. Basically the way I
5  presented it and that was my way of doing it was the
6  fact that both spaces were available. If you're
7  interested in a space you're interested in the first
8  level or the second level.
9      Mary did say that she wanted to reserve,
10  she wanted to keep the back space in the lower level
11  as a office and I had one fellow he never came in
12  either, he just called. He lived in Georgetown and
13  had an office in his house and wanted to rent the
14  lower level and then he said, well, I really want
15  the back space. I'm saying this because I -- he was
16  ready to rent the back space and Mary wouldn't -- I
17  actually asked her one time, I said you really don't
18  want to rent this.
19    Q  Can you distinguish what you mean by --
20    MR. BOUSE: Let him finish that thought first
21  then you can elaborate.
22    A  This fellow was interested in renting the

Page 11

1  back half of the lower level and Mary was going back
2  and forth, how much do you want for the back half
3  and how much this or I was asking those questions so
4  I could talk to this fellow and we came up with a
5  figure and all this sort of thing and I actually --
6  he was willing to rent it but Mary wouldn't rent it
7  and I said you really don't want to rent this. She
8  really didn't want to rent it, that's my opinion.
9    Q  And by it you mean?
10    A  She was doing it -- I think she was
11  offering the lower level, and this is my opinion,
12  she was offering the lower level on a basis that if
13  somebody would take the upper level -- it's all
14  conjecture on my part. She really didn't want to
15  rent it.
16    Q  I'm trying to distinguish what you mean by
17  the back half of the basement?
18    A  The basement was laid out or lower level
19  was laid out in two areas that were separated by
20  a -- it had a hallway in the middle of it but it was
21  separated by a bathroom or a powder room and a
22  utility closet. So there was like an office in the

Page 12

1  back and then there was a front portion that had a
2  window out to the street and then you walk down the
3  stairs.
4    Q  How large was the front portion of the
5  basement?
6    A  It was I guess 800 square feet maybe,
7  that's a wild guess.
8    Q  And would you say that the way the
9  basement was designed it was essentially two
10  separate -- it could have housed two separate
11  offices, one in the back side and one in the front
12  side of the basement?
13    MR. BOUSE: I object.
14    Q  Is that correct?
15    A  Actually you'd have to do some work to
16  separate the two. There was a hallway going back
17  between the two, you'd have to put up doors or put
18  up that sort of thing and then you -- well, you did
19  have access to the back through that other door.
20    Q  When you learned that the basement was
21  posted on the MRIS for lease, I'm referring to the
22  basement at 1622 Wisconsin Avenue property, did you

Page 13

1  understand that it was the front portion of the
2  basement that was offered for lease?
3    A  Yes.
4    Q  If I may distribute Exhibit 1 of this
5  deposition which is BRA 158.
6       (Anderson Exhibit No. 1 was marked)
7    Q  Do you recognize the address listed under
8  the Metropolitan Regional Information Systems, Inc.?
9    A  Yes, I do.
10    Q  And it says 1622 Wisconsin Avenue. Well,
11  Wisconsin, N.W., Washington, D.C. is that the space
12  that is owned by Ms. White?
13    A  I believe she is the owner, yes.
14    Q  Do you see where it says list price
15  halfway down on the right side of the page, list
16  price 1,000?
17    A  Yes, I do.
18    Q  Was that the price for the basement, the
19  rental price per month for the basement unit of this
20  property?
21    MR. RANCK: Objection.
22    MR. BOUSE: Objection, if you know.

4 (Pages 10 to 13)

Page 14
1   A   I have no idea. For the basement portion?
2   Q   Yes.
3   A   It does say main entrance lower level at
4   the top, so then that's what it is.
5   Q   For the basement that is?
6   MR. BOUSE: Objection.
7   MR. RANCK: Objection. The document speaks for
8   itself. The question is vague.
9   Q   The lower level the property?
10  A   I have no personal knowledge that the
11  thing was set up for a rent of a thousand dollars
12  and what I know here is you're giving me a document
13  off the MRIS that says it is for the lower level and
14  it's a list price of $1,000. Normally if you've got
15  a list price of $1,000 on a listing you're talking
16  about a rental and it's a thousand dollars, so
17  that's what the paper says.
18  Q   What would you conclude from this
19  document?
20  MR. BOUSE: I object.
21  MR. RANCK: Objection, calls for speculation.
22  The document speaks for itself and perhaps calls for

Page 15
1   expert testimony which the witness has not been
2   designated and the question is vague because you're
3   not asking what to conclude about what on the
4   document.
5   Q   What do you conclude from reviewing this
6   document?
7   MR. RANCK: Same objection.
8   MR. BOUSE: I object.
9   MR. RANCK: Do you understand the question?
10  Tell him anything you conclude, I suppose.
11  A   Well, it's a listing for the lower level
12  of the 1622 Wisconsin, N.W., that's what the
13  document is.
14  Q   Having reviewed this document and working
15  for Mary White in October 2005?
16  A   Well --
17  MR. BOUSE: Let him finish the question,
18  Mr. Anderson.
19  A   Go ahead.
20  Q   Please --
21  MR. RANCK: There's no question pending.
22  Q   If you'd like to elaborate on his

Page 16
1   statement?
2   A   That's fine. Go ahead.
3   Q   Having looked at this document and --
4   A   One thing -- let me say one thing I'm
5   trying to do is guess what you're going to be asking
6   and what it is that you want to know and I shouldn't
7   be doing that.
8   MR. BOUSE: No, you should not, Mr. Anderson.
9   Q   By all means I invite you to do that.
10  We're trying to obtain information and if you have
11  information that you'd like to share with us I'd be
12  glad to hear it. Let me interpose an objection and
13  as I've done repeatedly in the past if you'd like
14  the witness to step out so you don't think I'm
15  coaching, that's fine, but if you don't want him to
16  that's fine as well. I'm going to interpose an
17  objection before you ask your next question, just
18  let me know if you want the witness to step out or
19  not.
20  MR. SHAIBANI: Yes, I would.
21  MR. RANCK: I'm sorry, Mr. Anderson. Let me
22  just say I think it's wholly inappropriate for

Page 17
1   counsel to invite the witness to try to guess what
2   information you're looking for, which is what he
3   said he was trying to do and you invited him to
4   please try to guess what I'm going to ask you and
5   what I'm looking for. If you'd like to ask a
6   question at the end about is there anything else you
7   can think of relevant to the case or the questions I
8   asked you, but to invite the witness to, using his
9   term, guess and speculate as to what you're trying
10  to ask him and what information you're looking for I
11  think is wholly inappropriate and beyond the bounds
12  of permissible discovery.
13  MR. BOUSE: I join in that objection for the
14  same reasons.
15  MR. SHAIBANI: Well, this objection has been
16  noted on the record and I'd like to continue with my
17  deposition now.
18  MR. RANCK: Sure.
19  MR. BOUSE: Sure.
20  Q   Going back to Exhibit 1. I'd like to know
21  if by reviewing this document you would conclude
22  that the basement of this property was available for

Page 18

1  rental in October of 2005?
2      MR. BOUSE: Objection.
3      MR. RANCK: Objection for the reasons
4  previously stated.
5      A    What I'm looking for right now is that
6  there's a date on this.
7      Q    The date on the first page on the top
8  right side October 6, '05?
9      MR. RANCK: Your question?
10     A    I think the right answer to this is the
11 fact that I was not aware that the property was put
12 in the MRS until such time that people started
13 coming in and looking at it where John Pagones from
14 Chatel had either sent people down or people just
15 started walking in. So I was not aware of the
16 timing of when Mary put the property on, I think
17 that's what you're getting at.
18     Q    Did Ms. White ever ask you to attempt the
19 lease the front portion of the lower level of the
20 1622 Wisconsin Avenue property to a gentleman while
21 you were working for Ms. White?
22     MR. BOUSE: I object. He's testified he didn't

Page 19

1  lease anything for her. He was showing the property
2  and part of his duties were closing down her
3  business. I object to the mischaracterization of
4  his testimony.
5      A    Those were my duties was to close down the
6  business and handle whatever things happened. If
7  somebody came in to look at it I would show them
8  around and I showed them the apartment. I talked to
9  Mary about that and she said fine, you can show --
10 she didn't object to my showing and what my question
11 was not that I talked to her, I said why isn't
12 Pagones showing this stuff, that was my question
13 because that really wasn't my function to do that.
14     Q    But moments ago you mentioned there was a
15 gentleman who lived in Georgetown and worked from
16 his home and he wanted to lease the basement level
17 of the property. Is that what you mentioned
18 previously, we can go back?
19     A    He wanted to lease the back half.
20     Q    And did Ms. White tell you that she was
21 willing to lease the front half of the basement to
22 this gentleman?

Page 20

1      MR. BOUSE: I object.
2      A    No, because she was -- he wasn't
3  interested in the front.
4      Q    What did Ms. White tell you with respect
5  to this gentleman's interests in the basement level
6  of the property?
7      MR. BOUSE: I object.
8      A    She had me contact him a couple times and
9  on the -- or I was really initiating the thing and I
10 thought he was interested and I thought I'd be doing
11 something for Mary but he was only interested in the
12 back. So we talked about what rent she wanted for
13 the back. She wanted to reserve a portion of that
14 floor for a office outside her home, that was her
15 intention, and that flip flopped back and forth and
16 it was really a -- I think it was really a situation
17 where -- this was later, I don't know what later is,
18 but -- actually, like I said, if anybody had
19 interest in the bottom half other than this
20 gentleman we weren't able to rent it to him because
21 there was some problems with his access to that
22 portion of the property. And the way he wanted to

Page 21

1  get in and out was off of, I believe, 33rd Street
2  and the street just west of that and there was some
3  problems with the access, whether there was really
4  legal access or whether it was just neighborly
5  goodness that people were able to use it and that's
6  how that thing ended up. I said we can't rent it to
7  you because I'm not -- I said I don't think we're
8  going to be able to rent it to you because I'm not
9  sure that you'll able to get in and out.
10     Q    What was the regular entrance to the
11 basement?
12     A    In what structure?
13     Q    How could somebody enter the basement
14 level of that property?
15     A    You can get into -- the main or front
16 entrance would be off of Wisconsin Avenue. You go
17 into the entrance at 1622 and there's a flight of
18 stairs down to the lower level and a flight of
19 stairs up to the street level and then a door off of
20 that foyer type of thing that leads up to an
21 apartment on the third floor and for the lower level
22 and those are the only accesses that they have

Page 22

1  for -- the front entrance is the only access for the
2  street level and for the apartment and the lower
3  level has access through -- has two doors that go
4  out to a backyard area which is fenced in and
5  there's a gate in that fence that leads to a walkway
6  that goes to 33rd Street.
7      Q   The reason why you couldn't rent the
8  basement level to the gentleman who worked from his
9  home was because he wanted to access it from the
10 33rd Street as opposed to the Wisconsin Avenue
11 entrance?
12     MR. BOUSE: I object.
13     MR. RANCK: Objection. Calls for speculation
14 as to what's in Ms. White's mind.
15     MR. BOUSE: I object for the same reasons and
16 Mr. Anderson's already answered the question.
17     Q   Could you please respond? Could you read
18 back the question?
19         (Record was read)
20     MR. RANCK: Same objection.
21     MR. BOUSE: Same objection.
22     A   That's my understanding. But that was my

Page 23

1  communication to the gentleman.
2      Q   Did you ever discuss this gentleman's
3  interest in the basement with Mary White?
4      A   I did.
5      Q   And could you tell us what you talked
6  about with Ms. White?
7      A   How much she wanted to get for the space.
8      Q   And do you remember what she told you?
9      A   She didn't know. She never really did
10 tell me. So I told her what I thought would be a
11 good figure for it.
12     Q   And what did she say in response?
13     A   Not that she said anything, she just went
14 and we went on with the negotiations or I went on
15 with the negotiations to rent it to him. She
16 thought I was asking too much.
17     Q   Did she encourage you to lease the
18 basement to this gentleman?
19     A   No, and I said that before. She really
20 didn't want to do it but she didn't want to tell me
21 not to continue on and I finally after talking with
22 her two or three times and saying I just made the

Page 24

1  statement to her you really don't want to lease this
2  property or this portion of your building because
3  we've got this guy and -- she wasn't following
4  through. I had somebody that would have -- was a
5  prospect to lease it and she wouldn't follow through
6  on the thing because she didn't really want to lease
7  it.
8      Q   Do you know why she posted it on the MRIS,
9  the basement unit, if she didn't want to lease it?
10     MR. RANCK: Objection, speculation.
11     MR. BOUSE: Objection.
12     A   I don't have any idea or whatever on that.
13     Q   Do you recall who she gave the information
14 that resulted in this posting in Exhibit 1?
15     A   Who made the posting?
16     Q   Who provided?
17     A   I have no idea. I have -- completely out
18 of that loop. I had no idea that the listings were
19 being made so I have no knowledge of who gave whom
20 what information.
21     Q   Did you ever communicate with John Pagones
22 about the basement of this property?

Page 25

1      A   Well, I showed him down there one time. I
2  saw him down there when Mary was trying to get him
3  to put some signs on the building because she wasn't
4  getting any traffic.
5      Q   Was there a for rent sign outside the
6  property?
7      A   No.
8      Q   How would people know that it's available
9  for rental then?
10     A   They didn't, that's why Mary was trying to
11 get him to put a sign in.
12     Q   And do you remember when a sign was posted
13 outside the building?
14     A   When did they put the listing in the MRIS?
15     Q   Yes, approximately 13 days before October
16 6th?
17     MR. RANCK: Let me object on foundation. You
18 can answer. Do you know when the sign went up was
19 the question I think.
20     A   Right, I don't know of the particular
21 dates. I know that there was -- that the sign went
22 up but I know that there was Mary saying something

Page 26
1  that she had tried to get Chatel multiple times to
2  get a sign down there.
3    Q  Was this relating to the street level or
4  lower level of the property?
5    A  There was only one sign so it was for
6  whatever was available.
7    Q  Do you recall if there were two separate
8  lock boxes outside the property while you were
9  working there?
10   A  I don't even recall a lock box being
11 there.
12   Q  How would an agent show the property if
13 there was no lock box?
14   MR. RANCK: Objection to form.
15   MR. BOUSE: Objection.
16   MR. RANCK: And mischaracterization of his
17 testimony, lack of foundation.
18   Q  You don't remember a lock box being posted
19 outside the property?
20   MR. BOUSE: Asked and answered.
21   Q  1622 Wisconsin Avenue?
22   A  I remember a lock box that Bratton put on

Page 27
1  to his front -- I don't recall a lock box on the
2  property. I don't recall seeing one.
3    Q  Do you remember the dates that you were
4  working for Mary White, your start date?
5    A  I worked for the first week of, or excuse
6  me, the last week of May through, well, through
7  sometime in -- actually it was January of this year
8  but it would have been through December of '05 and I
9  did things just because we things that needed to get
10 finished up. I did things for Mary but I wasn't
11 really working for her on the basis that she wasn't
12 paying me in January.
13   Q  Do you remember the name of the former
14 office manager who was working for Mary White?
15   A  I don't recall that. I was trying to
16 remember that but I don't recall her name.
17   Q  Do you remember the name of the gentleman
18 who worked out of his home in Georgetown who
19 communicated with you about the basement?
20   A  I don't.
21   Q  Where did you place the calls to this
22 gentleman? How did you call him, from which phone?

Page 28
1    A  From the phone in the office.
2    Q  And where was your office physically
3  located?
4    A  It was on the street level.
5    Q  Do you know how many phone lines were at
6  that office?
7    A  I think two.
8    Q  On the street level or both levels?
9    A  That was somebody else's office. When I
10 first started there in June that belonged to some
11 shoreline design company that was renting it at the
12 time. Water front something or other, the prior
13 tenant.
14   Q  For which level?
15   A  The lower level.
16   Q  Do you remember the names of any of the
17 other prospective candidates for the property?
18   A  No.
19   Q  Do you remember if Ms. White ever talked
20 to any of these candidates on her own. The woman
21 that wanted to do her -- she came in early October I
22 would say and she actually I think she was the first

Page 29
1  one that came in and I don't know whether -- I
2  think, I don't know whether John sent her down or
3  what.
4    MR. BOUSE: John Pagones?
5    A  Yes. And I showed her through it. She
6  wanted to set up a jewelry store.
7    Q  Did John Bratton come to see this space
8  while you were working there?
9    A  Yes.
10   Q  And to your recollection was that before
11 or after Roberta Medlin, the jewelry store operator?
12   A  Medlin, is that the jewelry store
13 operator?
14   Q  Yes.
15   MR. RANCK: Just for clarification, do you
16 recall that now or are you taking that as what
17 counsel said was a given? Do you recall that was
18 her name?
19   A  No, I recall that was her name.
20   Q  When did the tenant for the basement
21 vacate the property?
22   A  I think that was September.

8 (Pages 26 to 29)

Page 30

1  Q  If I may pass out Exhibit 2.
2     (Anderson Exhibit No. 2 was marked)
3  Q  Do you see halfway down the page where it
4  says under the address box it says 1622 Wisconsin?
5  A  Yeah.
6  Q  And underneath the owner do you see where
7  it says White on the same line?
8  A  Right.
9  Q  And then under tenant it says Giddins. Do
10 you remember who that person might be?
11 A  Yes, that's the young woman that rented
12 the apartment upstairs, Natasha Giddins.
13 Q  Do you recall if Ms. White had problems
14 with this tenant?
15    MR. BOUSE: I object. What's the relevance of
16 that? I object. Totally irrelevant.
17    MR. RANCK: Calls for speculation.
18    MR. BOUSE: And I don't know what you mean by
19 problems.
20 A  Nothing major.
21 Q  Did she consider this tenant to be a good
22 tenant?

Page 31

1     MR. BOUSE: I object.
2     MR. RANCK: Objection, speculation.
3  A  She paid her bills. That's a good tenant.
4  Q  Did this tenant complain about various
5  things to Ms. White to your knowledge?
6     MR. BOUSE: I object.
7  A  She did have some complaints, yes.
8  Q  How did Ms. White react to those
9  complaints?
10    MR. BOUSE: I object.
11 A  That wasn't Ms. White's purview or
12 responsibility. It was Chatel's responsibility to
13 react to those complaints.
14 Q  When the tenant for the basement vacated
15 the property in September of '05, did Ms. White
16 provide you with any instructions about what to do
17 with the basement?
18 A  Just to clean it up because they left it
19 as a mess.
20 Q  Did she say what she wanted to do with the
21 basement after you would clean it up?
22 A  No, but that came through the fact that

Page 32

1  people started coming in and looking at it.
2  Q  How many candidates came to look asking
3  questions about the basement?
4     MR. BOUSE: I object.
5  A  Well, nobody actually came in and asked me
6  about the basement.
7  Q  Were there telephone calls made to you
8  about the basement aside from the Georgetown
9  gentleman who worked from his home?
10 A  No. As I said earlier, I presented both
11 spaces as being available because they, in my
12 estimation, they were or would be available, but
13 that was a marketing technique on my part. So if I
14 could get the top and the front part of the bottom
15 put together then that would be a good thing.
16 Q  Did Ms. White ever ask you to contact John
17 Pagones about the property?
18 A  Yes.
19 Q  And do you remember why she had asked you
20 to contact John Pagones?
21 A  She wanted me to go and have him reword
22 some of the verbiage that he put into the MLS

Page 33

1  because -- not that the verbiage was inaccurate but
2  the verbiage was not very -- wasn't very attractive.
3  Q  Do you recall when you had this
4  conversation with John Pagones?
5  A  Not exactly. I know I had the
6  conversation with him.
7  Q  Exhibit 3, which is the MRIS listing for
8  the street level of the property.
9     (Anderson Exhibit No. 3 was marked)
10    MR. BOUSE: Can we stop here?
11       (Off the record)
12 BY MR. SHAIBANI:
13 Q  Going back to your conversation with John
14 Pagones. Do you remember which listing on the MRIS
15 Ms. White wanted to be rephrased?
16 A  The street level.
17 Q  What did she want to change in that
18 listing, do you remember?
19 A  She just wanted it flowered up. She
20 wanted the directions changed. What's in the
21 listing are the bare facts of what's there and
22 there's nothing incorrect about those, but it wasn't

9 (Pages 30 to 33)

Page 34

1  a, how do you want to say, flowery enough for
2  Ms. White. It's not an attractive description.
3     Q   Did Ms. White --
4     A   There was a marketing thing that she
5  wanted it reworded.
6     Q   Do you remember who provided the
7  information in the listing to John Pagones
8  initially?
9     A   I have no idea. I would presume from the
10 discussion I had with John about trying to reword it
11 that he provided the information.
12    Q   When was the date of this conversation,
13 was it before John Bratton inquired about the space
14 or afterwards?
15    A   I don't recall.
16    Q   Why didn't Mary White pay you for your
17 last month in January of '06?
18    A   Because we should have gotten the job done
19 a lot faster than it actually got done and I don't
20 recall the exact reasons what was delaying it but I
21 said that I made the statement that I would finish
22 the thing up by December and wasn't able to do that

Page 35

1  so I finished up.
2     Q   Did Ms. White ever tell you during your
3  employment at her office that she wanted separate
4  tenants for each level of the property?
5     A   No.
6     Q   Did she ever tell you that she did not
7  want to give a right of first refusal to the tenant
8  of the property?
9     A   I wasn't involved in any of that process
10 at all.
11    Q   Did she tell you that --
12    A   If I asked she'd avoid any questions so I
13 quit asking.
14    Q   Did she ever tell you how long she wanted
15 to lease the street level?
16    A   No. I presume that's in the lease or in
17 the -- well, I'm not going to presume but she never
18 did.
19    Q   Did she ever tell you that she wanted the
20 tenant to pay a portion of the property taxes?
21    A   We didn't get into that. That wasn't my
22 business, wasn't my interest or anything else like

Page 36

1  that. Nothing was said. In fact a lot of that time
2  I had very little contact or communication with Mary
3  other than passing on what her telephone calls to
4  her and some instructions on what thing she wanted
5  to keep in her files, things she wanted to get rid
6  of her files, what she wanted to do with her office
7  furniture that sort of stuff, her real estate what
8  she was doing with real estate, unless she wanted me
9  to pull a listing or pull something off the MRIS
10 because she wasn't that computer literate. I
11 believe they made some new changes to the MRIS, they
12 upgraded it and she wasn't familiar with a lot of
13 the upgrades she knew the functions but wasn't sure
14 of the upgrades, how to get to them.
15    Q   Please turn to Exhibit 3, the second page
16 which is marked BRA 155 on the bottom. Towards the
17 bottom third of the page under financial information
18 in the middle column you see where it says minimum
19 maximum lease?
20    A   Right.
21    Q   See where it says 121/48?
22    A   I do.

Page 37

1     Q   To your knowledge did Ms. White intend to
2  lease the property for as long as four years to a
3  tenant?
4     A   I don't understand the 121/48, what that
5  means.
6     Q   121 is a typo?
7     MR. RANCK:  Object.
8     MR. BOUSE:  Object to the form.
9     MR. SHAIBANI:  It's obvious you can object,
10 that's fine.
11    MR. RANCK:  Unless you're going to be a witness
12 in the case you can't be saying that.
13    MR. SHAIBANI:  You've been testifying
14 throughout all the depositions and I haven't
15 objected yet.
16    MR. RANCK:  I don't think so.
17    MR. SHAIBANI:  I disagree.
18    MR. BOUSE:  Mr. Anderson's answer said he
19 didn't understand, that was the end of it.
20    Q   Who provided the information to Chatel to
21 create this listing set forth in Exhibit 3?
22    MR. RANCK:  Objection, asked and answered.

10 (Pages 34 to 37)

**Page 38**

1  MR. BOUSE: I object.
2  A   I had no part of that. My call was on
3  John Pagones, put it together, but that's all I know
4  about it. I don't know anything about it.
5  Q   Did anybody work for Mary White during
6  your employment for her, anyone aside from you?
7  A   Work for her?
8  Q   Yes. Did anybody work at her real estate
9  office while you were employed there?
10  A   She had a -- well, the woman that was her
11  previous office manager during the first week that's
12  why I started in the last week was to try and get
13  some type of turnover from her so I wasn't walking
14  into an empty office that had been -- and not know
15  what was going on in it. So I started a week
16  beforehand with -- if you know the woman's name I'd
17  appreciate that, but I don't recall her name, but
18  she was Mary's, I would say, office manager.
19  Q   After this lady quit was there anybody
20  aside from you working at Mary White's office?
21  A   No, she had -- working in her office, no.
22  She had an accountant come in and kind of straighten

**Page 39**

1  out her -- this was late in November, December,
2  somewhere in there, to straighten out the financial
3  software. We used Workbooks I believe.
4  Q   Was anybody helping her with the real
5  estate listings?
6  A   No, I did some of that stuff. This was
7  later on. There was a young girl that came in and
8  did some stuff, I think she's the gal that Mary's
9  using right now. I don't recall her name. She did
10  some address book stuff, that's what she was doing
11  for Mary.
12  Q   To your knowledge did Mary White have
13  communications with John Pagones directly about
14  leasing this property? Did she ever tell you she
15  talked with John Pagones about the property?
16  A   When did I meet Pagones? I'm not sure
17  about the timing, but your question brought up the
18  fact or remembrance that Liverman and Patty.
19  Q   Patsy Petty?
20  A   Yeah, that's the first time I met John
21  Pagones is the three of them came into the office.
22  Q   Was that before or after John Bratton

**Page 40**

1  asked about the property?
2  A   I don't recall.
3  Q   Do you remember if it was before or after
4  Roberta Medlin inquired about the property?
5  A   No, I'm just remembering that they did
6  come in.
7  Q   How long after you started working there
8  did they come in?
9  A   I can't put a thing on it.
10  Q   A moment ago you mentioned John Pagones
11  created the listing for the street level of this
12  property?
13  MR. RANCK: Let me object. That
14  mischaracterizes his testimony.
15  A   I have no idea about anything -- the only
16  thing I know about this listing is the fact that
17  Mary asked me to go down and talk to John Pagones
18  and she gave me some wording that she wanted to have
19  changed in the listing because she's didn't feel
20  that the wording was a good marketing tool. She
21  wanted it changed because she didn't like the
22  wording.

**Page 41**

1  Q   Who changed it after you talked to John
2  Pagones?
3  A   I don't think it ever got changed. I had
4  a very difficult time even talking to John in
5  bringing that subject up and he got very irate and
6  didn't -- he didn't throw me out of the office but
7  it was close.
8  Q   Why was John Pagones irate about your
9  wanting him to change the wording on this listing?
10  MR. RANCK: Objection, speculation.
11  A   It is speculation. I have no idea why.
12  His comments were the fact that the information in
13  there is right so what is it you don't like about
14  it.
15  Q   Did he tell you that he actually created
16  the listing?
17  A   He created that part of it, yes, because
18  he was defending the fact that it was right.
19  Q   And did the wording that was provided to
20  you by Mary White say anything about the right of
21  first refusal, did it say anything about a release?
22  A   No.

11 (Pages 38 to 41)

Page 42

1    Q   Did it say anything about property taxes?
2    MR. RANCK: Let me interpose an objection on
3  foundation. Your question is did the wording
4  provided by Mary White and I'm not sure other than
5  directions the witness testified that Mary White
6  gave him any wording to put in it.
7    Q   Did Mary White provide to you what was
8  referred to by you as the flowered up statement that
9  was supposed to go in the list?
10   A   Yes, we worked on it together.
11   Q   Did that wording say anything about a
12 right of first refusal?
13   A   No.
14   Q   Did it say anything about an option to
15 renew the lease?
16   A   Those -- it wouldn't have said that and it
17 did not, no.
18   Q   Did it say anything about the tenant
19 having to pay a portion of the property taxes?
20   A   No, that's not the purpose of the
21 description.
22   Q   Did it say anything with separate tenants

Page 43

1  for each level the property?
2    A   No.
3    Q   To your knowledge did John Pagones create
4  a listing for the basement level of the property?
5    A   I have no knowledge of that.
6    Q   Did you ever talk to Mary White about this
7  listing in Exhibit 1?
8    A   No.
9    Q   Did you ever talk to John Pagones about
10 it?
11   A   No.
12   Q   Do you remember if Roberta Medlin was
13 given a tour of the property by Mary White?
14   A   The second time she came in she may have
15 been shown the street level that's where he met
16 Mary. She just showed up at the door. Mary was in
17 the office. I opened the door and Ms. Medlin was
18 there with her daughter and had come back.
19   Q   Did Ms. White give a tour of the property
20 to Roberta Medlin at that time?
21   A   Not other than the fact that it was -- I
22 showed her to her office. I showed her to her

Page 44

1  office and you can't enter the property without
2  getting a tour, it's a one room office space so it's
3  a matter of wording I guess. I could answer that
4  yes or no.
5    Q   What did Ms. White tell Roberta Medlin at
6  that time?
7    A   I wasn't privy to the conversation that
8  went on in Mary's office which was in the front of
9  the space and I spent the time with her daughter or
10 the Medlin's daughter.
11   Q   Did Mary White talk to you after Roberta
12 Medlin left the office on that day?
13   A   I'm sure she talked to me, whether she
14 talked to me about that or not I don't recall.
15   Q   Did she saying anything about her wanting
16 to rent the space to Roberta Medlin?
17   A   Yes.
18   Q   What did she say?
19   A   Well, before Roberta Medlin left she asked
20 me to give her or pull off a -- from the -- one of
21 the real estate systems that they have that has the
22 forms on it, to pull off a financial form for

Page 45

1  Ms. Medlin.
2    Q   A financial form?
3    A   A financial.
4    Q   A credit report?
5    A   I guess that would be another term for it,
6  but it's not necessarily a credit report -- well,
7  that's the purpose of it I would say, yes. I don't
8  recall the form number, name of that form or
9  whatever if you have the forms, a list of them I
10 might be able to pull it back up.
11   Q   So essentially it was the same day that
12 Roberta Medlin came into the office that you pulled
13 her credit report?
14   MR. RANCK: Objection.
15   MR. BOUSE: Objection.
16   A   No, this is a form to be filled out by
17 Ms. Medlin on her financial status.
18   Q   Are you referring to a rental application
19 by any chance?
20   A   No, it's a standard form. It's on
21 whatever that system name is.
22   Q   Did you give that form to Roberta Medlin?

12 (Pages 42 to 45)