Page 46

1  A  Yes.
2  Q  Did she ever fill it out?
3  A  I don't know. I never saw it.
4  Q  To your knowledge did Roberta Medlin ever
5  give bank statements to Chatel or Mary White?
6  A  I have no -- I'm completely out of that
7  loop. That wasn't part of my responsibilities or
8  and, as I say, if I'd ask questions about how things
9  were going Mary would either avoid or go on to what
10 it was that she wanted done and because she was
11 always in the office and off to some appointment or
12 something else like that so that was -- it wasn't a
13 matter we were able to sit around and talk. It was
14 a matter of this is your mail and these are the
15 checks you've got to sign and this is what you're
16 telephone calls were and she was in and out. She
17 wasn't in the space very much at all.
18 Q  Did Mary White ever request Roberta Medlin
19 to provide her tax statements to your knowledge, her
20 income tax returns?
21 A  Other than if that's part of the form that
22 I gave her it's a standard form.

Page 47

1  Q  Is that a form that was on the office
2  computer at Mary White's office?
3  A  No, it's a form that is -- it's held by
4  the Real Estate Board.
5  Q  The Greater Capital Area Association of
6  Realtors?
7  A  Right.
8  Q  That's a form relating to leases or sales?
9  A  It's a form related to financial
10 background for a leasee or purchaser or whatever to
11 supply their financial background. That's my
12 understanding of the form or the purpose of the
13 form.
14 Q  What did Mary White tell you after Roberta
15 Medlin left the office aside from giving her this
16 form?
17 MR. RANCK: Objection, vague.
18 Q  Did Mary White talk to --
19 A  She may have said that -- well, she may
20 have said she seems very interested.
21 Q  She as in Mary White or Roberta Medlin?
22 A  She seems very interested as in Mary's

Page 48

1  statement referring to Ms. Roberta Medlin.
2  Q  Was there anything else that Mary wanted
3  to talk to you about?
4  A  She was interested because my contention
5  was she was interested. She came about on her own a
6  second time and happened to catch Mary in the
7  office.
8  Q  So the first time that she came in you
9  were there and Mary White wasn't?
10 A  Yes.
11 Q  And did you give a tour to Roberta Medlin
12 the first time around?
13 A  Yes, I did.
14 Q  And how long did it -- what was the time
15 line in terms of the first and the second time that
16 Ms. Medlin came into the office? How many days
17 elapsed?
18 A  Three, four, most of a week my
19 recollection.
20 Q  Did Mary White say anything else about her
21 intentions on what to do with the property after
22 Roberta Medlin left the office?

Page 49

1  MR. BOUSE: I object.
2  A  No. Some of this stuff I really don't
3  know how to answer you so I'm answering you no,
4  that's where I'm coming from, because I don't know
5  how to -- I don't specifically recall any comments,
6  any statements, about that so I'm saying no she
7  didn't, but I'm sure there was something would have
8  been said after the meeting and that sort of thing
9  but I don't have any recollection of what that was.
10 Q  To your knowledge did Mary White ever --
11 did Mary White ever tell you that she was going to
12 lease the property to Roberta Medlin?
13 MR. BOUSE: I object.
14 A  No.
15 Q  Did Mary White ever tell you that she was
16 going to lease the property to John Bratton?
17 MR. BOUSE: Same objection.
18 A  No. She didn't share that sort of stuff.
19 Q  Are you saying then that basically Mary
20 White's discussions about what to do with the
21 property was directly with Chatel and not with you?
22 MR. RANCK: Objection.

Page 50

1    MR. BOUSE: Objection, that's certainly not
2 what he's saying. He said discuss it with him.
3    Q   Who did she discuss it with?
4    MR. BOUSE: I object. How would he know that?
5    MR. RANCK: Objection, speculation.
6    MR. BOUSE: I object.
7    A   I don't know. Really, I don't know. Any
8 of that stuff that went on was -- I really didn't
9 know any of what was going on and, like I said
10 before, if I asked she'd avoid or she wouldn't
11 really answer my question, so I just quit asking.
12   Q   Why did Mary White avoid asking questions
13 about the property?
14   MR. RANCK: Objection, speculation.
15   MR. BOUSE: Objection.
16   A   My feeling on that was she had other
17 things, she was going to be in the office for half
18 hour, 45 minutes, she had things that she wanted to
19 get done and she wasn't going the chitchat about
20 what the other business was because it wasn't any of
21 my business.
22       (Anderson Exhibit No. 4 was marked)

Page 51

1    Q   This is Exhibit 4. Do you recognize this
2 photograph?
3    A   I don't.
4    MR. BOUSE: Can I see it?
5    A   I recognize the person in the photograph.
6 I don't recognize the photograph. It's not a very
7 good photograph.
8    Q   When John Bratton came to ask about the
9 property, do you remember what you talked about?
10   A   We talked about the fact he was in real
11 estate, in fact I really enjoined that thing because
12 I don't know whether I was getting bored at doing
13 what I was doing but I enjoyed him coming in.
14 Seemed to me to be a very charged up entrepreneurial
15 type individual that was looking to -- he said he
16 had a real estate office in Washington. He said it
17 was on the southeast side so I'm new to the city so
18 I don't know anything about what that is. I know
19 it's southeast the direction, and that he was
20 looking to expand into Georgetown and was looking to
21 also expand into an area that was off near closer to
22 the capital, that he was looking for two places that

Page 52

1 he wanted to expand his business.
2    Q   What else did you talk about?
3    A   I was trying to remember on the fact that
4 what his comment was that he commented on a piece of
5 art that was in the office or a sculpture or
6 something and we talked about his art, the fact that
7 he worked with art and that sort of thing.
8    Q   Do you recall telling John Bratton that
9 Mary White wanted to keep the backside of the lower
10 level for herself?
11   A   I may have.
12   Q   Do you recall giving a tour of the lower
13 level the property to John Bratton?
14   A   I do.
15   Q   And do you recall what you talked about
16 when you were giving that tour?
17   A   Other than the fact about what I was
18 showing him, I remember telling him that when he
19 told me that he was a real estate agent or broker I
20 told him that I wasn't and I wasn't an agent in any
21 way, shape or form in this transaction, all I was
22 doing was helping Mary close her office and had no

Page 53

1 agency one way or the other and that was always
2 being handled by Chatel.
3    Q   Did you direct John Bratton to anyone at
4 that point?
5    A   I directed him to Chatel's office and
6 probably to John Pagones.
7    Q   Please look at Exhibit 4. Do you remember
8 the person in this photograph?
9    A   Not from that photograph. I do remember
10 John Bratton, yes, he gave me his card and his
11 website address was on that and that sort of thing.
12   Q   Could you describe what John Bratton
13 looked like?
14   MR. BOUSE: You just gave him his photograph.
15 I object.
16   A   Could I describe what he looked like? He
17 was 5'8" to 5'10". He was Afro-American. I don't
18 know how I'd put that, all the other things. That's
19 what he looked like.
20   Q   Did he have long hair?
21   A   He did.
22   Q   Did he have dreadlochs?

14 (Pages 50 to 53)

Capital Reporting Company

Page 54

1  A  Yes, he did.
2  Q  Was there anything else about his
3  appearance that was memorable or striking?
4     MR. BOUSE: I object.
5     MR. RANCK: Let me object, too, just on lack of
6  foundation because the witness, I'm not sure what
7  you mean by "anything else."
8  A  Nothing was shocking or -- well, his
9  appearance was different on the basis that that's
10 the way he wanted to appear, all right, but I didn't
11 take that type of stuff into consideration and in
12 the conversations we had he was a very likeable and
13 I thought very good prospect.
14 Q  Did you pass on the information you
15 received from John Bratton to Mary White?
16 A  What point in time are you talking about?
17 Q  After John left the office?
18 A  No.
19 Q  What about later at any point did you
20 convey information from John Bratton to Mary White?
21    MR. BOUSE: What do you mean by information? I
22 object. I don't know what you mean.

Page 55

1  Q  Did you tell Mary White that this guy just
2  came in and he wants to lease the space and by this
3  guy I'm referring to John Bratton?
4  A  I don't believe I did, not at that point
5  in time.
6  Q  How long did it take for you to tell her?
7  A  If anything she would have come back to me
8  because I sent him down -- or at a later date I
9  asked if anything happened because I hadn't heard
10 anything on the fact that -- I don't think I
11 mentioned that to -- I didn't mention that to Mary
12 at all because the fact is or as I recall I sent
13 John down and exact timing I don't know, I sent him
14 down Pagones's office and he either called me.
15    MR. RANCK: He who?
16 A  He being John Bratton called me the next
17 day and -- or it may even have been later -- I'm
18 thinking it was the next day, the next morning. So
19 in answer to your question I wouldn't have told Mary
20 anything about it.
21 Q  Do you remember what John Bratton told you
22 when he called you the next morning?

Page 56

1  A  She said that he was not able to get a
2  lease out of John Pagones and that he was coming
3  with his own lease.
4  Q  Did he say anything else to you?
5  A  No.
6  Q  Did he say why he couldn't get a lease?
7  A  He asked me when I thought about it and I
8  said I think you should have gotten a lease. I
9  asked him the question why didn't you get a lease, I
10 don't know exact words but that conversation I think
11 went on.
12 Q  Did you talk to Mary White after that
13 conversation?
14 A  About that conversation?
15 Q  About John Bratton?
16 A  I believe I did, I worked for her, but
17 John Bratton.
18 Q  Yes. After he called you the next morning
19 and said he didn't get a lease did you talk to Mary
20 White?
21 A  Not during that day I don't believe.
22 Q  What about the next day?

Page 57

1  A  I think probably the first time I
2  mentioned it or it may have been I may have
3  mentioned it over the telephone that we had a fellow
4  that was going down to Chatel to get a lease that
5  was interested in it. I may have. I'm not saying I
6  did but I don't think I -- actually I don't recall
7  addressing this whole thing with Mary until Bratton
8  came in with his lease.
9  Q  When John came in with his own lease what
10 did you tell him?
11 A  I didn't tell him anything. I told him
12 I'd take it down to Chatel, that this wasn't the
13 place to present it.
14 Q  Did you take down the lease --
15 A  And whether I used those exact words or
16 whatever I don't know, but the point was being here
17 isn't the right place but I'll take it down to
18 Chatel for you.
19 Q  Did you take it to Chatel?
20 A  Yes.
21 Q  Who did you pass it on to?
22 A  I was trying to remember that. They had a

15 (Pages 54 to 57)

Page 58

1  young woman that worked in their office, a young
2  blond woman.
3     Q   Hope Edwards?
4     A   Yes, I believe I gave her the envelope.
5     Q   Did the envelope contain a check for the
6  first month's rent and a security deposit?
7     A   It contained two $2500 checks.
8     Q   Exhibit 5, it's two checks.
9        (Anderson Exhibit No. 5 was marked)
10    A   What about them?
11    Q   Do you remember if these were checks that
12 were contained in the envelope you took to Chatel?
13    A   I don't remember whether those were the
14 exact checks. I do recall seeing two checks for
15 $2500.
16    Q   You see the date on the checks?
17    A   I do.
18    Q   October 6th, '05?
19    A   I do.
20    Q   Do you remember John Bratton wrote the
21 checks the first time he came to look at the
22 property?

Page 59

1     A   The first time I saw checks were here.
2  I've got no idea when he wrote them.
3     Q   Did John tell you that he tried to submit
4  a check for the first month's rent and security
5  deposit to John Pagones when he went to Chatel?
6     A   No, I don't recall that.
7     Q   Did Hope Edwards tell you what he was
8  going to do with the envelope you took over to
9  Chatel?
10    A   I didn't ask her. I gave it to her and
11 said it was for John Pagones. I presume that it's
12 my presumption what she did with it, it's my
13 presumption she gave to it John Pagones.
14    Q   Did she tell you she was going to give it
15 to John Pagones?
16    A   Don't know. Don't recall.
17    Q   Did Mary White ever tell you that the
18 lower level of the property was mistakenly listed?
19    A   I told Mary that she didn't want to rent
20 it. I really never got into that, not that I
21 recall.
22    Q   Did Mary White ever inform John Pagones

Page 60

1  that the lower level was mistakenly listed?
2     A   No. Well, not that I recall, when I say
3  no that's what it means.
4     Q   The gentleman who worked out of his home
5  in Georgetown who you talked to about the basement
6  level, did you have those conversations with him
7  before or after Roberta Medlin came to ask about the
8  property?
9     A   I don't recall.
10    Q   Do you remember this gentleman's race, the
11 Georgetown gentleman who worked out of his home, was
12 he White?
13    A   I don't recall seeing him.
14    Q   From your conversation with him did you
15 sense that he was White or Black?
16    MR. BOUSE: I object.
17    MR. RANCK: I object to that as well.
18    Q   Based on the accent or tone of voice?
19    A   I didn't draw that conclusion one way or
20 another.
21    Q   Did he give you his name?
22    A   Yes, he did. I don't recall it. And

Page 61

1  telephone number and that sort of stuff. It's not
2  my -- not an issue.
3     Q   Does the computer in Mary White's office
4  have blank rental applications on file?
5     A   No.
6     Q   Does it have blank commercial leases?
7     A   No, in fact that was an issue.
8     Q   What about the other two couples who came
9  in physically to ask about the property, could you
10 tell us their race?
11    A   Their race?
12    Q   Were they White or Black?
13    A   They were Caucasians, yes.
14    Q   And --
15    A   One of them was Hispanic, I think.
16    Q   Was it a man and a woman, each of those
17 couples?
18    A   Yes.
19    Q   Did the man have long hair for either of
20 those couples?
21    A   No.
22    Q   What about the cross dresser?

16 (Pages 58 to 61)

Page 62

1  A  She had long hair too, or he had long
2  hair.
3  Q  Did you ever inform Mary White about these
4  prospective tenants, I mean the two couples who came
5  in?
6  A  I did.
7  MR. RANCK: I missed the question. What was
8  the question?
9  (Record was read)
10 Q  Did Mary White -- what did Mary White say
11 after you told her these two couples were interested
12 in the property?
13 A  I didn't tell her that.
14 MR. RANCK: Objection.
15 A  I didn't tell them that. I told them they
16 came in and I gave two couples a tour of the
17 property and if anything I would have said, well, I
18 don't know whether they're interested or not and
19 that's a matter of if people are interested, they
20 come back and go further or they take some further
21 action.
22 Q  Did you tell Mary White that these couples

Page 63

1  were Caucasian?
2  A  No.
3  Q  Did you describe the appearance of these
4  two couples to Mary White?
5  A  No.
6  Q  What did Mary White say?
7  A  I discussed the business aspects of why
8  they were in there based on they wanted to set up
9  a -- I'm not sure what the one was, we talked about
10 that, I talked to the young woman about her -- I
11 think it was a beauty shop. I think it's the one
12 that I said was a salon or something like that. She
13 wanted to set up a beauty shop and was going through
14 and talking to her husband about how she set up the
15 chairs or do whatever it was that she needed to do.
16 Q  And what did Mary White say in response?
17 A  What I told Mary White is the fact that
18 had a young couple, I probably gave her the names at
19 the time because I would have noted that down, gave
20 their names and said this is the type of business
21 they wanted to put in there.
22 Q  What did Mary White say?

Page 64

1  A  And just a matter that they came, good,
2  good that they came, but it's a statement it's good
3  that I'm getting traffic at my establishment.
4  That's not a statement that -- that's the way I'm
5  taking it.
6  Q  Do you remember what Mary White told you
7  in response?
8  A  In response to what?
9  Q  That these two couples were interested in
10 the property?
11 MR. RANCK: Objection, mischaracterizes his
12 testimony again.
13 A  I didn't tell them -- I didn't tell her
14 that they were interested in the property. I told
15 her that they came through the property.
16 Q  And what did Mary White say after you told
17 her?
18 A  She would have said good or have an
19 affirmative statement saying good and my
20 interpretation of that is we are getting traffic and
21 have people coming in to look. Basically I'm
22 extrapolating on that, you're not going to know

Page 65

1  whether you've got somebody that's interested until
2  you have somebody taking further action.
3  Q  Did those couples follow through
4  afterwards after the first time that they came in to
5  look at the property?
6  A  Not to my knowledge because I would have
7  taken them as I did with John and said if you want
8  to go any further you've got to go down to Chatel
9  because they're the ones that are handling it.
10 Q  Do you know if they actually went with
11 Chatel?
12 A  I don't.
13 Q  Do you remember Mary White telling you
14 anything about these two couples at any point after
15 that conversation?
16 A  No.
17 Q  Did you tell Mary White that there was a
18 cross dresser interested in the property?
19 A  No.
20 Q  Or came to look at the property?
21 A  I didn't tell her that, no. He came to
22 look at -- actually he came in, it was a really hot

Page 66

1 day that day he came in and he came in to get into
2 the air-conditioning and actually he started talking
3 about his stuff and I gave him a couple of
4 references of apartments in the area that he might
5 go and look at but what he did after he left I have
6 no idea.
7   Q   In September of '05 you mentioned there
8 was a tenant occupying the basement level of the
9 property?
10   A   I believe they left in September, yes, it
11 was waterfront something or other was the name of
12 their thing and I'm coming up with the name Breen,
13 as I say this that name is kind of popping into my
14 mind, I think Breen has something to do with it.
15   Q   What kind of company was it, do you
16 recall?
17   A   They designed waterfronts and they
18 consulted on designing waterfronts and they ran
19 international competitions on waterfront designs and
20 awarded prizes.
21   Q   How many employees did that company have?
22   A   I met two. I don't know how many they

Page 67

1 had. There was a woman in the office most of the
2 time and a young man that was in and out of the
3 office.
4   Q   Were these employees of the company
5 occupying the basement level of the property, were
6 they White or Black?
7   A   Yes, they were.
8   Q   They were White or Black?
9   A   Both.
10   Q   One of them was White and the other one
11 was Black?
12   A   Yes.
13   Q   And the Black employee, do you remember if
14 he had long hair with dreadlochs?
15   A   I don't.
16   Q   Do you recall their names?
17   A   I don't remember him having dreadlochs.
18   Q   Do you recall their names?
19   A   I believe his name was Steve and her name
20 I don't recall.
21   Q   Do you remember who was the owner of the
22 business?

Page 68

1   A   I believe this name Breen. There was
2 somebody else involved in it, too, lived up in
3 Connecticut.
4   Q   Breen is the woman or the man?
5   A   Breen is a woman, but that's not the woman
6 that worked there. She's not an employee. I
7 believe she was an owner or one of the major forces
8 in the business, the other two were just workers.
9   Q   That Breen person, is she White or Black?
10   A   White.
11   Q   And do you remember if --
12   A   I met her when he moved out, that's the
13 only time I met her.
14   Q   Do you remember who was providing the
15 rental checks for this property to Mary White from
16 this company?
17   A   I don't recall where they came from. I
18 believe it was -- I really don't know.
19   Q   Do you remember if Breen was the person
20 named on the lease for the lease between this
21 company and Mary White?
22   A   Don't know, never saw the lease.

Page 69

1   Q   Do you remember why that company occupying
2 the basement vacated the property?
3   MR. RANCK:  Objection, speculation.
4   A   I believe they moved to Connecticut. I
5 don't know.
6   Q   Did Mary White ever tell you that she
7 wanted this company to vacate the property because
8 she didn't want to lease the basement anymore?
9   A   No.
10   Q   Do you remember if this company left the
11 company prior to the expiration of their lease?
12   A   Not much, if any, day or so, at most a
13 week before.
14   Q   Aside from the lease on the first month's
15 check and the security deposit that John Bratton
16 delivered to you at Mary White's office did John
17 supply you with any other documents?
18   A   Say that again. From the question the
19 timing is Mary did tell me she did not want to lease
20 the back part of the lower level and I told Mary
21 because she wanted to use that as her personal
22 office, so some of these answers that I'm giving you

Page 70

1  are based on my understanding of the question that
2  you're asking me. And you're leaving the whole
3  timeframe wide open. So my answers could very well
4  be out of context with you're asking.
5     Q   I'm talking about basically September and
6  October of '05, that's the timeframe I'm referring
7  to. You mentioned this company vacated the property
8  in September of '05. At that time did Mary White
9  tell you that she wanted this company to leave?
10    A   At that point, no, she didn't say one way
11 or the other. She just told me they were leaving.
12    Q   She didn't ask them to leave because she
13 didn't want to rent a basement anymore?
14    MR. RANCK: Objection, speculation.
15    MR. BOUSE: Objection.
16    A   I don't know. I think it's speculation on
17 my part that they told her they were leaving.
18    Q   How long of a lease term did they have?
19    A   I don't know. I never saw the lease,
20 don't have any idea whether it was -- what type of
21 lease it was. I know they'd been there for a long
22 time though.

Page 71

1     Q   Did John Bratton provide you with any
2  other documents aside from his lease and the checks
3  for first month's rent and security deposit?
4     A   Gave me his business card.
5     Q   Did you provide his business card to Mary
6  White?
7     A   I did, either that or I left it in the
8  envelope that I took down to John, probably that was
9  the case. I don't recall.
10    MR. SHAIBANI: I'd like to take a short break.
11    (Off the record)
12 BY MR. SHAIBANI:
13    Q   Mr. Anderson, I'd like to know if you and
14 Mary White were trying to lease the front part of
15 the basement to the gentleman who worked out of his
16 home in Georgetown in September to October of '05?
17    A   Best way to answer that is the fact that I
18 tried to offer that to him because I -- when he had
19 expressed an interest he said -- actually he was
20 interested in the back half, so that's when -- I
21 guess the answer to that is yes.
22    Q   I'd like to -- look at Exhibit 6 which is

Page 72

1  an e-mail from you to Mary White dated October 11th?
2     A   Yes.
3     (Anderson Exhibit No. 6 was marked)
4     Q   Have you had a chance to review this?
5     A   I have. That was part of Exhibit A on
6  your subpoena. It's the same e-mail as I recall.
7     Q   Could you tell us based on this e-mail do
8  you have a better sense of a date that Roberta
9  Medlin and John Bratton came in to inquire about the
10 property?
11    MR. RANCK: The first time each of them
12 inquired?
13    Q   Yes.
14    A   Well, not exactly. If I can give you a
15 broad brush on the thing I can do that. Roberta
16 Medlin came in first. I showed her the property.
17 She said she was interested and had to do -- she
18 still had other things to look at or whatever. The
19 idea she was interested but she was interested in
20 pursuing it but would come back. John Bratton came
21 in and that was within a couple of days and looked
22 at the property and that's when the process with

Page 73

1  John Bratton started. Then Bobby Medlin came and
2  again and that's when she met with Mary White and
3  perhaps from the way I wrote this thing the lease
4  application is the same form and I'm not saying it
5  is but it probably could be the same form as
6  basically the form I gave to Bobby where I'm
7  referring to here would be the one that has her
8  financial background or financial information on it.
9  I would have never given her a lease or anything
10 else like that. So if the term lease application
11 that I've written down here, that's probably the
12 name of the form that I gave her that has the
13 financial background and requests for whatever
14 requests, I'm not sure what it is but it's basically
15 my understanding of the form I gave them is one to
16 substantiate -- asking to substantiate that you as
17 someone that's going to lease the property is
18 financially viable to lease it. And it's probably
19 called a lease application. I'm not sure.
20    Q   What did Mary White -- did Mary White ever
21 send you an e-mail in response to this e-mail?
22    A   No.

19 (Pages 70 to 73)

Page 74

1  Q  Did Mary White call you in response to
2  this e-mail?
3  A  No.
4  Q  Did you talk to Mary White in person after
5  you sent this e-mail regarding the inquiry in this
6  e-mail?
7  A  If I did, and I don't recall doing it
8  specifically, if I did it was have you taken care of
9  the e-mail I sent you.
10  Q  What did she say in response?
11  MR. RANCK: Object to the form and foundation.
12  MR. BOUSE: Object.
13  MR. RANCK: He said he doesn't recall and if he
14  did that's what he would have said. If he doesn't
15  recall what he did, how could he have responded?
16  Q  Did she ever respond to your response to
17  this e-mail in any form?
18  A  Not that I recollect, no.
19  Q  I'm going to mark 13 BRA 342.
20  (Anderson Exhibit No. 13 was marked)
21  Q  The first sentence on the first page where
22  it says Bratton Realty, Inc. in parenthesis tenant

Page 75

1  and the date October 7th, 2005 and then at the end
2  of that lease there's a signature by John Bratton
3  and a date of October 6th, '05?
4  A  I'm presuming you're asking whether this
5  is the lease that I passed on to Chatel?
6  Q  Yes.
7  A  I presume so.
8  Q  And I'll mark Exhibit 14.
9  (Anderson Exhibit No. 14 was marked)
10  Q  It's BRA 375. This is the rental
11  application submitted by Roberta Medlin. It has her
12  name and then the initial and on the second page
13  there's a signature and a date of October 11th, '05?
14  A  I don't recall ever seeing that.
15  Q  Could you tell us why this rental
16  application is dated October 11th?
17  A  No.
18  Q  And why Exhibit 13 is dated October 7th if
19  Roberta Medlin first came to inquire about the
20  property before John Bratton did?
21  MR. RANCK: Objection.
22  MR. BOUSE: Objection.

Page 76

1  A  I can tell you that Roberta came and saw
2  the property her first initial visit was prior to
3  John Bratton's visit.
4  Q  Are you certain of that?
5  A  Yes, I am. Absolutely certain.
6  Q  To your knowledge she didn't go to Chatel
7  to follow up with her inquiry before you passed John
8  Bratton's lease to Chatel?
9  MR. RANCK: I object.
10  MR. BOUSE: Object.
11  A  I don't know if she ever went to Chatel.
12  Q  You didn't provide her with this rental
13  application Exhibit 14 though; is that correct?
14  A  I don't believe so. I don't recall giving
15  her that.
16  MR. RANCK: Just for the record the document
17  I've been given as Exhibit 14 is a two-page
18  document.
19  MR. SHAIBANI: Yes.
20  MR. RANCK: The document itself says page 1 of
21  4 on the first page and on the back page says 4 of 4
22  and if you look at the document itself it doesn't

Page 77

1  appear that these pages are it. The second page of
2  this document, BRA 376, begins with the word
3  "applicant" and I'm not sure whether it carries over
4  from the first page, so I think this document is
5  clearly missing several pages.
6  MR. SHAIBANI: This is what I got -- I'll have
7  to go back to the binders to find out if there are
8  missing pages.
9  MR. RANCK: I need to say something else for
10  the record because it's important in light of your
11  last question to the witness and it pertains to my
12  belief as to the content of the missing pages and I
13  would ask if you check the binders now or else allow
14  the witness to step out of the room or I'll say it
15  with him here so I can make a record.
16  MR. SHAIBANI: You were saying that this
17  document is incomplete and, yes, it is.
18  MR. RANCK: But you're asking him is this the
19  document he provided the witness and he's saying I
20  think so. I don't think he can fairly answer that
21  question without seeing the whole document because I
22  think the missing information might be relevant to

20 (Pages 74 to 77)

Page 78

1  that testimony and I'm happy to say what I think
2  that is if you'd like him to leave the room. The
3  record show the witness is stepping out of the room
4  for a moment.
5      MR. SHAIBANI: We don't need for that to --
6      MR. RANCK: I'll say it with him here, but then
7  I don't want you to accuse me of testifying because
8  my problem is my recollection of this application is
9  it contains some lines with financial information on
10 it. The witness testified he provided Ms. Medlin
11 with a document pertaining to financial information,
12 he then later testified a few minutes ago that the
13 lease application referenced in Exhibit 6 might be
14 the same document. He's now been presented with a
15 rental application, Exhibit 14, and you're asking
16 him is this the document you provided without giving
17 him the whole document.
18     My problem is is he clearly doesn't know
19 what document he provided. He knows it pertained to
20 financial information and if this application has
21 financial information I don't think it's fair to ask
22 the witness whether he provided it without showing

Page 79

1  him the whole document.
2      MR. SHAIBANI: Off the record.
3          (Off the record)
4  BY MR. SHAIBANI:
5      Q  Exhibit 14, I'm going to mark this as 14.
6      MR. RANCK: Just for the record, read the Bates
7  numbers since we don't have copies for counsel.
8  Exhibit 14 is now CH 0053 through 56 which is a
9  four-page document.
10 BY MR. SHAIBANI:
11     Q  Do you recognize this document?
12     A  Not per se, no.
13     Q  Did you provide this document to Roberta
14 Medlin?
15     A  That is possible.
16     Q  Is this the financial information document
17 you were referring to earlier in the deposition?
18     A  I don't believe so.
19     MR. RANCK: Can you review the entire document,
20 please?
21     A  Yes. I don't believe that was the
22 document that I was referring to earlier. That's

Page 80

1  another -- I'd have to have access to the database
2  to identify the document, but as I recall it had a
3  lot more information on it such as bank accounts and
4  that sort of stuff, lot more financial information.
5  This could very well be a document that I gave her.
6      Q  This document there's a signature beneath
7  that's a dated October 11th, '05?
8      A  I see that.
9      Q  Did you provide this document to Roberta
10 Medlin?
11     MR. RANCK: Objection, asked and answered.
12     A  I provided a blank form to Roberta Medlin.
13 Roberta Medlin filled it out, contents of it I never
14 saw it after that.
15     Q  But the date of October 11th, this date is
16 later than the date in the lease that you submitted
17 to Chatel, isn't it, from John Bratton in Exhibit
18 13?
19     MR. RANCK: Objection.
20     MR. BOUSE: Objection.
21     MR. RANCK: Foundation.
22     Q  I'm asking to you look at --

Page 81

1      A  One date is October 7th and the other date
2  for the initial commercial lease agreement that John
3  Bratton provided and the one that's October 7th and
4  this one is October 11th.
5      Q  Well?
6      A  What's your question?
7      Q  The question is did Roberta Medlin go to
8  Chatel after John Bratton, that's the question?
9      MR. RANCK: Objection.
10     MR. BOUSE: Objection.
11     MR. RANCK: Asked and answered.
12     A  I have no idea whether she even went to
13 Chatel. The presumption is she did. I have no
14 knowledge one way or the other. I was out of that
15 business.
16     Q  Did you provide this blank form to John
17 Bratton, the rental application in Exhibit 14?
18     A  Probably. And there's another form which
19 was a much more extensive financial form.
20     Q  Did Mary White indicate to you that she
21 was she wanted the prospective tenants to submit
22 their two years of income tax returns and bank

21 (Pages 78 to 81)

Page 82

1 statements?
2    MR. BOUSE: I object.
3    Q   In connection with obtaining a lease?
4    A   She did not. My conjecture is a request
5 for the form that I'm talking about.
6    Q   Are you aware that Roberta Medlin did not
7 submit such forms in connection with her lease
8 application?
9    A   I believe she was given that form.
10   Q   Are you aware that credit reports were
11 conducted for both John Bratton and Roberta Medlin?
12   A   No.
13   Q   Did Roberta Medlin ever tell you that
14 Chatel didn't provide her a lease, a blank lease,
15 agreement?
16   A   She would have had no reason to tell me
17 that. The answer to that is no.
18   Q   But John Bratton did when you talked to
19 him over the phone?
20   MR. RANCK: Object to the form of the question.
21   A   Can I give you some background on that?
22   Q   Yes.

Page 83

1    A   I tried to get because at one time I was
2 interested in pursuing real estate in the
3 Washington, D.C. area and I tried to get a
4 commercial lease from Chatel and requested that from
5 Patsy Petty and she came back with a standard
6 apartment rental lease, not a commercial lease, and
7 that's what she gave me. When I said this isn't
8 what I asked for, she didn't have one that she was
9 aware.
10   Q   Mary White didn't have one on her computer
11 or somewhere at her office?
12   A   No.
13   Q   No hard copies of rental applications or
14 blank commercial leases in Mary White's office?
15   A   No, they had that stuff in.
16   Q   From my knowledge it was all in the GAR
17 database. There were no forms that were all put
18 there and the purpose of that being so that the real
19 estate agents across in the District would all be
20 using the most current form and the process was not
21 to have a hard copy or copies of those forms on your
22 computer but to draw that information, those forms,

Page 84

1 from a central database. That's my understanding of
2 the purpose.
3    (Anderson Exhibit No. 12 was marked)
4    Q   Look at Exhibit 12. It's an e-mail from
5 Mr. Liverman to you copying Patricia Petty. Do you
6 recall receiving this e-mail?
7    A   Not really but I did.
8    Q   Do you recall Mr. Liverman coming to the
9 office of Mary White to --
10   A   I do, that would be the time where I said
11 I wasn't really aware of the timing.
12   Q   So June 2nd, '05?
13   A   Let me read the whole thing before I jump
14 into that and make that conclusion. It would refer
15 back to the time that I said that Thierry Liverman
16 and Patsy Petty and John Pagones came to the office
17 and that was the first time I met any of them.
18   Q   And do you remember what they talked
19 about?
20   A   I believe it predominantly had to do with
21 renting the apartment. This was prior to the, well,
22 it was the rental of the third floor apartment to,

Page 85

1 what was her name, Natasha Giddins. It was prior to
2 even Natasha -- well, it's an informational thing.
3 Thierry's writing to me saying these are -- this is
4 information that I'm going to need for when we come
5 and talk about renting the apartment upstairs. I'm
6 going to need copies of any leases if there are any
7 equipment warranties, if any, that would be for your
8 stove, gas heater that type of stuff and any
9 insurance policies and what licenses have to do, I
10 don't know.
11   Q   Did you discuss the office spaces on 1622
12 Wisconsin Avenue at this point?
13   A   No.
14   Q   Do you ever recall having a discussion
15 with anyone at Chatel regarding the terms of a lease
16 for the office space on 1622 Wisconsin Avenue?
17   A   No, other than my request and that was
18 just for my own knowledge, I wanted to get a copy of
19 a commercial lease that Chatel had -- that Chatel
20 used so I knew what was the things that were covered
21 in that, which I was never able to obtain because
22 Patsy said they didn't have one.

Page 86

1  Q  Two additional exhibits, 15 is the lease
2  between Mary White and that is CH 71, that's Exhibit
3  15. Exhibit 16 is CH 7.
4      (Anderson Exhibit No. 15 was marked)
5      (Anderson Exhibit No. 16 was marked)
6  A  I have no knowledge of these. It's the
7  first time I've ever seen them. I was not involved
8  in any of that stuff.
9  Q  Please take a look at paragraph -- I want
10 to point out there are some cross-outs in Exhibit 16
11 which is a lease between John Bratton and Mary White
12 and there are no paragraphs crossed out in the
13 Exhibit 15 which is a document bearing the caption
14 commercial unit of lease between Mary White and
15 Roberta Medlin d/b/a Gallery?
16     MR. RANCK: Let me just interpose on objection.
17 The documents speak for themselves and the witness
18 said he's never seen these before today.
19     MR. BOUSE: I object.
20     MR. RANCK: I don't know what relevance having
21 him agree that there's cross-outs.
22 Q  There's clear relevance here. Why is it

Page 87

1  that one lease has all of these provisions crossed
2  out, the one for John Bratton?
3     MR. RANCK: Objection.
4  Q  Where as the other one doesn't have any?
5     MR. BOUSE: I object. He wasn't involved with
6  that.
7     MR. RANCK: Objection, speculation.
8  A  Are you asking me what my opinion is?
9  Q  Yes.
10 A  On why those things are crossed out?
11 Q  Yes.
12 A  Let me ask you what's the general rule of
13 thumb on a contract that you being a lawyer when you
14 cross something else out of a contract, what is it,
15 let me ask you. Why do you cross things out? You
16 don't know.
17 Q  You're negotiating terms?
18     MR. RANCK: The lawyers negotiating terms.
19 This witness said he didn't negotiate terms.
20 A  I had nothing to do with these two
21 contracts and cross-outs are cross-outs.
22 Q  I'm trying to find out in your opinion why

Page 88

1  would Mary White want certain provisions of this
2  lease crossed out for John Bratton but not for
3  Roberta Medlin?
4     MR. BOUSE: I object.
5     MR. RANCK: Objection, speculation.
6     MR. BOUSE: He's not an expert.
7  A  I can't say what Mary White can do, what
8  she can't do, it's not an issue.
9  Q  Did she ever talk to you about her wanting
10 these terms?
11 A  She never talked to me about leases, lease
12 terms, anything. My function was to let her know
13 that she received telephone calls that she had had
14 mail there and that sort thing. As far as the rest
15 of that stuff goes I had no part of anything to do
16 with terms or anything else.
17 Q  Look at Exhibit 16, page 6 designated CH
18 12. You see where it says paragraph 41?
19 A  I do.
20 Q  Could you please read paragraph 41?
21     MR. RANCK: I object.
22     MR. BOUSE: Object.

Page 89

1     MR. RANCK: Document speaks for itself.
2  A  Paragraph 31 of 41 of this lease agreement
3  and what are you --
4     MR. RANCK: He'd like you to take the time and
5  the number of lines necessary in the record to read
6  what this document clearly says.
7  Q  Paragraph 41 a few lines which could be
8  read?
9  A  It's difficult to read.
10    MR. RANCK: 13 lines.
11 A  It's underlined.
12 Q  Why don't I --
13 A  Where they underline it they didn't
14 underline it properly.
15 Q  Why don't I point out a specific --
16 A  What are you trying get at?
17 Q  This is what I want to get at in paragraph
18 41. There's a provision that's found in the second
19 to the last sentence it says landlord hereby agrees
20 that in the event that the property of which the
21 lease premises is part is offered for sale during
22 the term of the lease tenant shall be given five

23 (Pages 86 to 89)

Page 90

1  business days to which to meet any price for offered
2  in writing for the property so to match any signed
3  contract of sale. And then the next sentence says
4  tenant agrees that any such right of tenant to match
5  a contract to purchase the property shall be subject
6  to any tenant's right under the Tenant Opportunity
7  Act?
8      A   What would you say that means?
9      Q   The provision stating that landlord hereby
10 agrees that if the property is offered for sale
11 during the term of the lease tenant shall be given
12 five business days to match my price. That writing,
13 that's a right of first refusal, isn't it?
14     MR. RANCK: Objection.
15     MR. BOUSE: I object.
16     MR. RANCK: Calls for a legal conclusion.
17     Q   In your experience as a real estate --
18 real estate agent previously?
19     A   I was.
20     Q   In your experience as a real estate agent
21 is this a right of first refusal?
22     MR. BOUSE: I object.

Page 91

1      MR. RANCK: Objection.
2      A   I sold residential real estate not
3  commercial real estate, so I would say that from
4  reading those lines that it was negating that part
5  of the contract.
6      Q   Exactly why is it that that part of the
7  contract is negated in John Bratton's lease but not
8  in Roberta Medlin's lease?
9      MR. BOUSE: Objection.
10     MR. RANCK: Objection, speculation.
11     A   I had nothing to do with those.
12     Q   This is because of Mary White's
13 discrimination?
14     MR. BOUSE: Don't even answer that,
15 Mr. Anderson. You want to make your closing
16 argument. Counsel, I'm interrupting because it's
17 improper. I object. Don't answer that. I object
18 and move to strike.
19     Q   Please answer the question.
20     MR. BOUSE: Don't answer that question.
21     MR. SHAIBANI: We can call the judge if you
22 like.

Page 92

1      MR. BOUSE: You can call the judge and stand on
2  your head and spit quarters. You can follow my
3  instruction, you don't have to answer based on my
4  instruction. I suggest it's a totally improper
5  question and not to answer. You don't have to
6  follow that but I'm advising you you should.
7      Q   Please answer the question. Mary White
8  discriminated against John Bratton by not offering
9  him this paragraph 41 which she offered to Roberta
10 Medlin, didn't she?
11     MR. BOUSE: I object.
12     MR. RANCK: Objection, move to strike,
13 speculation.
14     A   I don't think there's a discriminatory
15 bone in Mary White's body and I believe that John
16 Bratton is off base. I tried to explain that to him
17 before he told me that he was instructed by his
18 lawyer not to talk to me.
19     Q   Instructed by whose lawyer?
20     A   John Bratton's lawyer.
21     Q   Who was that?
22     A   I don't know. I presume it's you but I

Page 93

1  was told by John Bratton that he was instructed by
2  his lawyer to no longer talk to me and would I
3  please respect that and not talk to him any further
4  or have any of his or talk to any of his employees
5  any further at all. And he even came back to me a
6  week later when I was just on the stoop in front of
7  1622 and talking to one of his office people just
8  saying what a nice day it was, he came back and
9  reminded me that I wasn't to talk to him anymore.
10     Q   Before that incident, before he reminded
11 you that he couldn't talk to you because he was
12 represented by counsel now, did he in -- October of
13 2005 did he tell you that he felt discriminated
14 against?
15     A   He did.
16     Q   Can you describe the substance of that
17 conversation?
18     A   He thought that had to do with his
19 feelings of the way that his meeting at Chatel took
20 place in his first meeting at Chatel and that
21 related back to him not being able to get a lease
22 and I related to him my feelings on the real estate

24 (Pages 90 to 93)

Page 94

1  company of Chatel and I told him it's not
2  discriminatory, they are not discriminatory, the
3  gentleman is not well, the term I used is the fact
4  that he was not competent.
5      Q   On that point I'd like to pass out Exhibit
6  17 now which is CH 299.
7      (Anderson Exhibit No. 17 was marked)
8      Q   Exhibit 17, do you see where on the top it
9  says John Pagones summary of charges 2005?
10     A   I do.
11     Q   And do you see on the bottom it says total
12 124,690?
13     A   I do.
14     Q   Does this amount of earnings for a real
15 estate agent suggest to you that they were doing
16 well?
17     MR. RANCK: Objection.
18     MR. BOUSE: I object.
19     MR. RANCK: Speculation.
20     A   It had no bearing on his competence.
21     Q   It has no bearing on how much he makes; is
22 that what you're saying? Even if he's making

Page 95

1  124,000, which I'd like to point to you Exhibit 18,
2  too, which is apparently the second highest income
3  of at least 12 agents of Chatel, the second highest
4  income by only a $2,000 difference?
5      A   It's my contention that Mr. Pagones was
6  making that money in spite of himself.
7      Q   And why do you think that he's
8  incompetent?
9      MR. RANCK: Let me object. I think it calls
10 for expert testimony and it calls for speculation
11 and lacks any foundation that a witness would need
12 in order to give that opinion, but go ahead.
13     Q   Why do you say that?
14     A   He didn't meet my expectations on how a
15 client of a realtor should be treated and should be
16 acted upon. And the young lady that he rented the
17 apartment to on the third floor had mentioned to me
18 about John Pagones and that he had a reputation in
19 the area as a property manager that his predominant
20 property rented was to Georgetown students and his
21 modus operandi was one of intimidation. Now that's
22 my conclusion. I have nothing to base that on other

Page 96

1  than just what my interaction with him and my
2  hearsay from Natasha Giddins. He was interested in
3  doing what he wanted to do. It had nothing to do
4  with what the clients wanted. And so that's where I
5  come up with the contention that he's making the
6  money in spite of himself. He was in a position to
7  carry out whatever function he needed to carry out,
8  to manage property or to lease, I think he was in
9  the sales part of the thing as I recall, and then
10 Patsy was the -- managed the other things. And I
11 told Mary that she was making a big mistake being
12 involved with him, once again my opinion.
13     Q   In your opinion by John Pagones you
14 mentioned your words he wanted to do whatever he
15 wanted, would he also select who he wants to do
16 business with?
17     A   I don't think Mr. Pagones and this, again,
18 is my opinion but I don't think Mr. Pagones was all
19 there. I think he had reached a level where he was
20 hanging on past what he should have been doing.
21     Q   Wasn't Mr. Pagones selecting with whom he
22 would do business with in spite of civil rights and

Page 97

1  fair housing laws?
2      MR. BOUSE: I object.
3      MR. RANCK: Objection, speculation.
4      A   I can't say that.
5      Q   By not offering a lease to John Bratton
6  wasn't he discriminating against him?
7      MR. BOUSE: Objection.
8      MR. RANCK: Objection.
9      A   I don't believe he knew that there was a
10 commercial lease available from the office or knew
11 where to get it because he didn't --
12     MR. RANCK: Objection.
13     A   That's my opinion. I was trying to get a
14 copy of a commercial lease myself and I couldn't get
15 one out of Chatel. Now whether or not -- they
16 weren't discriminating against me I don't think. I
17 think Mr. Bratton's way off base. He's a type A
18 personality that wants things done. If he could
19 have had that lease 15 minutes and signed it and
20 written his checks and that sort of thing, that's
21 the way he wanted business done and the people he
22 was doing business with didn't work that way.

25 (Pages 94 to 97)