Capital Reporting Company

Page 98

1  Q  Isn't it unusual for --
2  A  And, again, nothing to do with
3  discrimination. It had to do with the fact they
4  didn't work that way.
5  Q  You don't know that, do you?
6  MR. BOUSE: Object.
7  A  I do know.
8  Q  You said you don't know anything about
9  these leases?
10  A  I don't know anything about the leases.
11  Q  You said you didn't have interactions?
12  MR. RANCK: The court reporter can't get all
13  this.
14  A  I really don't know the way Chatel worked,
15  other than the fact that they didn't anywhere near
16  meet the expectations that I would think a real
17  estate firm. Now, how I can't really say all the
18  way up to Chatel, because my dealings were
19  predominantly with Mr. Pagones and Ms. Petty, you'd
20  give them instructions and they wouldn't remember
21  them, from the time they left 1622 and got back down
22  to their office or you'd have to call them up and

Page 99

1  remind them to do things or they'd have -- and this
2  was related to the apartment and not the buildings,
3  but they'd have work done and I don't know whether
4  all this is behind, I'm probably going way off base
5  or saying more than I should be saying, but
6  basically what I'm saying is I would never have
7  hired them to do anything for me and it has nothing
8  to do with discrimination. It has to do with
9  competence in their dealings with real estate and
10  there again I'm being specific to Mr. Pagones and
11  Ms. Petty. What went on other than that in the
12  office could be a whole bunch of other things and
13  showing me this has no relevance to that. From my
14  understanding he sold real estate in Georgetown for
15  years and years and years and did that at Chatel and
16  he's making that because Chatel was very kind to
17  him. Don't laugh, that's the truth. They were
18  being very kind to that gentleman.
19  Q  Was John Pagones fired from Chatel?
20  A  I have no idea. As far as I know he still
21  works for them except I did see that -- as far as I
22  knew prior to the time that I saw exhibit whatever

Page 100

1  it is that you handed out to me which is his letter
2  of -- I don't know what it is. It indicates on
3  there. Exhibit 7, that he's left their employ.
4  Other than that up to the time that I saw that
5  Exhibit 7 I thought he still worked there. I don't
6  care whether he did or not.
7  Q  Turn to Exhibit 11. This is an e-mail
8  from Mary White to Patsy Petty dated December 18th,
9  '05. Read that e-mail.
10  MR. RANCK: Objection, document speaks for
11  itself.
12  Q  The beginning Mary White says Patsy, he is
13  a challenge, isn't he?
14  MR. BOUSE: Is there a question in our future?
15  Q  It says why does Mary White refer to John
16  Bratton as a challenge?
17  MR. BOUSE: I object.
18  MR. RANCK: Objection, speculation.
19  A  It appears from this that they didn't get
20  his rent check.
21  Q  And then Mary White says that she wants
22  Chatel to hand deliver the letter to have proof of

Page 101

1  delivery. Why would she want that?
2  MR. BOUSE: I object.
3  MR. RANCK: Objection.
4  A  I have no idea.
5  Q  Is this the way Mary White treats her
6  tenants?
7  MR. BOUSE: I object.
8  A  No idea.
9  Q  Is she unpleasant to her tenants in your
10  opinion?
11  A  I never had any dealings with her tenants.
12  Q  Was Mary White unpleasant to her tenants
13  in your opinion?
14  MR. BOUSE: I object.
15  A  I doubt it. She's a very nice woman. I
16  doubt that she would be unpleasant, unless the
17  tenant did something that would make her unpleasant
18  and from this I would conclude from this e-mail that
19  for some reason the December rent check didn't
20  arrive. That would be a challenge to me. It's a
21  challenge to Patsy or challenge to anybody if you're
22  leasing a property and your renter doesn't -- his

(866) 448 - DEPO
www.CapitalReportingCompany.com

Page 102

1  rent checks don't come in. You're drawing a
2  conclusion that's discriminatory. I'm saying if he
3  was Caucasian American that had 400 billion dollars
4  and his rent checks didn't show up they would say
5  make his rent checks.
6     Q   What if he sent his rent check on time and
7  she didn't receive it?
8     MR. BOUSE: I object.
9     A   I have no idea. You're asking me to talk
10 about Exhibit 11. What Exhibit 11 is telling me is
11 that the rent check didn't show up, do something to
12 get it, that's all.
13    Q   Did Roberta Medlin knew Mary White before
14 she first walked into Chatel?
15    A   My recollection of that is no.
16    Q   Did Mary White ever tell you that?
17    A   Not until I -- well, before she walked
18 into Chatel, I, one, have no personal knowledge of
19 whether she ever did walk into Chatel.
20    Q   Before she walked into your office?
21    A   I introduced her to Mary at that time and
22 in my understanding that was -- I don't know

Page 103

1  whether -- I presume that was the first time that
2  they both met at that time personally.
3     Q   Did Mary White know Roberta Medlin's
4  husband prior to her arrival?
5     A   My recollection of that is the fact
6  whether she knew him personally or not I don't know,
7  but they had just moved to this area and bought the
8  house in Georgetown. He worked for, I don't recall
9  what company that he worked for. My thought process
10 is but I wouldn't put any money on it that he worked
11 for an insurance company, the CNA Insurance Company,
12 but I could be a hundred percent wrong. That's just
13 my recollection. But like I said, I could be a
14 hundred percent wrong on that. And the fact that
15 whoever that company was that Mary White had a good
16 friend, an acquaintance, and that could be that knew
17 or worked at the same company and knew Mr. Medlin,
18 and that's what I'm -- I believe Mary today told me
19 that.
20    Q   She told you she knew -- a colleague of
21 Roberta Medlin's husband?
22    A   I believe so, yes, that's my recollection.

Page 104

1     Q   Do you know who this supposed colleague
2  is?
3     A   I have no idea.
4     Q   Did you ever meet him?
5     A   No.
6     Q   Did this supposed colleague of Roberta
7  Medlin's husband give a recommendation for Roberta
8  Medlin?
9     A   I don't know. I was out of that,
10 predominantly out of that whole thing, any of the
11 negotiations, never saw any contracts. The only
12 lease that I saw was one that I opened up from John
13 Bratton that I opened up and saw that there was a
14 lease that he had in an envelope that he had filled
15 out and there were two checks in that thing and I
16 said you're bringing them to the wrong place, they
17 should go to John Bratton. That's the only thing I
18 have any knowledge of or any personal contact in the
19 whole negotiations of the leases and I'm aware of
20 the timing of the people that I showed around or
21 gave tours to that came through the office.
22    Q   Did Mary White ever meet with John

Page 105

1  Bratton?
2     A   I don't know if she did or not. I would
3  speculate no. But she may have in Chatel's office
4  or some other place, I have no idea.
5     Q   To your knowledge is anybody occupying the
6  basement level of 1622 Wisconsin Avenue property?
7     A   I don't know.
8     Q   When did Mary White physically move into
9  her office at Washington Fine Properties?
10    A   It would be a tenant is what you're
11 saying. There is somebody occupying it, it's Mary
12 White. She's just leaving it empty.
13    Q   When did Mary White move into her office
14 at Washington Fine Properties?
15    A   Good question. I don't know. I don't
16 recall October, November.
17    Q   Of 2005?
18    A   Probably in November timeframe last part
19 of October of '05 to -- last half of October to
20 first half of November that she would have moved in
21 there.
22    Q   Of 2005?

Page 106

1    MR. BOUSE: Object.
2    A    Somewhere in there.
3    MR. BOUSE: He doesn't know.
4    A    I don't know the exact dates. I helped
5    her move.
6    Q    You were in that office at that time?
7    A    I helped her move in but I don't recall
8    the exact dates when she moved in there.
9    Q    Was she using her office at 1622 Wisconsin
10   Avenue after she moved into Washington Fine
11   Properties' office?
12   MR. BOUSE: I object.
13   A    Yes, she was.
14   Q    She was physically occupying the 1622
15   Wisconsin Avenue office?
16   A    Lower level.
17   Q    After she moved into Washington Fine
18   Properties?
19   A    Yes.
20   Q    How often was she there?
21   A    Well, not any more than she was there all
22   Summer, which was not very often.

Page 107

1    Q    Do you know why she wanted to keep her
2    office at 1622 Wisconsin Avenue after she had moved
3    into --
4    A    From her statement to me was the fact that
5    she wanted to have an office to go to other than the
6    Washington Fine Properties where the office space
7    was very limited for her.
8    Q    Do you remember when you helped her move
9    into Washington Fine Properties where she physically
10   occupied an office at that company?
11   A    I do.
12   Q    Could you describe --
13   A    She had an area that was maybe three feet
14   wide, two feet deep, that was part of a row of --
15   they weren't really offices, they were just spaces
16   to work out of. They were not offices, they were
17   just a work space. It's a normal situation for real
18   estate agents at a brokerage where they provide you
19   with a desk to work with that has hook-ups for your
20   computer or for whatever equipment you have but it's
21   no -- it's slightly wider than the width of a chair.
22   Q    Was that an office in Georgetown?

Page 108

1    A    It was. It was a new office that
2    Washington Fine Properties opened up in Georgetown
3    in P Street, I'm not sure about that.
4    Q    When was that opened?
5    A    It was opened somewhere right in that same
6    timeframe. I don't know when their grand opening or
7    that sort of thing was, somewhere in October 15th to
8    November 15th of 2005.
9    Q    Why did Mary White hire John Gordon
10   Forrester?
11   MR. RANCK: Objection, speculation.
12   MR. BOUSE: Object, if you know.
13   A    My only knowledge of John Forrester is
14   that he is and/or was Mary White's attorney.
15   Q    Why did she hire an attorney to negotiate
16   a lease with John Bratton?
17   MR. BOUSE: I object.
18   MR. RANCK: Objection, speculation.
19   A    I have no idea, other than the fact that
20   she may have relied on professionals in fields to
21   assist her in doing her business. She had a
22   professional accountant. She had a professional

Page 109

1    bookkeeper. She had a professional -- she had
2    professional people that she relied on, I presume
3    that Mr. Forrester was one of them. My only contact
4    with him is dropping off envelopes. I never even
5    saw the man.
6    Q    What envelopes did you drop with him?
7    A    Whatever she had in her -- whatever she
8    asked me to drop off. I don't know what the
9    contents were.
10   Q    Did they relate to John Bratton?
11   A    I don't know what the contents were.
12   Q    Was there any notes on the envelope to
13   suggest what it was about?
14   A    No.
15   Q    Did Mary White use John Forrester in all
16   of her real estate transactions?
17   A    I have no idea.
18   Q    Did she use John Forrester to lease the
19   space to the residential tenant on the second floor
20   of the 1622 Wisconsin Avenue building?
21   A    I have no idea.
22   Q    Did she use John Forrester to negotiate

Page 110

1  the lease with the tenant in the basement?
2     A   I don't know what her dealings with
3  Mr. Forrester were. My only connection with
4  Mr. Forrester was to deliver an envelope to him.
5     Q   When John Bratton felt he was
6  discriminated against did you convey that
7  information to Mary White?
8     A   I don't recall whether I made that
9  statement or not.
10    Q   Which telephone company did Mary White use
11 at her office 1622 Wisconsin Avenue office?
12    A   My recollection is it was Verizon.
13    Q   Did Mary White ever provide written
14 communications or written instructions to Chatel
15 concerning the leasing of this property, 1622
16 Wisconsin Avenue?
17    MR. BOUSE: I object.
18    A   Not that I'm aware of.
19    Q   Aside from that flowered up listing
20 statement, did she ever give you any other documents
21 to take to Chatel or to convey to Chatel?
22    A   No, that might not be right. There may

Page 111

1  have been a rent check that I had taken down there
2  for one of the other properties that she was
3  managing that Chatel had taken over. There was
4  something like that. There were a couple properties
5  that were still that she managed and had turned over
6  to Chatel.
7     Q   Did Mary White ever tell you that she
8  didn't want to lease her space to somebody who wants
9  to have a real estate brokerage office at 1622
10 Wisconsin Avenue?
11    MR. BOUSE: I object.
12    A   No.
13    Q   How much money was Mary White making in
14 2005?
15    A   I haven't got any idea.
16    Q   Did she close any deals at Washington Fine
17 Properties to your knowledge in '05?
18    A   She did.
19    Q   How much, what kind of deals?
20    A   I don't know. I wasn't privy to that.
21    Q   She didn't tell you I just sold a three
22 million dollar house?

Page 112

1    MR. BOUSE: I object.
2    A   I wasn't privy to that sort of thing. I
3  know she had listings and I know that some of them
4  sold, some of them didn't. It wasn't information
5  that I paid much attention to. That wasn't part of
6  my -- wasn't part of what I considered to be my job.
7     Q   Did she tell you the type of listings that
8  she had?
9    MR. BOUSE: I object.
10    A   In what respect, types of listings? They
11 were houses that she was selling.
12    Q   For what price range?
13    MR. BOUSE: I object.
14    A   They were in Georgetown. The price range
15 in Georgetown is.
16    Q   Over a million?
17    A   A million, five to seven million dollars.
18 I don't know what she was selling that stuff for. I
19 don't think you could find one under a million
20 dollars but that's my cursory looks at some of the
21 markets while I was looking through stuff.
22    Q   Were those the types of deals that she

Page 113

1  regularly conducted as a real estate agent?
2    MR. BOUSE: I object. What's relevance of
3  that?
4     A   I don't know. I think this had a lot to
5  do with the reason why, once again this is
6  speculation on my part, that she was closing her
7  brokerage because the people that she had supporting
8  her as far as real estate things and that sort of
9  thing were using their licenses as social contacts
10 rather than they weren't interested in selling real
11 estate. So she was saying I got a better deal over
12 here and I'm going to close it down. But I never
13 did get into what her past sales were, that sort of
14 thing. I don't think it was getting a whole lot of
15 turn over. Once again that's speculation on my
16 part.
17    Q   Did Roberta Medlin ever tell you that she
18 didn't want to lease the 1622 Wisconsin Avenue
19 space?
20    A   No. Last contact I had with Roberta
21 Medlin was the second time that she was in and she
22 showed an interest and I gave her the forms that I

29 (Pages 110 to 113)

Capital Reporting Company

Page 114

1 stated earlier that I gave her and I never heard
2 from her after that.
3    Q   Is it unusual for a tenant to have to wait
4 24 days to lease an office space for 2500 a month?
5    MR. RANCK: Objection.
6    MR. BOUSE: I object.
7    MR. RANCK: Form, foundation.
8    A   That's a -- you'd have to ask the real
9 estate bureau what their -- what their average is.
10    Q   In your opinion is it unusual for a tenant
11 to have to wait 24 days to sign a lease for an
12 office space that's $2500 a month?
13    MR. BOUSE: I object.
14    MR. RANCK: Same objection.
15    A   I think it's a long time to have to wait.
16    Q   Look at Exhibit 8 BRA 205. It's a letter
17 apparently from John Forrester faxed to Mr. Liverman
18 dated October 26th. Do you see where it says the
19 terms and conditions are as follows and then some
20 terms listed?
21    A   I do.
22    Q   Do you see where it says --

Page 115

1    A   I would think that my opinion on this
2 tough is irrelevant.
3    Q   I'm not asking about your opinion. Did
4 Mary White ever tell you that these are the terms
5 that she wants to have on a lease for the 1622
6 Wisconsin Avenue space?
7    A   No, I had nothing to do with any of the
8 terms or any of the lease stuff, didn't know
9 anything about it as far as it was going on.
10    Q   Even though you were giving tours of the
11 properties to prospective tenants?
12    MR. BOUSE: What's the question? You want to
13 argue every answer. I object.
14    A   No, I really had no knowledge of this
15 stuff. This was all going on -- if people came in
16 the office I would show them around, that's all. I
17 didn't have any other information on the thing at
18 all. I really didn't.
19    Q   Did Mary White ask you to destroy
20 documents at her office?
21    A   That's too broad a question. That was my
22 job to destroy documents in her office and it had

Page 116

1 nothing to do with any particular -- that was my
2 job, cull out her files. She had 35 years of worth
3 of real estate files that was one of my main
4 purposes is to cull those things out and to destroy
5 and dispose of those documents. I did not dispose
6 or get rid of anything that was current business or
7 active ongoing business.
8    Q   Was there a file for 1622 Wisconsin Avenue
9 space?
10    A   There was one I believe Mary kept that at
11 her home or in her back office, which would be
12 downstairs.
13    Q   What happened to that file?
14    A   I don't know.
15    Q   Did you ever --
16    A   I never intentionally threw anything away
17 or did anything about that file.
18    Q   Did you ever read the file?
19    A   No.
20    Q   What about e-mails at the e-mail addresses
21 that you had at Mary White's office, were e-mails
22 deleted after October '05?

Page 117

1    MR. BOUSE: I object.
2    A   I would say no. I never did. I would say
3 no to that. I don't think Mary knew how to delete
4 them.
5    Q   When did Mary White find out that John
6 Bratton was black, has long hair with dreadlochs?
7    MR. BOUSE: I object.
8    A   I haven't got any idea. I would say she
9 probably found out when she got his business card.
10    Q   Are you talking about the logo, flier,
11 from his real estate office, is that what he dropped
12 off?
13    A   I believe that was along with it too. I
14 think that was in with the contract.
15    MR. SHAIBANI: Let me take a break. Off the
16 record.
17    (Off the record)
18    (Anderson Exhibit No. 19 was marked)
19 BY MR. SHAIBANI:
20    Q   This is Exhibit 19, a photocopy of a flier
21 from Bratton Realty?
22    A   Yes.

30 (Pages 114 to 117)

Page 118

1  Q  Do you recognize this document?
2  A  Well, I would say yes but it's not the
3  whole flier, it's just one portion of it. It's a
4  fold out type thing, folds out three or four spaces.
5  It's orange and blue.
6  Q  Is this the flier that John Bratton
7  dropped off at Mary White's office when you were
8  there?
9  A  I would presume so, yes.
10  Q  Did you give this to Mary White?
11  A  Yes, I did.
12  Q  Do you remember how many days after John
13  Bratton dropped it off that you gave it to Mary
14  White?
15  A  I don't. It would have been in her stack
16  of mail, so whenever she came by to pick it up.
17  Q  Did she pick up that stack of mail to your
18  knowledge?
19  A  Well, I presume so, yes.
20  Q  Did John Bratton inform Chatel that he
21  felt discriminated against?
22  A  I do not know that.

Page 119

1  Q  Do you know if anyone at Chatel had a
2  conversation with Mary White concerning John
3  Bratton's allegation of discrimination for the
4  leasing office space?
5  MR. BOUSE: I object.
6  MR. RANCK: Objection.
7  A  I've got no idea whether this was what
8  John Bratton -- well, if you'll restate the
9  question.
10  Q  Did Mary White ever tell you that she had
11  a discussion with someone at Chatel about John
12  Bratton's allegation of discrimination?
13  MR. BOUSE: I object.
14  A  No.
15  Q  Did anyone at Chatel inform you that John
16  Bratton had accused Chatel or Mary White of
17  discrimination?
18  MR. BOUSE: I object.
19  A  No. Those are two different questions,
20  right?
21  Q  Yes.
22  A  Chatel never related to me or talked to me

Page 120

1  about the situation at all. The question prior to
2  that one.
3  Q  Was it Mary White who told you that John
4  Bratton had accused her or Chatel of discrimination?
5  MR. BOUSE: I object.
6  A  She did inform me and I don't know exactly
7  what the timing was or anything else like that that
8  Bratton was suing them for discrimination or had
9  some charge up against them and that's what prompted
10  the conversation that I had with John Bratton on the
11  stoop.
12  Q  Was that in October of '05 to your
13  knowledge?
14  MR. BOUSE: I object.
15  MR. RANCK: Objection, asked and answered.
16  A  I don't know.
17  Q  Did Mary White say that this suit was an
18  administrative complaint at the Office of Human
19  Rights?
20  A  I don't recall specifics of what it was
21  she said it was, just the fact that she had -- that
22  he was charging her and Chatel with some type of

Page 121

1  discrimination.
2  Q  And to your knowledge when did Mary White
3  receive or learn of this discrimination complaint?
4  MR. BOUSE: I object.
5  A  I have no idea when she learned of it.
6  Q  The discussion you had with Mary White
7  concerning the complaint for discrimination occurred
8  while you were working with Mary White?
9  MR. BOUSE: I object.
10  A  Yes.
11  Q  It had to be before the end of December of
12  '05 or before the end of January '06; is that
13  correct?
14  A  Correct.
15  Q  Were you aware that Mary White removed
16  Chatel from the negotiations with John Bratton?
17  MR. RANCK: Objection, characterization, lack
18  of foundation.
19  MR. BOUSE: I object.
20  Q  Were you aware she hired John Forrester to
21  negotiate the lease with John Pagones?
22  MR. BOUSE: Object.

31 (Pages 118 to 121)

Page 122

1   A   No. I had no knowledge of any of that
2   stuff that transpired.
3   Q   Did Mary White ever say that she wanted
4   separate tenants for each level of the property?
5   MR. BOUSE: I object.
6   MR. RANCK: Asked and answered.
7   A   She was -- I don't know. The part she was
8   interested in renting she wanted to rent.
9   Q   Did Mary White favor Roberta Medlin over
10  John Bratton?
11  MR. BOUSE: I object.
12  A   I don't know.
13  Q   Did she ever tell you that she was going
14  to -- to your knowledge did Mary White ultimately
15  decide to lease the space to John Bratton because
16  she had learned of the administrative complaint for
17  complaint of discrimination?
18  MR. BOUSE: I object. He said he didn't know
19  anything about that.
20  MR. RANCK: Objection, speculation.
21  Q   Did Mary White ultimately decide to lease
22  the space to John Bratton because she had found out

Page 123

1   that Bratton filed a claim for discrimination
2   against her?
3   MR. BOUSE: I object.
4   MR. RANCK: Objection, speculation.
5   A   I have no knowledge of what was behind the
6   decision. I didn't know until after the fact that
7   she had in fact leased it to John Bratton.
8   Q   Are you aware that John Forrester told
9   John Bratton he was a test case for discrimination?
10  MR. BOUSE: I object.
11  A   Say that again.
12  Q   Are you aware that John Forrester informed
13  John Bratton that he was a test case for
14  discrimination?
15  MR. BOUSE: I object.
16  A   I'm not. Phrase that a different way.
17  Q   Did you ever find out from any source that
18  John Forrester had told John Bratton that he was a
19  test case for discrimination?
20  MR. BOUSE: I object.
21  MR. RANCK: Objection, foundation.
22  A   Answer to that question is no.

Page 124

1   Q   Are you aware that Mary White stated in
2   her response to plaintiff's request for admission
3   that the continual listing of the lower level of the
4   property was a mistake?
5   MR. BOUSE: I object. How would he know that?
6   A   No, but I can believe that.
7   Q   Are you aware that Mary White stated in
8   her answer to the original complaint in this case,
9   are you aware that she stated the basement was
10  mistakenly listed?
11  A   I just answered that.
12  MR. RANCK: Objection, you may be able to short
13  cut it, it's your deposition, but by asking whether
14  he's seen any of the pleadings or papers filed in
15  the case. Certainly it's appropriate to ask him
16  whether he has information about the matters
17  admitted or denied but asking that he's aware what
18  was said in the pleading, ask him if she's seen any
19  of them. He doesn't know what's in these pleadings
20  I suspect.
21  A   That's true.
22  Q   Did you review any of the documents in

Page 125

1   this case?
2   A   No.
3   Q   Did you ever receive the administrative
4   complaint filed at the Office of Human Rights?
5   A   No.
6   Q   To your knowledge did Mary White reject
7   the lease that John Bratton dropped with you at Mary
8   White's office?
9   MR. BOUSE: I object.
10  MR. RANCK: Objection.
11  A   The answer to that is no. I know she had
12  questions about that lease, but I don't know
13  anything. Then again, my presumption, I know she
14  had a lot of questions about it and had made the
15  statement if he's dropping off his own lease it's
16  probably very biased on his side so.
17  Q   Did she tell you why she thought that the
18  lease submitted by John Bratton was bias in his
19  favor?
20  MR. BOUSE: I object.
21  A   Well, she didn't, but the connotation that
22  I picked up from it is if you're submitting a lease

Page 126

1 you're going to submit it in such a way that it's
2 biased in your favor.
3    Q   Well, what if the submission was due to
4 the fact that you couldn't get a less from Chatel?
5    MR. BOUSE: Objection, that's argumentative.
6    MR. RANCK: Objection, argumentative.
7    A   Right, that's not why.
8    Q   To your knowledge did Mary White hire John
9 Forrester to negotiate the lease with John Bratton
10 after she found out that John had sued her for
11 discrimination?
12    MR. BOUSE: I object.
13    A   I don't have any idea what her dealings
14 were with him. My presumption is he's her lawyer.
15 She may have retain him earlier. I haven't any
16 idea.
17    Q   Did Mary White ever tell you that she
18 preferred to have the 1622 Wisconsin Avenue office
19 space used as a jewelry store rather than a real
20 estate office?
21    MR. BOUSE: I object, you've asked that one.
22    A   No.

Page 127

1    Q   To your knowledge did Chatel discriminate
2 against the disabled in the 1990s?
3    MR. RANCK: Objection.
4    A   I didn't even know Chatel existed in the
5 1990s.
6    Q   To your knowledge did John Pagones falsely
7 inform a handicapped person in a wheelchair that
8 there were no leases available in Georgetown?
9    MR. RANCK: Objection, foundation.
10    A   No, I have no knowledge of Chatel's
11 activities other than the ones that I personally was
12 involved in. I didn't do any research on them and
13 don't know.
14    Q   Are you aware that John Bratton submitted
15 his bank statements in October 2005 in connection
16 with leasing the office space at 1622 Wisconsin
17 Avenue?
18    MR. BOUSE: I object.
19    A   No. I'm aware that he got whatever that
20 form is I'm telling you.
21    (Anderson Exhibit No. 20 was marked)
22    (Anderson Exhibit No. 21 was marked)

Page 128

1    Q   To your knowledge did Chatel ever tell
2 John Bratton that Mary White had leased this space
3 to Roberta Medlin?
4    A   No.
5    Q   If you could take a look at Exhibits 20
6 and 21, just look at the name on the account. Do
7 you see the balance on this account?
8    A   I do.
9    Q   And it says on 20 the balance October
10 18th, '05 indicating there's $157,716 in this
11 account?
12    A   I do.
13    Q   That's the regular checking account ending
14 with 3395?
15    A   Yeah.
16    Q   Do you see the balance on the business
17 account checking account 2721 which is Exhibit 21 on
18 October 18th, '05 you see $114,015 balance in this
19 account?
20    A   I do. I don't see anything that
21 identifies these as John Bratton's account.
22    Q   For the purpose of --

Page 129

1    A   Or what type of accounts they are, regular
2 checking, are they personal accounts?
3    Q   Whatever the account is. My question --
4    A   Business, economy, check. Well, you're
5 asking whether I can read the balances. Yes, I can.
6    Q   What I'm asking is actually if somebody
7 walks in to lease an office space for $2500 a month
8 and they have $157,000 in one and $114,000 in
9 another account is this sufficient proof of
10 financial ability to pay their lease in your view?
11    MR. BOUSE: Objection.
12    MR. RANCK: Objection.
13    A   No.
14    Q   This is not?
15    A   No.
16    Q   What if they have a clean credit as well?
17    MR. BOUSE: I object.
18    MR. RANCK: Objection.
19    A   Well, it's a series of things and I'm not
20 sure what in the Washington market does, what
21 those -- all the series of steps are that
22 substantiate that conclusion.

Page 130

1  Q  What about in the market when you were a
2  real estate agent?
3  A  I can come in and print this thing out to
4  you and by the time I carried it over to you those
5  balances could be nothing. But anyway that's
6  neither here nor there, but this doesn't -- unless
7  tied with other things, history and that sort of
8  stuff, it's not -- this means absolutely nothing.
9  Q  Including a clean credit report, it would
10  still mean nothing?
11  MR. BOUSE: I object.
12  A  It's conjecture on my part and based on
13  what my decision would be in this instance and not,
14  as I say, I'm not familiar with the Washington
15  market and what the conditions are that determine
16  that type of affirmative response to a report in
17  Washington.
18  Q  Did you ever have any communications with
19  Mary White prior to this deposition over the last
20  six months?
21  A  Yes.
22  Q  Could you tell us the substance of your

Page 131

1  conversation?
2  A  She called and asked me when I started
3  working for her.
4  Q  Did she tell you anything else?
5  A  No.
6  Q  Were you contacted by any of the attorneys
7  in this room about this case?
8  A  I was.
9  Q  Could you tell us who you talked to?
10  A  Mr. Bouse.
11  Q  And could you tell us what you talked
12  about?
13  A  He gave me somewhat of a deposition going
14  over, what the -- he asked me questions, the same as
15  you're asking me questions.
16  Q  What else did you talk about?
17  A  That's what we talked about.
18  Q  He asked you some questions. What did he
19  ask you?
20  A  Basically the same questions, not same
21  wording, but same questions you're asking.
22  Q  Did he tell you that you could help Mary

Page 132

1  White by --
2  A  No.
3  Q  -- responding in a certain way?
4  MR. BOUSE: Are you accusing me of committing
5  perjury, put that on the record, we'll go to the Bar
6  Association, go ahead.
7  Q  I'm asking a question. I don't know what
8  you guys talked about. I'm not accusing you of
9  anything?
10  A  It is on the record and he did not. He
11  was very careful to not to do that based on some
12  questions that I asked him and he wouldn't answer.
13  Q  What about Mary White, did she ask you to
14  respond to inquiries in a certain way that would
15  help her?
16  A  No, if you knew Mary White you wouldn't be
17  asking the question.
18  Q  Well, I don't know her.
19  A  I know.
20  Q  Did you talk to Chatel's counsel about
21  this case?
22  A  Never talked this Chatel's counsel. Well,

Page 133

1  other than this morning, yes. And about the case,
2  no.
3  Q  Describe to counsel your conversation with
4  me before this deposition, we had one substantive
5  conversation and a couple other times that you've
6  called?
7  A  Right. I called you up around the, I
8  think it was the 18th of October, because I had
9  looked through all my papers and/or stuff that I had
10  at home and I didn't come up with anything but a
11  series of pictures of office equipment that I had
12  taken to as part of my job to put on Craig's List to
13  sell, attempt to sell the office equipment. The
14  other thing was I told you about a conversation that
15  I had with John Bratton on the stoop telling him
16  that my conjecture on this thing was he was barking
17  up the wrong tree and that it wasn't a matter of --
18  in my opinion a matter of discrimination but a
19  matter of which I said before a matter of
20  incompetence.
21  Q  The photographs?
22  A  He was looking at -- basically my point

Page 134

1  was that he was on the wrong track.
2  Q  The photographs that you attempted to
3  e-mail to me, could you tell us the office equipment
4  you mentioned, you tried to sell that on Craig's
5  List, when did this attempted sale occur?
6  A  That happened in the -- at the latter
7  parts of October and into November and into
8  December, they were out there pretty much all that
9  time.
10  Q  In 2005?
11  A  Yes.
12  Q  Were you able to sell the equipment?
13  A  Good majority of it, yes.
14  Q  What kind of equipment?
15  A  They had some desks that were putty
16  colored laminated office -- standard office desks
17  and file cabinets and file folders and a big
18  receptionist type desk that I was hoping we could
19  leave in the office but Mr. Bratton said he didn't
20  want it and I don't know why anybody would have
21  bought it myself but that's what they had. So I was
22  able to sell that and there was a refrigerator,

Page 135

1  there was an office chair.
2  Q  Was this from the street level of the
3  property or lower level?
4  A  Street level predominantly. I moved all
5  that stuff out and downstairs when I -- or I cleaned
6  out as much -- I cleaned out the whole street level
7  prior to November 1st that he moved in and the
8  morning of November 1st was the computer and the
9  telephone were still up in the office. I left them
10  sitting on a file cabinet.
11  Q  Do you know who the prior tenant of the
12  street level of 1622 Wisconsin Avenue property, who
13  was the prior tenant?
14  A  Street level? Mary White, Incorporated,
15  the realtor.
16  Q  So there was no other tenant after she
17  decided to close down her business?
18  A  Not on the street level, or to my
19  knowledge on the lower level. Which level are you
20  referring to?
21  Q  I thought you said there was a company in
22  the lower level that vacated the property in

Page 136

1  September?
2  A  In September.
3  MR. SHAIBANI:  Those are my questions, if you
4  have follow-up questions I may have some other
5  questions. I'm done with my questions for you,
6  thank you for coming here.
7  BY MR. RANCK:
8  Q  I do have a few. Mr. Anderson, as I met
9  you in the lobby this morning and introduced myself
10  I represent Chatel. Are you still planning to
11  e-mail those pictures to Mr. Shaibani?
12  A  I hoped he would say he doesn't want them.
13  MR. RANCK:  Mr. Shaibani?
14  MR. SHAIBANI:  I didn't receive them, they must
15  have bounced back.
16  MR. RANCK:  If you get them if we could get
17  copies.
18  MR. SHAIBANI:  Sure.
19  MR. BOUSE:  Do you still want them I guess is
20  the question?
21  A  They're office desks and refrigerators and
22  that's all they are.

Page 137

1  MR. SHAIBANI:  If you'd like to send them that
2  would be nice but I'm not going to take up your
3  time.
4  A  I don't want to send them so I won't be
5  sending them.
6  MR. SHAIBANI:  That's fine.
7  BY MR. RANCK:
8  Q  Mr. Anderson, during when you and I
9  returned from the lunch break you and Mr. Shaibani
10  were talking outside the building, was that having
11  anything to do with the case or your testimony up to
12  that point in time or just small talk, idle
13  chitchat?
14  A  Yes and no. It was idle chitchat in
15  relation to the case. I was trying to get an idea
16  of whether I was giving the -- whether he was
17  getting the answers not necessarily that he wanted
18  or how -- I was just trying to get a flavor for how
19  the deposition was going because I have a very fuzzy
20  feeling that any real value is coming out of the
21  answers that I have given him and I think basically
22  they're wrong in their supposition in the first

35 (Pages 134 to 137)

Capital Reporting Company

Page 138
1  place.
2     Q  Was the conversation limited to -- we know
3  you haven't been deposed before, was it limited to
4  things like whether you were being responsive in the
5  form of the answer or did you discuss any
6  substantive issues that have come up in the case,
7  substantive questions?
8     A  Well, I related back again the
9  conversation that I had on the stoop with John
10 Bratton about my -- which I also had with Stefan
11 prior to or right after I had the first subpoena for
12 the deposition and my conversation with him on that.
13    Q  How many days a week did you work for Mary
14 White?  Were you full time?
15    A  Yes, 40 hours a week.
16    Q  Five days a week, eight hours a day
17 generally?
18    A  Right.
19    Q  Had you related to us all the
20 conversations you recall having with anyone at
21 Chatel concerning the 1622 property or John Bratton?
22    A  No.  There are some questions, if I can

Page 139
1  guess what you're after, there are questions or
2  conversations and meetings and that sort of thing
3  that I had with Chatel in relation to their rental
4  of the apartment upstairs and some of the mechanics
5  of getting things fixed and that type of thing.
6     Q  Putting aside all that how about with
7  regard to the street level property and the basement
8  and anything having to do with Mr. Bratton, have you
9  related all your conversations with Chatel here
10 today?
11    A  Yes, I believe so.
12    Q  Is the same true with your communications
13 in dealing with Mary White regarding the street
14 level, basement and Mr. Bratton?
15    A  Yes.
16    Q  Same true with regard to communications
17 and dealings with John Bratton regarding this
18 property?
19    A  I would presume, yes.
20    Q  And same with Ms. Medlin?
21    A  Yes.
22    Q  Do you recall ever faxing anything to

Page 140
1  Roberta Medlin?
2     A  No.
3     MR. RANCK:  That's all I have, thank you.
4     A  That doesn't mean I didn't but I don't
5  recall doing it.
6     MR. BOUSE:  I don't have any questions.
7  Mr. Anderson, since you don't have counsel here, you
8  have a right to read this deposition.  You can under
9  the federal rules now make changes as to things you
10 misunderstood or that were mistaken down.  In view
11 of all the cross talking during your deposition I
12 suggest you read it and sign it, but I leave that up
13 to you.
14    A  All right.
15    (Reading and signing was not waived)
16    (3:30 p.m. the deposition was concluded)

Page 141
1  ACKNOWLEDGEMENT OF DEPONENT
2
3  I, E. BARRETT ANDERSON, do hereby acknowledge I have read
4  and examined the foregoing pages of testimony, and the same
5  is a true, correct and complete transcription of the
6  testimony given by me, and any changes or corrections, if
7  any, appear in the attached errata sheet signed by me.
8
9
10
11
12
13
14
15
16  ----------------        ------------------------
17  Date                    E. BARRETT ANDERSON

(866) 448 - DEPO
www.CapitalReportingCompany.com

Page 142

1  MATTHEW A. RANCK, ESQ.
2  Eccleston and Wolf
3  2001 S Street, N.W., Suite 310
4  Washington, D.C. 20009-1125
5  (202) 857-1696
6        IN RE: Bratton v. Chatel
7  Dear Mr. Ranck,
8        Enclosed please find a copy of the
9  deposition of you taken on November 16th, 2006,
10 along with the original signature page. As agreed,
11 you will be responsible for the reading and signing
12 this of transcript.
13       Within 30 days of receipt, please forward
14 errata sheet and original signed signature page to
15 counsel for Plaintiff, Mr. Shaibani, Esquire.
16       If you have any questions, please do not
17 hesitate to call. Thank you.
18 Yours,
19 Teague Gibson
20 Reporter/Notary
21 cc: Stefan Shaibani, Esq.
22     Robert H. Bouse, Jr., Esq.

Page 143

1            E R R A T A   S H E E T
2        Case Name:   Bratton v. Chatel
3  Witness name:  E. BARRETT ANDERSON
4  Deposition Date:  11/16/06
5  Page No.   Line No.      Change
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21  --------------------------     ---------------
22  Signature                      Date

Page 144

1  I, TEAGUE GIBSON, the officer before whom
2  the foregoing deposition was taken, do hereby
3  certify that the witness whose testimony appears in
4  the foregoing deposition was duly sworn by me; that
5  the testimony of said witness was taken by me in
6  stenotypy and thereafter reduced to typewriting
7  under my direction; that said deposition is a true
8  record of the testimony given by said witness; that
9  I am neither counsel for, related to, nor employed
10 by and of the parties to the action in which this
11 deposition was taken; and, further, that I am not a
12 relative or employee of any counsel or attorney
13 employed by the parties hereto, nor financially or
14 otherwise interested in the outcome of this action.
15
16           Teague Gibson
17        Notary Public in and for
18          the District of Columbia
19
20
21  My commission expires:
22  June 14, 2010