---

**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
-------------------------------X
JOHN BRATTON,                  :
        Plaintiff              :
    v.                         : Case No.:
CHATEL REAL ESTATE, INC., et al., : 1:06CV00694
        Defendants             :
-------------------------------X

            Deposition of THOMAS J. LYNCH
                 Washington, D.C.
              Friday, February 9, 2007
                    1:25 p.m.
Job No.: 1-96264
Pages 1 - 211
Reported by: Lynn Schindler
```

---

**Page 2**

Deposition of THOMAS J. LYNCH, held at the offices of:

LITIGATION ASSOCIATE, PLLC
Connecticut Building, Ninth Floor
1150 Connecticut Avenue, Northwest
Washington, D.C. 20036
(202) 277-8892

Pursuant to agreement, before Lynn M. Schindler, Notary Public in and for the District of Columbia.

---

**Page 3**

APPEARANCES

ON BEHALF OF PLAINTIFF:
   STEFAN SHAIBANI, ESQUIRE
   LITIGATION ASSOCIATE, PLLC
   Connecticut Building, Ninth Floor
   1150 Connecticut Avenue, Northwest
   Washington, D.C. 20036
   (202) 277-8892

ON BEHALF OF DEFENDANTS CHATEL REAL ESTATE AND THIERRY LIVERMAN:
   MATTHEW A. RANCK, ESQUIRE
   ECCLESTON & WOLF, P.C.
   2001 S Street, Northwest
   Suite 310
   Washington, D.C. 20009
   (202) 857-1696

---

**Page 4**

APPEARANCES (Continued)

ON BEHALF OF DEFENDANT MARY WHITE: (BY TELEPHONE)
   ROBERT H. BOUSE, JR., ESQUIRE
   ANDERSON, COE & KING
   Suite 2000
   201 North Charles Street
   Baltimore, Maryland 21201
   (410) 752-1630

---

PLAINTIFF'S EXHIBIT 2

Page 5

CONTENTS

EXAMINATION OF THOMAS J. LYNCH    PAGE
    By Mr. Ranck: . . . . . . . . . . . . . . .    6

---

EXHIBITS

(Exhibits retained by counsel.)

LYNCH DEPOSITION EXHIBITS    PAGE
1    Curriculum vitae . . . . . . . . . . .    6
2    Shaibani letter 9/12/06 . . . . . . .    6
3    Draft Expert Report of Thomas Lynch .    6
4    Final Expert Report of Thomas Lynch .    6
5    Handwritten notes . . . . . . . . . .    168
6    Shaibani letter 9/12/06 with time . .    168
     entries

Page 6

PROCEEDINGS

    (Lynch Deposition Exhibit Numbers 1 through 4 were marked for identification and retained by counsel.)

    Whereupon,
        THOMAS J. LYNCH,
being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS CHATEL REAL ESTATE AND THIERRY LIVERMAN

BY MR. RANCK:

    Q    Could you state your name and address for the record, please?

    A    Thomas J. Lynch, 1062 Harriman Street, Great Falls, Virginia, 22066.

    Q    Mr. Lynch, my name is Matt Ranck. I introduced myself before the deposition started. I represent Thierry Liverman and Chatel Real Estate. Bob Bouse who represents Mary White is also on the phone. I take it you've been deposed any number of times before?

Page 7

    A    I have.

    Q    About how many? Just roughly.

    A    10, 12, 15 times.

    Q    Okay. The only thing I'm going to ask you is if you don't understand my question, or need to review something, let me know. If you don't understand my question, let me know, I'll try to clarify it to make sure you're answering what I'm asking. Is that fair?

    A    That's fair.

    Q    Okay. And obviously if you need a break at any time, let us know. Prior to the deposition, Mr. Shaibani provided me with some documents that apparently were mailed a couple days ago but not received in my office yet, and you brought with you some binders here today; correct?

    A    That is correct.

    Q    Among the documents Mr. Shaibani provided is an index of documents that you apparently reviewed, and a similar list appears in your report in this case, and my question to you is is that what's reflected in those binders, all those documents

Page 8

identified in your report?

    A    That's correct.

    Q    All right. Do you have one couple things I've not been provided? I've not been provided with any notes that you have regarding this case. Do you have any notes?

    A    I have a couple.

    Q    Okay. May I take a look at them, please?

    A    These are fairly recent.

    Q    They bear a date at the top, Monday, February 5, and it says prep for depo. Is that the day you prepared these?

    A    That's correct.

    Q    Okay. Give me one minute just to take a -- actually, I'll come back to these in a little bit. Are there any other notes that you have perhaps on some of the substantive documents in those binders? Do you know if you took any notes?

    A    I don't believe so. I may have -- I may have made a pencil check mark somewhere in the middle of a deposition or something.

    Q    The other thing I've not been provided is

**9**

1  any billing or time sheet, time record information.
2  Do you have anything of that nature?
3      A    I have some. It's sketchy. I have some
4  notes that I made on Mr. Shaibani's letter when he
5  sent me all these documents that -- other than what I
6  think I may have noted on that particular document, I
7  have some times up to the 20th of October, some others
8  I have somewhere else. I can produce them later. I
9  don't have them right now.
10     Q    Can you tell me, you're referring to -- in
11 one of the binders the top page is a letter from Mr.
12 Shaibani of September 22, 2006 transmitting a bunch of
13 documents; correct?
14     A    That's correct.
15     Q    And you've got some handwritten notes at the
16 bottom that represent time entries or something?
17     A    That is correct.
18     Q    All right. May I take a quick look at that,
19 please?
20     A    It's a sturdy one.
21     Q    I'm sorry?
22     A    I said it's a sturdy binder. We're fighting

**10**

1  the binder.
2      Q    Okay. All right. You indicated that these
3  other handwritten notes, do they also have some kind
4  of time entry on somewhere, did you say?
5      A    I didn't say it had other -- I doubt that
6  there are other handwritten notes. I mean, you wanted
7  notes. Those are notes that I had.
8      Q    Right. No, I'm referring to the page you
9  gave me, the page dated Monday, February 5.
10     A    Correct.
11     Q    Is there -- are there -- is there something
12 on here that indicates an amount of time spent, a time
13 entry of some sort? I thought that's what you said
14 previously.
15     A    I don't know if it's on there. I thought I
16 had something on there. That meeting lasted about two
17 and a half hours from 10:00 to 12:30, as best I
18 remember.
19     Q    That was a meting with Mr. Shaibani?
20     A    Mr. Shaibani on the phone and Mr. Bratton,
21 faccia -- face to face.
22     Q    Is that the first time you had met

**11**

1  Mr. Bratton?
2      A    That is correct.
3      Q    First time you had spoken with Mr. Bratton?
4      A    That is correct.
5          MR. BOUSE: What is the date he first met
6  Mr. Bratton? I'm sorry. I didn't hear that.
7          MR. RANCK: February 5, Bob.
8          MR. BOUSE: Thank you.
9  BY MR. RANCK:
10     Q    When I asked about time entries, you said
11 you thought you might have something else elsewhere
12 that you could provide me later?
13     A    Yes.
14     Q    What is it that you might have elsewhere?
15     A    Times that I was reading depositions, or
16 whatever the case may be. After this, all these other
17 folders just have depositions, copies of depositions
18 in them.
19     Q    Okay. Any way for you to estimate as you
20 sit here how much other time you spent on the case
21 other than is indicated here?
22     A    I'd say it's probably in the neighborhood of

**12**

1  seven or eight hours.
2      Q    I'm going to leave these aside, if I can,
3  because I'm going to want to mark those as exhibits as
4  we move forward. Referring to what's been marked as
5  Exhibit 1, Mr. Lynch, can you identify -- I'm -- is
6  that -- referring to what's been marked as Exhibit 1,
7  can you identify that document for me? That was
8  provided to me this morning by Mr. Shaibani, one of
9  the documents that was mailed a couple days ago.
10     A    I would deem this to be my curriculum vitae.
11     Q    Okay. Can you tell me is that CV up to
12 date, or is it the most current that you have?
13     A    I would say it's both of those.
14     Q    And it accurately reflects your educational
15 background and your work experience?
16     A    It does.
17     Q    All right. Is there anything notable with
18 regard to educational background or work experience
19 that's left off of that document?
20     A    No.
21     Q    Let me just borrow this for one minute,
22 please. You've been retained as an expert witness

Page 13

1 previously, I understand; correct?
2   A   That's correct.
3   Q   And is there any way for you to estimate how
4 many times you've been engaged as an expert in
5 litigation?
6   A   It was probably close to 30 times.
7   Q   And can you estimate for me the percentage,
8 I guess, of times you've been on plaintiff's side,
9 defense side?
10      MR. SHAIBANI: Objection on the relevance.
11 BY MR. RANCK:
12   Q   You can answer.
13   A   Probably 60-40. 60 on the defendant's side
14 and perhaps 40 percent on the plaintiff's side.
15   Q   All right. Are those percentages similar if
16 I change the question from plaintiff-defendant to real
17 estate professional and person on the opposite side of
18 the case? Do you understand my question?
19   A   Probably not. Probably wouldn't change it
20 terribly much.
21   Q   Okay, so --
22   A   As much as that 60-40 is a guesstimate to

Page 14

1 your question.
2   Q   Sure. 60 percent of the time, you are
3 testifying, roughly, testifying on behalf of the real
4 estate professional, 40 percent of the time on behalf
5 of persons opposing the real estate --
6      MR. SHAIBANI: Objection, relevance.
7   A   Well, let me make sure I understand the
8 question. I think the first question was
9 plaintiff-defendant, and then was that pretty much the
10 same in real estate, and I said it's pretty much the
11 same. I think you're in a different area when you
12 start talking about how the real estate ones divide
13 down to --
14 BY MR. RANCK:
15   Q   Okay. We spoke across one another and it's
16 my fault.
17   A   Okay.
18   Q   Putting aside the plaintiff-defendant
19 question, you've been involved as an expert in cases
20 where there were claims either brought by or against a
21 real estates professional; correct?
22      MR. SHAIBANI: Objection. Relevance.

Page 15

1   A   That's correct.
2 BY MR. RANCK:
3   Q   All right. Of the 30 times you've been an
4 expert, roughy how many of those times were involving
5 claims by or against a real estate professional?
6      MR. SHAIBANI: Objection. Relevance.
7   A   Ask the question again, please.
8 BY MR. RANCK:
9   Q   Sure. Of the 30 or so times that you've
10 been engaged as an expert in litigation before, how
11 many of those cases involved claims by or against a
12 real estates professional?
13      MR. SHAIBANI: Same objection.
14   A   I don't recall being an expert outside of
15 the real estate industry.
16 BY MR. RANCK:
17   Q   Okay. So now my question is assuming that,
18 or taking that the 30 or so times you've been an
19 expert have all involved real estate professionals;
20 correct?
21   A   That's correct.
22   Q   As far as you can recall, how many of

Page 16

1 those -- what percentage, if can you tell me, of those
2 times were you testifying on behalf of the real estate
3 professional and what percentage were you testifying
4 against the real estate professional?
5      MR. SHAIBANI: Same objection.
6   A   I think it's really your same question from
7 before. I mean, it's going to be 100 percent. I
8 can't recall being an expert witness in a case that
9 didn't involve real estate. So they're all real
10 estate.
11 BY MR. RANCK:
12   Q   Right. My question is sometimes the real
13 estate professional is a defendant --
14   A   The problem is that's not what you asked.
15   Q   I thought that was what I asked.
16   A   No, it's not exactly the way you put it.
17   Q   It's good we're going through it. Of the 30
18 or so times you've been an expert, how many times have
19 you testified adverse to the real estate professional?
20      MR. SHAIBANI: Same objection.
21   A   I would say the only way I can answer that
22 question is that I would suspect that 70 percent of

Page 17

1  the time a real estate professional was a defendant.
2  That doesn't preclude real estate professionals from
3  being plaintiffs.
4  BY MR. RANCK:
5     Q   But that's not answering my question.
6     A   Then you have to make your question much
7  more specific. You're going out to -- you go along,
8  and then you go out to a little generalization, and I
9  can't come to the specific unless you narrow your
10 question.
11    Q   All I need you to do is answer question the
12 question I ask, if you can. If you don't, then ask me
13 to clarify it. I don't need you to guess at what I'm
14 trying to ask. You've testified in claims in which a
15 real estate professional was involved approximately 30
16 times, you've been engaged as an exert; correct?
17    A   That's correct.
18    Q   Some of those times the real estate
19 professional was a defendant; correct?
20    A   Correct.
21    Q   How many times, roughly, if you can give me
22 a reasonable estimate, how many times were you engaged

Page 18

1  by the defense in that case to testify in favor of the
2  real estate professional's conduct?
3        MR. SHAIBANI: Objection. Relevance.
4     A   Please clarify. As to the conduct of the
5  agent as a defendant or the conduct of an agent as a
6  plaintiff? It's two different questions.
7  BY MR. RANCK:
8     Q   Well, really, my question is, all right. I
9  thought I did. How many times have you been retained
10 on behalf of the defense to testify that the real
11 estate professional acted appropriately?
12       MR. SHAIBANI: Objection. Relevance. Asked
13 and answered.
14       MR. RANCK: Well, he's saying he didn't --
15    A   I'm saying approximately 70 percent, because
16 now the question was narrower.
17 BY MR. RANCK:
18    Q   All right. So 70 percent of the time,
19 you're on the side of the real estates professional?
20    A   Approximately.
21    Q   Okay. How many of these prior 30 cases that
22 you've been a expert in involved allegations of

Page 19

1  discrimination?
2        MR. SHAIBANI: Same objection.
3     A   There's only one that comes to mind right
4  now.
5  BY MR. RANCK:
6     Q   Other than this case.
7     A   Other than this case.
8     Q   All right. And in that case, were you
9  testifying that the real estate professional engaged
10 in discrimination or did not engage in discrimination?
11    A   Did not.
12    Q   What court was that pending in?
13    A   D.C. Superior.
14    Q   Do you recall the attorneys involved in that
15 case?
16    A   Timothy Casey was one. Benny Katz was
17 another. I think Benny was an expert witness
18 actually. I'm trying to remember who the attorneys
19 were. I can't recall the attorneys on the other side,
20 but I know Benny Katz was an expert.
21    Q   Do you recall the names of the parties?
22       MR. SHAIBANI: I'm going to make a

Page 20

1  continuing objection on relevance, grounds to this
2  line of the question.
3        You can answer.
4  BY MR. RANCK:
5     A   Long and Foster was the defendant
6  respondent, and I do not recall the name of the
7  complainant plaintiff.
8     Q   And Mr. Casey retained you? He represented
9  Long and Foster and retained on you behalf of Long and
10 Foster and/or its agent?
11    A   Yes. Casey handles an awful lot of the
12 insurance work that's involved with Long and Foster,
13 and I guess the insurance company, Casey and Long and
14 Foster were all the ones involved.
15    Q   Do you know what the disposition of that
16 case was?
17    A   That case was settled prior to going to
18 trial, like so many others.
19    Q   Were you deposed in the case?
20    A   I was not.
21    Q   Did you issue a report?
22    A   I believe I did.

Page 21

1  Q  Was the discrimination alleged in that case
2  racial in nature, or was there some other protected
3  class that the plaintiff was alleging?
4  A  It was racial in nature.
5  Q  Any way just to roughly estimate percentage
6  of your income you get from litigation support versus
7  being a practicing real estate professional?
8      MR. SHAIBANI: Objection on relevance
9  grounds.
10  A  Probably less than ten percent.
11 BY MR. RANCK:
12  Q  Any prior dealings with Mr. Shaibani or
13 anyone in his firm?
14  A  No.
15  Q  And other than this case, no prior dealings
16 with Mr. Bratton?
17  A  No.
18  Q  Did you know Mr. Bratton at all prior to
19 this case?
20  A  No.
21  Q  Have you ever had your opinions in a case
22 stricken or disallowed?

Page 22

1  A  Never.
2  Q  Ever failed to qualify?
3  A  Never.
4  Q  Ever been sued yourself?
5  A  No.
6  Q  Ever had your company, any company that you
7  were -- had an ownership interest sued as a result of
8  any transaction that you were involved in?
9  A  No.
10  Q  Any disciplinary or ethical or licensing
11 complaints filed against you?
12     MR. SHAIBANI: Objection.
13  A  None.
14 BY MR. RANCK:
15  Q  Thank you. When was your first involvement
16 in this case?
17  A  I would say prior to the date of that letter
18 was the --
19  Q  Let me show you what's been marked as
20 Exhibit 2, if I could, please. Can you identify that
21 for the record?
22  A  Yes. This is a letter from Mr. Shaibani to

Page 23

1  me basically saying that they would like to retain my
2  services in this particular case, Bratton v. Chatel
3  Real Estate, Inc.
4  Q  And that's dated September 12?
5  A  That's correct.
6  Q  Did you have conversations with Mr. Shaibani
7  about the case prior to receiving that letter?
8  A  I did.
9  Q  Okay. Do you recall the nature or substance
10 of the conversations?
11     MR. SHAIBANI: Objection.
12  A  Sorry. I'm sometimes too fast.
13 BY MR. RANCK:
14  Q  You can go, you can answer.
15  A  Yeah. The nature of the conversation was
16 pretty much the same as the conversation that I'd have
17 with any attorney who was talking to a prospective
18 expert witness, a few minutes of recitation of the
19 facts of the case, and my more or less immediate
20 reaction to the case as to whether or not -- as to how
21 I read the case, and obviously the first read of my
22 part, not literally reading, but reading based on the

Page 24

1  recitation of facts of the case from the attorney, I
2  would take a general position, and we had that
3  conversation, and then I sent to Mr. Shaibani my CV
4  and my rate schedule, and he responded, I suspect a
5  few days later on the 12th with this letter, and then
6  the package arrived around the 22nd.
7  Q  What is your rate schedule?
8  A  $125 per hour for consultation reading.
9  $175 an hour for depositions with four-hour minimums,
10 $2,000 per day for a court appearance, and expenses
11 beyond 20 miles.
12  Q  All right. Now, getting back to your
13 conversation with Mr. Shaibani prior to receiving
14 Exhibit 2, can you tell me, do you recall the
15 substance of his summation of the facts that he gave
16 you?
17     MR. SHAIBANI: Objection.
18     MR. RANCK: Basis.
19     MR. SHAIBANI: I'm just making a general
20 objection to preserve it for trial.
21     MR. RANCK: Well, what's the basis of it
22 though, I'm asking?

Page 25

1   MR. SHAIBANI: It would be a joint mediation
2   privilege objection.
3   MR. RANCK: What you told the expert is
4   privileged?
5   MR. SHAIBANI: Well, if the expert is part
6   of the team, I believe that could qualify under joint
7   litigation privilege.
8   MR. RANCK: Okay.
9   BY MR. RANCK:
10   Q   You can answer the question.
11   MR. BOUSE: I didn't -- he trailed off.
12   That his response, the team --
13   MR. RANCK: That it could qualify under a
14   joint litigation privilege, and I said okay, and told
15   the witness he could answer.
16   MR. BOUSE: All right.
17   THE WITNESS: I would say the conversation
18   that Mr. Shaibani and I had are pretty much the issues
19   that are recited throughout the case, the situation
20   with respect to Mr. Bratton attempting to lease the
21   property at 1622 Wisconsin Avenue, Northwest; the fact
22   that there was another potential lessee; there was

Page 26

1   apparent difficulty on the part of Mr. Bratton to be
2   able to get the Chatel organization to create a lease
3   for him, so he started preparing his own.
4   Mr. Bratton felt that the delay in doing
5   the actual lease and the possibility of the talk
6   about another lease being accepted in place of
7   his, he felt that he was being discriminated
8   against, and I said it certainly sounds very, very
9   plausible and reasonable that we have a case of
10   discrimination here based on his race and other
11   protected interests under the D.C. Human Rights
12   Act of 1977 as amended, specifically personal
13   appearance. And that was pretty much our
14   discussion of the facts of the case.
15   Obviously, when you discuss it with an
16   attorney who's going to hire you as an expert
17   witness, you hear the facts of the case as
18   presented -- as they were presented by
19   Mr. Shaibani, and I said that bears out. I have
20   no problem saying that I have a reasonable belief
21   that there was an issue here.
22   BY MR. RANCK:

Page 27

1   Q   Did you just say if that bears out?
2   A   I said when you have a discussion, you get
3   hired, obviously there's a big difference between
4   going through a ton of material and having a brief
5   conversation.
6   Q   Sure. But did you tell him if that bears
7   out --
8   A   I can't say that I -- I can't say that I
9   said that. What I'm saying is, when I have been asked
10   to be an expert witness, and I've been told the facts
11   and I said well, based on what you told me,
12   everything's okay, and then I review things and I'm
13   saying, you know, I don't think this is quite the way
14   I understood you to present it, and I am not
15   comfortable with it, and I said, you know, I really
16   don't want to do this case. I will demur in this
17   case.
18   Q   Did you ask him any questions during that
19   conversation that you recall that might have been
20   pertinent to your immediate reaction?
21   A   I suspect I did. I mean, it was an
22   interactive conversation, but, exactly what I said,

Page 28

1   what I didn't say, I would ask probably more questions
2   if the presentation of the facts were less coherent
3   than they apparently were that day, because I don't
4   suspect I asked an awful lot of questions. Based on
5   what you've told me --
6   Q   Did you take any notes of that conversation?
7   A   You know, I might have, but probably very
8   sketchy. I do a lot better listening than trying to
9   write.
10   Q   You didn't maintain those? If you took
11   them, you don't have them anymore; is that fair?
12   A   That's quite possible I don't have any more.
13   It's quite possible.
14   Q   If you do, I just ask you provide them to
15   Mr. Shaibani so we can get them if you're not sure.
16   Did you ask him -- do you recall asking him what the
17   defendant's explanations for their alleged conduct
18   was?
19   A   I don't specifically recall that. No, I
20   don't. I mean, I'd be guessing now as to what I said,
21   but I don't recall specifically saying something like
22   that.

Page 29

1  Q  With regard to your opinions that you intend
2  to offer in this case, are the defendants'
3  explanations to the allegations leveled at them by
4  Mr. Bratton, are they pertinent to your evaluation?
5      MR. SHAIBANI: I'm going to object on
6  vagueness grounds.
7  BY MR. RANCK:
8  Q  You can answer.
9  A  Just repeat the question, please.
10 Q  With regard to the opinions you intend to
11 offer in this case, are the defendants' explanations
12 as to their alleged conduct pertinent to those
13 opinions, to your evaluation?
14     MR. SHAIBANI: Same objection. I guess I'm
15 trying to find out are you referring to what Mr.
16 Bratton told him, or what he drew from reading his
17 deposition and the documents in the case?
18     MR. RANCK: None of that. That wasn't my
19 question at all.
20     THE WITNESS: Well, then clarify your
21 question.
22 BY MR. RANCK:

Page 30

1  Q  Does it matter for the purpose of your
2  opinions what the defendants, what their explanation
3  is for the things that Mr. Bratton accuses them of?
4      MR. SHAIBANI: Same objection.
5  A  I wasn't privy to the depositions of the
6  defendants prior to the 20th of October, with the
7  exception of Roberta Medlin's deposition.
8  BY MR. RANCK:
9  Q  That doesn't answer my question, with all
10 due respect. The question is without regard to
11 whether you were privy to them, does what they say,
12 does their explanation for the allegations leveled at
13 them, does that matter to you in the formation of your
14 opinions?
15 A  If I think I understand what you're saying,
16 it does.
17 Q  You see in Exhibit 2, where it in the first
18 paragraph, the last sentence of the first paragraph,
19 can you read that to yourself, please? Actually, for
20 Mr. Bouse's benefit, if you would read that aloud,
21 that would probably be helpful to him.
22     MR. BOUSE: What are you asking him to read

Page 31

1  from, Matt? I'm sorry.
2      MR. RANCK: The September 12 letter, Exhibit
3  2.
4      MR. BOUSE: I don't have that, okay.
5      MR. RANCK: That's why I'm asking him to
6  read it for you, Bob.
7  A  You want me to read the --
8  BY MR. RANCK:
9  Q  The last sentence in the first paragraph.
10 A  The last sentence of the first paragraph.
11 You will be asked to render an expert opinion whether
12 the defendants' conduct in this case with respect to
13 leasing Georgetown office space to John Bratton
14 amounted to discrimination, a violation of the civil
15 rights act and the District of Columbia human rights
16 act.
17 Q  Okay. Does that in a general sense
18 accurately capture of nature of your opinions in this
19 case?
20 A  I believe it does.
21 Q  Okay. Can I have this back, please? Can
22 you give me a little bit of background on your -- the

Page 32

1  nature of your business, and I guess not necessarily
2  current, but over time. I mean, have you generally,
3  as a real estate professional, generally been involved
4  in sales or leases or both?
5  A  Both.
6  Q  All right. Have you been involved in
7  commercial transactions?
8  A  I have.
9  Q  Would you say that that's a majority of your
10 business or a minority of your business?
11 A  Minority.
12 Q  Can you estimate for me what percentage of
13 your business has been commercial versus residential?
14     MR. SHAIBANI: Objection on relevance
15 grounds.
16 A  Probably in the neighborhood of 88 percent
17 residential, 12 percent commercial, somewhere in that
18 neighborhood.
19 BY MR. RANCK:
20 Q  All right. And of the 12 percent
21 commercial, is that, for the most part, sales
22 transactions or lease transactions?

Case 1:06-cv-00694-JDB   Document 49-4   Filed 03/22/2007   Page 9 of 15
DEPOSITION OF THOMAS LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

9 (Pages 33 to 36)

33

1     MR. SHAIBANI: Same objection.
2  A   I would say it was probably 50 -- no, it was
3  probably, probably 60 percent leasing and 40 percent
4  sales.
5  BY MR. RANCK:
6  Q   Now, you're using a past tense there, Mr.
7  Lynch. Saying it was 60. When is the last time you
8  engaged in a commercial transaction, that you were
9  involved in a commercial transaction as a real estate
10 professional?
11     MR. SHAIBANI: Objection. Relevance.
12 A   I would say it was in the last couple of
13 years.
14 BY MR. RANCK:
15 Q   Was that a lease or a sale?
16 A   Lease.
17 Q   It sounds as if, and I could be interpreting
18 this wrong, it sounds as if you're talking about a
19 single transaction, commercial transaction occurred in
20 the last couple of years. Prior to that one, when was
21 the last commercial transaction?
22     MR. SHAIBANI: Objection. Mischaracterizes

34

1  prior testimony and relevance.
2  A   I would say that I was -- well, to make it
3  simple for you. I think I was pretty much totally
4  engaged in commercial real estate from around 1979 to
5  1984, and then a certain percentage of my activities
6  primarily as the principal broker, were involved in
7  commercial as well as residential right up through
8  into the '90s, did probably less commercial during the
9  '90s, and even less commercial perhaps during the
10 early 2000s.
11 BY MR. RANCK:
12 Q   Can you estimate for me how many commercial
13 lease transactions you've been involved in as a real
14 estate professional since 2000, so in the last six
15 years, six and a sixth year?
16     MR. SHAIBANI: Objection. Relevance.
17 A   Probably four or so.
18 BY MR. RANCK:
19 Q   And those were all commercial leases.
20 A   Yeah, those would be leases.
21 Q   And using sort of a vague term saying you
22 were involved in, what was your level of involvement?

35

1  That is, were you involved in the negotiating of the
2  lease or just the listing as the broker and then an
3  agent handled it? Can you characterize for me the
4  level of your involvement in those four transactions?
5  A   In a couple those, I was the principal in
6  the transaction working with the listing and owners of
7  the property. That's -- in the most recent
8  activities, that's what it would have been.
9  Q   All right. So generally, your role in those
10 transactions would have been somewhat similar to
11 Chatel's role in this transaction?
12     MR. SHAIBANI: Objection. Vague,
13 mischaracterizing prior testimony.
14 BY MR. RANCK:
15 Q   Is that just a fair generalization?
16 A   I would say in some of those commercial
17 issues, I acted as a consultant to another broker who
18 was attempting to negotiate some commercial
19 transactions. In others I was a principal in a
20 commercial lease transaction negotiating on behalf of
21 a corporation of which I was an employee.
22     MR. RANCK: I'm sorry. Can you read that

36

1  back real quick, please?
2     (The answer was read by the court
3  reporter.)
4  BY MR. RANCK:
5  Q   Now, in your answer there, you used the word
6  negotiation a couple of times. Would you agree with
7  me that negotiation over terms is not an unusual
8  practice in a commercial lease transaction?
9     MR. SHAIBANI: Objection.
10 A   I think life is negotiated.
11     MR. BOUSE: I didn't hear that response.
12     MR. SHAIBANI: Is that a --
13 A   I think life is a negotiation.
14     MR. BOUSE: That's one thing we agree on.
15 BY MR. RANCK:
16 Q   So is that a yes, that it is commonplace
17 that the parties to a prospective commercial lease
18 negotiate the terms?
19     MR. SHAIBANI: Objection.
20 A   If you would be so kind as to define what
21 you mean by negotiation in that question?
22 BY MR. RANCK:

Case 1:06-cv-00694-JDB   Document 49-4   Filed 03/22/2007   Page 10 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

10 (Pages 37 to 40)

37

1  Q  No, sir. You used the term negotiate twice
2  in your prior answer, and I'm using the term however
3  you used it. Would you agree with me, and I'm not
4  quite sure how many definitions negotiate can have
5  when we're talking about negotiating a commercial
6  lease transaction, so if you have different
7  definitions that you need to explore in answer the
8  question, that's fine. But my question is is would
9  you agree that it's common that the parties to a
10 prospective commercial lease negotiate the terms?
11       MR. SHAIBANI: Objection on vagueness.
12  A  I will accept that negotiate terms, yeah.
13 I'll agree that terms are negotiated.
14 BY MR. RANCK:
15  Q  That that's common. That was really my
16 question.
17  A  I would say it's common.
18  Q  So in and of itself, the fact that
19 Mr. Bratton's proposed leases were not accepted on
20 their face by the defense, the defendants, that's not
21 suggestive to you that there was discrimination going
22 on; correct?

38

1       MR. SHAIBANI: Objection. Mischaracterizing
2  prior testimony.
3       MR. RANCK: I didn't characterize any
4  testimony, Mr. Shaibani.
5       MR. SHAIBANI: And leading.
6  A  Would you ask your question again, please.
7       MR. RANCK: Perhaps the court reporter could
8  read it back for us again, thanks.
9       (The question was read by the reporter.)
10      MR. SHAIBANI: Same objection. And I would
11 object also on mischaracterization of the record in
12 this case.
13 BY MR. RANCK:
14  Q  You can answer. Unless he instructs you not
15 to answer, you can answer after he objects.
16  A  I just have to sift it all.
17  Q  Sure.
18  A  The lack of -- the presentation of proposals
19 from Mr. Bratton indicated to me his keen desire to
20 lease this space. The fact that he had to do it
21 multiple times indicated to me that there was less
22 alacrity on the other side to satisfy his request to

39

1  lease the space.
2  Q  So are you saying the fact that they didn't
3  accept the terms that he proposed on their face, that
4  does suggest discrimination to you? Is that what
5  you're saying?
6  A  That's not what I said.
7  Q  My question was is whether or not the fact
8  that his proposed leases were not accepted on their
9  face, does that suggest discrimination to you? That's
10 the question I need to you answer.
11      MR. SHAIBANI: I'm objecting on vagueness.
12 What do you mean, accepted on their face? I mean,
13 what do you mean by that?
14 BY MR. RANCK:
15  Q  You can answer the question, Mr. Lynch.
16  A  I'll answer the question this way. Their
17 lack of response even to his first that he had to
18 repeat indicates to me a lack of response on their
19 part, which could very clearly be a matter of
20 discrimination.
21  Q  Would you agree with me that it could very
22 clearly be a matter of things other than

40

1  discrimination?
2       MR. SHAIBANI: Objection. Mischaracterizing
3  prior testimony, asked and answered.
4       MR. RANCK: Note my chuckle for the record
5  at the objection.
6  A  It's possible.
7  BY MR. RANCK:
8  Q  Okay. Is it equally as possible, Mr. Lynch,
9  that the failure to immediately respond was due to
10 something other than discrimination?
11      MR. SHAIBANI: Objection.
12  A  The word immediately respond is your term.
13 I did not suggest immediate response. I believe I
14 said lack of alacrity in responding to his requests.
15 BY MR. RANCK:
16  Q  Tell me what you mean by lack of alacrity.
17  A  Well, I find it unusual that a tenant who
18 has presented -- prospective tenant who has presented
19 himself or herself as someone who is interested in a
20 property and goes so far as to get the ball rolling
21 and keep the ball rolling and has difficulty getting a
22 response in kind, that's what I would describe as a

Page 41

1  lack of alacrity on their part. He clearly was
2  expressing his intent that he wanted to get going on
3  this thing now.
4      Q   Here's, I guess, what I'm asking you is
5  those facts are equally suggestive of Chatel being
6  sloppy or Mary White being busy. It's equally
7  suggestive of those things as it is discrimination;
8  isn't it?
9      MR. SHAIBANI: Objection. The
10 mischaracterizing the record of the case.
11     A   I said earlier that it's possible, but it
12 doesn't remove the discrimination issue either.
13 They're not mutually exclusive, I don't believe.
14 BY MR. RANCK:
15     Q   What limits -- let me ask this. Strike
16 that.
17         Who is it that decides which of varying
18 proposed leases are accepted? Who makes the decision
19 as to which lease to accept?
20     MR. SHAIBANI: Objection on vagueness.
21 BY MR. RANCK:
22     Q   On the owner landlord side specifically the

Page 42

1  owner? The broker? The agent? Who makes the
2  decision?
3      A   I would say the parties of the contract.
4  That would be lessor and lessee.
5      Q   Okay. And are there any limits on the basis
6  that the lessor can use to make a decision on which
7  lease to accept?
8      MR. SHAIBANI: I'm objecting on vagueness.
9  BY MR. RANCK:
10     Q   Other than, you can't refuse a lease based
11 on one of the protected classes such as race; correct?
12     A   That would be a limit.
13     Q   And other than the other protected classes,
14 gender, national origin, religion, sexual orientation,
15 whatever the protected classes are, other than those
16 protected classes, is there any other limit on an
17 owner's ability to choose between different leases of
18 different prospective tenants?
19     A   Generally speaking, with the number of
20 protected classes in the District of Columbia under
21 the D.C. human rights act, I would say that the single
22 limitation, the single issue on which a lessor can act

Page 43

1  contrary to the wishes of the proposed lessee would be
2  financial.
3      Q   I'm sorry. I don't understand what you're
4  saying.
5      A   Let's put it this way. Physical handicap is
6  protected. Mental handicap is protected. Financial
7  handicap is not a protected class.
8      Q   So clearly if an applicant doesn't qualify
9  financially, the lessor doesn't have to lease the
10 property; correct?
11     A   That is correct.
12     Q   All right. But the lessor, being the owner
13 of the property, I mean, they can choose, he or she,
14 in this case she, she can choose that she doesn't want
15 to rent it to a certain type of business, for
16 instance; right?
17     MR. SHAIBANI: Objection.
18     A   There can be limitations on different types
19 of businesses based on the ability to place a certain
20 type of business in a given location or other existing
21 agreements wherein you won't have duplication of
22 activities in a tenant situation.

Page 44

1  BY MR. RANCK:
2      Q   I don't mean anything like that. I mean, if
3  I'm running --
4      A   You're asking a general question, I gave you
5  an answer as to where somebody could place limitations
6  choosing one business over another.
7      Q   But really that's the opposite of my
8  question. My question was, I'll change it now.
9  Hypothetically, I own property, commercial space, and
10 I want to lease it, and somebody comes to me, and they
11 want to put some establishment that's permitted by the
12 local laws, but I just don't want that establishment
13 in my commercial space. I can make a decision not to
14 lease to that business on that basis; can I not?
15     MR. SHAIBANI: Objection. Vagueness. Calls
16 for speculation. Further I require that limits on the
17 proposed business that would be leased at 1622
18 Wisconsin Avenue were set forth in the MRIS listings.
19 BY MR. RANCK:
20     Q   That's why I posed the question in the form
21 of a hypothetical. I can as an owner decide I don't
22 want a certain type of business in my premises; can't

Case 1:06-cv-00694-JDB   Document 49-4   Filed 03/22/2007   Page 12 of 15
DEPOSITION OF THOMAS J. ORLOFF
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

12 (Pages 45 to 48)

**Page 45**

1  I?
2      MR. SHAIBANI: Same objection.
3      A   Generally speaking, I would say yes.
4  BY MR. RANCK:
5      Q   And I could choose not to rent it to
6  somebody with red hair, if I didn't want to; right?
7      MR. SHAIBANI: Objection.
8      A   No, you wouldn't be able to not rent it to
9  someone with red hair because that would be an issue
10 of personal appearance.
11 BY MR. RANCK:
12     Q   Personal appearance, okay. I could choose
13 to rent it to somebody who doesn't have a college
14 degree; right?
15     MR. SHAIBANI: Objection. If you want to
16 point out to the provisions of the D.C. Human Rights
17 Act and ask him if that's a protected class --
18     MR. RANCK: That's not my question.
19     MR. SHAIBANI: I mean, is this a pop quiz
20 or --
21     MR. RANCK: He's an expert, Mr. Shaibani.
22 I'm exploring the bases and foundation of his opinions

**Page 46**

1  in a very serious case in which he's testifying that
2  my clients committed discrimination. I think, I'm
3  pretty sure I'm entitled to explore the bounds of his
4  opinions. You can answer the question.
5      MR. SHAIBANI: I would object to the
6  protected classes are described in his report, and
7  he's not required to memorize every single protected
8  class. The ones at issue here are race and personal
9  appearance, but if you want to ask him other
10 questions, go ahead.
11     MR. RANCK: I don't. I asked the question I
12 asked. Can he answer it?
13     A   Let's say someone didn't have a college
14 degree because they weren't finished college, and
15 someone who is in the process of obtaining an
16 education in the District of Columbia is a protected
17 class.
18 BY MR. RANCK:
19     Q   Okay. Do I have to -- does an owner like
20 Ms. White, did she have to rent the space to
21 Mr. Bratton because he was an African-American?
22     A   No.

**Page 47**

1      Q   And she wouldn't have to have rented the
2  space to a woman because that person was a female;
3  right?
4      A   That's correct.
5      Q   And she wouldn't have to rent the space to
6  somebody from a certain country, because they were
7  from that country; correct?
8      A   That's correct.
9      Q   All right. So the statutes that we're
10 dealing with simply prohibit discrimination on the
11 basis of race, but they don't give extra rights to the
12 protected classes; is that fair?
13     A   That's correct.
14     Q   Let me -- I need you to educate me on some
15 concepts in real estate, and the first one I'd like
16 you to educate me on is the right of first refusal.
17 You've seen that sprinkled throughout this case; have
18 you not?
19     A   I have.
20     Q   In fact it's more than sprinkled, it's --
21 permeates the entire case. Can you explain to me what
22 your understanding of a right of first refusal is?

**Page 48**

1      A   A right of first refusal is an opportunity
2  given to a tenant to be able to meet or beat a third
3  party's offer to purchase or lease.
4      Q   It doesn't have to be given to a tenant;
5  correct? I mean, if I sell you my property, we could
6  in that sales agreement agree that if you ever sell
7  it, I get a right of first refusal on it.
8      A   That's correct, you could do that.
9      Q   So -- it's --
10     A   Okay.
11     Q   Go ahead.
12     A   The reason I used tenant is because that's
13 99 percent of the time, that's where right of first
14 refusal is going to appear in a owner-tenant
15 relationship, but if you want to be more general, a
16 right of first refusal can be granted from any
17 competent party to another competent party.
18     Q   The District of Columbia has what's called
19 the Tenant Opportunity to Purchase Act; right?
20     A   Correct.
21     Q   All right. And am I correct in saying that
22 that act requires that a residential tenant be given a

Case 1:06-cv-00694-JDB   Document 49-4   Filed 03/22/2007   Page 13 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

13 (Pages 49 to 52)

**Page 49**

1 right of first refusal if the owner decides they want
2 to sell the property?
3   A   That's part of what they're -- have to be
4 given.
5   Q   So the residential tenant has to be given
6 additional things?
7   A   That's correct.
8   Q   Such as what?
9   A   TOPA, which is the statute, Chapter 47 of
10 Title 14 rental sale and conversion regs state that a
11 residential tenant is to be given three things if
12 necessary. The first two absolutely apply in all
13 cases. The third may or may not be necessary. First
14 is what's at the heart of the TOPA statute, tenant
15 opportunity and notice to purchase. When a
16 third-party contract is ratified, the tenant is given
17 a statutory period of time under what is called the
18 first right of refusal. When all statutory periods of
19 time have expired and the tenant is still remaining in
20 the property, then the landlord, excuse me, the seller
21 or the contract purchaser has the right to deliver a
22 90-day eviction notice to the tenant. Those are the

**Page 50**

1 three elements.
2   Q   All right. So one is notice?
3   A   One is notice and opportunity to purchase.
4   Q   The second?
5   A   First right of refusal. Third, if needed,
6 is eviction.
7   Q   And that third one kicks in if the statutory
8 period expires without the tenant exercising the other
9 rights, the right to purchase.
10   A   Or leaving.
11   Q   Or leaving. All right. TOPA doesn't apply
12 to commercial tenants; does it?
13   A   Does not.
14   Q   So there was no requirement that Mary White
15 agree to give John Bratton the right of first refusal;
16 is that right?
17       MR. SHAIBANI: Objection. Vagueness. No
18 requirement under what?
19 BY MR. RANCK:
20   Q   You can answer. If you can think of any
21 requirement, I'd be interested in hearing it.
22   A   There's no requirement under law.

**Page 51**

1   Q   Would you agree with me that a right of
2 first refusal is valuable to the tenant?
3   A   Yes.
4   Q   Would you agree with me that it's a
5 detriment to the owner?
6       MR. SHAIBANI: Objection.
7   A   Possibly.
8 BY MR. RANCK:
9   Q   So there's a potential detriment to the
10 owner; right?
11       MR. SHAIBANI: Objection.
12   A   I believe there's always the possibility of
13 potential risk, but, generally speaking, the right of
14 first refusal is more positive to the owner, because
15 the owner would have potentially a buyer of -- a
16 purchaser of interest and another one who would be
17 also in the wings.
18 BY MR. RANCK:
19   Q   Well, does not a right of first refusal --
20 or strike that.
21       Is it not possible that the right of first
22 refusal could interfere with the free alienability of

**Page 52**

1 land?
2       MR. SHAIBANI: Objection.
3   A   If the seller's desire is to divest of the
4 property, a first right of refusal that is exercised
5 is going to accomplish his desire to divest himself of
6 the property at the same or better price than the
7 party he had considered in the first place.
8 BY MR. RANCK:
9   Q   Well, couldn't it result in a lower price?
10   A   Why would it?
11   Q   Well, you're the expert. I'm asking --
12   A   Well, I'm saying if -- let's take the
13 hypothetical that you sell your property to party A
14 for 100,000, and tenant B, who is the tenant in your
15 property, A is not a tenant, tenant B says I have the
16 right of first refusal, I either pay the 100,000 or I
17 might even pay more, but you're going to achieve your
18 100,000.
19   Q   Well, is it possible that the existence of a
20 right of first refusal acts as a -- could dissuade
21 persons from -- more persons from having interest in a
22 property because there's no way that they know they're

Page 53

1   going to get it, so they can put in an offer, go to
2   line up financing, take all the steps they need to
3   take, line up a sale of their own property, and then
4   still end up not getting this, because the residential
5   tenant exercises their TOPA rights?
6        MR. SHAIBANI: Objection. Compound, calls
7   for speculation, mischaracterizes the record of this
8   case entirely.
9     A   Well, I think your question is directed
10  towards a residential right of first refusal, and I
11  don't think we're talking residential right of first
12  refusal for Mr. Bratton. So you've go another --
13  you've brought up another case and another issue.
14  BY MR. RANCK:
15    Q   Well, we're going to get to this one. But
16  you agree with me, then in a residential, it could
17  negatively impact the alienability, the salability,
18  the interest of the market in that property.
19    A   In the District of Columbia, it certainly
20  could, but there's no choice in terms of the seller,
21  because it's a matter of statute and regulation.
22    Q   Well, wouldn't the same negative impact

Page 54

1   apply in a commercial setting?
2     A   Not necessarily.
3        MR. SHAIBANI: Objection.
4   BY MR. RANCK:
5     Q   I don't need you to speak in definitiveness,
6   so I'm not interested necessarily in your comment not
7   necessarily, but my question is is couldn't it have
8   that same negative impact?
9        MR. SHAIBANI: Same objection.
10    A   I doubt it would have the same negative
11  impact.
12  BY MR. RANCK:
13    Q   Why?
14    A   Because the regulations and statute on the
15  residential side are very strict, and very real with
16  no flexibility on the part of the landlord negotiating
17  a lease to alter those periods of time, whereas in a
18  commercial right of first refusal, you can have a
19  very, very short period of time that really wouldn't
20  interfere with the prospective purchaser of interest.
21    Q   So the right of first refusal rather than
22  providing 90 days I think you said, that TOPA

Page 55

1   provides, the opportunity to purchase; is that what
2   you said?
3     A   No.
4     Q   Okay. I misheard you.
5     A   No, I didn't say 90 days.
6     Q   What period of time does a residential
7   tenant under TOPA have to exercise the right of first
8   refusal?
9     A   Again, you're talking about exercising the
10  right of first refusal. You're narrowing the scope of
11  what TOPA spells out.
12    Q   Let me ask you a different question. What
13  you're talking about is is the lessor and the lessee
14  in the lease could grant a right of first refusal to
15  the lessee, but give such a short period of time for
16  that right to be exercised that a prospective
17  third-party purchaser wouldn't be worried about it.
18    A   That's correct.
19    Q   So the length of time we're talking about,
20  the scope in terms of that right of first refusal,
21  that would be a matter of negotiation between the
22  lessor and lessee; correct?

Page 56

1        MR. SHAIBANI: Objection.
2     A   I would agree.
3   BY MR. RANCK:
4     Q   Okay. Could Mr. Bratton have gotten a valid
5   right of first refusal for the 1622 property given
6   that there is a residential tenant upstairs?
7     A   Yes, I believe he could have gotten a valid
8   right of first refusal.
9     Q   Well, would he have been in second place?
10    A   I think he'd be in second place.
11    Q   So the property -- if the third-party
12  purchaser ratified a contract, an offer to buy the
13  property, and it was ratified by Ms. White, the
14  residential tenant, not withstanding whatever Mr.
15  Bratton's lease says, that residential tenant gets the
16  first opportunity to purchase the property; correct?
17    A   That's correct.
18    Q   So there would be no guarantee under that
19  scenario that Mr. Bratton would ever get an
20  opportunity to exercise his right of first refusal;
21  right?
22    A   Objection. Calls for speculation.

Page 57

BY MR. RANCK:
Q You can answer.
A Well, Mr. Bratton could improve his situation and put himself in a very good position to exercise his right of first refusal, because the rights of the residential tenants can be transferred to someone else who has a desired interest in the property.
Q So he could buy out the residential tenant's rights?
A That's correct.
Q Nothing obligating that tenant to sell those rights to Mr. Bratton, though; right?
A No one is obligated to sell real estate except in eminent domain.
Q Would you agree with me that Ms. White's desire to not have a right of first refusal in her commercial lease does not -- is not suggestive of discrimination?
MR. SHAIBANI: Objection. Mischaracterizing the record to the extent that the lease presented to Roberta Medlin did contain a right of first refusal.

Page 58

MR. BOUSE: And I object to speaking objections.
MR. RANCK: Yeah. I'm going to specifically ask right now, and I'm going to seek the court's intervention, not on the phone, but in a motion and seeking to recover my fees for having to do it, I'm going to ask Mr. Shaibani if he's going to make a speaking objection, that he have the burden, that he take the impetus to have his expert witness leave the room before he does so. It's highly improper, so if you're going to speak, that's fine, you can make your record, but you need to have your expert leave the room. He's very well qualified apparently, and doesn't need you coaching him.
MR. SHAIBANI: I'm not coaching him. You have speaking objections throughout all these depositions, and I haven't said a word on that.
MR. RANCK: That's my request. If you think it's appropriate, then you go right ahead, and I'm going to take it up with the court.
MR. BOUSE: I join in that objection.
BY MR. RANCK:

Page 59

Q Can you answer my question?
MR. SHAIBANI: Before you respond to questions, if you'd pause for a moment so I could make my objection, or you may need to leave the room, to make arrangements first.
THE WITNESS: Sure. I'm from New York. I speak fast.
BY MR. RANCK:
Q Can you answer my question?
A Repeat it. It's been lost in the breach.
Q The fact that Ms. White didn't want to write a first refusal in her lease with Mr. Bratton, that's not suggestive of an attempt to discriminate against him; is it?
MR. SHAIBANI: Objection. Mischaracterizing the record of the case.
A I found it suggestive of discrimination because of the difference in the terms offered to John Bratton versus the terms offered to Roberta Medlin.
BY MR. RANCK:
Q Did you review Mary White's deposition transcript?

Page 60

A I read most of her transcript. I read it more quickly than some of the others.
Q Did you see the part where she said she wasn't going to offer the right of first refusal to Roberta Medlin either?
A I don't exactly recall, but what I base my answer on and my opinion on was looking at the lease that was -- the lease, proposed lease that was sent to Roberto Medlin sometime around the 13th or so of October 2000.
Q Let me ask you this hypothetical question which I'm entitled to do with expert witnesses, since all your opinions are based on facts to be established at trial. If Mary White did not intend that Roberta Medlin have a first right of refusal, or that any lessee have a right of first refusal, you would agree with men, would you not, that the fact that she wouldn't give one to Mr. Bratton does not suggest discrimination?
MR. SHAIBANI: Objection. Calls for speculation. Mischaracterizing the record.
A I don't know if that's a fair hypothetical.