Page 61

1  You said it was a hypothetical, and now you have
2  discussed the parties of the contract rather than some
3  other situation that is --
4  BY MR. RANCK:
5    Q  The beginning of my question was if Mary
6  White did not. That makes it a hypothetical. If she
7  did not want to give Roberta Medlin a right of first
8  refusal, or any lessee of that commercial space the
9  right of first refusal, you would agree with me, would
10 you not, that the fact that she didn't want to give it
11 to Mr. Bratton does not suggests discrimination?
12       MR. SHAIBANI: Objection. Mischaracterizing
13 the record. Calls for speculation.
14    A  Insofar as your question is hypothetical, I
15 won't deny your hypothetical question.
16 BY MR. RANCK:
17    Q  Okay. So the only reason that you think it
18 would suggest -- strike that.
19       The only reason that you believe that the
20 failure to offer John Bratton the right of first
21 refusal was discriminatory is because your
22 understanding is is that Roberta Medlin was offered

Page 62

1  that right; is that correct?
2       MR. SHAIBANI: Objection. You can answer.
3    A  That's correct.
4  BY MR. RANCK:
5    Q  All right. Now, I'd like to go through the
6  same sort of questions, although a little bit more
7  abbreviated, I guess, with the issue that's in this
8  case about an extension for an additional year at the
9  end of the term of the lease. Okay?
10   A  Okay.
11   Q  Mr. Bratton wanted an option for another
12 year; is that your understanding?
13   A  That's my understanding.
14   Q  Okay. Does the commercial lessor have some
15 obligation to give a commercial lessee an extension,
16 an option for an additional year at the end of the
17 term of the lease?
18       MR. SHAIBANI: Objection. Vagueness as to
19 what you mean by obligation.
20   A  Not required by law to do it. If you would
21 consider, I mean, certainly a legal obligation would
22 be such. I don't believe there is any.

Page 63

1  BY MR. RANCK:
2    Q  Is there some other obligation other than --
3    A  Well, I mean, what other obligation are we
4  talking about? There's no obligation of law to
5  extend.
6  BY MR. RANCK:
7    Q  Would you agree with me that the option for
8  a third year is a value to the tenant, to the lessee?
9    A  I believe it's a value to both.
10   Q  Well, my question is is it a value to the
11 lessee?
12   A  Yes.
13   Q  And why do you believe it's a value to the
14 lessor?
15   A  Because the lessor will have an experienced
16 tenant in the property for another year.
17   Q  Does the lessor, if there's an option for a
18 third year, have an option to increase the rent?
19   A  That should all be part of the contract.
20   Q  Okay. If there was no increase in the rent,
21 the lessor would be tied in for an additional year at
22 the existing agreed upon rent; correct?

Page 64

1       MR. SHAIBANI: Objection. Mischaracterizing
2  the record. Calls for speculation.
3    A  If the only rent provided for in the lease
4  was the rent, a monthly rent that was for the entire
5  term of the lease and any extensions thereof, that
6  would be true.
7  BY MR. RANCK:
8    Q  The existence of an option that the lessee
9  have an additional year at the end of the term of the
10 lease, that could interfere with the owner's desire or
11 ability to sell the property at the end of the primary
12 term; would it not?
13       MR. SHAIBANI: Objection. Mischaracterizing
14 the evidence.
15       MR. RANCK: Mr. Shaibani, you can lengthen
16 the record all you want, but I'm not characterizing
17 any evidence. I'm asking questions not based on
18 evidence in the case. I'm asking questions of the
19 expert to explore his opinions. I haven't gotten to
20 questions about the evidence in the case yet, but you
21 can object all you want, because we're all going to
22 pay for the longer transcript, and that's fine, but --

Page 65

1  MR. SHAIBANI: Are you suggesting that I'm
2  not entitled to make objections at your deposition?
3  MR. RANCK: No, I'm just trying to clarify
4  the nature of my questions, because maybe you're
5  misinterpreting them. I'm not characterizing any
6  evidence in the case in these questions. You can
7  interpose whatever objection you feel is appropriate
8  as long as it's not speaking and coaching, but I just
9  want to clarify that I'm not attempting to
10 characterize any of the evidence. I'm simply asking
11 this witness general questions about commercial
12 leases.
13 BY MR. RANCK:
14   Q   I think the question -- do you recall the
15 question?
16   A   I think I recall enough of the question that
17 the answer is it would depend on a prospective
18 purchaser. It could be plus -- it could be a positive
19 or a negative.
20 BY MR. RANCK:
21   Q   Well, if Ms. White, hypothetically, if
22 Ms. White thought she might want to sell the property

Page 66

1  after two years, then giving Mr. Bratton an option for
2  a third year, that would hinder her ability to sell
3  the property; would it not?
4     MR. SHAIBANI: Objection. Calls for
5  speculation. Mischaracterizes the record.
6   A   I don't believe it necessarily has to.
7  BY MR. RANCK:
8   Q   Why is that? Why is --
9   A   Well, it depends on who the purchaser is.
10  Q   Assume the purchaser wanted to purchase the
11 property and move in immediately, take over --
12  A   That's a different question.
13  Q   Well, that's my question.
14  A   Well, but that's not the way it was
15 presented.
16 BY MR. RANCK:
17  Q   Well, maybe not the way it was interpreted.
18  A   No, it was not the way it was presented,
19 because you asked in a very general sense, you said to
20 interfere with her ability to sell, and I said not
21 necessarily so. it would depend on who the purchaser
22 was. That's very clear.

Page 67

1   Q   So you agree there are circumstances in
2  which it would interfere with her ability to sell?
3     MR. SHAIBANI: Same objections.
4   A   I do, just as I would feel that it would be
5  beneficial as well. Could be beneficial as well.
6  BY MR. RANCK:
7   Q   But that gets back to the -- that's for the
8  owner-lessor to decide; right? What's in their
9  interest, his or her own interest; correct?
10  A   I would think any party to a contract,
11 lessor, lessee, is looking for his or her best
12 interest.
13  Q   And there's nothing discriminatory about, as
14 a general matter, about not giving a commercial lessee
15 an option for an additional year after the end of the
16 original term; is that right?
17     MR. SHAIBANI: Objection. Calls for
18 speculation. Mischaracterizes the record.
19  A   Not offering an extension for reasons other
20 than trying to avoid working with a protected class is
21 not a problem.
22 BY MR. RANCK:

Page 68

1   Q   All right. Let me hand you what's been
2  marked as Exhibit 3, which I've not looked at yet
3  today. I received it here at the deposition. If you
4  can identify that for me.
5   A   I would say Exhibit 3 is my list of my
6  opinions, some credentials, a list of documents that I
7  reviewed prior to.
8   Q   Okay. That Exhibit 3 on the front page
9  bears a stamp that says draft. Do you see that?
10  A   Okay.
11  Q   And I believe, perhaps you can confirm it,
12 but I believe Mr. Shaibani is representing that that's
13 a draft of your report.
14     MR. RANCK: Is that true, Mr. Shaibani?
15     MR. SHAIBANI: Yes. I stamped draft on it
16 to make that clear.
17     MR. RANCK: To distinguish it from the
18 actual report?
19     MR. SHAIBANI: From the final version, yes.
20 BY MR. RANCK:
21  Q   Did you review the draft that's represented
22 by Exhibit 3?

Page 69

1   A   I did.
2   Q   You reviewed a draft before you signed the
3   final report; correct?
4   A   I reviewed a draft, and I reviewed the final
5   report before I signed it.
6   Q   Whose computer does that draft exist on?
7   Did you type that?
8   A   No, I did not.
9   Q   Who typed that, to your knowledge?
10      MR. SHAIBANI: I'm going to make an
11  objection here. And we'll stipulate that this was a
12  joint product of counsel and Tom Lynch, and as well as
13  discussions with my staff.
14  BY MR. RANCK:
15  Q   Okay. So Mr. Shaibani and/or his staff
16  typed that report; correct?
17  A   Yes, because you can't afford me to type
18  something.
19  Q   Do you recall when you discussed that with
20  him? And I'm --
21  A   Yes, the 12th of October.
22  Q   October 12. All right. Is that what's

Page 70

1   reflected on this -- in your handwritten notes on the
2   September 22 letter that says 2.5 hours?
3   A   Yeah, I write on papers in front of me or
4   envelopes.
5   Q   Okay.
6   A   I was 2.5 hours working on this document in
7   Mr. Shaibani's office.
8   Q   So you came here and met with him?
9   A   That is correct.
10  Q   And prepared it together. Did you tell
11  Mr. Shaibani what to put in the report, or did he put
12  things in the report himself?
13      MR. SHAIBANI: I'll make an objection on the
14  basis of asked and answered to the extent it's a joint
15  product of counsel and Tom Lynch.
16      MR. RANCK: You can make that objection, but
17  I'm going to find out who contributed what to this
18  report.
19  BY MR. RANCK:
20  Q   So my question is is did you put everything
21  in that report in there, or was that put in there by
22  Mr. Shaibani, and then you later agreed to it?

Page 71

1       MR. SHAIBANI: I'm going to instruct him not
2   to respond to the way you phrased the question,
3   because it's highly misleading basically.
4       MR. RANCK: I don't see why it's misleading.
5   The witness can answer the question as to whether you
6   told him everything to put in the report.
7   BY MR. RANCK:
8   Q   Did you tell Mr. Shaibani what to put in the
9   report, or did he prepare the report prior to you all
10  even getting together?
11      MR. SHAIBANI: Again, as I said, this was a
12  joint product of counsel and Tom Lynch, and whether we
13  had discussions and I typed something, then he looked
14  at it, he submitted another his comments, and I
15  revised it again. This is a going back and forth
16  project. It's not -- you cannot say if I presented
17  something and he signed off on it. If that's your
18  question, I would say that's clearly not what
19  happened.
20      MR. RANCK: Well, here's -- I'd like an
21  answer to my last question.
22  BY MR. RANCK:

Page 72

1   Q   Can you answer my question?
2       MR. BOUSE: Why don't we swear Mr. Shaibani
3   in since he just testified.
4       MR. RANCK: He may get his chance.
5   BY MR. RANCK:
6   Q   But can you answer my last question?
7   A   Would you just -- somebody repeat the
8   question.
9   Q   Well, let me -- I'll start over, because I
10  am going to walk through this. All of the documents
11  or notes or what have you that you prepared with
12  regard to your participation in this case, none of
13  them indicate any substantive discussion between you
14  and Mr. Shaibani prior to October 12 when you said you
15  had this meeting. Okay? You've got six hours, it
16  looks like, reviewing a package and two hours
17  reviewing Ms. Medlin's deposition. Am I interpreting
18  your notes right?
19  A   I think they're pretty self-explanatory.
20  Q   Am I interpreting them right?
21  A   Correct?
22  Q   So it does not appear that you had

Case 1:06-cv-00694-JDB   Document 49-5   Filed 03/22/2007   Page 4 of 16
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

19 (Pages 73 to 76)

Page 73

1  substantive conversations with Mr. Shaibani prior to
2  the genesis of this draft report Exhibit 3; correct?
3      MR. SHAIBANI: Objection. Asked and
4  answered in the beginning of the deposition when we
5  first talked, and what we talked about.
6  BY MR. RANCK:
7      Q  You can answer.
8      A  As I said earlier, we spoke in general about
9  these things. I didn't put all the footnotes in here.
10  The footnotes reference the documents.
11     Q  Was that document, Exhibit 3, in some form
12  prepared when you arrived for your meeting with
13  Mr. Shaibani?
14     A  It was.
15     Q  Can you tell me how much of that document
16  was prepared when you arrived for your meeting with
17  Mr. Shaibani?
18     MR. SHAIBANI: Are you asking him to read
19  the whole report?
20     MR. RANCK: He can look at whatever he
21  wants. I want to know how much of that you prepared,
22  and how much came from this expert witness. That's

Page 74

1  exactly what I want to know.
2      MR. SHAIBANI: And as I said before, this
3  was a joint product of counsel and Tom Lynch.
4  BY MR. RANCK:
5      Q  Mr. Lynch, my question is is how much of
6  that report was put together before you got here on
7  October 12?
8      A  I'd say a goodly amount of it. Yeah.
9      Q  Almost the entire thing?
10     A  A very large, large portion of the report or
11  the elements of the report. I can't say, you know, I
12  don't have a copy -- I don't have a copy of changes
13  and wordsmithing and other things that I added in
14  here. I don't know how these two compare. I know I
15  was reading a Word document. I have a copy of this in
16  both Word and a PDF file.
17     Q  You got a copy of it in Word from
18  Mr. Shaibani.
19     A  Correct.
20     Q  And a PDF from him.
21     A  Correct.
22     Q  After your meeting on the 12th.

Page 75

1      A  Correct.
2      Q  All right. What changes do you recall were
3  made to the draft report at your meeting on the 12th?
4      A  I don't recall.
5      Q  Do you recall any substantive changes that
6  you asked be made to that draft report?
7      MR. SHAIBANI: Objection. Asked and
8  answered. If you want to convert the two documents
9  and see what the changes are, that's how you can
10  arrive at your answer. I mean, this is -- it's been
11  months before -- since these were drafted. How do you
12  expect him to point out which words to change on which
13  page right now?
14     MR. RANCK: Most experts will recall when
15  counsel prepares a report, and they have to ask for
16  something to be changed. They recall it, Mr.
17  Shaibani.
18  BY MR. RANCK:
19     Q  Mr. Lynch, my question is what substantive
20  changes did you ask or require be made to the draft
21  report that Mr. Shaibani prepared before you got here
22  on the 12th of October?

Page 76

1      A  As best as I can remember, the changes I
2  would have asked for would have been the deal with
3  phraseology or perhaps the connection of more in --
4  something more in keeping with my interpretation of
5  the D.C. human right act and how it applies, and what,
6  you know, what's my understanding of protected
7  classes. It was more --
8      Q  Is it fair to say, and I'm asking you this
9  question, not Mr. Shaibani. Is it fair to say that he
10  prepared your report, and you signed off on it?
11     MR. SHAIBANI: Objection --
12  BY MR. RANCK:
13     Q  -- with some changes to phraseology?
14     MR. SHAIBANI: -- objection.
15  Mischaracterizes prior testimony. Asked and answered.
16  BY MR. RANCK:
17     Q  You can answer.
18     A  No, I believe, and I've said to you I can't
19  pinpoint exactly there, but I would say some of the
20  changes I suggested would have to be considered
21  substantial because there were changes more than just
22  the -- we're not just talking about wordsmithing.

**Page 77**

1  Q  But the interpretation of the law, those are
2  changes you made. Did you ask him to change any
3  conclusions?
4      MR. SHAIBANI: I'll object on vagueness.
5  What conclusions are you referring to? The last page
6  that's captioned conclusion?
7  BY MR. RANCK:
8  Q  Did you ask him to change any conclusions or
9  opinions?
10  A  No, I don't think we asked to change
11  opinions fundamentally or conclusions fundamentally.
12  Q  Did you ask him to add or eliminate any of
13  the substantive factual assumptions contained in the
14  report?
15      MR. SHAIBANI: Objection. Asked and
16  answered.
17  A  I would say we were substantially in
18  agreement as to the nature of the report.
19  BY MR. RANCK:
20  Q  Well, you were substantially in agreement
21  with the nature of the report he prepared, the draft;
22  correct?

**Page 78**

1  A  That's correct, and that's not in any shape
2  or form unusual in an expert witness situation.
3  Q  I would beg to differ, but I guess people
4  can have different opinions on that. Bear with me one
5  second, please. Do you have any notes or changes to
6  the draft or anything of that nature on your computer
7  with regard to what he e-mailed you?
8  A  No.
9  Q  Okay. All right. Let's take a look at
10  what's been marked as Exhibit 4.
11      MR. RANCK: Bob, Exhibit 4 is the final
12  report that was filed?
13      MR. BOUSE: Okay, thanks.
14      MR. RANCK: Although we'll have witness
15  confirm that, but just so the record's clear, I
16  discussed this with Mr. Shaibani off the record and
17  he's okay with this. Exhibit 4 contains an unsigned
18  page 27, that is, there's a signature line, but no
19  signature. Mr. Shaibani had provided separately the
20  signature, Mr. Lynch's actual signature, so what we've
21  done is just appended -- there are two page 27s.
22      MR. BOUSE: I've got that.

**Page 79**

1      MR. RANCK: One is unsigned and one is
2  signed. Is that fair, Mr. Shaibani?
3      MR. SHAIBANI: The signed page was an
4  exhibit to the rule 26(b)(4) I believe that was filed.
5  BY MR. RANCK:
6  Q  Sure. Yeah. Okay. I just -- there are two
7  page 27s, one is signed and one is not. And that's
8  why, Mr. Lynch, if you could look at Exhibit 4 and
9  identify that document and the signature on the second
10  page 27, if you would?
11  A  That's my signature.
12  Q  That's the report that contains your
13  opinions in this case; is that correct?
14  A  That is correct.
15  Q  All right. I'd like to go through this, if
16  you would. If you look at page 3 of your report?
17      (Discussion off the record.)
18  BY MR. RANCK:
19  Q  Page 3 contains a list but not of documents
20  you reviewed, although it's only one of several pages,
21  correct, that list of documents. Right?
22  A  Yes, I believe it starts on page 2.

**Page 80**

1  Q  Yeah, I'm focusing on the list on page 3,
2  though. Do the numbers here reflecting documents you
3  reviewed, do they correspond to the tabs in your
4  binders in some way? And here's my question. Looking
5  at No. 23, item 23 on page 3 of your report.
6  A  Uh-huh.
7  Q  It says leases submitted by John Bratton to
8  Chatel Real Estate which were rejected. Do you see
9  that?
10  A  Yes.
11  Q  I'd like you to identify for me what leases
12  you're referring to there that you've reviewed.
13      MR. SHAIBANI: It says Tab V.
14      THE WITNESS: V for victory. Leases
15  submitted by John Bratton which were rejected.
16  BY MR. RANCK:
17  Q  Okay. They seem to be corresponding to tab
18  V in one of your binders; is that right?
19  A  Correct.
20  Q  Can you tell me, my first question is how
21  many leases do you have, and what are the dates of
22  those leases that are referenced by item 23 in your

Case 1:06-cv-00694-JDB    Document 49-5    Filed 03/22/2007    Page 6 of 16
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

21 (Pages 81 to 84)

Page 81

1 report?
2 A  There is a lease here that appears to be
3 dated 10 October.
4     MR. SHAIBANI: If you can read the Bates
5 numbers, that might be helpful, at the bottom. It's
6 BRA --
7 A  BRA 0030.
8 BY MR. RANCK:
9 Q  Okay. Well just maybe give the first and
10 last Bates number.
11 A  I'm looking for them, the last.
12 Q  Or actually.
13     (Discussion off the record.)
14 BY MR. RANCK:
15 Q  All right. What's after the October 10
16 BRA0030, what's the next lease that you have?
17 A  There's an addendum BRA0037 of 10-19.
18 Q  What other leases do you have that you
19 reviewed?
20 A  There's 0022.
21 Q  What's the date of that lease?
22 A  It's the 10th, but it has a lot of different

Page 82

1 information on it as compared to the other one that's
2 dated the 10th.
3 Q  Okay.
4 A  And we have one that is -- starts on 0011.
5 It's actually 0010. There's a cover note and a
6 commercial lease agreement called BRA0011, dated the
7 10th. And commercial lease agreement dated October 7,
8 BRA0217.
9 Q  And that's the October 7 lease that's got a
10 bunch of Xs in the margin and a bunch of the
11 provisions are scratched out; correct?
12 A  That's correct.
13 Q  What other leases do you have there that are
14 reflected in No. 23 on page 3 of your report?
15 A  This seems to be the extent of the section.
16 Q  All right. We'll come back to those in a
17 minute or two. I'd like to go through sort of page by
18 page on this -- of your report here.
19     (Discussion off the record.)
20     MR. SHAIBANI: -- for a fact the reason I
21 was going to point out that tab T of Tom's -- it's in
22 tab U in Tom's binder contains a signed lease between

Page 83

1 John Bratton and Mary White, and tabs R and S
2 contained unsigned leases between Roberta Medlin and
3 Mary White.
4     MR. RANCK: Roberta Medlin, M-E-D-L-I-N.
5 All set, Bob?
6     MR. BOUSE: Okay, thank you.
7 BY MR. RANCK:
8 Q  Okay. Mr. Lynch, if you can take a look at
9 page 5 of your report, I'd like to start there as we
10 walk through this. Focusing on the incomplete
11 paragraph at the bottom of the page, do you see it
12 begins defendants stripped John Bratton; do you see
13 that?
14 A  Correct.
15 Q  The first line or the first clause says the
16 defendant stripped John Bratton of these rights when
17 they unreasonably delayed to lease office space to him
18 due to his race; do you see that?
19 A  I do.
20 Q  Okay. I'd like you to identify for me, if
21 you can, well, first of all, are you of the opinion
22 that Chatel Real Estate or any of its agents or

Page 84

1 Thierry Liverman discriminated against John Bratton by
2 somehow unreasonably delaying the process?
3     MR. SHAIBANI: I'm going to object on the
4 basis of that's not entirely his opinion as set forth
5 in the report.
6 BY MR. RANCK:
7 Q  That's why I'm asking.
8     MR. BOUSE: I didn't hear the objection, or
9 I didn't hear anything.
10     MR. RANCK: Stefan objected on the ground
11 that that's not the, I guess, full opinion as set
12 forth in the report or something.
13     MR. BOUSE: Okay.
14 BY MR. RANCK:
15 Q  But I'm just asking the question. Do you
16 hold that opinion? Let me strike the question and
17 start here.
18     I'm going to use the term Chatel, okay, and
19 what I mean by is Chatel is Thierry Liverman, John
20 Pagones, all other agents, employees of Chatel Real
21 Estate; okay?
22 A  Understood.

Case 1:06-cv-00694-JDB    Document 49-5    Filed 03/22/2007    Page 7 of 16
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

22 (Pages 85 to 88)

Page 85

1   Q   I don't want to distinguish between, get
2  caught up in semantics, whether I meant Mr. Pagones or
3  Chatel the entity. Okay? Is that fair?
4   A   That's correct. That's fine.
5   Q   When I speak of Chatel, I'm referring to all
6  of the Chatel folks. Are you of the opinion that
7  Chatel engaged in unlawful discrimination against John
8  Bratton by somehow unreasonably delaying the
9  processing of his lease application, his prospective
10 leases?
11  A   I am.
12  Q   Okay. Tell me the basis for that opinion,
13 that is, and I want to stop you at each interval, but
14 tell me where you think they discriminatorily,
15 unreasonably delayed.
16      MR. SHAIBANI: By they, you're referring to
17 Chatel?
18      MR. RANCK: Chatel, yes. And let me, I
19 guess, let me ask the question this way.
20 BY MR. RANCK:
21  Q   Do you agree with me that Mr. Bratton
22 submitted his first lease to Chatel on October 7?

Page 86

1   A   I believe that's correct.
2   Q   All right. And actually, he submitted it to
3  Barrett Anderson, correct, and Mr. Anderson dropped it
4  off to Chatel; is that your understanding?
5   A   My understanding.
6   Q   All right. Mr. Bratton came in on
7  October 6; right? To Chatel.
8   A   That's my understanding.
9   Q   All right. And by October 7, Mr. Bratton
10 had submitted a first proposed lease; right? Correct?
11  A   Yes.
12  Q   All right. And what do you understand that
13 Chatel did with that proposed lease once they got it?
14      MR. SHAIBANI: I'll object on the basis that
15 the record speaks for itself.
16      MR. RANCK: Well, Mr. Shaibani, the record
17 is what's important here. I'm asking him what his
18 understanding is. How can I -- how can you --
19      MR. SHAIBANI: If you're going to point out
20 to me --
21      MR. RANCK: -- object to my -- let me -- no,
22 don't cut me off, please. That's not courteous and

Page 87

1  the court reporter can't get it. both of us at the
2  same time.
3  BY MR. RANCK:
4   Q   My question is to this witness since he
5  opines that my clients unreasonably delayed, what's
6  the basis for that, what does he understand they did
7  with the lease once they got it? I can't conceive how
8  that's objectionable, but put your objection on the
9  record.
10      MR. SHAIBANI: Well, first of all, this
11 report was drafted before many of the depositions were
12 taken. You can ask him if he's read the transcripts,
13 and if he stands by the report still.
14 BY MR. RANCK:
15  Q   Did you stand by the opinions expressed in
16 your report?
17  A   I do.
18  Q   And you're of the opinion that Chatel
19 engaged in unlawful discrimination by delaying the
20 processing of John Bratton's proposed leases; correct?
21  A   Correct.
22  Q   All right. You understand that he came in

Page 88

1  the 6th, Mr. Bratton did, submitted a proposed lease
2  on the 7th, made its way to Chatel on the 7th, what is
3  your understanding as to what Chatel did with it?
4   A   They didn't do much of anything with it
5  until probably around the 10th or so.
6   Q   Well, did you read Mr. Pagones's deposition?
7   A   Yes, I think I read almost all of his
8  deposition.
9   Q   Mr. Pagones testified, did he not, that when
10 he got Mr. Bratton's lease on the 7th, he delivered it
11 to Mary White. Wasn't that his testimony? He
12 delivered it to Mary White on the 7th.
13  A   On the 7th. All right. I believe he said
14 that.
15  Q   So we're of the same understanding that the
16 very day Chatel got Mr. Bratton's first proposed
17 lease, they delivered it to the owner; correct?
18  A   Correct.
19  Q   Do you agree there's no unreasonable delay
20 in that time period?
21      MR. SHAIBANI: I will object on the basis
22 that the delay referred to in Tom Lynch's report --

**89**

1  MR. RANCK: No, no, no, no, no, no. You're
2  about to testify, I'm sorry to raise my voice, but I
3  need to cut you off. You were about to testify, so if
4  you're going to testify, I'm going to need the witness
5  to leave the room. So if you're going to say what the
6  report says, he needs to leave.
7  MR. SHAIBANI: Okay. Tom, would you mind
8  standing outside for a moment?
9  THE WITNESS: Okay. I'll stand outside.
10  (Witness leaves the room.)
11  MR. SHAIBANI: I'm objecting -- well, first
12  of all, I believe there's a lot of mischaracterization
13  of testimony here, but my objection is basically that
14  the delay he's referring to in his report, which we've
15  discussed a number of times as well as the 24 days
16  that it took for John Bratton to sign a lease, and
17  that's the basis of his claim of a delay. Now,
18  whether Chatel delivered a lease to Mary White the
19  same day.
20  MR. RANCK: Well, that, Mr. Shaibani, with
21  all due respect, that's Mr. Bratton's claim. And I'm
22  not deposing Mr. Bratton today. I'm deposing your

**90**

1  expert. I don't care what Mr. Bratton says his claim
2  is based on. I want to know what this expert opinion
3  is based on. So I'm going to walk him through the
4  entire time period and let him tell me where he thinks
5  Chatel unreasonably delayed.
6  And I'm entitled to do that, and we're
7  not going to finish today if you continue to
8  obstruct the deposition, and we have to have him
9  continually from this point forward leave the room
10  so you don't tell what his report says. The man's
11  been in the real estate industry for nearly 30
12  years or more, and he's been an expert numerous
13  times, and he appears to be fully competent to
14  tell me what his say opinions are. Okay? So
15  we're not, and I'm not going to pay for extra time
16  spent by you telling him what his opinions are.
17  MR. SHAIBANI: You can tell that the judge.
18  MR. RANCK: I will when I move to strike
19  him.
20  MR. SHAIBANI: Sure. You can do whatever
21  you want. Good luck with that by the way.
22  MR. BOUSE: Is he back in the room?

**91**

1  MR. RANCK: No, Stefan is getting him.
2  (Witness reenters room.)
3  MR. SHAIBANI: Strike him, yeah, right.
4  You're quite ambitious, sir. Daubert? Are you
5  thinking you're going to strike him based on Daubert?
6  Is that your approach?
7  MR. RANCK: You'll see how ambitious I am
8  soon, Mr. Shaibani. I hate to have you do this, but I
9  don't know what I had asked the witness before
10  Mr. Shaibani went to interpose his objection.
11  (The question was read by the court
12  reporter.)
13  MR. SHAIBANI: Same objections.
14  BY MR. RANCK:
15  Q  Do you agree with that, Mr. Lynch?
16  A  **In the narrow time period of 7 to 10**
17  **whatever?**
18  Q  No.
19  A  **7 to 7?**
20  Q  October, Friday October 7 to the delivery to
21  Ms. White on that same day.
22  A  **No, I don't have a problem with that.**

**92**

1  Q  Okay. And do you believe that there was any
2  unreasonable delay by Chatel or discriminatory delay
3  by Chatel over the intervening weekend?
4  MR. SHAIBANI: Same objections.
5  A  **No, I don't think so.**
6  BY MR. RANCK:
7  Q  All right. So now we're moving forward in
8  time to Monday, October 10; correct? What do you
9  understand happened on Monday, October 10 with respect
10  to Mr. Bratton's efforts to obtain this commercial
11  space?
12  MR. SHAIBANI: I will object on the basis
13  that the record speaks for itself.
14  BY MR. RANCK:
15  Q  I guess -- never mind.
16  MR. BOUSE: Never mind. Never mind.
17  Talking to myself.
18  A  **On October the 10th, it appears that a**
19  **handwritten lease was being prepared for Mary Wite,**
20  **the landlord and Bratton Realty, LLC, the tenants for**
21  **1622 Wisconsin.**
22  BY MR. RANCK:

**93**

1  Q  Let me show you, and I don't have copies of
2  these, counsel, because, frankly, I think we've got so
3  many deposition exhibits that are all the same. I
4  brought the Bratton deposition exhibits, and I'd like
5  to show you, Mr. Lynch, what was previously marked as
6  Bratton Deposition Exhibit 4, which is an October 7
7  lease submitted by Bratton Realty. Is that the lease
8  you were speaking about dated, I mean, that he
9  submitted October 7?
10 A  Yes. That's in the -- one of the BRA
11 documents that we discussed.
12 Q  All right. And now on October 10, and
13 you're referring to --
14 A  BRA0030?
15 Q  But BRA0030, that's an October 10 lease on a
16 form, on a Chatel form; correct?
17 A  That's correct.
18 Q  Is it your understanding that's the next
19 lease submitted by Mr. Bratton?
20 A  There's another one on the 10th that's a
21 Bratton lease.
22 Q  Not a Chatel form?

**94**

1  A  Not a Chatel form.
2  Q  Do you know which was submitted first,
3  Mr. Lynch?
4      MR. SHAIBANI: I'll object on the basis that
5  the crossed-out provisions on the 7th lease, we have
6  on the testimony on the record already that that's not
7  cross-outs by John Bratton, so somebody else must have
8  made those cross-outs.
9      MR. RANCK: That's not the one that I was,
10 frankly, referring to.
11 BY MR. RANCK:
12 Q  If you can look at what was marked as
13 Bratton Exhibit 6, which you referred to somewhere in
14 your documents there. BRA010, and then the lease at
15 0011.
16 A  0011.
17 Q  Yes. There are no cross-outs on that lease;
18 are there, Mr. Lynch?
19 A  No, I don't see any cross-outs.
20 Q  All right. And that's not on the Chatel
21 form; correct?
22 A  That's correct.

**95**

1  Q  All right. Do you know -- that's dated
2  October 10; right?
3  A  That's correct. It says October the 10th on
4  the top.
5  Q  Did you know which lease was the second one
6  submitted by Mr. Bratton?
7      MR. SHAIBANI: I'll object on the basis that
8  the documents speak for themselves and the record
9  speaks for itself.
10 A  Are you asking me to say which was second,
11 the one on the Chatel form versus the one that's in a
12 free form?
13 BY MR. RANCK:
14 Q  No, I'm asking you of all the leases you
15 have, whether you can identify which one is second,
16 because you've identified several October 10 leases.
17 A  Well, there's certainly at least in here two
18 October 10s marked up that have the 10th of October
19 that are on Chatel form.
20 Q  My question, sir, is do you know which one
21 was submitted to Chatel next by Mr. -- well, by
22 Bratton Realty?

**96**

1      MR. SHAIBANI: Same objections.
2  A  I think I'll be speculating, but if I had to
3  choose one, I would say since Mr. Bratton was running
4  with the ball that if I had to make an educated
5  supposition with respect to these leases, I would say
6  his 10 preceded the Chatel 10, the start of the Chatel
7  form.
8  BY MR. RANCK:
9  Q  So you're saying the first lease was Bratton
10 Exhibit 4, dated October 7.
11 A  7.
12 Q  The second lease, you're speculating is
13 BRA0011; correct?
14 A  Yes.
15 Q  And your rationale is because that's still
16 on Bratton's own form; correct?
17 A  Yes.
18 Q  Right. Now, Mr. Bratton changed the terms
19 that he was offering between the October 7 and
20 October 10 versions of his own lease; did he not?
21     MR. SHAIBANI: Objection. What terms are
22 you referring to and if this is a crossed out --

**Page 97**

1   MR. RANCK: It's not, Mr. Shaibani.
2   MR. SHAIBANI: Well, that's what it is. The
3   one he has is --
4   MR. RANCK: No, well, the one he has is the
5   wrong page. I'm referring to BR0011.
6   THE WITNESS: I'm looking at 0011.
7   MR. RANCK: And Bratton Exhibit 4, which is
8   before the witness. Which perhaps he doesn't have
9   from counsel.
10  MR. SHAIBANI: These are two different
11  leases.
12  THE WITNESS: Yes.
13  BY MR. RANCK:
14  Q   Well, you're now --
15  A   **This appears to be a copy of this. It's**
16  **truncated.**
17  Q   I want you to ignore BRA0217. I'm not
18  asking about that one. I'm asking Bratton Exhibit 4,
19  which is BRA342 is the October 7 lease; correct?
20  A   **That's what it says, October 7.**
21  Q   And you said you believe the next lease
22  submitted was BRA0011, which is Mr. Bratton's form

**Page 98**

1   dated October 10; correct?
2   A   **Correct.**
3   Q   And I'm asking you do you or don't you agree
4   with me or you recognize, do you not, that he changed
5   some of provisions between the two leases; didn't he?
6   MR. SHAIBANI: Which provisions are you
7   referring to, counsel?
8   MR. RANCK: Well, I'll get to that if the
9   witness doesn't recall, because I think it's --
10  A   **I don't -- I mean, I'd have to sit down and**
11  **take a look at these things and compare them paragraph**
12  **to paragraph.**
13  BY MR. RANCK:
14  Q   You don't believe it's significant in
15  concluding whether Chatel and Mary White discriminated
16  against Mr. Bratton as to whether or not he was
17  changing the terms of the leases he was proposing?
18  That's not significant to you?
19  MR. SHAIBANI: Objection. Argumentative.
20  A   **It would depend on whether you characterize**
21  **the changes as being conciliatory to Mary White or to**
22  **the benefit of John Bratton.**

**Page 99**

1   BY MR. RANCK:
2   Q   Well, do you recall whether any changes were
3   to one's benefit or the other?
4   MR. SHAIBANI: I'll object on vagueness
5   grounds, and the documents speak for themselves. If
6   you want him to sit here and read through all of these
7   leases and compare them paragraph to paragraph, you
8   can do that, but it's going to be a very long
9   deposition, all right? Discovery cutoff is Monday.
10  I'm not going to make through another day of
11  depositions.
12  MR. RANCK: I don't really have -- strike
13  that. Never mind.
14  The witness prepared a report saying
15  certain things. I'm testing the basis of his
16  report.
17  MR. SHAIBANI: What portion of the report
18  are you referring to? In fact, I don't even see what
19  your questions are relating to there. Just
20  argumentative really.
21  THE WITNESS: I would have to go over this
22  paragraph by paragraph, but just looking at the

**Page 100**

1   sublease and assignment from the lease dated the 7th
2   where handwritten changes were made, those handwritten
3   changes do not appear on the 10th.
4   BY MR. RANCK:
5   Q   Okay. Mr. Lynch, if you could then -- are
6   you of the opinion that Chatel engaged in any
7   discriminatory delay or any unreasonable delay between
8   the time it got Mr. Bratton's second proposed lease,
9   BRA0011?
10  MR. SHAIBANI: That's not a document you
11  have in front of him, I don't believe.
12  MR. RANCK: It is, actually.
13  BY MR. RANCK:
14  Q   And Mr. Bratton's submission of his next
15  proposed lease?
16  A   **I would say 0011 -- 0010 and 0011 came at**
17  **the same time.**
18  Q   I agree, but my question is is after Chatel
19  got that second proposed lease, 0011, which has a
20  cover letter of 0010.
21  A   **Correct.**
22  Q   Right? I mean, you're not of the position

**Page 101**

1 that they unreasonably delayed in getting that to Mary
2 White; are you?
3       MR. SHAIBANI: Objection.
4   A   No. My opinion is based on a totality of
5 events that occurred that ended up in a -- what I
6 would consider fairly simple negotiation beginning on
7 the 7th and not culminating until October the 31st.
8 BY MR. RANCK:
9   Q   I appreciate that, but what I need to do
10 because Chatel wasn't involved the whole time is to
11 break down and see what delay you attribute to Chatel.
12 Okay? So we've gone through those two leases. Now --
13   A   I wouldn't characterize that Chatel wasn't
14 involved in the entire time, because they still were
15 the agent for Mary White during the entire process.
16   Q   That's fine. If you can look at what's been
17 previously marked as Bratton 8, 9 and 10. I'm going
18 to hand them to you. You've identified two of those
19 documents this morning, but not -- well, you've
20 identified at least one of those and probably two, but
21 not the third. Can you tell me what Bratton 8,
22 Exhibit 8, 9 and 10 are, Deposition Exhibits 8, 9 and

**Page 102**

1 10?
2       MR. SHAIBANI: I'll object on the basis that
3 the documents speak for themselves.
4   A   8, 9 and 10 appear to be related documents
5 that have some different terms on them, but they
6 appear to have gone back and forth pretty much in the
7 same day. The fax numbers.
8 BY MR. RANCK:
9   Q   Do you know which of those documents were
10 submitted by Bratton Realty to Chatel and in what
11 order?
12       MR. SHAIBANI: Same objections.
13   A   Well, just looking at them, I would say
14 No. 8 was first.
15 BY MR. RANCK:
16   Q   Okay. And of 9 and 10? Do you know whether
17 8 was actually submitted by the way, by Bratton Realty
18 to Chatel?
19   A   Based on the -- on what went back and forth
20 with -- from Chatel Real Estate, I would say they had
21 them all at one time or another, because they're all
22 coming from the same phone numbers all in the same

**Page 103**

1 day. They're all --
2   Q   Okay. The form was --
3   A   -- repeated packages.
4   Q   The form appears to have been faxed by
5 Chatel; right? That what it appears from that fax
6 line?
7   A   Yes.
8   Q   Okay. But all of those three documents,
9 each of them contains different handwriting all over
10 it; correct?
11       MR. SHAIBANI: Objection on vagueness.
12 Different handwriting as to different people writing
13 it, or different provisions written by the same
14 person?
15 BY MR. RANCK:
16   Q   Answer my question, please, Mr. Lynch.
17       MR. SHAIBANI: Please clarify your question.
18       MR. RANCK: I think he understands.
19   A   Well, I'm not that good at handwriting, but
20 I can see that there are different items added to --
21 initialed by apparently the same person. In other
22 words, on the 8 is fairly straightforward. 10 doesn't

**Page 104**

1 contain the $2,500 that is initialed, and that 9 has,
2 and 10 has a reference to utilities.
3 BY MR. RANCK:
4   Q   Okay. I guess my question, the form
5 document is all the same.
6   A   I would say the boilerplate appears to be
7 the same.
8   Q   Exactly, but there's different -- the
9 content of the writing on those three documents varies
10 between the documents; right?
11   A   Yeah, I would say the content of the
12 documents varies by virtue of what was added or not
13 added.
14   Q   Do you have any information to suggest that
15 Chatel unreasonably delayed in providing any of those
16 documents to Mary White?
17       MR. SHAIBANI: Objection. Calls for
18 speculation.
19   A   I really don't know how much of this was
20 sent off to Mary White and in what time frame.
21 BY MR. RANCK:
22   Q   All right. So you do not intend to offer an

**Page 105**

1  opinion that Chatel engaged in some sort of
2  unreasonable delay in connection with transmitting
3  those documents submitted by Bratton Realty to Mary
4  White; correct?
5      A   I have no way of knowing if they did delay.
6      Q   So you're not -- you don't offer that
7  opinion; is that right? You can't offer that opinion,
8  because you don't have the necessary information;
9  correct?
10     A   With vis-a-vis the 10th, no, I don't.
11     Q   Okay. Now, ultimately, a lease was
12 submitted by Mr. Bratton to go to Ms. White that she
13 considered; correct?
14         MR. SHAIBANI: Objection.
15         MR. RANCK: You know what? I agree with you
16 this time, Mr. Shaibani. That was a very poorly
17 worded question.
18 BY MR. RANCK:
19     Q   Is your understanding, Mr. Lynch, is it your
20 understanding that one of those proposed Bratton
21 Realty leases, exhibit -- Bratton Deposition Exhibits
22 8, 9 or 10, one of those was the one considered by

**Page 106**

1  Ms. White when she decided which tenant applicant to
2  pursue; is that right?
3      A   I would say one of these, but you said
4  presented. These changes, I don't know where they
5  were coming from. I can't imagine these changes are
6  appearing on these documents without Ms. White's
7  involvement.
8          MR. BOUSE: I object, move to strike.
9  BY MR. RANCK:
10     Q   Do you recall Mr. Bratton's testimony about
11 those three documents?
12     A   Not specifically.
13     Q   Okay. Let me see if I can -- may I have
14 those back, just so they're not -- they don't get
15 misplaced?
16         Is this a fair summation of the chronology
17 with regard to Chatel's involvement in this process up
18 through October 12? Okay? And I want to know if you
19 have a different understanding of the facts.
20 Mr. Bratton appeared at Chatel's offices on October 6,
21 Mr. Bratton submitted a lease on his own form on
22 October 7. Mr. Bratton -- I'm sorry. Chatel

**Page 107**

1  delivered that proposed Bratton Realty lease to Ms.
2  White on October 7. Bratton Realty submitted a second
3  lease on October 10 and then submitted one or more of
4  these three other leases on October 10, Exhibits 8, 9
5  and 10 to Mr. Bratton's deposition.
6      A   Uh-huh.
7      Q   That based on whatever the operative lease
8  proposed by Bratton Realty was as of October 12,
9  Thierry Liverman and Ms. White met on October 12 to
10 evaluate Mr. Bratton's lease and Roberta Medlin's
11 lease; is that correct?
12     A   That's my understanding. The 12th of
13 October.
14     Q   Okay.
15     A   With the October 11 Medlin lease proposal.
16     Q   Do you believe that Chatel engaged in any
17 unreasonable delay with regard to the processing or
18 otherwise pertaining to Mr. Bratton's proposed leases
19 from the period October 6 to October 12 when
20 Mr. Liverman had the meeting with Ms. White?
21         MR. SHAIBANI: Objection.
22     A   If my understanding of the time line is

**Page 108**

1  correct, Ms. Medlin's original proposal was drawn a
2  lot quicker -- a lot more quickly than any kind of
3  proposal for -- on a Chatel form for John Bratton.
4  BY MR. RANCK:
5      Q   All right. Now, with all due respect, I'm
6  not sure that answers my question. My question is is
7  are you of opinion that Chatel engaged in any
8  unreasonable delay between October 6 when Mr. Bratton
9  first came in and getting the owner to decide between
10 the leases on October 12?
11         MR. SHAIBANI: Same objections.
12 BY MR. RANCK:
13     Q   That's only a six-day period with a two-day
14 weekend in between. So I'm asking do you believe
15 that's unreasonable delay?
16         MR. SHAIBANI: Objection on vagueness as
17 well.
18     A   I will say it's a delay. He found himself
19 in competition where there was no competition when he
20 first came into the picture. As to deciding
21 reasonableness, I think that's for a higher authority
22 to determine the degree of reasonableness.

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007
Case 1:06-cv-00694-JDB    Document 49-5    Filed 03/23/2007    Page 13 of 16

28 (Pages 109 to 112)

109

1  BY MR. RANCK:
2     Q   Well, you opine in your report that there's
3  unreasonable delay. Are you retracting that
4  statement?
5     A   No, I'm not retracting that.
6     Q   All right. So you think it was unreasonable
7  delay, and I want you to identify --
8     A   I say it's unreasonable in the sense that it
9  put him in a situation where he was in computation,
10 whereas he was ready go to pretty much the day that he
11 looked at the property on the 6th, and if Chatel was
12 prepared to produce the appropriate documents to
13 create the lease, it might very well have negotiated
14 his lease without coming into a competition with
15 Roberta Medlin.
16    Q   Who do you understand first expressed an
17 interest in this property, John Bratton or Roberta
18 Medlin?
19    A   I believe it was John Bratton.
20    Q   You do? Did you review the testimony of
21 Barrett Anderson who is Mary White's employee?
22    A   Employee? I reviewed it very briefly, very

110

1  quickly.
2     Q   Do you recall that Mr. Anderson testified on
3  numerous occasions in no uncertain terms that Roberta
4  Medlin came to the property and toured it first?
5         MR. SHAIBANI: Objection to the extent that
6  it mischaracterizes the testimony on the record.
7  BY MR. RANCK:
8     Q   Do you recall that testimony, sir?
9     A   No, I don't.
10    Q   Well, would that make a difference in your
11 opinions if Roberta Medlin actually came to the
12 property and expressed an interest and toured it
13 first?
14        MR. SHAIBANI: I'll object on vagueness as
15 well. Expressed an interest to whom? There was no
16 testimony that she went to Chatel on the 6th of
17 October.
18        MR. RANCK: That wasn't my question.
19        MR. SHAIBANI: Voiced interest to whom?
20        MR. RANCK: To the owner.
21        MR. SHAIBANI: Good.
22 BY MR. RANCK:

111

1     Q   Would that affect your opinions, Mr. Lynch?
2     A   Just repeat the question.
3     Q   Sure. Would it affect your opinions if
4  Roberta Medlin toured the property and expressed an
5  interest in leasing it to the owner before Mr. Bratton
6  did so?
7     A   Well, Roberta Medlin certainly didn't appear
8  to express an interest in writing as Mr. Bratton did
9  as of the 7th of October.
10    Q   Well, I mean, you're not -- you obviously
11 can't get into Roberta Medlin's head, but Ms. Medlin
12 appeared sometime on or before the 6th if she beat --
13 if she was there before Mr. Bratton; agreed?
14        MR. SHAIBANI: Objection. Mischaracterizing
15 prior testimony on the record.
16    A   Well, I don't think it's that much of a case
17 of who saw it first as who actually made a move such
18 as producing a lease or making a proposition. I think
19 that Bratton made the first proposition.
20 BY MR. RANCK:
21    Q   Okay. Bratton, do you understand -- you
22 understand that Mary White has testified that she

112

1  wasn't interested in a right of first refusal for any
2  tenant; correct?
3         MR. SHAIBANI: Objection.
4  BY MR. RANCK:
5     Q   You can --
6     A   Yes, yes, yes.
7     Q   Okay. So given --
8     A   The prepared document seems to say other
9  than that.
10    Q   Which prepared document?
11    A   The lease prepared by Chatel --
12    Q   Oh, the Chatel form.
13    A   -- on the 11th. Yeah.
14    Q   The Chatel form.
15    A   Yes. Well, for Roberta Medlin d/b/a Gallery
16 Mamost (phonetic).
17    Q   Well, the form lease that Chatel provided
18 Mr. Bratton -- right, you do understand -- we agree
19 that Chatel provided Mr. Bratton with a Chatel form
20 lease.
21    A   Correct.
22    Q   The form lease Chatel provided Mr. Bratton

Page 113

1 was identical to the form lease Chatel provided
2 Roberta Medlin; was it not?
3     MR. SHAIBANI: Objection.
4     MR. RANCK: Let me -- let me --
5     MR. SHAIBANI: The contents of the two
6 leases are clearly different. One has provisions
7 crossed out --
8     MR. RANCK: No, they don't.
9     MR. SHAIBANI: -- the other one doesn't.
10 BY MR. RANCK:
11    Q   Let me refer you back to the form. I'm just
12 talking about the form of Exhibits 8, 9 and 10, which
13 is the three Bratton Realty-Chatel leases, and you can
14 take a look specifically at, if you'd care to, at
15 Paragraph 41, which has to do with the right of first
16 refusal. Do you see that provision?
17    A   Sales, should the property be put -- yes.
18    Q   That's the first of first refusal provision,
19 Paragraph 41; right?
20    A   Correct.
21    Q   And the form that Chatel provided
22 Mr. Bratton included that provision; didn't it?

Page 114

1    A   I believe it did. We have a blank form.
2    Q   So would you agree with me that the form
3 provided by Chatel to Bratton Realty was identical to
4 the form provided by Chatel to Ms. Medlin?
5     MR. SHAIBANI: Objection, that's to the
6 extent the documents speak for themselves, and that
7 mischaracterizes the record as to the contents of the
8 documents. If you're saying did Chatel provide a
9 commercial lease to both Medlin and John Bratton
10 before anything was written in it? Is that what
11 you're saying?
12 BY MR. RANCK:
13    Q   Do you understand my question?
14    A   I think's that's what you're saying, and I
15 don't believe that's so. I believe that they sent a
16 blank form to Bratton, but I don't think Roberta
17 Medlin received a blank form.
18    Q   Well, the provisions in the lease sent to
19 Mr. Bratton in the form provisions were the same as
20 the form provisions in Roberta Medlin's lease;
21 correct?
22     MR. SHAIBANI: Objection. Asked and

Page 115

1 answered. Mischaracterizes prior testimony and the
2 record as well.
3 BY MR. RANCK:
4    Q   When provided the right of first refusal. I
5 mean, that's the same provision in the same form;
6 right?
7    A   Yeah, it's the same -- it's the same
8 paragraph 41, but to reiterate, Roberta Medlin did not
9 see a blank form. What Roberta Medlin saw was one
10 filled out by Mary White's agent, Chatel.
11    Q   Actually, Roberta Medlin and Mary White
12 filled out the blank Chatel form together; didn't
13 they? And then Ms. Medlin came to Chatel to have it
14 typed up? Isn't that right?
15     MR. SHAIBANI: Objection to the extent that
16 it doesn't accurately reflect the entire record.
17    A   It's clear that the 11th, the lease of --
18 the lease on Chatel's form of the 11 of October
19 contains a great deal of negotiated items that are not
20 in the 8, 9, 10 with Bratton. There's a --
21 BY MR. RANCK:
22    Q   When you say the agreement of the 11th, are

Page 116

1 you referring to Bratton Exhibit --
2    A   No, I'm talking about --
3    Q   -- Deposition Exhibit 11, which is the draft
4 or the proposed Roberta Medlin lease? Is that what
5 you're referring to?
6    A   Yes.
7    Q   Have you seen a prior version of the Roberta
8 Medlin lease with handwritten modifications to it?
9    A   I'm not sure if I have that in my documents.
10 I'd have to look.
11     MR. SHAIBANI: It's R and S.
12    A   See which one it is. R and S. R and S.
13 Here's R. And there's S. S is not handwritten. The
14 handwritten document BRA 0377 dated 11 October in
15 handwriting does not contain the addendum page. It's
16 the most obvious difference.
17 BY MR. RANCK:
18    Q   Okay. But do you know who negotiated those
19 addendum items? Do you know whether they -- or
20 whether they were agreed on, or whether they were just
21 proposed by the lessee Roberta -- the proposed lessee
22 Roberta Medlin?

117

1  MR. SHAIBANI: Objection. Compound.
2  A  Let me get to the 11th lease. The very
3  lease that had to be communicated to Chatel to place
4  in the typed document, there's no indication as to
5  their existence in the handwritten document that Mary
6  White -- I suspect this is Mary White's handwriting.
7  BY MR. RANCK:
8  Q  If Roberta Medlin showed up at Chatel's
9  office and asked that those terms be prepared in a
10 typed document and Chatel typed the document pursuant
11 to her request, do you think they did anything wrong
12 or discriminatory in doing that?
13 A  No.
14 Q  Okay. Let's -- and we'll have to come back
15 to this a little bit, but let's move on for just a
16 second. Looking at page 5 of your report still, you
17 indicate that Chatel in the second to last line
18 misrepresented the availability of the property to
19 Mr. Bratton. Do you see that?
20 A  Yes.
21 Q  Okay. Can you tell me what facts that's
22 based on, that opinion?

118

1  MR. SHAIBANI: Objection to the extent that
2  the record speaks for itself. And secondly I would
3  say you're reading a portion of a lengthy sentence,
4  and you're trying to have him base his conclusions
5  based on a portion of the record, and you should read
6  the entire sentence if you want to ask him a question
7  about that sentence. I mean, I don't think it's fair
8  to him. This is an objection you've raised, by the
9  way, in many depositions.
10 MR. RANCK: But mine was appropriate.
11 BY MR. RANCK:
12 Q  Mr. Lynch, are you of the opinion that
13 Chatel misrepresented the availability of property to
14 Mr. Bratton?
15 A  Yes.
16 Q  Okay. Tell me what facts you base that
17 opinion on.
18 A  The fact that Chatel reported to Bratton
19 that the property was taken, and it wasn't available,
20 and that's borne out even more by the fact that Chatel
21 didn't notify Bratton that the property was not
22 actually taken. Example, on the 12th, I believe it

119

1  was the 12th, that Chatel told Bratton that Mary White
2  had chosen the other one, and that other deal, you
3  know, what was meant by chosen, you know, I would
4  interpret it you're out, the other person's in. Then
5  when Medlin was no longer in the picture, Chatel
6  didn't go back to Bratton and say it's available.
7  That's the essence of saying we're making something
8  available and not available.
9  Q  All right. You agree with me that if the
10 property wasn't available, that Chatel acted
11 appropriately to advise Bratton Realty that it wasn't
12 available.
13 MR. SHAIBANI: I'm sorry. Can you repeat
14 the question?
15 BY MR. RANCK:
16 Q  Yeah, let's assume that Ms. White had signed
17 a lease with Ms. Medlin. Okay? On October 12.
18 A  Okay.
19 Q  You would agree that Chatel -- it would be
20 appropriate for Chatel to call Mr. Bratton and say
21 Ms. White signed a lease with somebody else, so the
22 property is not available.

120

1  MR. SHAIBANI: I'll object on the basis that
2  that's not the record. There is no signed lease.
3  MR. RANCK: Of course. I stipulate to that.
4  It's a hypothetical.
5  MR. SHAIBANI: Well, then it calls for
6  speculation.
7  MR. RANCK: No, it doesn't. It's
8  ridiculous.
9  BY MR. RANCK:
10 Q  Can you -- do you agree --
11 A  If Chatel had actual knowledge --
12 Q  I mean, if the property wasn't available,
13 Chatel -- it would be appropriate for Chatel to tell
14 Mr. Bratton it's not available; right?
15 A  Let's go back to your hypothetical. You
16 said if they knew that there was a signed lease, and
17 that's how I was beginning to phrase my answer. If
18 they had actual knowledge of a signed lease between
19 Mary White and Roberta Medlin, then it would have been
20 appropriate to communicate to John Bratton that the
21 property is not available, it's leased.
22 BY MR. RANCK:

Case 1:06-cv-00694-JDB   Document 49-5   Filed 03/22/2007   Page 16 of 16
DEPOSITION OF THOMAS J. ACHESON
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

31 (Pages 121 to 124)

```
                                                    121
 1    Q  Of course. You agree with that; right?
 2    A  I do.
 3    Q  Yeah. I mean, you know, they don't want to
 4  keep him stringing along; right? You need to be fair
 5  to one applicant so that they can pursue other
 6  properties if they need to; correct?
 7      MR. SHAIBANI: Objection. Mischaracterizes
 8  the record.
 9    A  It is my understanding that on the 12th,
10  there was no signed lease between Roberta Medlin.
11  BY MR. RANCK:
12    Q  I understand that.
13    A  That's what flavors the lack of
14  availability. The improper description of
15  availability.
16    Q  I understand that. But assuming that there
17  was a signed lease, assuming that a lease had been
18  signed, Chatel -- it would have been appropriate for
19  Chatel to tell Mr. Bratton that the property has been
20  leased to someone else, it's no longer available, and
21  the reason it would have been appropriate is that so
22  he can pursue other opportunities if he needs to;

                                                    122
 1  correct?
 2      MR. SHAIBANI: Objection. Relevance, calls
 3  for speculation, mischaracterizes the record, and as
 4  whatever. Please go ahead, answer the question.
 5    A  I believe I answered that they would -- it
 6  would be appropriate for them to communicate that
 7  information --
 8  BY MR. RANCK:
 9    Q  I'm asking --
10    A  -- because legally, Chatel has an obligation
11  to Bratton, the customer, not to give him false
12  information. So, in fact, if it was not truly not
13  available and they had actual knowledge of that, they
14  had an obligation to communicate that. Not
15  attributing any that -- trying to be nice guys and
16  don't string him along, I think it's more profound
17  than that.
18    Q  Well, wait a minute. I don't want to -- I
19  want to stop you there for a second, because would it
20  have been appropriate -- would it be appropriate for a
21  real estate professional under that circumstance, like
22  Chatel, to not call Mr. Bratton at all?

                                                    123
 1    A  I didn't say that.
 2    Q  No, I'm asking you that. That wouldn't be
 3  appropriate; would it?
 4    A  No, that would be inappropriate.
 5    Q  Okay. Because you are leading him to
 6  believe that he still has a chance; right?
 7      MR. SHAIBANI: Objection.
 8  BY MR. RANCK:
 9    Q  Isn't that why?
10      MR. SHAIBANI: Vagueness, mischaracterizes
11  the record, calls for speculation. I believe if you
12  have a hypothetical question, you should phrase that
13  rather than to ask a hypo and then pretend as though
14  that's the facts in your follow-up questions, which is
15  what you are doing now.
16      MR. RANCK: I'm not doing that at all. I
17  stipulated here five minutes ago that there was no
18  signed lease, so I don't know how you can say I'm
19  trying to say that there was. I'm not. Okay?
20  BY MR. RANCK:
21    Q  But it would be appropriate for them to
22  contact Bratton Realty and tell them the property has

                                                    124
 1  been leased to somebody else; correct?
 2    A  That's correct.
 3    Q  You said that. Okay. It would be -- would
 4  it be inappropriate for them just to do nothing, or do
 5  they have an affirmative obligation to contact them?
 6  Do you understand my distinction?
 7    A  I understand your -- but a lot would depend
 8  upon whether or not the -- I'm going to go with the
 9  hypothetical in return. Whether or not the signed
10  agreement had some contingencies in it that might
11  cause that signed agreement to collapse in the very
12  near term. Since Chatel is working to the best
13  interest of the seller, they might very well not
14  communicate that information right away.
15    Q  Okay. So what's important is that someone
16  in Bratton Realty's position be told that as accurate
17  the state of events as possible; is that right?
18    A  Yeah, if you're going to make it a black and
19  white situation, it's gone, it's gone. It kind of
20  gone, that's a different story.
21    Q  Did you -- you did see Mary White's
22  deposition, you said?
```