Case 1:06-cv-00694-JDB    Document 49-6    Filed 03/22/2007    Page 1 of 16
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

32 (Pages 125 to 128)

**Page 125**

1  A  Yes.
2  Q  And did you see Thierry Liverman's
3  deposition?
4  A  Yes.
5  Q  If Ms. White chose to pursue negotiations
6  with Roberta Medlin first, what in your opinion should
7  Chatel have done vis-a-vis Mr. Bratton?
8      MR. SHAIBANI: Objection to the extent it
9  doesn't accurately reflect the record.
10     MR. RANCK: It accurately reflects Mary
11 White's testimony.
12 BY MR. RANCK:
13  Q  So assuming that what Mary White testified
14 to, tell me please what your opinion is as to what
15 Chatel should have told Mr. Bratton.
16  A  The broker representing the lessor is not
17 compelled to tell another prospective lessee that the
18 lessor is looking very hard at another proposal, so as
19 not to discourage the prospective lessee to sort of
20 drop his interests and go off somewhere else.
21  Q  Okay.
22  A  While they're in negotiation. You don't

**Page 126**

1  have to share that.
2   Q  Respectfully, that doesn't answer my
3  question. My question was in your opinion, what
4  should Chatel have done, and your answer was --
5   A  In what situation?
6   Q  I just gave you what it was --
7   A  Make the situation?
8   Q  I did, Mr. Lynch.
9   A  Well, then I answered your question.
10  Q  No, you didn't.
11  A  Yes, I did.
12  Q  Let me explain why because we're missing
13 each other.
14  A  Okay.
15  Q  My question was what should Chatel have done
16 if Mary White indicated she was going to pursue
17 negotiations with Roberta Medlin. Your answer was
18 they're not compelled to tell Mr. Bratton that. That
19 doesn't answer what in your opinion they should have
20 done. In your expert opinion, what is the appropriate
21 thing for them to do? To remain silent, or to call
22 him and tell him what's going on?

**Page 127**

1      MR. SHAIBANI: Objection to the extent it
2  mischaracterizes the record and calls for speculation.
3  And it's highly misleading. Again, you're asking
4  hypos and then pretending as though the facts are
5  true.
6   A  I don't see a great difference between
7  should and compel, but I see a great difference
8  between should and could, and what they could have
9  done is any number of things.
10 BY MR. RANCK:
11  Q  Would you agree with me Mr. Bratton --
12  A  The question is what I understand they have
13 done.
14  Q  No, that's not what I'm asking you.
15 Mr. Bratton was antsy to get his lease signed; right?
16  A  Correct.
17  Q  He wanted information; right? Correct?
18  A  Yes.
19  Q  He wanted his lease signed. He was pushing,
20 he was calling Mary White. He may have been calling
21 Chatel; correct?
22  A  Correct.

**Page 128**

1   Q  Okay. And now Chatel has information that
2  the owner is going to pursue negotiations, assuming
3  this is the information they have, assuming Chatel's
4  information the owner is going to pursue negotiations
5  with Roberta Medlin, is it your opinion that Chatel
6  should have kept Mr. Bratton out there and not told
7  him what the status was?
8      MR. SHAIBANI: Same objections.
9   A  I can't get into the mind of Chatel, but it
10 would be Chatel's call to determine whether or not
11 telling Bratton that they're working another deal with
12 no -- they don't have any understanding that it's
13 actually going to work out, are they scaring off a
14 potential lessee for the client?
15 BY MR. RANCK:
16  Q  But if Chatel clears that with Mary White,
17 hypothetically Mary White says I'm going to pursue
18 negotiations with Roberta Medlin, and Thierry
19 Liverman's response to Mary White, hypothetically, is
20 we need to tell Mr. Bratton because he's, you know, he
21 needs to know what's going on, it's only fair to him,
22 and Thierry Liverman calls Mr. Bratton and says the

Case 1:06-cv-00694-JDB   Document 49-6   Filed 03/22/2007   Page 2 of 16
DEPOSITION OF THOMAS LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

33 (Pages 129 to 132)

129

1 property's going to another candidate, do you believe
2 Mr. Liverman, Chatel did anything inappropriate?
3         MR. SHAIBANI: Objection. Calls for
4 speculation. Mischaracterizes the record. Assumes
5 facts not in evidence.
6     A    If Mr. Liverman in your hypothetical told
7 that the property was going to another candidate and
8 understanding that going to another candidate says
9 that it is no way, shape or form available to you,
10 then he should have told Bratton. If that, in fact,
11 was the case.
12 BY MR. RANCK:
13    Q    Let's just play this out a little bit.
14 Would you -- assuming that Mr. Liverman talked, had
15 that conversation with Mr. Bratton that I -- that he
16 said it was going to another candidate based on
17 Ms. White saying that she was going to pursue
18 negotiations with Roberta Medlin, I mean, would you
19 agree with me that -- you would agree he obviously
20 could have been more artful in what he told
21 Mr. Bratton; correct?
22    A    Correct. Might have been more accurate.

130

1    Q    He could -- well, he could have been more
2 specific and perhaps accurate, but based on the
3 information he had, that's arguable, but he could have
4 been more specific with him; correct?
5         MR. SHAIBANI: Same objections.
6     A   Not to make my answer sound difficult, were
7 you talking about -- I think you're combining and
8 making equal, it's an accepted deal with the other
9 party versus we're negotiating. And those are two
10 very different circumstances that require a different
11 response on the part of --
12 BY MR. RANCK:
13    Q    Do you believe --
14    A    In other words, if I don't tell someone that
15 you're out, it's gone, sorry, it's just business,
16 that's way it is, they chose the other people, when,
17 in fact, they hadn't chosen the other people, that's a
18 mischaracterization of what's really happening.
19    Q    My hypothetical is is that he -- that
20 Mr. Liverman said she's going with another candidate.
21 Now, my question to you is there are any number of --
22 assuming that that conversation occurred, is it your

131

1 opinion that Mr. Liverman in conveying that message to
2 Mr. Bratton was engaged in unlawful racial
3 discrimination or discrimination based upon
4 Mr. Bratton's personal appearance, is that your
5 testimony?
6         MR. SHAIBANI: Objection. Assumes facts not
7 evidence, mischaracterizes the record, calls for
8 speculation.
9     A    If, in fact, the property was not under
10 contract with Roberta Medlin, then his
11 characterization of what actually was going on was
12 saying something was unavailable when, in fact, it was
13 still available, and that is one of the principal
14 no-nos as far as dealing with human rights and fair
15 dealing with respect to the D.C. Human Rights Act.
16 BY MR. RANCK:
17    Q    Do you have an opinion, because you said a
18 minute ago, well, more like three or four minutes ago,
19 and I quote, I can't get into the mind.
20    A    I think she has to quote it.
21    Q    I can't get into the mind of Chatel. And my
22 question is are you prepared to testify in federal

132

1 court that Thierry Liverman, when he had that
2 conversation, assuming that conversation with John
3 Bratton, that he was motivated by racism?
4         MR. SHAIBANI: Objection. Assumes facts not
5 in evidence, calls for speculation, mischaracterizes
6 the record.
7 BY MR. RANCK:
8    Q    Is that going to be your testimony,
9 Mr. Lynch?
10    A    My testimony will be that he participated in
11 a prohibited activity under the D.C. human rights act.
12    Q    And you can't say whether it's motivated by
13 racial animus, discrimination based on Mr. Bratton's
14 personal appearance, or just sloppy realtoring by
15 Mr. Liverman; can you?
16         MR. SHAIBANI: Same objections.
17    A    When someone who -- when the issue of race
18 and personal appearance and any one of those other
19 issues come up, when someone engages in a prohibited
20 activity, the perception of discrimination is just as
21 much a cause of action as actually doing it, and
22 that's the way it is.

133

BY MR. RANCK:
Q Okay. A cause of action. It can provide a prospective tenant candidate like Bratton Realty a cause of action; right?
A Correct.
Q But because they can state a claim for discrimination, that doesn't mean that there was actually discrimination; right?
    MR. SHAIBANI: Same objections.
A And it doesn't prevent me from giving an opinion that I believe there was discrimination based on what occurred.
BY MR. RANCK:
Q But you -- all right. But you -- would you agree with me that you are -- you're testifying as to Chatel's motivation, the reason that they said --
A Only because you're trying to get me to testify to the motivation.
Q No, I'm trying to ask. To me, when you're testifying as to that someone did something, they were motivated by racial animus; right?
A Uh-huh.

134

Q Right? You're testifying -- your opinion is -- is -- it gets into their mind. It says what their motivation was; right? The reason that they did certain things; correct?
A Correct.
Q So you are excluding the possibility that they were negligent, that there was a misunderstanding, that all these other things could have occurred, and you are deciding, you are opining, and I guess I'm trying to get to the base of it, how do you opine what's in Thierry Liverman's or someone else at Chatel's head? How do you testify as to why they did something?
    MR. SHAIBANI: Same objections, and I think it's fair to have Mr. Lynch read the portion of this report into the record to clarify.
    MR. RANCK: Well, you can ask him in follow-up if you want. You can ask him whatever you want, but I'm not asking him that right now. So I'm asking --
A I'm opining on the perception that was presented by virtue of the words and actions of Chatel

135

vis-a-vis Bratton, the availability, the unavailability of the property, and the fact that he is African-American, the fact that he did have a -- his personal appearance being what it is. That's not only enough for Mr. Bratton to bring a cause of action, it's enough for someone looking at the thing and saying it sure looks like an issue of discrimination, or a more strong word, animus.
BY MR. RANCK:
Q Is it fair then, more fair to characterize your opinion not that there was racial discrimination, because that gets into the thought process of the defendants, but rather that their conduct certainly allows for the perception that there was discrimination based on these facts?
    MR. SHAIBANI: Objection. Mischaracterizes prior testimony.
    MR. RANCK: I asking. No, I'm asking him his opinion.
BY MR. RANCK:
Q Is that a more accurate way to capture your opinion that based on these facts, it can certainly be

136

perceived that there was discrimination, but -- or do you have a way of knowing and opining to a reasonable degree of certainty that these defendants were motivated by racism?
    MR. SHAIBANI: I will object also on the grounds that this calls for a legal conclusion as to what's required under the law to qualify as discrimination, which is what you're asking him.
    MR. RANCK: No, I'm not.
BY MR. RANCK:
Q Can you answer my question, please?
A I'll answer it again saying the perception of discrimination here of the prohibited act of stating something that was unavailable was not -- that is -- that was still available, and that mischaracterization offers a very strong perception of discrimination. I'm not trying to get into anybody's mind, but I'm just saying it's reasonable for me to see that from, you know, being the fly on the wall, listening to the conversation or watching the actions to say this looks like discrimination to me, and I'm afraid that the burden is on Chatel to show that it's

**Page 137**

1 not.
2 Q If John Bratton were white, you would not be
3 offering the opinion that Chatel discriminated against
4 him because he was white. Based on exactly the same
5 facts alleged in the complaint and everything you've
6 reviewed, you wouldn't conclude that they were
7 discriminating against him because he's white; would
8 you?
9     MR. SHAIBANI: Objection. Assumes facts not
10 in evidence.
11   A I don't think it matters what your race is.
12 If -- is there -- the whole idea of having a list of
13 prohibited activities together with protected classes
14 is to say that these prohibited activities have been
15 identified as the kinds of things that happen to
16 people for whom this legislation was created.
17 Guarantee you, although I firmly believe that race,
18 the protection of race, protects me. I'm equally
19 protected under the D.C. human rights act as anybody
20 else.
21     But the entire intent of the council, the
22 D.C. City Council in creating the D.C. Human Rights

**Page 138**

1 Act of 1997 and the first paragraph said it is the
2 intent of the council is to put an end to
3 discrimination in the District of Columbia save for
4 personal issues. In other words, discriminating
5 against people because they belong to a group. If I
6 have lousy financing, I don't get the loan, that's not
7 considered discrimination.
8 BY MR. RANCK:
9   Q Would you look at the last line on page 5 of
10 your report, please?
11   A Okay.
12   Q You say that, and I'm going to use, what do
13 you call, an ellipsis? Defendants in the last
14 paragraph, defendants stripped John Bratton of these
15 rights, and then referring down to the last line, when
16 they requested financial information, paren, income
17 tax returns and bank statements, not requested of a
18 white prospective tenant. Do you see that?
19   A Correct.
20   Q Are you of the opinion that Chatel stripped
21 Mr. Bratton of some right or discriminated against him
22 when they did this?

**Page 139**

1     MR. SHAIBANI: I'll object again on the
2 basis that this is only reading a portion of a
3 sentence and not its entirety.
4   A Chatel was the agent of Mary White. Maybe
5 someone else can separate what was Chatel's idea and
6 what was White's idea and so on and so forth, what
7 they did with respect to the other prospective lessee,
8 and what they requested of Mr. Bratton, the additional
9 terms and conditions that we call, you know, barriers.
10 I'm focusing on this as well on the same thing.
11 BY MR. RANCK:
12   Q The financial. Do you have any information
13 that Chatel requested Mr. Bratton's tax returns? Or
14 do you know who requested them?
15   A It matters not to me right now whether Mary
16 White requested them or Chatel requested them. The
17 fact of the matter is, I think, in terms of the
18 negotiating with John Bratton, Mary White and Chatel
19 as client and agent were joined at the hip.
20   Q Do you know when the tax returns were
21 requested? I mean, it's -- let me cut through it.
22 It's 4:10 on a Friday. Let me shorten it a little

**Page 140**

1 bit. Gordon Forester, Mary White's attorney requested
2 Mr. Bratton's tax returns; correct?
3   A Correct.
4   Q Mr. Bratton testified that by the time
5 Gordon Forester got involved, Chatel was out of the
6 picture; right?
7     MR. SHAIBANI: That's -- I'm objecting on
8 the basis that it mischaracterizes the deposition
9 testimony and the record.
10 BY MR. RANCK:
11   Q Well, isn't that your understanding, Mr.
12 Lynch?
13   A My understanding is that Chatel was never
14 entirely out of the picture. Their documents were
15 being used, they still had it listed, they were still
16 agents for that property. That property was still a
17 listed property is my understanding.
18   Q What facts do you have, or tell me all the
19 facts you have as to what Chatel's involvement in this
20 transaction was after October the 13th.
21     MR. SHAIBANI: I'll object on the basis that
22 the record speaks for itself.

**141**

1   A   Regardless of, regardless of, what's his
2   name, Gordon Forester's involvement, it's not unusual
3   that a prospective lessee or lessor ask one's personal
4   attorney to get involved in the lease. It doesn't
5   take Chatel entirely out of the picture, because they
6   are still agents.
7   BY MR. RANCK:
8       Q   If something happened against -- if
9   something happened to Mr. Bratton after Chatel --
10  after October 13, when Chatel was no longer dealing
11  with Mr. Bratton, if somebody at Gordon Forester did
12  something that Mr. Bratton alleges is discriminatory,
13  is it your opinion that Chatel is somehow responsible
14  for that, that that conduct becomes conduct of Chatel?
15          MR. SHAIBANI: Objection.
16      A   I don't know what communications and
17  conversations Forester might have had, but I would say
18  it certainly lessens Chatel's issues.
19  BY MR. RANCK:
20      Q   Tell me what discriminatory acts Chatel
21  engaged in after October 13 in your opinion.
22      A   I think they did the most significant damage

**142**

1   probably on the 12th.
2       Q   That wasn't my question, however. My
3   question was after October 13, which as far as I
4   understand the record is the last contact between John
5   Bratton and Chatel, you tell me what discriminatory
6   acts in your opinion Chatel engaged in.
7       A   I don't know of any after the 13th that just
8   jump into my mind at all.
9       Q   Are you aware of any on the 13th?
10      A   No.
11      Q   So the last act in your opinion that Chatel
12  engaged in that was discriminatory was on October 12
13  when Mr. Liverman, I presume, called Mr. Bratton? Is
14  that your testimony?
15      A   I would say that's a very big issue. One
16  thing I do not -- I'd have to dig this thing out as to
17  whether or not Chatel made any -- when and if they
18  made any changes as to the availability of the
19  property on the 12 to -- 12- to 48-month program. I
20  mean, they still had control of what was basically put
21  out there to the buying -- not the buying, excuse me,
22  the leasing public and also to -- and obviously to

**143**

1   brokers who subscribe to the MRIS system. So the --
2       Q   But assuming --
3       A   That continued after. That's what I'm
4   saying.
5       Q   Assuming that Chatel did not promptly remove
6   the property from MRIS.
7       A   Or change whatever terms that were
8   supposedly important terms that were not going to be
9   accepted.
10      Q   Your opinion would be that was in error;
11  correct?
12      A   Yeah, I would, I would.
13      Q   But your opinion wouldn't be that that was
14  somehow discriminatory.
15      A   Well, only in the sense that, if I'm John
16  Bratton and I'm looking at -- it's still staying this
17  in the computer, is that just for somebody else, and
18  it's a different program for me. This is --
19      Q   But that's not active discrimination against
20  Mr. Bratton. That would just, in Mr. Bratton's mind,
21  I presume, evidence the discrimination that had
22  occurred. They told me the property was leased, but

**144**

1   it's still open.
2           MR. SHAIBANI: Objection.
3   BY MR. RANCK:
4       Q   Right?
5       A   Yeah. I think someone's negligence or
6   mistakes could be interpreted as discrimination.
7       Q   Well, could be interpreted or is equivalent
8   to?
9           MR. SHAIBANI: Objection.
10  BY MR. RANCK:
11      Q   Is negligence in your view equivalent with
12  discrimination?
13          MR. SHAIBANI: Objection. Calls for a legal
14  conclusion. You don't have to answer that question.
15      A   No.
16          MR. RANCK: Of course he does, Mr. Shaibani.
17          MR. SHAIBANI: No, he doesn't have to answer
18  that question. That's a legal conclusion.
19  BY MR. RANCK:
20      Q   All right. Is the breach of the standard of
21  care for real estate professionals equivalent in your
22  opinion to discrimination?

Page 145

1  A   It depends on the circumstances in which the
2  breach occurred.
3  Q   So it's not always; right? You can have a
4  breach of the standard of care that's not
5  discriminatory, obviously.
6  A   I have a hard time saying always.
7  Q   Right, correct. If you could flip to page
8  10 of your report, please. Looking at the second
9  paragraph on page 10. The third line. It indicates
10 when plaintiff inquired as to whether Chatel had a
11 blank lease agreement, Mr. Pagones stated I don't have
12 a lease. Do you see that?
13 A   I do.
14 Q   Okay. Do you have any information, any
15 facts to suggest that that's not true, that what
16 Mr. Pagones said when he said I don't have a lease is
17 not true?
18     MR. SHAIBANI: Objection as vague.
19 A   I think that if he said he didn't have a
20 lease, that it could be certainly interpreted I don't
21 have a lease. The other party might say I don't have
22 a lease for you, but, you know, could he be without a

Page 146

1  lease and it appears that there's enough stuff that
2  the -- John Pagones although he was the listing agent
3  and this was his property, it certainly appeared that
4  he wasn't prepared to lease it if somebody came along
5  and wanted to lease it.
6  BY MR. RANCK:
7  Q   But my question is is do you have facts to
8  suggest that he was lying, that his statement I don't
9  have a lease was untrue at the time he uttered it on
10 October 6?
11 A   No. No.
12 Q   All right. So him telling Mr. Bratton I
13 don't have a lease, if that was true, he didn't have
14 access to a lease, then there's no discrimination with
15 regard to that statement; right?
16 A   If that's in fact the case.
17     MR. SHAIBANI: Objection.
18 BY MR. RANCK:
19 Q   All right. On the next page, the top line,
20 it says when Mr. Bratton next inquired as to whether
21 John Pagones had a rental application available, Mr.
22 Pagones stated he did not have one. Okay? Now,

Page 147

1  hypothetically, assume Mr. -- assume that John Bratton
2  did not ask Mr. Pagones for a rental application. Was
3  Mr. Pagones discriminatory in not providing him with
4  one?
5      MR. SHAIBANI: Objection. Calls for
6  speculation. Assumes facts not in evidence.
7  A   It would have to be determined how
8  Mr. Pagones generally conducted himself when someone
9  came in and said I wanted to lease something, if he
10 routinely said to people, well, first thing we need is
11 an application. And that's pretty customary in the
12 industry.
13 BY MR. RANCK:
14 Q   If Mr. Pagones were to testify that his
15 practice was I give an application at the same time I
16 give a lease, and I didn't give an application, I
17 didn't have a lease available, and this gentleman
18 never asked for an application, assuming that those
19 were the facts, you would agree that there's no
20 discrimination in not providing an application;
21 wouldn't you?
22     MR. SHAIBANI: Objection.

Page 148

1  A   And he's never offered an application to
2  anybody else unsolicited.
3  BY MR. RANCK:
4  Q   Are you saying -- I though we could almost
5  never say never. You saying if he's ever done it in
6  his 40-year career, then his failure to provide an
7  unsolicited application to John Bratton is
8  discriminatory? Is that what your testimony is?
9      MR. SHAIBANI: Objection.
10 A   No, no, that's not my testimony.
11 BY MR. RANCK:
12 Q   So if Mr. Pagones testified that his
13 practice is to provide the application and lease at
14 the same time, he was asked for a lease and he didn't
15 have one, so he wasn't asked for an application, it
16 didn't occur to him to give one, that's not in
17 accordance with his general practice, then you would
18 agree no suggestion of discrimination there; right?
19     MR. SHAIBANI: Objection. Assumes facts not
20 in evidence.
21 A   To someone who might think that he was being
22 discriminated, it could be a suggestion of

LYNCH
JANUARY 9, 2007

38 (Pages 149 to 152)

**Page 149**

1  discrimination, but may not bear out to be
2  discrimination if John Pagones can prove that this is
3  the way he always did it.
4  BY MR. RANCK:
5     Q   All right. Let me take out the word
6  suggestion. Assuming those same facts in
7  Mr. Pagones's testimony, if you assume those facts to
8  be true, you can't opine that he discriminated by not
9  providing an application; can you?
10       MR. SHAIBANI: Objection. Assumes facts not
11 in evidence.
12    A   If we're saying that he -- it was not his
13 normal business practice to offer an application, and
14 he didn't offer it this time, not offering an
15 application may well stand up for John Pagones.
16 BY MR. RANCK:
17    Q   I'm trying to get you to use specific words.
18 My question was you can't opine that he discriminated
19 if those facts are true; can you?
20    A   No.
21    Q   Okay.
22       MR. SHAIBANI: Same objections as before.

**Page 150**

1     A   Yeah.
2  BY MR. RANCK:
3     Q   All right. And is the same thing true if
4  Mr. Pagones is also -- that my practice is to take,
5  and in general policy in the office, is to take
6  applications, leases and security deposits first
7  month's rent checks all at the same time in one
8  package, and that's why I did not accept Mr. Bratton's
9  or Bratton Realty's checks that were proffered, if
10 those facts are true, you can't opine that he
11 discriminated; can you?
12       MR. SHAIBANI: Objection. Assumes facts not
13 in evidence.
14    A   Well, the biggest problem I have with that
15 is that John Bratton produced checks, here's the
16 money. You know, what else do I need to do to get you
17 to start this process for me, get things rolling?
18 BY MR. RANCK:
19    Q   No. I mean, do you have any facts to
20 suggest that's what he said, because my understanding,
21 you tell me if you disagree, is Bratton wanted to do
22 a -- according to Mr. Pagones, if these facts are

**Page 151**

1  true, assuming the -- this is my hypothetical.
2  Assuming these facts are true, John Bratton asked for
3  a lease, Mr. Pagones said I don't have one available
4  to me right now. Thierry Liverman has them, and I
5  don't have his pass code. Okay? Mr. Bratton didn't
6  ask for an application, Mr. Bratton did offer to try
7  to leave two checks but my practice and our office
8  practice is to accept all those documents, the
9  application, the lease and the checks all at once for
10 a variety of reasons, so I declined, expecting to
11 provide Mr. Bratton with the materials the next day,
12 and accept his package all at once. If those are the
13 facts, you can't opine that he was discriminating
14 against Mr. Bratton; can you?
15       MR. SHAIBANI: Objection. Assumes facts not
16 evidence and mischaracterizes the record.
17    A   If the facts as you present them are such,
18 then I would not.
19 BY MR. RANCK:
20    Q   Bear with me one second, please.
21       There is certainly no discrimination arising
22 from a policy, assuming one exists, that Thierry

**Page 152**

1  Liverman the broker needs to know about and provide a
2  commercial lease; is there?
3     A   No.
4        MR. SHAIBANI: Would you repeat the
5  question, please?
6        MR. RANCK: He answered it.
7        MR. SHAIBANI: Well, I'm going to raise an
8  objection because I didn't even hear the question.
9  BY MR. RANCK:
10    Q   The question is is there's no discrimination
11 in a policy if one exists that Thierry Liverman as the
12 broker provided to know about any commercial lease.
13 The answer was no, there's no discrimination; correct?
14    A   Per se, no.
15    Q   Did you read Barrett Anderson's deposition
16 you said, or no?
17    A   I think I read a portion of it.
18    Q   Did you see the part where he testified that
19 he tried to get a commercial lease from Chatel and
20 wasn't able to get one? Did you see that?
21    A   I don't specifically recall, but let's
22 assume that it was there.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

Page 153

1  Q  Okay.
2  A  I mean, let's assume that --
3  Q  You wouldn't opine that Chatel was
4  discriminating against Mr. Anderson, a white man, by
5  not providing him that commercial lease; would you?
6      MR. SHAIBANI: Objection on relevance
7  grounds. Anderson was never trying to lease property.
8  BY MR. RANCK:
9  Q  Well, I don't know that.
10  A  Well, it appears that Anderson was trying to
11  get a document and having difficulty getting a blank
12  document.
13  Q  You would agree that he appeared to have the
14  same difficulty that Bratton Realty had getting that
15  blank lease the first time he asked for it; correct?
16      MR. SHAIBANI: Objection. Assumes facts not
17  in evidence, mischaracterizes the record.
18  A  Yeah, but I would also characterize that not
19  making it available perhaps to Anderson is less of an
20  issue than not making it available to someone standing
21  in front of you who actually does want to rent, rather
22  than someone who is interested in collecting a

Page 154

1  document form that you have. People ask me for forms
2  all the time, and I'm saying I'm sorry, I'm not in the
3  business of providing forms. If you want to sit down
4  and negotiate a lease, then we'll, you know, we'll get
5  out the appropriate forms. So there is a distinction.
6  BY MR. RANCK:
7  Q  What do you understand John Pagones's level
8  of experience with commercial lease transactions to
9  be.
10  A  Apparently not very deep.
11  Q  Does his lack of experience impact your
12  opinions at all?
13      MR. SHAIBANI: Objection.
14  A  Well, I'll tell you how I go to his lack of
15  experience. The type of --
16  Q  Well, can you answer the question first and
17  then explain?
18  A  All right. Ask the question, I'll give you
19  a yes or no, but.
20  Q  Sure.
21  A  Ask it again, please, so --
22  Q  Does his lack of experience impact your

Page 155

1  opinions at all?
2      MR. SHAIBANI: Objection.
3  A  I could answer that question if you clarify.
4  Does it -- and this is what you mean, but it's not
5  what you said. Does his lack of experience in
6  commercial leasing.
7  BY MR. RANCK:
8  Q  Yeah.
9  A  The experience part, I'm not denying John's
10  experience.
11  Q  No. The reason that my follow-up question
12  didn't have that is originally I asked as an immediate
13  follow-up to the prior commercial question.
14  A  Understood. Understood.
15  Q  Does a lack of experience in commercial
16  lease transactions impact your opinions at all?
17  A  No.
18  Q  Does it impact your view as to the reasons
19  he acted in the way in which he did?
20      MR. SHAIBANI: Objection. Vagueness.
21  A  Does it impact my reasons or his reasons?
22  BY MR. RANCK:

Page 156

1  Q  His. I mean, you believe -- you tell me, if
2  you can, what John Pagones did that was
3  discriminatory.
4  A  Or what appeared to be discriminatory.
5  Q  No, sir. And this is what happened a little
6  bit of a problem. A distinction here. If your
7  opinion is limited to what appeared to be
8  discriminatory, then I'm absolutely fine accepting
9  that, and we can talk about what appeared. Do you
10  have any opinions in this case that Chatel was
11  discriminatory?
12      MR. SHAIBANI: Objection. To the extent the
13  record speaks for itself, and asked and answered
14  previous in a deposition.
15  A  Yes, I do.
16  BY MR. RANCK:
17  Q  Okay. Tell me what conduct was
18  discriminatory in your view. To a reasonable degree
19  of real estate certainty.
20      MR. SHAIBANI: Objection. Asked and
21  answered.
22  A  Now to go back to my original answer to a

**Page 157**

similar question, the -- stating a property to be unavailable that was available is the -- is a principal issue. The sum of all the other little things that happened tend to have the effect of gilding the lily of that particular infraction.

BY MR. RANCK:

Q All right. Would you agree with me that probably many real estate professionals have misrepresented the availability of a property?

MR. SHAIBANI: Objection. Calls for speculation. Assumes facts not in evidence and relevance.

BY MR. RANCK:

Q You'll acknowledge that; won't you?

A Has the availability of property been misrepresented by other Realtors?

Q Many, many, many times.

MR. SHAIBANI: Same objections.

A Yes, and it can also be misrepresented innocently.

BY MR. RANCK:

Q Yes, exactly. In fact, most of the time --

**Page 158**

would you agree that most of the time, the misrepresentation of the availability of a property is attributable to either an innocent misrepresentation, a miscommunication as to the availability?

A No.

Q You wouldn't.

A No.

Q What would you attribute most of the misrepresentations as to availability of property to be attributable to?

MR. SHAIBANI: Same objections.

A I would say misrepresentation of availability of property is a very common ploy in a discriminatory practice.

BY MR. RANCK:

Q That's not my question, sir. You've acknowledged that many -- that the availability of property has been misrepresented many times throughout the real estates profession; correct?

A Correct.

Q My question isn't whether it's common to discrimination. I'm asking most of the time what's it

**Page 159**

called. what can it be attributable to?

MR. SHAIBANI: Objection. Calls for speculation. Assumes facts not in evidence.

A I can't say what most of the time it's attributed to.

BY MR. RANCK:

Q There are a lot of innocent mistakes; correct?

MR. SHAIBANI: Same objections.

BY MR. RANCK:

Q With regard to the representation of -- the misrepresentation of the availability of property; right?

A It certainly can be.

Q Right. I mean, many times Realtors don't take it off the MRIS as promptly as they should; right?

MR. SHAIBANI: Same objections.

A That's correct.

BY MR. RANCK:

Q Right? In fact, certain regulatory bodies have now instituted rules on how promptly you're

**Page 160**

supposed to do it; right?

A Those rules were in place before. I mean, it's a violation to have something appear to be available that's not available and unavailable that is available.

Q Right. And many times, the misrepresentation of availability is innocent, you said, and would you agree also that many times it's just due to sloppiness, incompetence, at least with regard to that transaction?

MR. SHAIBANI: Same objections.

A I would say that many times it's attributable to mistake, sloppiness and many times outright discrimination.

BY MR. RANCK:

Q Have you ever done any studies with regard to the number of the percentage of times a property is misrepresented, property's availability is misrepresented and the various reasons for the misrepresentation?

MR. SHAIBANI: Objection on relevance. What relevance does that have with this case? I mean, what

161

1 studies? I mean, are you telling me --
2     MR. RANCK: That appears to be the crux of
3 his opinion. If this misrepresentation was due to
4 discrimination and I'd like to know if he's familiar
5 with out of a number of times a property is
6 misrepresented what the causes are.
7     MR. SHAIBANI: What are we are talking about
8 this case and the total facts presented, not about
9 some social study that may or may not have been
10 conducted.
11 BY MR. RANCK:
12  Q   Are you familiar with any such studies?
13  A   I cannot give you a specific study, but I
14 have seen a lot of studies where the -- in cases where
15 the most common way to discriminate was to declare
16 something to be not available, when, in fact, it was
17 available, not available to party A, but available to
18 party B. And then there's enough -- there's plenty of
19 that in the court records.
20  Q   Do you if you find out that another real
21 estate professional has acted in a discriminatory
22 fashion, that would be unethical, I presume?

162

1  A   Illegal and unethical.
2  Q   Okay. Do you as a real estate professional
3 have some obligation to report them to somebody if you
4 know they've done that?
5  A   I do.
6  Q   Have you reported anybody in connection with
7 this transaction?
8     MR. SHAIBANI: Objection. Relevance.
9  A   I don't believe that the -- that involved in
10 this transaction this is the appropriate time for me
11 to report it. It's not a --
12 BY MR. RANCK:
13  Q   So the --
14  A   Being involved in a case or being involved
15 in an investigation or a study or a grievance
16 committee or a professional standards or an ethical
17 hearing, being aware of that through some professional
18 capacity doesn't necessarily require that I report
19 this to the real estate board. The real estate --
20 there's a requirement of the real estate board
21 fundamentally to report lack of protection of the
22 public primarily to fraud and misrepresentation, and

163

1 there's a case of misrepresentation here. Having come
2 to this as part of an active lawsuit, I don't feel
3 that I am required any more than a director or a
4 hearing judge or anyone else working on the
5 investigation through a grievance committee is
6 compelled while the process is going on to make this
7 report to the real estate board, according to 26.
8  Q   What's the purpose of that rule, requiring
9 one real estate professional to turn in another one
10 when they have information that somebody is
11 misrepresented? To protect the public?
12  A   The whole reason for anything to deal with
13 is to protect the public. The raison d'etre of the
14 real estate board and the rules.
15  Q   You were in the process of identifying all
16 the acts of discrimination that Chatel engaged in and
17 then you said the availability of the property and the
18 sum total of something.
19  A   Well, not having a lease, not --
20  Q   Wait a minute. Let me stop you for a
21 minute. How is not having a lease discriminatory?
22 You mean, if they had a lease but refused to provide

164

1 it to Mr. Bratton, it's discriminatory.
2  A   Correct.
3  Q   But you don't have any information that they
4 actually and Mr. Pagones actually had a lease
5 available to him on the 6th; right?
6  A   A discrimination case can be brought if I am
7 the object of being told we don't have a lease, and
8 whatever else has happened is -- only adds to my sense
9 of frustration, you don't take my checks, I'm really
10 trying to show that I am in the most sincere person in
11 the world, here I am writing checks, what else do I
12 have to do to get this property? I want it, and I
13 want it now.
14  Q   And he delivered the package the next day,
15 and Chatel delivered it to the owner; right?
16  A   Right.
17  Q   And Mr. Bratton submitted a second lease the
18 following Monday, and Chatel immediately delivered
19 that to the owner; right? Monday the 10th.
20  A   It was certainly faxed about yeah, the 10th,
21 yeah. The three copies of the -- the three versions
22 of the 10th.

165

1   Q   The owner indicated that she needed it on a
2   Chatel form lease; right?
3   A   Yeah.
4   Q   And so that same day the form lease was sent
5   to Mr. Bratton by Chatel; right?
6   A   Yes.
7   Q   And Mr. Bratton filled it out and sent it
8   back to Chatel on the next day, the 11th; right?
9   A   Okay.
10  Q   Yes?
11  A   Yes.
12  Q   And the very next day, Thierry Liverman, the
13  broker met with the owner to choose between the
14  various leases; correct?
15  A   That's correct. The owner and Thierry met
16  on the 12th.
17      MR. RANCK: Bear with me one second, please.
18  Bob, you still okay?
19      MR. BOUSE: Yeah. You want to take a break?
20  How long are we going to go tonight?
21      MR. RANCK: I don't -- I'm trying to -- I'm
22  trying to finish up.

166

1       MR. BOUSE: I understand, but I'm going to
2   have, I don't know, maybe an hour and a half, two
3   hours?
4       MR. RANCK: Well, I'm going to suggest that
5   we do that by phone like we did the other ones, and
6   that way -- can you -- do you have the ability to do a
7   deposition by telephone?
8       THE WITNESS: I can use the phone.
9       MR. RANCK: Well, I wasn't allowed to come
10  to your office house, so I don't know what your
11  facilities are like. Well, let me go a few more
12  minutes, Bob, and we'll see where we are.
13      MR. BOUSE: Good. Do you want to take a
14  break, or how about the court reporter?
15      MR. RANCK: Do you mind a few more minutes?
16  I'd prefer to take a few more minutes, and stop than
17  take a break and then -- is that okay? Does anybody
18  object to stopping at 5:00?
19      MR. SHAIBANI: I'm objecting to a second day
20  of depositions. If you intended to take a lengthy
21  deposition, you could have scheduled in the morning.
22      MR. RANCK: No, I had court this morning.

167

1   We asked for dates from everybody. We did go back and
2   forth and cooperated. I mean, if you think Judge
3   Bates is going to say we can't finish your expert's
4   deposition, we'll take it up at the status conference
5   on Tuesday. But, respectfully, I don't think there's
6   any -- he's told us to work these things out.
7       MR. SHAIBANI: Yes, but working it out to
8   your convenience is a way of you working it out. I've
9   always finished my depositions the same day --
10      MR. RANCK: Whatever.
11      MR. SHAIBANI: -- and you have taken two
12  days of depositions for the plaintiff, and now you
13  want to take two days of depositions of our expert,
14  and this results in my waste of time in this.
15      MR. RANCK: It's not two days. This is only
16  a half a day. You're going to spend the same amount
17  of time, whether it's over a one-day period or two-day
18  period.
19      MR. SHAIBANI: Now I'm not. You were the
20  one who wanted to have two depositions the same day
21  when it came to Chatel's witnesses. You're now
22  calling for separate days --

168

1       MR. RANCK: But you weren't able -- I'm not
2   going to bicker with you.
3       (Discussion off the record.)
4       (Lynch Deposition Exhibit Numbers 5 and 6
5   were marked for identification and retained by
6   counsel.)
7   BY MR. RANCK:
8   Q   Mr. Lynch, at page 10 of your report, you
9   begin going through what you caption as Chatel's
10  discriminatory treatment of John Bratton. Do you see
11  that? Do you see that?
12  A   Yes.
13  Q   And you break it down into five
14  subcategories. The first appears on page 10, and
15  that's failure to provide a blank lease and rental
16  application. Do you see that?
17  A   Yes.
18  Q   And have we -- and take as much time as you
19  need to look at this, but have we discussed your
20  opinions with regard to those issues, or is there
21  something else that you need to offer at this time?
22  A   On A through whatever?

**169**

1   Q   Just A.
2   A   What I would add to what we've said before
3   is that we had discussions about I have a lease, I
4   don't have a lease. Any one of these issues on its
5   own merits may not seem like a big deal. The synergy
6   created with -- the combination of things can create,
7   at least in the mind of Mr. Bratton, a great deal. As
8   I said earlier, I mentioned the aggregate. That's
9   just making sure that that's -- this didn't happen
10  this day, that's one thing. If this didn't happen
11  another day, that's something else. This didn't
12  happen a third day, it's something else. I
13  triangulate, it becomes another issue. That's what I
14  opine.
15  Q   Okay. If Mr. Pagones had lied to
16  Mr. Bratton, had Mr. Bratton asked for a rental
17  application and Mr. Pagones untruthfully said I don't
18  have one, that would obviously be wrongful conduct;
19  you would agree with that obviously; right?
20  A   Correct.
21  Q   All right. That wouldn't necessarily,
22  though, be discriminatory; correct?

**170**

1       MR. SHAIBANI: Objection.
2   BY MR. RANCK:
3   Q   Unless Mr. Pagones' motivation for lying was
4   due to Mr. Bratton's skin color or personal
5   appearance; right?
6   A   All I can say is it could be or could be
7   not. And then I can't say anything other than that.
8   BY MR. RANCK
9   Q   Okay. The next subcategories on page --
10  appears, begins on page 11, and that's failure to
11  provide information about the property. If
12  Mr. Pagones responded to the best of his ability to
13  the questions posed by Mr. Bratton, then you would
14  agree there's no discrimination; correct?
15      MR. SHAIBANI: Objection.
16  A   I would almost answer this the same way as I
17  answered the previous one, that if he didn't have
18  information, and that was all, then it wouldn't seem
19  like such a big deal. However, you brought up the
20  issue of standard of care earlier. I find it hard to
21  imagine that the listing agent doesn't have this
22  information.

**171**

1   BY MR. RANCK:
2   Q   Well, what information?
3   A   Whatever information, you know, that --
4   Q   Well, I'm asking you. You find it hard to
5   fathom that the listing agent --
6   A   I find it hard to fathom that John Pagones
7   was as ill prepared for this transaction as he
8   appeared to be.
9   Q   What facts do you have that suggest he was
10  ill prepared?
11  A   I don't have a lease.
12  Q   Okay, now --
13  A   It's like saying I'm selling you a property,
14  but I don't have a piece of paper that I can use to
15  sell it.
16  Q   What's your recollection as to how many
17  lease transactions Mr. Pagones -- commercial lease
18  transactions Mr. Pagones had been involved in over the
19  course of his career?
20      MR. SHAIBANI: Objection. Relevance.
21  A   He indicated he had perhaps as few as two.
22  BY MR. RANCK:

**172**

1   Q   Okay.
2   A   However, I think we're making an awful lot
3   about this as a commercial lease. This is a pretty --
4   this is not that much more complicated than renting an
5   apartment. We're not talking about a law firm leasing
6   40,000 square feet at Franklin Square. We're not --
7   this is not in any way, shape or form a complicated
8   lease that's beyond someone of Mr. Pagones's
9   experience in the world of real estate.
10  Q   Do you have an understanding as to whether
11  Chatel keeps their form leases laying around available
12  to all the agents?
13  A   It's my understanding they have, and getting
14  less, or having less frequently now, what was always
15  called the closet.
16  Q   But do you have any understanding as to
17  whether form commercial leases were ever kept in that
18  closet? Chatel form commercial leases?
19  A   It seems to indicate that there was more
20  control of the form leases, but at the same time, I
21  would expect of a leasing agent, and if I'm leasing,
22  I'm \going to\go together be leasing a commercial

Case 1:06-cv-00694-JDB    Document 49-6    Filed 03/22/2007    Page 13 of 16
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

44 (Pages 173 to 176)

173

1 property, I would have a copy of the form lease.
2 Granted it may not go anywhere until Mr. Liverman
3 reviewed it after the leasing agent, whoever he or she
4 might be prepared the initial --
5    Q   But I guess my question is is you said
6 something about control of the form lease, and I
7 didn't understand what you meant. But my question is
8 is are you aware of any facts in any of the material
9 you've reviewed in this case that suggest that
10 Mr. Pagones did have a commercial lease available to
11 him? Putting aside whether he should have, did he
12 have?
13    A   No, no, I think I answered that question
14 earlier. I mean, and if he honestly said he didn't
15 have it, he may well not have had it. But just
16 assuming that he told the truth. And, you know, I
17 can't come in there and say that he had one in his
18 back pocket, but he was not going to show it. I am,
19 as I've expressed before, somewhat chagrined by the
20 lack of preparation, which may just be a lack of
21 preparation, but to someone on the other side, it can
22 be interpreted an entirely different way, i.e,

174

1 Mr. Bratton.
2    Q   Do the various statutes, 1981 and 2 and the
3 fair housing, the D.C. versions of those statutes that
4 we're dealing with in this case, do they prohibit
5 discriminatory conduct, or conduct that can be
6 perceived as discriminatory?
7       MR. SHAIBANI: Objection. Calls for a legal
8 conclusion, and I'm instructing him not to answer that
9 question.
10      MR. BOUSE: How can you do that? He's not
11 your client.
12      MR. SHAIBANI: Yes. This is it a legal
13 conclusion, and you cannot -- the instructions from
14 the court will advise the jury what's required to
15 prove the case, not Mr. Lynch's testimony, doesn't say
16 anything about appearance versus reality.
17      MR. RANCK: Are you then prepared to
18 withdraw all of the portions of your expert's report
19 where he lays out what the law is and what's
20 prohibited?
21      MR. SHAIBANI: No. Those portions cite
22 specific statutes and most of them are COSIF.

175

1 BY MR. RANCK:
2    Q   All right. I'm asking you as a real estate
3 professional your understanding. I'm not asking you
4 what the law does, I'm asking as a real estate
5 professional, is it your understanding that these acts
6 prohibit you as a real estate professional from
7 engaging in discriminatory conduct or conduct that
8 might be perceived as discriminatory?
9    A   I think it's both.
10   Q   How does one avoid -- so you believe that as
11 a -- strike that.
12      You believe as a real estate professional
13 you are prohibited from engaging in conduct that
14 someone might perceive as discriminatory.
15   A   I believe that one can -- one can engage in
16 activity that someone else may well perceive as being
17 discriminatory, and whether it is or not, I still have
18 to defend myself against that perception.
19   Q   Okay. Do you agree that that is exceedingly
20 broad and open-ended, I guess, in terms of exposing
21 the real estate professional to suit, discipline,
22 because we can't control how others perceive our

176

1 conduct? Do you agree with that statement?
2      MR. SHAIBANI: Objection.
3    A   It's exceedingly broad, it's exceedingly
4 dangerous. It's inherently risky to be in this
5 business under those circumstances, and others, and
6 that's why companies will have policies and
7 procedures, documentation, documentation, knowing full
8 well that you may be faced with the situation of
9 disproving the claim by showing that you didn't do it.
10 BY MR. RANCK:
11   Q   Okay. It's --
12   A   And that's complicated.
13   Q   It's exceedingly dangerous and everything
14 you said because you could have to defend yourself
15 from allegations that you discriminated based upon the
16 other person's perception of what happened; right?
17   A   Absolutely.
18   Q   Even if their perception is wrong.
19      MR. SHAIBANI: Objection.
20   A   Correct.
21 BY MR. RANCK:
22   Q   So would you agree with me that -- well --

**Page 177**

1 would you agree with me that often the perceptions by
2 the people that think they're discriminated against
3 are wrong?
4    MR. SHAIBANI: Objection. Relevance. Calls
5 for speculation. Assumes facts not in evidence.
6    A   I don't think I can answer to a
7 quantitative. I certainly there's a qualitative
8 affirmative.
9 BY MR. RANCK:
10   Q   You teach courses in this area; correct?
11   A   I do.
12   Q   And part of the purpose of your teaching the
13 courses is to educate real estate professionals as to
14 how to avoid claims such as this; correct?
15   A   Correct.
16   Q   And is part of your curriculum or your --
17 the lecture, the course materials, do you explain or
18 try to make clear to your students, whoever you're
19 teaching, that their conduct can be misperceived, and
20 that's why they need to make an extra step to protect
21 themselves?
22   A   Absolutely.

**Page 178**

1    Q   So you explain to them that even though that
2 they might not have been discriminating against
3 somebody, they could nevertheless be subject to a
4 discrimination suit.
5    MR. SHAIBANI: Objection.
6 BY MR. RANCK:
7    Q   Based on the plaintiff's perception of what
8 occurred.
9    MR. SHAIBANI: Mischaracterizes prior
10 testimony.
11   A   They could be, and they could also be
12 accused of discrimination even though they had no
13 intention to discriminate, but what they actually did
14 was deemed -- was discriminatory.
15 BY MR. RANCK:
16   Q   Can you give me an example of that latter?
17   A   I'm give you the perfect example. I'm
18 giving you an example.
19      Let's say I'm the father -- let's say I'm
20 the father of a -- I have a daughter. Okay? Once
21 upon a time, she was just graduating from school and
22 going off to rent her own apartment and so on and so

**Page 179**

1 forth. Interestingly enough, she said to me when she
2 showed me some of the units she was looking at, she
3 made to a point to me saying that even though this is
4 the first floor, it's not really ground level, it's
5 15 feet above the ground. I said what does that have
6 do with anything, talking to her the way I would talk
7 to a real estate agent. She said I don't want to live
8 on the ground floor.
9      It's common enough for a real estate agent
10 to have a young woman come into an office, and you're
11 real estate agent but you're also parent, and this
12 woman says I'm looking for a one-bedroom apartment,
13 and you have three available, one on the ground level,
14 really ground level, the same unit available on the
15 second level, and, oddly enough, the same unit
16 available on the third level, and agents would show
17 the second and third only and not make the first one
18 available, thinking I wouldn't want my daughter to be
19 living on the ground level. I'd want her to be on the
20 second or third floor.
21     And that is the essence of discrimination
22 and inequality, not allowing people to make their own

**Page 180**

1 decisions.
2    Q   That's -- I would call that de facto
3 discrimination, even though --
4    A   Oh, it is discrimination, but it wasn't --
5 de facto not the other way.
6    Q   That's what I mean. You didn't intend to
7 discriminate, but the fact of your actions was
8 discriminatory.
9    A   I agree. And that was the point I was --
10 that was the example to the answer I gave previously.
11   Q   Okay. Would -- what other in subsection B
12 here again on page 11, information failure to provide
13 information about the property, you mentioned the
14 lease. What other facts are you basing that opinion
15 on that Chatel discriminated by failing to provide
16 Mr. -- Bratton Realty with information about the
17 property?
18     MR. SHAIBANI: Objection. Asked and
19 answered.
20   A   I go back to my previous statement that the
21 apparent lack of preparedness on the part of John
22 Pagones as one more bit of frustration for Mr. Bratton

181

1  was adding to that, if nothing else, at least to the
2  perception that I'm not being treated because I am
3  whatever I am.
4  BY MR. RANCK:
5     Q   Okay. Assuming that what Mr. Bratton says
6  about that initial meeting between he and Mr. Pagones
7  is true, that Mr. Bratton asked a bunch of questions
8  and Mr. Pagones was ill prepared and couldn't --
9  didn't provide the information; okay? Assuming that
10 was true, assuming that Mr. Pagones was ill prepared,
11 you would agree with me that we may have the
12 perception of discrimination here, but we won't have a
13 case of the de facto discrimination in that scenario;
14 right? Because had a white applicant come in ten
15 minutes later, Mr. Pagones would have been equally
16 unprepared for that person. Is that fair?
17        MR. SHAIBANI: Objection. Assumes facts not
18 in evidence, calls for speculation.
19    A   That would be so if, in fact, Pagones's
20 responses were because he was ill prepared, rather
21 than responding differently to Mr. Bratton because of
22 his race and/or personal appearance.

182

1  BY MR. RANCK:
2     Q   Sure. What information do you know -- you
3  keep saying Mr. Pagones was ill prepared. we've
4  identified the lease but what other information was he
5  asked for that he couldn't provide to your
6  understanding that forms the basis of your opinion?
7     A   Well, for one, it appears from Mary White's
8  testimony later that he didn't represent the
9  appropriate times or possibly even represent what was
10 available. Whether the basement was available or not
11 apparently that has become a question. The basement
12 unit.
13    Q   Well, are you saying that Mr. Bratton asked
14 about that in the first meeting?
15    A   No, no. I'm not saying that.
16    Q   Then respectfully, I'm asking what
17 information did Mr. Bratton ask about that Mr. Pagones
18 was ill prepared to provide in that first meeting?
19        MR. SHAIBANI: Objection. Asked and
20 answered.
21    A   Well, as spelled out in -- it says plaintiff
22 inquired as to whether Chatel had a blank lease, he

183

1  said I don't have a lease.
2  BY MR. RANCK:
3     Q   We've talked about the lease.
4     A   All right. And B, when John Bratton visited
5  Chatel's office on October the 6th, he requested
6  information. Upon inquiring about terms and
7  conditions the landlord might require in the lease,
8  Pagones stated that he had no information at all about
9  the lease or the property.
10    Q   What terms and conditions do you understand
11 Mr. Bratton asked about?
12    A   I don't think it really matters. Mr.
13 Bratton believes that he asked for terms and
14 conditions of the lease, and the listing agent says I
15 haven't got a clue, I don't know anything about it. I
16 really don't know about the property, it's my listing.
17 Bratton is also a real estate broker, and that would
18 strike a real estate broker as very odd, as it strikes
19 myself, as very, very odd.
20    Q   I mean, Mr. Pagones gave Mr. Bratton all the
21 information in the MRIS; right?
22    A   I think Mr. Bratton obtained that for

184

1  himself.
2     Q   Well, I beg to differ, but he may have
3  obtained it for himself, too.
4     A   Well, I mean anybody in the world could get
5  the information from MRIS.
6     Q   But assuming Mr. Pagones gave that to him,
7  and he gave him the lease term that Ms. White was
8  interested in; didn't he?
9         MR. SHAIBANI: Objection. Mischaracterizing
10 the record.
11        MR. RANCK: It does?
12        MR. SHAIBANI: The lease term?
13        MR. RANCK: Yeah, the length of the lease
14 that Ms. White was interested in?
15        MR. SHAIBANI: No, that's why you have
16 submit several different versions of the same lease
17 to --
18        MR. RANCK: No.
19    A   -- ask him to sign.
20        MR. RANCK: Huh.
21 BY MR. RANCK:
22    Q   I mean, you got Mr. Bratton's deposition

185

1    there, Mr. -- I'll show it to you. I'm going to read
2    from it, and then I guess just to speed things up, we
3    can be -- wrap it up for today.
4         By Mr. Bratton at page 110, line 14. Of the
5    other questions that I asked were questions
6    specifically about drafting the lease, I asked him,
7    you know, what type of lease term was she more
8    inclined to be agreeable on? What was she really
9    looking for? His response was that she was looking
10   for like two- or three-year lease. That was like one
11   of the only -- one of the only questions that he
12   answered out of the series of questions that I asked.
13   Do you recall that testimony?
14   A    Yes?
15   Q    Page 110, line 14.
16   A    Okay.
17   Q    You do? Does that clarify the record?
18        MR. SHAIBANI: Two- or three-year lease,
19   that's part of the problem, because one- to two-year
20   term was presented with an option to renew for a third
21   year, and that was turned down.
22   BY MR. RANCK:

186

1    Q    Does that clarify my question, Mr. Lynch, as
2    to whether Mr. Pagones could advise Mr. Bratton as to
3    the term of the lease the owner was interested in?
4    A    Well, I'd have to dig out the MLS printout.
5    Stefan might find it first, but the MLS printout, I
6    believe, indicated a longer -- a broad range of time
7    as short as 12, as long as 48.
8    Q    And that was clarified by Mr. Pagones in the
9    meeting; right? Narrowed it to two or three.
10   A    Two or three. I think if -- I think that
11   the first one that -- let me get this lease, the first
12   lease on the Chatel form, he was asking for three
13   years originally.
14   Q    Well, what was -- at the meeting with
15   Mr. Pagones on the 6th, Mr. Pagones said a two- or
16   three-year lease. Do you recall the term that Mr.
17   Bratton submitted in his first lease proposal?
18   A    We're looking at 8, 9 and 10 again.
19   Q    No, sir.
20   A    Oh, his first lease proposal. Well, it's
21   still 8, 9 and 10. I'll me just pull this up.
22   Q    I'll give it to you here.

187

1    A    No, it's right here.
2    Q    It's -- the one you have has all the
3    scratch-outs on it.
4    A    Term, term, he says initial term beginning
5    November 1, 2005 ending October 31, 2006.
6    Q    So Mr. --
7    A    He started with -- yes.
8    Q    So Mr. Bratton's first lease despite what
9    Mr. Pagones told him, he submitted a lease for only a
10   one-year term; didn't he?
11        MR. SHAIBANI: Objection. That's not --
12   A    And then it says the tenant may renew the
13   lease for one extended term of 12 months.
14   BY MR. RANCK:
15   Q    What was the term that Mr. Bratton proposed?
16        MR. SHAIBANI: Objection. We have Bratton's
17   testimony indicating that that one year was an
18   error --
19        MR. RANCK: Actually he --
20        MR. SHAIBANI: -- as he drafted it at 3:00
21   a.m.
22        MR. RANCK: -- specifically refused to say

188

1    it was an error. And don't coach the witness, please.
2    BY MR. RANCK:
3    Q    What term did Mr. Bratton propose in that
4    document?
5    A    One plus a renewal.
6    Q    All right. Which is contrary to what he was
7    expressly told the owner wanted; correct?
8        MR. SHAIBANI: Objection.
9    A    Well, let's assume that Pagones told him two
10   to three years.
11   BY MR. RANCK:
12   Q    Which Mr. Bratton --
13   A    If I said one plus one, that's two.
14   Q    At the option of the lessee so, as far as
15   the owner is concerned, the lessee is only obligating
16   himself to one year; right? Mr. Bratton proposed, or
17   not Mr. Bratton, Bratton Realty's lease proposed that
18   it be obligated for one year; correct?
19   A    Correct.
20   Q    And Mr. Pagones had told Mr. Bratton that
21   the owner wanted two to three years; correct?
22        MR. SHAIBANI: Objection.