**189**

1    A    That's what is supportedly have said, two to
2    three years. So Bratton in his first proposal asked
3    for one and one.
4    BY MR. RANCK:
5        Q    Obligated himself to one; right?
6        A    Well, I mean, if I'm writing my lease, I'm
7    writing it to my benefit as I perceive my benefit to
8    be at the moment.
9        Q    Exactly. So Mr. Bratton's first proposed
10   lease was tenant friendly; right? It was written for
11   his benefit; correct?
12           MR. SHAIBANI: Objection.
13           MR. RANCK: That's what your witness just
14   said; correct?
15       A    Well --
16   BY MR. RANCK:
17       Q    Yes or no.
18       A    I think.
19       Q    You can explain.
20       A    I'll say yes, but what I'm saying is that
21   Bratton, I think, lacked -- felt like he really lacked
22   a fair amount of guidance from Pagones. You may pick

**190**

1    on this point or that point. He was clearly getting
2    the message that Pagones didn't know very much at all
3    about this property, so I see Bratton starting the
4    ball rolling somewhere to elicit some sort of a
5    response that would give a lot more predictable
6    direction than is just being given by a guy who says I
7    really don't know much about it.
8        Q    Okay. I want to ask just one other thing,
9    and then we can break for the day. Let me show you,
10   can you just identify for the record Exhibits 5 and 6,
11   please?
12       A    Exhibit 5 are some notes that I took --
13   wrote down in preparation for today's deposition in a
14   face-to-face with Mr. Bratton, and a conference call
15   with counsel to review the issues rather than sit back
16   and reread all this stuff.
17       Q    Okay.
18       A    That's 5. 6 is the, I would call it, the
19   delivery letter from Mr. Shaibani to me of all the
20   documents in my large binder here that were assembled
21   and organized for my review prior to getting together
22   for the opinion.

**191**

1        Q    Okay. We can put these aside or put them on
2    the side. Looking at -- can you get your copy of
3    Exhibit 5 out? It's the notes. You should have your
4    original back.
5        A    I should. Exactly where I put it is --
6        Q    I saw Mr. Shaibani give it to you.
7        A    It's called hidden under the book.
8        Q    And you have written at the top economic
9    damages, and then you have written on the left-hand
10   margin economic damages again, and you discuss some
11   issues here. Those pertain to Mr. Bratton. That
12   information is coming from Mr. Bratton; is that right,
13   on what he claims his economic damages are?
14       A    Well, he obviously has a claim of economic
15   damages. The question -- what I was talking about him
16   saying I have -- I understand that as I wrote it down
17   here, those are probably more my words than anything
18   else, the panache and the cachet for Georgetown having
19   been operating out of offices in Georgetown myself for
20   a long, long time. Having to move is an issue. It's
21   a problem. I mean, and it's being -- saying, you
22   know, Georgetown as your office as compared to

**192**

1    somewhere else.
2        Q    These issues have nothing to do with the
3    question of whether he was discriminated against;
4    correct?
5            MR. SHAIBANI: Objection. The damages
6    obviously relate to his claim. They follow from it.
7            MR. RANCK: That's not the -- really wasn't
8    what I was asking for in the question.
9    BY MR. RANCK:
10       Q    I mean, these issues don't have anything to
11   do with whether he was discriminated. These issues
12   pertain to what damages assuming --
13       A    No, I don't think they have to deal with
14   whether he was discriminated against. It's the effect
15   of the discrimination is what I'm talking about.
16       Q    Okay. Now, I don't see anywhere in your
17   report anything concerning damages, any effect of
18   damages. Is that a fair assessment?
19       A    Fair assessment.
20       Q    I don't believe you were designated to
21   testify to any of that, so I'm not going to --
22           MR. SHAIBANI: Objection. That's not --

**193**

1  MR. RANCK: You show me where in the report
2  he discusses the opinions on damages?
3  MR. SHAIBANI: His designation is not
4  limited to liabilities. I can tell you that.
5  MR. RANCK: Can you tell me in his report,
6  Mr. Shaibani? Point me to where he had -- offers
7  opinions?
8  MR. SHAIBANI: I don't have to submit any
9  expert report to have an expert testify. What makes
10  you think that I can submit an expert report on
11  liability but somehow be precluded from having the
12  expert testify on damages? I mean, this is the
13  deposition. You can ask him about the damages.
14  MR. RANCK: Bob, did you get that? Bob?
15  MR. BOUSE: I did.
16  MR. RANCK: That doesn't comport with my
17  understanding of the federal rules and the requirement
18  that we get a report from the expert, but.
19  MR. SHAIBANI: You don't have to get a
20  report from an expert. It could just be a designation
21  of an expert without the report.
22  THE COURT REPORTER: Doesn't Rule 26 require

**194**

1  a report prepared -- signed by the expert?
2  MR. SHAIBANI: If there is a report. I
3  don't believe there are experts required to file a
4  report.
5  MR. RANCK: You don't think in federal court
6  an expert is required -- there's not required to be an
7  expert report?
8  MR. SHAIBANI: I don't believe that the
9  expert report has to cover every single issue that the
10  expert is going testify about.
11  MR. RANCK: Okay. Well, we'll see about
12  that. I am specifically not going to question this
13  expert with regard to opinions on damages because they
14  were not previously disclosed, and I can't be taken by
15  surprise at a deposition, not even given this document
16  before the deposition.
17  MR. SHAIBANI: What document?
18  MR. RANCK: The document Exhibit 5. Other
19  than before the day of the deposition as I arrived
20  here.
21  My position, Bob, and I don't know if
22  you can hear me, or join this, is I object, and

**195**

1  will move to strike and disallow any testimony by
2  this witness with regard to damages as not being
3  previously, that's the word, previously disclosed
4  and certainly not referenced in the report that's
5  been provided.
6  MR. BOUSE: And I will join that objection
7  on behalf of Mary White.
8  MR. SHAIBANI: I will raise that at the
9  status conference that you have a second day of
10  deposition, and this is your chance now to prepare for
11  the damages questions if you're going to have any --
12  MR. RANCK: I don't think so.
13  MR. SHAIBANI: -- and I will most certainly
14  be -- have -- asking questions about damages at trial.
15  So you can't claim there was a surprise here. You're
16  having a second opportunity to depose Mr. Lynch on
17  Monday.
18  MR. RANCK: No, I'm not. No, I'm not. It's
19  not a second --
20  MR. SHAIBANI: Yes, you are.
21  MR. RANCK: No, I'm not.
22  BY MR. RANCK:

**196**

1  Q  All right. Going on. Halfway down the
2  page, you have the word liability. Do you see that?
3  A  Yes.
4  Q  No. 1 is under there is terms and conditions
5  of lease Medlin versus Bratton -- 24 days? Did I read
6  that right?
7  A  Right.
8  Q  And above Medlin is one or two days;
9  correct?
10  A  Correct.
11  Q  Why do you say one or two days? That's from
12  the time Ms. Medlin went to Chatel until what?
13  A  **I'm saying that Medlin has a -- prepares or**
14  **has a lease prepared on the 11th that goes into a very**
15  **formal mode, and the client is told that the other**
16  **lease is taken, so, I mean, he finally got a lease**
17  **negotiated 24 days later.**
18  Q  Did you see that Mary White said that she
19  would haven't agreed to a bunch of the terms in
20  Ms. Medlin's proposed lease, so that wasn't final?
21  They hadn't negotiated those terms yet? Did you see
22  that?

Case 1:06-cv-00694-JDB    Document 49-7    Filed 03/22/2007    Page 3 of 6
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

50 (Pages 197 to 200)

**197**

1    A  Yeah, I saw that, but I have a hard time
2  with the agent of Mary White preparing a lease that
3  she pretty much put together supposedly with Medlin
4  and saying I'm not prepared to accept this.  I mean,
5  all of those terms and conditions and the addendum
6  page in that lease for Medlin --
7    Q  So you think Mary White is lying?
8    A  I think it's quite possible.
9    MR. SHAIBANI:  Object --
10    MR. BOUSE:  I object.  You're passing on the
11  veracity of my client.  I don't think an expert can do
12  that.  And Mr. Bratton is telling the complete truth.
13    MR. RANCK:  Yeah.
14  BY MR. RANCK:
15    Q  The one to two days over Medlin also ignores
16  her having come into the office previously; right?
17    MR. SHAIBANI:  Objection.  The office of
18  Chatel versus the office of Mary White.
19  BY MR. RANCK:
20    Q  I'm sorry.  That's a fair objection.  It's
21  getting late, and I'm getting tired.  The one to two
22  days --

**198**

1    A  Is the Chatel visit.
2    Q  It ignores the fact that Medlin appeared at
3  the 1622 property and toured it prior to October 6;
4  correct?
5    A  That's correct.  I'm talking here about
6  getting into Chatel and getting things on paper.
7    Q  If you were to count that time period, let's
8  just take October 5 to October 13, it's eight days to
9  get a lease, a proposed lease typed up for Ms. Medlin;
10  right?  The 5th to the 13th?
11    A  I don't know if there was a proposed lease
12  on the 5th.  I'm not arguing that she didn't see the
13  property.
14    Q  That's not what I'm saying.  I'm saying that
15  from the time she came in and toured the property to
16  the time that she was able to get a proposed lease
17  typed up was eight days.
18    MR. SHAIBANI:  Objection.
19    A  I don't think that really has an awful lot
20  to do with it.  I have somebody made an offer on a
21  property two days ago that viewed it a month ago and
22  waited around a month to do something.  So she may

**199**

1  have seen it on the 5th, and she didn't say I want to
2  start talking turkey until a certain day, and all
3  sudden, things started -- that's what I'm talking
4  about.
5  BY MR. RANCK:
6    Q  Ms. Medlin came to Chatel with an
7  appointment; right?
8    A  I think she was -- I think she was -- I
9  think she had an appointment; yes.
10    Q  Mr. Bratton when he showed up didn't have an
11  appointment; did he?
12    A  I don't believe so.
13    Q  No. 2, disparate treatment, it says meeting
14  something.
15    A  I think basically what we're talking about
16  in disparate treatment, we're talking about the
17  difference in the financial information demanded of
18  Bratton versus --
19    Q  What financial information was demanded of
20  Bratton by October 12?
21    A  I didn't say disparate treatment prior to
22  October the 12th.

**200**

1    Q  What does the -- in the middle of that, it
2  says disparate treatment -- meetings.  What is the
3  next symbol?  At or with?
4    A  At.
5    Q  Meeting at what's that refer to?
6    A  I'm referring to Bratton's first encounter
7  at Chatel and Medlin's first encounter at Chatel.
8    Q  What financial information did Chatel ask
9  for from Bratton ever?
10    A  I'm not saying this is -- this is the case
11  in its entirety.  There's more that Chatel in this
12  case.
13    Q  Okay.  So No. 2 there doesn't pertain to
14  Chatel.
15    MR. SHAIBANI:  Objection.
16    A  I would say it probably pertains more to the
17  actions of Forster or Forester, whatever his name is.
18  I'm sorry if I get his name wrong.  I'd like to get it
19  right.
20  BY MR. RANCK:
21    Q  It's F-O-R-E-S-T-E-R?
22    A  Forester.

Case 1:06-cv-00694-JDB   Document 49-7   Filed 03/22/2007   Page 4 of 6
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

51 (Pages 201 to 204)

201

1    Q   No. 4, defense -- not a real estate. and I
2   can't read the last thing.
3       A   That was probably office.
4    Q   What does that note refer to?
5       A   That was just -- actually, you notice I sort
6   of drew a line through four, but I was scribbling down
7   there. I mean, the -- I made a note to myself there
8   that is there a possibility of somebody offering a
9   defense that the reason they were giving him a hard
10  time was that he was a real estate company and not,
11  you know, and not a beads and bangles or something.
12   Q   Does No. 4 weigh into, factor into your
13  opinions at all in this case, or can we ignore that?
14      A   I would say 1, 2, 3 is what I'm concerned
15  about in terms of opinions.
16   Q   So we can No. 4. Right?
17      A   Yes.
18   Q   Okay.
19      MR. BOUSE: I'm still unclear. I don't have
20  a copy of that document. Is that right?
21      MR. SHAIBANI: That's correct. That's what
22  I'm going to fax you Monday.

202

1      MR. BOUSE: That's supposed to show -- hold
2   that for a second. Thank you.
3   BY MR. RANCK:
4    Q   Now, you then under that refer to Mary White
5   depo statement mugging by youths in 1980. What's the
6   significance of that?
7       A   That was a bit of information that I wrote
8   down, and to determine what the significance is, you
9   know, there could be little significance or great
10  significance, depending upon Mary White's view of the
11  world after 1980.
12   Q   Do you believe that it's more likely she
13  might discriminate against an African-American because
14  she was mugged by African-American youths 27 years
15  ago?
16      A   I think that's possible.
17   Q   Would you do that?
18      A   I wouldn't.
19      MR. SHAIBANI: Objection as to relevance.
20  And the year wasn't '80. It was '86.
21      A   Was it '86?
22  BY MR. RANCK:

203

1    Q   I can only -- I'm referring to what the
2   witness wrote, Mr. Shaibani. You can testify about
3   the year, but I'm going off what he was told
4   apparently.
5       A   Well, I may have -- well, my 1980 might have
6   been appropriately written 1980s. I don't know if
7   there was a definite date.
8    Q   I don't care about the year. 20 years ago.
9       A   No, no. 20 years ago.
10   Q   Would you do that, would you discriminate
11  against?
12      A   I wouldn't be in the suit period.
13   Q   That's not my question. My question is if
14  you were mugged --
15      A   I wouldn't do that, nor would I do any of
16  these other things.
17   Q   Have you ever been mugged?
18      MR. SHAIBANI: Objection. Relevance.
19      A   I've been involved in a couple of attempted
20  muggings. I'm not most mugable guy in the world. I'm
21  lovable, but not the most mugable. I am 6 foot 1 and
22  over 250 pounds.

204

1   BY MR. RANCK:
2    Q   Underneath you have a squiggly arrow and
3   liability to Chatel, arrow, TL on 12th October,
4   misinformed. Do you see that?
5       A   Yeah. I'm talking about representation of
6   availability versus nonavailability.
7    Q   Under that continued to negosh, and then it
8   says something drafts question mark why. Do you see
9   that?
10      A   Yeah. The question I had to myself why do
11  we have so few items with Medlin and so much going on
12  with Bratton over the period of time, and even with a
13  short period of negotiating with Medlin, one to two
14  days, Bratton is informed that you lost, she won, it's
15  just business. That's what that's all about.
16   Q   Do the various forms that Bratton submitted
17  on the Chatel draft leases, I mean, those are kind of
18  a mess; aren't they, if you look at all the
19  handwriting on them?
20      MR. SHAIBANI: Objection.
21  BY MR. RANCK:
22   Q   Aren't they hard to interpret what's being

Case 1:06-cv-00694-JDB   Document 497   Filed 03/22/2007   Page 5 of 6
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

52 (Pages 205 to 208)

205
1  offered?
2      A   They look like pretty typical real estate
3  deals. I can recall the first time a lawyer asked me
4  well, can't you just type this whole thing up fresh
5  and have people sign them? And I says no. You don't
6  do that. You keep scratching and pushing.
7      MR. RANCK: Okay. Bob, I'm inclined at 6 --
8  at 5:40 to stop for the day.
9      MR. BOUSE: Yup.
10     MR. RANCK: We'll start back at --
11     MR. BOUSE: 1:00 on Monday.
12     MR. RANCK: 1:00 on Monday. I will finish
13 up in probably a half hour or something like that.
14 Maybe a tiny bit longer. If the witness adds more as
15 I go through -- some of the report, and I don't mean
16 this in a critical way, some of the report is
17 repetitive, so if he adds stuff as I ask about things,
18 then it will take a little bit longer, but certainly
19 not longer than an hour.
20     MR. BOUSE: Okay.
21     MR. SHAIBANI: I'm holding you to the seven
22 hours of deposition time, and basically it's 1:00 to

206
1  5:40. You had --
2      MR. RANCK: We started late, we took breaks,
3  so we can fight about that. If you're going to cut it
4  off on Monday, feel free, and we'll address it with
5  Judge Bates on Tuesday. That's fine with me, because
6  I'm not bickering and wasting the witness's time and
7  my client's, my time and my client's money fighting
8  about that.
9      MR. SHAIBANI: Yeah, if you think you're
10 going to have another full day deposition, that's not
11 going to happen.
12     MR. RANCK: We're not starting until 1:00.
13 How can we?
14     MR. SHAIBANI: Well, you're not going to
15 have a 10-hour deposition, I can tell you that. Seven
16 hours is the maximum you're getting. You've going to
17 have to go to the judge to get any more than that.
18     MR. RANCK: Well said.
19     MR. SHAIBANI: The fact that we're giving
20 you a second day is a courtesy, and our -- and not to
21 your lack of time management and organization, and
22 frankly, you made us wait two hours the last time you

207
1  were supposed to show up for a deposition.
2      MR. BOUSE: Regular and a mini.
3      MR. SHAIBANI: Copy. Mini.
4      MR. RANCK: Regular delivery.
5      (Signature having not been waived, the
6  deposition of THOMAS J. LYNCH was suspended at 5:41
7  p.m.)

208
1          ACKNOWLEDGMENT OF DEPONENT
2      I, Thomas J. Lynch, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true,
5  correct and complete transcription of the
6  testimony given by me and any corrections appear
7  on the attached Errata sheet signed by me.
8
9  _____    _____
10     (DATE)                     (SIGNATURE)

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

53 (Pages 209 to 211)

**209**

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Lynn Schindler, the officer before whom

3    the foregoing proceedings were taken, do hereby

4    certify that the foregoing transcript is a true and

5    correct record of the proceedings; that said

6    proceedings were taken by me stenographically and

7    thereafter reduced to typewriting under my

8    supervision; and that I am neither counsel for,

9    related to, nor employed by any of the parties to this

10   case and have no interest, financial or otherwise, in

11   its outcome.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 26th day of

14   February, 2007.

15   My commission expires:

16   October 1, 2007

17

18

19   _____

20   NOTARY PUBLIC IN AND FOR

21   THE DISTRICT OF COLUMBIA

22

**211**

1    E R R A T A  S H E E T  C O N T I N U E D

2    IN RE:  Bratton v. Chatel Real Estate, et al.

3    RETURN BY: _____

4    PAGE    LINE    CORRECTION AND REASON

5    ____  ____  _____

6    ____  ____  _____

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

     (DATE)        (SIGNATURE)

**210**

1        E R R A T A  S H E E T

2    IN RE:  Bratton v. Chatel Real Estate, et al.

3    RETURN BY: _____

4    PAGE    LINE    CORRECTION AND REASON

5    ____  ____  _____

6    ____  ____  _____

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

     (DATE)        (SIGNATURE)