1 (Pages 212 to 215)

**212**

1    IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3    ------------------------------------X
4    JOHN BRATTON,              :
5         Plaintiff            :
6         v.            :  Case No.:
7    CHATEL REAL ESTATE, INC., et al.,  : 1:06CV00694
8         Defendants         :
9    ------------------------------------X
10
11         Deposition of THOMAS J. LYNCH
12              VOLUME II
13            Washington, D.C.
14         Monday, February 12, 2007
15              1:12 p.m.
16   Job No.: 1-96976
17   Pages 212 - 338
18   Reported by: Lynn Schindler
19
20
21
22

**213**

1         Deposition of THOMAS J. LYNCH, held at the
2    offices of:
3
4
5        LITIGATION ASSOCIATE, PLLC
6        Connecticut Building, Ninth Floor
7        1150 Connecticut Avenue, Northwest
8        Washington, D.C. 20036
9        (202) 277-8892
10
11
12
13         Pursuant to agreement, before Lynn M.
14   Schindler, Notary Public in and for the District of
15   Columbia.
16
17
18
19
20
21
22

**214**

1           A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFF:
4        STEFAN SHAIBANI, ESQUIRE
5        LITIGATION ASSOCIATE, PLLC
6        Connecticut Building, Ninth Floor
7        1150 Connecticut Avenue, Northwest
8        Washington, D.C. 20036
9        (202) 277-8892
10
11
12     ON BEHALF OF DEFENDANTS CHATEL REAL ESTATE AND
13   THIERRY LIVERMAN:
14        MATTHEW A. RANCK, ESQUIRE
15        ECCLESTON & WOLF, P.C.
16        2001 S Street, Northwest
17        Suite 310
18        Washington, D.C. 20009
19        (202) 857-1696
20
21
22

**215**

1          A P P E A R A N C E S (Continued)
2
3
4    ON BEHALF OF DEFENDANT MARY WHITE: (BY TELEPHONE)
5        ROBERT H. BOUSE, JR., ESQUIRE
6        ANDERSON, COE & KING
7        Suite 2000
8        201 North Charles Street
9        Baltimore, Maryland 21201
10        (410) 752-1630
11
12
13
14
15
16
17
18
19
20
21
22

PLAINTIFF'S
EXHIBIT
3
ALL-STATE LEGAL®

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

2 (Pages 216 to 219)

216

1       C O N T E N T S
2   EXAMINATION OF THOMAS J. LYNCH         PAGE
3       By Mr. Ranck: . . . . . . . . . . . . . .   217
4       By Mr. Bouse: . . . . . . . . . . . . .   251
5       By Mr. Shaibani: . . . . . . . . . . .   296
6       By Mr. Ranck: . . . . . . . . . . . . . .   312
7       By Mr. Bouse: . . . . . . . . . . . . .   332
8       By Mr. Shaibani: . . . . . . . . . . .   332
9                   - - -
10          E X H I B I T S
11      (Exhibit retained by counsel.)
12  LYNCH DEPOSITION EXHIBITS            PAGE
13  7     Liverman letter 10/12/05 . . . . . . .   278
14
15
16
17
18
19
20
21
22

217

1           P R O C E E D I N G S
2   Whereupon,
3           THOMAS J. LYNCH,
4   being first duly sworn to testify to the truth, the
5   whole truth, and nothing but the truth, was examined
6   and testified as follows:
7   EXAMINATION BY COUNSEL FOR THE DEFENDANTS CHATEL REAL
8           ESTATE AND THIERRY LIVERMAN
9   BY MR. RANCK:
10      Q   Mr. Lynch, have you had any substantive
11  conversations with Mr. Shaibani since Friday
12  afternoon's deposition?
13      A   No.
14      Q   Can you tell me when is the first time -- if
15  you look back at Exhibit 5 was your notes from
16  February 5?
17      A   Uh-huh.
18      Q   Right?
19      A   Yes.
20      Q   If you look at the top, we referenced it
21  pertains to damages?
22      A   Correct.

218

1       Q   Is that the first time you were consulted
2   with regard to damages in this case?
3       A   I don't believe so. I believe Mr. Shaibani
4   and I probably talked about the question of damages
5   perhaps a week or so prior to the 5th.
6       Q   Okay. The end of January. Was that the
7   first time you talked about the damages in the case?
8       A   I believe that I heard Mr. Shaibani in
9   another conversation say something about damages. I
10  didn't focus too much on it.
11      Q   I guess --
12      A   In other words, I would say the real
13  conversation we had about damages was probably, like I
14  said, roughly ten -- seven, ten days prior to the 5th.
15      Q   Okay. Do you have your report in front of
16  you, which was Exhibit No. 4?
17      A   I do.
18      Q   If you could turn to page 12, I think that's
19  where we stopped off last Friday. Subparagraph C, and
20  this is under the category that you have identified as
21  Chatel's discriminatory treatment of John Bratton.
22  Subcategory C is the failure to respond to

219

1   communications and unnecessary delay in presenting the
2   lease offers. Do you see that?
3       A   That's correct.
4       Q   Okay. Can you identify for me what you mean
5   by failure to respond to communications from John
6   Bratton? And I'm asking for you to identify the
7   communications you're referring to.
8       A   I'm referring to the fact that I believe
9   that Mr. Pagones -- I think we discussed this the
10  other day -- did not accept checks to accompany the
11  lease of Mr. Bratton and communicate that to the
12  landlord.
13      Q   Any other communications that you're
14  referring to with regard to that opinion?
15      A   I am not aware, or I cannot think of now of
16  anything in terms of telephone communications.
17      Q   All right. And the second part of
18  Subcategory C, unnecessary delay in presenting lease
19  offers to the landlord, I think we did discuss that on
20  Friday; did we not?
21      A   I believe we did.
22      Q   And as I recall, the crux of your opinion is

Case 1:06-cv-00694-JDB   Document 48-8   Filed 03/22/2007   Page 3 of 15
DEPOSITION OF THOMAS J. FINCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

3 (Pages 220 to 223)

220

1  why you can't identify any unreasonable delay in any
2  discrete time, it was your view that the totality of
3  the circumstances allowed another tenant applicant
4  into the process when she otherwise wouldn't have
5  been? Is that a fair summary?
6      MR. SHAIBANI: I'd like to object on the
7  basis of mischaracterizing prior testimony.
8      You can answer.
9      A  I believe I said that if the -- that
10 Ms. Medlin would not have been in the position she was
11 on the 11th and 12th had the dealings with John
12 Bratton been done with more -- I think I probably used
13 the word alacrity.
14 BY MR. RANCK:
15     Q  Okay. Anything else you're referring to
16 there in unnecessary delay?
17     A  Well, I believe if -- about the last --
18 second-or-third-from-last sentence, if John Pagones
19 had no information about the property, he should have
20 referred Bratton to the broker or landlord Mary White,
21 and I -- we're on page 12. Mr. Pagones' response, I
22 don't know anything about the property, this, that and

221

1  the other thing, we discussed that on Friday, his lack
2  or knowledge, whether he had true lack of knowledge or
3  had knowledge, or whatever the case may be, certainly
4  his inability to respond to Mr. Bratton's questions
5  caused a delay.
6      Q  All right. Flipping over to page 14. Your
7  Subsection D is misrepresenting the availability of
8  the property to John Bratton, and that we did discuss.
9  That pertains to the October 12 conversation between
10 Mr. Liverman and Mr. Bratton?
11     A  That's correct.
12     Q  Anything else other than that conversation?
13     A  I think that's the crucial element of
14 misrepresentation of the availability or
15 nonavailability of the property.
16     Q  Okay. Now, Subsection E then, beginning on
17 page 15, failure to follow the standards of conduct
18 for real estate brokers and salespersons; do you see
19 that?
20     A  I do.
21     Q  All right. In this first sentence, under
22 that subparagraph, you indicate that Roberta Medlin

222

1  informed Chatel that she was not going to lease the
2  property on October 12. My question is where do you
3  get those facts from?
4      A  I may have gleaned that from Roberta
5  Medlin's deposition.
6      Q  All right.
7      A  But as importantly is the fact that it was
8  not leased on the 12th. That's what's really crucial
9  to the representation.
10     Q  Now, this sentence has a footnote which
11 references Ms. Medlin's testimony; right?
12     A  That's correct.
13     Q  And this is one of those sentences that
14 Mr. Shaibani drafted, including the footnote?
15     A  That's correct. And I would have looked at
16 the footnote. I have her deposition here. I'd be
17 happy to look at it again.
18     Q  Can you pull out her deposition and just
19 refer to the lines cited and the page?
20     A  Page 30. It's this little four to a page,
21 slows down in reading. Page 30, lines 19 to 22, and
22 then 31, lines 1 to 6.

223

1      19 to 22. Question was to Ms. Medlin,
2  "Could you tell us why you decided not to lease the
3  property?
4      "The second time I had contact with Chatel,
5  I phoned them. I don't recall the person I spoke
6  with. I phoned Chatel from Kansas City and said I
7  don't believe our timing is syncing up, meaning my
8  timing and Mary White's."
9      31, lines 1 through 6. "Question: Do you
10 recognize this document?"
11     Answer of Ms. Medlin: "I don't remember.
12 It was a fax.
13     "Well, that's what I'd like to ask you. I
14 don't see a fax note anywhere on this document."
15     And she goes on in 6 to say, "With all due
16 respect, this was an extremely busy time for us. The
17 transaction never came, that never provided fruit for
18 me. I'm having great difficulty remembering things
19 that no longer meant anything to me."
20     Q  All right. Is there anything in the part
21 that you read that indicates that she informed Chatel
22 on October 12 that she wasn't going to lease the

224

1  property?
2      MR. SHAIBANI:  I'd like to object on the
3  basis that the transcript speaks for itself, and the
4  entire context of the discussion in there should be
5  viewed in response to this question.
6  BY MR. RANCK:
7      Q  That's fine.  The cite, the portion that you
8  cited in your report that you signed, Mr. Lynch, I
9  believe you just read into the record.  And can you
10 tell me does it say anywhere in there in what you read
11 that she advised Chatel on October 12 that she was not
12 going to lease the property?
13     A  I do not see a specific reference to the
14 12th, although obviously, I'm aware of the
15 conversation that went on on the 12th with Bratton and
16 Liverman.
17     Q  Okay.  Does it change your opinion at all
18 with regard to the representation of the
19 unavailability of the property whether Ms. Medlin had
20 pulled out of the negotiations by that time or not?
21     A  If she had pulled out of the negotiations,
22 then it was a misrepresentation of availability.  If

225

1  she had not pulled out of the negotiations, it was
2  still a misrepresentation of availability, stating
3  that they had decided to go with the other one, it's
4  just business.  Either way, I believe it's a
5  misrepresentation of the true facts.
6      Q  And if Ms. White and Ms. Medlin were still
7  negotiating, meaning Ms. Medlin had not pulled out and
8  Mr. Liverman said that Ms. White is going with another
9  candidate, in your opinion, is that a
10 misrepresentation of the availability?
11     A  Yes.
12     Q  Okay.  Have you developed any other opinions
13 as they pertain to Chatel in this case since the
14 issuance of your report?  I should say since you
15 signed your report?
16     MR. SHAIBANI:  I'd like to object on the
17 basis that the damages have not been discussed in this
18 report, but as we discussed earlier in the motion that
19 was filed yesterday, Mr. Lynch will be testifying as
20 to plaintiff's damages.
21     MR. RANCK:  Well, that would be an issue for
22 the court to determine, because we obviously are going

226

1  to oppose that.  But let me be more specific in my
2  questioning, because I have no intention of getting
3  into the damages issue today, having not had a chance
4  to explore those issues in other discovery.
5  BY MR. RANCK:
6      Q  Have you developed or come to any further
7  opinions or conclusions with regard to Chatel's
8  conduct in this case since the issuance or signing of
9  your report other than with respect to the damages?
10     A  Well, I read John Pagones' deposition since
11 the forming of the report.  There wasn't much in the
12 way of depositions other than Roberta Medlin's.  I
13 think the statement that John makes to Mary White in
14 the nature of, I believe he said something like in the
15 introduction of the offer, he presented to Mary White
16 that this prospective purchaser is an
17 African-American, and look out for trouble or
18 something to that effect.  I'm sure there are specific
19 cites in the deposition, but that was the effect.
20 That struck me as a rather odd and peculiar, and I
21 dare say improper statement for someone to make to a
22 client to even -- to bring up someone's race in the

227

1  presentation of an offer.
2      Q  Hypothetically, if a prospective candidate
3  were to come in and were to tell the agent I'm
4  interested in leasing this property -- well, let me
5  withdraw that and phrase the question this way.
6      Assuming that Mr. Bratton came in to
7  Chatel's offices on October 6 as he says, posed the
8  questions to Mr. Pagones as he says, Mr. Pagones gave
9  the responses that Mr. Bratton claims Mr. Pagones
10 gave, and then Mr. Bratton says look, I'm getting the
11 sense you don't want to deal with me because I'm
12 African-American, and that better not be the case or
13 I'll sue you guys.  Assume those facts.  Would it be
14 appropriate for Mr. Pagones to convey any of that to
15 Ms. White?
16     MR. SHAIBANI:  I'd like to object on the
17 basis of mischaracterizing prior testimony and the
18 record of the case, assuming facts not in evidence and
19 compound as well.
20 BY MR. RANCK:
21     Q  You can answer.
22     A  I think it would be improper for an agent in

Case 1:06-cv-00694-JDB Document 42-6 Filed 03/22/2007 Page 5 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY. FEBRUARY 12, 2007

5 (Pages 228 to 231)

228

1  your hypothetical in this case, if you want to use
2  Pagones as the hypothetical agent, to mention the
3  issue of race either way.  Even if Bratton says I want
4  to tell your client that I'm African-American, I still
5  would say that that's an improper thing to say.
6      Q   Is there ever a time an agent can tell his
7  principal -- can mention race to his principal?
8      A   I don't believe so.
9      Q   Assuming that when Mr. Pagones advised
10 Ms. White that Mr. Bratton was an African-American and
11 that he could be trouble, if he had said, if you don't
12 accept his lease, in your view, that's still improper?
13     A   To mention the fact that he's
14 African-American would be improper under all
15 circumstances.
16     Q   Okay.  Now, you're using the term you've
17 used in your response, and then I adopted it for my
18 questions.  You're using the term improper.  Do you
19 equate improper as being the same as discrimination?
20     A   In this case, I would equate it with
21 discrimination and illegal at the same time.
22     Q   So if Mr. Pagones were to have told

229

1  Ms. White hypothetically this guy was a very
2  aggressive guy, he pointed out that he's an
3  African-American and is going to sue if he doesn't get
4  the property, and so Mary, I think you should take his
5  lease, and thereby Mr. Pagones advocated for
6  Mr. Bratton, you still think that's discrimination
7  against Mr. Bratton?
8          MR. SHAIBANI: Objection on the basis of
9  mischaracterizes the record of the case and prior
10 testimony, assumes facts not in evidence, calls for
11 speculation.
12     A   I repeat, to mention the fact that he's
13 African-American, directed by Bratton or not,
14 well-intentioned or not, would be improper,
15 discriminatory and illegal, as far as I'm concerned.
16 BY MR. RANCK:
17     Q   What I'm trying to get at to make sure I
18 understand that we're saying the same thing is even if
19 the agent is advocating for the person, it's still
20 discrimination against the person?  That's your view?
21     A   Yes.
22     Q   Mr. Lynch, when we had the deposition last

230

1  week, you were going to look for some time records and
2  things.  Did you --
3      A   I spent a little bit of time and didn't seem
4  to come up with anything.  But I have to confess, I
5  was gainfully employed doing a lot of other things
6  other than this case.
7      Q   Do you still believe they may exist, or did
8  you look where you expected to have found them if they
9  did exist?
10     A   I made a cursory search, at best.  So I
11 can't say for sure that they exist or don't exist.
12     Q   Have you submitted a bill to Mr. Shaibani
13 yet?
14     A   I have not.
15     Q   Do you know when you intend to do that?
16     A   I suspect if the creek doesn't rise,
17 sometime at the end of this week, when I come up for
18 air.
19     Q   Exhibit No. 5--I'm sorry, 6, was the
20 document in which you had sketched out your time
21 entries?
22          MR. SHAIBANI:  Can we get a copy of that?

231

1          MR. RANCK:  This is it.
2  BY MR. RANCK:
3      Q   Other than what's indicated on here and
4  other than the two-and-a-half-hour February 5 meeting,
5  do you recall additional time?
6      A   Yes, there is additional time.  Obviously,
7  reviewing these transcripts of depositions.  I believe
8  I did have a conversation about the case.  I'd have to
9  dig that out.  It was a Sunday evening now that it
10 comes to me a little more, the first time I had a
11 serious conversation with Mr. Shaibani about damages,
12 and we discussed some other elements of the case.
13 That was probably a half-an-hour-plus conversation.
14     Q   Okay.  How about any additional time, do you
15 recall, prior to October 20, which is the date of your
16 report?  Is that all reflected on this Exhibit 6?
17     A   That's pretty much reflected there.  We may
18 have had a conversation or so, but I would -- I
19 generally -- I don't generally bill for the first
20 conversation I have with an attorney, because we're
21 trying to determine whether or not we're going to be
22 working together.  That's sort of on the by the by.

232

1 But as I said, I may have some scribbled notes
2 somewhere. These are the -- you know, this -- I would
3 say this is the bulk of the time prior to signing off
4 on the statement that you have in front of you.
5    Q   Okay. Do you have anywhere a list of all
6 the cases that you've testified in in the past few
7 years?
8    A   I have -- I have -- I have a pretty good
9 list of cases that I've worked on. I try to keep some
10 sort of a synopsis.
11       MR. RANCK:  Stefan, we've not been provided
12 with the list of cases in which the witness has
13 testified in the last four years, which I believe is
14 something that's required by the rules. Can you get
15 that prepared and sent to us.
16       MR. SHAIBANI:  Yes. As soon as I receive
17 it, I'll send it along.
18       MR. RANCK:  Well, can you -- without regard
19 to as soon as you receive it, can you see that it's
20 prepared and provided to us?
21       THE WITNESS:  You're talking about the
22 federal court, we're talking about cases that actually

233

1 were tried in the last four years, because as I said
2 in my deposition the other day, the greater multitude
3 of these cases never see the inside of the courtroom.
4 BY MR. RANCK:
5    Q   I understand that, but the federal rules
6 have certain requirements of things that have to be
7 provided with an expert report, and we've not received
8 everything that the rules require, and that's what I'm
9 asking for. If you can see that that list is prepared
10 and provided to us.
11       MR. SHAIBANI:  You haven't received
12 anything, have you, Bob?
13       MR. BOUSE:  I haven't received anything,
14 with cases he's reviewed or cases he's testified in or
15 given opinions in.
16 BY MR. RANCK:
17    Q   And I believe the rule speaks to the last
18 four years, but I'd have to look at it.
19       MR. SHAIBANI:  Well, we can put something
20 together.
21       THE WITNESS:  But are we talking about where
22 we had court testimony last four years or we had --

234

1       MR. RANCK:  I'll leave that to your counsel.
2 It's a matter of complying with the rule, and I don't
3 want to interpret the rule for him. So whatever the
4 rule requires, that's all I'm asking for.
5       Bear with me one minute, please.
6 BY MR. RANCK:
7    Q   Mr. Lynch, if you look at page 5 of your
8 report?
9    A   Correct.
10    Q   Document No. 46?
11    A   On page 5?
12    Q   Yes.
13    A   The document, I'm sorry. I'm looking at the
14 footnotes.
15    Q   Item No. 46, or document 46 is listed as
16 Chatel's fair housing manual. Do you see that?
17    A   I do.
18    Q   Does Chatel's fair housing manual play at
19 all into this case? Are they relevant to your
20 opinions in this case?
21       MR. SHAIBANI:  I'd like to request that you
22 present him with the fair housing manual.

235

1       MR. RANCK:  Well, I will if his answer is
2 yes. If his answer is no --
3    A   I think it's important to the extent that
4 the fair housing manual is really about equal
5 opportunity and protected classes and a few other
6 things in the District of Columbia that cross over the
7 line from just fair housing. We are not talking about
8 the housing situation here. We're talking about the
9 commercial lease, but the substance of fair housing in
10 the District is in inexorably tied to the Human Rights
11 Act of '77, as amended, which covers commercial
12 equally with residential. So in that sense, it is.
13 BY MR. RANCK:
14    Q   Well, does the fair housing manual -- is it
15 part of what forms the basis for your opinions against
16 Chatel in the case? And if so, I'm going to ask you
17 to identify what portions of it. So I guess what I'm
18 asking is I don't know if your review of the fair
19 housing manual was for background and just general --
20 more materials consistent with your opinions or if the
21 fair housing manual in some way provides or forms part
22 of the basis of your opinions?

Case 1:06-cv-00694-JDB   Document 49-5   Filed 03/22/2007   Page 7 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

7 (Pages 236 to 239)

236

1   A   Well, it's clear that the fair housing
2   manual addresses the protected classes of the 68 laws
3   amended. It does refer to the Civil Rights Act of
4   1866, which says race is a protected class, which is
5   the first protected class.
6   Q   Would you agree with me that the fair
7   housing manual is for residential transactions;
8   correct?
9       MR. SHAIBANI: I will object to that
10  question to the extent that it mischaracterizes the
11  document.
12  A   I think it's a misnomer to think that --
13  personally, I don't care for the word fair housing to
14  describe the way real estate agents have to conduct
15  their business in the District of Columbia as compared
16  to other jurisdictions. Fair housing is just one
17  element of the D.C. Human Rights Act, and I think the
18  two are adjoined at the hip. And that's why it's
19  important.
20  BY MR. RANCK:
21  Q   I'm not asking for whether the Fair Housing
22  Act, which, as amended or expanded, may comprise a

237

1   commercial transaction or may involve commercial
2   transactions. I'm asking specifically about Chatel's
3   fair housing manual.
4       MR. SHAIBANI: I'd like to raise the same
5   objection. The document speaks for itself, and your
6   interpretation of it mischaracterizes the document.
7   BY MR. RANCK:
8   Q   Okay. Well, do you understand my question,
9   Mr. Lynch?
10  A   I understand your question.
11  Q   Do you think Chatel violated its own fair
12  housing manual?
13  A   I think they did insofar as they violated
14  elements of the 1866 civil rights law and the D.C.
15  Human Rights Act of 1977, as amended.
16  Q   Okay. Can you turn to page BRA 246 of the
17  fair housing manual? That the version you have, with
18  the BRA numbers?
19  A   Correct.
20  Q   And before I go through this series of
21  questions, I do want to make sure you understand. I'm
22  not asking whether the spirit of the Fair Housing Act

238

1   was complied with. I'm asking about the Chatel's own
2   fair housing manual. Okay? So with that foundation
3   to this next series of questions, if you can look at
4   BRA 246, in the introduction in the second line, it
5   references understanding and compliance with fair
6   housing; correct?
7   A   Correct.
8   Q   It doesn't say commercial; does it?
9   A   No, it does not.
10  Q   Okay. And two more lines down, it's dealing
11  with using the best principles of managing residential
12  property; correct? Is that what it says?
13  A   That's correct.
14  Q   It doesn't say commercial property; does it?
15      MR. RANCK: I'll object on the basis that
16  the document speaks for itself.
17  BY MR. RANCK:
18  Q   Does it?
19  A   No.
20  Q   And in the next paragraph, it says that
21  Chatel Real Estate Inc. fair housing means fair
22  housing opportunity; correct?

239

1   A   That's correct.
2   Q   It doesn't reference commercial; correct?
3   A   Not specifically.
4   Q   And if you read further in that paragraph,
5   it's referencing guaranteeing qualified people equal
6   opportunity to rent an apartment free of
7   discrimination; right?
8       MR. RANCK: Same objection.
9   A   I see that it says that.
10  BY MR. RANCK:
11  Q   It doesn't say commercial space; right?
12  A   But it does say where in which state and
13  local legislatures have said it should not limit that
14  opportunity, and certainly state and local
15  legislatures address other opportunities.
16  Q   Okay. But it says that opportunity. We can
17  get into basic English. It says that opportunity.
18  A   That's correct.
19  Q   And the opportunity referred was to rent an
20  apartment; right?
21  A   That's what it says.
22  Q   Okay. And this was formed for Chatel's own

Case 1:06-cv-00694-JDB Document 103-6 Filed 03/21/2007 Page 8 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

8 (Pages 240 to 243)

240

1  in-house purposes; right?
2      MR. RANCK: Objection on the basis that it
3  calls for speculation.
4      A   I recall that Mr. Liverman in his deposition
5  said that they hired some attorneys to prepare this
6  document for them.
7  BY MR. RANCK:
8      Q   For Chatel?
9      A   For Chatel.
10     Q   But your testimony is is notwithstanding
11 what Chatel's position is on what this document is,
12 and despite the language we've looked at, that they
13 violated it; is that right?
14     MR. SHAIBANI: I'll object on the basis that
15 it mischaracterizes the prior testimony and this
16 document.
17 BY MR. RANCK:
18     Q   You can answer.
19     A   You know, my opinion is that they have
20 violated the D.C. Human Rights Act, which encompasses
21 the Fair Housing Act of 1968 as well.
22     Q   I'm trying to be clear for you. I'm not

241

1  asking you about the acts. I'm asking you about their
2  manual. Mr. Shaibani has opened now the document
3  despite the fact that it's my deposition, to a
4  specific page that I presume he wants you to look at.
5  But my question is is do you opine that they violated
6  their own manual?
7      A   I do. They violated, as I think I said to
8  you earlier, I think it was Section D, when they're
9  talking about the Civil Rights Act of 1866.
10     Q   What page are you looking at?
11     A   D, page 5.
12     Q   We hadn't gotten to D yet.
13     A   Well, I mentioned D earlier when you were
14 asking me the questions. I talked about D, and I
15 talked about E in my answer.
16     MR. RANCK: You referring to the sections or
17 the index BRA 0244.
18     A   BRA 0244, referring to page 35, and it looks
19 like a lot of it is on page 5, but part of it carries
20 over to page 6.
21 BY MR. RANCK:
22     Q   And show me what provision of their manual

242

1  that was violated? Perhaps Mr. Shaibani could point
2  you back to the page that he wanted you to look at.
3      A   Well, I was the one who brought up Section D
4  first.
5      MR. SHAIBANI: And perhaps you could provide
6  me with a copy of the exhibits for the deposition as
7  well as a courtesy.
8      MR. RANCK: It's Liverman Exhibit 1. It's
9  your own exhibits Mr. Shaibani.
10     MR. SHAIBANI: Well, I don't have it in
11 front of me.
12     MR. RANCK: I have no idea. Your office is
13 about 20 feet across the hall.
14 BY MR. RANCK:
15     Q   What page are you looking at, sir?
16     A   I'm looking at page 5, D, big D, little D.
17     Q   Okay. And that's just a summary prepared by
18 some lawyer, to your understanding, of what the Civil
19 Rights Act of 1866 requires; correct?
20     A   That's correct.
21     Q   Okay. And what Chatel policy can you point
22 to on that page that was violated?

243

1      A   Well, the 1866 law in reality goes beyond
2  housing.
3      Q   Okay. So I'm asking you what provision of
4  Chatel's fair housing manual do you opine they
5  violated? The part that gives a general description
6  of certain statutes?
7      MR. SHAIBANI: Would you like him to review
8  the manual before he responds to your question? I
9  don't think it's fair for you to point out one of many
10 exhibits that he's looked at several months ago and
11 ask him to identify which provisions of this specific
12 document he believes were violated without him having
13 reviewed it.
14     MR. RANCK: Well, it might be easier to look
15 at his report, since he's the expert and he's here
16 today. He didn't say he needed an opportunity to
17 review the document, but for opining here today that
18 they violated their manual, so I presume that because
19 he's of that opinion, he knows what provision he
20 thinks they violated.
21     MR. SHAIBANI: Tom, if you'd like to review
22 the manual --

244

1    A   No, I'm fine with this.  Maybe I'm finding
2  fault with the manual as well in terms of what they're
3  representing with respect to the Civil Rights Act of
4  1866.
5  BY MR. RANCK:
6    Q   Are you going to opine as to what their
7  manual should say to comply with some law?  Do you
8  have an opinion?
9    A   I have an opinion that it goes beyond
10 housing, as I've already stated.
11   Q   This is a fair housing manual, though;
12 right?  A fair housing manual; correct?
13   A   Correct.
14   Q   All right.  Does this purport to your
15 understanding to control how Chatel should govern its
16 conduct with regard to any transaction or just fair
17 housing?
18      MR. SHAIBANI:  I'll object on the basis that
19 your interpretation of the term fair housing
20 mischaracterizes the fair housing manual's contents.
21 BY MR. RANCK:
22   Q   Can you answer?

245

1    A   I'd say that the fair housing manual as they
2  have it is -- some of it is too narrow.
3  Specifically -- well, the 1866 law.
4    Q   And who do you understand prepared this?  A
5  lawyer?
6    A   That's what I heard or read, I should say,
7  read, I believe, in Mr. Liverman's deposition.
8    Q   Okay.  So you're criticizing now the lawyer
9  that put the manual together for having drafted it in
10 too narrow a fashion; is that right?
11      MR. SHAIBANI:  Objection.  Asked and
12 answered.
13   A   I think it's too narrow.
14 BY MR. RANCK:
15   Q   Well, that wasn't my question.  My question
16 is are you criticizing the lawyer who drafted it for
17 drafting it in too narrow a fashion?
18      MR. SHAIBANI:  Objection.  Asked and
19 answered argumentative.
20   A   I may well be.
21 BY MR. RANCK:
22   Q   Okay.  And why do you believe it's too

246

1  narrow?  Because it's limited to housing?
2      MR. SHAIBANI:  Objection.  Mischaracterizes
3  prior testimony, asked and answered.
4    A   I think it's too narrow because it only
5  refers to housing, and the fact Chatel, like many
6  other real estate companies, is a general brokerage,
7  and their policies and procedures in dealing with
8  people of various race, colors, et cetera, et cetera,
9  should be more broad.
10 BY MR. RANCK:
11   Q   Well, do you know whether they have policies
12 that are more broad?
13   A   I sincerely doubt it.
14   Q   You do?  You don't think they have any --
15   A   I have no way of absolutely knowing that,
16 but based on this and that nothing else has been
17 presented, I doubt that they do.
18   Q   Okay.  If this is too narrow because it's
19 limited to housing -- that's what you said; right?
20   A   I think it's too narrow to the reference of
21 the 1866 law, correct.
22   Q   Okay.  Then where is it violated?  If this

247

1  is referring to housing, and the Bratton transaction
2  was commercial, where is the manual violated?  I can
3  understand that you think it's too narrow, or I can
4  understand that you think it's violated, but I can't
5  understand how you think it's both too narrow because
6  it's limited to housing, yet violated because -- even
7  though it's a commercial transaction.
8      MR. SHAIBANI:  Is there a question?
9      MR. RANCK:  Yeah.  I asked it and then I
10 have an explanation for my question.
11   A   Okay.  Well, then perhaps I will rephrase my
12 answers to say they have a faulty document, and
13 they're responsible for a document that doesn't go far
14 enough.
15 BY MR. RANCK:
16   Q   Okay.  So your opinion now is that they did
17 not violate their fair housing manual, but that's only
18 because their fair housing manual is deficient?
19      MR. SHAIBANI:  Objection.  Mischaracterizes
20 prior testimony.  Asked and answered.
21 BY MR. RANCK:
22   Q   Is that right; Mr. Lynch?

Case 1:06-cv-00694-JDB Document 40-12 Filed 03/22/2007 Page 10 of 15
DEPOSITION OF THOMAS J. LYNCH, II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

10 (Pages 248 to 251)

248

1   A   The reason I think they're violating their
2   manual, and we can go all day about semantics, is
3   because that the whole issue of fair housing, civil
4   rights, human rights and all of the discussions,
5   manuals, rules, regulations, et cetera, have to point
6   to the fact that in all of your dealings in real
7   estate, you are, as a realtor -- not even as a
8   realtor, as a licensee, you are bound to honor the
9   issues of race, color, religion, et cetera.
10   Q   A firm like Chatel is required to educate
11   its agents with regard to those issues; right?
12   A   Yes.
13   Q   Are they required to put all of that
14   education in writing?
15   A   I don't think they're necessarily required
16   to put all of their education in writing.
17   Q   All right. So you're not here to offer any
18   opinion on the sufficiency of Chatel's in-house
19   educational materials or practices; are you?
20   A   No. But I do believe if they commissioned a
21   manual to be written, they should have understood that
22   it needed to be broader.

249

1   Q   Because it doesn't encompass commercial?
2   A   It doesn't encompass all of the issues that
3   the District of Columbia Human Rights Act addresses
4   itself to.
5   Q   If Chatel, in addition to the written
6   materials, hired competent legal counsel to come in
7   and give training, and the training covered the issues
8   you're speaking of that aren't covered in the written
9   materials, that would be sufficient; wouldn't it?
10   MR. SHAIBANI: Objection. Calls for
11   speculation. Assumes facts not in evidence.
12   A   Well, given it were a hypothetical, and they
13   hired competent people, they might be doing well, but
14   if they didn't hire competent people, they might be
15   doing poorly.
16   BY MR. RANCK:
17   Q   Do you know who drafted the fair housing
18   manual?
19   A   I don't.
20   Q   Do you know who gave any in-house seminars
21   to Chatel's agents?
22   A   I do not. I don't believe I read any of

250

1   that, no reference to those people.
2   Q   You deal with real estate attorneys in the
3   city regularly?
4   A   I deal with real estates attorneys in the
5   city, out of the city.
6   Q   Name for me, I don't know, four or five top
7   real estate attorneys in the city.
8   MR. SHAIBANI: Objection. Relevance.
9   A   Well, other than Matthew Ranck?
10   BY MR. RANCK:
11   Q   I'm not a real estate attorney, sir.
12   MR. BOUSE: I object to the witness sucking
13   up to Mr. Ranck.
14   A   You've got to cut the witness a little slack
15   once in a while.
16   Carol Blumenthal is a very good real estate
17   attorney. Mark Policy. Timothy Casey. Abe
18   Greenstein.
19   BY MR. RANCK:
20   Q   Benny Kass?
21   A   Benny Kass.
22   Q   Richard Luchs?

251

1   A   Richard Luchs.
2   Q   Anyone else you can think of?
3   A   There's a few folks over there at a few of
4   these firms that I've had deals with from time to
5   time.
6   Q   Mr. Lynch, subject to follow-up when
7   Mr. Bouse is done, I don't believe I have any other
8   questions for you at this time, and I do appreciate
9   your time.
10   EXAMINATION BY COUNSEL FOR THE DEFENDANT MARY WHITE
11   BY MR. BOUSE:
12   Q   Mr. Lynch, can you hear me, sir?
13   A   I can hear you.
14   Q   My name is Bob Bouse, and I've been
15   introduced to you over telephone. I apologize for
16   having to do it this way, but for the last couple of
17   days it's been impossible for me to get down to
18   Washington, D.C. So I apologize for not being there
19   face-to-face, sir.
20   A   That's all right.
21   Q   I'm going to skip around, so if at any time
22   you don't understand where I am in point of time or

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 11 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

11 (Pages 252 to 255)

252

1   reference, just say so, and I'll try to rephrase the
2   question. Okay, sir?
3       A   Very good.
4       Q   I know this is going to be difficult,
5   especially if I ask about a document. I will try to
6   identify it, and if this doesn't work out, then I will
7   try to fax down to Mr. Shaibani the documents I've
8   reviewed. We'll take a break, and I'll do that rather
9   quickly. I didn't get back to my office in time to do
10  that this morning, so I apologize to you.
11      Mr. Lynch, do you know Mary White?
12      A   Yes.
13      Q   And how do you know her?
14      A   I daresay we have probably done some deals
15  down through the years. I actually had her in class a
16  couple weeks ago.
17      Q   A class for what?
18      A   Fair housing, legislative issues or ethics
19  or a combination thereof.
20      Q   This is a requirement that you have to have
21  to keep your real estate license in D.C.?
22      A   That's correct. There are nine required

253

1   hours and six electives.
2       Q   And are they graded in any way?
3       A   No, they're not.
4       Q   All right. Now, in your dealing with Mary
5   White, did you ever have any reason to make a
6   complaint against her for any type of discrimination?
7       A   No.
8       Q   How about in incompetency?
9       A   No.
10      Q   And did you know her socially at all?
11      A   No.
12      Q   Now, the deals that you did that you can
13  recall doing with Mary White, did any of those involve
14  any minorities of any kind?
15      A   I can't possibly recall.
16      Q   Do you know anything about Mary White's
17  family?
18      A   Not really.
19      Q   When you had Mary White in class, I take it
20  you knew about this case at that time, since you said
21  it was just a couple weeks ago?
22      A   That's correct.

254

1       Q   Did you speak with her about this case?
2       A   No.
3       Q   Did she ever attempt to speak with you about
4   this case?
5       A   No.
6       Q   Now, let me try to cut through some of this.
7   Do you have an opinion as to whether or not any of
8   Mary White's actions before October 12, 2005 were
9   discriminatory?
10      MR. SHAIBANI: I'll object on the basis of
11  vagueness.
12      A   Can you give me that date again, please?
13  BY MR. BOUSE:
14      Q   Before October 12, 2005, sir.
15      A   Other than the fact that I said I think she
16  was slow to respond to what appeared to be rather
17  urgent proposals from Mr. Bratton.
18      Q   Is that indication of discrimination or a
19  busy person, or don't you know at this point?
20      A   Could be all of those things.
21      Q   I mean, but you can't say with a reasonable
22  degree of real estate certainty that the fact that

255

1   someone -- an owner of the property doesn't call back
2   a prospective tenant, that that in and of itself is
3   discriminatory?
4       MR. SHAIBANI: Objection.
5       A   No, not in and of itself.
6   BY MR. BOUSE:
7       Q   And have you read Mary White's deposition?
8       A   I have not been provided a copy yet.
9       Q   At one point, and this is sort of in keeping
10  with what Mr. Bratton made what he calls a brain map.
11  Have you seen that?
12      A   No.
13      Q   Okay. Basically it helped him remember the
14  instances involving the leasing of this property for
15  his company, and he indicated that he spoke with Mary
16  White on the 10th for the first time, and at
17  that time, she stated Chatel was in charge, and that
18  she had to go. Do you find that response to be
19  discriminatory?
20      MR. SHAIBANI: Objection.
21      A   One might perceive it as discriminatory if
22  it were passing the buck.

Case 1:06-cv-00694-JDB   DEPOSITION OF THOMAS J. FINCH   Document 49-2   Filed 03/22/2007   Page 12 of 15
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

12 (Pages 256 to 259)

256

BY MR. BOUSE:

1  Q   Well, she also testified at her deposition
2  that she was with a customer who -- they were in a rug
3  store, she was helping a customer purchase a rug for a
4  new home that she was selling to the customer or
5  client, and she was very busy at the time, and that
6  was her testimony.  And she said please, I have listed
7  it with Chatel, her testimony was she told Mr. White
8  (sic) to get in touch with Chatel.  Is that in and of
9  itself -- discriminatory?
10  MR. SHAIBANI:  Objection.
11  MR. BOUSE:  Is that explanation?
12  A   No.
13 BY MR. BOUSE:
14  Q   Now, let me ask you something about the
15  MRIS.  Does everything that is supposed go in a lease
16  or a proposal to lease the property, must everything
17  that one would place in a lease or proposal to lease
18  the property be put in the MRIS, or is it required to
19  be put in the MRIS?
20  A   Well, there are required fields, and
21  nonrequired fields there.  The MRIS provides for a

257

1  greet deal of information to possibly put into the
2  system.
3  Q   Do you have to put in that you do not wish
4  to give the lessee a right of first refusal?
5  A   I would have to take a look at the
6  commercial -- the commercial sheets that are used --
7  excuse me.  When you put things into MRIS, the various
8  types of property, single family, multi-family,
9  commercial, sale, rental, so on and so forth, they
10  have profile sheets.  I would suspect that the
11  commercial profile sheet is probably seven or eight
12  pages long, and I don't have one in front of me.  But
13  would there be a place there for right of first
14  refusal, yes or no, it would be hard for me to imagine
15  that it's not there.
16  Q   Assuming that it's not there -- well, at
17  this point -- let me ask you this question at this
18  point.  At this point, based upon the report you gave,
19  you did not reach an opinion as of the date you signed
20  on this report, a lot of it was drafted by
21  Mr. Shaibani, that it was discriminatory not to place
22  in the MRIS that there would be no right of first

258

1  refusal?
2  MR. SHAIBANI:  I'll object to the
3  characterization of the report being drafted by
4  Mr. Shaibani.
5  MR. BOUSE:  I thought that was his
6  testimony.
7  A   No, you said it was a collaborative effort,
8  but the fact of the matter is obviously the report was
9  without the benefit of all the depositions, save for
10  Roberta Medlin's.
11 BY MR. BOUSE:
12  Q   But did you have the MRIS at the time that
13  you drafted the report?
14  A   I have an MRIS printout, but I'm not privy
15  to the profile sheets that would have been used to
16  prepare the MRIS.
17  Q   Mr. Lynch, it's fair to say that nowhere in
18  that report did you indicate that it was
19  discriminatory for the MRIS not to have the
20  information about the owner not wanting to give a
21  right of first refusal; correct?
22  MR. SHAIBANI:  Objection.  The document

259

1  speaks for itself.
2 BY MR. BOUSE:
3  Q   Is that correct, sir?
4  A   I don't think what's in MRIS or not in MRIS,
5  unless it changes, is -- putting things in MRIS is not
6  in itself discriminatory or nondiscriminatory.
7  Q   Thank you, sir.  Now, so then other than --
8  what's the word I'm looking for -- and I apologize,
9  I'm doing 10,000 things this morning, and I do
10  apologize, Mr. Lynch.  What you said was the fact that
11  Mary White didn't call back Mr. Bratton, while not in
12  and of itself discriminatory, it could give the
13  appearance of being discriminatory; is that correct?
14  A   Yeah, it could.  And especially her
15  involvement with Mr. Roberta Medlin and her lack of
16  involvement with John. Bratton.
17  Q   Well, do you know how she became involved
18  with Roberta Medlin?
19  A   It's my understanding that she met Roberta
20  Medlin perhaps the second time that Roberta Medlin
21  came back to the property.
22  Q   And her testimony was she just happened to

260

1  be there that time. Do you have any evidence to
2  dispute that testimony of Ms. White?
3      A   No.
4      Q   So had Mr. Bratton come in when she had been
5  there, and she did the same thing for Mr. Bratton,
6  then you would say that wouldn't be discriminatory;
7  correct?
8          MR. SHAIBANI: Objection. Calls for
9  speculation. Assumes facts not in evidence.
10     A   I don't think meeting anybody is or isn't
11 discriminatory.
12 BY MR. BOUSE:
13     Q   Now, Mr. Lynch, there is -- and I apologize
14 for this, if you want me to fax it down to you --
15 there is a letter dated October 12, 2005, Wednesday,
16 was hand delivered to Mary White by Thierry Liverman
17 and let me just read it to you and maybe someone will
18 have it there. If not, I can stop. I have a couple
19 things for you to look at.
20         It says "Dear Mary, attached for both
21 candidates are: 1, the rental application; 2, the
22 First American registry report; 3, the draft leases.

261

1  The one for Roberta Medlin is more advanced, simply
2  because I had her information yesterday. Sincerely,
3  Thierry Liverman."
4          And then it's carbon copied to John Pagones,
5  and then there's a handwritten note on it that says
6  credit looks good. Okay? Have you seen that?
7          MR. SHAIBANI: Bob, I think you need to send
8  that down to us. I don't think Tom has that letter.
9          MR. BOUSE: Let's take, for the court
10 reporter's sake, a little break, and I will grab the
11 document that I want him to look at and send them
12 down, fax it right down to you.
13         (Discussion off the record.)
14 BY MR. BOUSE:
15     Q   Mr. Lynch, do you have that record in front
16 of you?
17     A   I have a letter from Thierry Liverman on
18 Chatel's stationery hand delivered to Mary White.
19     Q   Do you find any discriminatory action on
20 behalf of Mary White if she had requested through John
21 Pagones to have Mr. Bratton fill out a standard lease
22 agreement an application for the property on

262

1  October 10?
2      A   Did you ask do I find it discriminatory if
3  she asked him to fill out a Chatel lease form?
4      Q   Right.
5      A   No, I don't think so.
6      Q   How about the application for the lease?
7  Application for the property?
8      A   No, I don't fault the application. My
9  problem really was with the delay in getting him an
10 application, but that's something else.
11     Q   Yeah, that's not Mary White; is it?
12     A   That's right.
13     Q   Okay. Mr. Lynch, look at that letter, and
14 it says -- from Mr. Liverman. It says attached for
15 both candidates: 1, the rental application; and 2 is
16 the First American registry report. What is that,
17 sir?
18     A   I believe that's a credit report.
19     Q   And then the third is the draft leases?
20     A   Correct.
21     Q   And then Mr. Liverman says that Roberta
22 Medlin's is more advanced simply because I had her

263

1  information yesterday. Do you know what he meant by
2  that other than what it says there?
3          MR. SHAIBANI: Objection. Calls for
4  speculation.
5      A   I believe the lease drawn up by Chatel on
6  the 11th, Roberta Medlin had a fairly long addendum
7  page to it.
8  BY MR. BOUSE:
9      Q   Now, assuming that Mary White got all that
10 information, these three things on the 12th and she
11 looked at it and she says credit looks good for both.
12 Is there any discrimination for her choosing at that
13 point, on October the 12th, Roberta Medlin over John
14 Bratton?
15         MR. SHAIBANI: Objection. Mischaracterizes
16 the record of the case, assumes facts not in evidence
17 and calls for speculation.
18 BY MR. BOUSE:
19     Q   I think you can answer.
20     A   She had the -- these three items for each
21 prospective lessee. She was also aware of the
22 differences in race, so she could well have allowed

Case 1:06-cv-00694-JDB   Document 104-15   Filed 03/22/2007   Page 14 of 15
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

14 (Pages 264 to 267)

264

1  race to enter into her decision.
2      Q   Isn't that speculation; Mr. Lynch?
3          MR. SHAIBANI: Objection. Argumentative.
4      A   It's kind of easy to throw out the word
5  speculation, but I mean this is the way the world
6  goes. People are judged by their action or their
7  perceived actions.
8  BY MR. RANCK:
9      Q   Is your opinion based upon the fact that you
10 know that she was mugged by African-Americans in 1988?
11         MR. SHAIBANI: Objection. Mischaracterizes
12 the witness' testimony.
13     A   No, it's not based on that.
14 BY MR. BOUSE:
15     Q   Okay. Do you have any -- other than it
16 could have been discriminatory because of her
17 knowledge that Mr. Bratton was an African-American,
18 other than that, do you have any facts upon which you
19 base our opinion that as of October 12, 2005, when she
20 considered the rental application, the first American
21 Registry reports and the draft leases, and she chose
22 Roberta Medlin, that that was in some way

265

1  discriminatory? I want to know what facts you have to
2  that point. Not that it could be because he was
3  Afro-American? Do you have any facts?
4          MR. SHAIBANI: Objection. Assumes facts not
5  in evidence, mischaracterizes the record of the case
6  and calls for speculation. You can answer.
7      A   I cannot cite specific facts where she, you
8  know, has admitted that his race had something to do
9  with her decision. I have not read her deposition,
10 though.
11 BY MR. BOUSE:
12     Q   Right. So you don't know what Ms. White
13 testified to about hearing or not hearing the
14 conversation that Thierry Liverman had on October 12
15 with John Bratton; do you?
16     A   No, I do not have a copy of her deposition.
17     Q   Okay. And if her decision was simply based
18 upon looking at the rental application, the first
19 registry report and the draft leases and decided that
20 both were equal, does she not have a right to choose
21 Roberta Medlin, even though Mr. Bratton is
22 African-American?

266

1          MR. SHAIBANI: Objection. Assumes facts not
2  in evidence, calls for speculation and
3  mischaracterizes the record of the case.
4      A   She has the right the choose whomever, but
5  given the circumstances of Mr. Pagones telling her
6  that this chap is African-American and be prepared for
7  trouble, she may be choosing one equal over another at
8  her own peril.
9  BY MR. BOUSE:
10     Q   But you don't know that, do you, sir?
11         MR. SHAIBANI: Objection. Argumentative,
12 asked and answered.
13     A   I think that's fundamentally the nature of
14 disputes with respect to race and other protected
15 class issues.
16 BY MR. BOUSE:
17     Q   Well, when John Pagones, if John Pagones
18 said that to Mary White, she didn't say, well, don't
19 send me his application? She didn't say don't do
20 anything more, I'm going to choose someone else, did
21 she, as far as you know?
22         MR. SHAIBANI: Objection. Calls for

267

1  speculation.
2      A   I don't have Mary's response, but I do
3  have -- we do have John Pagones's testimony in his
4  deposition, which I'll have to take as fact.
5  BY MR. BOUSE:
6      Q   Okay. Now, you indicated that you found
7  some pretext for discrimination on the fact that there
8  was some assertion that the reason that Mrs. White
9  chose Roberta Medlin at least to continue negotiating
10 with -- and you'll agree there was never a lease
11 signed by Ms. Medlin; correct?
12         MR. SHAIBANI: I'll object to the first part
13 of the question.
14 BY MR. BOUSE:
15     Q   It was compound. I do apologize. You would
16 agree, Mr. Lynch, that there never was a lease signed
17 by Roberta Medlin and Mary White?
18     A   That's correct.
19     Q   Now, there is in your report -- I'm talking
20 about page 17, sir. Do you have it front of you?
21     A   Let me turn to that page. I have it in
22 front of me.

15 (Pages 268 to 271)

268

1    Q   You indicated that you thought there was a
2  basis for the pretext for discrimination when either
3  Thierry Liverman or Mary White asserted the
4  decision to lease the property to Roberta Medlin
5  instead of John Bratton was one, Ms. Medlin was
6  already a property owner in the area; is that correct?
7    A   Excuse me. I'm on the wrong page. If I
8  could tell a six from an eight, I'd be okay. I'm on
9  16 now.
10      MR. SHAIBANI: Page 17, actually.
11    A   It starts on 16, goes over to 17. We're
12  talking sort of the bottom half of that page?
13  BY MR. BOUSE:
14    Q   Yes, sir. It starts with the sentence
15  October 12, 2005, and then it sets forth three reasons
16  either stated by Mr. Liverman or Ms. White as to why
17  the property was leased to Ms. Medlin as opposed to
18  Mr. Bratton.
19      MR. SHAIBANI: What's the question, Bob?
20  BY MR. BOUSE:
21    Q   The first question was Ms. Medlin was
22  already a property owner in the area. Why is that a

269

1  pretext for discrimination?
2    A   Well, while we're talking about pretexts,
3  someone can interpret, well, Ms. Medlin is already a
4  property owner in the area, that she's from the right
5  neighborhood.
6    Q   What does that mean?
7    A   To A lot of people, it could mean, well,
8  she's a Georgetown person, this is -- she's more -- a
9  better candidate because she owns property in the
10  area, although the area of Washington is a very small
11  area. I believe the plaintiff, Mr. Bratton, also owns
12  property in the area.
13    Q   Okay. Do you know what property that refers
14  to? It says that Ms. Medlin was a property owner in
15  the area. Do you know what property that refers to?
16    A   I believe that the Medlins recently
17  purchased a home in Washington.
18    Q   And do you know the amount that they paid
19  for that home?
20    A   I don't recall right now. I'm sure it was
21  significant.
22    Q   All right. Let's look at No. 2. Ms. White

270

1  preferred the property be used as a jewelry store
2  rather than a real estate brokerage. Why is that a
3  pretext for discrimination?
4      MR. SHAIBANI: I'll object here on the basis
5  that --
6      MR. BOUSE: Don't coach him. I'm just
7  asking him a question based upon -- if you want to
8  state something on the record, have him step out.
9      MR. SHAIBANI: Yes. Why don't I phrase my
10  objection this way. I'll object on the basis that
11  this mischaracterizes the testimony of Mary White.
12  BY MR. BOUSE:
13    Q   I'm just asking in his report. He said Mary
14  White, Ms. White preferred the property be used as a
15  jewelry store rather than a real estate brokerage.
16  I'm asking why is it a pretext for discrimination as
17  his report indicates?
18      MR. SHAIBANI: Objection. Assumes facts not
19  in evidence. Mischaracterizes the testimony of Mary
20  White in her deposition.
21      MR. RANCK: Hold on one second. I'm
22  confused as to the nature of the objection. Are you

271

1  objecting because the report mischaracterizes Mary
2  White's deposition?
3      MR. SHAIBANI: No. I'm objecting because
4  Mary White's -- if you want him to step out, that's
5  fine.
6      MR. RANCK: But I think the question
7  pending, and correct me if I'm wrong, Bob. The
8  question pending is why in your report do you say that
9  item No. 2 here is a pretext for discrimination?
10      MR. BOUSE: Exactly right.
11      MR. RANCK: So he's not characterizing Mary
12  White's deposition at all. He's basing his question
13  on the clause that's right from the report.
14      MR. SHAIBANI: Yes, which was taken from the
15  discovery responses of Mary White, which were
16  subsequently recanted in her deposition. That's my
17  objection.
18      MR. BOUSE: Well, Thierry Liverman also said
19  that. You can coach him all you want. My question is
20  in his report. All I'm asking him is to tell me if he
21  feels that an owner of a property prefers the property
22  to be used as one type of store rather than another,