---

272

1  is that a pretext for discrimination?
2      MR. SHAIBANI: Same objections.
3      You can answer.
4    A  I would consider it still a pretext for
5  discrimination, because you can use the example of any
6  excuse is a good excuse. I'm saying that I prefer a
7  jewelry store or a hat shop versus a real estate
8  company, because this African-American with the
9  dreadlocks is a real estate company, so let's just say
10 I don't want a real estate company. I'm saying it
11 could be a bad --
12 BY MR. BOUSE:
13   Q  I mean, if you decide -- how about a beauty
14 salon. You know that there was an indication by
15 Mrs. White she did not want a beauty salon in that
16 property. Is that a pretext for discrimination?
17     MR. SHAIBANI: Objection as to relevance.
18   A  I recall there was someone trying to --
19 looked at the space. I don't know if it was in
20 Barrett Anderson's deposition or not, about someone
21 who was looking to do a beauty salon. I thought the
22 big issue that Mary White had was a food

273

1  establishment. That's what comes to mind.
2    Q  Well, it was in her testimony that she did
3  not want a beauty salon.
4    A  Well, I don't specifically recall that.
5  That may have been in her deposition.
6    Q  All right. If that's in the record, is that
7  a pretext for discrimination?
8      MR. SHAIBANI: I'm sorry, Bob. I didn't
9  quite hear that last part of your question.
10 BY MR. BOUSE:
11   Q  It's in the record, the fact that indicated
12 that she did not want a beauty salon, is that a
13 pretext for discrimination?
14   A  I think it's a whole different story. It's
15 saying -- I'd rather have a jewelry store over a
16 beauty salon is not the same thing as saying I'd
17 rather have a jewelry store over a real estate
18 operation, which I know that this African-American
19 prospective tenant actually operates.
20   Q  What records do you have or what information
21 do you have that Mary White knew that Mr. Bratton was
22 going to make a claim with the office of human rights,

274

1  District of Columbia Office of Human Rights? Do you
2  have a date?
3    A  I don't have the date. I have the
4  application in my three-inch-thick folder here.
5      MR. SHAIBANI: I'll object on the basis of
6  foundation. I'm not even sure if that's -- is that
7  part of the report you're referring to, Bob.
8      MR. BOUSE: No, it's another question. I'm
9  referring to this report.
10     MR. SHAIBANI: Are you saying that he's
11 testifying to that effect.
12 BY MR. BOUSE:
13   Q  What information does he have, what facts
14 does he have as to when Ms. White was made aware of
15 the fact that Mr. Bratton had filed a complaint with
16 the District of Columbia Office of Human Rights?
17     MR. SHAIBANI: Well, he hasn't testified
18 about that. I'm not sure what you're getting at here.
19 BY MR. BOUSE:
20   Q  The question is do you have any information
21 concerning when Ms. White found out about the fact
22 that Mr. Bratton had filed a complaint?

275

1      MR. SHAIBANI: Objection on foundation.
2      You can answer, if you know.
3    A  Within my collection of documents here, I
4  have a copy of his application to OHR and some other
5  documents relating to this particular case.
6  BY MR. BOUSE:
7    Q  Okay. Now, you have B here, in your report,
8  page 19, Mr. Lynch. Okay?
9    A  I'm on page 19.
10   Q  This is why I asked the question. The
11 second -- if you start down the second sentence of
12 that page 19 of your report says, "However, following
13 Mr. Bratton's threats to sue for discrimination and
14 subsequent complaint with the District of Columbia
15 Office of Human Rights, Mr. White's counsel, John
16 Gordon Forester informed Mr. Bratton that he was going
17 to 'negotiate the lease.'"
18     I want to know what facts you have as to
19 when Ms. White knew there was going to be a complaint
20 filed or she actually received the complaint. It's in
21 your report.
22     MR. SHAIBANI: I'll object on the basis that

Case 1:06-cv-00694-JDB   Document 49-5   Filed 03/22/2007   Page 2 of 17
DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

17 (Pages 276 to 279)

**Page 276**

1 the entire sentence should be read into the record if
2 you want to ask him a question about that, and the --
3     MR. BOUSE: You can read it. I'll just stop
4 right there. If you want to read the whole page 19,
5 you can, Mr. Lynch.
6     MR. SHAIBANI: The sentence beginning with
7 however, can you read it to the end?
8 BY MR. BOUSE:
9     Q   Second sentence.
10    A   "However, following Mr. Bratton's threats to
11 sue for discrimination and subsequent complaint with
12 the District of Columbia Office of Human Rights,
13 Ms. White's counsel, John Gordon Forester, informed
14 Mr. Bratton that he was going to 'negotiate the lease'
15 with him despite Ms. White's previous
16 misrepresentations that another tenant had executed a
17 lease agreement for the property and that the property
18 was no longer available."
19    Q   Okay. So my question is what evidence do
20 you have as to when Ms. White knew that there was a
21 going to compliant filed with the District of Columbia
22 Office of Human Rights?

**Page 277**

1     A   I'd have to go back through all of these
2 documents to come up with a date that this was filed
3 or she might have first been informed that it was
4 about to be filed.
5     Q   Okay. So you don't have a date, and if it
6 was after the time that Mr. Forester began negotiating
7 with Mr. Bratton, then that would not be
8 discriminatory; would it?
9     MR. SHAIBANI: Objection on the basis that
10 it mischaracterizes the record of the case and assumes
11 facts not in evidence.
12 BY MR. BOUSE:
13    Q   I'm sorry. You can answer.
14    A   I'm not prepared to answer that question. I
15 think we're going around about a whole bunch of dates
16 and times and things that would need to be researched
17 a little bit more. I mean, this is --
18    Q   This is your collaborative report?
19    A   Yes, I understand.
20    Q   And I'm entitled to know your knowledge of
21 that collaborative report.
22    A   I understand, and if we want to delay this

**Page 278**

1 while I read through all this stuff one more time,
2 that's okay. I'm just going on the basis of my
3 understanding of the events in a report that was
4 created back in October of 2006.
5     Q   Okay. Let me ask about the damage.
6 Mr. Shaibani, show him the letter from Mr. Forester
7 dated October 18, 2005?
8     MR. SHAIBANI: Is that the fax you sent him?
9     MR. BOUSE: Yes, it is. I'd ask the court
10 reporter to mark that first letter I referred to dated
11 October 12, 2005 from Mr. Liverman to Ms. White as the
12 next deposition exhibit, please.
13    MR. SHAIBANI: The one dated October 18?
14    MR. BOUSE: No, the one date October 12.
15    MR. RANCK: That will be Exhibit 7.
16    (Lynch Deposition Exhibit Number 7 was
17 marked for identification and retained by counsel.)
18 BY MR. BOUSE:
19    Q   Have you looked at that letter of
20 October 18, 2005 from Mr. Forester to Mr. Bratton?
21    MR. SHAIBANI: Actually, can we have that
22 back? He's referring to it.

**Page 279**

1     (Discussion off the record.)
2     THE WITNESS: Okay. I have what appears to
3 be a draft of a letter from John Gordon Forester, Jr.
4 to Mr. Bratton as of the 18th of October.
5 BY MR. BOUSE:
6     Q   Okay. In that, Mr. Forester indicates that
7 they had a telephone conversation in the morning. Are
8 you aware of what that conversation was and what it
9 was about?
10    A   No.
11    Q   Okay. And he also indicates what the basis
12 for the leasing of the property will be in
13 Paragraph 2; is that correct?
14    A   That's correct.
15    Q   And then he asked for federal tax returns
16 for 2003 and 2004. Do you find the fact that he asks
17 for those income tax returns discriminatory?
18    A   I find it rather odd for a $2,500-a-month
19 lease.
20    Q   Do you know what Mary White did with the
21 other tenants in that property that she owned, what
22 she requested of them or what she required of them to

Case 1:06-cv-00694-JDB    Document 49-9    Filed 03/22/2007    Page 3 of 17
DEPOSITION OF THOMAS J. LYNCH, VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

18 (Pages 280 to 283)

**Page 280**

1  lease the property?
2  A  There appears to be no evidence that the
3  same was requested of Roberta Medlin.
4  Q  If I told you Ms. White testified under oath
5  that she was going to ask for the same tax returns
6  from Mrs. Medlin, would you find then -- if that's
7  true, would you find that discriminatory by asking
8  Mr. Bratton for his tax returns?
9    MR. SHAIBANI: Objection. Assumes facts not
10 in evidence and calls for speculation.
11 A  If she were actually going to do that, I
12 would have expected to see some reference to that in
13 the lease that was prepared on the 11th of October
14 which seemed to be to terribly complete.
15 BY MR. BOUSE:
16 Q  Do you know whether or not Mary White ever
17 saw that lease as completed by Chatel and faxed to
18 Ms. Medlin before it was faxed to her?
19   MR. SHAIBANI: Objection.
20 A  I think Ms. White's involvement with Roberta
21 Medlin seems to indicate to me that Ms. White was much
22 more familiar with the terms and conditions of the

**Page 281**

1  lease prepared on the 11th for Medlin.
2  BY MR. BOUSE:
3  Q  And you base that on Roberta Medlin's
4  testimony, or what do you base that on, sir?
5  A  I base it on the fact that she and Medlin
6  had far more -- they had more exchanges than she
7  obviously had with Bratton, and the lease on the 11th
8  was very complete, including a typed sheet of addenda
9  issues.
10 Q  Do you know what Mrs. White testified about
11 those addendum issues in her deposition?
12 A  I do not have a copy of her deposition, as
13 previously stated.
14 Q  Do you know whether or not Ms. White
15 required tax returns for the other two tenants at 1622
16 Wisconsin Avenue?
17   MR. SHAIBANI: Objection. Assumes facts not
18 in evidence and relevance as well.
19 BY MR. BOUSE:
20 Q  All right, sir. Do you know?
21 A  I don't know and certainly didn't see them
22 asked for or made a condition of the October 11 lease.

**Page 282**

1  Q  No. I'm talking about the other two tenants
2  that are in the property at 1622 Wisconsin. I'm not
3  talking about Ms. Medlin now.
4  A  I don't have any information on the other
5  two tenants that are in the property.
6  Q  Okay. Is it discriminatory on its face to
7  ask someone who is self-employed to attach tax returns
8  for an application for a lease?
9    MR. SHAIBANI: Objection. Asked and
10 answered.
11 BY MR. BOUSE:
12 Q  I'm just asking that.
13 A  I think that asking Bratton for this with no
14 evidence that it was asked of the other candidate in
15 question, Roberta Medlin, can be interpreted as
16 discriminatory on its face as an additional condition
17 or road block thrown in his way that was not thrown in
18 the way of someone else.
19 Q  Okay. My question was, Mr. Lynch, I know
20 what you say about whether it was asked of Ms. Medlin
21 or not. My question is asking a prospective tenant
22 for income tax returns, if he happens to be

**Page 283**

1  African-American, is that in and of itself
2  discriminatory?
3    MR. SHAIBANI: Objection. Asked and
4  answered.
5  A  Asking for information on someone regardless
6  of race is not in and itself discriminatory, and that
7  is not what this case is about. This case indicates
8  that there was different treatment for one candidate
9  versus another.
10 BY MR. BOUSE:
11 Q  Okay. Now, in looking at this letter of
12 Mr. Forester's dated October 18, 2005, his explanation
13 as to why he wanted those income tax return, do you
14 find that to be discriminatory in Mr. Forester's
15 negotiations with Mr. Bratton --
16   MR. SHAIBANI: I'll object to the document
17 since it's unsigned.
18   MR. BOUSE: -- if the same information was
19 asked of Ms. Medlin.
20   MR. SHAIBANI: I'll object that the document
21 referred to is unsigned and is not even on the
22 letterhead of John Gordon Forester.

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 4 of 17
DEPOSITION OF THOMAS J. LYNCH - VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

19 (Pages 284 to 287)

**284**

1     MR. RANCK: May I see the document for a
2 minute, please?
3     THE WITNESS: Would you kindly repeat your
4 question?
5 BY MR. BOUSE:
6   Q  Sure. I'm asking whether or not the
7 explanation Mr. Forester gave Mr. Bratton, without
8 consideration of whether Ms. Medlin was asked the same
9 thing, is that in and of itself, for the reasons that
10 Mr. Forester stated in that letter, discriminatory?
11     MR. SHAIBANI: Objection to the document, to
12 the document's authenticity and the objection that the
13 question was asked and answered.
14 BY MR. BOUSE:
15   Q  Mr. Lynch, can you answer that, sir?
16   A  As I think I said earlier, that asking for
17 information in and of itself is not discriminatory,
18 regardless of whom it is asked.
19   Q  Have you reviewed all of the correspondence
20 between Mr. Forester and Mr. Bratton?
21   A  The information that you sent just recently,
22 I believe it's in my folio, and I read it back

**285**

1 sometime in early October, late September, probably
2   Q  Do you find that Mr. Forester's dealing with
3 Mr. Bratton and his responses to Mr. Bratton's letters
4 back and forth -- this is a general question -- were
5 in and of themselves discriminatory or show
6 discrimination?
7     MR. SHAIBANI: Objection to the extent that
8 the documents speak for themselves.
9   A  I think I can answer that question if you
10 were to choose a particular expression of
11 Mr. Forester's to Mr. Bratton, and I would state my
12 reaction to that.
13 BY MR. BOUSE:
14   Q  Let's look at Mr. Forester's responses. Do
15 you have the letter of October 26, 2005 from
16 Mr. Forester to Mr. Bratton?
17   A  I believe this is the one that says on
18 October 20, upon receiving.
19   Q  This will acknowledge receipt of your fax
20 transmission dated October 26. It starts with that.
21   A  Let's see. I see it now. There's two
22 letters dated the 26th.

**286**

1   Q  One is from Mr. Bratton to Mr. Forester.
2 You may want to look at that.
3     MR. SHAIBANI: I'll object to the document
4 reference, because it's unsigned and not on
5 letterhead.
6     MR. BOUSE: Sure.
7   A  Okay. I have the document in front of me.
8 Dear Mr. Bratton, this will acknowledge?
9 BY MR. BOUSE:
10   Q  Yes, sir.
11   A  There is some specific language here.
12   Q  I'm just wondering, you've read that letter.
13 Is that --
14   A  I read it months ago. I'll read it one more
15 time. Then you can ask me a question. Okay.
16   Q  Is there anything in there that is evidence
17 of discrimination, Mr. Forester's response to
18 Mr. Bratton?
19     MR. SHAIBANI: I'll object to the document's
20 authenticity.
21   A  There was nothing in the MRIS that said that
22 the same tenant couldn't rent the lower level and the

**287**

1 middle level at the same time, although Mr. Forester
2 here is saying well, the obvious reason is only one
3 space will be vacant at one time. The lower floor is
4 separate -- is available to rent to a separate tenant,
5 but only after the space --
6   Q  So what is discriminatory about that?
7   A  Well, I think the issue is I'm not so much
8 concerned about Washington Fine Properties being
9 available, but the fact that the lower floor is
10 available to rent to a separate tenant is perhaps
11 another way to discourage Mr. Bratton from entering
12 into an agreement for this property, since he seemed
13 to want the lower unit as well as the middle unit.
14   Q  Do you believe that Mr. Forester in his
15 dealings with Mr. Bratton was discriminatory in and of
16 itself in any way? In his representation of
17 Ms. White, was he himself acting in a discriminatory
18 way towards Mr. Bratton?
19     MR. SHAIBANI: Objection.
20   A  I don't see that which -- in this letter
21 that which is in and of itself taken out of context
22 would necessarily be a discriminatory. I think it's a

Case 1:06-cv-00694-JDB    Document 49-9    Filed 03/22/2007    Page 5 of 17
DEPOSITION OF THOMAS J. LYNCH, VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

20 (Pages 288 to 291)

288

1  little edgy in some of the language that he uses.
2  BY MR. BOUSE:
3     Q  If Mr. Forester said to Mr. Bratton, as
4  there's been some testimony, what are you trying to
5  do, make this is a test case, would that be evidence
6  of a discrimination?
7     MR. SHAIBANI: I'll object to the phrasing
8  of the testimony of Mr. Bratton. I believe it was a
9  test case for discrimination, looking for a reason to
10 sue.
11    MR. BOUSE: Are you finished, Mr. Shaibani?
12    MR. SHAIBANI: Yes.
13 BY MR. BOUSE:
14    Q  Mr. Lynch, can you answer my question?
15    A  You're stating to me that Mr. Forester said
16 to Mr. Bratton what do you want to be, a test case?
17    Q  Words to that fact. During their
18 negotiations --
19    A  Yes. Yeah, I would consider that -- I would
20 consider that to be a response that certainly would
21 give me and a lot of other people the perception that
22 there was a sense of discrimination here at the very

289

1  least.
2     Q  Would that apply to Mrs. White? If that
3  statement was made of Mr. Forester during his
4  negotiation, can you attribute that statement to
5  Mrs. White?
6     MR. SHAIBANI: I'll object to the extent
7  that the question calls for a legal conclusion as to
8  the meaning of respondeat superior.
9     You can answer the question.
10    A  I think that J. Gordon Forester, as well as
11 Chatel, was acting as agent for Mary White, and I do
12 believe there is a connection between the actions of
13 the agent and the actions of the employer.
14 BY MR. BOUSE:
15    Q  Do you have any evidence that Mary White
16 told either Chatel or John Gordon Forester to
17 discriminate against Mr. Bratton?
18    MR. SHAIBANI: Objection. Calls for
19 speculation.
20    MR. RANCK: How -- never mind.
21    A  I've made my opinion based on a continuum of
22 actions with Mr. Bratton and the parties involved in

290

1  the transaction. I daresay it might be very difficult
2  to find a statement from Ms. White. I have not read
3  her deposition that says yeah, I clearly intended to
4  discriminate against him. I'd have a hard time
5  finding that.
6  BY MR. BOUSE:
7     Q  Mr. Lynch, if a property is listed, a rental
8  is listed in MRIS, and the owner at any time tells
9  someone who wants to lease it for nondiscriminatory
10 reasons that it's no longer available, just because
11 it's in the MRIS -- simply because it's listed in the
12 MRIS, does that mean that the owner must lease it to
13 someone who wants to rent it?
14    MR. SHAIBANI: Objection. Compound.
15 BY MR. BOUSE:
16    Q  If it's not based on discriminatory reasons.
17    MR. SHAIBANI: And vague as well.
18    A  An owner may remove an offering in the MRIS
19 at any time that the owner desires to do so. However,
20 depending upon whether -- depending upon the nature of
21 the agency relationship, if one, in fact, does exist,
22 the owner withdrawing an offering may be doing so at

291

1  his or her own peril.
2  BY MR. BOUSE:
3     Q  Let's assume for purposes of this
4  question -- the facts for this question, Mr. Lynch.
5  Suppose Mary White had agreed to lease the basement
6  level to Mr. Bratton, and then because of whatever
7  circumstances, she couldn't go to Washington Fine
8  Properties and for whatever reasons, she said then I'm
9  not going to lease it to you because I'm going to use
10 it myself. Is that in and of itself discriminatory?
11    MR. SHAIBANI: Objection. Assumes facts not
12 in evidence. Mischaracterizes the record of the case
13 and calls for speculation.
14    A  If she removed it from availability, and the
15 question would be -- that should be reflected in the
16 MRIS record very, very quickly as well. Otherwise, it
17 might appear that it was being removed only because of
18 who was negotiating a transaction at the time. But,
19 you know, an awful lot of things in and of themselves
20 may not necessarily be discriminatory, because when we
21 say in and of themselves, I think you're taking them
22 out of context.

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 6 of 17
DEPOSITION OF THOMAS J. LYNCH, VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

21 (Pages 292 to 295)

292

BY MR. BOUSE:
Q   Mr. Bratton wanted the term month to month after the period of his lease of two years elapsed, right?
A   These my understanding.
Q   Under D.C. rules and regulations or laws, what kind of notice does the landlord have to give to terminate a holdover month-to-month lease?
MR. SHAIBANI: Objection. Calls for a legal conclusion.
A   Are you equating a month-to-month to a holdover?
BY MR. BOUSE:
Q   Yeah?
A   I don't believe that's true.
Q   What is the difference, and maybe I don't understand, and I appreciate you educating me. What's is the difference between a holdover which becomes a month-to-month and a month-to-month lease?
A   I think Thierry Liverman came pretty close to it when he referred to a tenant who suffers. What I'm sure he meant to say in his deposition a tenant

293

that sufferance. That best describes a holdover tenant, and a holdover tenant is a tenant who had a right to be in a space at a certain time per a contractual lease, and the person still remains even though no new lease or extension thereof has been negotiated. The 30-day month-to-month that follows upon a term lease that changes a term lease by contract from a term lease to a periodic lease is just simply a month-to-month lease. It's not a holdover. It just carries forward the rights, terms and conditions of both parties under the original lease.
Q   Okay. So what was Mr. Bratton looking for? What is your understanding of what he was looking for?
A   My understanding was he wanted to stay there longer than two years.
Q   Yeah. But he understood he's going to get a two-year lease, but I thought he said he wanted a month-to-month following that. Is that a holdover or is that a month-to-month lease?
A   No, that's an extension of the original lease, and the reality of life is a month-to-month becomes a year. Tempus fugit. Everybody gets into a

294

groove, the rent is coming in, most people on a month-to-month end up being month-to-month for a very long time.
Q   Does the landlord have a right to increase the rent at the end of the two-year term before the month-to-month starts?
A   I would say with appropriate notice to that effect, as to how the original lease said. But in a fairly typical situation, if you have -- you would have for the full term of the term lease, alias estate for years, that Mr. Bratton enjoyed or would enjoy for the first two years to an extension thereof, could carry an increase in rent, and if he or anyone else is on a month-to-month lease, then with an appropriate 30-day notice, either the tenant could signify his desire to no longer continue in this situation or the landlord could signify a desire to increase the rent.
Q   Do you believe that Mary White's not leasing the street level to Mr. Bratton was discriminatory?
MR. SHAIBANI: The street level?
BY MR. BOUSE:
Q   I'm sorry. The basement level. I did say

295

street level. I'm sorry, Mr. Lynch.
A   As I said, it's a continuum of situations here. Both levels were available in the MRIS, and he was interested in both, and he was not given the opportunity to rent the bottom space.
Q   Well, you know, Mary White testified that she wanted to use it for herself. I don't know if you know that or not. If she used it for storage or other reasons for herself, is it then discriminatory not to lease it to Mr. Bratton?
MR. SHAIBANI: Objection. Assumes facts not in evidence, Mischaracterizes the record of the case and calls for speculation.
You can answer.
A   I think if she wanted to avoid even a scintilla of discriminatory behavior, she would have done well to have directed Chatel to negotiate with Mr. Bratton that he would be able to rent that bottom space as soon as she was able to free herself from it, and perhaps create a document that would say she would give him 30 days notice of the availability of the space, and he would have to act on it.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

---

Page 296

BY MR. BOUSE:

Q   And not doing so was discriminatory?

A   It may well have been her motive.

Q   And again, you can't get inside the mind of Mary White; can you?

A   I can't get inside the mind of Mary White. I am sitting on the outside observing a series of events.

MR. BOUSE: I don't think I have I anything else. Thank you, sir.

THE WITNESS: You're welcome.

MR. SHAIBANI: I have some follow-up questions.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. SHAIBANI:

Q   Mr. Lynch, you testified before that you had engaged in four commercial lease transactions since 2000, and that from '79 to '84, your real estate business focused on commercial properties. Do you consider yourself qualified to testify as an expert concerning discrimination in the terms and conditions of leasing a commercial property?

Page 297

A   I do.

Q   Now, there's been a lot of discussion in this case as to negotiation of the terms of a commercial property as being significantly different from residential property. With respect to Mary White's property, do you consider that to be the street and basement levels, is it so complex to negotiate a lease for the street and basement levels of Mary White's property?

MR. RANCK: Is it so complex? I object.

MR. BOUSE: Objection. Form.

MR. RANCK: Vague.

BY MR. RANCK:

Q   Do you consider the negotiation for leasing Mary White's street level and basement level, which were posted as available for rental and $2,500 for the street level and a 1,000 for the basement, do you consider that to be the type of commercial transaction that requires extensive negotiation?

MR. BOUSE: I object.

A   I believe I answered on Friday in my deposition that I thought that this transaction was a

Page 298

simple as renting out an apartment. We're talking about 635 square feet and probably less than that on the lower level. Neither of these transactions nor this entire transaction is complicated. It's called commercial, I think, only because it happens to be in the C2A zone. As far as the magnitude of difficulty and complexity, I think it's negligible.

Q   Counsel previously asked during the deposition of Friday whether Mary White or Chatel were required under the law to give Bratton the right of first refusal. Do you believe that Mr. Bratton could have been given a right of first refusal or a right of second refusal with respect to Mary White's property, even though the residential tenant on the second level has the right of first refusal?

MR. RANCK: Objection to form.

MR. BOUSE: I object.

A   I think I would answer it almost pretty much the same way I answered it on Friday. That granted, there are specific statutes and regulations vis-a-vis the rights of a residential tenant, but I see no difficulty in offering Mr. Bratton at least a

Page 299

secondary right of first refusal in the event that the residential tenant did not exercise any right for the entire building. He having a right of first refusal with respect to the space that he was using seems very, very fundamental, basic and normal sort of situation.

BY MR. SHAIBANI:

Q   And you think that if Ms. White intended to bequeath her property to her heirs, would that somehow preclude her from giving Mr. Bratton a right of first refusal if she has a will in which she basically gives her property to her heirs?

MR. BOUSE: I object to the form of the question.

MR. RANCK: Same objection. I don't see what difference it would really make if this property were to be in her will to go to her heirs, and the fact that he had a right of first refusal would interfere with what she's able to pass on to her heirs. His right of first refusal would only be exercised if she intended and had a contract to sell the property to someone else and he was merely

Page 300

1  stepping in and exercising a right that he had
2  negotiated in a contract had with her. You know,
3  what's going to go to your heirs is really -- I wish I
4  knew what was going to go to my heirs because one, I
5  don't know when I'm going to pass anything to my
6  heirs, and I have no way of determining what my
7  financial and property disposition will be at that
8  moment in time that none of us knows.
9  BY MR. SHAIBANI:
10     Q   Would Mary White lose her free right of
11 alienability in her commercial property as a result of
12 giving Mr. Bratton a right of first refusal for that
13 property?
14     MR. BOUSE: Objection.
15     MR. RANCK: Object to the form.
16     A   I think rights of first refusal are given
17 every day of the week.
18     MR. RANCK: Is that somehow responsive to
19 the question?
20     A   I don't think it interferes with her right
21 of free alienability. That's an expression of
22 alienability to enter into a right of first refusal.

Page 301

1  BY MR. SHAIBANI:
2     Q   Would you agree that providing a commercial
3  tenant an option to renew the lease or to convert to a
4  month-to-month lease at the end of the initial lease
5  term is standard in -- is a standard term in
6  commercial lease transactions?
7     MR. BOUSE: I object.
8     MR. RANCK: Objection to the form. Leading.
9     A   I would say that it's customary and
10 commonplace, but I would steer clear of the word
11 standard.
12 BY MR. SHAIBANI:
13     Q   If Ms. White had given a right of first
14 refusal to Roberta Medlin and at the term which would
15 allow Ms. Medlin to convert her lease to a
16 month-to-month at the end of a two-year term, wouldn't
17 she be violating the law by not giving these terms to
18 Mr. Bratton when the property is the same and the
19 price of the rent is the same?
20     MR. RANCK: Objection.
21     MR. BOUSE: I object. There was never any
22 lease signed by Roberta Medlin.

Page 302

1     MR. RANCK: Objection. Form, leading, calls
2  for an express legal conclusion.
3     MR. BOUSE: I object.
4     A   I'm going to answer that saying that the
5  essence of discrimination is summed up in quoting
6  different terms and conditions to different people.
7  BY MR. SHAIBANI:
8     Q   There was some discussion about
9  Mr. Liverman's contacting Mr. Bratton after his
10 meeting with Mary White to inform him that the
11 property is no longer available. Now, if Chatel
12 discovered on the 13th of October from Roberta Medlin
13 that Roberta Medlin had withdrawn her offer, what
14 should have Chatel done at that point to remain in
15 compliance with the laws governing discrimination?
16     MR. RANCK: I object in as far as it calls
17 for a legal conclusion.
18 BY MR. SHAIBANI:
19     Q   I can rephrase the question. If Chatel
20 found out on the 13th of October that Roberta Medlin
21 was withdrawing her offer, and Chatel had informed
22 Mr. Bratton the previous day that the property was no

Page 303

1  longer available, what should Chatel have done after
2  it discovered that Roberta Medlin was not going to be
3  leasing the property?
4     MR. SHAIBANI: Same objection.
5     MR. BOUSE: I object.
6     A   I believe that the materialness of the fact
7  that the property was indeed available after
8  Ms. Medlin removed herself from the negotiations was
9  such that the agent owed an obligation under the
10 statute vis-a-vis agency to treat the customer
11 honestly, and that is not knowingly giving him false
12 information or allowing him to continue to dwell in
13 the falsehood of the lack of the availability of the
14 property.
15 BY MR. SHAIBANI:
16     Q   If Mary White had questioned Chatel on the
17 12th of October whether she would be sued by
18 Mr. Bratton if she didn't lease him the property,
19 would Chatel's obligations change in my way?
20     MR. BOUSE: I object.
21     MR. RANCK: I object again insofar as it
22 calls for a legal conclusion.

**Page 304**

1  A   I don't think that the threat of a suit
2  changes one's obligations in negotiating fairly,
3  openly, honestly and without discrimination with any
4  number of parties.
5  BY MR. SHAIBANI:
6      Q   If Mary White had informed Chatel that she
7  didn't want to lease her property to an
8  African-American, wouldn't Chatel be obligated to
9  withdraw from the listing agreement and document its
10 termination of the agency agreement with Mary White in
11 order to remain free of discrimination itself?
12         MR. RANCK: I object to the form.
13         MR. BOUSE: I object.
14 A   If Mary White told them she didn't want to
15 rent to an African-American, I believe that the duty
16 of Chatel would have been first to dissuade her of
17 that idea, and if they were not successful within an
18 exceedingly short, short, short period of time, then
19 their best protection would have been to release Mary
20 White from any further obligations on the listing and
21 disassociate themselves from that particular potential
22 transaction.

**Page 305**

1  BY MR. SHAIBANI:
2      Q   Can there be discrimination in real estate
3  transactions when there's no discriminatory intent,
4  but the course of conduct is such that the impact on
5  the two prospective candidates for leasing a property
6  is discriminatory?
7          MR. BOUSE: I object. Clearly calls for a
8  legal conclusion. I object.
9          MR. RANCK: Same objection.
10 A   I think we had a similar question on Friday
11 where counsel for Chatel asked me to explain how that
12 could happen without intent to discriminate, and I
13 used the example of the agent who doesn't show the
14 first floor apartment, ground floor apartment to a
15 prospective female tenant because the agent was acting
16 more as a parent than as a real estate agent. No
17 intent to discriminate, but their actions were, in
18 fact, discriminatory by not making all of the actual
19 available units available. The decision would be with
20 the tenant, and I believe I finished my answer on
21 Friday with that -- the quintessential discriminatory
22 act is not allowing people to make their own

**Page 306**

1  decisions.
2  BY MR. SHAIBANI:
3      Q   Aren't the civil rights agent and the D.C.
4  Human Rights Act applicable to commercial real estate
5  transactions?
6  A   Well, clearly, the 1866 Civil Rights Act is
7  applicable to commercial real estate transactions as
8  well as other types of transactions and interactions,
9  and the D.C. Human Rights Act of 1977, as amended,
10 specifically states that it applies to commercial
11 transactions as well as retail transactions, workplace
12 transactions, auto insurance, education. It's a very,
13 very broad piece of legislation.
14     Q   Is it a violation of the MRIS rules to list
15 a property as being available for a lease term of 12
16 to 48 months, but then deny a prospective tenant the
17 opportunity to lease it for the maximum term as
18 advertised on the MRIS?
19 A   Well, at the very least, MRIS would want --
20 if the conditions have changed, have been altered
21 between the less -- between the would-be lessor and
22 the listing agent, probably the management company,

**Page 307**

1  then in a matter of 48 hours, that should have been
2  reflected in the MRIS printout, per MRIS regulations.
3      Q   And do you believe that Chatel violated the
4  MRIS rules by not changing the designation of Mary
5  White's street level property as being available for
6  12 to 48 months if Mr. Bratton was denied the maximum
7  term of that lease as advertised on the MRIS?
8          MR. RANCK: Did you say street level?
9          MR. SHAIBANI: Yes.
10 A   Well, if I can go back to my answer to your
11 previous question, where I said it was basically
12 inconsistent or a violation of MRIS regulations not to
13 make a significant change like that within the 48-hour
14 period of time, given that it was still there, and he
15 was denied, I think that becomes one of those other
16 little things that maybe in and of itself is not such
17 a great big deal, but the compound effect of ABCDE
18 does build up to a significant issue.
19 BY MR. SHAIBANI:
20     Q   Now, previously, you were being questioned
21 about Chatel's fair housing manual, and I just have a
22 couple of follow-up questions about that. If you

**Page 308**

1  could please turn to page 2 of Chatel's fair housing
2  manual, which is designated by BRA 247?
3     A   Okay.
4     Q   At the bottom of the page, do you see where
5  it says it is unlawful to represent a house or
6  apartment as unavailable when, in fact, it is
7  available?
8     A   Correct.
9     Q   Do you believe that misrepresentation about
10 the availability of a property is a violation of the
11 civil rights act and the D.C. Human Rights Act if that
12 misrepresentation is based on the race of the
13 applicant --
14       MR. RANCK: Objection.
15    Q   With respect to a commercial property?
16       MR. RANCK: Objection. Calls for a legal
17 conclusion.
18       MR. BOUSE: Objection.
19    A   I would offer that saying that the property
20 is unavailable that, in fact, is not unavailable on
21 basis of race would be a violation of both the 1866
22 civil rights law as well as the D.C. Human Rights Act

**Page 309**

1  of 1977, as amended.
2  BY MR. SHAIBANI:
3     Q   And do you see at the bottom of page 2 of
4  Chatel's fair housing manual, where it says it is
5  unlawful to refuse to rent or to negotiate for the
6  rental of a house or apartment or otherwise make
7  housing available? Do you believe that this provision
8  applies to commercial property?
9        MR. RANCK: Objection to the form and calls
10 for a legal conclusion.
11       MR. BOUSE: I object.
12    A   It certainly does under the D.C. Human
13 Rights Act of 1977, as amended.
14 BY MR. SHAIBANI:
15    Q   And the next page, on page 3, do you see
16 where it says it is unlawful to discriminate in the
17 terms and conditions for renting a house or apartment?
18 Do you believe that it's a violation of the civil
19 rights act and the D.C. Human Rights Act to
20 discriminate in the terms and conditions for renting a
21 commercial property?
22    A   I do.

**Page 310**

1     Q   And do you believe that Chatel violated its
2  fair housing manual by misrepresenting the
3  availability of Mary White's property to John Bratton
4  by refusing to provide him the same level of services
5  as that provided to Roberta Medlin?
6        MR. RANCK: Objection to form.
7        MR. BOUSE: Object.
8     A   I believe, as I think I said earlier, it
9  does in the sense that the fair housing manual, which
10 we had a great discussion today about housing -- that
11 the fair housing manual does reference the 1866 law
12 and the D.C. Human Rights Act, and to that extent, it
13 is an issue.
14 BY MR. SHAIBANI:
15    Q   Is it a violation of the standards and
16 regulations of the real estate profession to inform a
17 prospective candidate that they would be better off
18 renting property in another location? For instance,
19 to tell him instead of looking for office space in
20 Georgetown, why don't you look for office space in the
21 northeast of Washington, D.C. Would that be
22 discriminatory?

**Page 311**

1        MR. RANCK: Objection to form of the
2  question, lack of foundation.
3        MR. BOUSE: Objection.
4     A   Clearly suggesting that someone rents in
5  another location or look in another location would be
6  a violation of the not only the standard of care, but
7  the laws in place. They give a name to that. It's
8  called steering, and steering is a specifically
9  mentioned odious practice.
10 BY MR. SHAIBANI:
11    Q   Mr. Lynch, the expert report that was filed
12 in this case, is it your position that this was a
13 collaborative effort between counsel and yourself?
14       MR. RANCK: Objection. Leading.
15       MR. BOUSE: Objection.
16       MR. RANCK: Asked and answered.
17    A   Yes. I agree that it is, and I think we've
18 stated that before.
19       MR. SHAIBANI: I have no further questions.
20 Thank you.
21       MR. RANCK: I have some follow-up.
22 EXAMINATION BY COUNSEL FOR THE DEFENDANTS CHATEL REAL

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 11 of 17
DEPOSITION OF THOMAS J. LYNCH 3/22/2007
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

26 (Pages 312 to 315)

**Page 312**

ESTATE AND THIERRY LIVERMAN
BY MR. RANCK:
Q   You'd agree with me that the various acts you're talking about, statutes, they apply to discrimination; right? Not to simple mistakes?
MR. SHAIBANI: Objection. Assumes facts not in evidence.
A   I think they apply as a directive as to how people are to comport themselves in these dealings.
BY MR. RANCK:
Q   Yes. But in order to violate one of these statutes you've been testifying about, you have to have done something on the basis of one of the protected class; correct?
A   I think I said that one could unintentionally --
BY MR. RANCK:
Q   My question had nothing to do with intent. You have to have acted on the basis of one of those protected classes; correct?
A   I think you have to have a protected class as part of the equation to which your actions are

**Page 313**

attached.
Q   Right. If my client, if I'm an agent, and my client says that the property is available September 1 and I list the property as available October 1, I have haven't necessarily violated -- or strike that.
   If my client says the property is available September 1, and I when a person calls me on the phone to ask to inquire about the property, and I tell them October 1, I haven't violated one of these acts unless I've given them the wrong information based on their race, color, sex, religion, national origin, disability, familial status; right?
A   Direct.
Q   So if I just misspoke, I didn't violate one of these acts; correct?
MR. SHAIBANI: Objection. Assumes facts not in evidence.
A   You can misspeak and be in violation, depending upon what you misspeak. Example. We have no apartments available, or we have no space available, when, in fact, there is space available.

**Page 314**

And there's a disparate impact. I mean in other words, it's available to party A, but not to party B.
BY MR. RANCK:
Q   All right. If as an agent, my client calls me and says I've ratified Contract 1, so I call the agent for the prospective Buyer No. 2, and say my client ratified Contract 1, when in fact, my client didn't ratify it yet, and I haven't conveyed that misinformation because of Buyer 2's race or other protected class, I haven't violated one of these acts; have I?
MR. SHAIBANI: Objection. Assumes facts not in evidence.
A   I agree.
BY MR. RANCK:
Q   Even if Buyer No. 2 happens to be an African-American?
MR. SHAIBANI: Same objections.
A   I agree.
BY MR. RANCK:
Q   Okay. Now, Mr. Shaibani asked you about what Chatel should have done if they learned on

**Page 315**

October 13 that Roberta Medlin withdrew; do you recall that question?
A   I do.
Q   Let me ask you to add a couple of facts to that equation, hypothetical facts. Roberta Medlin pulls out of the negotiation on October 13. Chatel conveys that to Mary White. Chatel is then told by March White that she's going to have her lawyer take over the negotiation. Does Chatel violate one of these acts by not calling Mr. Bratton?
MR. SHAIBANI: Objection. Mischaracterizes the record of the case, assumes facts not in evidence and calls for speculation.
A   In spite of the fact that Mary White says my lawyer is going to take over the negotiations, Chatel is the one that communicated to Mr. Bratton that the space is no longer available. Chatel should have said, the space is available, you'll be hearing from Mr. White's attorney to continue your negotiations.
BY MR. RANCK:
Q   Well, my question is do they violate one of the acts?

**Page 316**

1  A  If they did it for an improper reason.
2  Q  And as to what Mr. Bouse asked about Mary
3  White, when you said motive or reason, you can't get
4  into Chatel's head, and you don't know why they did
5  certain things; correct?
6      MR. SHAIBANI: Objection.
7  A  I don't know why. I can certainly judge
8  what they did and what they didn't do.
9  BY MR. RANCK:
10 Q  Okay. Mr. Shaibani asked you some questions
11 about the complexity of this negotiation, whether it
12 should have been complicated or not. The right of
13 first refusal appears to have been very important to
14 Mr. Bratton; correct?
15 A  Yes.
16 Q  If you assume that Ms. White did not want to
17 give a right of first refusal to any prospective
18 tenant, then would you agree with me that that issue
19 could cause a negotiation to go on longer? Let me ask
20 you that question, first.
21     MR. SHAIBANI: Objection. Assumes facts not
22 in evidence. Calls for speculation.

**Page 317**

1  A  Might and might not.
2  BY MR. RANCK:
3  Q  In fact, in your years, you've seen
4  negotiations break done for a single issue; correct?
5      MR. SHAIBANI: Objection. Mischaracterizes
6  prior testimony.
7  A  I have certainly seen a single issue cause a
8  deal to go forward or not to go forward, certainly.
9  BY MR. RANCK:
10 Q  And I would guess in your 40 years in the
11 business --
12 A  Well, I'm probably in my 38th year. Close
13 enough. In that decade.
14 Q  38 years in the business, you have
15 undoubtedly seen some transactions fall through
16 because of disputes that you didn't think were
17 terribly significant; isn't that fair?
18     MR. SHAIBANI: Objection.
19 BY MR. RANCK:
20 Q  You're wondering why, what's the big deal
21 about that?
22 A  Well, I've seen deals fall through on things

**Page 318**

1  that I may not have thought be terribly significant,
2  but if they fell through, somebody thought it was
3  significant.
4  BY MR. RANCK:
5  Q  Exactly. Exactly. Is it your position that
6  if Ms. White left this property in her will to her
7  heirs, what is your position as to upon her death?
8  What happens to the property?
9  A  Well, I think the question was if it was in
10 her will.
11 Q  This is a different question. It's in her
12 will, going to certain heirs and she dies, what is
13 your opinion as to the title, if you will, of the
14 property?
15     MR. SHAIBANI: Objection. Assumes facts not
16 in evidence. Calls for speculation.
17     MR. RANCK: I'll concede Ms. White hasn't
18 died yet, if that's the fact not in evidence.
19     MR. SHAIBANI: Same objection.
20 A  Well, I would say that if she, in fact, has
21 left this property to certain named individuals in her
22 will, then during the carrying out the probate of her

**Page 319**

1  will, the property would, after all other -- all of
2  her debts and so on and so forth were taken care of,
3  the property, if it were still there and intact, would
4  be deeded in fact to the heirs named, designated in
5  her will.
6  BY MR. RANCK:
7  Q  Okay. Subject to Mr. Bratton's right of
8  first refusal, if there was one -- if there was a
9  right of first refusal in Mr. Bratton's lease, the
10 heirs would take it subject to that right of first
11 refusal; correct?
12     MR. SHAIBANI: Same objections.
13 A  I think the right of first refusal we're
14 talking about is selling the property to someone else
15 and not interfering with her will.
16 BY MR. RANCK:
17 Q  I'm asking. Do you know that that is the
18 rule of the law, or is that your best guess?
19 A  I don't imagine that the right of first
20 refusal attached to the lease is going to change the
21 will. What is -- the devise that would come to the
22 heirs would contain the property, and any extant

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 13 of 17
DEPOSITION OF THOMAS J. LYNCH - VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

28 (Pages 320 to 323)

**Page 320**

1  leases and attendant situations, contingency, et
2  cetera that would be associated with that lease.
3      Q   Do TOPA rights survive the death of the
4  owner?
5      A   TOPA rights are associated with the tenant,
6  regardless of who --
7      Q   Yes. So with regard to the upstairs
8  residential tenant, if Ms. White dies, her heirs will
9  take the property, but when they try to sell, the
10 upstairs tenant would still be able to exercise their
11 TOPA rights; correct?
12         MR. SHAIBANI: Objection.
13     A   Whoever ends up with the property would end
14 up with the property with all of its benefits and
15 encumbrances.
16 BY MR. RANCK:
17     Q   Do TOPA rights survive sales of the property
18 within the family? If Ms. White wanted to sell the
19 property to her sister, or transfer it to her husband,
20 assuming she has a sister or a husband, do those
21 persons take it subject still to the residential --
22     A   TOPA doesn't kick in if it's a nonarm's

**Page 321**

1  length noncompensation transaction.
2      Q   So Ms. White could sell it --
3      A   I didn't say sell it. TOPA kicks in if
4  there's any kind of a sale of part or all of the
5  interests in the property.
6      Q   How about a contractual right of first
7  refusal if Ms. White wanted to sell the property to
8  her sister?
9          MR. SHAIBANI: Same objections.
10     A   If she was wanted to sell it to her sister
11 would be a sale, and that's when the right of refusal
12 on a sale would kick in.
13 BY MR. RANCK:
14     Q   So giving Mr. Bratton a right of first
15 refusal would interfere with her ability to sell the
16 property to a relative; right?
17     A   It would be a condition of the property,
18 regardless of whom she told it to. A relative, an
19 investor.
20     Q   So just so make sure the record is clear,
21 she could not sell the property to a relative without
22 Mr. Bratton having a right to buy it first?

**Page 322**

1      A   She couldn't sell the property to anyone
2  without the terms and conditions of the lease being
3  honored.
4      Q   The MRIS -- and I just have a couple more
5  follow-up questions here. Would an MRIS list the term
6  of the property -- strike that.
7          The information in the MRIS, is that binding
8  on the owner or the lessor or can those proposed terms
9  in the MRIS change through negotiation?
10     A   You could change terms during negotiation.
11     Q   When a property is listed as being available
12 for 12 to 48 months, right? Mr. Shaibani asked you
13 about that term. Do you recall that?
14     A   I do.
15     Q   Does that mean that the lessor has to accept
16 an offer that's within the 12 to 48 months or does
17 that mean that the lessor will consider offers in that
18 range?
19         MR. SHAIBANI: Objection to the form.
20     A   If I read that in the MRIS, it indicates to
21 me that the lessor is open to someone who wants to
22 lease it for a year, two years, three years or four,

**Page 323**

1  and they would have to be prepared for someone to come
2  along and offer them and expect to have a positive
3  response if they offered to rent it for a year, two
4  year, three years or four.
5  BY MR. RANCK:
6      Q   But are they bound to accept any offer in
7  that range? They're not bound; are they?
8      A   They're not bound. It's sort of a
9  unilateral extension of terms.
10     Q   Okay. I understand an MRIS is deemed to be
11 reliable; right?
12     A   Deemed to be.
13     Q   Yes. But doesn't -- it really amounts to an
14 offer to receive offers; correct?
15     A   Yeah, it's a unilateral extension of an
16 offer.
17     Q   What do you mean by that?
18     A   Only one party making an offer in the MRIS
19 it's unilateral. It's not bilateral.
20     Q   I don't want to get too much into the
21 legalese. It's not binding; right?
22         MR. SHAIBANI: Objection.

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 14 of 17
DEPOSITION OF THOMAS J. LYNCH, VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

29 (Pages 324 to 327)

Page 324

1  A  It could be binding if someone met all the
2  terms and conditions of what extensively was being
3  offered, sort of textbook. Far more difficult to
4  actually make the case in the real world, but it
5  certainly has happened.
6  BY MR. RANCK:
7   Q  What does somebody like you as an expert in
8  the field interpret an MRIS when you see an MRIS
9  that's clearly got erroneous information, clearly a
10  typo, what's your reaction to that?
11      MR. SHAIBANI: Objection.
12  A  My reaction is it's 12 to 48 months, and not
13  128 to 48 months. I mean, there are typos. We've all
14  done it.
15  BY MR. RANCK:
16   Q  Prior to your first contact from
17  Mr. Shaibani, did you know Thierry Liverman?
18  A  Yes, I know Thierry.
19   Q  How long have you known Thierry?
20  A  Gosh. As I said earlier, his mother ran the
21  operation before he did. I suspect I've known Thierry
22  since the '70s, certainly the '80s, but I would

Page 325

1  suspect as late as the '70s -- as early as the '70s.
2   Q  Have you known him in a professional
3  capacity?
4  A  Correct.
5   Q  How about as social or friendly?
6  A  No.
7   Q  Strictly professional?
8  A  Strictly professional.
9   Q  Have you been involved in transactions with
10  him?
11  A  I am sure that my organizations have been
12  involved in transactions with Chatel, which he would
13  normally become involved in. I spent an awful lot of
14  years in Georgetown.
15   Q  But were you personally -- you said your
16  organization. Were you personally involved in
17  transactions with Thierry that you can recall?
18  A  I don't believe being a listing agent or a
19  selling agent on something that Thierry was listing or
20  selling.
21   Q  How about John Pagones? Did you know him
22  prior to this?

Page 326

1  A  Yes, I know John.
2   Q  How long have you known him?
3  A  Probably since the early '70s.
4   Q  Transactions you guys both been involved in
5  together or in the same transaction?
6  A  Again, not John Pagones and Tom Lynch, but
7  John Pagones representing Chatel and Tom Lynch
8  representing Boston Phelps Real Estate or Bay or
9  whatever the case may be. I'm sure in that business
10  sense, we would have been involved with transactions
11  with John Pagones. He's a significant player in the
12  Georgetown market.
13   Q  Now, other than Thierry Liverman and John
14  Pagones and Mr. Liverman's mother which you've
15  referred, are you familiar with other agents at
16  Chatel?
17  A  I am. I'd have to look at the roster. I
18  think they still have a young lady by the name of
19  Hoffgrin (phonetic) that's in that office that I
20  remember interviewing back in the early '70s. I knew
21  some other agents that had worked for me that went to
22  work for Chatel at a later time. I don't know if

Page 327

1  they're all still in the business.
2   Q  In the 30-plus years that you've known
3  Thierry Liverman, have you ever had reason to question
4  whether he was engaged in discrimination other than
5  this case?
6  A  No.
7   Q  In the 30-plus years you've known John
8  Pagones, have you ever had any occasion to question
9  whether he was engaged in any discrimination other
10  than this case?
11      MR. SHAIBANI: Objection.
12  A  No.
13  BY MR. RANCK:
14   Q  Are you familiar with Thierry Liverman's
15  reputation in the business community, the real estate
16  community?
17  A  Not really.
18   Q  How about John Pagones? Being as identified
19  him as a major player in Georgetown, I presume that
20  you know something about him?
21  A  Yeah, I know something about John Pagones.
22  He's been a very active agent in Georgetown. I don't

Case 1:06-cv-00694-JDB   Document 49-9   Filed 03/22/2007   Page 15 of 17
DEPOSITION OF THOMAS J. LYNCH, VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

30 (Pages 328 to 331)

**328**

1 even know if he ever worked for anybody other than
2 Chatel.
3   Q   How big a real estate market is Georgetown?
4 You commented earlier it's not very big. Is that
5 fair?
6   A   Geographically, the whole district is a
7 small place.
8   Q   So is it fair to say the group of realtors
9 in the district -- I mean, you know a lot of people;
10 right? And people at Chatel know a lot of people, and
11 a lot of people know them. I mean, it's a small sort
12 of close knit business community in the real estate
13 profession?
14       MR. SHAIBANI: Objection. Relevance,
15 compound.
16   A   Well, in spite of the fact that there
17 probably some 13,000 licensees in the District of
18 Columbia, in large measure it is kind of a small,
19 small world.
20 BY MR. RANCK:
21   Q   Have you ever heard anybody else call into
22 question Thierry Liverman with regard to whether he's

**329**

1 acted in a discriminatory fashion?
2       MR. SHAIBANI: Objection.
3   A   I have not, but I really don't get involved
4 much in the way of conversations over the back fence
5 of who's doing what. In other words --
6 BY MR. RANCK:
7   Q   There are certain professionals in the real
8 estate profession in D.C. and Georgetown who don't
9 have very good reputations; isn't that right?
10      MR. SHAIBANI: Objection.
11  A   There may be.
12 BY MR. RANCK:
13  Q   Well, are you familiar with anyone who
14 doesn't have a good reputation?
15      MR. SHAIBANI: Objection.
16  A   I'm not prepared to single out someone.
17 BY MR. RANCK:
18  Q   I'm not going to ask you to, but my question
19 generally is are you familiar that certain people have
20 reputations?
21  A   Have I heard that some people are difficult
22 to deal with or this, that or the other thing, I have.

**330**

1 But unless I experience it personally, I really don't
2 pay a lot of mind to it.
3   Q   Have you ever had heard anything about
4 Thierry Liverman other than in a positive light?
5       MR. SHAIBANI: Objection.
6   A   I haven't heard much one way or the other.
7 BY MR. RANCK:
8   Q   How about John Pagones?
9       MR. SHAIBANI: Objection.
10  A   I would answer the same way.
11 BY MR. RANCK:
12  Q   How about Chatel generally?
13      MR. SHAIBANI: Objection.
14  A   I wouldn't say anything, you know, that you
15 know, heard a lot of good or bad. It's nothing -- I'd
16 answer it the same way that I answered the question
17 about Thierry and John.
18 BY MR. RANCK:
19  Q   Bear with me one second. I think that's all
20 I have I wanted to ask you, but let me just check one
21 thing. Oh.
22      Are you aware of any facts in this case to

**331**

1 suggest that Chatel engaged in steering of Mr. Bratton
2 or Bratton Realty?
3   A   I can't think of the -- there's two ways you
4 can steer, put it that way. You can steer towards or
5 away. One could interpret the fact that he was
6 getting different circumstances presented to him other
7 than those of Roberta Medlin, that could be deemed to
8 be a form of steering, like discouraging a person to
9 coming here or encourage them to go somewhere else.
10 Either one of those would be considered steering.
11  Q   Are you aware of any facts to suggest that
12 Chatel engaged in a type of steering where they
13 encouraged him to go somewhere else?
14      MR. SHAIBANI: Objection.
15  A   I can't come up with a precise cite, no.
16 BY MR. RANCK:
17  Q   Did you discuss with Mr. Shaibani -- before
18 he asked these questions at a break or anything, did
19 you discuss the questions he was going to ask you?
20 Did he tell you what he was going to ask you?
21  A   I had no idea what he was going to ask me.
22      MR. RANCK: I've got nothing else.

Case 1:06-cv-00694-JDB  Document 49-9  Filed 03/22/2007  Page 16 of 17
DEPOSITION OF THOMAS J. LYNCH, VOLUME II
CONDUCTED ON MONDAY, FEBRUARY 12, 2007

31 (Pages 332 to 335)

**Page 332**

1  MR. BOUSE: Mr. Lynch, just one question.
2  EXAMINATION BY COUNSEL FOR THE DEFENDANT MARY WHITE
3  BY MR. BOUSE:
4  Q  Let me ask you the same questions about Mary
5  White. I think I asked you this, but you do you have
6  any knowledge of any reputation of Mary White for
7  discriminatory actions in the Georgetown area?
8  A  No.
9  MR. BOUSE: Thank you, sir.
10  EXAMINATION BY COUNSEL FOR THE PLAINTIFF
11  BY MR. SHAIBANI:
12  Q  I have a follow-up question. Mr. Lynch,
13  have you reviewed the Dateline NBC episode called "No
14  Way In"?
15  A  Yes.
16  Q  And do you recall the incident where John
17  Pagones, the real estate agent at Chatel, was
18  videotaped was informing a person in a wheelchair I
19  have nothing in Georgetown when, in fact, Chatel had
20  several listings in Georgetown at the time?
21  MR. RANCK: Objection. Lack of foundation.
22

**Page 333**

1  A  I recall seeing that piece.
2  BY MR. SHAIBANI:
3  Q  And does this refresh your memory as to the
4  reputation of Chatel, John Pagones and Thierry
5  Liverman with respect to allegations of
6  discrimination?
7  A  Well, I'll answer the question two ways.
8  Yes, it does bring to mind, refresh my memory with
9  respect to that particular show. Also, a series of
10  questions and answers in Mr. Pagones's deposition.
11  But the question had been was I ever aware that there
12  was some sort of issue at any time, then that would be
13  affirmative. I think the questions that were being
14  asked by counsel were do I have information vis-a-vis
15  reputation one way or the other, and I said no.
16  MR. RANCK: The question I had asked was did
17  you ever have any reason to call into question, any
18  occasion to call into question. That was the question
19  I asked.
20  THE WITNESS: Well, I would say I haven't
21  had an occasion to call into question other than this
22  case, and the things that have come up as a result of

**Page 334**

1  this case. I was not aware of that situation prior to
2  becoming involved in the case, and I think basically
3  we said prior the this case or outside of this case, I
4  think we answered in the affirmative to you.
5  BY MR. SHAIBANI:
6  Q  Mr. Lynch, do you stand by what's being said
7  in your expert report that was filed in this case in
8  October?
9  A  I am.
10  Q  And do you recall that Mary White and Chatel
11  and Mr. Liverman discriminated against John Bratton in
12  his attempting to lease Mary White's property?
13  MR. BOUSE: Objection.
14  MR. RANCK: Objection. Calls for a legal
15  conclusion.
16  A  **I'm rendering my opinion in that manner in**
17  **the affirmative.**
18  MR. SHAIBANI: Thank you. Could I get a
19  mini, please?
20  THE WITNESS: I read.
21  MR. BOUSE: Yes.
22  MR. RANCK: Regular delivery.

**Page 335**

1  (Signature having not been waived, the
2  deposition of THOMAS J. LYNCH was concluded at 4:06
3  p.m.)
4  ACKNOWLEDGMENT OF DEPONENT
5  I, Thomas J. Lynch, do hereby
6  acknowledge that I have read and examined the
7  foregoing testimony, and the same is a true,
8  correct and complete transcription of the
9  testimony given by me and any corrections appear
10  on the attached Errata sheet signed by me.
11
12  _____    _____
13  (DATE)                    (SIGNATURE)

**336**

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2           I, Lynn Schindler, the officer before whom
3   the foregoing proceedings were taken, do hereby
4   certify that the foregoing transcript is a true and
5   correct record of the proceedings; that said
6   proceedings were taken by me stenographically and
7   thereafter reduced to typewriting under my
8   supervision; and that I am neither counsel for,
9   related to, nor employed by any of the parties to this
10  case and have no interest, financial or otherwise, in
11  its outcome.
12          IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 26th day of
14  February, 2007.
15  My commission expires:
16  October 1, 2007
17
18
19  _____
20  NOTARY PUBLIC IN AND FOR
21  THE DISTRICT OF COLUMBIA
22

**337**

1           E R R A T A  S H E E T
2   IN RE:  Bratton v. Chatel Real Estate, Inc.,
3           et al.
4   RETURN BY: _____
5   PAGE    LINE    CORRECTION AND REASON
6   ____    ____    _____
7   ____    ____    _____
8   ____    ____    _____
9   ____    ____    _____
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14  ____    ____    _____
15  ____    ____    _____
16  ____    ____    _____
17  ____    ____    _____
18  ____    ____    _____
19  ____    ____    _____
20  ____    ____    _____
21  ____    ____    _____
22  _____
        (DATE)          (SIGNATURE)

**338**

1           E R R A T A  S H E E T  C O N T I N U E D
2   IN RE:  Bratton v. Chatel Real Estate, Inc.,
3           et al.
4   RETURN BY: _____
5   PAGE    LINE    CORRECTION AND REASON
6   ____    ____    _____
7   ____    ____    _____
8   ____    ____    _____
9   ____    ____    _____
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14  ____    ____    _____
15  ____    ____    _____
16  ____    ____    _____
17  ____    ____    _____
18  ____    ____    _____
19  ____    ____    _____
20  ____    ____    _____
21  ____    ____    _____
22  _____
        (DATE)          (SIGNATURE)