**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JOHN BRATTON,               )
                             )
    Plaintiff,           )
                             )
     vs.             )     Civil Action No. 06-694 (JDB)
                             )
CHATEL REAL ESTATE, INC., *et al.,*   )
                             )
    Defendants.      )
                             )

## EXPERT REPORT OF THOMAS J. LYNCH

### I.    INTRODUCTION

I have been asked by the law firm of Litigation Associate, PLLC to render my opinion regarding Chatel Real Estate, Inc.'s ("Chatel") and Mary White's dealings with John Bratton. I understand that this report will be filed in this case to assist the Court in resolving plaintiff's complaint. This suit arises from John Bratton's attempts to lease Georgetown office space and the alleged discriminatory actions toward Mr. Bratton by Chatel, John Pagones (a former real estate salesperson at Chatel), Thierry Liverman (Chatel's manager and owner), and Mary White (the property's landlord). The property at issue is located at 1622 Wisconsin Avenue, NW, Washington, DC ("Property"). I have examined the conduct of defendants in this case in light of real estate industry standards and applicable federal and District of Columbia statutes prohibiting discrimination in property transactions.

### II.    QUALIFICATIONS

My expert qualifications are as follows. I am a licensed real estate broker in the District of Columbia, Virginia, and Maryland, and have worked in the field since 1970. I

EXHIBIT

attended Maryland University, Strayer College, Arlington County Adult Education and numerous specialized courses and seminars in the real estate industry sponsored by the National Association of Realtors and local associations. I have owned Thomas J. Lynch Real Estate, Inc. since 1979 and am also currently the principal broker for Realitywatch.com, LLC. In addition, I am a member of numerous real estate organizations including the Washington, D.C. Association of Realtors, the Greater Capital Area Association of Realtors ("GCAAR"), and the National Association of Realtors ("NAR"). Further, I have taught courses to real estate brokers and salespersons sponsored by GCAAR, including classes on discrimination, professional standards, diversity and grievance investigations for many years. I have also served as an expert witness to the United States Civil Rights Commission on Discrimination and Housing with respect to housing discrimination against AIDS victims, and in federal and state courts in the Metropolitan area in over 30 cases.

### III.    DOCUMENTS REVIEWED

In drafting this report, I reviewed and relied upon the following pleadings and documents:

1. Complaint (filed April 18, 2006)

2. Answer of Defendant Mary White to Plaintiff's Complaint ( May 3, 2006)

3. Answer of Defendants Chatel Real Estate, Inc. and Thierry Liverman to Counts I and II of Plaintiff's Complaint (May 8, 2006)

4. First Amended Complaint (filed May 17, 2006)

5. Answer of Defendants Chatel Real Estate, Inc. and Thierry Liverman to Plaintiff's Amended Complaint (June 7, 2006)

6. Answer to First Amended Complaint by Mary White (June 14, 2006)

7. Scheduling Order (July 25, 2006)

8. Mary White's Response to Request for Admissions of Fact (August 25, 2006)

9. Defendants Chatel Real Estate's and Thierry Liverman's Responses to Plaintiff's Requests for Admissions of Fact (September 8, 2006)

10. Defendant Mary White's Response to Plaintiff's Request for Production of Documents

11. Defendants Chatel Real Estate's and Thierry Liverman's Responses to Plaintiff's Interrogatories

12. Defendant Mary White's Response to Plaintiff's Interrogatories

13. Plaintiff's Response to Defendants Chatel Real Estate's and Thierry Liverman's Interrogatories

14. Plaintiff's Response to Defendant Mary White's Interrogatories

15. Defendants Chatel and Thierry Liverman's Initial Disclosures Pursuant to Rule 26(a)(1) (August 25, 2006)

16. Defendant Mary White's Initial Disclosures Pursuant to Rule 26(a)(1) (August 24, 2006)

17. Plaintiff's Initial Disclosures Pursuant to Rule 26(a)(1) (August 25, 2006)

18. GCAAR Rental Application from Roberta J. Medlin (signed by Roberta Medlin) (October 11, 2005)

19. Commercial Agreement of Lease between Mary White and unnamed Tenant (unsigned) (October 11, 2005)

20. Commercial Agreement of Lease between Mary White and Roberta J Medlin (unsigned) (October 11, 2005)

21. Roberta J. Medlin's Credit Report: Invoice No: 29807640: First American Registry Inc. (October 11, 2005)

22. Commercial Lease Agreement between Mary White & John Bratton: (signed by Mary White and John Bratton) (October 31, 2005)

23. Leases submitted by John Bratton to Chatel Real Estate which were rejected

Oct 10 -

3

24. GCAAR Rental Application from Bratton Realty, LLC (signed by John Bratton) (October 10, 2005)

25. John Bratton's Letter to Mary White (October 7, 2005)

26. John Gordon Forester's Letter to John Bratton re: 1622 Wisconsin Avenue, N.W. (October 18, 2005)

27. John Bratton's Letter to John Gordon Forester re: 1622 Wisconsin Ave— Commercial Lease Agreement (October 19, 2005)

28. John Gordon Forester's Letter to John Bratton re: 1622 Wisconsin Avenue, N.W. (October 19, 2005)

29. John Gordon Forester's Facsimile to Thierry Liverman re: 1622 Wisconsin Avenue (October 26, 2005)

30. John Gordon Forester's Letter to John Bratton re: 1622 Wisconsin Avenue, N.W. (October 26, 2005)

31. John Bratton's Facsimile to John Gordon Forester re: 1622 Wisconsin Avenue— Delayed Lease Agreement (October 26, 2005)

32. John Bratton's Letter to John Gordon Forester re: 1622 Wisconsin Avenue— Final Lease (October 28, 2005)

33. Metropolitan Regional Information Systems, Inc. (first floor) (October 6, 2005)

34. Metropolitan Regional Information Systems, Inc. (lower floor) (October 6, 2005)

35. Metropolitan Regional Information Systems, Inc. (first floor) (October 13, 2005)

36. Metropolitan Regional Information Systems, Inc. (lower floor) (October 13, 2005)

37. Metropolitan Regional Information Systems, Inc. (lower floor) (November 7, 2005)

38. Metropolitan Regional Information Systems, Inc. (first floor) (November 7, 2005)

39. Facsimile Transmission from Paul Beito to John Gordon Forester re: John Bratton (October 18, 2005)

40. Bank of America Account Activity: Business Economy Checking Account held by John Bratton (October 19, 2005)

41. Bank of America Account Activity: Regular Checking Account held by John Bratton (October 19, 2005)

42. John Bratton: Mortgages, bank accounts and bills as of October 6, 2005

43. John Bratton: National Registry Credit Report (October 12, 2005)

44. John Bratton's formal complaint filed at the District of Columbia Office of Human Rights, including October 25, 2005 letter of Mandi Galloway

45. Photographs of John Bratton: October 2005

46. Chatel Real Estate Inc.'s Fair Housing Manual

47. Chatel Real Estate Inc.'s Property Manager's Manual

48. Transcript of the Deposition of Roberta J. Medlin (September 26, 2006)

## IV.    STANDARDS OF CONDUCT FOR REAL ESTATE SALESPERSONS & BROKERS

### A.  42 U.S.C. §§ 1981 AND 1982

Real estate brokers and salespersons are expected to comply with the Civil Rights Act, 42 U.S.C. §§ 1981 and 1982. The Civil Rights Act prohibits racial discrimination in the sale and rental of real estate. Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."[1] Section 1982 provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."[2]

Defendants stripped John Bratton of these rights when they unreasonably delayed to lease office space to him due to his race, when they misrepresented the availability of the Property to him, when they requested financial documents (income tax returns and

---

[1] 42 U.S.C. § 1981.
[2] 42 U.S.C. § 1982.

bank statements) not requested of a white prospective tenant, and when they offered him

lease terms materially different from terms offered to a white prospective tenant, in an

attempt to dissuade him from leasing the Property.  In addition, defendants refused to

give John Bratton an option to renew his 2-year lease, even though he insisted upon it and

the MRIS listing for the Property stated that the Property was available for a 12-48 month

lease.  As discussed below, it is my opinion that Defendants violated the Civil Rights Act,

§§ 1981 and 1982.

### B. DISTRICT OF COLUMBIA HUMAN RIGHTS ACT (§§ 2-1402.21 and 2-1402.23)

The District of Columbia Human Rights Act prohibits discrimination on the basis

of race and personal appearance in the sale and rental of real estate.  Section 2-1402.21 of

the District of Columbia Human Rights Act provides:  "it shall be unlawful

discriminatory practice to interrupt or terminate, or refuse or fail to initiate or conduct

any transaction in real property; or to require different terms for such transaction; or to

represent falsely that an interest in real property is not available for transaction."[3]

Defendants unreasonably delayed and interrupted John Bratton's efforts to lease the

Property, misrepresented to him that the Property was unavailable, required him to

submit income tax returns and bank statements not required of a White candidate for the

Property, and offered him lease terms that were highly disadvantageous and different

from terms offered to the White candidate.  Defendants' conduct was aimed at dissuading

John Bratton from leasing the Property.

Section 2-1402.23 further provides "any real estate broker or real estate

salesperson who commits any act of discrimination prohibited under the provisions of

---

[3] District of Columbia Human Rights Act, § 2-1402.21(a)(1).

this chapter ... shall be considered by the Real Estate Commission as having endangered the public interest." [4]  The protected classes under the District of Columbia Human Rights Act include: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, disability, matriculation, political affiliation, source of income, and place of residence or business of any individual.[5]  Defendants violated John Bratton's rights under the District of Columbia Human Rights Act by unreasonably delaying to lease him office space, misrepresenting the availability of the Property, requiring different financial documentation (income tax returns and bank statements) than a White candidate, refusing to give plaintiff an option to renew a 2-year lease when the MRIS listing for the Property stated that the Property was available for a 12-48 month lease, and demanding lease terms that were materially different from that offered to a White candidate.  In my opinion, Defendants discriminated against John Bratton because of his race (African-American) and personal appearance (long hair with dreadlocks).

## C. CUSTOMER SERVICE STANDARDS

The National Association of Realtors (NAR) Code of Ethics and Standards of Practice sets forth proper customer service standards for member real estate salespersons and brokers.  Real estate salespersons and brokers in the District of Columbia are required to complete training on the DC Code of Ethics.  Article 10 of the NAR Code sets forth in detail fair standards in real estate practices and specifically provides that "REALTORS shall not deny equal professional services to any person for reasons of race, color, religion, sex, handicap, familial status, or national origin.  REALTORS shall

---

[4] District of Columbia Human Rights Act, § 2-1402.23.
[5] District of Columbia Human Rights Act, § 2-1402.21(a).

7

not be parties to any plan or agreement to discriminate against a person or persons on the basis of race, color, religion, sex, handicap, familial status, or national origin."[6]

Additionally, real estate brokers and salespersons are required to follow Standards of Practice 1-6: "REALTORS shall submit offers and counter offers objectively and as quickly as possible." [7]  Defendants' responses to John Bratton's offers to lease the Property demonstrate their preference shown to a White prospective tenant and their illegitimate and discriminatory behavior towards Mr. Bratton.

### D.  THE FAIR HOUSING ACT

The Fair Housing Act, though not directly applicable to this case, prohibits "discrimination on the basis of race, color, religion, sex, handicap, familial status, or national origin."[8]  Although the Fair Housing Act pertains to residential property, the same principles apply to this case based upon the Civil Rights Act and the District of Columbia Human Rights Act.  Notably, real estate salespersons and brokers are required to take classes on the Fair Housing Act and on discrimination in order to renew their licenses.  Indeed, licensed real estate salespersons and brokers are not ignorant of these principles.

### E.  REAL ESTATE SALESPERSONS AND BROKERS ARE HELD TO A HIGHER STANDARD THAN JUST ANY LANDLORD

Defendants in this case are all real estate brokers.  Real estate salespersons and brokers are held to a higher standard than just any landlord with respect to discrimination laws because unlike a landlord, real estate salespersons and brokers are trained to avoid discrimination in real estate transactions and because they are directly involved with

---

[6] National Association of Realtors Code of Standards and Ethics, Article 10. *See also* DC Code, Title 17, § 2601.01.
[7] National Association of Realtors Code of Standards and Ethics, Standards of Practice 1-6.
[8] Fair Housing Act, 42 U.S.C. 3601.

clients and property transactions.  In this regard, the text used by most real estate

licensing training institutes in the Metropolitan area, *Modern Real Estate Practice*,

provides that real estate salespersons and brokers are responsible for upholding higher

standards because "the real estate industry is largely responsible for creating and

maintaining an open housing market.  Brokers and salespersons are a community's real

estate experts.  Along with the privilege of profiting from real estate transactions comes

the social and legal responsibilities to ensure that everyone's civil rights are protected."[9]

In this instance, defendants renounced their legal obligations and societal duty and denied

fair and equitable treatment to Mr. Bratton as a prospective tenant and the owner of a

black-owned business.

Further, not only must real estate salespersons and brokers strive to meet a higher

standard of service, they must also abide by the crucial rule that "all parties deserve the

same standard of service.  Everyone has the right to expect equal treatment, within his or

her property requirements, financial ability, and experience in the marketplace . . . .

Standardized inventories of property listings, standardized criteria for financial

qualification, and written documentation of all conversations are three effective means of

self-protection for licensees."[10]  Licensed real estate salespersons and brokers should be

fully aware of their duty to abide by these rules and to meet these standards.

---

[9] *Modern Real Estate Practice*, at 349.
[10] *Modern Real Estate Practice*, at 349.

## V.    DISCRIMINATORY TREATMENT RECEIVED BY JOHN BRATTON

### A. CHATEL REAL ESTATE, INC.'S DISCRIMINATORY TREATMENT OF JOHN BRATTON

#### a. Failure to Provide a Blank Lease and Rental Application

On Thursday, October 6, 2005, John Bratton visited 1622 Wisconsin Avenue, N.W., Washington, DC to determine whether it would be a suitable office space for his real estate brokerage, Bratton Realty, Inc.[11] At the time, the street and lower levels of the Property were listed for lease on the Metropolitan Regional Information Systems ("MRIS"), the primary database of real estate listings in the Metropolitan area.[12] Defendant Mary White owns the Property. John Pagones, a real estate salesperson at Chatel, was the listing agent for the Property, and Thierry Liverman and Chatel were the brokers for the Property. John Bratton toured the Property with Barrett Anderson, Mary White's office manager, and upon informing Mr. Anderson that he was interested in leasing the Property, Mr. Anderson directed Mr. Bratton to John Pagones and Chatel's Georgetown office.[13]

Upon his arrival at Chatel's Georgetown office, Mr. Bratton informed John Pagones that he had recently toured the Property and was interested in leasing it for his real estate business. When plaintiff inquired as to whether Chatel had a blank lease agreement, Mr. Pagones stated, "I don't have a lease."[14] Chatel and Thierry Liverman admitted that John Bratton requested John Pagones for a blank lease agreement for the

---

[11] Amended Complaint, ¶ 28; Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admission Nos. 6 & 7.
[12] BRA 0004-0009.
[13] Amended Complaint, ¶ 28; Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admission No. 10.
[14] Amended Complaint, ¶ 30.

Property on October 6, 2005.[15]  When Mr. Bratton next inquired as to whether John

Pagones had a rental application available, Mr. Pagones stated that he did not have one.

When John Bratton offered to provide a security deposit and first month's rent to John

Pagones in order to make an offer for the Property the next day, Mr. Pagones declined to

accept his checks.[16]

John Pagones' behavior was extremely unusual and improper for a qualified real

estate salesperson.  Chatel's Georgetown office is a real estate brokerage and property

management office and was responsible for leasing the Property.[17]  Consequently, it is

peculiar that there was not a rental application or blank lease agreement available in the

entire office, or that one could not be readily obtained from Chatel's computers,

including a suggested rental application on GCAAR's database of forms available online

and, in fact, used by Chatel as its rental application.[18]  Despite Mr. Pagones'

representations to plaintiff, Chatel likely possessed or should have been able to readily

obtain a rental application and a blank commercial lease agreement at its Georgetown

office on October 6, 2005.  Mr. Pagones' representations to John Bratton that Chatel had

neither a lease agreement nor a rental application on October 6, 2005 were completely

improper.[19]

### b.  Failure to Provide Information About the Property

When John Bratton visited Chatel's Georgetown office on October 6, 2005, he

requested information about the Property from John Pagones.  Upon inquiring about the

terms and conditions that the landlord required on the lease, Mr. Pagones stated that he

---

[15] Chatel Real Estate and John Pagones' Response to Plaintiff's Requests for Admissions No. 9.
[16] Amended Complaint, ¶ 30.
[17] CH 0001-0006.
[18] See Rental Application executed by Roberta Jean Medlin, BRA 0375-0376.
[19] Amended Complaint, ¶ 31.

had no information at all about the lease or the Property.[20]  Considering that John

Pagones was the listing agent for the Property, this assertion is highly suspicious.[21]

Indeed, John Pagones' behavior was extremely odd for an experienced real estate

salesperson.  John Pagones had thirty-seven years of experience as a real estate

salesperson and was familiar with Chatel's Property Management Procedure Manual

which directs agents to keep an accurate list of vacant properties and to familiarize

themselves with these properties.[22]  Further, John Pagones was the listing agent for the

Property and must have known basic facts about it.  Chatel and Thierry Liverman

admitted that John Pagones was the listing agent for the Property.[23]  If John Pagones had

no information about the Property, he should have referred John Bratton to the broker,

Thierry Liverman, or landlord, Mary White, who purportedly had this information.[24]  The

evidence is strongly suggestive that Mr. Pagones was neither incompetent nor unaware of

real estate standards; instead, he discriminated against Mr. Bratton because of his race

(African-American) and personal appearance (long hair with dreadlocks).

### c.   Failure to Respond to Communications from John Bratton and Unnecessary Delay in Presenting Lease Offers to the Landlord

At the conclusion of his conversation with John Pagones on October 6, 2005,

John Bratton informed Mr. Pagones that he would draft his own lease agreement at his

office and make an offer for the Property the next day.  On October 7, 2005, John Bratton

hand-delivered his lease agreement to Mr. Anderson, along with his financial

---

[20] Amended Complaint, ¶ 30.
[21] CH 0178-0179.
[22] BRA 0288-0311.
[23] Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admissions No. 2.
[24] BRA 0288-0311; Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admissions No. 2.

information, security deposit ($2500) and first month's rent ($2500).[25]  Mr. Anderson

promptly delivered this material to Chatel.  However, thereafter, despite numerous

telephone calls to John Pagones, Mr. Bratton's telephone calls were not returned.[26]

On October 10, 2005, John Pagones informed Mr. Bratton that Mary White (the

landlord) had rejected his lease agreement because she wanted him to "fill out a standard

commercial lease and an application."[27]  Interestingly, on October 10, 2005, Mr. Pagones

had blank lease agreements available at Chatel's office, though he claimed not to have

them on October 6, 2005.  John Pagones faxed John Bratton a blank lease agreement

bearing Chatel's logo, and a rental application (the suggested rental application issued by

GCAAR and available on GCAAR's website), both of which he could have readily

obtained on October 6, 2005.[28]

On October 11, 2005, John Bratton submitted a revised lease agreement to Chatel on

the forms supplied by Chatel in which he stated his intention to rent both the street and

lower levels of the Property at the total combined listed price (for both levels) of

$3,500.[29]  On the evening of October 12, 2005, Thierry Liverman, Chatel's broker,

informed Mr. Bratton that Mary White had decided to lease the Property to another

individual, later identified to be Roberta Jean Medlin, despite John Bratton's expressed

interest to lease the space on October 6, 2005.  However, Mary White had not leased the

space to Ms. Medlin on October 12, 2005 or anytime thereafter, and Chatel had been

informed by Ms. Medlin that she withdrew her offer to lease the Property shortly after

Ms. Medlin received a lease agreement prepared for her by Chatel and faxed to her home

---

[25] BRA 0217-0223.
[26] Amended Complaint,¶ 34.
[27] Amended Complaint, ¶ 35.
[28] Amended Complaint,¶ 35.
[29] BRA 0022-0029.

in Kansas City, Missouri.[30]  The lease prepared for Roberta Jean Medlin by Chatel is

dated October 11, 2005 and is unsigned.[31]

### d. Misrepresenting the Availability of the Property to John Bratton

Although Chatel informed John Bratton on or about October 12, 2005, that the

Property had been leased to another candidate, this was false.  Mary White admitted that

no lease agreement was ever executed between Roberta Jean Medlin (the other

prospective tenant) and herself for the Property.[32]  Roberta Jean Medlin never signed a

lease for the Property.[33]  There was no other candidate who had executed a lease

agreement for the Property.  Chatel and Thierry Liverman admitted that "no lease

agreement was ever executed between Roberta Jean Medlin and Mary White for the

Property."[34]

Thierry Liverman misrepresented the availability of the Property to John Bratton

when he informed him on October 12, 2005 that the Property had been leased to a "friend

of a friend" of Mary White, that Ms. White was not going to change her mind, and that

this was "just business."[35]  As mentioned above, no such lease agreement exists between

Ms. White and Ms. Medlin.  Indeed, the lease agreement Chatel provided for Roberta

Jean Medlin dated October 11, 2005 is unsigned.[36]  In addition, Chatel employee Patricia

"Patsy" Petty purportedly wrote a note to Roberta Jean Medlin stating:  "Bobbie, so sorry

the lease didn't work out," which further evidences that although Thierry Liverman

---

[30] BRA 0203; see Transcript of the Deposition of Roberta Medlin, at p. 57, lines 2-4.
[31] BRA 0390-0398.
[32] Mary White's Answer to Plaintiff's Amended Complaint No. 39.
[33] Transcript of the Deposition of Roberta Medlin, at 28, line 16.
[34] Defendant Chatel Real Estate's and Thierry Liverman's Response to Plaintiff's Request for Admission No. 20.
[35] Amended Complaint, ¶ 37.
[36] BRA 0390-0398.

informed John Bratton that Mary White had chosen another tenant and that this decision was "just business," this was not the case.[37]

Surely, Chatel would know if the Property had been leased because Chatel was the listing broker for the Property. Indeed, Chatel and Thierry Liverman never changed the availability status of the Property on the MRIS, which indicated that the Property was still available for rent as of October 13, 2005.[38] Chatel and Thierry Liverman misrepresented to plaintiff the unavailability of the Property after Ms. Medlin telephonically informed Chatel that she withdrew her offer shortly after Chatel faxed a lease agreement to Ms. Medlin at her home in Kansas.[39] No one executed a lease agreement for the Property between October 6 and October 12, 2005. Chatel admitted that plaintiff was the only person who executed a lease agreement with Mary White for the Property in October 2005.[40] In my opinion, Chatel's misrepresentation of the availability of the Property to John Bratton on or about October 12, 2005 is a text book example of unlawful discrimination based upon Mr. Bratton's race and personal appearance.

### e.  Failure to follow the Standards of Conduct for Real Estate Brokers and Salespersons

Thierry Liverman failed to follow the applicable standards for real estate brokers when he informed John Bratton that the Property was unavailable, even though Roberta Jean Medlin informed Chatel that she was not going to lease the Property on October 12, 2005.[41] Further, as an experienced real estate salesperson, John Pagones was familiar

---

[37] CH 0057.
[38] BRA 0039-0040.
[39] Deposition Transcript of Roberta Medlin, at 48, lines 8-10.
[40] BRA 0194-0199.
[41] Deposition Transcript of Roberta Medlin, at 30, lines 19-22; at 31, lines 1-6.

with the discrimination laws and industry standards of treatment of potential clients.

John Pagones has been a real estate salesperson for thirty-seven years, licensed not only

in the District of Columbia, but in Maryland and Virginia as well.[42]  As such, he has

attended numerous classes to renew his license, including classes on Fair Housing

Laws.[43]  Indeed, Mr. Pagones admits, "I have attended numerous classes in fair housing

and diversity training over the years, provided by GCAAR.  These courses are required

for renewal of my Broker's license."[44]

Further, as an agent of Chatel, John Pagones was required to sign a form stating

that he had read Chatel's Fair Housing Manual and was familiar with Chatel's "first

come, first serve" policy.[45]  There can be no doubt that John Pagones was aware not only

of company policy regarding fair and non-discriminatory treatment of customers, but also

of the applicable statutes as detailed above.  John Pagones' failure to meet these

standards, even though he had received training on them and had been in the real estate

business for many years, demonstrates that his treatment of John Bratton was

discriminatory and motivated by racial animus.

## B.  MARY WHITE'S DISCRIMINATORY TREATMENT OF JOHN BRATTON

### a.  Mary White Refused to Lease the Property to John Bratton for 24 Days When No Other Candidate Had Executed A Lease

After he decided to lease the Property, John Bratton wrote a letter to Mary White

dated October 7, 2005 conveying his interest in the Property.[46]  Mr. Bratton also left

---

[42] CH 0190-0245.
[43] CH 0200.
[44] D.C. Office of Human Rights:  Answers to Interrogatories and Requests for Production of Documents by Mary White:  November 16, 2005, Answer to Interrogatory No. 8.
[45] BRA 0243-0265.
[46] BRA 201.

16

telephonic messages for Ms. White which she never returned.[47] Ms. White never responded to Mr. Bratton's attempts to communicate with her, even though she later admitted receiving the letter.[48] On October 10, 2005, Ms. White, through John Pagones, informed Mr. Bratton that she wanted him to fill out a standard lease agreement and application for the Property, and on October 12, 2005, Ms. White claimed she decided to lease the Property to Roberta Jean Medlin because she was a "friend of a friend." Yet, Roberta Jean Medlin testified in her deposition that she did not know Mary White prior to "walking into that property" on October 11, 2005, and that no one referred her to Mary White.[49] Further, Mary White admitted that no one other than plaintiff executed a lease agreement for the Property in October 2005.[50]

On October 12, 2005 Mary White informed Chatel that she was not going to lease the Property to John Bratton despite his continued interest and compliance with her request to submit the lease on a specific form, excellent credit report, and financial documents.[51] Chatel and Thierry Liverman claim that Ms. White asserted three bases for her decision to lease the Property to Roberta Jean Medlin instead of John Bratton: "(1) Ms. Medlin was already a property owner in the area, (2) Ms. White preferred the Property be used as a jewelry store rather than a real estate brokerage, and, most significantly, (3) a personal friend had given an extremely favorable reference for Ms. Medlin."[52] In my opinion, based upon the evidence in this case, all of these bases are pretexts for discrimination.

---

[47] Amended Complaint, ¶ 34.
[48] Mary White's Response to Plaintiff's Request for Admission of Fact No. 7.
[49] Deposition Transcript of Roberta Medlin, at 11, lines 5-9.
[50] Mary White's Answer to Plaintiff's Complaint, ¶ 38.
[51] BRA 0161-0164, 0224-0230.
[52] Defendants Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Interrogatory No. 6.

Significantly, Roberta Jean Medlin testified in her deposition that Mary White never committed to lease the Property to her.[53] As to the first alleged reason for Ms. White's decision to lease the Property to Roberta Jean Medlin instead of John Bratton, it must be noted that John Bratton owns several properties in the Metropolitan area, a fact about which Ms. White was aware based on financial documents submitted by John Bratton to Chatel.[54] As to a personal friend giving an extremely favorable reference for Ms. Medlin, Ms. Medlin denied knowing Ms. White prior to October 11, 2005 and denied knowing any friend of Ms. White's.[55] Ms. White did not lease the Property to Ms. Medlin on October 12, 2005 or at any other time. No written or verbal agreement to that effect exists.[56] The only decision made on October 12, 2005 was that Mary White was not going to lease the Property to John Bratton. Indeed, Mary White admitted that no one other than plaintiff executed a lease agreement for the subject Property; thus, she could not have made a decision to pick someone else, when Roberta Jean Medlin clearly withdrew her offer voluntarily and denied the existence of even a verbal commitment by Ms. White to lease the space to her.[57] Indeed, Ms. Medlin testified in her deposition that Mary White "did not make a commitment to me, she said she was not ready yet to make a commitment."[58]

---

[53] Deposition Transcript of Roberta Medlin, at 25, line 22; at 26, line 1.
[54] BRA 0207.
[55] Deposition Transcript of Roberta Medlin, at 13, lines 14-18.
[56] Deposition Transcript of Roberta Medlin, at 25, lines 14-17.
[57] Mary White's Answers to Plaintiff's Amended Complaint-Answer No. 39.
[58] Deposition Transcript of Roberta Medlin, at 25-26, lines 1, 9-10.

### b.  Mary White's "Negotiations" with John Bratton for Lease of the Property

As noted above, on October 12, 2005, Mary White told Thierry Liverman that she intended to lease the Property to Roberta Jean Medlin instead of John Bratton.[59] However, following Mr. Bratton's threats to sue for discrimination and subsequent complaint with the District of Columbia Office of Human Rights, Ms. White's counsel, John Gordon Forester, informed Mr. Bratton that he was going to "negotiate the lease" with him despite Ms. White's previous misrepresentations that another tenant had executed a lease agreement for the Property and that the Property was no longer available.[60]  Nonetheless, Mary White did not genuinely intend to negotiate a lease with Mr. Bratton even at that time; but instead sought to dissuade John Bratton from leasing the Property by demanding terms and conditions in the lease that were highly disadvantageous to Mr. Bratton, terms and conditions that were not demanded of Roberta Jean Medlin.[61]

Ms. White required John Bratton to submit financial documents (income tax returns and bank statements) which Roberta Jean Medlin, another applicant for the Property, was not asked to submit.[62]  Specifically, Mr. Bratton was required to submit his federal income tax returns for the years 2003 and 2004 as well as his recent bank statements in October 2005.  Mary White did not require Roberta Jean Medlin to provide these financial documents.[63]  Mr. Bratton was also required to pay $200 extra per month

---

[59] Defendants Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Interrogatory No. 6.
[60] BRA 0041.
[61] BRA 0064-0071.
[62] See Transcript of the Deposition of Roberta Medlin, at 40, lines 4-6.
[63] See Transcript of the Deposition of Roberta Medlin, at 37, lines 5-15.

for real estate taxes.[64]  Roberta Jean Medlin was not required to pay this amount based upon the lease that Chatel drafted for her.  Further, Mary White personally gave Roberta Jean Medlin a tour of the Property on the first day she arrived.  Ms. Medlin testified in her deposition that, "I actually met with Mary White personally in her office on Wisconsin [Avenue]."[65]  In contrast, Mary White did not even return John Bratton's telephone calls even though he had sought the office space five days earlier than Ms. Medlin and had indicated his desire to meet with Mary White.[66]

Moreover, John Gordon Forester's burdensome "negotiations" with plaintiff, and his statement to Mr. Bratton that he was a "test case" for discrimination, are indicative of defendants' racial animus resulting in delays and rejections of plaintiff's offers to lease the Property.[67]

### C. COMPARISON OF THE LEASE SIGNED BY JOHN BRATTON AND THE LEASE DRAFTED BY CHATEL FOR ROBERTA MEDLIN

#### a.  John Bratton's Financial Profile

It is important to note that in October 2005, John Bratton had over $200,000 in his Bank of America business checking accounts, made approximately $200,000 in annual income, and had a substantial net worth (including several properties).[68]  In addition, John Bratton had an excellent credit rating.[69]  That Mr. Bratton could afford to pay for the lease cannot be disputed, and Mr. Bratton's financial status could not have been the reason for Chatel's and Mary White's initial refusal to rent the Property to him.

---

[64] BRA 0041.
[65] Deposition Transcript of Roberta Medlin, at 27, lines 18-20.
[66] Deposition Transcript of Roberta Medlin, at 27, lines 18-20.
[67] Mary White's Answer to Plaintiff's Complaint No. 45.
[68] BRA 0141-0142, 0207.
[69] BRA 0224-0230.

As discussed below, the lease dated October 31, 2005 signed by John Bratton and Mary White contains materially different terms and conditions from the lease drafted by Chatel for Roberta Jean Medlin, the boilerplate commercial lease agreement used by Chatel for its clients.[70]

1.  John Bratton's October 31, 2005 lease includes a provision that "Tenant shall pay Landlord as additional rent $200 per month as a contribution to real estate taxes."[71] Neither Roberta Jean Medlin's lease, nor the lease John Bratton completed on October 10, 2005 included this provision, even though John Gordon Forester, Mary White's attorney, claimed in a letter to John Bratton dated October 19, 2005 that "the rent is $2500 plus approximately $200 a month for taxes. This latter provision has always been a requirement."[72] The MRIS listings on the Property from October 6, 2005 and October 13, 2005 do not indicate that a portion of the real estate taxes were to be paid by the tenant.[73] This was a new requirement, not an old one.[74]

2.  John Bratton's final lease did not include a Right of First Refusal to purchase the Property for the same price as the highest offer received by the landlord during the term of the lease, even though he asked for one. Roberta Jean Medlin's lease did include a Right of First Refusal, even though she did not ask for one.[75] In fact, the boilerplate Chatel lease includes a Right of First

---

[70] BRA 0064-0071.
[71] BRA 0064-0071.
[72] BRA 0022-0029, 0044.
[73] BRA 0004-0009, 0038-0039.
[74] Mary White's Answer to Plaintiff's Amended Complaint-Answer No. 25.
[75] BRA 0390-0398, 0064-0071.

Refusal, but this provision was explicitly crossed out on John Bratton's lease.[76]

3.  John Bratton's lease automatically ends at the end of two years, even though he requested an option to renew the lease. This provision is detrimental to his business because he will have to leave the Property and relocate at the end of two years. Indeed, Mr. Bratton has had to keep a second office in the District of Columbia and pay additional rents because his lease at the Property expires in November 2007 and cannot be renewed. Chatel's draft of Roberta Jean Medlin's lease did not contain such a provision; instead, her lease converted to a month-to-month lease at the end of its two-year term, so she would not have to leave the Property at the end of her lease.[77] Further, the MRIS listings for the Property stated that the street level of the Property was available for a 12-48 month lease. Defendants added these provisions to discourage John Bratton from leasing the Property as a result of their racial animus towards him and because they disliked his personal appearance (long hair with dreadlocks).

## D. ROBERTA MEDLIN RECEIVED DIFFERENT TREATMENT THAN JOHN BRATTON

### a. Chatel's Processing of John Bratton's and Roberta Medlin's Respective Applications

Roberta Jean Medlin's application was processed the same day she walked in to Chatel (October 11, 2005).[78] In contrast, John Bratton had to wait five days before Chatel even began to process his application in direct violation of Chatel's "First Come,

---

[76] BRA 0064-0071; see Mary White's Response to Request for Admission of Fact No. 2.
[77] BRA 0390-0398.
[78] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Interrogatory No. 6.

First Serve" policy.[79]  Defendants admitted that Roberta Jean Medlin's credit check was

conducted prior to John Bratton's credit check, on October 11, 2005, even though John

Bratton presented two checks in the amounts of $2500 for his security deposit and first

month's rent on October 6, 2005, five days prior to Roberta Jean Medlin.[80]  Moreover,

Thierry Liverman met with Roberta Jean Medlin when she walked into Chatel's office on

October 11, 2005 and signed a rental application.[81]  Mr. Liverman did not meet with John

Bratton at any time to discuss the terms of his lease.  Significantly, Mary White gave Ms.

Medlin a personal tour of the Property the first day she inquired about it on October 11,

2005.  Ms. White, however, refused to even speak to John Bratton, let alone give him a

personal tour of the Property despite his expressed interest in the Property from October

6, 2005.[82]

### b. Roberta Medlin and John Bratton Were Asked to Submit Different Documents to Chatel

While both John Bratton and Roberta Jean Medlin were asked to submit to credit

checks, Roberta Jean Medlin was not asked to submit two years of tax returns and bank

statements when she signed a rental application.[83]  In contrast, John Bratton received a

letter from John Gordon Forester on October 18, 2005 stating: "we require copies of your

federal income tax returns for 2003 and 2004.  I am sure you understand that this is

because you are self-employed."[84]  Roberta Jean Medlin was also self-employed, but she

did not receive such a demand.

---

[79] BRA 0256.
[80] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Interrogatory No. 6.
[81] BRA 0375-0376.
[82] Deposition Transcript of Roberta Medlin, at 35, lines 2-4.
[83] Deposition Transcript of Roberta Medlin, at 37, lines 5-9.
[84] BRA 0041.

### c. Roberta Medlin's Request was Promptly Conveyed to Mary White

Roberta Jean Medlin's request to lease the Property was promptly conveyed to Mary White, and John Bratton was informed that he did not get the lease a day after Medlin expressed an interest in it.[85] John Bratton's request was subject to a five-day delay despite his repeated attempts at communication with both Mary White and Chatel.[86] In total, it took John Bratton 24 days to sign a two-year lease for office space at the monthly rent of $2500 despite his best efforts to make the process quick and efficient.[87] In contrast, it took Roberta Jean Medlin two days to conclude the process.

### d. Mary White Did Not Commit to Leasing the Space to Roberta Medlin on October 12, 2005

Mary White never committed to leasing the space to Roberta Jean Medlin.[88] Chatel maintains, however, that "on October 12, once a comparable set of documents had been received from both tenant candidates, Ms. White met with Thierry Liverman to choose between the offers. Ms. White reached her decision to lease the Property to Ms. Medlin."[89]

First, as addressed above, a comparable set of documents was not requested from both candidates. John Bratton was required to submit tax returns and bank statements; Roberta Jean Medlin was not. Second, in spite of this claim, the fact remains that on October 12, 2005, Roberta Jean Medlin withdrew her offer, and Mary White did not even make a verbal commitment to lease the Property to Roberta Medlin, let alone execute a

---

[85] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Interrogatory No. 6.
[86] BRA 0201.
[87] BRA 0064-0070.
[88] Deposition Transcript of Roberta Medlin, at 14, line 10.
[89] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Interrogatory No. 6.

written lease agreement with Medlin.[90]  See also Thierry Liverman's fascimile re: 1622

Wisconsin, to Mary White on October 14, 2005, which provides: "As promised, here is

the paper trail for the two candidates."[91]  If a decision had been reached on October 12,

2005, there would not have been candidates for the Property; there would not have been a

paper trail; there would have been a tenant.

### F. DEFENDANTS' REFUSAL TO RENT THE LOWER LEVEL OF THE PROPERTY TO JOHN BRATTON

On October 6, 2005, John Bratton expressed his interest in leasing the Property. In

response, Mr. Pagones stated that Ms. White intended to "keep the back room in the

lower level unit and the backyard for herself."  Yet, the MRIS listings for the Property on

October 6, 2006 show that both the lower level and street level units were available for

lease.[92]  The backyard had no relation to the street level property sought by John

Bratton.[93]  However, when on October 11, 2005, John Bratton submitted a lease

agreement to Ms. White, stating his intent to lease both the upper and lower levels of the

Property, he was told by Chatel that the lower level was not available for lease even

though the lower level unit was still listed as available for lease on the MRIS.[94]

#### a. The Lower Level Unit Was Listed on the MRIS for 13 Days When John Bratton Inquired About It to Chatel

Mary White's lawyer, John Gordon Forester, informed John Bratton "that the

lower level unit is not available and further more that it was never available for lease and

Ms. White had no idea that Chatel Real Estate was ever listing the space as available."[95]

---

[90] Deposition Transcript of Roberta Medlin, at 25-26, lines 14-17.
[91] BRA 0203.
[92] BRA 0004-0009.
[93] Amended Complaint, ¶ 32.
[94] BRA 0039-0040.
[95] BRA 0132-0133.

The MRIS listing for the lower-level unit of the Property, however, demonstrates that the lower level unit had been listed for 13 days at the time John Bratton first saw the Property on October 6, 2005.[96] Further, Barrett Anderson gave a tour of the lower-level unit to John Bratton on October 6, 2005 and informed him that the unit was available for lease. It is ludicrous for Mary White to claim that she never knew the basement level of the Property was listed on the MRIS.[97] Chatel admits that Ms. White instructed Chatel to list both levels of the Property on the MRIS and the two listings describe two distinct levels. Mary White is an experienced real estate broker, not a novice home owner. Mary White stated that "the defendant never offered the lower level for rent."[98] This statement is blatantly false. Indeed, Chatel and Thierry Liverman admit that "as of October 6, 2005 the lower level unit of the Property had been listed on MRIS for 13 days."[99]

### b. Barrett Anderson Showed the Lower Level Unit to John Bratton and Said the Basement Unit, Other Than the Backyard, was Available for Rent

When John Bratton toured the Property with Barrett Anderson on October 6, 2005, Mr. Anderson showed Mr. Bratton both the street and lower levels of the Property and informed Mr. Bratton that both were available for lease. On October 6, 2006, the street level of the Property had been on the market for 66 days (since July 29, 2005), and the lower level of the Property had been listed for 13 days.[100] Mary White's contention that "defendant denies that she listed the basement floor for rent," is contradicted by the

---

[96] BRA 0004-0009.
[97] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admission of Fact No. 7.
[98] Mary White's Answer to John Bratton's Amended Complaint, ¶ 44.
[99] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admission of Fact No. 7.
[100] BRA 0004-0009.

MRIS listings of the Property and Chatel's admissions.[101]  Indeed, Mary White changed her answer in the Amended Complaint, stating that "the lower level was mistakenly listed."[102]

Mary White's position is further contradicted by the fact that on October 6, 2005, there were two separate lock boxes outside the Property containing separate keys for the street level and the lower level units of the Property.  Chatel and Thierry Liverman admit that on October 6, 2005, there were two lock boxes with separate keys outside of the Property.[103]  A lock box for the lower level unit would not have been placed there if the unit was unavailable for lease.  Clearly, both the street and lower level units of the Property were listed and available for lease when John Bratton inquired as to their status. The only logical explanation is that Mary White refused to lease the lower-level unit of the Property to John Bratton because of her racial animus toward him for being an African-American and because of his personal appearance (long hair with dreadlocks).

## VI.    CONCLUSION

In my opinion, Defendants' treatment of John Bratton was discriminatory in violation of 42 U.S.C. § 1981, 42 U.S.C. §1982, and the District of Columbia Human Rights Act §§ 2-1402.21 and 2-1402.23.

Dated: October 20, 2006

_____
Thomas J. Lynch
Great Falls, Virginia

---

[101] Mary White's Response to Plaintiff's Amended Complaint-Response No.17.
[102] Mary Whites Response to Plaintiff's Amended Complaint-Response No. 24.
[103] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admission of Fact No. 8.

MRIS listings of the Property and Chatel's admissions.[101] Indeed, Mary White changed her answer in the Amended Complaint, stating that "the lower level was mistakenly listed."[102]

Mary White's position is further contradicted by the fact that on October 6, 2005, there were two separate lock boxes outside the Property containing separate keys for the street level and the lower level units of the Property. Chatel and Thierry Liverman admit that on October 6, 2005, there were two lock boxes with separate keys outside of the Property.[103] A lock box for the lower level unit would not have been placed there if the unit was unavailable for lease. Clearly, both the street and lower level units of the Property were listed and available for lease when John Bratton inquired as to their status. The only logical explanation is that Mary White refused to lease the lower-level unit of the Property to John Bratton because of her racial animus toward him for being an African-American and because of his personal appearance (long hair with dreadlocks).

## VI.   CONCLUSION

In my opinion, Defendants' treatment of John Bratton was discriminatory in violation of 42 U.S.C. § 1981, 42 U.S.C. §1982, and the District of Columbia Human Rights Act §§ 2-1402.21 and 2-1402.23.

Dated: October 20, 2006

Thomas J. Lynch
Great Falls, Virginia

---

[101] Mary White's Response to Plaintiff's Amended Complaint-Response No.17.
[102] Mary Whites Response to Plaintiff's Amended Complaint-Response No. 24.
[103] Defendant Chatel Real Estate and Thierry Liverman's Response to Plaintiff's Request for Admission of Fact No. 8.