DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

---------------------------------------X

JOHN BRATTON,                           :

       Plaintiff                       :

  v.                                    :   Case No.:

CHATEL REAL ESTATE, INC., et al.,       :   1:06CV00694

       Defendants                      :

---------------------------------------X

Deposition of THOMAS J. LYNCH

Washington, D.C.

Friday, February 9, 2007

1:25 p.m.

Job No.: 1-96264

Pages 1 - 211

Reported by: Lynn Schindler

EXHIBIT 2

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

7852bbcd-ae9c-4c2f-93ef-0f4dda0abe40

Page 22

1    A    Never.
2    Q    Ever failed to qualify?
3    A    Never.
4    Q    Ever been sued yourself?
5    A    No.
6    Q    Ever had your company, any company that you
7    were -- had an ownership interest sued as a result of
8    any transaction that you were involved in?
9    A    No.
10   Q    Any disciplinary or ethical or licensing
11   complaints filed against you?
12        MR. SHAIBANI:  Objection.
13   A    None.
14   BY MR. RANCK:
15   Q    Thank you.  When was your first involvement
16   in this case?
17   A    I would say prior to the date of that letter
18   was the --
19   Q    Let me show you what's been marked as
20   Exhibit 2, if I could, please.  Can you identify that
21   for the record?
22   A    Yes.  This is a letter from Mr. Shaibani to

Page 23

1    me basically saying that they would like to retain my
2    services in this particular case, Bratton v. Chatel
3    Real Estate, Inc.
4    Q    And that's dated September 12?
5    A    That's correct.
6    Q    Did you have conversations with Mr. Shaibani
7    about the case prior to receiving that letter?
8    A    I did.
9    Q    Okay.  Do you recall the nature or substance
10   of the conversations?
11        MR. SHAIBANI:  Objection.
12   A    Sorry.  I'm sometimes too fast.
13   BY MR. RANCK:
14   Q    You can go, you can answer.
15   A    Yeah.  The nature of the conversation was
16   pretty much the same as the conversation that I'd have
17   with any attorney who was talking to a prospective
18   expert witness, a few minutes of recitation of the
19   facts of the case, and my more or less immediate
20   reaction to the case as to whether or not -- as to how
21   I read the case, and obviously the first read of my
22   part, not literally reading, but reading based on the

Page 24

1    recitation of facts of the case from the attorney, I
2    would take a general position, and we had that
3    conversation, and then I sent to Mr. Shaibani my CV
4    and my rate schedule, and he responded, I suspect a
5    few days later on the 12th with this letter, and then
6    the package arrived around the 22nd.
7    Q    What is your rate schedule?
8    A    $125 per hour for consultation reading.
9    $175 an hour for depositions with four-hour minimums,
10   $2,000 per day for a court appearance, and expenses
11   beyond 20 miles.
12   Q    All right.  Now, getting back to your
13   conversation with Mr. Shaibani prior to receiving
14   Exhibit 2, can you tell me, do you recall the
15   substance of his summation of the facts that he gave
16   you?
17        MR. SHAIBANI:  Objection.
18        MR. RANCK:  Basis.
19        MR. SHAIBANI:  I'm just making a general
20   objection to preserve it for trial.
21        MR. RANCK:  Well, what's the basis of it
22   though, I'm asking?

Page 25

1         MR. SHAIBANI:  It would be a joint mediation
2    privilege objection.
3         MR. RANCK:  What you told the expert is
4    privileged?
5         MR. SHAIBANI:  Well, if the expert is part
6    of the team, I believe that could qualify under joint
7    litigation privilege.
8         MR. RANCK:  Okay.
9    BY MR. RANCK:
10   Q    You can answer the question.
11        MR. BOUSE:  I didn't -- he trailed off.
12   That his response, the team --
13        MR. RANCK:  That it could qualify under a
14   joint litigation privilege, and I said okay, and told
15   the witness he could answer.
16        MR. BOUSE:  All right.
17        THE WITNESS:  I would say the conversation
18   that Mr. Shaibani and I had are pretty much the issues
19   that are recited throughout the case, the situation
20   with respect to Mr. Bratton attempting to lease the
21   property at 1622 Wisconsin Avenue, Northwest; the fact
22   that there was another potential lessee; there was

Page 26

1  apparent difficulty on the part of Mr. Bratton to be
2  able to get the Chatel organization to create a lease
3  for him, so he started preparing his own.
4       Mr. Bratton felt that the delay in doing
5  the actual lease and the possibility of the talk
6  about another lease being accepted in place of
7  his, he felt that he was being discriminated
8  against, and I said it certainly sounds very, very
9  plausible and reasonable that we have a case of
10 discrimination here based on his race and other
11 protected interests under the D.C. Human Rights
12 Act of 1977 as amended, specifically personal
13 appearance. And that was pretty much our
14 discussion of the facts of the case.
15      Obviously, when you discuss it with an
16 attorney who's going to hire you as an expert
17 witness, you hear the facts of the case as
18 presented -- as they were presented by
19 Mr. Shaibani, and I said that bears out. I have
20 no problem saying that I have a reasonable belief
21 that there was an issue here.
22 BY MR. RANCK:

Page 27

1  Q  Did you just say if that bears out?
2  A  I said when you have a discussion, you get
3  hired, obviously there's a big difference between
4  going through a ton of material and having a brief
5  conversation.
6  Q  Sure. But did you tell him if that bears
7  out --
8  A  I can't say that I -- I can't say that I
9  said that. What I'm saying is, when I have been asked
10 to be an expert witness, and I've been told the facts
11 and I said well, based on what you told me,
12 everything's okay, and then I review things and I'm
13 saying, you know, I don't think this is quite the way
14 I understood you to present it, and I am not
15 comfortable with it, and I said, you know, I really
16 don't want to do this case. I will demur in this
17 case.
18 Q  Did you ask him any questions during that
19 conversation that you recall that might have been
20 pertinent to your immediate reaction?
21 A  I suspect I did. I mean, it was an
22 interactive conversation, but, exactly what I said,

Page 28

1  what I didn't say, I would ask probably more questions
2  if the presentation of the facts were less coherent
3  than they apparently were that day, because I don't
4  suspect I asked an awful lot of questions. Based on
5  what you've told me --
6  Q  Did you take any notes of that conversation?
7  A  You know, I might have, but probably very
8  sketchy. I do a lot better listening than trying to
9  write.
10 Q  You didn't maintain those? If you took
11 them, you don't have them anymore; is that fair?
12 A  That's quite possible I don't have any more.
13 It's quite possible.
14 Q  If you do, I just ask you provide them to
15 Mr. Shaibani so we can get them if you're not sure.
16 Did you ask him -- do you recall asking him what the
17 defendant's explanations for their alleged conduct
18 was?
19 A  I don't specifically recall that. No, I
20 don't. I mean, I'd be guessing now as to what I said,
21 but I don't recall specifically saying something like
22 that.

Page 29

1  Q  With regard to your opinions that you intend
2  to offer in this case, are the defendants'
3  explanations to the allegations leveled at them by
4  Mr. Bratton, are they pertinent to your evaluation?
5       MR. SHAIBANI: I'm going to object on
6  vagueness grounds.
7  BY MR. RANCK:
8  Q  You can answer.
9  A  Just repeat the question, please.
10 Q  With regard to the opinions you intend to
11 offer in this case, are the defendants' explanations
12 as to their alleged conduct pertinent to those
13 opinions, to your evaluation?
14      MR. SHAIBANI: Same objection. I guess I'm
15 trying to find out are you referring to what Mr.
16 Bratton told him, or what he drew from reading his
17 deposition and the documents in the case?
18      MR. RANCK: None of that. That wasn't my
19 question at all.
20      THE WITNESS: Well, then clarify your
21 question.
22 BY MR. RANCK:

DEPOSITION OF THOMAS J. LYNCH
CONDUCTED ON FRIDAY, FEBRUARY 9, 2007

Page 174

1  Mr. Bratton.
2    Q   Do the various statutes, 1981 and 2 and the
3  fair housing, the D.C. versions of those statutes that
4  we're dealing with in this case, do they prohibit
5  discriminatory conduct, or conduct that can be
6  perceived as discriminatory?
7        MR. SHAIBANI:  Objection.  Calls for a legal
8  conclusion, and I'm instructing him not to answer that
9  question.
10       MR. BOUSE:  How can you do that?  He's not
11 your client.
12       MR. SHAIBANI:  Yes.  This is it a legal
13 conclusion, and you cannot -- the instructions from
14 the court will advise the jury what's required to
15 prove the case, not Mr. Lynch's testimony, doesn't say
16 anything about appearance versus reality.
17       MR. RANCK:  Are you then prepared to
18 withdraw all of the portions of your expert's report
19 where he lays out what the law is and what's
20 prohibited?
21       MR. SHAIBANI:  No.  Those portions cite
22 specific statutes and most of them are COSIF.

Page 175

1  BY MR. RANCK:
2    Q   All right.  I'm asking you as a real estate
3  professional your understanding.  I'm not asking you
4  what the law does, I'm asking as a real estate
5  professional, is it your understanding that these acts
6  prohibit you as a real estate professional from
7  engaging in discriminatory conduct or conduct that
8  might be perceived as discriminatory?
9    A   I think it's both.
10   Q   How does one avoid -- so you believe that as
11 a -- strike that.
12       You believe as a real estate professional
13 you are prohibited from engaging in conduct that
14 someone might perceive as discriminatory.
15   A   I believe that one can -- one can engage in
16 activity that someone else may well perceive as being
17 discriminatory, and whether it is or not, I still have
18 to defend myself against that perception.
19   Q   Okay.  Do you agree that that is exceedingly
20 broad and open-ended, I guess, in terms of exposing
21 the real estate professional to suit, discipline,
22 because we can't control how others perceive our

Page 176

1  conduct?  Do you agree with that statement?
2        MR. SHAIBANI:  Objection.
3    A   It's exceedingly broad, it's exceedingly
4  dangerous.  It's inherently risky to be in this
5  business under those circumstances, and others, and
6  that's why companies will have policies and
7  procedures, documentation, documentation, knowing full
8  well that you may be faced with the situation of
9  disproving the claim by showing that you didn't do it.
10 BY MR. RANCK:
11   Q   Okay.  It's --
12   A   And that's complicated.
13   Q   It's exceedingly dangerous and everything
14 you said because you could have to defend yourself
15 from allegations that you discriminated based upon the
16 other person's perception of what happened; right?
17   A   Absolutely.
18   Q   Even if their perception is wrong.
19       MR. SHAIBANI:  Objection.
20   A   Correct.
21 BY MR. RANCK:
22   Q   So would you agree with me that -- well --

Page 177

1  would you agree with me that often the perceptions by
2  the people that think they're discriminated against
3  are wrong?
4        MR. SHAIBANI:  Objection.  Relevance.  Calls
5  for speculation.  Assumes facts not in evidence.
6    A   I don't think I can answer to a
7  quantitative.  I certainly there's a qualitative
8  affirmative.
9  BY MR. RANCK:
10   Q   You teach courses in this area; correct?
11   A   I do.
12   Q   And part of the purpose of your teaching the
13 courses is to educate real estate professionals as to
14 how to avoid claims such as this; correct?
15   A   Correct.
16   Q   And is part of your curriculum or your --
17 the lecture, the course materials, do you explain or
18 try to make clear to your students, whoever you're
19 teaching, that their conduct can be misperceived, and
20 that's why they need to make an extra step to protect
21 themselves?
22   A   Absolutely.