UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN BRATTON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Civil Action No. 06-694 (JDB) |
| ) | |
| CHATEL REAL ESTATE, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**EXPERT REPORT OF THOMAS LYNCH ON STANDARDS OF CONDUCT**

**I.   INTRODUCTION**

I have been asked by the law firm of Litigation Associates, PLLC to render an opinion concerning defendants Chatel Real Estate, Inc.'s, Mary White, Inc.'s, Mary White's, and Thierry Liverman's conduct in leasing office space to plaintiffs John Bratton and Bratton Realty, LLC ("plaintiffs"). I understand that this report will be filed in this case to assist the Court in resolving plaintiffs' complaint. I have examined defendants' conduct in this case in light of real estate industry standards, the National Association of Realtors ("NAR") Code of Ethics and Standards of Practice, the Greater Capital Area Association of Realtors ("GCAAR") Bylaws on Professional Standards, the Metropolitan Regional Information Systems ("MRIS") Rules and Regulations, Chatel's Fair Housing Manual and Property Manager's Manual, and the Independent Contractor Agreement executed by Mary White with Washington Fine Properties, which collectively set forth proper standards of conduct for real estate brokers.

**II.   QUALIFICATIONS**

My qualifications are as follows. I have been a licensed real estate broker in the District of Columbia, Virginia, and Maryland for over 35 years. I attended Maryland University, Strayer

College, Arlington County Adult Education for real estate courses as well as seminars in the real estate industry sponsored by the National Association of Realtors and local associations. I have owned Thomas J. Lynch Real Estate, Inc. since 1979 and am currently the owner and principal broker for Realitywatch.com, LLC. In addition, I am a member of numerous real estate organizations including the Washington, D.C. Association of Realtors, the Greater Capital Area Association of Realtors ("GCAAR"), the National Association of Realtors ("NAR") and the Northern Virginia Association of Realtors ("NVAR"). Further, I have taught courses to real estate brokers sponsored by GCAAR, including classes on ethics, professional standards, fair housing, diversity and grievance investigations for many years. From 1979 to the present, I have been retained as an expert witness in approximately 30 lawsuits involving real estate professionals. I have recently been contacted as a possible expert witness in the United States Department of Justice's antitrust action against the National Association of Realtors.

### III.    DOCUMENTS REVIEWED

In drafting this report, I reviewed the following material:

1. Complaint; First Amended Complaint; Second Amended Complaint
2. Answer of Defendant Mary White to Plaintiff's Complaint ( May 3, 2006)
3. Answer of Defendants Chatel Real Estate, Inc. and Thierry Liverman to Counts I and II of Plaintiff's Complaint (May 8, 2006)
4. First Amended Complaint (filed May 17, 2006)
5. Answer of Defendants Chatel Real Estate, Inc. and Thierry Liverman to Plaintiff's Amended Complaint (June 7, 2006)
6. Answer to First Amended Complaint by Mary White (June 14, 2006)
7. Scheduling Order (July 25, 2006)
8. Mary White's Response to Request for Admissions of Fact (August 25, 2006)

9. Defendants Chatel Real Estate's and Thierry Liverman's Responses to Plaintiff's Requests for Admissions of Fact (September 8, 2006)

10. Defendant Mary White's Response to Plaintiff's Request for Production of Documents

11. Defendants Chatel Real Estate's and Thierry Liverman's Responses to Plaintiff's Interrogatories

12. Defendant Mary White's Response to Plaintiff's Interrogatories

13. Plaintiff's Response to Defendants Chatel Real Estate's and Thierry Liverman's Interrogatories

14. Plaintiff's Response to Defendant Mary White's Interrogatories

15. Defendants Chatel and Thierry Liverman's Initial Disclosures Pursuant to Rule 26(a)(1) (August 25, 2006)

16. Defendant Mary White's Initial Disclosures Pursuant to Rule 26(a)(1) (August 24, 2006)

17. Plaintiff's Initial Disclosures Pursuant to Rule 26(a)(1) (August 25, 2006)

18. GCAAR Rental Application from Roberta J. Medlin (signed by Roberta Medlin) (October 11, 2005)

19. Commercial Agreement of Lease between Mary White and unnamed Tenant (unsigned) (October 11, 2005)

20. Commercial Agreement of Lease between Mary White and Roberta J Medlin (unsigned) (October 11, 2005)

21. Roberta J. Medlin's Credit Report:  Invoice No:  29807640:  First American Registry Inc. (October 11, 2005)

22. Commercial Lease Agreement between Mary White & John Bratton: (signed by Mary White and John Bratton) (October 31, 2005)

23. Leases submitted by John Bratton to Chatel Real Estate which were rejected

24. GCAAR Rental Application from Bratton Realty, LLC (signed by John Bratton) (October 10, 2005)

25. John Bratton's Letter to Mary White (October 7, 2005)

26. John Gordon Forester's Letter to John Bratton re:  1622 Wisconsin Avenue, N.W.

27. John Bratton's Letter to John Gordon Forester re: 1622 Wisconsin Ave—Commercial Lease Agreement (October 19, 2005)

28. John Gordon Forester's Letter to John Bratton re: 1622 Wisconsin Avenue, N.W. (October 19, 2005)

29. John Gordon Forester's Facsimile to Thierry Liverman re: 1622 Wisconsin Avenue (October 26, 2005)

30. John Gordon Forester's Letter to John Bratton re: 1622 Wisconsin Avenue, N.W. (October 26, 2005)

31. John Bratton's Facsimile to John Gordon Forester re: 1622 Wisconsin Avenue—Delayed Lease Agreement (October 26, 2005)

32. John Bratton's Letter to John Gordon Forester re: 1622 Wisconsin Avenue—Final Lease (October 28, 2005)

33. Metropolitan Regional Information Systems, Inc. (first floor) (October 6, 2005)

34. Metropolitan Regional Information Systems, Inc. (lower floor) (October 6, 2005)

35. Metropolitan Regional Information Systems, Inc. (first floor) (October 13, 2005)

36. Metropolitan Regional Information Systems, Inc. (lower floor) (October 13, 2005)

37. Metropolitan Regional Information Systems, Inc. (lower floor) (November 7, 2005)

38. Metropolitan Regional Information Systems, Inc. (first floor) (November 7, 2005)

39. Facsimile Transmission from Paul Beito to John Gordon Forester re: John Bratton (October 18, 2005)

40. Bank of America Account Activity: Business Economy Checking Account held by John Bratton (October 19, 2005)

41. Bank of America Account Activity: Regular Checking Account held by John Bratton (October 19, 2005)

42. John Bratton: Mortgages, bank accounts and bills as of October 6, 2005

43. John Bratton: National Registry Credit Report (October 12, 2005)

44. John Bratton's formal complaint filed at the District of Columbia Office of Human Rights, including October 25, 2005 letter of Mandi Galloway

45. Photographs of John Bratton: October 2005

46. Chatel Real Estate Inc.'s Fair Housing Manual

47. Chatel Real Estate Inc.'s Property Manager's Manual

48. Transcript of the Deposition of Roberta J. Medlin (September 26, 2006)

49. Transcript of the Deposition of Thierry Liverman

50. Transcript of the Depositions John Bratton

51. Transcript of the Deposition of Mary White

52. Transcript of the Deposition of John Pagones

53. Transcript of the Deposition of Barrett Anderson

54. Transcript of the Deposition of Hope Edwards

55. Transcript of the Deposition of Patsy Petty

56. Transcript of the Deposition of Thomas Anderson

57. Metropolitan Regional Information Systems, Inc. Rules and Regulations Manual

58. Code of Ethics and Standards of Practice of the National Association of Realtors (NAR)

59. Greater Capital Area Association of Realtors, Inc. Bylaws

60. Chatel Real Estate Inc. Fair Housing Manual

61. Chatel Real Estate Inc. Property Manager's Manual

62. Bratton Realty's Income Tax Returns for 2005 and 2006

63. Metropolitan Regional Information Systems, Inc. Listing Summary Report for Bratton Realty for 2005-2007

64. Metropolitan Regional Information Systems, Inc. Year End Real Estate Trend Indicator for 01/01/06 to 12/31/06.

65. Metropolitan Regional Information Systems, Inc. Computation for Rental Value for Basement of 1223 10th Street, NW Property.

66. Metropolitan Regional Information Systems, Inc. Summary Data on the Mid-Atlantic Housing Market.

## IV. DEFENDANTS VIOLATED THE CODE OF ETHICS AND STANDARDS OF CONDUCT APPLICABLE TO REAL ESTATE BROKERS

Real estate brokers are expected to comply with the NAR Code of Ethics and Standards of Practice which is incorporated in the GCAAR Bylaws[1] and the MRIS Rules and Regulations Manual.[2] Because Defendants are real estate brokers in the District of Columbia and members of the GCAAR and the MRIS, Defendants are bound by these rules. As described below, Defendants violated ethical codes and standards of practice in their dealings with plaintiffs, including Article 10 of the NAR Code of Ethics and Standards of Practice which endorses the Civil Rights Act, the Fair Housing Act, and the DC Human Rights Act.

### a. Defendants' 24-Day Delay in Processing Plaintiffs' Lease Application

According to Section 1-6 of the NAR Code of Ethics and Standards of Practice, "Realtors shall submit offers and counter-offers objectively and as quickly as possible."[3] Defendants' lack of response to Plaintiffs' offers to lease the Property displayed their lack of alacrity and contrasts sharply with the rapid manner in which the lease for Roberta Medlin, the other interested candidate, was drawn and processed. It should not have taken Defendants 24 days to process plaintiffs' application for a relatively simple lease for office space that is the size of a 1-bedroom apartment, especially when plaintiffs were the first candidate to express serious interest in the Property. This was not a lease for an entire building on K Street, or an entire floor of a high-rise in downtown. Defendants' unreasonable delay in processing plaintiffs' lease application is problematic. Further, John Pagones' introduction of plaintiffs' lease to Mary White by stating,

---

[1] Greater Capital Area Association of Realtors, Inc. Bylaws, Article VII, § 1.
[2] Metropolitan Regional Information System Rules and Regulations, Article II, §1.
[3] National Association of Realtors, Code of Ethics and Standards of Practice 1-6.

6

"it's an African-American . . . be prepared for trouble" was contrary to industry and ethical standards in the real estate profession.

### b. Defendants' Misrepresentations Regarding The Availability Of The Property

Article 2 of the NAR Code of Ethics provides that "Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction."[4] This is also reiterated in Chatel's Fair Housing Manual which endorses the Civil Rights Act, the Fair Housing Act and the DC Human Rights Act, as is the ordinary business practice in the real estate brokerage industry.[5] Chatel's Fair Housing Manual provides that it is unlawful to "represent a house or apartment is unavailable when, in fact, it is available."[6] Thierry Liverman informed John Bratton on October 12, 2005, that the Property was no longer available and that Mary White had decided to lease the Property to a "friend of a friend." The truth remains that no lease agreement had been signed between Roberta Medlin and Mary White and the property was available contrary to Mr. Liverman's representations to Mr. Bratton. Stating that a property is no longer available when it is, in fact, available is a mischaracterization of what is really happening and a violation of the applicable standards of conduct.

Article 12 of the NAR Code of Ethics provides that "Realtors shall be careful at all times to present a true picture in their advertising and representations to the public."[7] This is also reiterated in the MRIS Rules and Regulations Manual, which provides that property listings should be "complete, current and accurate in every detail,"[8] and changes in pricing or terms in the listing "must be executed in writing, signed by the owner and Principal Broker Subscriber

---

[4] National Association of Realtors Code of Ethics and Standards of Practice, Article 2.
[5] Chatel's Fair Housing Manual.
[6] Chatel's Fair Housing Manual, p. 3.
[7] National Association of Realtors, Article 12.
[8] Metropolitan Regional Information System Rules and Regulations Manual, Article XI, § 16.

and entered into the [MRIS database] service within 48 hours."[9] As of July 29, 2005, Mary White's Property was advertised on the MRIS as available for a 12-48 month lease, yet in October 2005 Defendants refused to lease it to plaintiffs for a term longer than 24 months despite their desire for a longer lease term. In addition, Defendants refused to lease the lower-level of the Property to plaintiffs even though the basement was advertised to the public as available for lease as of September 23, 2005. The suddenly unavailability of Mary White's basement after plaintiffs expressed an interest in leasing it was highly improper. Defendants not only failed to alter material terms regarding the duration of the lease and the Property's availability in the MRIS advertisement in accordance with the MRIS rules, but given plaintiffs' strong interest in leasing both the street and lower-level of the Property, this could be interpreted as an attempt by Defendants to discourage plaintiffs from pursuing the lease negotiations and a blatant violation of the applicable standards of conduct.

### c. Defendants' Imposition of More Stringent Financial Qualification Requirements On Plaintiffs Than Roberta Medlin

Real estate brokers must ensure that all parties receive the "same standard of service."[10] Despite their excellent credit rating and secure financial status, plaintiffs were asked to submit financial documents that were not requested from Roberta Medlin to lease the Property. Plaintiffs were requested to submit two years of income tax returns and bank statements to substantiate their creditworthiness, even though Defendants ran Mr. Bratton's credit and it came out clean. In contrast, Roberta Medlin was neither asked to submit bank statements nor income tax returns in order to make an offer to lease the property. Defendants' behavior in this regard is highly suspicious of imposing more stringent financial qualification

---

[9] Metropolitan Regional Information System Rules and Regulations Manual, Article XII, § 1.
[10] Modern Real Estate Practice, at 349.

requirements on a candidate who is African-American than a candidate who is Caucasian. This is not the industry standard in the real estate profession, and brokers who conduct this practice are breaching their ethical duties and professional responsibilities.

Similarly, real estate professionals are supposed to respond to customer inquiries concerning listings within a reasonable period of time.[11]  From October 6-10, 2005, Mr. Bratton attempted to contact John Pagones, Thierry Liverman and Mary White several times with questions concerning the Property, yet no one responded to his calls for several days. In contrast, Defendants met with Roberta Medlin at length and drafted a lease for her the first day she visited the Property.

### d. Defendants' Insistence That Plaintiffs' Lease Agreement Have Different Terms And Conditions Than That Prepared For Roberta Medlin

Despite plaintiffs' excellent credit score and secure financial status, plaintiffs' lease contained materially different terms and conditions than the lease drafted by Chatel for Roberta Medlin. Specifically, Defendants crossed out from plaintiffs' lease the right of first refusal and option to convert the lease to month-to-month at the expiration of the term. The right of first refusal and the option to convert the least to month-to-month were included in Roberta Medlin's lease. The right of first refusal is a fundamental part of the lease negotiation process and serves to benefit the owner, guaranteeing that she would have two potential buyers for the property; one as the original tenant and the other as a third-party buyer. The option to convert the lease to month-to-month serves to prevent formation of a lease that would require the tenant to vacate the property at the termination of the lease or otherwise become a tenant-at-sufferance. The owner cannot be harmed by having a month-to-month lease at the termination of the initial term because she could simply send a notice to the tenant to increase the rent, occupy the property, or

---

[11] Chatel Real Estate Inc., Property Manager's Manual, p. 1.

9

lease it to another candidate for a longer term.  The disparate terms and conditions offered by Defendants to plaintiffs and Roberta Medlin for the same Property were contrary to industry standards and applicable ethical principles.  In addition, requiring plaintiffs to pay $200 per month for real estate taxes, but not requiring the same of Roberta Medlin runs afoul of MRIS Rules.[12]  Plaintiffs were required to pay $2,700 per month rather than the $2,500 for the street level of the Property as advertised on the MRIS.  It is improper to require an African-American candidate to pay higher rents for a property than a Caucasian candidate, particularly when the MRIS advertisement specifies the rent.

## V.   CONCLUSION

Based on my discussions with plaintiffs, my review of the documents and pleadings referenced above, and my familiarity with the industry standards and code of ethics applicable to real estate brokers, it is my opinion that Defendants' unreasonable delay in processing plaintiffs' lease application, Defendants' misrepresentations to plaintiffs regarding the availability of the Property, Defendants' rejection of the first five lease applications submitted by plaintiffs, Defendants' imposition of more stringent financial qualification requirements on plaintiffs than that imposed on Roberta Medlin, Defendants' denial to plaintiffs of an option to renew the lease and the right to convert the lease to month-to-month at the end of the two-year term, and Defendants' other acts and omissions discussed above were unacceptable violations of the code of ethics and industry standards applicable to real estate brokers.

Dated:  September 5, 2007                                             _____
                                                                                              Thomas J. Lynch

---

[12] MRIS Rules and Regulations Manual, Art. XII, § 1.