UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN BRATTON, et. al.** | Case No.: 1:06CV00694 |
| Plaintiffs | **ORAL HEARING REQUESTED** |
| v. | Hon. John D. Bates |
| **CHATEL REAL ESTATE, INC, et al.** | |
| Defendants. | |

## DEFENDANTS CHATEL REAL ESTATE, INC. AND THIERRY LIVERMAN'S MOTION FOR SUMMARY JUDGMENT

Defendants Chatel Real Estate, Inc. and Thierry Liverman (collectively "Chatel Defendants"), by and through their undersigned counsel, move this Court, pursuant to the Rule 56 of the Federal Rules of Civil Procedure, for an Order granting summary judgment as to all claims asserted against the Chatel Defendants, and state as follows:

1.      Plaintiff John Bratton lacks standing to bring the claims asserted against the Chatel Defendants.

2.      The undisputed facts demonstrate that the Chatel Defendants are entitled to judgment as a matter of law as to all counts in the operative Complaint.

3.      Attached hereto and incorporated by reference is a Memorandum of Points and Authorities in support of this Motion.

WHEREFORE, for the reasons stated herein and in their Memorandum of Points and Authorities, Defendants Chatel Real Estate, Inc. and Thierry Liverman respectfully request that the court dismiss with prejudice all claims asserted against them by Plaintiffs John Bratton and Bratton Realty, LLC.

Respectfully Submitted,

**CHATEL REAL ESTATE, INC. and
THIERRY LIVERMAN**

By:            _____/s/ Matthew A. Ranck_____
Matthew A. Ranck, Esq. (D.C. Bar # 484983)
ECCLESTON AND WOLF, P.C.
2001 S Street, N.W., Suite 310
Washington, D.C. 20009
(202) 857-1696 (telephone)
*Counsel for Defendants Chatel Real Estate,
Inc. and Thierry Liverman*

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on this matter.

_____/s/ Matthew A. Ranck_____
Matthew A. Ranck

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of March, 2008, a true copy of the foregoing Motion was served electronically to:

**Stefan Shaibani**
LITIGATION ASSOCIATE, PLLC
1150 Connecticut Avenue, N.W.
9th Floor
Washington, D.C. 20036
*Counsel for Plaintiffs*

**Robert H. Bouse, Jr.**
ANDERSON, COE & KING, LLP
201 North Charles Street
Suite 2000
Baltimore, MD 21201
*Counsel for Defendants
Mary White and Mary White, Inc.*

_____/s/ Matthew A. Ranck_____
Matthew A. Ranck

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN BRATTON, et. al.**<br><br>    Plaintiffs<br><br>v.<br><br>**CHATEL REAL ESTATE, INC, et al.**<br><br>    Defendants. | Case No.: 1:06CV00694<br><br>**ORAL HEARING REQUESTED**<br><br>Hon. John D. Bates |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS CHATEL REAL ESTATE, INC. AND THIERRY LIVERMAN'S MOTION FOR SUMMARY JUDGMENT

Defendants Chatel Real Estate, Inc. and Thierry Liverman (collectively "Chatel Defendants"), by and through their undersigned counsel, move this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an Order granting summary judgment as to all claims asserted against them. In support of their Motion, the Chatel Defendants state the following.

### INTRODUCTION

In the summer of 2005, Defendant Mary White decided to make a certain commercial property located at 1622 Wisconsin Avenue (the "Property") available for lease. She retained Defendant Chatel to find tenants for the Property and, in July 2005, the Property was listed in the Metropolitan Regional Information System (MRIS) as available for lease. In October 2005, Plaintiff John Bratton ("Bratton") expressed interest in the Property as a location for Bratton Realty, LLC ("Bratton Realty") a real estate company that he owns and operates. Subsequently, several lease offers were submitted on behalf of Bratton Realty. However, Defendant White also received an application from another applicant, Roberta Medlin, and ultimately decided to pursue negotiations with Ms. Medlin.

1

Shortly thereafter, negotiations to finalize lease terms with Ms. Medlin broke down and the property again became available. Within days, Defendant White caused her attorney to reinstate negotiations with Bratton, and on October 31, 2006, a lease agreement was finalized between Bratton and Defendant White.

Despite the fact that a lease was executed within 24 days of Bratton's initial submittal, he filed the instant action alleging that the Defendants' conduct was driven by racial animus and amounted to discrimination in violation of: (1) 42 U.S.C. §§ 1981 and 1982 and (2) D.C. Code §§ 2-1402.21 and 2-1402.23. However, as demonstrated herein, Plaintiffs claims are based upon nothing other than specualtion, conjecture and unsubstantiated suspicion, all of which are patently insufficient to support the claims asserted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff John Bratton ("Bratton") is owner and president of Bratton Realty, LLC ("Bratton Realty"), formed in September 2003 under the laws of the District of Columbia.[1] Bratton Realty primarily handles residential sales, and does not get involved in property management.[2] On Thursday October 6, 2005, Bratton came to the offices of Defendant Chatel and spoke to John Pagones ("Pagones"), a Chatel agent, expressing interest in renting space owned by Mary White at 1622 Wisconsin Avenue for Bratton Realty, identifying himself as "the owner of [Bratton Realty]."[3] While Bratton asked for a blank commercial lease agreement, Pagones could not provide it, as he did not have access to such a document.[4] Moreover, blank commercial lease applications are not generally available to Chatel's agents in the office.[5]

---

[1] *See* Exhibit 1, Certificate of Good Standing, dated 12/27/05.
[2] *See* Exhibit 2, Deposition of John Bratton dated January 19, 2007, at 64:13 – 65:5.
[3] *Id.* at 89:8-9, 96:8-10; *see also* Amended Complaint, at ¶ 29.
[4] *See* Exhibit 3, Deposition of Thierry Liverman, at 42:7-22; *see also* Exhibit 23, Deposition of John Pagones, at 39:2-19.
[5] Exhibit 3 at 39:5-18

The next day, October 7, 2005, Plaintiff submitted a proposed lease, identifying the tenant as "Bratton Realty."[6]   This proposed lease was tenant-friendly and written to Mr. Bratton's benefit.[7]   It was also accompanied by two checks written from a Bratton Realty account[8] (intended to cover the security deposit and first month's rent) and a cover letter indicating, "the space was a great fit for [Bratton's] current plans to open a second [Bratton Realty] office in DC[,]" and explaining that he hoped to "continue the tradition of [the Property] being a boutique real estate firm."[9]

On October 10, 2005, Plaintiff submitted a second proposed lease, which increased the lease term but continued to identify Bratton Realty as the tenant.[10]   Later on October 10, Plaintiff was told that he would be required complete a Chatel standard commercial lease agreement (as opposed to the lease he had drafted) and was provided with the form document to complete.[11] On October 11, 2005 Plaintiff submitted multiple versions of the form Chatel lease.  While each agreement contained slight variations in terms, all identified Bratton Realty as the tenant.[12]

Also on October 11, another candidate, Roberta Medlin ("Medlin") completed a rental application for the Property,[13] after visiting the property at least once prior to completing the application.[14]   Medlin received a blank form lease and asked Defendant White to ask what to do with it,[15] at which point Defendant White sent Medlin to back Chatel for assistance.[16]

---

[6] See Exhibit 4, Lease Agreement dated 10/7/05.
[7] See Exhibit 5, Deposition of Thomas Lynch dated February 9, 2007, at 189:6-20; see also Exhibit 3, supra, at 115:1-9.
[8] See Exhibit 6, Checks from Bratton Realty
[9] See Exhibit 7, 10/7/05 letter from Bratton Realty to Mary White.
[10] See Exhibit 8, Letter from John Bratton to John Pagones with "Updated Lease" attached.
[11] See Exhibit 2, supra, at 173:5-7, 176: 9-20.
[12] See Exhibit 9, Lease submitted by Plaintiff.
[13] See Exhibit 10, Rental Application of Roberta Medlin.
[14] See Exhibit 11, Deposition of Mary White, at 14:17-20.
[15] Id. at 105:14-16.
[16] See Exhibit 3, supra, at 135:5-20.

Subsequently, some of the blanks were completed and several items were left for negotiation, subject to bring stricken by Defendant White.[17]

Credit checks on Medlin and Bratton were performed on the same day in accordance with their rental applications, which gave Defendant White the right to request both candidates' credit reports.[18] Both candidates received satisfactory credit reports.

On October 12, 2005, Defendant White met with Chatel principal and Defendant Thierry Liverman ("Liverman") to evaluate the documents submitted by Bratton Realty and Medlin.[19] Defendant White made a decision to pursue negotiations with Medlin, at which time Liverman notified Bratton of Ms. White's decision.[20] After this date, the Chatel Defendants had no further contact with Bratton.[21] In fact, Plaintiffs admit that negotiations on the final lease occurred from that point forward through Defendant White's personal attorney.[22]

However, Medlin voluntarily withdrew her offer and the property again became available.[23] Defendant White's personal counsel immediately resumed negotiations with Bratton and the parties came to an agreement on October 31, 2005, by which Bratton, individually, leased the Property for two years.[24] As part of these negotiations, Ms. White requested that Plaintiff personally guarantee the lease,[25] and in order to address this issue, the lease was signed by Bratton in his individual capacity.[26] The Chatel Defendants were not substantively involved

---

[17] *Id.* at 105:14 – 109:5; *see also* Exhibit 12, Lease submitted by Roberta Medlin dated October 11, 2005.

[18] *See* Exhibit 11, *supra*, at 173:2-16.

[19] *See* Exhibit 3, *supra*, at 100:11-21.

[20] *Id.* at 100:8-102:5.

[21] *See* Exhibit 2, *supra,* at 277:8-15.

[22] *See* Exhibit 13, Plaintiffs' Response to Defendant Chatel Real Estate Inc.'s First Set of Interrogatories to Plaintiff, at p. 16.

[23] *See* Exhibit 14, Deposition of Roberta Medlin, at 31:7-10.

[24] *See* Exhibit 15, final lease entered into between Bratton and Defendant White.

[25] *See* Exhibit 16, 10/18/05 letter from John Gordon Forester.

[26] *See* Exhibit 17, 10/19/05 letter from Plaintiff offering to lease the property in his own capacity, at ¶4.

in the negotiation and preparation of this final lease, merely sending an electronic copy of the form lease to Defendant White's attorney.[27]

## ARGUMENT

Summary judgment must be granted, pursuant to Rule 56 of the Federal Rules of Civil Procedure, when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order to defeat summary judgment, "nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts ....'" *Arrington v. United States*, 473 F.3d 329, 342 (D.C. Cir. 2006). Moreover, "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Arrington*, 473 F.3d at 342 (citing *Anderson* with approval).

Plaintiffs bring claims under 42 U.S.C. §§ 1981 and 1982 and D.C. Code §§ 2-1402.21 and 2-1402.23. Pursuant to 42 U.S.C. §§ 1981, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ...." According to § 1982, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." D.C. Code § 2-1402.21 makes it unlawful to

> do any of the following acts, wholly or partially for a discriminatory reason ... (1) To interrupt or terminate, or refuse or fail to initiate or conduct any transaction in real property; or to require different terms for such transaction; or to represent falsely that an interest in real property is not available for transaction; (2) To include in the terms or conditions of a transaction in real property, any clause, condition or restriction ....

---

[27] *See* Exhibit 3, *supra*, at 120:11 – 121:18.

Finally, D.C. Code § 2-1402.23 includes penalties when "[a]ny real estate broker or real estate salesperson … commits any act of discrimination prohibited under the provisions of this chapter …."

However, "In order to state a claim under section 1981, plaintiff must allege … *specific acts, practices, or policies* which resulted in the alleged discrimination." *Davey v. Tomlinson*, 627 F. Supp. 1458, 1462 (E.D. Mich. 1986) (emphasis added). "To state a cause of action for a section 1981, the plaintiff must allege some facts that demonstrate that his race was the *reason* for the defendant's inaction." *Phelps v. Washburn University of Topeka*, 632 F. Supp. 455, 459 (D. Kan. 1986) (emphasis added).

The undisputed facts of this case demonstrate that: (1) Plaintiff Bratton lacks standing to bring individual claims; (2) the Chatel Defendants had no substantive involvement in the negotiation and preparation of the final lease and, thus, cannot be held liable for any alleged discrimination during that process; (3) even prior to Defendant White's attorney undertaking the negotiations, the facts do not support any claims of discrimination by the Chatel Defendants; (4) throughout the process, Defendant Liverman's involvement was limited and does not provide a basis for the claims against him; and (5) the Plaintiffs' damages are speculative, unsupported and unrecoverable as a matter of law. Consequently, the Chatel Defendants are entitled to judgment as a matter of law on all claims brought against them.

## I.    PLAINTIFF BRATTON DOES NOT HAVE STANDING TO BRING INDIVIDUAL CLAIMS[28]

---

[28] Although the Chatel Defendants previously raised this standing issue, the Court denied their prior Motion for Summary Judgment on the ground that a genuine issue of material fact existed given the parties' positions as to why Bratton personally, not Bratton Realty, was the tenant/lessee on the final lease. However, as noted *supra* (*see* footnotes 25 and 26), Bratton signed the lease individually due to a request made by Defendant White and/or her personal counsel, at a time when there is no evidence that the Chatel Defendants were substantively involved in the negotiations, as discussed *infra* (*see* Section II).

During all dealings with the Chatel Defendants, it is undisputed that Bratton was acting for the benefit of Bratton Realty, LLC and was attempting to enter into a contract on behalf of that entity. Significantly, at no point did Bratton submit any document to the Chatel Defendants identifying himself as the lessee, or otherwise indicating that he wished to negotiate or contract in his individual capacity. Rather, every lease submitted to the Chatel Defendants was submitted on behalf of, and identified the prospective tenant as, Bratton Realty. As such, any injuries allegedly caused by these Defendants as the result of a refusal to lease (or delay in leasing) were sustained solely by Bratton Realty. Therefore, Bratton, merely as an employee and owner of Bratton Realty, lacks standing to bring these civil rights actions against the Chatel Defendants. *See Johnson v. D.C.,* 2004 U.S. App LEXIS 24145, *1 (D.C. Cir. 2004) (citing *Gersman v. Group Health Association, Inc.,* 289 U.S. App. D.C. 332, 931 F.2d 1565, 1569 (D.C. Cir. 1991)).

Indeed, as set forth more fully below, it is a fundamental premise that the president, employees or shareholders of a corporation have no standing to bring a lawsuit for injuries sustained by the corporation. This premise holds true even in circumstances almost identical to those presented here. *Id.*; *see also Dominos Pizza v. McDonald*, 546 U.S. 470, 126 S.Ct. 1246, 1249-1252 (2006).

A.    *The President, Employees or Shareholders of a Corporation Have No Standing to Bring Civil Rights Claims for Injuries Sustained by the Corporation*

As noted above, in 2006, the Supreme Court reaffirmed this rule and its rationale. In *Dominos Pizza v. McDonald*, 546 U.S. 470, 126 S.Ct. 1246, 1249-1252 (2006), plaintiff John McDonald claimed that, due to his race and personal appearance, defendants had refused to enter into certain construction contracts with a construction company he owned and operated. As such, McDonald brought suit in his individual capacity under § 1981 of the Civil Rights Act. The 9th Circuit allowed his claim to proceed and the defendants appealed. The Supreme Court

reversed, determining that McDonald lacked standing to assert such claims because the contracts that he intended to enter into were not for his own benefit, but for that of his construction company. The Court explained:

> McDonald argues that the statute must be read to give him a cause of action because he 'made and enforced contracts' for [his construction company]. On his reading of the text, 'if Domino's refused to deal with the salesman for a pepperoni manufacturer because the salesman was black, that would violate the section 1981 right of the salesman to make a contract on behalf of his principal.' We think not. The right to 'make contracts' guaranteed by the statute [is] not the insignificant right to act as an agent for someone else's contracting ... [but rather, the right] to give and receive *contractual rights* on one's own behalf. Common usage alone is enough to establish this, but the text of the statute makes this common meaning doubly clear by speaking of the right to 'make *and enforce*' contracts .... Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights .... Absent the requirement that the plaintiff himself must have rights under the contractual relationship, § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to *somebody's* contract. We have never read the statute in this unbounded – or rather, *peculiarly* bounded – way.

*Id.* at 1249-1251 (internal citations omitted).

In the case at bar, the undisputed facts demonstrate that the Chatel Defendants were involved with only one contemplated contractual relationship, the one between *Bratton Realty* and Mary White. Indeed, each of the numerous leases submitted to and through Chatel specifically identified the prospective tenant as Bratton Realty.[29] In fact, Bratton himself was quick to indicate to the Chatel Defendants at their first meeting that he was interested in leasing space *on behalf of his real estate firm*.[30]

Thus, while Bratton alleges discrimination based on *his* personal appearance and asserts that *he* was personally injured in his capacity as president and owner of Bratton Realty, such

---

[29] *See* Exhibits 4, 8-9.
[30] *See* FN3, *supra*.

allegations, even if true, simply do not provide the requisite standing for Bratton to pursue these claims. As Justice Scalia explained in response to a similar argument:

> [The plaintiff] proposes a new test for § 1981 standing: Any person who is an 'actual target' of discrimination, and who loses some benefit that would otherwise have inured to him had a contract not been impaired, may bring a suit. Under this theory, an individual is the 'actual target' if he was the *reason* a defendant chose to impair its contractual relationship with a third party. [Plaintiff]'s formulation simply ignores the explicit statutory requirement that the plaintiff be the 'person' whose 'right ... to make and enforce contracts,' § 1981(a), was 'impaired,' § 1981(c), on account of race. It is just the statutory construction we have always rejected ... nothing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for *all* racial injustice. If so, it would not have been limited to situations involving contracts. Trying to make it a cure-all not only goes beyond any expression of congressional intent but would produce satellite § 1981 litigation of immense scope. [Plaintiff]'s theory would permit class actions by all the minority employees of the nonbreaching party to a broken contract (or, for that matter, minority employees of any company failing to receive a contract award), alleging that the reason for the breach (or for the refusal to contract) was racial animus against them.

*Dominos,* 126 S.Ct., at 1251-52.

As such, regardless of whether discrimination actually occurred or whether Bratton was the target of that discrimination, because the contracts at issue during the Chatel Defendants' involvement were indisputably between Ms. White and *Bratton Realty,* and were to be enforceable solely by *Bratton Realty* as the lessee, that entity is the only party with standing to bring these civil rights claims. Consequently, summary judgment must be granted as to all claims brought by Bratton individually.

B.    *This Rule Applies Equally To Each Claim, Not Merely § 1981*

While the Court in *Dominos* dealt only with § 1981, standing requirements under each of the other asserted statutes have been evaluated and construed consistently with this same rule. For instance, in *Krupa v. Leonardi,* 2007 U.S. Dist. LEXIS 3972 (N.D. Ill. 2007), a case with many factual similarities to the one at bar, the *Dominos* rule was applied to § 1982. In *Krupa,*

9

plaintiff Shaurin Mehta was the sole owner and officer of a small grocery store. Mr. Mehta sought to obtain assignment of the leasehold over a property where he intended to operate his store. When the defendant-landlord failed to approve the assignment, Mr. Mehta filed suit under §§ 1981 and 1982, claiming that the refusal was motivated by racial animus. The court noted that "[s]ections 1981 and 1982 are construed in tandem," cited the *Dominos* holding, and granted defendants summary judgment on both claims.

In support of its conclusion, the court explained that just as a claim under § 1981 requires a showing that the plaintiff intended to enter into a contract *in his own capacity*, a claim under § 1982 requires a showing that the plaintiff intended to lease or purchase property *in his own capacity.* That is, such claims "require[] that the plaintiff have his 'own contractual relationship, not of [sic] someone else's ....'" The court concluded, "a shareholder and contracting officer has no rights ... under the corporation's contracts. Accordingly, a shareholder and contracting officer of a corporation cannot bring suit under Section 1981 [] and similarly section 1982 ...." *Id.* at *6 - *8.

Similarly, in *Gersman, supra,* 289 U.S. App. D.C. 332, the D.C. Circuit specifically applied the *Dominos* rationale to the D.C. Human Rights Act. In that case, plaintiff Alan Gersman was the president and (along with his wife) owner of a software company called CSI. Mr. Gersman believed that a contract to which CSI was a party was terminated solely because the other contracting party discovered Mr. Gersman was Jewish. Gersman filed suit in the U.S. District Court for the District of Columbia, both in his own capacity and in the name of CSI, asserting claims under § 1981 and the D.C. Human Rights Act. Before analyzing the merits of CSI's claim, the court noted, as a threshold issue, that Gersman himself had no standing to bring his civil rights claims, explaining: "It was CSI, and not Gersman, whose contract was terminated.

Gersman, as a shareholder, has no standing to bring claims for an injury suffered by CSI." *Id.* at 1569 (internal citations omitted); *see also Johnson v. D.C.,* 2004 U.S. App LEXIS 24145 (citing *Gersman* as good law).

Each of the claims asserted in this case requires that the direct victims of the alleged discrimination, not the alleged targets, bring the action. Thus, the undisputed facts make clear that only Bratton Realty, as the entity that sought the contract during the Chatel Defendants' substantive involvement, has standing to assert these claims.

C.     *Bratton Has Alleged No Harm Distinct From That Allegedly Suffered By Bratton Realty*

As discussed at length above, a stockholder/officer generally cannot maintain an individual action for injuries caused to his corporation. However, some courts have suggested that a limited exception may exist. *See, e.g., Stat-Tech Intl. Corp v. Delutes,* 47 F.3d 1054, 1060 (10th Cir. 1995); *see also, Guides v. Yarmouth,* 295 F.3d 1065, 1072-73 (10th Cir. 2002). This exception would apply where "the actions of the third party that injure the corporation also cause injury to the shareholder which is unique to himself or herself ... and not suffered by other shareholders." *Id.* That is, a shareholder/employee/officer may posses a separate cause of action only if his injury is wholly distinct from the injury suffered by the corporation or other shareholders.

In the case at bar, there are two categories of alleged damages: (1) the economic consequences of Defendants' alleged delay in processing Bratton Realty's proposed lease and/or refusal to accept its proposed terms; and (2) the alleged humiliation, embarrassment and emotional distress that allegedly arose from the these Defendants' actions. Even if Bratton shared in the alleged economic consequences, his damages certainly could not be said to be unique from those allegedly suffered by Bratton Realty.

The Plaintiffs' expert's most recent report focused on the economic damages allegedly suffered. In this regard, the expert identified the following: (1) lost profits and loss of good will; (2) lost rental revenue; (3) relocation costs; and (4) lost commissions. However, as to several of these categories, even the Plaintiffs' expert identified damages solely suffered by Bratton Realty.[31] As such, the Plaintiffs' own expert can not opine that any damages concerning lost profits or relocation costs would be suffered by Bratton in his individual capacity.

Furthermore, Bratton himself testified that several of the expenses pertaining to relocation costs were made by Bratton Realty, not Bratton individually. Specifically, allegedly as a result of the move from Georgetown, Bratton Realty, not Bratton, paid for new business cards, letterhead, office accessories, paint, and office appliances. *See* Exhibit 18, *supra*, at 58:20 – 65:1. Indeed, Bratton specifically testified that payment for the painting of Bratton Realty's new office was "in the name of Bratton Realty ... The work was requested by Bratton Realty." *Id.* at 65:8-12.

Similarly, several of the bills and invoices pertaining to the relocation costs support the fact that the expenses were made solely by Bratton Realty. In this regard, a Verizon "Work Authorization/Completion Acknowledgment" for $175.00 identifies the customer as Bratton Realty LLC. A Geeks on Call Invoice for $439.00 for the setup of Bratton Realty's computer network states that the customer was Bratton Realty. Furthermore, that invoice appears to have been paid via a credit card with the name "John Bratton Realty." Invoices for new business cards, letterhead, and envelopes, totaling $893.34, were billed to and shipped to Bratton Realty.

---

[31] As to lost profits and loss of good will, the expert stated: "*Bratton Realty* will have a difficult time retaining and recruiting new agents ... [I]f *Bratton Realty* were still operating from the basement of [a prior] property, its sales would have been dramatically lower ... Transferring the business to a new location will be a blow to the [sic] *Bratton Realty*, resulting in a substantial lost profits [sic] and loss of good will." Moreover, the expert concluded that section by "estimat[ing] *Bratton Realty's* lost profits to amount to over two months of revenue ..." without identifying any loss of profits allegedly suffered by Bratton himself. *See* Exhibit 19, Expert Report of Thomas Lynch on Economic Damages, at 7-9 (emphasis added). Concerning relocation costs, the expert stated: "*Bratton Realty* will suffer relocation expenses for having to move ...." *Id.* at 9 (emphasis added).

The invoice of an air conditioning service for $85.00 also stated that the customer was "Bratton Realty." A graphic design invoice, apparently to update Bratton Realty's Web site, was billed to Bratton Realty. In addition, an estimate for new signs for $1,895.25 was addressed to Bratton Realty. A receipt for payment of $500 for five computer desks with chairs states that a check was received from Bratton Realty. Finally, a "work order" stating that an Eric Rothermel was paid $300 to assist in the move to a new location states "Office Move for Bratton Realty."[32]

Even as to the remaining two categories (lost rental revenue and lost commissions) the expert noted damages suffered by "plaintiffs" generally, without identifying damages unique to either of them. As such, even as to damages that Bratton himself may theoretically suffer, Bratton Realty would suffer the identical damages in each instance as well and, thus, Bratton does not have standing to pursue the claims alleged in his individual capacity under this exception to the standing requirements.

Application of this exception to emotional distress has been specifically considered and rejected in a case with facts nearly identical to the case at bar. *See Guides, supra,* 295 F.3d, at 1072. In *Guides,* plaintiff Tseghe Foote was the president and sole shareholder of Africa House, a small store operating out of a property leased from defendant Yarmouth. When the lease expired, Ms. Foote attempted to negotiate a long-term renewal. Although another tenant was offered a ten-year lease, Ms. Foote was told that the Africa House "did not mix well with the other tenants" and was offered only a four-month tenancy. Ms. Foote brought claims under §§ 1981 and 1982, claiming that the refusal to offer Africa House terms similar to those offered other tenants was motivated by racial animus. The claims were filed in both Ms. Foote's name and in the name of Africa House, alleging both economic and emotional distress damages. Ms.

---

[32] *See generally,* Exhibit 20, receipts, bills, and invoices pertaining to items and services allegedly purchased upon Bratton Realty's move from 1622 Wisconsin Avenue.

Foote's claims were dismissed for lack of standing and she appealed, invoking the exception discussed above.  The court, in an analysis that could apply verbatim to the case at bar, explained:

> Ms. Foote alleged that she suffered emotional distress as a result of the defendants' actions. However, this distress arose from the failure of the defendants to contract with or lease to Africa House and was a product of the economic damages which were suffered by the corporation. Foote suffered no violation of her contract rights or right to lease that was in any way different from the violations claimed by Africa House. Her claim is derivative of that of Africa House and she does not have standing to sue on her own behalf.

*Id.*  That is, alleged emotional distress suffered by a shareholder/officer arising from another's allegedly wrongful refusal to lease property to their corporation *is not a distinct injury giving standing to such an individual*, even for emotional distress damages.  As such, under *Guides,* Plaintiff's emotional distress cannot serve as the basis for standing.  Not only is *Guides* factually similar to the case at bar, but its holding and rule have been specifically embraced by this Court. *See DAG Ent. v. Exxon Mobil Corp.,* 2004 U.S. Dist. LEXIS 27393, *11 - *12 (D.C. 2004) (citing *Guides*, 295 F.3d, at 1072).

Thus, the undisputed facts simply do not support any contention that Bratton would suffer damages in his individual capacity distinct from damages allegedly suffered by Bratton Realty. Furthermore, Bratton cannot recover emotional distress damages stemming from the alleged refusal to lease to Bratton Realty.  As such, the Chatel Defendants are entitled to summary judgment as to Bratton's individual claims.

## II. THE CHATEL DEFENDANTS HAD NO SUBSTANTIVE INVOLVEMENT IN THE NEGOTIATION AND PREPARATION OF THE FINAL LEASE

Plaintiffs allege that the terms of the final lease were discriminatory inasmuch as provisions desired by Plaintiffs were not allowed in the final lease *agreed to by Plaintiffs*.

However, there is no evidence that the Chatel Defendants were substantively involved in the negotiation and preparation of the final lease. Indeed, the undisputed facts show otherwise. As such, the Chatel Defendants are entitled to summary judgment on any claims based on alleged discrimination arising from the negotiation and terms of that lease.

After Defendant Liverman called Bratton on October 12, 2005 to notify Bratton of Defendant White's decision, it is undisputed that the Chatel Defendants' only involvement with regard to the final lease was sending Defendant White's attorney a blank Chatel lease in electronic format.[33] Indeed, Plaintiffs admit that all negotiations on the final lease occurred through Defendant White's personal counsel. Thus, Plaintiffs' answer to Defendant Chatel's Interrogatory No. 11 states:

> Mary White decided to engage in 'negotiations' with plaintiff on October 18, 2005 through her attorney, John Gordon Forester. However, Mary White did not genuinely intend to negotiate a lease with plaintiff even at that time but instead sought to dissuade him from leasing the Property by demanding terms and conditions in the lease that were highly disadvantageous to plaintiff.[34]

Missing from the Plaintiffs' response is any statement implicating the Chatel Defendants in the alleged discrimination stemming from the terms of the final lease.

Thus, the undisputed facts of this case establish that any claim of discrimination against the Chatel Defendants arising from the negotiation or terms of the final lease agreed to by Plaintiffs must fail.[35] As such, the Chatel Defendants are entitled to judgment as a matter of law on all such claims.

### III.    THE FACTS DO NOT SUPPORT DISCRIMINATION CLAIMS AGAINST THE CHATEL DEFENDANTS BASED ON ACTS THROUGH OCTOBER 12, 2005

---

[33] *See* Exhibit 3, *supra*, at 120:11 – 121:18.
[34] *See* Exhibit 13, *supra*, at p. 16.
[35] The Chatel Defendants vehemently deny that any Defendant, or the negotiation or terms of the final lease itself, was in any way discriminatory.

In addition to the lack of any evidence of the Chatel Defendants' involvement in the lease negotiation after October 12, 2005, the undisputed facts demonstrate that even their involvement prior to that date does not give rise to the claims alleged by Plaintiffs. In sum, Plaintiff alleges that the Chatel Defendants, due to racial animus, wrongfully interfered with, and delayed the processing of, Plaintiff's application and lease. In this regard, Plaintiffs allege that Pagones "willfully declined to provide plaintiff [Bratton] with a rental application, blank lease agreement, and information pertaining to the Property on October 6, 2005. Mr. Pagones allegedly further failed to promptly communicate John Bratton's offers to lease the Property to Mary White."[36] Plaintiffs also complain that they received disparate treatment regarding the processing of their application compared to that of Ms. Medlin.[37] However, the undisputed facts do not support any of the Plaintiffs' claims.

First, Pagones testified that he could not provide Bratton with a blank commercial lease, as they were not available to him because they were kept on Mr. Liverman's computer.[38] There are no facts to contradict this testimony. Moreover, Pagones testified that he would not have provided Bratton with a commercial rental application if one had been asked for because the office policy is to give an application and a lease together.[39] Similarly, even if Bratton had offered to give checks for the first month's rent and a security deposit, Pagones would not have taken them because the office takes all documentation together. *Id.* The next morning, October 7, 2005, Mr. Pagones sent Bratton the necessary forms, but Bratton had already prepared a lease

---

[36] *See* Exhibit 13, *supra*, at p. 16.
[37] *See id.* at p. 16-17.
[38] *See* Exhibit 21, Deposition of John Pagones, at 39:2-19; *see also* Exhibit 3 at 42:7-22.
[39] *See id.* at 40:12-14; 41:7-11.

on his own form.[40]   When Pagones saw the lease, he took it to Defendant Liverman, called
Defendant White to inform her of it, then took it to Defendant White to show her.[41]

Defendant Liverman's testimony was in accord, as follows: "[W]henever we get an
application, we process it quickly … I also know that, in this case, John Bratton chose to
communicate by giving us a bunch of papers on Friday [October 7, 2005] and we give them,
right away, to Mary [White]."[42]   As it is uncontroverted that the Chatel Defendants transmitted
the leases submitted by Bratton to Defendant White immediately upon receipt, any claim that the
Chatel Defendants delayed in processing Plaintiff's efforts to lease the property is completely
unsupported.   Rather, plaintiffs rely entirely on speculation and conjecture, as there is simply no
evidence that Chatel interfered with this process at all.

Plaintiffs also assert that they were discriminated against because another applicant, Ms.
Medlin, somehow received favorable treatment or was offered favorable terms.   However, the
uncontroverted evidence is to the contrary.   First, Pagones testified that he had nothing to do with
the lease submitted by Ms. Medlin, he never discussed her with Defendant White, and never saw
the lease submitted by Ms. Medlin.[43]   As there is no evidence to the contrary, there can be no
claim that he gave preferable treatment to Ms. Medlin.

Moreover, while Plaintiffs assert that Ms. Medlin was offered more favorable terms than
he ultimately received, Defendant Liverman testified that the draft lease given to Ms. Medlin was
just that – a DRAFT – and was subject to negotiation and to being stricken by Defendant
White.[44]   As Ms. Medlin withdrew her application, she and Defendant White never negotiated all

---

[40] *See id.* at 45:4-16.
[41] *See id.* at 51:20 – 52:11; 53:1-3.
[42] *See* Exhibit 3, *supra*, at 193:12-16.
[43] *See id.* at 61:6 – 62:2.
[44] *See id.* at 105:14 – 109:5.

terms or came to an agreement, and the document was never finalized.  As such, Defendant White never deleted what she may have had negotiations proceeded.[45]

Similarly, Ms. White and Ms. Medlin testified that, although they were negotiating the lease, certain of the specific terms had not yet been discussed, such as the Right of First Refusal.[46]  Nevertheless, Ms. White stated with certainty that she would not have agreed to a Right of First Refusal with any applicant.[47]

Finally, Plaintiff asserts that, unlike Ms. Medlin, he was required to provide income tax returns and bank statements before he could lease the Property.  However, the record is undisputed that the only reason Defendant White did not request two years of income tax returns and bank statements from Ms. Medlin was because negotiations did not get that far.[48]  Had negotiations proceeded, Defendant White would have asked for those documents.[49]

## IV.    DEFENDANT LIVERMAN IS ENTITLED TO SUMMARY JUDGMENT BASED ON HIS LIMITED PERSONAL INVOLVEMENT

Defendant Liverman is entitled to summary judgment as his involvement in the leasing process was limited to assisting Medlin at Defendant White's request with completing the blanks in the form lease she received, meeting with Ms. White to discuss the competing submittals and communicating Defendant White's decision to pursue negotiations with Medlin.  Indeed, Bratton testified, "[The phone call with Liverman on October 12, 2005 was] the only time I spoke to someone other than John Pagones at Chatel.  So all my information was coming from John Pagones, with the exception of the denial.  The denial came from Thierry Liverman.  From that

---

[45] *See* Exhibit 11 at 106:11 – 109:5.
[46] *See id.* at 106:18 – 107:9, 107:19 – 108:22; *see also* Exhibit 14, *supra*, at 24:19 – 25:13, 44:8-13.
[47] *See* Exhibit 11, at 62:3-18; 109:1-5
[48] *Id.* at 173:2-22.
[49] *Id.*

point on, I was dealing with John Gordon Forester."[50]   The undisputed facts make clear,

however, that there is no basis for any claim against Mr. Liverman for discrimination.

First, although Liverman also assisted Medlin, at Defendant White's request, with

completing the blanks in the form lease she had received, Liverman testified that the only reason

he did not meet with Bratton was because "nobody ever asked me to meet with him."  Moreover,

Mr. Pagones had been the Chatel agent working with Bratton and, as such, "Why should I

[Liverman] suddenly jump in and ask to meet somebody who has already met with an agent[?]

The broker doesn't meet everybody who comes in ...."[51]

Second, with regard to Ms. White's decision to pursue a lease with Ms. Medlin rather

than Plaintiff, the uncontroverted facts make clear that when Liverman met with Defendant

White on October 12, 2005, he encouraged a nondiscriminatory process.   Thus, Liverman

testified,

> Mary asked me a question, which was whether she had to take John ... I said,
> [']Mary, I don't think you have to accept it.  I don't think the law requires it.  You
> have to make absolutely sure that your decision is based on objective
> nondiscriminatory factors.[']   I said, [']tell me what basis you're making your
> decision on.['] ... [After she did so,] [']We've got to call John [Bratton] right
> away to be fair to him so, if he wants, he can pursue his other alternative.[']" [52]

Based upon these undisputed facts, there is absolutely no basis upon which Defendant

Liverman can be liable for any alleged discriminatory treatment of Plaintiffs.  Plaintiffs admitted

that Liverman's only involvement with them was communicating Ms. White's decision.

Furthermore, the undisputed facts show that Defendant Liverman actually encouraged a

nondiscriminatory decision.   Thus, Defendant Liverman is entitled to judgment as a matter of

law based on the undisputed facts herein.

---

[50] See Exhibit 2, *supra*, at 221:14-19.
[51] See Exhibit 3, *supra*, at 192:11-17.
[52] *Id.* at 254:5-17.

V.    **PLAINTIFFS' ALLEGED DAMAGES ARE SPECULATIVE AND UNSUPPORTED BY THE UNDISPUTED FACTS**

Plaintiffs have identified four categories of economic damages, each of which was assigned a dollar value in the Plaintiffs' expert's most recent report: (1) lost profits and loss of good will ($73,874); (2) lost rental revenue ("over $36,000"); (3) relocation costs ("over $31,868"); and (4) lost commissions ($55,622.60).  Plaintiffs have also attempted to establish Bratton's emotional distress as an element of damages.  However, the undisputed facts do not support the Plaintiffs' alleged damages.

First, the opinion testimony of Plaintiffs' expert witness, Thomas Lynch, is patently insufficient to support the damage claims.  In this regard, the opinions amount to nothing more than sheer speculation, conjecture and theory, and have no basis in the facts of this case.  As such, Mr. Lynch's testimony should be disregarded and stricken, as it cannot possibly assist the trier of fact pursuant Federal Rule of Evidence 702.  *See Mays v. State Farm Lloyds*, 98 F. Supp. 2d 785, 787 (N.D. Tex. 2000) (*quoting Brown v. Parker-Hannifin Corp.*, 919 F.2d 308, 311-12 (5th Cir. 1990)) (Plaintiffs' expert's testimony was inadmissible where it 'amount[ed] to speculation and [was] of no assistance to the jury.'").

Specifically, although Mr. Lynch opines that, "Studies concerning displaced businesses have confirmed that the effect of an involuntary relocation on a business is substantial in the form of lost revenues,"[53] he testified that he has not reviewed <u>any studies</u> in conjunction with this case.[54]  Furthermore, Mr. Lynch testified that he has <u>never</u> reviewed a study or prepared one comparing the performance of a Georgetown real estate company or real estate agent versus

---

[53] Exhibit 19, at p. 8.
[54] *See* Exhibit 22, Deposition of Thomas Lynch dated December 10, 2007, at 364:12 – 365:1; *see also id.* at 405:20 – 406:16.

similar companies and agents in other D.C. locations, and he was not even aware of whether any such studies exist.[55]

Rather, the $73,874 for lost profits was based on two months of lost revenue, extrapolated from Bratton Realty's sales when it operated from the subject property throughout 2006, and premised on the belief that the move caused a loss of Bratton realty sales agents and therefore sales. However, the undisputed facts do not support this theory. For instance, while Bratton Realty was located in Georgetown during 2006, it was not located in Georgetown for the majority of 2005. Nevertheless, its sales commissions in 2006 were actually lower by almost 25%.[56] Similarly, Bratton's tax returns showed $108,227 in net profits for 2005 and $52,314 in 2006.

Moreover, Mr. Lynch testified that he did not interview any of the agents allegedly lost by Plaintiffs due to the move, in order to ascertain their reasons for leaving.[57] Thus, he was unable to testify to the identity of any agent, other than James Grant, who was with Bratton Realty after its move to Georgetown[58], and he could not identify any agent that associated with Bratton Realty merely due to its Georgetown location.[59]

As demonstrated below, had Mr. Lynch investigated the matter or interviewed these witnesses, he would have discovered that many of the Plaintiffs' claims and damages are unsupported. In this regard, Bratton Realty's own former agents testified regarding their reasons for leaving Bratton Realty.

---

[55] *See id.* at 365:2 – 366:15.
[56] *See* Exhibits 23 and 24, Bratton Realty's 2005 and 2006 commissions, respectively, showing $620,092 (total sales multiplied by 2.75%) in commissions in 2005 and $479,427.75 in 2006.
[57] *See id.* at 545:14-18.
[58] *See id.* at 408:18-22.
[59] *See id.* at 409:1-6.

Gerardo Cruz, who began as an agent with Bratton Realty in February 2004 and left in late 2007, testified that he e-mailed Bratton to notify him he was leaving real estate.[60]   When asked why he left real estate, Mr. Cruz did not mention Bratton Realty's move from Georgetown. Rather, he stated: "Because of the way of the market ... it became very difficult to do business and I felt like it was the type of business where you really need to invest and I did not have the time or the money to do that."[61]   Moreover, Mr. Cruz responded affirmatively when asked, "Would you have left if the office stayed in Georgetown?  Would you have left anyway?"[62]

Takia Moore, an agent still with Bratton Realty, testified that she transitioned to inactive status solely "[b]ecause business has really slowed down and my income is not the same as what it was before."[63]   Furthermore, she testified that business being slower is because of the downturn in the market generally.  As such, Ms. Moore, like Mr. Cruz, did not leave Bratton Realty due to the move from Georgetown.

Finally, James Grant began with Bratton Realty in July 2005 and left to work at Keller Williams, another firm, in late September 2007.[64]   Contrary to Plaintiffs' assertions, Mr. Grant left Bratton Realty because he had "no personal growth.  I wanted to go a new direction."[65] Specifically, Mr. Grant testified:

> I decided that this company in particular, Keller Williams, and a couple of the people there, I was interested really in working with.  They do a lot of business. And they structure their teams differently and I really wanted to go to the next level of having my own team.  So that was a big weighing factor in my move.[66]

---

[60] *See* Exhibit 25, Deposition of Gerardo Cruz, at 13:16, 17:11-15.
[61] *See id.* at 18:20 – 19:2.
[62] *See id.* at 31:14-17.
[63] *See* Exhibit 26, Deposition of Takia Moore, at 15:13-20, 18:14-21.
[64] *See* Exhibit 27, Deposition of James Grant, at 13:11-13, 16:13-19.
[65] *See id.* at 24:1-4.
[66] *See id.* at 24:13-19.

Indeed, almost a year prior to leaving, Mr. Grant first had a conversation with a principal at Keller Williams.[67]   Moreover, while he left in September 2007, Mr. Grant began thinking of leaving as early as January 2007.[68]   Thus, the undisputed facts also establish that Mr. Grant left for many reasons other than Bratton Realty's move from Georgetown.

Plaintiffs also claim that had they had a longer lease at the Property, they could have rented out other commercial space they owned[69].   Plaintiffs' expert states that Plaintiffs could have made $1,500 per month leasing 1223 10th Street.   To support that allegation, Plaintiffs produced a document titled "CMA Statistics," which apparently compared nine (9) rental listings and provided average and median list and rent prices.[70]   Bratton stated that the estimated rent Plaintiffs could have earned is based on "what a one-bedroom basement apartment with parking goes for in that area."[71]   However, the Statistics did not state the location of any of the listings or their square footage.

Moreover, although Mr. Lynch estimated Plaintiffs' lost rental revenue at "over $36,000," he testified that he did not look at any comparable properties to come to that figure.[72] He was also unaware of the amount of space Plaintiffs' allegedly could have rented.[73]   As such, his opinions regarding the amount that Plaintiffs allegedly could have received for renting Plaintiffs' other property is purely speculative and cannot be used to support this claim.

Next, Plaintiffs claim damages estimated at $55,622.50 in lost commissions allegedly incurred because Bratton lacked the time to devote to certain prospective clients while he was

---

[67] *See id.* at 28:20 – 29:4.
[68] *See id.* at 30:7-11.
[69] Obviously, Defendants also deny that Plaintiffs had any right to a lease of any particular length.  This peculiar conclusion appears to have no basis in law.
[70] *See* Exhibit 28.
[71] *See* Exhibit 19, at 97:19-20.
[72] *See* Exhibit 22, *supra*, at 424:4-8.
[73] *See id.* at 425:2-4.

working on securing the lease for the Property. There are numerous problems with this claim, all based on the undisputed facts.

First, Plaintiff testified that during the period of Chatel's involvement, he did little in terms of working on securing the lease. Rather, he testified that he essentially made a few calls to determine the status, and sat around waiting for a response.[74]

In addition, all of the allegedly lost clients or customers that could be deposed testified that their use of other realtors was for reasons that can in no way be in any way related to Plaintiffs' attempts to lease the subject Property. In this regard, while client Paul Stanton was looking for properties to buy in late 2005 and Bratton was involved in that effort[75], during that time period, Mr. Stanton never complained that Bratton did not have sufficient time to devote or that Bratton was not responsive.[76] Moreover, Bratton never informed Mr. Stanton that he did not have time to assist Mr. Stanton. Most significantly, Mr. Stanton testified that he was working with other real estate professionals at the time and is "never … married to an agent."[77] Ultimately, another realtor found a property for him.[78] Interestingly, Mr. Stanton has been involved in four or five transactions with this particular agent and he has been friends with her the other agent for a long time.[79] Finally, Mr. Stanton answered affirmatively when asked if the reason he did not use Bratton was because he "chose the broker that … is most appropriate for the transaction at issue …."[80]

Federico Yepes was another potential customer of Bratton in late 2005. Mr. Yepes testified that he was interested in using Bratton as a decorator for several of the properties he

---

[74] *See* Exhibit 2, supra, at 159:2-14; 166:21 – 167:6; 172:11 – 173:4; 266:3-11.
[75] *See* Exhibit 29, Deposition of Paul Stanton, at 29:12-22.
[76] *See id.* at 30-31:2.
[77] *See id.* at 31-32:5.
[78] *See id.* at 32:1-15.
[79] *See id.* at 33:13-15, 38:1-2.
[80] *See id.* at 48:7-11.

24

owned.[81]  However, that possibility never progressed and Mr. Yepes never engaged Bratton.[82]

Furthermore, Mr. Yepes never used Bratton as his agent for a purchase or sale.[83]  Mr. Yepes does

not use the same agent repeatedly, but typically "bounce[s] around."[84]  Finally, although Mr.

Yepes was looking for properties to purchase in the fall of 2005, he had not engaged any agent to

assist him with the search.[85]  He had also not engaged in real estate professional to assist in

selling properties during that time frame.[86]

      Penelope and Phillip Edwards allegedly "approached Mr. Bratton to purchase a property

in October 2005, but were compelled to find another real estate agent because of Mr. Bratton's

inability to devote sufficient time and energy to the Edwards ...."[87]  Mr. Lynch indicates that the

Edwards purchased a property worth $279,900 and opines, with no particular basis, that

Plaintiffs would have received $6,997.50 in commission on that property.  However, the MRIS

listing referring to the property allegedly purchased by the Edwards does not support the

Plaintiffs' allegation.[88]  In this regard, the listing indicates that the contract date was February 21,

2006 and the closing occurred on April 5, 2006.[89]  Thus, there is no factual basis to conclude that

Plaintiffs would have received the commission on the property purchased several months after

the lease negotiations concluded.  Similarly, there is no evidence that the Edwards chose another

agent because Plaintiffs did not have sufficient time to service them.

      Thus, there is no evidence that any "clients" of Plaintiffs left Plaintiffs because they were

not getting adequate service.  Moreover, Plaintiffs' agents testified that they were available to

---

[81] *See* Exhibit 30, Deposition of Federico Aurelio Yepes, at 12:13-17.
[82] *See id.* at 13:2-15.
[83] *See id.* at 13:21 – 14:6.
[84] *See id.* at 21:6-10.
[85] *See id.* at 21:21 – 22:8.
[86] *See id.* at 22:20 – 23:1.
[87] *See* Exhibit 19, at p. 10.
[88] *See* Exhibit 31.
[89] See *id.*

assist clients in October 2005 and would have taken on new clients had Bratton approached them and said he did not have time.[90]  As such, the undisputed facts do not support Plaintiffs' claims that they would have received commissions for the clients or customers identified.  Even if Bratton was unavailable to assist those customers (a proposition for which there is no support), Bratton Realty still could have earned the commission if its other agents assisted those clients.

The undisputed facts also do not support the Plaintiffs' entitlement to relocation costs, inasmuch as any such costs would obviously have been incurred at some point when Plaintiffs vacated the property[91].  That is, even had the Plaintiffs had a longer lease, they would have incurred these costs when that lease expired.  Even Mr. Lynch agreed that "there are – there are expenses.  The question is when do you have them ...."[92]  Furthermore, Mr. Lynch agreed that even if Plaintiffs stayed at the property longer, they "certainly would have some costs."[93]  As such, the Plaintiffs' alleged relocation costs cannot be supported by the undisputed facts.[94]

Finally, the undisputed facts fail to support Plaintiffs' allegation of emotional distress.  In this regard, several witnesses testified that Bratton's personality and demeanor did not change after the lease negotiation concluded.  Gerardo Cruz testified that Bratton "was always a happy guy," even after the move to Georgetown.[95]  James Grant "[could not] say that [he] saw a difference" between Bratton's demeanor at the 10th Street address and 1622 Wisconsin Avenue.[96]  Finally, Paul Stanton, one of Plaintiffs' former clients, testified that he never noticed a change in

---

[90] *See* Exhibits 25 at 28:1-16, 26 at 53:18 – 54:5, 27 at 22:1-12.
[91] This is true of all alleged damages associated with having to move from Georgetown.
[92] Exhibit 24, at 428:12 – 429:6.
[93] *Id.* at 429:22 – 430:4.
[94] In addition, because the expert's report was produced prior to the actual move, the amounts given for relocation costs were estimates only.  No final quantification of money actually spent due to the move has been provided.  *See id.* at 433:20 – 434:1.
[95] *See* Exhibit 25 at 26:2-11.
[96] *See* Exhibit 27 at 33:5-15.

Bratton's demeanor.[97]  As such, the undisputed facts established to date do not support Plaintiffs' alleged emotional distress damages.

As the undisputed facts do not support the Plaintiffs' categories of alleged damages, the Chatel Defendants are entitled to judgment as a matter of law.

---

[97] *See* Exhibit 29 at 41:17-22.

WHEREFORE, for the reasons stated herein, Defendants Chatel Real Estate, Inc. and Thierry Liverman respectfully request that the court enter Summary Judgment as to all claims asserted against them by Plaintiffs John Bratton and Bratton Realty, LLC.

Respectfully Submitted,

**CHATEL REAL ESTATE, INC. and THIERRY LIVERMAN**

By:   /s/ Matthew A. Ranck
     Matthew A. Ranck, Esq. (D.C. Bar # 484983)
     ECCLESTON AND WOLF, P.C.
     2001 S Street, N.W., Suite 310
     Washington, D.C. 20009
     (202) 857-1696 (telephone)
     *Counsel for Defendants Chatel Real Estate, Inc.*
     *and Thierry Liverman*

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on this matter.

     /s/ Matthew A. Ranck
     Matthew A. Ranck

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2008, a true copy of the foregoing Memorandum of Points and Authorities in Support of Defendants Chatel Real Estate Inc. and Thierry Liverman's Motion for Summary Judgment, was served electronically and by first-class mail, postage pre-paid, to:

**Stefan Shaibani**
LITIGATION ASSOCIATE, PLLC
1150 Connecticut Avenue, N.W.
9th Floor
Washington, D.C. 20036
*Counsel for Plaintiffs*

**Robert H. Bouse, Jr.**
ANDERSON, COE & KING, LLP
201 North Charles Street
Suite 2000
Baltimore, MD 21201
*Counsel for Defendants*
*Mary White and Mary White, Inc.*

_____/s/ Matthew A. Ranck_____
Matthew A. Ranck