Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3   JOHN BRATTON                  *
 4        Plaintiff                *
 5   vs.                           *    Case Number:
 6   CHATEL REAL ESTATE, INC.,     *    1:06CV00694
 7   et al.,                       *
 8        Defendants               *
 9   *      *      *      *      *      *
10           THE DEPOSITION OF JOHN H. BRATTON
11           The Deposition of John H. Bratton, taken
12   in the above-captioned case on Friday, January 19,
13   2007, commencing at 10:00 a.m., at the law offices
14   of Eccleston & Wolf, 2001 S Street, Northwest,
15   Suite 310, Washington D.C. 20009, and reported by
16   Monique Kastner, Court Reporter and Notary Public.
17
18
19              EVANS REPORTING SERVICE
           Two North Charles Street, Suite 950
20              Baltimore, Maryland 21201
                    (410) 727-7100
21                  (800) 256-8410
```

EXHIBIT 2

Page 2

1  APPEARANCES:
2
3  STEFAN SHAIBANI, ESQUIRE and
4  SHABNAM KEYVAN, ESQUIRE
5       Litigation Associate, PLLC
6       1150 Connecticut Avenue, Northwest
7       Washington, D.C. 20036
8       202-862-4335
9       On Behalf of the Plaintiff
10
11 MATTHEW A. RANCK, ESQUIRE
12      Eccleston & Wolf, P.C.
13      2001 S Street Northwest, Suite 310
14      Washington, D.C. 20009
15      202-857-1696
16      On Behalf of the Defendants, Chatel Real
17      Estate and Thierry Liverman
18
19
20
21

Page 3

1  APPEARANCES CONTINUED:
2
3  ROBERT H. BOUSE, JR., ESQUIRE
4       Anderson, Coe & King, LLP
5       201 North Charles Street, Suite 2000
6       Baltimore, Maryland 21201
7       410-752-1630
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 4

1       REALTIME PROCEEDINGS:
2  Whereupon,
3       JOHN H. BRATTON,
4  the witness herein, being first duly sworn under
5  penalty of perjury to tell the truth, the whole
6  truth, and nothing but the truth, was examined and
7  testified as follows:
8            EXAMINATION
9       BY MR. RANCK:
10      Q  Good morning, Mr. Bratton.  As you
11 know, my name is Matt Ranck and I represent Chatel
12 and Mr. Liverman in a case you've brought.  You
13 have been to several depositions in the case, at
14 least one, but I think several is my recollection,
15 so I don't know that it's necessary to go through
16 all of the deposition rules and all that.  You kind
17 of know what's going to happen, correct?
18      A  Correct.
19      Q  Only two things I guess I would point
20 out.  One is, please make absolutely sure you
21 understand my question.  And if you don't, you

Page 5

1  should ask me to rephrase it or tell me you don't
2  understand.  If you answer, I am going to assume
3  you understood.
4            Is that fair?
5       A  That's fair.
6       Q  And if you need a break at any time,
7  give a holler and let us know, and we'll take a
8  break.
9            Can you just state your name and
10 address for the record, please.
11      A  John Henry Bratton, 410 North Jackson
12 Street, Arlington, Virginia 22201.
13      Q  That's your home address?
14      A  Correct.
15      Q  You operate a business, correct?
16      A  Correct.
17      Q  What is it called?
18      A  Bratton Realty.
19      Q  I have seen some references in some of
20 the documents to Bratton Realty, LLC, and to
21 Bratton Realty, Inc.  Are they the same?

Page 62

1  my legal fees for even coming after me, so cases
2  like that.
3      Q   All right. As I understand your
4  testimony, you have been now involved in real
5  estate for about five years; is that right?
6      A   Six years.
7      Q   Six years.
8          All right. When was Bratton Realty
9  incorporated or organized, formed?
10     A   April the 1st, 2001.
11     Q   You're the sole owner of Bratton
12 Realty?
13     A   Yes.
14     Q   And how many employees does it have?
15     A   I have no employees.
16     Q   All right. How many agents does it
17 have, does it use?
18     A   Seven agents.
19     Q   They're all independent contractors?
20     A   Yes.
21     Q   Are you the only broker?

Page 63

1      A   Yes.
2      Q   You have two locations; is that
3  correct? Let me strike that.
4          Bratton Realty has two locations?
5      A   Bratton Realty has one primary
6  location, which is the Georgetown office, 1622
7  Wisconsin Avenue, the property in question.
8          However, I have held on to my previous
9  office, because of the discriminatory manner in
10 which I have been treated with this property.
11         So therefore, given that my -- all my
12 rights have been stricken from the lease, I have no
13 right to renew and I have no right to purchase. I
14 have held on to my previous office in the event
15 that I will end up back there in November.
16     Q   What's that address?
17     A   1223 10th Street Northwest, Washington,
18 DC.
19     Q   1223?
20     A   Yes.
21     Q   For the purposes of this deposition, do

Page 64

1  you have any problem if we refer to the Georgetown
2  location as the 1622 property?
3      A   That will be fine.
4      Q   1223 10th Street, how long have you
5  been there, since you started in April of '01?
6      A   Yes. Actually, prior to that, but as
7  an agent.
8      Q   And is that a building that you own or
9  that Bratton Realty owns?
10     A   Yes.
11     Q   Have you always owned it?
12     A   Yes.
13     Q   Describe for me, if you would, Bratton
14 Realty's business. What type of business does it
15 do? Just sales?
16     A   Mostly sales.
17     Q   Can you --
18     A   I do very few rentals. I do no
19 property management. The only time I even get
20 involved in property management is if it's my own
21 personal stuff or something -- just helping a

Page 65

1  friend out with. So mostly it's purchase and
2  sales, listings and sales.
3      Q   Residential sales?
4      A   Yes. I have done one commercial
5  transaction, I think, maybe two.
6      Q   When I say "sales," I mean being on
7  both ends --
8      A   Yes.
9      Q   -- either side of the transaction,
10 whether you're representing the seller or
11 the buyer.
12     A   Listing agent, as well as buying agent.
13     Q   Okay. You said very few leases, I
14 think.
15     A   Correct.
16     Q   Can you give me in an average year,
17 what percentage of the business is sales versus
18 leasing, or is leasing so demanding --
19     A   It wouldn't even measure a percentage.
20     Q   Okay. So when you say "mostly sales,"
21 you mean almost exclusively sales?

Page 66

```
1      A  I would say 99.8 percent. I have done
2   maybe -- in six years, maybe three or four lease.
3          MR. SHAIBANI: If I may request, when
4   you say "I," are you referring to Bratton
5   Realty as the broker or are you referring to
6   yourself as the agent who conducted the
7   transaction?
8          THE WITNESS: My answer was combined as
9   both. My personal transactions as well as
10  transactions for Bratton Realty.
11         BY MR. RANCK:
12     Q  Would any of Bratton Realty's agents
13  engage in a leasing transaction without your
14  knowledge?
15     A  Not without my knowledge, but as a
16  licensed agent, you're authorized to do lease as
17  well as sales.
18     Q  I understand, but my question is really
19  leading up to when you testified that in six years
20  you have done three or four leases.
21         You're saying whether it was you or an
```

Page 67

```
1   agent, three or four leases have come through
2   Bratton Realty in the last six years, right?
3      A  Correct. Approximately.
4      Q  Okay. And one or two commercial
5   transactions in six years?
6      A  Correct.
7      Q  And just like the leases, if someone at
8   Bratton Realty, an agent, were to become involved
9   in a commercial transaction, you, as a broker,
10  would know, correct?
11     A  Could you repeat the question?
12     Q  Sure.
13         As a matter of practice, not as a
14  matter of law, but as a matter of Bratton Realty
15  practice, if one of your agents became involved in
16  either end of a commercial transaction, you, as the
17  owner of Bratton Realty, would know about that,
18  right?
19     A  Yes. As a practice, yes.
20     Q  All right. So when you say, "One or
21  two commercial transactions over six years," you're
```

Page 68

```
1   referring to Bratton Realty?
2      A  I'm referring to what I have done
3   personally and as Bratton Realty as a whole, I
4   would say maybe up to four or five.
5      Q  The one or two that you have been
6   involved in, were they commercial sales or leases?
7      A  They were both sales. One was a gas,
8   auto body shop in Tacoma Park, and the other one
9   was where the White House used to keep their
10  horses, in Blackdone's Alley, historic alley.
11         It was like five carriage houses, which
12  I -- technically, was not really commercial. It
13  was more residential.
14     Q  The 1223 10th Street property?
15     A  Yes.
16     Q  That's Bratton's other location,
17  correct?
18     A  Yes.
19     Q  Is there any other use made of that
20  property?
21     A  It used to be my primary residence.
```

Page 69

```
1      Q  Okay. It's not anymore?
2      A  No.
3      Q  All right. Have you leased the
4   residential space?
5      A  Just part of it.
6      Q  So you have a residential tenant.
7      A  I have a residential tenant, and the
8   office was always separate. The office was never
9   part of the main house.
10     Q  Do you own that property outright? Do
11  you own it or does Bratton Realty?
12     A  I own it.
13     Q  Okay. Do you own it outright or is
14  there a mortgage?
15     A  There's a mortgage.
16     Q  All right. Do you know how much equity
17  is in the property?
18         MR. SHAIBANI: Objection on relevance
19  grounds.
20         BY MR. RANCK:
21     Q  You can answer, unless he's going to
```

Page 86

1  me.
2      BY MR. RANCK:
3      Q  Well, that's what I'm trying to figure
4  out. So what your counsel has represented, and you
5  alluded to this before, I guess that's not part of
6  the damage claim. The damage claim is the, I
7  guess, increased costs of having to maintain two
8  locations, correct?
9      A  Correct.
10     Q  All right. Did you intend to sell the
11 1223 10th Street property?
12     A  No, I did not.
13     Q  Okay. As you sit here today, do you
14 intend to sell it?
15     A  No. It's not on the market. I just
16 rented it out with a year lease.
17     Q  And had you gotten your right of first
18 refusal on the 1622, you still didn't intend to
19 sell 1223, you just intended to stop using it for
20 Bratton Realty?
21     MR. SHAIBANI: Objection. Just to be

Page 87

1  clear, are you referring to the commercial
2  level or the residential levels that's at 1223?
3      MR. RANCK: He can't sell part of it.
4      BY MR. RANCK:
5      Q  My question is --
6      A  Actually, I can.
7      Q  Had you gotten everything you wanted in
8  the 1622 lease, your plan -- is this correct? I'm
9  asking you, was it your plan to stop using the 1223
10 property for Bratton Realty's operations, but to
11 keep that property because you owned it anyway?
12     A  No. My plan was to use Georgetown as
13 my D.C. office.
14     Q  As Bratton's D.C. office?
15     A  As Bratton Realty's D.C. office, which
16 I stated earlier, and then to open up an office in
17 downtown Silver Springs and then Clarendon,
18 Virginia. That was my plan.
19     Q  My question is, what did your plan
20 conceive of with respect to the use of 1223 10th
21 Street? What were you going to do with that

Page 88

1  property?
2      A  1223 10th Street can be -- right back
3  to what I said -- can be a rental. It's two
4  totally separate units.
5      Q  Okay. So you --
6      A  There's an upper unit, and there's a
7  lower unit.
8      Q  So you would rent out that commercial
9  space to somebody else?
10     A  Correct. I have lost rent on that
11 space as well.
12     Q  You own that 1223 personally, right?
13     A  Correct.
14     Q  Does Bratton Realty pay you rent?
15     A  Yes.
16     Q  What does Bratton Realty pay you in
17 rent every month for 1223?
18     A  I would have to check my accountant.
19     MR. RANCK: All right. Can we take
20 just a quick five-minute break?
21     MR. SHAIBANI: Sure.

Page 89

1      (Whereupon, a brief recess was taken.)
2      BY MR. RANCK:
3      Q  All right. Mr. Bratton, at some point
4  you became interested in 1622 Wisconsin, correct?
5      A  Correct.
6      Q  And can you tell me if you recall what
7  date that first occurred?
8      A  October. I think it was October the
9  6th, 2005.
10     Q  All right. Did you see this property
11 listed on the MRIS or did you see the property
12 itself first?
13     A  I saw the property itself.
14     Q  All right. So tell me how it came to
15 be that you saw the property.
16     A  Actually, I was on my way to tour
17 another property that I had toured previously. I
18 was going back for my second visit.
19     I can't think of the name of the place,
20 but Feta was the owner of the shop. And he had
21 just moved his business from one location to the

Page 90

1  other, and I was going to move into his old
2  location, but it was not at the street level and it
3  was pretty small and it was kind of damp.
4       Fortunately for me, he was running
5  about 20 minutes late, and so I paced up and down
6  the street a little bit killing time. I happened
7  to see two lockboxes on the fence of Mary White's
8  property and a sign in the window that said "For
9  lease."
10      Q  When you say "Mary White's property,"
11 you mean 1622?
12      A  Correct.
13      Q  All right. Once you saw the sign and
14 the lock boxes, what did you do?
15      A  I walked in and spoke with Barrett
16 Anderson, asked him about the property, which he
17 gave me a little information, gave me a tour, gave
18 me a tour or the main level, gave me a tour of the
19 lower level. And he gave me a tour of the backyard
20 and a tour of the alley and a long explanation
21 about what Mary White was doing with the space,

Page 91

1  that she wanted to lease both spaces.
2       They were both available. No one had
3  even been there to look at the place in the past
4  several weeks. So he didn't think I had any
5  competition whatsoever on the space, but he told me
6  that I had to go talk with John Pagones in order to
7  get more information. He just said that he was the
8  office manager for Mary White.
9       Q  So he didn't mention that anyone else
10 had recently inquired about the property?
11      A  He said that no -- as long as he's been
12 there, no one has really expressed any interest in
13 leasing the property, and he was there to shut down
14 the office for Mary White.
15      Q  And you said you did not review his
16 deposition, right?
17      A  No.
18      Q  Are you familiar with his testimony
19 about when Roberta Medland came in?
20      A  No.
21      Q  When you went into the space that first

Page 92

1  time and met Mr. Anderson, what did you express to
2  him as to what part of the property you were
3  interested in?
4       A  Well, I was interested in the whole
5  property when I first went in.
6       Q  The street level and the basement?
7       A  I am -- he showed me both properties.
8  The tour entailed both properties as if it was one.
9       Q  Did you understand at that time that
10 there were two separate spaces?
11      A  Yes.
12      Q  The street level and the basement?
13      A  Yes.
14      Q  Okay. You saw two different lock
15 boxes?
16      A  Yes.
17      Q  Okay. And you expressed to him a
18 potential interest in both of the spaces at that
19 point?
20      A  Yes. I wanted information on both of
21 the spaces, but I primarily was interested in the

Page 93

1  main level. I wanted to be above ground street
2  level, so that was what I was primarily interested
3  in.
4       Q  Okay. Anything else you can recall
5  about your conversation with Barrett Anderson that
6  first day, October 26th?
7       A  Anything you want to ask me?
8       Q  I just did. Is there anything else you
9  can recall?
10      A  I mean, we talked about a whole array
11 of things.
12      Q  Do you recall what they were?
13      A  We talked about George Salengero. We
14 talked about him moving from wherever he was
15 living. He's a chatty person. We talked about the
16 property. We talked about --
17      Q  Well, that's what I would like to find
18 out. I'm not interested in just small talk.
19          Is there anything else you can recall
20 about your conversation with Mr. Anderson about
21 Mary White, Chatel or any of its agents or the

24 (Pages 90 to 93)

Page 94

1  property?
2      A  From that first visit, not in
3  particular, other than what I just said.
4      Q  Okay.
5      A  He gave me a tour. He told me about
6  the property. He told me that John Pagones was
7  handling the property. He told me his schedule,
8  that he's there.
9      Q  Did you know Mr. Pagones?
10     A  No.
11     Q  Had you ever heard of him?
12     A  Yes, I have heard of him.
13     Q  When you heard his name from
14 Mr. Anderson, did that name ring a bell? It was
15 familiar to you?
16     A  Not familiar, but there's a lot of real
17 estate agents' names that I can say. Ann Taylor, I
18 know she does a lot of business in Georgetown. I
19 know a name, but that's about it.
20     Q  That's what I am asking. You had heard
21 of him?

Page 95

1      A  I had heard the name before.
2      Q  Did you have any impression or were you
3  familiar at all with his reputation?
4      A  No. I had no idea.
5      Q  You had just heard his name before?
6      A  Just heard his name before.
7      Q  All right. How about Chatel? Did Mr.
8  Anderson say "John Pagones of Chatel"? Did he
9  mention Chatel?
10     A  Yeah. I'm sure he mentioned Chatel.
11     Q  I guess he must have, because you knew
12 to go to Chatel, right?
13     A  Well, he gave me the address to go to
14 Chatel.
15     Q  Okay. Had you heard of Chatel before?
16     A  Yes.
17     Q  Okay. Were you more familiar with them
18 than with just Mr. Pagones' name?
19     A  I'm not really familiar with either
20 one. I mean, I know Chatel has an operation near
21 the Real Plaza, which is a Mexican place to eat. I

Page 96

1  have seen their sign, but other than driving past
2  their sign, I don't think we have ever done any
3  business together.
4      Q  Okay. But again, were you familiar at
5  all with their reputation in the field?
6      A  I have no idea what their reputation in
7  the field was.
8      Q  Okay. So you left the 1622 property
9  and went to Chatel?
10     A  Yes.
11     Q  Did you go directly there; do you
12 recall?
13     A  I recall just kind of walking along,
14 and I may have stopped to get something to drink,
15 but aside from that, yeah, I think pretty much.
16     Q  Your level of interest in the property
17 was such that, when you left there -- were you
18 excited about the property then?
19     A  I was very excited about the property.
20     Q  Okay. So more likely than not, you
21 pretty much went straight to Chatel. Not that you

Page 97

1  didn't stop to get a drink or something like that,
2  but you went to Chatel after leaving Mr. Anderson?
3      A  Yes.
4      Q  Had you ever been in Chatel's offices
5  before?
6      A  Not that I recall.
7      Q  Okay.
8      A  Definitely not that location.
9      Q  All right. And tell me what happened
10 when you went into Chatel.
11     A  I basically just walked in the door.
12 It's a split-level. Didn't know whether to go up
13 or down, so I chose to go up because there was a
14 lady sitting at her desk, Hope Edwards. Hope
15 Edwards greeted me.
16         I informed her that my name was John
17 Bratton. I just got finished touring the property
18 at 1622, and the listing agent is John Pagones. I
19 would like to speak to him.
20     Q  All right. Did she introduce herself?
21     A  She greeted me. I don't know if she

Page 98

1  ever told me her name.
2     Q  You didn't know her name at the time?
3     A  No. I didn't know her name at the
4  time.
5     Q  All right. And what happened after you
6  mentioned Mr. Pagones' name?
7     A  She then said, "Have a seat" or "Hold
8  on a moment," and she went to the back and she
9  got -- she told John that I was out there. She
10  came back to her desk, sat down and said, "He'll be
11  right with you."
12     Q  Okay. And then he came out?
13     A  I wouldn't say he came out. I would
14  say he came to the area. He never came up to me.
15  He never came within handshaking distance of me, so
16  I then had to walk to him. He was talking to me
17  from a distance. So I walked towards him, towards
18  the back area behind Hope's desk and told him why I
19  was there.
20     Q  Okay. And what did you tell him?
21     A  I told him that I just toured the

Page 99

1  property. I told him I was a real-estate agent and
2  a broker, and I was thinking about putting my
3  brokerage firm here in Georgetown. That's the
4  perfect fit, exact same size I'm looking for. It's
5  street level, exactly what I was looking for, and
6  that I was interested in doing an application to
7  lease.
8     Q  Okay. Did you indicate to him that you
9  were only interested in the street level or did you
10  specify the street level? Did you say the whole
11  property? What do you recall about that?
12     A  I spoke about the street level.
13     Q  Okay. Why didn't you mention anything
14  about the basement level at that time?
15     A  There was no need to mention anything
16  about the basement. I was asking about the whole
17  property, but I specifically said that I just
18  toured the main level, which is what I'm most
19  interested in.
20     Q  Okay. And what was his response?
21     A  His response was -- he broke out into a

Page 100

1  cold sweat, and it was not a hot day. He turned
2  red, he became flustered and extremely nervous. I
3  tried to ignore it, but it was very evident. It
4  was very obvious. He was very awkward in talking
5  with me, very on edge.
6       And so then he finally -- at this
7  point, he finally goes and sits behind the desk
8  that was back there. And I -- and then I sit at
9  the desk, and I started asking him a couple
10  questions about the property.
11     Q  Okay. Let me apologize and interrupt.
12       I asked you how did he respond, and you
13  described a bunch of physical characteristics --
14     A  That's a response to me.
15     Q  Okay. Let me finish my question.
16       You described a bunch of physical
17  characteristics. You didn't say that he verbalized
18  anything. Did he say anything?
19     A  When I asked him about the property,
20  his response was at the same time of the things I
21  just described to you. He said that -- he asked me

Page 101

1  how did I find out about the property.
2     Q  Okay.
3     A  I told him the same thing I just told
4  you. And the way he asked the question was very
5  defensive; like how did I find out about the
6  property, how did I get into this property type of
7  thing.
8       I reiterated that I was a broker and I
9  was an agent, but that's not how I got into the
10  property. Barrett Anderson was in the office and
11  he gave me a tour, I said, "But Barrett couldn't
12  answer all my questions. That's why I'm here."
13     Q  So --
14     A  So he said, "Well, what do you want to
15  know?"
16     Q  Okay.
17     A  That was one of the first things that
18  he said to me.
19     Q  All right. Let me stop you there for a
20  second.
21     A  Sure.

Page 158

1  couple hours later to, once again, let her know
2  that I dropped off the information, and I was
3  looking forward to leasing the space.
4      I think the first time I left a
5  voice -- the first time I called, I think I left a
6  voice-mail message, which might have been the very
7  first day I toured the property, which probably
8  would have been that Thursday.
9      On that Friday, I think I actually
10 reached Mary White. I'm not sure. One of the
11 days, I actually reached Mary White, had a short
12 conversation with her. She didn't want to talk
13 with me.
14     I basically just wanted to let her know
15 that I wanted the space and I was having difficulty
16 getting some answers and I just wanted some answers
17 to some of the missing holes in the lease.
18     Q  Okay. So after you left the 1622
19 property, that Friday, October 7th, you had couple
20 of phone calls with Mary White's office or cell
21 phone where you might have left messages. You may

Page 159

1  have had one conversation with her.
2      Anything else you did on that Friday,
3  the 7th, with regard to this property?
4      A  Not that I can recall.
5      Q  You were just waiting to hear back?
6      A  I was just in wait mode.
7      Q  Okay.
8      A  I had done all I could do. I had
9  called Mary White to let her know that the
10 documents were in Chatel's hands, that -- with that
11 call, I was hoping she would somehow squeeze it
12 into her schedule to go over and sign the documents
13 so that this could be a done deal on the same day,
14 so I was in wait mode.
15     Q  Okay. Why don't we take a break for
16 lunch. I want do ask one question, first.
17     There's a document in front of you. It
18 appears to be a diagram of something. Is that
19 related to the case?
20     A  It's a mind map.
21     Q  A mind map. Is that related to the

Page 160

1  case?
2      A  Yes, it is.
3      Q  All right. May I take a look at it
4  while we're breaking for lunch?
5      A  I would not -- rather not -- I'll let
6  you look at it and give it right back to me, but
7  these are my personal notes that I have jotted
8  down.
9      Q  Okay. You're referring to it during
10 the course of the deposition, so I would like to
11 look at it, and we'll probably just mark it as an
12 exhibit, and then you can feel free to have the
13 original back, unless there's something --
14     A  I can't make notes?
15     MR. BOUSE: You can make notes. We can
16 look at them.
17     THE WITNESS: I'm not looking at your
18 notes over there.
19     MR. SHAIBANI: I guess if you stipulate
20 that these notes don't reflect the actual,
21 like, for instance, precise dates and

Page 161

1  communications, because I don't think it would
2  be fair to take a diagram and say, well, this
3  is when he went to the property and that's what
4  somebody else told you, it would be completely
5  out of context and the first time that I have
6  seen this.
7      MR. RANCK: Well, I have no idea
8  whether I can stipulate to anything, because I
9  haven't seen it. But if he's got things on
10 there that contradict what he's testifying to,
11 I may question him about that, but certainly
12 there's no reason that we can't. He's
13 referring to it during the deposition.
14     THE WITNESS: That's the first time I
15 looked down at it.
16     MR. RANCK: You have been looking down
17 at it all morning.
18     THE WITNESS: No. Actually, you
19 haven't asked me one question that warranted me
20 looking at this paper. It's a date. Dates is
21 the only reason why I need to look down on

Page 162

1  anything is -- whether it was on the 7th, was
2  it a Friday or was it a Thursday.
3       MR. RANCK:  Mr. Shaibani, I don't want
4  to belabor it.  I guess if you can just give me
5  your position, I would like to review it, which
6  you client said would be fine, and then if
7  appropriate copy it and mark it to the
8  deposition.
9       Whether it's admissible or not, that's
10 something for the judge to decide, but I can't
11 think of a reason why we can't see it.  So if
12 we can have your --
13      MR. SHAIBANI:  Okay.
14      MR. RANCK:  Thank you.
15      We are going to break.  I would suggest
16 we try to do it quicker as opposed to longer
17 being it's a Friday and we had some delay with
18 the court and whatnot.
19      (Whereupon, a brief luncheon recess was
20 taken.)
21      (Whereupon, Bratton Deposition Exhibit

Page 163

1  No. 23 was marked for identification.)
2       BY MR. RANCK:
3    Q   Mr. Bratton, if you can, take a look at
4  what's been marked as Exhibit 23 if you would
5  please.  Let me know when you have had a chance to
6  look at that.
7    A   Yes.
8    Q   All right.  It appears to me -- and I'm
9  asking you if you agree or disagree with this.  It
10 appears to me that Exhibit 23 is a marked-up copy
11 of Exhibit 4, which is the original lease you
12 submitted, proposal you submitted.
13   A   Yes.
14   Q   Okay.  Are you familiar with that
15 document?  Have you seen Exhibit 23 before?
16   A   Yes.
17   Q   Can you tell me whose handwriting that
18 is?  If you can, tell me whose handwriting that is,
19 including the cross-outs and the X's.
20   A   I have no idea whose handwriting that
21 is.

Page 164

1    Q   Okay.  How about the handwritten
2  inserts, the words that are around it; can you
3  identify that?
4       MR. SHAIBANI:  I would like to object
5  on the grounds that if he can specify which
6  inserts, because there are many of them.  I
7  mean, there's a signature page at the end.
8       THE WITNESS:  I will say that the only
9  thing that looks like my handwriting is the
10 date, October 7th, and my signature and my name
11 and the date.  All the rest is someone else's.
12      BY MR. RANCK:
13   Q   When you say your name, if you could
14 look at the final page of the exhibit, the
15 signature is yours, right?
16   A   The signature is mine.
17   Q   How about the handwritten name; is that
18 yours too?
19   A   Yes.
20   Q   Okay.  Do you recall when you wrote
21 that on there?  That being the handwritten, not

Page 165

1  signed --
2    A   October 6th, which is the first day I
3  walked into the property at 1622.
4    Q   How about the word "personally"?
5    A   I didn't write that.
6    Q   Oh, that's not your handwriting?
7    A   No.
8    Q   Okay.  The word "personally" on the
9  last page of Exhibit 23, that's not your writing?
10   A   I don't recall -- I don't know if I
11 recall even seeing this.
12   Q   Okay.  It was produced by you and your
13 counsel in the case.
14   A   No.  The scratch-outs was not produced.
15   Q   Actually, it's got your Bates number at
16 the bottom so --
17      MR. SHAIBANI:  For the record, this is
18 part of the documents received from the Office
19 of Human Rights.  It has the OHR stamp on it.
20      It might have been presented by Mary
21 White or Chatel, for that matter.  Just because

Page 166

1  we produced it doesn't mean that it was drafted
2  by Mr. Bratton in its entirety.
3      MR. RANCK: Sure. I didn't say it was.
4  I just said, clearly, you all had it, because
5  it's got your Bates numbers on it and you
6  produced it.
7      BY MR. RANCK:
8      Q  That's all I was going to ask you about
9  that, so you can put that aside for a minute if
10 you're done looking at it.
11     All right. We had discussed before
12 lunch the events of Friday, October 8th, 2005, and
13 your phone calls to Ms. White and Mr. Pagones for
14 which you received no return calls, correct?
15     MR. SHAIBANI: If I may object, October
16 8th is actually a Saturday.
17     MR. RANCK: I'm sorry. You're right.
18     BY MR. RANCK:
19     Q  Friday, October 7th, correct?
20     A  Correct.
21     Q  Can you tell me what, if anything, you

Page 167

1  did with regard to the 1622 property on Saturday,
2  October 8th?
3      A  Saturday, October 8th, once again, is a
4  date, so once again, I was in waiting mode on the
5  8th. I just waited for someone to contact me and
6  let me know.
7      Q  Okay.
8      A  I mean, this is something that I
9  thought should have taken a couple of hours to
10 review and sign.
11     Once again, at this point, I'm still in
12 the mindset that Mary White is going to come
13 through and make this right, even though it was
14 botched by Chatel. There was every opportunity on
15 Friday to just make this right and be done with it
16 and have it signed.
17     I mean, isn't this exactly what any
18 property owner wants is someone who's ready,
19 willing and able to lease their space? So on
20 Saturday, I was just in waiting mode.
21     Q  When I asked that last question, you

Page 168

1  again referred to that document in front of you.
2  You called it a mind map; is that right?
3      A  Yes.
4      Q  When did you create that mind map?
5      A  Last night.
6      Q  Okay. When you're testifying with
7  regard to dates, are you testifying based on your
8  memory or based on the mind map, if you understand
9  the distinction?
10     A  I don't understand the distinction.
11     Q  If I were to take that mind map away
12 from you, could you still answer the question with
13 regard to dates?
14     A  I could answer questions with regards
15 to dates, not necessarily whether October 7th is a
16 Friday or Saturday or a Thursday or Friday, but
17 with this I clearly know that I can see the dates.
18     Q  Okay. Did you refer to a calendar when
19 creating the mind map?
20     A  No.
21     Q  Okay.

Page 169

1      A  So this is all based on my memory.
2      Q  Okay. If there's a discrepancy on the
3  mind map between the day of the week you have
4  indicated and the date, do you have any idea which
5  would control, just by way of --
6      MR. SHAIBANI: Objection.
7      BY MR. RANCK:
8      Q  Just by way of example, you have -- for
9  instance, if I can point to your mind map, you have
10 Tuesday, 10/10. If you look at the calendar before
11 you, 10/10 was actually a Monday.
12     A  Okay.
13     Q  And there are some other dates that
14 might be a discrepancy between the day of the week
15 and the date of the day.
16     A  That's why this was made for my
17 consumption and not yours.
18     Q  Well, all I'm asking, which of those
19 would control; do you know?
20     A  It's not meant to control. You don't
21 understand the purpose of a mind map.

43 (Pages 166 to 169)

Page 170

1  Q  Apparently not.
2  A  That's why I made this for my own
3  consumption.
4  Q  Well, we'll just go forward.
5     Saturday, you're in waiting mode. Did
6  you call Ms. White again?
7  A  No.
8  Q  Did you call Mr. Pagones again?
9  A  I don't think -- no, I had no contact
10 with Mr. Pagones.
11 Q  My question -- I guess I appreciate
12 that no contact -- but did you attempt to have
13 contact? Did you call and leave messages?
14 A  No.
15 Q  Okay. Anything else you did with
16 regard to the 1622 property or your attempts to get
17 it on October 9th, other than wait for a response?
18 I'm sorry. It's Saturday, the 8th.
19 A  Saturday, okay.
20 Q  I'm doing it myself.
21 A  Saturday, the 8th, basically, I was

Page 171

1  planning -- I was planning as to -- I already had
2  the layout of the space. I actually -- I think I
3  went to IKEA on Saturday to shop for furniture,
4  just to get some general idea as to what I was
5  going to put in the space.
6     I mean, I just didn't see any possible
7  way that this -- I was not getting this space, so I
8  was just moving forward. I was going to use the
9  weekend as an opportunity to get ready, plus, you
10 know, whatever else I had going on.
11 Q  Okay. You didn't ask Mr. Pagones when
12 you met him on the 6th whether anyone else was
13 interested though, did you?
14 A  I was told no one else was interested.
15 Q  By Mr. Pagones?
16 A  By Barrett Anderson. That no one else
17 had toured the property, and he had been there the
18 whole entire time.
19 Q  My question was, did you ask
20 Mr. Pagones on October 6th whether anyone else was
21 interested?

Page 172

1  A  No, I didn't.
2  Q  Okay. And Mr. Pagones didn't make any
3  representation to you one way or another about
4  whether anybody else was interested?
5  A  No, he did not.
6  Q  All right. Sunday, October 9th, what
7  did you do, if anything, with regard to the 1622
8  property?
9  A  Not much that I can think of, other
10 than just waiting.
11 Q  Did you attempt to call Ms. White or
12 Mr. Pagones?
13 A  On Sunday? I doubt it. I don't think
14 so. Not that I can recall. I don't know the date.
15 I don't know what -- I guess, what, the 9th?
16 Q  It was a Sunday.
17 A  Sunday was the 9th, yeah.
18 Q  Yeah, what? Yeah, you didn't call, as
19 far as you can recall?
20 A  No, I didn't.
21 Q  Okay. Anything else you can recall you

Page 173

1  did with regard to the property? You indicated on
2  Saturday you think you went to IKEA for shopping.
3  Anything like that on Sunday?
4  A  No.
5  Q  All right. On Monday, October 10th,
6  what do you recall happening with regard to the
7  1622 property?
8  A  Monday is when everybody is back to
9  work -- you know, let's get this done. I was
10 expecting to try to get this signed off by, like,
11 first thing in the morning.
12    Mary White had the lease application,
13 all the information, my financials. I supplied
14 more than enough information for a final decision
15 to be made and for a lease to be signed so that I
16 could move on with my plan and start getting geared
17 up to move into the space.
18    I didn't hear anything back, so I
19 called John Pagones.
20 Q  Do you recall what time that was?
21 A  First thing in the morning. I don't

Page 174

1  know the exact time.
2       I asked for the status of my lease
3  being signed. He said, "Well, Mary White had a
4  question about the lease. She wanted to know what
5  was your intentions with the backyard."
6       Something -- once again, that question
7  came up. And I just remember thinking that of all
8  the information I have provided and all this -- I
9  mean, the checks, everything, why would that one
10 simple question hold her up from signing my lease.
11      And I said, "I really don't have any
12 intentions with the backyard, but if I get the
13 lower-level space, it would just be nice to have
14 outside space, you know, so if you're having a
15 function, people can walk outside." I didn't have
16 any big plans to do a garden or anything like that.
17      He said, "Okay. I'll get that
18 information back to her, and I'll get back to you."
19      The next call I got from him was,
20 "Well, I spoke with Mary White, and she says that
21 your lease has to be on the standard form."

Page 175

1    Q  Okay. Now, this is on Monday, the
2  10th?
3    A  Yes. I'm very sure it's still Monday,
4  the 10th.
5    Q  Okay. Mary White tells you it has to
6  be on the standard form?
7    A  Yes.
8       MR. SHAIBANI: John Pagones told you
9    that Mary White wanted you to have the lease on
10   the standard form, or did you talk to Mary
11   White directly?
12      BY MR. RANCK:
13   Q  Okay. I didn't understand that's what
14 you said. Was that your testimony?
15   A  John Pagones.
16   Q  John Pagones.
17   A  Yes.
18   Q  Okay. John Pagones said he spoke with
19 Mary White.
20   A  Right. I have only been on the phone
21 with Mary White one time, and that was that Friday

Page 176

1  when I was trying to alert her that I was having
2  some difficulty getting the information.
3    Q  All right.
4    A  So John Pagones is the person.
5    Q  I apologize for my confusion.
6       You called Pagones in the morning. He
7  said that Mary has a question about the backyard.
8  You basically said, "I have no plans."
9       He said, "I'll get back to you." He
10 got back to you later, or did you call him again?
11   A  He got back to me later.
12   Q  He got back to you and said, "Mary says
13 she needs your lease on the standard form."
14   A  Correct.
15   Q  Okay.
16   A  So here we go.
17   Q  What else did he say, anything else in
18 that conversation?
19   A  He said that she needs all the
20 information on a standard form, which -- this is
21 the interesting part -- which I have and I can fax

Page 177

1  to you as soon as I get off the phone.
2    Q  Okay.
3    A  And it struck me as the oddest thing
4  for him to say, given that I spent much time in his
5  office on that Friday -- on that Thursday, trying
6  to get a leasing application from him. He went
7  right to his computer, printed it out, and faxed me
8  over a Chatel application and a Chatel standard
9  lease for me to fill out.
10   Q  Okay. When he told you that Mary White
11 wanted the lease on the standard form, did he say
12 he needed an application too, do you recall,
13 because you just said he sent you the standard form
14 and an application.
15   A  Yes, he did.
16   Q  He mentioned the application before
17 too?
18   A  He sent both of them together.
19   Q  All right. Now, how long had you spent
20 with him on the Thursday? You said after you spent
21 all that time with him on Thursday. How long was

Page 178

1  your whole meeting with him on Thursday?
2      A  Roughly, 30 minutes.
3      Q  Thirty minutes. Okay.
4      A  Thirty minutes of him being in his
5  office, right where he just produced the same
6  document that he said he never had.
7      Q  Okay. You just testified a minute ago
8  that he said he printed it off his commuter. How
9  do you know that?
10     A  Because you can see that it's a
11 standardized printed form.
12     Q  Okay. Well, didn't he tell you on the
13 6th that he didn't have one because Thierry
14 Liverman had them and he didn't have Thierry's pass
15 code?
16         MR. SHAIBANI: Objection. That assumes
17     facts not in evidence.
18         MR. RANCK: That assumes? That's what
19     Mr. Bratton testified to a few minutes ago -- a
20     few hours ago.
21         MR. SHAIBANI: I don't believe there

Page 179

1  was testimony about a password.
2          THE WITNESS: The forms that he faxed
3  to me, the application and the lease, had
4  Chatel already pre-printed on the top of the
5  forms and throughout the form, throughout the
6  lease. And these are the documents that he
7  faxed over to me, as well as he said that there
8  also was a change, that the first change was
9  that she -- there were two changes. One was
10 the taxes. It was one-third the taxes. That
11 was the second change.
12         BY MR. RANCK:
13     Q  Taxes or utilities?
14     A  Taxes on the property.
15        Then he asked me to fill that out and
16 send it back to him, and that she needed my tax
17 information. So I sent -- I got the fax. I filled
18 it out, signed it, sent it back, all in the same
19 day.
20     Q  All right. I'm confused on the two
21 changes. Mr. Pagones tells you, "Mary says that

Page 180

1  she needs a standard form and an application, and
2  I'll send those to you."
3      Q  And he did, correct?
4      A  Correct.
5      Q  And there were two changes. One was
6  that you were now being expected to pay a third of
7  the taxes?
8      A  Right.
9      Q  And what was the second change?
10     A  And the second change was either
11 first -- first right of refusal was removed because
12 she was not doing first right of refusal.
13     Q  Didn't you submit a revised version of
14 your own lease before you got the Chatel form
15 lease?
16         MR. SHAIBANI: Objection.
17         THE WITNESS: No, not that I recall.
18         MR. BOUSE: It may be because I'm lost.
19     This conversation you're having is on Monday
20     with John Pagones that you just testified to?
21         THE WITNESS: Yes.

Page 181

1          MR. BOUSE: Okay. I'm sorry. Thank
2      you.
3          (Whereupon, Bratton Deposition Exhibit
4      No. 6 was marked for identification.)
5          BY MR. RANCK:
6      Q  Can you look at what's been marked as
7  Exhibit 6, please, and tell me if you can identify
8  that document?
9      A  Yes. That's the commercial lease.
10     Q  Now, what's the date on that one?
11     A  The 10th.
12     Q  And is that your signature on the last
13 page and your handwritten name?
14     A  Yes, it is.
15     Q  And what's the date? You dated it on
16 the last page.
17     A  The 10th.
18     Q  All right. Does that refresh your
19 memory that you submitted your own --
20     A  It's the same --
21     Q  May I finish my question?

Page 214

1  Medland, but you had provisions still to be crossed
2  out; isn't that possible?
3         MR. SHAIBANI: Objection. Calls for
4  speculation. Argumentative. Assumes fact not
5  in evidence.
6         If you want to present him with what
7  was given to Roberta Medland, you're welcome
8  to.
9         MR. RANCK: I will get around to it.
10        BY MR. RANCK:
11   Q   You can answer the question.
12   A   The information that was in my lease
13  was specifically geared towards me not having first
14  right of refusal.
15   Q   Have you seen the proposed lease that
16  was given to Roberta Medland?
17   A   I've looked at it. I don't recall
18  exactly what's in the document.
19   Q   Are you familiar generally because of
20  your occupation and profession with rights of first
21  refusal?

Page 215

1   A   No. I'm familiar because I sat across
2  the table from her when you were doing her
3  deposition.
4   Q   That wasn't my question. My question
5  is, based on your profession and occupation, are
6  you familiar?
7         MR. SHAIBANI: Objection.
8         THE WITNESS: I'm not familiar with
9  what?
10        BY MR. RANCK:
11   Q   With rights of first refusal.
12   A   Yes, I am.
13   Q   Okay. So even if you missed Roberta
14  Medland's deposition, you knew what a right of
15  first refusal was?
16   A   Of course I did.
17   Q   Okay. Have you ever compared Paragraph
18  41 in the proposed lease that Mr. Pagones sent you
19  with the Paragraph 41 in the proposed lease sent to
20  Roberta Medland?
21        MR. SHAIBANI: Objection.

Page 216

1         THE WITNESS: I had no need to.
2         (Whereupon, Bratton Deposition Exhibit
3  No. 11 was marked for identification.)
4         BY MR. RANCK:
5   Q   Okay. Let me show you what's been
6  marked as Exhibit 11, please. Have you ever seen
7  that document before, Mr. Bratton?
8   A   I haven't seen this particular document
9  in this format, but I'm sure I probably glanced at
10  it during her deposition if it was passed across
11  the table to me.
12   Q   Have you ever reviewed Paragraph 41 on
13  Exhibit 11 and compared it to the form Chatel lease
14  you were provided?
15        MR. SHAIBANI: Objection. Asked and
16  answered.
17        THE WITNESS: I have never reviewed to
18  compare her lease. I didn't even know she
19  existed until the day of the deposition.
20        BY MR. RANCK:
21   Q   In fact, you didn't believe she

Page 217

1  existed; isn't that right?
2         MR. SHAIBANI: Objection.
3         THE WITNESS: If you're asking me a
4  question, actually, the person that was
5  described to me as the person who was my --
6  well, I can't talk about it.
7         MR. SHAIBANI: Yes. You cannot
8  disclose information from the mediation
9  hearing.
10        BY MR. RANCK:
11   Q   My question still stands.
12        Up until the day of Ms. Medland's
13  deposition, did you believe that such a person
14  existed?
15        MR. SHAIBANI: Objection.
16        THE WITNESS: Well, that's -- it's not
17  a matter of whether I believe that person
18  existed. It's whether I believe that person
19  was qualified prior to me submitting all my
20  documents.
21        BY MR. RANCK:

Page 218

1  Q  When Mr. Liverman told you weren't
2  getting the lease and explained to you someone else
3  was in the picture -- putting aside what exactly he
4  said -- your version is, he told you that someone
5  else has signed a lease. He obviously testifies
6  differently, okay?
7       MR. SHAIBANI: Objection.
8       BY MR. RANCK:
9  Q  But in that conversation, when you got
10 done with that conversation, did you believe that
11 there even was someone else in the picture, or did
12 you believe that Mr. Liverman and/or Ms. White had
13 just concocted this person in order to keep you
14 from getting the property?
15      MR. SHAIBANI: Objection.
16      THE WITNESS: I believe that after my
17 conversation with Thierry Liverman, that after
18 me -- as you can see from the many documents --
19 have worked so diligently for six days --
20 approximately six days at that point, that all
21 of a sudden a friend of a friend just comes out

Page 219

1  of the blue and is able to see the property,
2  see Mary White, sign a lease and have a lease
3  ratified all in a matter of, like, one day, no,
4  that's not very believable to me that this
5  person just came out of the blue.
6       Testimony has shown that that's not
7  believable, so -- as far as Ms. Medland has
8  never known anyone who knew Mary White.
9       It was no friend of a friend, as they
10 told me on the phone. There was no lease
11 signed, as they told me on the phone. It was
12 not a done deal, as I was told on that very
13 same phone call.
14      So, no, I do not believe the
15 information that I was given on the day that
16 Thierry Liverman called me.
17      BY MR. RANCK:
18 Q  You have answered interrogatories in
19 the case, correct, written questions from the
20 defendants to you that you signed under oath,
21 correct?

Page 220

1  A  Correct.
2  Q  And you've filed various papers in OHR,
3  correct?
4  A  Correct.
5  Q  And you reviewed this lawsuit, the
6  complaint, and then the first amended complaint
7  prior to their being filed, did you not?
8       MR. SHAIBANI: Objection. Can you
9  rephrase the question?
10      BY MR. RANCK:
11 Q  Did you review the complaint in this
12 case and the first amended complaint prior to them
13 being filed for factual accuracy?
14 A  Yes, I did.
15 Q  Okay. Can you explain to me why, until
16 today, it's never appeared, as far as I can recall,
17 in any document anywhere that Mr. Pagones told you
18 on October 10th or at any time that you couldn't
19 have right of first refusal?
20      MR. SHAIBANI: Objection.
21      THE WITNESS: Mr. Pagones -- I have

Page 221

1  said all along that Mr. Pagones is the one
2  who -- I never dealt with anyone but Mr.
3  Pagones all the way up until the day that
4  Thierry Liverman stepped in and decided that he
5  was going to take it from there, which was --
6  the justification for that was that it was a
7  Jewish holiday, and John Pagones was off
8  because of that Jewish holiday.
9       BY MR. RANCK:
10 Q  Do you doubt --
11 A  I don't doubt -- I don't know what the
12 Jewish holiday calendar is, so I have no basis to
13 doubt anything about when a holiday is.
14      The -- so that's the only time I spoke
15 to someone other than John Pagones at Chatel. So
16 all my information was coming from John Pagones,
17 with the exception of the denial. The denial came
18 from Thierry Liverman. From that point on, I was
19 dealing with John Gordon Forester.
20 Q  My confusion is -- my understanding up
21 until today is that, based on things you said in

Page 262

1    A  Someone who I don't know, character.
2    Q  That's not what I'm asking.
3    A  You're asking me if I believe -- I
4  don't have a belief on whether Barrett Anderson
5  would lie or not.
6    Q  That wasn't my question, sir.
7    A  What is your question?
8    Q  My question is, are you aware of any
9  reason that he would lie?
10      MR. SHAIBANI: Objection. Calls for
11  speculation. Asked and answered.
12      THE WITNESS: Other than being a hired
13  employee of Mary White, I don't know.
14      BY MR. RANCK:
15    Q  That's what I'm looking for. You guys
16  didn't have a fight, did you, an argument or
17  anything, you and Mr. Anderson?
18    A  We had no fight, but I told him that I
19  didn't want to speak to him about this process.
20    Q  Because your lawyer told you not to?
21    A  A lawyer doesn't have to tell me not

Page 263

1  to. I know that if I'm litigating against someone,
2  and their employee is in my same space right below
3  me, that that's not a person I should sit around
4  and talk about the case or Mary White or Chatel.
5      So we didn't speak at all the whole
6  entire time he was working out of the office.
7    Q  After the 12th, the conversation with
8  Mr. Liverman when you learned you weren't getting
9  the lease, did you call him the next day?
10    A  Yes, I did.
11    Q  Okay. And isn't that when you told him
12  you were going to take it to the next level?
13    A  No, it is not.
14    Q  You didn't say that in that
15  conversation?
16    A  I told him the first time I talked to
17  him. I told him when he called me on the phone to
18  give me the news that I did not get the space.
19    Q  Okay. That you were going to take it
20  to the next -- do you remember what was said in
21  that conversation?

Page 264

1    A  I think I just said that.
2    Q  I don't know that you meant to be
3  telling me word for word what was said. Do you
4  recall if you said something about filing an action
5  or a suit?
6    A  Exactly. That's what's what I said
7  earlier.
8    Q  Okay. An action or a lawsuit, a
9  complaint with OHR? Do you recall specifically
10  what you said?
11    A  I didn't say specifically. I said that
12  I would be filing a discrimination case against --
13    Q  Okay. All right. And the next day,
14  you called to find out who Chatel's press agent and
15  legal counsel were?
16    A  Yes. As well as Washington Fine
17  Properties.
18    Q  Okay. And what did Mr. Liverman tell
19  you? This is Thursday the 13th, right?
20    A  Correct.
21    Q  Okay. What did he tell you?

Page 265

1    A  I think he just gave me the name, the
2  address of his company, and that was it.
3    Q  He gave you his legal counsel's name?
4    A  I don't recall ever getting a press
5  agent's name.
6    Q  Did he tell you they don't have one?
7  Do you remember that?
8    A  I didn't write down a press agent's
9  name.
10    Q  No. My question is, do you remember
11  him saying, "We don't have one"?
12    A  No, I don't remember that exact phrase,
13  "We don't have one," but I remember him not giving
14  me a press agent's name.
15    Q  Do you remember him giving you his
16  lawyer's name or Chatel's legal counsel's name?
17    A  Yes. I don't remember.
18    Q  That's Thursday the 13th. What, if
19  anything, did you do or what happened with respect
20  to the 1622 property on Friday, the 14th?
21    A  Friday the 14th. I can't recall much

67 (Pages 262 to 265)

Page 266

1  of anything that I might have done on Friday the
2  14.
3      Q  Okay. How about the weekend, Saturday
4  the 15th, Sunday the 16th?
5      A  I don't think there was much activity.
6      Q  Probably nothing? Okay.
7          Monday the 17th -- and I'm building to
8  Mr. Forester's first letter to you which is Tuesday
9  the 18th. Do you recall anything before Tuesday
10 the 18th?
11     A  Not much of anything significant.
12     Q  Okay. Through the end of Monday the
13 17th, did you have any conversations with anyone
14 about your feeling that you had been discriminated
15 against, other than the people involved in the
16 transaction? I mean, did you have conversations
17 with other people?
18         MR. SHAIBANI: Objection to the extent
19     you're eliciting conversations with counsel.
20         BY MR. RANCK:
21     Q  Oh, absolutely, other than counsel.

Page 267

1  Did you tell your friends?
2      A  I had talked to a couple of friends
3  very casually about the incidents.
4      Q  Did you talk to them in that time
5  period between --
6      A  Over the weekend? I'm sure I talked to
7  a couple people about the incidents.
8      Q  Okay. Well, let me back up then.
9          From the time from October 6th
10 through -- that's the first day you went in
11 Chatel -- through October the 12th when you got the
12 call from Mr. Liverman who told you that you
13 weren't getting the lease, did you discuss the fact
14 that you felt you has been discriminated against
15 with any of your friends and family?
16     A  I'm sure I had conversations with a
17 couple friends, yes.
18     Q  Can you identify who they were?
19     A  Just Eric Rothmel probably.
20     Q  You're saying "probably." Yes or no?
21 Do you recall? He's identified as a person with

Page 268

1  knowledge.
2      A  Yeah. Eric Rothmel.
3      Q  And who's he?
4      A  Eric Rothmel is my best friend. And
5  Jeanette Dumbrel is my office assistant.
6      Q  Do you recall talking to either of them
7  about your encounter with Mr. Pagones on
8  October 6th, that night?
9          That is, on October 6th, after you
10 dealt with Mr. Pagones and had this unpleasant
11 encounter, did you tell any of these people about
12 it?
13     A  Yes.
14     Q  Who?
15     A  Those two. I'm sure Eric. And I'm
16 sure within a day Jeanette.
17     Q  Okay. Anybody else you can recall?
18     A  You want to know everybody who knows
19 about this case?
20     Q  Well --
21     A  That I'm in the middle of a

Page 269

1  discrimination case?
2      Q  No. That's not what I'm asking.
3      A  Are you asking for someone who I sat
4  down and --
5          MR. SHAIBANI: No question is pending.
6      Do you have a timeframe?
7          MR. RANCK: I did, but I'm not sure the
8      witness understood that I did.
9          BY MR. RANCK:
10     Q  Exhibit 7 was your rental application.
11 You identified Eric Rothmel as your partner.
12     A  Yeah.
13     Q  Is that a business thing or a personal
14 thing?
15     A  It's both.
16     Q  In what respect is he your business
17 partner?
18     A  We do development projects together.
19     Q  Okay. You guys live together?
20     A  Yes.
21     Q  How long you been together?

68 (Pages 266 to 269)