**Capital Reporting Company**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLUMBIA
 3    - - - - - - - - - - - - - X
 4    JOHN BRATTON              :
 5         Plaintiff,           :
 6    vs.                       :  Case No.:
 7                              :  1:06CV00694
 8    CHATEL REAL ESTATE, INC., :
 9    et al                     :
10         Defendants.          :
11    - - - - - - - - - - - - - X
12                                Washington, D.C.
13                        Thursday, January 11, 2007
14    Deposition of:
15                    THIERRY LIVERMAN
16    called for oral examination by counsel for
17    Plaintiff, pursuant to notice, at the offices
18    of Litigation Associate, PLLC, 1150 Connecticut
19    Avenue, N.W., Suite 900, Washington, D.C.,
20    before Jodi Scheffel, a Notary Public in and for
21    the District of Columbia, beginning at 10:20 a.m.,
22    when were present on behalf of the parties:
```

(866)448-DEPO
www.CapitalReportingCompany.com

EXHIBIT 3

## Capital Reporting Company

Page 2

1  APPEARANCES
2
3  On behalf of the Plaintiff:
4    STEFAN SHAIBANI, ESQUIRE
5    SHABNAM KEYVAN, ESQUIRE
6    (Admitted in MD only and practicing
7    under the supervision of Stefan Shaibani
8    licensed DC attorney)
9    Litigation Associate, PLLC
10   1150 Connecticut Avenue, N.W.
11   Suite 900
12   Washington, D.C. 20036
13   (202) 862-4335
14
15 On behalf of Defendant Chatel:
16   MATTHEW A. RANCK, ESQUIRE
17   Eccleston and Wolf, P.C.
18   2001 S Street, N.W.
19   Suite 310
20   Washington, D.C. 20009-1125
21   (202) 857-1696
22

Page 3

1  APPEARANCES (Continued)
2
3  On behalf of Defendant Mary White
4    ROBERT BOUSE, ESQUIRE
5    Anderson Coe & King, LLP
6    201 North Charles Street
7    Suite 2000
8    Baltimore, Maryland 21201
9    (410) 752-1630
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 4

1  CONTENTS
2  EXAMINATION BY:                              PAGE
3  Counsel for Plaintiffs                        5
4
5             EXHIBITS
6  PLAINTIFF'S DEPOSITION EXHIBITS:
7  No. 1  Fair Housing Manual                   28
8  No. 2  GCAAR Property Mgt. and
9         Exclusive Rental Agreement            64
10 No. 3  MRIS Listing                          71
11 No. 4  MRIS Listing                          82
12 No. 5  MRIS Listing                          88
13 No. 6  Defendant's Answers to
14        Interrogatories                       96
15 No. 7  Matrix Telecom Call Detail           107
16 No. 8  Response to Pagone's Answers
17        to Interrogatories and Requests
18        for Production of Documents          113
19 No. 9  Commercial Agreement of Lease        127
20 No. 10 Commercial Agreement of Lease        127
21 No. 11 Listing                              148
22 No. 12 Listing                              148

Page 5

1  CONTENTS (Continued)
2  No. 13 Facsimile                            151
3  No. 14 Chatel 1099-Misc for 2005            160
4  No. 15 Defendant's Responses to
5         Plaintiff's Request for Admissions  177
6  No. 16 Chatel Statement                     184
7  No. 17 Bratton Invoice No. 29807640         184
8  No. 18 Bratton Invoice No. 29834939         184
9  No. 19 Updated Lease                        227
10 No. 20 Commercial Agreement of Lease        227
11 No. 21 Commercial Lease Agreement           227
12 No. 22 Bank of America Acct. Activity       240
13 No. 23 Bank of America Acct. Activity       240
14 No. 24 Rental Application                   249
15 No. 25 Rental Application                   250
16 No. 26 10/18/05 Letter                      262
17 No. 27 Copy of Check #9357                  263
18 No. 28 Bratton Realty Brochure              270
19 No. 29 Email 10/11/05                       280
20 No. 30 09/11/06 Statement                   280
21 No. 31 John Pagones Response                282
22        (*Exhibits attached to original only.)

Capital Reporting Company

Page 6

1  PROCEEDINGS
2  Whereupon,
3      THIERRY LIVERMAN,
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFF
7  BY MR. SHAIBANI:
8      Q  Mr. Liverman, thank you for coming here
9  today. Can you please state your position at
10 Chatel?
11     A  I'm the president of Chatel Real Estate.
12     Q  And are you in charge of all of the
13 offices of Chatel?
14     A  Yes.
15     Q  How long have you been maintaining this
16 position?
17     A  Something like 10 or 12 years.
18     Q  And who was the prior president of
19 Chatel?
20     A  My mother, Micheline Courard.
21     Q  Was Chatel's office in Georgetown at the
22 same location when you first became president?

Page 7

1      A  Yes.
2      Q  And was Mary White working at that office
3  at the time?
4      A  No.
5      Q  Was Mary White ever affiliated with
6  Chatel?
7      A  Yes, years before, she had been
8  affiliated with Chatel, years before my time. She
9  was there for -- I don't know how long, but I've
10 always heard that.
11     Q  Approximately 10 years perhaps?
12     A  I don't understand the question. She was
13 with us for 10 years?
14     Q  Yes.
15     A  I couldn't tell you how long.
16     Q  Was she a real estate agent when she was
17 working at Chatel?
18     A  Yes.
19     Q  Did you have a personal relationship with
20 Mary White at any time?
21     A  I don't know what you mean by personal.
22        MR. RANCK: Objection, vague.

Page 8

1      Q  Are you friends or do you know each other
2  socially aside from her work at Chatel?
3         MR. RANCK: Well, let me object because I
4  think it mischaracterizes or misinterprets or
5  misunderstands his testimony. His testimony was
6  Mary White was at Chatel before his time there.
7  BY MR. SHAIBANI:
8      Q  Before you became president, were you
9  working at Chatel?
10     A  Yes.
11     Q  For how long?
12     A  Since about '84, '85.
13     Q  Was Mary White working at Chatel in the
14 '80s at any point?
15     A  As I said a minute ago, not while I was
16 there.
17     Q  Are you currently friends with Mary
18 White?
19     A  Cordial acquaintances, I would say.
20     Q  Is John Pagones friends with Mary White?
21        MR. BOUSE: Objection; speculation.
22     A  I don't know.

Page 9

1      Q  Did you have direct supervision over John
2  Pagones while he was working at Chatel?
3      A  I don't know how to answer that. In some
4  sense, none of the agents have direct supervision.
5  They're independent contractors. That limits what
6  I can ask them to do or not do.
7      Q  Do they have to follow a certain office
8  procedure that's dictated by you?
9      A  We have some procedures that they should
10 follow.
11     Q  Who makes those procedures?
12     A  Well, many of them inherit them. They've
13 been there forever.
14     Q  What about the other ones?
15     A  Over the years, as situations come up, I
16 created procedures after talking to them and
17 working it out.
18     Q  Are the agents expected to follow the
19 procedures that you have instituted?
20     A  Yes.
21     Q  Did John Pagones follow those procedures
22 in 2005?

3 (Pages 6 to 9)

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 38

1  would have to watch all the time what people are
2  taking out of the closet or not. We basically
3  phased out the closet. One of the reasons was, we
4  would always have these stock-outs. In other
5  words, someone would take the last form and not be
6  nice enough to make copies, stuff like that. So
7  it's constantly changing. You have to watch all
8  the time. We tried to keep it current and
9  complete, but we couldn't.
10   Q   Weren't there master forms retained in
11  that closet, which were used to make additional
12  copies?
13   A   For some of them, yes; for others, no.
14   Q   Does Chatel maintain blank commercial
15  lease applications and rental applications at its
16  offices now?
17   A   No. I still would want to get involved.
18  When somebody would ask me for it and they give me
19  you know, some sensible background, I provide it.
20   Q   Could John Pagones have obtained a blank
21  lease application -- excuse me, a blank rental
22  application and a commercial lease agreement from

Page 39

1  Chatel's computers when John Bratton first walked
2  into the office?
3   A   Given John's knowledge of computers, I'd
4  say it's kind of shaky.
5   Q   Does Chatel maintain those documents in
6  its computers in a form that's available to the
7  agents?
8       MR. RANCK: Objection to form and
9  foundation.
10   A   Which forms?
11   Q   The rental application and commercial
12  lease agreement?
13       MR. RANCK: Same objection.
14       You can answer.
15   A   Residential lease application, yes;
16  commercial lease application, if there is such a
17  thing, no; commercial lease, no, again because I
18  want to be involved.
19  BY MR. SHAIBANI:
20   Q   Is it your testimony that you're the only
21  person at Chatel who has a commercial lease
22  application?

Page 40

1   A   I'm saying we don't have a commercial
2  lease application. We use the residential.
3   Q   In fact, you do use the residential
4  rental applications for commercial lease
5  transactions?
6   A   We have. We've used other forms, too.
7   Q   What about commercial lease agreements;
8  are you the only person who has access to that at
9  Chatel's offices?
10   A   If you have the right password, you can
11  get to it. You asked the question a while ago. My
12  password gives me that right. Judy Stillwell knows
13  that. I don't believe any of the other agents
14  know. They're not very curious about computers.
15   Q   Is it your testimony that the only
16  computer at Chatel's office that has a copy of the
17  commercial lease agreement is yours?
18   A   No.
19   Q   Could you tell us who else has that form
20  on a computer?
21       MR. RANCK: Objection to the form and
22  foundation of the question.

Page 41

1       You can answer.
2   A   Let's talk technology for a minute. We
3  have a network. There are a lot of computers that
4  are connected to it. It's not maintained on my
5  computer. It's maintained on the server.
6  Obviously, anybody who deals with computers has
7  password protection for their server. We have
8  different levels. I don't know what you mean when
9  you say maintain on my computer.
10   Q   Well, you mentioned that there's a
11  specific password for your computer --
12   A   For the network. Like any network, if
13  you have the right password, you can get in.
14   Q   Would you agree, then, that all the forms
15  that are on the network are available to the agents
16  at Chatel?
17   A   No. It depends on their password.
18   Q   Does a real estate sales agent's password
19  only entitle them to review a limited set of
20  documents on a network? Well, I guess what I want
21  to know, are there two sets of passwords that give
22  access to those documents?

11 (Pages 38 to 41)

Capital Reporting Company

Page 42

1  A  Well, there are multiple sets of
2  passwords. The agents have one level of passwords.
3  The property managers have another. I have
4  another. Judy has another. The operations manager
5  in Dupont has another. There are quite a few
6  levels.
7  Q  Why is it that the real estate agents
8  cannot access the commercial lease agreement on a
9  network?
10 A  Because, as I've explained, I want to be
11 involved in the commercial transactions. It's a
12 need to know. The other factor is that, when
13 you're trying to introduce people to computers, you
14 want to make it simple; therefore, having them do
15 it step by step and having limited access is
16 helpful.
17 Q  Could John Pagones have obtained the
18 commercial lease agreement within 24 hours of the
19 time that John Bratton first inquired about Marie
20 White property?
21 A  If he asked me I would provide them. I
22 happened to be away at that time.

Page 43

1  Q  Did John Pagones actually ask you for
2  the commercial lease agreement?
3  A  When?
4  Q  October 6th of '05.
5  A  I wasn't there in the afternoon on the
6  6th. I didn't see him -- this is just from general
7  memory -- after maybe three, four in the afternoon.
8  Q  On October 6th, that is?
9  A  Correct.
10 Q  Did he actually ask you for a commercial
11 lease agreement at that point?
12 A  I wasn't there to be asked.
13 Q  At 4:00 p.m. I thought you mentioned
14 that you left the office and --
15 A  No. I said I left the office at three or
16 four in the afternoon. I didn't come back after
17 that. I'm telling you the hours, which I left the
18 office.
19 Q  When did you return to the office next?
20 A  The next morning.
21 Q  Did John Pagones ask you for a commercial
22 lease agreement at that point?

Page 44

1  MR. RANCK: Objection; foundation. Do
2  you know whether John Pagones was in the office
3  when you were there?
4  THE WITNESS: Which day?
5  MR. RANCK: I think he's trying to find
6  out when John Pagones asked you for the commercial
7  lease agreement.
8  Is that what you're trying to find out?
9  MR. SHAIBANI: Yes.
10 MR. RANCK: Do you recall when John
11 Pagones asked you for the commercial lease after
12 John Bratton first showed up at the office.
13 THE WITNESS: I think it was the
14 following Monday. When I came in on Friday, John
15 told me, gee, I had this meeting with someone and
16 that suddenly he had a proposal from that person.
17 The focus at that time, since the proposal was
18 really for the owner, is let's get it quickly to
19 the owner.
20 BY MR. SHAIBANI:
21 Q  Let's get to the owner. This discussion
22 occurred on Friday, October 7th?

Page 45

1  A  I believe so.
2  Q  Did you actually provide a commercial
3  lease agreement to John Pagones on the 7th of
4  October so that he could give it to Bratton?
5  MR. RANCK: Objection. That's not what
6  the testimony was.
7  MR. SHAIBANI: Well, I'm asking. I don't
8  know if that's what happened.
9  MR. RANCK: But he already said that he
10 thinks Pagones asked for the lease the following
11 Monday.
12 MR. SHAIBANI: But the discussion about
13 the offer occurred on Friday.
14 MR. RANCK: The discussion about the one
15 that Mr. Bratton had submitted is what Mr. Liverman
16 said.
17 BY MR. SHAIBANI:
18 Q  You're talking about the lease that was
19 drafted by John Bratton himself?
20 A  Yes.
21 Q  Could you tell us why John Pagones didn't
22 provide a blank rental application to John Bratton

12 (Pages 42 to 45)

Capital Reporting Company

Page 98

1  presented competition to her?
2     A   Absolutely not.
3     Q   Did you assist counsel in drafting the
4  responses to these interrogatories?
5        MR. RANCK: Let me interpose an
6  objection. I'll stipulate that the drafting of the
7  interrogatories, as it always is, a combined effort
8  of counsel and client.
9        MR. SHAIBANI: I'm not saying that it
10 isn't. Are you asking, did he personally provide
11 information? Is that your question?
12       MR. SHAIBANI: Yes.
13       MR. RANCK: I misunderstood it.
14 BY MR. SHAIBANI:
15    Q   Is your signature on page 17?
16    A   Uh-huh.
17    Q   Now, going back to the dates, I received
18 conflicting information. According to Mr. Bratton,
19 he believes that the telephone conversation he had
20 with you when you told him the property that Mary
21 had selected Roberta Medlin occurred on the 11th of
22 October, which is a Tuesday evening. In your

Page 99

1  responses here, you indicated that he called him on
2  the 13th of October when he told him that the
3  property is not available?
4     A   It says here the 12th.
5        MR. RANCK: The very last line on page
6  seven.
7  BY MR. SHAIBANI:
8     Q   The 12th. Was that around a Jewish
9  holiday, to your knowledge?
10    A   I believe it was the first day -- and I'm
11 not an expert in such religious matters, but I
12 believe it was the first day of Roshashuna and they
13 have restricted activities from sunset to sunset.
14 That's why John asked me to cover.
15    Q   Did you, in fact, call John Bratton on
16 the 12th of October to inform him that Ms. White
17 was selecting the other candidate?
18    A   Absolutely.
19    Q   Could you tell us what Ms. White actually
20 told you? Did she specifically say that the
21 property has been leased to Roberta Medlin?
22       MR. BOUSE: I object.

Page 100

1     A   No, she did not.
2     Q   What did she say specifically?
3     A   She said she wanted to go with Medlin.
4     Q   Did she tell you she had already
5  committed the property to Medlin?
6        MR. BOUSE: I object.
7     A   No.
8     Q   Well, why, then, did you tell Mr. Bratton
9  on the 12th that Ms. White was selecting the other
10 candidate.
11    A   I think you're confusing the dates. On
12 the 12th, I had the meeting with Mary as I
13 summarized here. At the end of the meeting, it
14 becomes clear she's going to go with the other
15 candidate. I said to Mary, as a courtesy, we
16 always need to tell the unfortunate candidates.
17 You know, for people who don't get it, we owe them
18 the courtesy of telling them right away. That's
19 why I called right after the session with Mary.
20 She just made her decision. I couldn't tell
21 before.
22    Q   Didn't she tell John Bratton that the

Page 101

1  property has been leased and this is just business?
2     A   I didn't tell him that the property was
3  leased. I told him she was going with the other
4  candidate.
5     Q   But you did tell him, this is just
6  business?
7     A   I said, yes, it's a decision by the owner
8  and that's just business; in other words, I was
9  referring to the fact that reality in the real
10 estate business, you work for principal, the
11 principal is the owner.
12    Q   Don't you have to receive confirmation
13 that a lease has been signed before you inform a
14 prospective tenant that the property is gone?
15       MR. BOUSE: Objection.
16       MR. RANCK: Objection; mischaracterizes
17 his testimony and lacks foundation.
18       Answer if you can.
19    A   What I told John is, is that Mary was
20 going with the other candidate. Obviously, the
21 lease -- they hadn't formalized whatever efforts
22 with Medlin. There was no lease at that moment.

26 (Pages 98 to 101)

## Capital Reporting Company

Page 102

1  That's why I said, she's going with the other
2  candidate. As a courtesy to a member of the
3  public, I think you want to tell them that, you
4  know, one avenue is not going to work out, you've
5  got to go on. Why would you want to drag it out.
6  BY MR. SHAIBANI:
7     Q  Can you describe what else you discussed
8  with John Bratton on the 12th of October?
9     A  There was nothing else. John got very
10 irate and very mad very fast. I doubt it was a
11 conversation that lasted more than two minutes.
12    Q  What did he tell you in response?
13    A  He said that he wasn't going to take this
14 lying down and he would take this to a higher
15 level.
16    Q  I believe, in response to another
17 question here, you have a date of October 13th. If
18 you could please take a look at page 12,
19 Interrogatory No. 13, the last sentence, it says,
20 Defendant Liverman recalls a conversation with
21 Plaintiff on October 13, 2005 in which he indicated
22 that he felt he had been discriminated against and

Page 103

1  was taking it to another level.
2     A  Uh-huh. On the morning of the 13th, I
3  happened to be in the bookkeeping department. I
4  took a call from John when he made these statements
5  and he also asked who our counsel or legal counsel
6  was and who our public relations counsel was.
7  Since I was back there and didn't have access to my
8  Rolodex, I told him that the legal counsel was
9  Richard Luchs. I'm not actually sure whether I
10 gave him Richard's address at that time. I told
11 him we had no public relations counselor.
12    Q  Well, this conversation, did it take
13 place on the 12th or the 13th because you have --
14    A  Don't mix them up.
15    MR. RANCK: I'm sorry, what was the
16 question; because he has two what?
17 BY MR. SHAIBANI:
18    Q  Well, on the 12th, you mentioned you
19 called John Bratton.
20    A  No. I said, he called me.
21    MR. RANCK: I'm sorry. We're missing
22 each other now.

Page 104

1  BY MR. SHAIBANI:
2     Q  Did you have two separate conversations
3  then?
4     A  Yes.
5     MR. RANCK: On the 12th, he asked first,
6  you called Mr. Bratton after your meeting with
7  Ms. White. Now, he's asking about the 13th.
8  That's where things broke up. On the 13th, the
9  testimony was Bratton called Mr. Liverman. That's
10 exactly what it says in the Answers to
11 Interrogatories. Well, the answer says he recalls
12 a conversation. Mr. Liverman just testified he was
13 in the bookkeeping department and Bratton called
14 him. On the 12th, Mr. Liverman call Mr. Bratton
15 after the meeting with Ms. White. That's what the
16 interrogatories say and that's what the testimony
17 just was.
18 BY MR. SHAIBANI:
19    Q  The statement that he felt discriminated
20 against and was taking it to another level, was
21 that stated on the 12th or the 13th?
22    A  As the answer says, on the 13th.

Page 105

1     Q  When did you receive the administrative
2  complaint for discrimination?
3     A  I don't remember that. It probably was a
4  fair amount of time later.
5     Q  After your conversation with John Bratton
6  on the 13th, did you discuss his comments with
7  Ms. White?
8     A  Yes. I told her the substance of the
9  conversation and asked her whether she had gotten a
10 similar call.
11    Q  What did she say in response?
12    A  At that time, she said she hadn't gotten
13 a similar call.
14    Q  Did you inform Ms. White that Mr. Bratton
15 felt discriminated against and was taking it to
16 another level?
17    A  I'd tried to be as faithful as I could
18 be.
19    Q  How did she react to that?
20    A  I don't think she expressed any reaction
21 at the time.
22    Q  Did she inform you -- well, actually, can

27 (Pages 102 to 105)

## Capital Reporting Company

Page 106

1 you tell us when you spoke to Ms. White after the
2 October 13th conversation with John Bratton? Was
3 that the same day?
4   A   I don't understand the question.
5   Q   After the October 13th conversation with
6 John Bratton, when did you first speak to
7 Ms. White?
8   A   Shortly thereafter, within 10, 15
9 minutes.
10   Q   At that time, did she maintain that the
11 property had been leased to Roberta Medlin?
12       MR. BOUSE: Objection.
13   A   The topic didn't come up.
14   Q   Did you subsequently send a fax to
15 Roberta Medlin containing a lease agreement for
16 Ms. White's property?
17   A   We had been through this before. I have
18 no recollection of saying anything.
19   Q   Wasn't there a fax sent from Chatel to
20 Roberta Medlin in Kansas City on the 13th of
21 October?
22   A   I don't have it in front of me.

Page 107

1       MR. SHAIBANI: This will be Exhibit 7.
2       (Plaintiff's Exhibit No. 7 was
3       marked for identification.)
4       THE WITNESS: In response to the request,
5 we've gone through our phone records. It shows
6 that on 10/13/05 at 3:49 in the afternoon there was
7 a call to Kansas City, Missouri --
8       MR. RANCK: I thought you said a call.
9       THE WITNESS: How do you initiate a fax?
10 I mean, you send it through the phone -- to Kansas
11 City, Missouri and a number there. I don't know
12 what that number is. As I said, I have no
13 recollection of faxing it myself. I don't know
14 what that number is. The answer has to be I don't
15 know, but it's possible. The record speaks for
16 itself. I don't know what that number is.
17 BY MR. SHAIBANI:
18   Q   What was the purpose of the fax?
19   A   I didn't initiate the fax. So I can't
20 answer it.
21   Q   Did you instruct somebody else to send
22 the fax?

Page 108

1   A   I answered the question. No, I don't
2 have any recollection of instructing anyone to send
3 a fax.
4   Q   Did John Pagones do it, to your
5 knowledge?
6   A   I don't know.
7   Q   Didn't Roberta Medlin subsequently
8 contact Chatel the same day or the next day, this
9 October 13th fax, informing Chatel specifically
10 that she was not leasing Ms. White's property?
11   A   I believe that Mary told me that Medlin
12 had called her to withdraw. I believe that was on
13 the next day, the 14th. It was not a call to me.
14   Q   Are you maintaining that Roberta Medlin
15 did not contact Chatel or that she didn't contact
16 you?
17   A   I think I am saying that she contacted
18 Mary.
19   Q   But did she contact anyone at Chatel?
20   A   Not to my knowledge.
21   Q   You don't recall having a conversation
22 with Roberta Medlin on the 13th or 14th of October?

Page 109

1   A   Absolutely not.
2   Q   When Mary White contacted you on the 14th
3 to inform you that Roberta Medlin was not going to
4 lease the property, what did you do subsequently?
5   A   In some sense, nothing. Mary said she
6 wanted to go on. I didn't know what that meant.
7 She didn't have any discussions with me or tell me
8 anything. Suddenly, the next week, Gordon
9 Forester, who's a lawyer, calls and asks me for a
10 form, which I sent.
11   Q   Why didn't you contact John Bratton after
12 Mary White informed you on October 14th that
13 Roberta Medlin was not leasing the property?
14   A   Say the question again.
15   Q   Why didn't you contact John Bratton?
16   A   She?
17   Q   You.
18   A   Because I am acting for a principal,
19 who's Mary. She has made a decision, a few days
20 before, to go with another candidate. I need
21 instructions from my principal at that point. She
22 didn't tell me to call John Bratton.

28 (Pages 106 to 109)

Page 114

1 from John Bratton and Roberta Medlin, with whom you
2 were negotiating the property in October of '05?
3    A   I don't know. This is the best answer we
4 could give. I know that John Pagones had said he
5 had a feeler from somebody else, but I don't know
6 whether it was in October.
7    Q   Do you recall their names?
8    A   No, because I never had contact with
9 them.
10   Q   You mentioned in response to question
11 six, which is on pages BRA197 to 198 --
12   A   I'm sorry, I'm lost.
13   Q   BRA199, is that your signature?
14   A   Yes.
15   Q   Do you recognize John Pagones' signature
16 as well?
17   A   Yes.
18   Q   In response to question six, which
19 appears on BRA197, you mention that John Bratton
20 had submitted a lease in the name of his LLC on a
21 form that was very pro-tenant.
22   A   Uh-huh.

Page 115

1    Q   Can you explain why his lease was pro-
2 tenant?
3        MR. RANCK: Can you point to the passage
4 you're referring to?
5        MR. SHAIBANI: Yes, the fourth paragraph
6 on page BRA197.
7        THE WITNESS: These two terms that the
8 owner, Mary, did not offer, that is, the 30-year
9 and the right of first refusal.
10 BY MR. SHAIBANI:
11   Q   You mentioned a moment ago that Ms. White
12 never informed Chatel that she didn't want the
13 lease to have -- excuse me, that Ms. White didn't
14 want the tenant to have a right of first refusal or
15 an option to renew in the lease.
16       MR. RANCK: I'm sorry, I object. I don't
17 understand your question. I think you're
18 mischaracterizing. If I understand what you're
19 trying to ask, you're mischaracterizing what he
20 said. Perhaps, you can ask it again because I
21 don't understand it.
22 BY MR. SHAIBANI:

Page 116

1    Q   Well, at the beginning of this
2 deposition when I asked Mr. Liverman if Ms. White
3 had informed Chatel that she did not want the
4 tenant for a commercial property to have an option
5 to renew or a right of first refusal, the response
6 was, no, that that statement was made.
7        MR. RANCK: That's absolutely not what he
8 said.
9        MR. SHAIBANI: We can read it back.
10       MR. RANCK: You may help yourself, if you
11 want to, but that's not what he said. What he
12 said, so we don't have to take the time, was no
13 statement was made to him to that effect --
14       MR. SHAIBANI: Yes.
15       MR. RANCK: -- and he has no knowledge
16 what was said to someone else at Chatel like Mr.
17 Pagones. That's exactly what he said.
18       MR. SHAIBANI: Mr. Pagones testified that
19 no such instructions were given to him.
20       MR. RANCK: That's fine, but that's not
21 the question and the testimony of this witness. So
22 don't mischaracterize it.

Page 117

1        MR. SHAIBANI: Here we have the
2 signatures of both these individuals who have
3 testified in their depositions that Ms. White never
4 told them about this. So why were these two terms,
5 the right of first refusal and the option to renew,
6 somehow relevant all of the sudden?
7        MR. RANCK: Mr. Shaibani, I'm not here
8 to quibble with you. All I'm saying is, I object
9 to your prior question because you mischaracterized
10 the witness' testimony. I'm not here to weigh what
11 all of the evidence is and give explanations and
12 all that. I objected because your question was
13 improper. If you have another one, please ask it
14 so we can move on.
15 BY MR. SHAIBANI:
16   Q   The question is, did you draft the
17 response to Interrogatory No. 6 to the OHR
18 Interrogatory No. 6?
19       MR. RANCK: Objection. As with the
20 Interrogatory Answers in this case, the
21 Interrogatory Answers to the OHR proceeding were a
22 combined effort of Chatel counsel and whatever

30 (Pages 114 to 117)

Capital Reporting Company

Page 118

1 witnesses we could get a hold of in our
2 investigation.
3     MR. SHAIBANI: I don't see counsel's
4 name on this document.
5     MR. RANCK: Counsel doesn't typically
6 have to sign the Interrogatory Answers under oath.
7     MR. SHAIBANI: Let me rephrase the
8 question.
9 BY MR. SHAIBANI:
10   Q Did you actually provide -- did you
11 instruct whoever drafted this response to
12 Interrogatory No. 6 of the OHR to specify that Mr.
13 Bratton's lease was very pro-tenant because it
14 included terms for an option to extend the term of
15 the lease and a right of first refusal?
16     MR. SHAIBANI: I instruct you not to
17 answer any question that pertains to your
18 communications with counsel.
19   A There's a clause in the lease, which
20 extends it and adds an additional year. Whether or
21 not the owner has talked about it is clearly
22 pro-tenant, anti-landlord. So whether or not Mary

Page 119

1 had raised it before, any lease you go through
2 representing someone, you say, make sure you read
3 this, make sure you read that.
4   Q Does Chatel's commercial lease agreement
5 include, as one of the terms, a right of first
6 refusal?
7   A There is a form that we sometimes use
8 that has that and has a lot of other things. As
9 I've said -- I can't tell how many times --
10 commercial leases are always very carefully
11 negotiated and there are a lot of things in a form,
12 particularly in a commercial lease, that change,
13 get thrown out, get altered. That's why it takes
14 much longer to put together a commercial lease than
15 a residential lease. Putting together a commercial
16 lease is much more complicated than just filling in
17 the form. As I think I've said, maybe a half dozen
18 times, that's one of the reasons I tell all of the
19 agents I have to be involved.
20   Q Isn't it true that Chatel's boilerplate
21 commercial lease agreement includes a provision
22 allowing the lease to convert to a month-to-month

Page 120

1 lease as the expiration of its term?
2   A That's D.C. law.
3   Q Why is it that the lease drafted between
4 Ms. White and John Bratton has that provision
5 crossed out?
6     MR. RANCK: The final lease?
7     MR. SHAIBANI: Yes.
8     MR. RANCK: Objection; calls for
9 speculation.
10     MR. BOUSE: I object.
11     THE WITNESS: I didn't prepare the final
12 lease. I can't answer.
13 BY MR. SHAIBANI:
14   Q Can you tell us who prepared it?
15   A No, because I wasn't involved. I could
16 guess, but you don't want me to guess.
17   Q You weren't involved, as in Chatel wasn't
18 involved in drafting a lease, or you personally
19 were not involved at Chatel?
20     MR. RANCK: Again, the final lease of
21 October 31st that's executed between Ms. White and
22 Mr. Bratton? Is that what you're talking about?

Page 121

1     MR. SHAIBANI: Yes.
2 BY MR. SHAIBANI:
3   Q Wasn't there a fax sent specifically from
4 John Gordon Forester to Chatel stating that these
5 are the terms of the lease and those terms were to
6 exclude the right of first refusal and an option to
7 renew?
8   A Well, the documents speak for themselves.
9 Gordon Forester first said, you know, here, I want
10 you to change this and do this. And I said, John
11 or Gordon, make it easy. Here's an electronic copy
12 of the lease.
13   Q Is it your testimony that Chatel had no
14 involvement with the drafting of the final lease
15 between Mary White and John Bratton?
16   A That's not my testimony. My testimony
17 is, except for the limited involvement that I just
18 described, we had no other involvement.
19     MR. RANCK: Maybe you can clarify whether
20 you mean drafting or negotiating the terms because
21 drafting, in some sense, implies typing what others
22 have said or, in this case, transmitting an

31 (Pages 118 to 121)

Page 122

1 electronic document.
2  Q  Well, transmitting the electronic
3 document, I guess I want to find out if the
4 provisions that are crossed out on the boilerplate
5 Chatel commercial lease, if Chatel crossed those
6 provisions out in the final lease that was executed
7 between John Bratton and Mary White?
8  A  The answer, as it was a minute ago, is we
9 did not prepare the final lease, and therefore
10 anything struck out in there was not struck out by
11 us.
12  Q  Would you agree that Mary White crossed
13 those provisions out?
14      MR. RANCK: Objection; speculation.
15  A  I do not know.
16      MR. RANCK: He just said he wasn't
17 involved in that part of it.
18  Q  Did she ever tell you who prepared that
19 lease?
20  A  No, she did not.
21  Q  Did John Gordon Forester inform you who
22 prepared the lease?

Page 123

1      MR. RANCK: Let me object --
2  A  Not in such words.
3      MR. RANCK: -- let me object on the
4 ground the question is vague and the use of the
5 term compared.
6 BY MR. SHAIBANI:
7  Q  Drafted, crossed out the provisions.
8  A  You should know that years ago John or
9 Gordon -- what he goes by -- was with the law firm
10 that Richard Luchs is with and worked with him. He
11 was not a new name.
12      MR. RANCK: I'm happy to have the witness
13 step out, if you want, Mr. Shaibani, while I
14 explain my problem with your question. My problem
15 is, you're using terms like drafting and prepared
16 and who struck out. The fact is, Mr. Bratton, as I
17 understand it, doesn't allege those things were
18 struck out before he signed it. He negotiated the
19 lease with Mr. Forester, is our understanding. The
20 lease was prepared in its final form and then
21 everybody, Mr. Bratton and his wife, signed it.
22      So my position would be, Mr. Bratton also

Page 124

1 prepared that lease. Even though he didn't
2 physically type it up or perhaps it wasn't his pen
3 crossing out provisions, he agreed to the
4 provisions and was involved in the preparation of
5 the lease. Chatel was not involved in that.
6 That's the difficulty I'm having with the words
7 you're using.
8      MR. SHAIBANI: Well, we know that John
9 had insisted on having the right of first refusal
10 and an option to renew --
11      MR. RANCK: Apparently not. Let's move
12 on with the deposition.
13      MR. SHAIBANI: It was shoved down his
14 throat basically because he didn't have a choice.
15 That's why he was discriminated against.
16      Can we have the two leases, please?
17 BY MR. SHAIBANI:
18  Q  While we're waiting, could you please
19 describe what a right of first refusal is?
20      MR. RANCK: Objection.
21      You can answer.
22  A  A provision in the lease or another

Page 125

1 document that says that someone can match some kind
2 of offer, which is presented by a third person or,
3 saying it another way, an owner cannot accept an
4 offer from a third person without coming back to
5 the person who has the right of first refusal who
6 votes basically up or down.
7  Q  Right of first refusal, would you agree
8 that the existing tenant who has that right is not
9 receiving any financial benefit in terms of the
10 transaction in the sense that he has to provide the
11 same price -- he has to match the price offered by
12 whoever else has made the offer in order to
13 purchase the property and exercise that right;
14 isn't that correct?
15      MR. RANCK: Object to the form and
16 foundation of the question.
17      You can answer.
18  A  That's such a long statement. I don't
19 know how to answer it. If you want to break it
20 down, please do.
21  Q  Isn't it correct that the tenant who has
22 the right of first refusal is obligated to match

32 (Pages 122 to 125)

## Capital Reporting Company

Page 134

1  I mean, I can't answer because you have so garbled
2  the time and chronology. We spent half an hour
3  getting it right. I would say this: Mary can't
4  object to something from John Bratton until it's on
5  a piece of paper from John Bratton.
6  BY MR. SHAIBANI:
7   Q   If she had instructed Chatel to use their
8  lease and that lease already includes a right of
9  first refusal in paragraph 41 --
10      MR. RANCK: There's no question pending.
11 BY MR. SHAIBANI:
12  Q   -- why didn't she provide this provision
13 to John Bratton?
14  A   Ask a simple question and I can answer
15 it. I'll be glad to answer.
16      MR. RANCK: Objection; argumentative,
17 speculative. It calls for speculation.
18 BY MR. SHAIBANI:
19  Q   Could you tell us who prepared the
20 commercial lease agreement set forth in Exhibit 9,
21 CH71?
22      MR. RANCK: Now, referring to the

Page 135

1  information that's been added to the form?
2      MR. SHAIBANI: Yes.
3      THE WITNESS: Probably me.
4  BY MR. SHAIBANI:
5   Q   Where did you obtain information to draft
6  these provisions?
7   A   From Roberta Medlin. On that Tuesday
8  which, I believe, was the 11th, I took a call from
9  Mary in the early afternoon saying this lady is
10 going to come and see you. She's seen the property
11 with me. We worked a lot out. Fifteen minutes
12 later, Roberta Medlin shows up with a copy of the
13 basic form with a lot of blanks filled in -- I
14 recognize the handwriting of Mary and, I think, she
15 also had another piece of paper in an envelope, but
16 I don't know -- with some very specific and unusual
17 terms which, I think, are the basis of what -- it's
18 page CH0079 -- what the two ladies had worked out
19 in terms of declaration and changes and things like
20 that.
21  Q   The additional provisions addendum was
22 brought to you by Roberta Medlin? Is that what

Page 136

1  you're testifying?
2   A   I was given, as I say, a piece of paper
3  or an envelope -- I can't be specific -- which
4  summarized some of their negotiations. I then
5  tried to, as I often do, put it into Peter Rabbit
6  English.
7   Q   Did you actually speak to Mary White
8  before you prepared this?
9   A   As I testified a minute ago, Mary called
10 me and said Roberta is going to come, write up what
11 she says.
12  Q   But she didn't --
13  A   She didn't give me the specifics. One of
14 the significant things is that, when Roberta came,
15 I could tell Mary's handwriting.
16  Q   Handwriting on?
17  A   On a form like this and this extra sheet
18 with these, if you will, special terms.
19  Q   Have you provided the Chatel Commercial
20 Agreement of Lease to Mary White before that?
21  A   Much before that.
22  Q   So she, in fact, drafted some of the

Page 137

1  terms of the unexecuted lease between Mary White
2  and Roberta Medlin; is that correct?
3      MR. BOUSE: I object.
4      MR. RANCK: Can you read that back,
5  please? I'm sorry, I was working and I missed the
6  question.
7      (The last question was read back by the
8  court reporter.)
9      MR. RANCK: Object. It's vague and it
10 calls for speculation.
11     You can answer.
12     THE WITNESS: I got a call from Mary
13 saying somebody is going to come down, treat her
14 well, et cetera. I, Mary, and this person just
15 met. Then, as I say, very promptly someone shows
16 up with a document with Mary's handwriting all
17 over.
18 BY MR. SHAIBANI:
19  Q   Following your conversation with Mary
20 White regarding Roberta Medlin coming to your
21 office to present this lease, did you send her a
22 copy of this Exhibit 9 for her to review?

35 (Pages 134 to 137)

Page 190

1  THE WITNESS: I don't.
2  BY MR. SHAIBANI:
3     Q  Did you personally meet with Roberta
4  Medlin when she came in to inquire about Mary
5  White's property?
6     A  I think I testified before, Mary called
7  to tell me this nice lady was going to come down
8  and I met with Roberta Medlin.
9     Q  And you processed her credit report the
10 same day; is that correct?
11    A  As soon as we could.
12    Q  Why is it that you didn't meet with John
13 Bratton even though he came five days before
14 Roberta Medlin?
15    A  Nobody ever asked me to meet with him.
16    MR. RANCK: Objection.
17    Q  Nobody as in John Bratton or Mary White?
18    A  Nobody means nobody.
19    MR. RANCK: It's completely
20 mischaracterizing his testimony. Come on, you're
21 not even being fair, Mr. Shaibani. Ms. Medlin came
22 following a phone call from Ms. White. Mr. Bratton

Page 191

1  showed up unannounced without any appointment.
2     Q  Did Mr. Bratton have to make an
3  appointment to come in to inquire about the
4  property?
5     MR. RANCK: Objection; asked and
6  answered. My point is, is to say why didn't you
7  meet with him, when Mr. Liverman has testified he
8  wasn't there when the gentleman came in unannounced
9  without an appointment, is a little bit
10 mischaracterizing his testimony.
11 BY MR. SHAIBANI:
12    Q  Apparently John Bratton came in the next
13 day and, several times after that, there were a
14 number of calls and letters and whatnot and nothing
15 was done until five days later basically.
16    MR. RANCK: We'll see what the evidence
17 proves. If you have another question for the
18 witness, why don't we move on.
19 BY MR. SHAIBANI:
20    Q  Did John Bratton have to make appointment
21 to come in to inquire about the property?
22    MR. RANCK: Objection; asked and

Page 192

1  answered.
2     You can answer.
3     A  I don't interview everyone who comes in.
4  If somebody wants to meet with me, I have an open-
5  door policy.
6     Q  I would like to know if prospective
7  tenants are required to make appointments to come
8  in to Chatel to inquire about properties that are
9  available for lease?
10    MR. RANCK: Objection.
11    A  You keep forgetting he met with John
12 Pagones. Why should I suddenly jump in and ask to
13 meet somebody who has already met with an agent.
14 The broker doesn't meet everybody who comes in. He
15 doesn't ask to meet everybody who comes in. The
16 broker should maintain an open-door policy, which I
17 did.
18    Q  You mentioned before that you personally
19 became involved in all commercial lease
20 transactions.
21    A  That doesn't mean that I meet with all
22 principals. We don't have to do that.

Page 193

1     Q  Even though you knew that John Pagones
2  had not given the black rental application to
3  Mr. Bratton, you --
4     A  I knew that --
5     MR. RANCK: Wait a minute. The beginning
6  of your question certainly assumes facts not in
7  evidence. It lacks foundation.
8     Q  Would you agree that if John Pagones had
9  given a black rental application to John Bratton on
10 October 6th, you would have been able to run John
11 Bratton's credit report shortly thereafter?
12    A  I testified that whenever we get an
13 application, we process it quickly, yes. I also
14 know that, in this case, John Bratton chose to
15 communicate by giving us a bunch of papers on
16 Friday and we give them, right away, to Mary. Am I
17 supposed to assume on top of that, that anything
18 but that is, for whatever reason, is a means of
19 communication he's chosen. Am I suddenly supposed
20 to become a mind reader?
21    Q  Didn't you want to review the documents
22 submitted by Mr. Bratton to determine if it's a

49 (Pages 190 to 193)

**Capital Reporting Company**

Page 254

1  Q  Did you inform her that she couldn't base
2  her decision on the basis of race and personal
3  appearance?
4      MR. BOUSE: I object.
5  A  Mary asked me a question, which was
6  whether she had to take John. I paused. I knew it
7  was an important question. I knew it should be
8  answered right. After 30 seconds, I said, Mary, I
9  don't think you have to accept it. I don't think
10 the law requires it. You have to make absolutely
11 sure that your decision is based on objective
12 nondiscriminatory factors. I said, tell me what
13 basis you're making your decision on. That's what
14 led to the three comments there. I said, come on,
15 let's agree, let's turn around. We've got to call
16 John right away to be fair to him so, if he wants,
17 he can pursue his other alternative.
18 Q  Did you believe Mary White's proffered
19 reasons as to why she wanted to select Roberta
20 Medlin over John Bratton?
21     MR. BOUSE: I object.
22     MR. RANCK: I object, too.

Page 255

1  You can answer it, if can you.
2      THE WITNESS: The answer is, yes. I had
3  no reason to disbelieve her.
4  BY MR. SHAIBANI:
5  Q  Do you still believe those proffered
6  reasons?
7  A  Yes. I don't see what -- well, yes.
8  Q  Could you tell us what Mary White
9  informed you after you told her that she didn't
10 have to select John, but she would have to base her
11 selection on objective factors?
12 A  I think I just testified I said, Mary,
13 what is the basis for your decision? She gave
14 those three reasons. We agreed that we should call
15 John right away. We did that. John was very, very
16 upset, if not more. I reported that to Mary and
17 then we broke up. It was in the evening. It was
18 either 6:00, within a half hour. It could be
19 either way, 5:30. I think it was more like 6:30 or
20 something. It was dark. I remember that.
21 Q  Did you inform Ms. White of Mr. Bratton's
22 statement to you that he felt discriminated against

Page 256

1  and was going to take it to the next level?
2      MR. RANCK: Objection; asked and
3  answered.
4      MR. BOUSE: I object.
5      THE WITNESS: Do I have to answer?
6      MR. RANCK: You can answer it one more
7  time.
8      THE WITNESS: Right after my conversation
9  with John Bratton, I turned around -- Mary is in
10 the same room -- I said, as closely as I could,
11 what John had told me. The answer is yes.
12 BY MR. SHAIBANI:
13 Q  What did Ms. White say in response?
14     MR. BOUSE: I object.
15     MR. RANCK: Objection; asked and
16 answered. With all due respect, do you sincerely
17 not recall asking him to give testimony on this
18 very same subject matter, these very same
19 questions?
20     MR. SHAIBANI: I just want to make sure
21 that all the communications are being conveyed
22 since this is my one chance of getting all the

Page 257

1  information.
2      MR. RANCK: But you're asking the same
3  question repeatedly. As I've said in other
4  depositions, it's unfair after hours to go back and
5  ask the same question you asked earlier, perhaps
6  trying to get different testimony. I object. It's
7  asked and answered. The record will speak for
8  itself.
9  BY MR. SHAIBANI:
10 Q  Would you agree that Mary White decided
11 to lease the property to John Bratton only after
12 she learned of his intent to sue her for
13 discrimination.
14     MR. BOUSE: I object.
15 BY MR. SHAIBANI:
16 Q  I'm talking about the timing here.
17     MR. BOUSE: I object.
18 A  That's not what your question asks.
19 Q  With respect to the timing of her
20 decision to lease the property to John Bratton, was
21 that after you informed her of his statement to you
22 that he felt discriminated against?

65 (Pages 254 to 257)

Page 270

```
1    A  Eight years.
2    Q  You're close?
3    A  I think that's obvious.
4    Q  Okay.  Well, I need an answer.
5    A  That would be like me asking you, are
6  you close with your wife?
7    Q  And that's a fair question these days.
8        Now, when you went home on the evening
9  of October 6th, did you tell Eric what had happened
10 and that you felt you had been discriminated
11 against on the basis of your race and personal
12 appearance?
13   A  I didn't have to tell him actually.  As
14 soon as he saw the pattern -- as soon as I talked
15 to him about the pattern of behavior, what was
16 going on with the lease, he knew what was going on.
17 So, yes.  But we discussed it, yes.
18   Q  Okay.  And did you discuss the events
19 with him as they went on?
20   A  No.
21   Q  Okay.  Do you think he observed you
```

Page 271

```
1  during that period of time and would be able to
2  comment as to how it was affecting you?
3    A  I'm sure he can.
4    Q  How about Martha Williams, who is she?
5    A  She is a real-estate agent.
6    Q  Did you tell her about this on October
7  6th?
8    A  Not necessarily on the same day, but we
9  talked about it.
10   Q  How Robert Spaneletti?
11   A  Spaneletti.  The attorney general of
12 the city.
13   Q  You identified him as your best friend.
14 Has that been supplanted by Eric now?
15   A  No.  I don't know how your life works,
16 but I can have multiple best friends.
17   Q  Okay.  Did you talk to him on October
18 6th about how you had been treated?
19   A  Yes.
20   Q  Okay.  And I don't want to know if it
21 was in an attorney/client capacity, but did you
```

Page 272

```
1  talk to him as a friend or as an attorney?
2    A  As a friend.
3    Q  All right.  Everything you told
4  everybody that night about what happened on October
5  6th is consistent with what you testified to today,
6  I take it?
7    A  Correct.
8    Q  And throughout October 6th to October
9  12th, did you periodically with these people you've
10 identified -- do they know what was going on,
11 having heard it from you?  Did you tell them what
12 was going on?
13   A  Not necessarily.
14   Q  Okay.  Eric would know though because
15 you saw him every night, I take it?
16   A  Correct.
17   Q  You talked to him about it on October
18 12th after you got the call from Mr. Liverman?
19   A  No.  He was there.  He listened.  He
20 heard the whole conversation.
21   Q  Okay.  Did you have it on speaker
```

Page 273

```
1  phone?
2    A  No.
3    Q  So he heard your end?
4    A  He heard my end.
5    Q  Okay.  How about Jeanette Dumbrel, is
6  that what you said?
7    A  Dumbrel.
8    Q  She's an employee of Bratton Realty?
9    A  I don't have any employees.
10   Q  She's an agent at Bratton Realty?
11   A  She's an independent agent, yes.
12   Q  Anyone else?  Your answers to
13 interrogatories identify Jeff Augello.  Have we
14 discussed everything he knows about this as far as
15 you can recall?
16   A  Jeff Augello knows -- he's the one --
17 that's the same person who drafted up the
18 commercial lease.
19   Q  That's what I mean.  He wasn't involved
20 after that, right?
21   A  Not necessary.
```

Page 274

1    Q  Did you consult with him about the way
2  you thought you were treated?
3    A  Your questions to me are like a fishing
4  expedition. I have friends. I'm very, very close
5  to my friends. I'm very, very close to my family.
6  So I talk to my family, and I talk to my friends.
7        I don't necessarily talk to them about
8  the details of the case, but anyone who is close to
9  me knows that I'm going through this suit.
10        That doesn't mean they know details,
11 and it doesn't mean I sit down -- as a matter of
12 fact, that's probably only the two people who even
13 know that I'm in this mode of doing depositions.
14        So it's a very general question and
15 vague question, because I talk to people that know
16 I'm going through this, but we don't sit down and
17 plot and plan and talk about the details of the
18 case, no.
19   Q  Well, the reason I ask, Mr. Bratton, is
20 you, in your answers to interrogatories, identify
21 these persons with knowledge. It's not a fishing

Page 275

1  expedition.
2        You have said as to Mr. Augello, "He
3  has personal knowledge pertaining to the chain of
4  events giving rise to the claim." And I'm trying
5  to figure out what he has knowledge of from you?
6        MR. SHAIBANI: Objection. Asked and
7     answered about his knowledge.
8        BY MR. RANCK:
9    Q  How about Daniel Lee?
10   A  Daniel Lee's knowledge extends to the
11 fact that he was there that day I decided to draw
12 the layout.
13   Q  Okay. Anything else that you know that
14 you told Mr. Lee about this?
15   A  That's about all the knowledge he has.
16   Q  Spanletti. Anything else, other than
17 you said --
18   A  Just --
19   Q  Rothmel we have discussed. This
20 person, Jeanette, is not notified in your answers
21 to interrogatories. Why wasn't she identified?

Page 276

1  Was it just an oversight?
2    A  There's no reason for her to be
3  identified. She's a -- she's a friend, and she
4  works with me.
5    Q  Okay.
6    A  And she's sitting in the office every
7  day, so she has been told not to discuss any issues
8  about this case or the lease with anyone that comes
9  in.
10   Q  You said that nothing really happened
11 on Friday the 14th, Saturday and Sunday, the 15th
12 and 16th, nor Monday the 17th, and that things then
13 picked up on October 18th when you heard from
14 Mr. Forester; is that right?
15   A  Yes.
16   Q  Did you first hear from him by phone
17 call or letter?
18   A  Phone call is the first thing I recall
19 receiving.
20   Q  Okay. What did you and Mr. Forester
21 discuss in that first phone call?

Page 277

1    A  I stated earlier that he called me and
2  then started talking about he's here to set things
3  straight and that Chatel was terminated and was no
4  longer in the equation and that he was taking over.
5    Q  Mr. Bratton, I had just asked and you
6  had responded with regard to your first phone call
7  with Mr. Forester on October 18th.
8        Before I get farther into Mr.
9  Forester's involvement, can you tell me, what
10 involvement did you have with anyone at Chatel
11 after your phone call with Mr. Liverman on October
12 13th? And that was the call in which you asked for
13 a press agent and lawyer's name.
14   A  I think that was about the extent of
15 it.
16   Q  So everything that happened thereafter
17 was interactions between you and Mr. Forester on
18 behalf of Ms. White?
19   A  I wouldn't say everything, but he was
20 the lead -- he was the lead person in charge to my
21 knowledge as of that point.

70 (Pages 274 to 277)