Capital Reporting Company

Page 1

```
1    STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3    _____

4    JOHN BRATTON,                    :

5              Plaintiff,             :

6         v                           : CASE NO:

7                                     : 060694

8    CHATEL REAL ESTATE,              :

9              Defendant              :

10   _____

11

12                                    Washington, D.C.

13                                    Thursday, February 1, 2007

14   Deposition of:

15                   MARY WHITE

16   called for oral examination by counsel for

17   Plaintiff, pursuant to Notice, at the Law Offices

18   of Stefan Shaibani, 1150 Connecticut Avenue,

19   Northwest, Suite 900, Washington, D.C., before

20   Mary E. Warner of Capital Reporting, sworn by a

21   Notary Public in and for the District of Columbia,

22   beginning at 10:00 a.m.
```

EXHIBIT

(866)448-DEPO
www.CapitalReportingCompany.com

## Capital Reporting Company

Page 2

1  APPEARANCES
2
3  On Behalf of the Plaintiff:
4
5  STEFAN SHAIBANI, ESQUIRE
6  SHABNAM KEYVAN, ESQUIRE
7  Litigation Associates, PPLC
8  1150 Connecticut Avenue, NW, Suite 900
9  Washington, D.C. 20036
10 (202) 862-4335
11 Stefan@litigationassociate.com
12
13 On Behalf of the Defendant Chatel Real Estate:
14
15 MATTHEW A. RANCK, ESQUIRE, ESQUIRE
16 Eccleston and Wolf
17 2001 S. Street, NW, Suite 310
18 Washington, DC 20009-1125
19 (202) 857-1696
20 Ranck@ewdc.com
21
22

Page 3

1  A P P E A R A N C E S (Continued)
2
3  On behalf of Defendant Mary White:
4
5  GORDON FORESTER, ESQUIRE
6  1742 N Street, NW
7  Washington, DC
8  (202) 293-3353
9  ROBERT H. BOUSE, JR., ESQUIRE
10 Anderson Coe King
11 201 North Charles Street, Suite 2000
12 Baltimore, MD 21201-4135
13 (410) 752-1630
14 Bouse@acklaw.com
15
16 ALSO PRESENT:
17
18 John Bratton
19
20
21
22

Page 4

1  CONTENTS
2  EXAMINATION BY                PAGE
3    Counsel for Plaintiff         4
4
5
6  MARY WHITE DEPOSITION EXHIBITS    PAGE
7   1 Rental Agreement            54
8   2 Listing                     64
9   3 MIRS Listing                77
10  4 Lease                       92
11  5 Fax, 10/26/05               96
12  6 Lease                       98
13  7 Lease                      105
14  8 Photos                     121
15  9 Photos                     121
16 10 E-mail, 10/11              126
17 11 Interrogatories            133
18 12 Policies                   138
19 13 Interrogatories            165
20 14 Electronic Business Card   169
21 15 MIRS Listing               176
22 16 Letter                     177

Page 5

1  17 Letter                    177
2  18 Interrogatories            189
3  19 Complaint                  200
4  20 Fax, 10/11                 213
5  21 Letter                     216
6  22 Lease                      230
7  23 Lease                      230
8  24 Lease                      230
9  25 Fax, 10/13                 252
10 26 Letter, 10/19              258
11 27 Letter                     259
12 28 Plumbing Bill              267
13 29 Comparative Listing Rental 278
14 30 E-mail                     284
15
16
17
18
19
20
21
22

2 (Pages 2 to 5)

(866)448-DEPO
www.CapitalReportingCompany.com

Capital Reporting Company

Page 6

1   PROCEEDINGS
2   WHEREUPON,
3       MARY WHITE
4   called as a witness, and having been first duly
5   sworn, was examined and testified as follows:
6       EXAMINATION BY COUNSEL FOR PLAINTIFF
7   BY MR. SHAIBANI:
8       Q  Ms. White?
9       A  Yes.
10      Q  My name is Stefan Shaibani. I represent
11  the Plaintiff in this case. I'm going to ask you
12  some questions today. And your Counsel may object
13  to them. If he decides to instruct you not to
14  respond to the question, if we could resolve it at
15  that point but if there's no instruction not to
16  respond to the question, you will be expect to
17  answer after the objections are raised. If at any
18  point you require me to repeat a question or
19  clarify something, just let me know.
20      A  Uh-huh.
21      Q  Could you tell us the name of the person
22  who supposedly provided a referal to Roberta

Page 7

1   Medlin?
2       MR. BOUSE: I object. We refuse to
3   answer that, for the reasons, I said in our
4   Answers to Interrogatories. We can take it up
5   with the Court later. If the Court agrees, we'll
6   provide a name and you can follow up with any
7   questions you want of Ms. White. All right?
8   BY MR. SHAIBANI:
9       Q  Are you saying that somebody in fact
10  provided an extremely favorable reference for
11  Roberta Medlin to you?
12      MR. BOUSE: I object. You can answer
13  that.
14      THE WITNESS: There is somebody that I
15  know who knows him, yes, who is a client of mine.
16  BY MR. SHAIBANI:
17      Q  And this client of yours knows Roberto
18  Medlin or her husband?
19      A  Primarily her husband.
20      Q  And what exactly did this person tell
21  you?
22      A  I don't think I --

Page 8

1       MR. BOUSE: You can tell him what he told
2   you.
3       THE WITNESS: I don't know that's right
4   because --
5       MR. BOUSE: I know what she's saying.
6   There wasn't a conversation, I take it?
7       THE WITNESS: No, there wasn't a
8   conversation.
9       MR. BOUSE: What Ms. White will tell you
10  if asked a proper question --
11      MR. SHAIBANI: I don't want you to coach
12  her.
13      MR. BOUSE: Then the answer is what I
14  just said. Next question. I was trying to help.
15  BY MR. SHAIBANI:
16      Q  There was no verbal conversation with
17  this person, then?
18      A  That's correct.
19      Q  And the so-called reference, was that
20  provided in writing then?
21      A  No.
22      Q  And it wasn't provided verbally?

Page 9

1       A  No.
2       Q  Okay. So there was no reference then,
3   isn't that correct?
4       MR. BOUSE: Objection.
5       MR. RANCK: Objection.
6       MR. BOUSE: You can answer.
7       THE WITNESS: That gets into --
8       MR. BOUSE: You can answer. Just answer
9   his question.
10      THE WITNESS: I don't know how to say yes
11  or no, though.
12      MR. BOUSE: Answer it and give an
13  explanation for it.
14      THE WITNESS: Mr. Medlin had recently
15  joined a firm. And someone in that firm had just
16  purchased a house from me. And I was privy to the
17  financial affairs of the firm. And that's as far
18  as I want to go because it's very personal.
19  BY MR. SHAIBANI:
20      Q  Yes, but a financial -- the financial
21  background for Mr. Medlin was not provided. You
22  were provided the financial background for your

3 (Pages 6 to 9)

(866)448-DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 14

1  she purchased. She was from Kansas City. They
2  were moving here. We discussed why they were
3  moving here. And we discussed the kind of
4  business she would have. She had a jewelry
5  business. She had on a piece of her jewelry, so
6  we talked about that.
7      Q  Did you at any point commit to lease your
8  property to Ms. Medlin?
9      A  No.
10     Q  And you mentioned that she first walked
11 into your office in the beginning of October. Do
12 you remember if it was before October 6th when
13 Mr. Bratton first came to visit the property?
14     A  I can look back in my notes and see
15 approximately what date it was. I'm not sure of
16 the exact date.
17     Q  Did Ms. Medlin come to visit the property
18 before October 11th when she went to Chatel?
19     A  Oh, yes. And I think she saw the
20 property before I met her as her second visit.
21     Q  Did Ms. Medlin contact you to make an
22 appointment before she walked into your office?

Page 15

1      A  No.
2      Q  I'm going to jump around a little bit.
3  Could you tell us how long you've been a broker, a
4  real estate broker?
5      A  Probably close to 30 years.
6      Q  And are you licensed in DC, Virginia and
7  Maryland?
8      A  Yes.
9      Q  Were you an agent with Chatel during your
10 career?
11     A  Yes.
12     Q  And do you remember the years when you
13 were affiliated with Chatel?
14     A  Late '60s.
15     Q  And did you go on to start your own real
16 estate brokerage after you left Chatel?
17     A  No, I went to the office of Michael
18 Sullivan Real Estate.
19     Q  I see. How long were you there for?
20     A  About four years.
21     Q  During your affiliation with Chatel, did
22 you come in contact with John Pagones?

Page 16

1      A  Yes.
2      Q  Could you describe your relationship with
3  him?
4          MR. BOUSE:  While she worked at Chatel?
5          MR. SHAIBANI:  Yes.
6          THE WITNESS:  He was another agent in the
7  office.
8  BY MR. SHAIBANI:
9      Q  Did you work on deals together on a
10 regular basis?
11     A  I don't know if John and I ever were on
12 the same deal or not but we were in the same
13 office. And it was not a large office.
14     Q  Was Thierry Liverman at that office when
15 you were working for Chatel?
16     A  No, I don't think he was there then. I
17 think he was in school.
18     Q  And what about at the -- well, in October
19 of '05, I would say actually beginning from the
20 summer of '05 until the present time, how would
21 you describe your relationship with John Pagones?
22     A  I don't know how to describe it. I don't

Page 17

1  know how to answer that. It has to be more
2  specific, I guess.
3      Q  Are you friends or is it just a working
4  relationship?
5      A  It's a working relationship.
6      Q  Did you specifically request John Pagones
7  to be your agent?
8      A  No.
9      Q  Who did you contact at Chatel to list
10 your property?
11     A  Thierry Liverman.
12     Q  And did Thierry explain to you why he had
13 selected John Pagones to handle this transaction?
14     A  No.
15     Q  Did you at any time object to Thierry's
16 selection of John Pagones for your agent for
17 leasing the commercial space?
18     A  No.
19     Q  Were you satisfied with the way he had
20 done his duties in connection with the leasing of
21 the property?
22         MR. BOUSE:  What period of time? All of

5 (Pages 14 to 17)

**Capital Reporting Company**

Page 62

1 what you're talking about.
2 BY MR. SHAIBANI:
3    Q Did you tell John Pagones that you didn't
4 want to have the tenant for the commercial
5 property to have a right of first refusal and an
6 option to renew their lease?
7    A That came up when we got into the
8 negotiation of a lease.
9    Q And --
10    A I had stated in here, I wanted a two year
11 lease, period.
12    Q And this discussion that you had with
13 Chatel occurred after John Bratton presented his
14 offer to lease the property, isn't that correct?
15      MR. BOUSE: I object. Go ahead.
16      THE WITNESS: The original instruction
17 was a two year lease. We certainly talked about
18 it again. It was always a two years lease.
19 BY MR. SHAIBANI:
20    Q Yes, but the instructions that you gave
21 were also to use the Chatel lease and that lease
22 has a right of first refusal as one of its

Page 63

1 provisions and it converts to a month to month,
2 doesn't it?
3      MR. BOUSE: I object she already said
4 there were going to be changes when she negotiated
5 the lease. She already testified to that. It's
6 argumentative.
7      MR. RANCK: And I object, too. You're
8 mischaracterizing the testimony and the evidence.
9 Your prior question even used the term boiler
10 plate. And the witness did say modifications were
11 certainly possible.
12 BY MR. SHAIBANI:
13    Q Didn't the MIRS -- I'll rephrase the
14 question actually. Did you provide the
15 information to John Pagones or Chatel to create
16 the MIRS listings for the commercial units of your
17 property?
18    A I'd say probably yes and no. When John
19 and Thierry and Patsy were in the building, we
20 talked about the building. We had no further
21 discussion about it.
22    Q Did you review the MIRS listing?

Page 64

1    A Not immediately.
2    Q How many days did it --
3    A Sometime later.
4    Q Was it like less than a month?
5    A When did it start?
6    Q Why don't I pass this to you as Exhibit
7 2?
8      (White Exhibit No. 2
9      was marked for identification).
10      MR. BOUSE: Thank you.
11      THE WITNESS: It doesn't say when it
12 started.
13      MR. BOUSE: I'm trying to find it.
14      THE WITNESS: Days on the market 66.
15 What day was this run, do you know?
16 BY MR. SHAIBANI:
17    Q The list date apparently July 29th of
18 '05, its on the third page.
19    A You wanted to know --
20    Q Yes, I wanted to know how many days after
21 the listing was posted -- well, I guess my
22 question is when did you review this listing after

Page 65

1 it was posted on the MIRS?
2    A I don't know.
3    Q Was it within a month?
4    A We tried to figure out when it started.
5 And I don't think --
6      MR. BOUSE: There's a listing right back
7 here. I don't know if this helps you or not.
8      THE WITNESS: Listing, oh, July 29th.
9      MR. BOUSE: You tell me.
10      THE WITNESS: I thought it was listed
11 prior to that.
12      MR. RANCK: I would just ask the witness
13 not to guess or speculate in response to the
14 question, if you have a reasonable estimate as to
15 when you reviewed the listing, that's obviously
16 fair game.
17      THE WITNESS: No, I don't.
18 BY MR. SHAIBANI:
19    Q By September of '05, did you review this
20 listing?
21    A I said I don't know when I did.
22    Q Well, a moment ago you mentioned that you

17 (Pages 62 to 65)

Capital Reporting Company

Page 102

1    THE WITNESS: There are various reasons.
2  One is that the building is in my will and it's
3  designated to go to certain people. And if I
4  should die and he's there, that's the way it goes,
5  it doesn't go at the end of it. It goes to a
6  member, someone I'm leaving it to. Number two,
7  the tenant upstairs, the residential lease by law
8  has the right of first refusal, a right that she
9  cannot waive. I can't give two rights of first
10 refusal. The commercial right of first refusal is
11 not something required by law. It's required in a
12 residential, not in a commercial. I can't give
13 the same thing to two different tenants.
14 BY MR. SHAIBANI:
15   Q  Is it your testimony 1622 Wisconsin has
16 to be sold all as one property?
17   A  Yeah, it has one lot number and square
18 number, yeah.
19   Q  And what about the conversion to month to
20 month, was there any reason why you didn't want
21 Mr. Bratton to have his lease convert to a month
22 to month at the end of the two years?

Page 103

1    MR. BOUSE: I object.
2    THE WITNESS: I suppose we could enter
3  into negotiation for a new lease but I don't want
4  to go month to month. None of my leases are month
5  to month.
6  BY MR. SHAIBANI:
7    Q  Isn't it true that you can give a right
8  of first refusal to different people if they were
9  to present offers that would be -- one would be
10 higher by the other even if it's a dollar?
11   A  Now say that again. There's no way I can
12 grant a right of first refusal?
13   MR. RANCK: I object to the form of the
14 question.
15   MR. BOUSE: You're not answering the
16 question. Do you want to reask the question or do
17 you want to stand on that?
18 BY MR. SHAIBANI:
19   Q  I want to know, couldn't you give a right
20 of first refusal to two different tenants and
21 basically structure it in a way that the person
22 making the offer to match can have his offer

Page 104

1  increased by a dollar, so that you wouldn't have
2  two offers for the same price, basically, to
3  select from?
4    MR. RANCK: I object to the form of the
5  question because I don't understand what you're --
6    MR. BOUSE: I object also.
7  BY MR. SHAIBANI:
8    Q  In DC what law, which you mentioned, does
9  not give you the right of first refusal?
10   A  What?
11   Q  What law precludes you from giving the
12 right of first refusal to two different tenants?
13   MR. RANCK: Objection, mischaracterizes
14 her testimony.
15   MR. BOUSE: Don't answer that.
16   MR. RANCK: It did mischaracterize her
17 testimony. It's not at all what she said.
18   MR. SHAIBANI: She said I can't give a
19 right of first refusal to two different people.
20   MR. RANCK: That may be what she said,
21 but that's not what you just asked.
22   MR. BOUSE: No.

Page 105

1    MR. SHAIBANI: That's okay. We can have
2  Tom discuss that, I'm sure. Can we get the other
3  lease?
4    MR. BOUSE: Are you done with this one?
5    MR. SHAIBANI: For now, yes.
6    (White Exhibit No. 7
7    was marked for identification).
8  BY MR. SHAIBANI:
9    Q  I'd like to distribute Exhibit 7. Do you
10 recognize this document?
11   A  Yes.
12   Q  Did you have any role in the filling of
13 the blanks in this document?
14   A  I do remember that Ms. Medlin did come to
15 me at where I was at, my open house, and wanted to
16 know what to do with this. I think she had to
17 have gotten it from Chatel. Evidently they didn't
18 help her fill it out. She came to me. I said,
19 "Fill out the address and so forth and go back to
20 them and have them show you how to do the rest of
21 it."
22   Q  Didn't you contact Thierry Liverman to

27 (Pages 102 to 105)

## Capital Reporting Company

Page 106

1  let him know that Roberta Medlin was going to come
2  to see him and he should assist her with preparing
3  this lease?
4      A  I don't remember that. It's possible. I
5  think John was not in the office and so we had to
6  figure out if she went back to Chatel, who should
7  she see. I probably sent her to John to begin
8  with. She came back and said, "He's not there, so
9  who is there?" So I called Thierry to find out
10 who was there.
11     Q  Can you tell us why you did not refuse to
12 give a right of first refusal to Roberta Medlin in
13 this lease?
14         MR. BOUSE: I object, that assumes
15 that's -- assumes that she didn't -- she did give
16 a right of first refusal to Roberta Medlin.
17         MR. RANCK: I object as well.
18         THE WITNESS: This was a preliminary
19 document. This was presented to me by Thierry.
20 This was the first time I had seen it. There's
21 certain things we have to negotiate here. She's
22 added a list here on page -- doesn't have a page

Page 107

1  number, additional provisions, which obviously are
2  items that have to be negotiated.
3  BY MR. SHAIBANI:
4      Q  And those provisions, didn't you
5  negotiate them with her before this was drafted,
6  the addendum?
7      A  No, I remember she asked about some of
8  them but I didn't make any decision. I don't
9  think there's anything in here that --
10     Q  Why is it that this lease for Roberta
11 Medlin converts to month to month at the end of
12 the two years but the lease for Mr. Bratton
13 doesn't?
14     A  This lease is not finalized. This is a
15 draft presented to me for negotiation.
16     Q  And what was your response to
17 Mr. Liverman after you received this draft?
18     A  That perhaps we should negotiate it.
19     Q  And what provisions did you intend to
20 negotiate in this lease?
21         MR. BOUSE: I object. Go ahead.
22         THE WITNESS: Lots of them.

Page 108

1  BY MR. SHAIBANI:
2      Q  Well, could you go over some of them?
3      A  Right of first refusal would be one.
4  Going beyond -- I think was hers a one year lease
5  or two? One year lease. No, maybe this is two
6  year, two year, I guess. And then these
7  conditions that she's got on the back. Some of
8  these things were things that were scheduled, like
9  the exterior painting of the building was
10 scheduled for early November. We were waiting for
11 the city to complete its work on Wisconsin Avenue.
12 And once the work was completed, then we would be
13 able to paint. She obviously wanted to paint the
14 entryway and hallway. We would have to talk about
15 how she would paint it. Changing the interior
16 lights, we certainly would talk about that. The
17 signage is really controlled by DC. Take out
18 certainly anything that has to do with sublease
19 would really have to be talked about, basically I
20 don't allow sublets at all. And the awning, I
21 remember she asked about an awning. That's
22 controlled by the city.

Page 109

1      Q  Did you intend to cross out the
2  provisions in this lease relating to the
3  conversion to month to month?
4      A  Yes, and once again, right of first
5  refusal wouldn't work.
6      Q  And did you actually give those
7  instructions to Thierry Liverman to cross out the
8  right of first refusal and the month to month
9  provision for the Medlin lease?
10     A  Before this was prepared or after it was
11 prepared?
12     Q  Either before or after?
13     A  Not before.
14     Q  What about afterwards?
15     A  When we were negotiating, we might have.
16 We never got to that point because she withdrew.
17     Q  Well, do you remember a date that she
18 withdrew her offer?
19     A  No, I don't. I would like to know that
20 but I don't. I don't even remember how I learned
21 it. It wasn't a phone call from her that I do
22 know.

28 (Pages 106 to 109)

## Capital Reporting Company

**Page 170**

1  that was yesterday. I didn't know what you were
2  talking about in the depositions. I saw that
3  referred to. I didn't know what it was.
4     Q  And didn't Barrett Anderson give
5  Mr. Bratton's business card, didn't he leave it at
6  your office as part of the mail that was coming in
7  on the 6th of October?
8     A  I don't think so. I never saw it.
9     Q  Didn't John Pagones inform you that
10  Mr. Bratton was African American on October 7th?
11      MR. BOUSE: Objection, she already
12  answered that question. Go ahead.
13      THE WITNESS: I've already answered it.
14      MR. BOUSE: You can answer it again,
15  Mary.
16      THE WITNESS: Did John Pagones? No.
17  Give me the question again.
18  BY MR. SHAIBANI:
19     Q  Didn't John Pagones inform you on October
20  7th --
21     A  No.
22     Q  -- that John Bratton was African

**Page 171**

1  American?
2     A  No, I told you my recollection of that
3  conversation is he told me to note who the
4  character references were.
5     Q  And how did you find out that Mr. Bratton
6  was African American then?
7     A  I don't remember.
8     Q  Was it through your discussions with
9  Thierry Liverman on the 12th of October in the
10  evening?
11     A  I just don't know.
12     Q  Didn't you in fact ask Mr. Liverman in
13  your meeting on October 12th whether you had to
14  accept Mr. Bratton's lease in order not to be
15  sued?
16     A  That's possible. I might have asked
17  that. I don't know. John had evidently implied
18  that, are you saying? The only thing he told me
19  was the character. He wanted to be sure I was
20  free to work with either one.
21     Q  Why would you ask that question?
22     A  I guess when you get two leases, you want

**Page 172**

1  to know what you have to deal with, how does he as
2  the presenting agent or broker want me to handle
3  these.
4     Q  Did you at any point believe that John
5  Bratton couldn't afford to rent your property?
6     A  I think that what John's net worth was
7  something that kept changing so we just had to be
8  sure that it was accurate. It just kept changing.
9     Q  Did you request two years of income tax
10  returns and bank statements from Mr. Bratton
11  because you wanted to find out if he would
12  financially qualify for renting your property?
13     A  Well, I think when he signed the
14  permission to do a credit check, it said if he was
15  self-employed, bank statements and income tax
16  statements would be provided.
17     Q  How many years of tax returns did you
18  request from Mr. Bratton?
19     A  That would be up to Gordon Forrester's
20  recommendation.
21     Q  Do you recall what his recommendation
22  was?

**Page 173**

1     A  No.
2     Q  Why is it that you didn't require two
3  years of income tax returns and bank statements
4  from Roberta Medlin?
5     A  How do you know I didn't?
6      MR. BOUSE: I object.
7  BY MR. SHAIBANI:
8     Q  Did you?
9     A  We didn't get that far with hers.
10     Q  Did you request it from her, though?
11     A  Did she fill out the same credit report?
12  If she did, she would have agreed to and we'd be
13  able to ask for it. I'd have to look at her
14  application she filled out. It was the same one
15  John filled out. We have the right to ask for
16  them.
17     Q  I know you have the right to ask for them
18  but did you actually ask her to submit you those
19  documents in order to financially qualify for the
20  lease?
21     A  If we got further along in the
22  negotiations, we would have. We didn't get that

44 (Pages 170 to 173)