### Page 339

```
 1   IN THE UNITED STATES DISTRICT COURT
 2      FOR THE DISTRICT OF COLUMBIA
 3   - - - - - - - - - - - - - - - - X
 4   JOHN BRATTON, et al.,         :
 5        Plaintiffs,              :
 6   vs.                 : Case No.: 1:06CV00694
 7   CHATEL REAL ESTATE, INC.,     :
 8   et al.,                       :
 9        Defendants.              :
10   - - - - - - - - - - - - - - - - X
11
12              Volume III
13   Continued Deposition of THOMAS J. LYNCH
14            Washington, D.C.
15         Monday, December 10, 2007
16              12:18 p.m.
17
18
19
20   Job No.: 1-118037
21   Pages: 339 - 567
22   Reported by: Dana C. Ryan, RPR, CRR
```

### Page 340

```
 1       Continued Deposition of THOMAS J. LYNCH, held
 2   at the law offices of:
 3        Eccleston & Wolf, P.C.
 4        2001 S Street, N.W.
 5        Suite 310
 6        Washington, D.C. 20009
 7        (202) 857-1696
 8
 9
10        Pursuant to agreement, before Dana C. Ryan,
11   Registered Professional Reporter, Certified Realtime
12   Reporter and Notary Public in and for the District of
13   Columbia.
```

### Page 341

```
 1              APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4        STEFAN SHAIBANI, Esquire
 5        Litigation Associate, P.L.L.C.
 6        1150 Connecticut Avenue, N.W.
 7        Ninth Floor
 8        Washington, D.C. 20036
 9        Telephone: (202) 862-4335
10
11
12   ON BEHALF OF THE DEFENDANTS CHATEL REAL
13   ESTATE, INC., AND THIERRY LIVERMAN:
14        MATTHEW A. RANCK, Esquire
15        SETH P. KLEINER, Esquire
16        Eccleston & Wolf, P.C.
17        2001 S Street, N.W.
18        Suite 310
19        Washington, D.C. 20009
20        Telephone: (202) 857-1696
```

### Page 342

```
 1          APPEARANCES CONTINUED
 2
 3   ON BEHALF OF THE DEFENDANT MARY WHITE:
 4        ROBERT H. BOUSE, JR., Esquire
 5        Anderson, Coe & King, L.L.P.
 6        201 North Charles Street
 7        Suite 2000
 8        Baltimore, Maryland 21201
 9        Telephone: (410) 752-1630
```

EXHIBIT 22

**Page 343**

CONTENTS

EXAMINATION OF THOMAS J. LYNCH:    PAGE:
By Mr. Ranck    344
By Mr. Shaibani    500
By Mr. Bouse    526
By Mr. Ranck    550

EXHIBITS
(Attached to the Transcript)

LYNCH DEPOSITION EXHIBIT    PAGE
No. 8    Expert Report Of Thomas Lynch    362
          On Economic Damages

**Page 344**

PROCEEDINGS
THOMAS J. LYNCH,
having been duly sworn, testified as follows:
EXAMINATION BY COUNSEL FOR THE DEFENDANTS
CHATEL REAL ESTATE, INC., AND THIERRY LIVERMAN
BY MR. RANCK:

Q Can you state your name and address for the record again even though we've been through this one time sometime back?

A Thomas J. Lynch, L-Y-N-C-H, 1062 Harriman, H-A-R-R-I-M-A-N, Street, Great Falls, Virginia 22066.

Q Your address hasn't changed since the date of your first deposition, Mr. Lynch?

A It has not.

Q And that's your office or home or both?

A It's -- it's an office and a home.

Q How long have you used that as your office?

A It's been my D.C. office probably for four years.

Q Four years?

A Yeah.

Q Is your practice primarily residential or

**Page 345**

commercial or both?

A I would say primarily residential.

Q What percent primarily?

A Well, it varies from time to time, but I would say in recent times it's -- it's probably 98 or 99 percent. It's very -- very few commercial transactions of late.

Q When you say, "of late," what period --

A The last few years. I mean the last --

Q Ten years? The last ten years?

A I believe we -- in Virginia we leased a commercial -- a small commercial building last year, so, I mean --

Q Well, let me just -- in the last ten years just so --

A In the last ten years I would say -- in the last ten years, 1997 to -- now I would say it's pretty much a residential business.

Q Okay. Have you ever had an office in Georgetown?

A Yes.

Q When was that?

**Page 346**

A I had an office in Georgetown from '74 to '79, an office in Georgetown from -- another location from '84 to '90 and had my office -- up until the last few years ago, my D.C. office was at -- just a little bit north of Georgetown at the corner of Calvert and Wisconsin.

Q And how long were you at that location?

A Probably from '90.

Q Now, I am going to do my best to competently and successfully not to re-cover ground that I did in your first deposition. There are a couple of background questions I've asked already and a couple more, and then after that we're going to get into your report. Do you have education and training as an accountant?

MR. SHAIBANI: Objection.

THE WITNESS: I have taken the accounting courses, yes.

BY MR. RANCK:

Q Are you a CPA?

A No.

Q What accounting courses have you taken?

**Page 363**

1  MR. RANCK: Exhibit 8, for the record,
2  everybody, it's continuing from the first -- whatever
3  exhibits were marked the first day.
4  BY MR. RANCK:
5  Q  Mr. Lynch, looking at what's been marked as
6  Exhibit 8, that's your September 7 report on economic
7  damages; correct?
8  A  Correct.
9  Q  All right. And the document I want to talk
10 to you -- or ask you about is -- at the bottom of
11 page 1, the last few words, you reference a cost
12 summary analysis itemizing Bratton Realty's relocation
13 costs and expenses; do you recall that document?
14 A  I don't recall a specific document. There
15 might have been some numbers thrown around. Then I
16 remarked on them. I said the numbers that are -- that
17 are in this report are the numbers that -- that I
18 believe to be what someone would expect, and obviously
19 the move has been made, so this is best guess months
20 before the move, so . . .
21 Q  Right. Can you identify for me what studies
22 you've reviewed in preparation of Exhibit 8?

**Page 364**

1  MR. SHAIBANI: Objection, vague.
2  THE WITNESS: I'm not so sure what you
3  mean by "what studies."
4  BY MR. RANCK:
5  Q  Well, you refer -- and we'll go into it in
6  more detail later, but you refer on page 8 --
7  A  Page 8?
8  Q  Yes, sir. At the beginning of the final
9  paragraph, your report says, Studies concerning
10 displaced businesses. Do you see that?
11 A  Yes.
12 Q  Okay. My question is, is what studies have
13 you reviewed in conjunction with or in preparation of
14 Exhibit 8?
15 A  I can't give you any specific studies.
16 These are -- this is information I picked up over the
17 course of more than 35 years in the business from
18 classes, whatever the case may be, so --
19 Q  My question isn't to this study referred to
20 on page 8. That was simply an example. My question
21 is can you refer me to any study that you have
22 reviewed in conjunction with this case?

**Page 365**

1  A  I think the answer is no.
2  Q  Okay. Have you ever reviewed a study or
3  prepared a study that evaluated the performance of a
4  Georgetown real estate company versus the performance
5  of similarly situated companies in other locations
6  throughout D.C.?
7  A  I think that's two questions.
8  Q  Well, I'm not sure, but you can answer each
9  of them, then.
10 THE WITNESS: Would you please repeat
11 the question or the questions?
12 BY MR. RANCK:
13 Q  I'll just ask it again.
14 A  Yeah.
15 Q  Have you ever prepared a study which
16 evaluated the performance of a Georgetown real estate
17 company versus a non-Georgetown/District of Columbia
18 real estate study?
19 A  No.
20 Q  Have you ever reviewed such a study
21 question?
22 A  No.

**Page 366**

1  Q  Are you aware if any such studies exist?
2  A  I don't know of any specific study to --
3  that exist.
4  Q  How about the same couple of questions but
5  pertaining to the performance of real estate agents
6  versus non-Georgetown/District of Columbia real estate
7  agents; have you ever prepared any such studies?
8  MR. SHAIBANI: Objection.
9  THE WITNESS: No.
10 BY MR. RANCK:
11 Q  Have you reviewed any such studies?
12 A  No.
13 Q  Are you aware of whether any such studies
14 exist?
15 A  I am not.
16 Q  Okay. Now, generally is it -- I mean, real
17 estate is generally -- it's a -- it's a service
18 business; right?
19 MR. SHAIBANI: Objection.
20 THE WITNESS: I would say we're in the
21 service industry, yes.
22 BY MR. RANCK:

Page 403

1  looking at your watch. Do you need a break or --
2    A  No, no, I'm just --
3       MR. SHAIBANI: I could use a
4  five-minute break or a three-minute break.
5       MR. RANCK: Sure. Absolutely.
6    (Recess -- 1:24 p.m.)
7    (After recess -- 1:28 p.m.)
8    (The record was read as requested.)
9  BY MR. RANCK:
10   Q  All right. Are you saying that clients care
11 more about location than they do the quality of
12 service and the competence of the professional?
13      MR. SHAIBANI: Objection.
14      THE WITNESS: I wouldn't characterize
15 it that way.
16 BY MR. RANCK:
17   Q  But would you agree with me that the
18 majority of clients care more about competence of the
19 professional and the quality of service than they do
20 where the firm is located?
21      MR. SHAIBANI: Objection.
22      THE WITNESS: You would hope so.

Page 404

1  BY MR. RANCK:
2    Q  Now, with regard to all of the transactions
3  in which Bratton Realty was involved -- and I'm
4  talking about transactions that closed, okay? Whether
5  they be representing the seller or the buyer, all the
6  ones that occurred when Bratton Realty was at
7  Georgetown, have you spoken with a single one of those
8  clients?
9    A  No.
10   Q  Have you spoken with any customer of Bratton
11 Realty that was -- that contacted the company during
12 the period of time in which it was in Georgetown?
13   A  No.
14   Q  Have you looked at any of the sales and
15 transactions that occurred on -- on those sheets,
16 right -- the listings that you referred to earlier of
17 transactions to determine which wouldn't have occurred
18 if Bratton Realty had not been in Georgetown?
19   A  No.
20   Q  All right. So if I show you these four
21 pages that you identified earlier, BRA0665 through 68,
22 you can't point to any of those transactions and tell

Page 405

1  me which one wouldn't have occurred had Mr. Bratton
2  not been in Georgetown; right?
3    A  That's correct.
4    Q  Can you identify for me -- well, strike
5  that.
6       Four lines from the bottom of that same
7  paragraph, the report that's over signature says,
8  Bratton Realty's customers have come to associate the
9  business with the Wisconsin Avenue location and this
10 location draws numerous clientele. Do you see that?
11 Do you see that?
12   A  Yes. I was looking at the bottom. You're
13 talking about the middle paragraph.
14   Q  Yes. The same paragraph we were discussing
15 a moment ago. Tell me what customers you were
16 referring to. Can you identify any for me?
17      MR. SHAIBANI: Objection.
18      THE WITNESS: Specifically, no.
19 BY MR. RANCK:
20   Q  All right. In the next paragraph -- I asked
21 you about this generally earlier and now I'm going to
22 ask specifically -- can you tell me what study you're

Page 406

1  referring to?
2    A  Not specifically.
3    Q  Can you tell me when you reviewed this study
4  you can't identify specifically?
5    A  I believe I answered that question earlier
6  and I said I did not review a specific study with
7  respect to this. This is the involuntary relocation
8  or even voluntary relocation, but here we're talking
9  involuntary, the business is -- there's a loss of
10 revenue, and that's -- that's something that I've come
11 across and have heard -- I've heard discussed time and
12 time again. I mean --
13   Q  Can you tell me who has prepared and
14 authored any of the studies that you're referring to
15 in your report?
16   A  No.
17   Q  Can you tell me what time period they
18 covered?
19   A  About the last 35 years.
20   Q  Can you be any more specific than that?
21   A  No, I'm saying this is something that I
22 have -- I have come to know and -- and -- and believe

**407**

as a result of being in the real estate industry for more than 35 years.

Q  These are studies that deal with real estate companies' displacement or business in general, because your report doesn't say studies concerning displaced real estate companies? It says concerning displaced --

A  It says businesses.

Q  -- businesses?

A  Yes.

Q  So businesses in general?

A  I would say so.

Q  Do you recall whether the studies addressed that the effect of moving your operation was even greater the longer you've maintained a presence in a given place?

A  I don't recall specifically, no.

Q  You obviously -- you -- you can't identify any specific sale that's been lost as a result of Bratton having to move --

MR. SHAIBANI: Objection.

BY MR. RANCK:

**408**

Q  -- from Georgetown to the new location, can you?

MR. SHAIBANI: Objection.

THE WITNESS: No, and I haven't attempted to, no.

BY MR. RANCK:

Q  Okay. Do you plan to attempt to?

A  No.

Q  Okay. Can you identify for me the names of the agents that worked at Bratton's original -- the location it was at -- its prior location before moving to Georgetown?

A  No.

MR. SHAIBANI: Objection, asked and answered.

THE WITNESS: No.

BY MR. RANCK:

Q  Can you identify, other than Mr. Grant, the name of any agent that was with Bratton Realty after it moved to Georgetown?

A  I believe I said no to that question earlier, a similar question.

**409**

Q  Can you identify for me any agent that associated with Bratton Realty simply due to its location in Georgetown?

MR. SHAIBANI: Objection.

THE WITNESS: I don't -- I can't name a specific agent or agents.

BY MR. RANCK:

Q  All right. So on page 8 there, in the last three lines of your report when you say Bratton Realty will lose "revenue because it may have difficulty in recruiting and retaining good real estate agents" -- and this is the part I would like to focus on -- "who previously associated with the brokerage due to its prime location on Wisconsin Avenue in Georgetown" -- you say that in your report, you see; correct?

A  Correct.

Q  But you can't identify any agents who you know previously associated with it simply because of its location in Georgetown --

MR. SHAIBANI: Objection.

BY MR. RANCK:

Q  -- is that true?

**410**

MR. SHAIBANI: Mischaracterizes prior testimony.

THE WITNESS: What I'm saying in that statement is that I believe there will be a loss of revenue and difficulty recruiting and retaining those who were previously associated due to its location. Even if they were with Bratton prior to the location, the loss of the location to me creates a problem for the agents that are there that have become accustomed to having the ability to say, oh, my office is in Georgetown.

BY MR. RANCK:

Q  Okay. Can I see that exhibit for a minute, please?

A  (Indicating).

Q  Thank you. Now, do you recall the methodology you used to determine the lost profits that you attribute to having to move from Georgetown?

A  I estimated that -- that it would be easily a loss of a couple of months of business activity as well as a couple of weeks of lost activity due to the move. That there would be a loss associated with the

Page 423

1  have done that?
2     A  No.
3     Q  Okay. Now, this $36,000 in lost rental
4  revenue for the two years -- well, strike that.
5        Oh, by the way, before I forget, on the
6  first item of damage, the lost profits, have you ever
7  done any sort of study of Bratton Realty's historical
8  performance on a month-by-month basis?
9     A  No.
10    Q  Okay. You don't know -- you have no way to
11 know with regard to these listings, BRA665 through
12 668, what months any of these transactions occurred
13 in; right?
14    A  No, nor can you determine what's going to
15 happen in a -- it's best to use an annual.
16    Q  Okay. Now, on the -- or back to rental
17 revenue, where did you come up with the $1,500 per
18 month that he could have rented this space for?
19    A  I'm not so sure if that $1,500 figure came
20 up a long time ago in a conversation with -- with
21 Mr. Bratton. That may -- may have been part of a
22 discussion we had back in 2005, for all I know, when

Page 424

1  we had a very, very long meeting.
2     Q  Well, do you -- have you reviewed any --
3  well, strike that.
4        Are you aware -- did you look at any
5  comparables --
6     A  No.
7     Q  -- to come up with this figure?
8     A  No.
9     Q  So, I'm sorry, I'm failing to understand. I
10 apologize for the pause on the record. What is the
11 basis for your opinion that he could have leased the
12 property for $1,500 a month during that two-year
13 period?
14       MR. SHAIBANI: Objection.
15       THE WITNESS: As I said, it may well
16 have been a conversation I had with Mr. Bratton when
17 we first started working on this case and the $1,500
18 number seemed reasonable. He certainly was -- was up
19 close and in person with respect to what could be done
20 with that property, and when I wrote this report, I
21 didn't think $1,500 per month was a bad number. It
22 could be more.

Page 425

1  BY MR. RANCK:
2     Q  Well, how much space was he going to
3  lease -- going to rent out?
4     A  I don't recall.
5     Q  Well, isn't that sort of relevant in
6  determining how much per month you can charge?
7     A  In a -- in a situation like that, price per
8  square foot, I think is what you're -- what you're
9  addressing, is not the issue that it would be in a
10 large -- in a large -- in a large office building. It
11 comes down more to how much people are willing to pay
12 for -- for having an office in a given location.
13 It's -- it's -- many times on the smaller offices, if
14 you calculate the price per square foot, the people in
15 downtown CPD would love to get it for their space, but
16 it's not an easy, simple comparison.
17    Q  How many units were in the 1223 10th Street
18 property?
19       MR. SHAIBANI: Objection, relevance.
20       THE WITNESS: I think there were three.
21 BY MR. RANCK:
22    Q  Okay. And what was Mr. Bratton's plan with

Page 426

1  regard to each of the three units, I guess is my --
2  well, you can answer that question.
3     A  Well, I thought it -- for a long time that
4  the entire property was vacant, but I have heard that
5  he did have some residential tenants in there. I
6  don't know what the circumstances of that were.
7     Q  Okay. So this $1,500 a month, how many of
8  the units was that for?
9     A  I was talking about the office space.
10    Q  Which was where?
11    A  The lower level, the basement level.
12    Q  Okay. One unit?
13    A  Yeah.
14    Q  The lower level basement unit?
15    A  Yeah.
16    Q  Okay. So, do you know how long the leases
17 were for the other units?
18    A  I do not. I do not.
19    Q  You would agree with me under D.C. law, I
20 guess, that he couldn't just kick the residential
21 units out in order to sell the property to somebody
22 else; right?

Case 1:06-cv-00694-JDB   Document 80-24   Filed 03/03/2008   Page 7 of 9
DEPOSITION OF THOMAS J. LYNCH - VOLUME III
CONDUCTED ON MONDAY, DECEMBER 10, 2007

23 (Pages 427 to 430)

**Page 427**

1  A  Certainly not the way you phrased it.
2  Q  As far as you know, the property was never
3  advertised for sale or lease; right?
4       MR. SHAIBANI: Objection,
5  mischaracterizing the record.
6       THE WITNESS: I don't know.
7  BY MR. RANCK:
8  Q  Is it your understanding that Mr. Bratton
9  would have leased his 1223 property for two years had
10 he gotten a four-year lease with Ms. White?
11      MR. SHAIBANI: Objection.
12      THE WITNESS: I think he might have
13 leased it for two or more years had he had a four-year
14 lease.
15 BY MR. RANCK:
16 Q  Okay. You agree with me that the rent he
17 was paying Ms. White was more than $1,500 a month;
18 right?
19 A  Correct.
20 Q  So he would have paid more to Ms. White to
21 stay there than he would have taken in from some
22 renter at $1,500 a month; right?

**Page 428**

1  A  That was his choice to pay Georgetown
2  prices, yes.
3  Q  So actually he would have -- in offsetting
4  the rent factor, he would have lost money on rent out
5  versus rent in had he stayed with Ms. White, correct,
6  had he stayed in the property for four years and
7  rented his property for two years; right?
8       MR. SHAIBANI: Objection, relevance.
9       THE WITNESS: Yeah, I mean, I'm --
10 that's just a mathematical question.
11 BY MR. RANCK:
12 Q  Right. All right. The next area that you
13 opined is relocation costs. We've already been
14 through where the document is and hopefully counsel is
15 going to revisit that issue. Now, I guess first on --
16 on a sort of a big-picture basis, even had Mr. Bratton
17 gotten to stay in Ms. White's property for the four
18 years he was looking for, he would have incurred these
19 same relocation costs at the end of that four-year
20 period; correct?
21      MR. SHAIBANI: Objection, assumes facts
22 not in evidence and mischaracterizing the record.

**Page 429**

1  BY MR. RANCK:
2  Q  Do you understand my question?
3  A  I understand your question.
4  Q  It's just -- do you agree with it?
5  A  Yeah, there are -- there are expenses. The
6  question is when do you have them; how do you --
7  Q  Right. If you move --
8  A  -- create reserves for them, or whatever the
9  case may be.
10 Q  If he moves out like he did November 1st of
11 this year, October 31st, whenever it was, right, he
12 had to pay these now, currently, as opposed to paying
13 them in two years when the four-year lease had been
14 over; correct?
15      MR. SHAIBANI: Objection, assumes that
16 he would have moved out at the culmination of this
17 lease.
18      MR. RANCK: Number one, I'm asking the
19 witness -- there is a pending question.
20 BY MR. RANCK:
21 Q  Can you answer the question, Mr. Lynch?
22 A  He certainly would have some costs. The --

**Page 430**

1  the timing is -- the timing is an issue, but some of
2  the -- the costs associated four years from now might
3  be for replacing things he'd have to replace even if
4  he stayed there.
5  Q  Okay.
6       MR. RANCK: And, Mr. Shaibani, I'm
7  going to ask you again, and I don't know how many
8  times I have to do it, please do not make speaking
9  objections. That was an absolutely classic speaking
10 objection that appears to have been intended to coach
11 the witness, and all I'm asking -- you can make them,
12 I would just like you to please let me know so I can
13 have the witness excused from the room before you do;
14 is that fair?
15      MR. SHAIBANI: Sure.
16      MR. RANCK: Thank you.
17 BY MR. RANCK:
18 Q  All right. I'd like to -- well, is there a
19 legal requirement that you're aware of in real estate
20 that would have required Ms. White's property be
21 offered for more than two years?
22      MR. SHAIBANI: Objection.

**Page 431**

THE WITNESS: No.

BY MR. RANCK:

Q Okay. I'd like to go through each of these relocation costs now. Subparagraph (a) here, New office supplies for $500. Do you see that?

A Yes.

Q What new office supplies did you anticipate would have to be purchased?

A (Witness reviews document.) I can't think of -- of specifics right now.

Q Well --

A It's a very modest number when you get down into the world of office supplies.

Q Well, Mr. Lynch, this subcategory of new office supplies and the amount of 500, did you come up with that or did counsel provide you with that?

MR. SHAIBANI: Objection.

THE WITNESS: I think that was a number bandied about. Lots of things don't move well, toner cartridges and stuff become a problem, so it's simple enough to spend $500 on almost what you would almost call incidentals. but if you have to buy anything like

**Page 432**

that because of the move, spending $500 is -- is a very easy thing to do. I would think that $500 could be a conservative number. It's not a number I had --

BY MR. RANCK:

Q Can you identify for me what new office supplies they actually had to purchase?

A I don't know. This was written before the move, as you -- as you well know.

Q And I'm going to ask you both.

A Okay.

Q I asked you what you contemplated at the time and you couldn't identify anything and --

A I just mentioned to you that lots of times you have difficulty with toners and so on and so forth when you move.

Q Right. When I first asked the question, nothing came to mind, okay? Then we discussed it, and I asked where you got this category and this number and you mentioned toner.

A Believe it or not, I continue to think.

Q That's good, and I want to make sure you continue to supplement your responses because I want

**Page 433**

to know everything that you're going to say.

Q Do you know whether they bought new toner?

A I do not.

Q Do you know whether they spent a penny on new office supplies in connection with this move?

MR. SHAIBANI: Objection.

MR. RANCK: Basis?

MR. SHAIBANI: The basis is that he's answered the question. The move occurred after this report was generated. If you want to find out specific costs incurred, you're asking the wrong person. We'll have to get the receipts from Bratton Realty.

MR. RANCK: I already asked Mr. Bratton, and he couldn't tell me and the documents haven't been produced, so unless you want to pay for Mr. Lynch to come back again, I'm going to ask the question -- which we may have to do anyway -- then I need to ask the question.

THE WITNESS: Well, I think my answer is what I gave before. This -- these were -- this was my best guesstimate at the time. I do not have hard

**Page 434**

numbers from the actual move.

BY MR. RANCK:

Q All right. New business cards for six independent contractors and John Bratton. That's subcategory (b); correct? And new office letterhead?

A Yes.

Q Total of $1,500; right?

A Correct. It's probably a conservative number.

Q Did you come up with that category?

A Yes, yes --

Q You came up --

A I don't know if I came up with the category. I certainly came up with the number. This is a conservative number.

Q So you came up with the number of 1,500?

A Yes.

Q Okay. Well, why -- if you expected some of these independent agents to leave Bratton Realty, why were you buying -- why did you account to buy them all new business cards?

MR. SHAIBANI: Objection.

Page 543

BY MR. BOUSE:
Q -- people?
A There's an outfit in town, Cane and Fitzgerald office movers. They are two people -- two names that come to mind that are -- that specialize in this.
Q And they can move and set up your office very quickly?
A Well, they certainly hold themselves --
MR. SHAIBANI: Objection.
THE WITNESS: -- up to be very expert in this line. They specialize in it.
BY MR. BOUSE:
Q Now, in determining the loss in -- let's see. I'm sorry. Your -- I guess it's under loss of profits and good will for the two months that he had the cost of relocating from Wisconsin Avenue to his new location. You indicated that you -- Bratton Realty generated $443,246 in real estate sales commission in 2006, and you estimate its monthly revenue for sales commissions was 36,937; is that correct, sir?

Page 544

A I believe --
Q That's in your footnote.
A I believe that's in the footnote, yes.
Q Is it fair to say that there are better months in the real estate business in the D.C. area; for example, wouldn't typically November and December be low income-producing months in the real estate market, even in the Washington, D.C. area?
MR. SHAIBANI: Objection to form.
THE WITNESS: It's kind of interesting that you asked that question. I discussed that with a group of people the other day and I said, you know, real estate is seasonal in the suburbs, not so seasonal in D.C. And in my experience I've had every month of the year the best month of the year, and not because the rest of the year was lousy. I've had February be the best month. I've had December be the best month a number of times. I've had November. Everybody says, oh, the holidays, nobody is doing anything. D.C. real estate is not as seasonal as it is in the suburbs at all.
BY MR. BOUSE:

Page 545

Q Did you ask Mr. Bratton for the amount of sales commissions that he made in November, December, January 2005 and early 2006 -- November 2005, December 2005, January 2006, did you ask for those real estate commissions?
MR. SHAIBANI: Objection. I'll point to the MRIS listings which have been produced.
BY MR. BOUSE:
Q My question is did you ask Mr. Bratton for those?
A I don't think I asked for it specifically. I looked at the transactions. I looked at tax returns.
Q So we're clear, you have not interviewed any real estate agent who left Mr. Bratton to find out why he left, if it was because of the move from Georgetown or for some other reason; is that correct, sir?
A That's what I testified to, yes.
Q Okay. You've had a couple hours in a meeting with Mr. Bratton, you said, August 15th. You had 15 or 20 minutes on September 5th and 45 minutes a week ago. Have you submitted bills to Mr. Shaibani

Page 546

for those meetings yet?
A Actually, no, I have -- I -- I -- I scribble them down on a sheet, and I neglected to bring them today, but because I had written them down on my sheet and looked at them, I remembered them. That's how I can be so definite.
Q I know you didn't make any note yourself or any records, but when you reviewed the documents that you produced here in your report, did you make any notes on any of the documents that you were shown and given yourself?
MR. SHAIBANI: Objection, asked and answered.
THE WITNESS: I don't recall. You'll notice -- I mean, you made copies of my things. When I had gone over this, I had, you know, scribbled some notes on this document myself subsequent to the document being submitted.
BY MR. BOUSE:
Q During the meeting in preparation of this report, were you given any documents?
A No. I had the documents.