DEPOSITION OF GERARDO CRUZ
CONDUCTED ON FRIDAY, JANUARY 11, 2008

1 (Pages 1 to 4)

1

1   IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF COLUMBIA
3   - - - - - - - - - - - - - - x
                                    :
4   JOHN BRATTON, et al.,        :
                                    :
5       Plaintiffs,    :
                                    :
6   vs.            : Case No. 1:06CV00694
                                    :
7   CHATEL REAL ESTATE, INC.,   :
    et al.,                        :
8                                   :
        Defendants.    :
9                                   :
    - - - - - - - - - - - - - - x
10
11
12
        Deposition of GERARDO CRUZ
13
        Washington, D.C.
14
        Friday, January 11, 2008
15
        2:35 p.m.
16
17
18
19
20   Job No. 1-119747
21   Pages 1 - 35
22   Reported by: Paula J. Eastes

2

1       Deposition of GERARDO CRUZ, held at the
2   offices of:
3
4       ECCLESTON & WOLF, P.C.
5       2001 S Street, Northwest
6       Suite 310
7       Washington, D.C. 20009-1125
8       (202) 857-1696
9
10
11
12
13
14
15
16       Pursuant to agreement, before Paula J.
17   Eastes, Court Reporter and Notary Public in and for
18   the District of Columbia.
19
20
21
22

3

1       A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4
5       STEFAN SHAIBANI, ESQUIRE  (TELEPHONIC)
6       Litigation Associates, PLLC
7       1150 Connecticut Avenue, Northwest
8       9th Floor
9       Washington, D.C. 20036
10       (202) 862-4335
11
12   ON BEHALF OF THE DEFENDANT CHATEL REAL ESTATE,
13       INC. AND THIERRY LIVERMAN:
14
15       MATTHEW A. RANCK, ESQUIRE
16       Eccleston & Wolf, P.C.
17       2001 S Street, N.W.
18       Suite 310
19       Washington, D.C.  20009-1125
20       (202) 857-1696
21
22

4

1       C O N T E N T S
2   EXAMINATION OF GERARDO CRUZ          PAGE
3       By Mr. Ranck              5
4
5
6
7
8
9       E X H I B I T S
10       (None)
11
12
13
14
15
16
17
18
19
20
21
22

EXHIBIT
25

DEPOSITION OF GERARDO CRUZ
CONDUCTED ON FRIDAY, JANUARY 11, 2008

2 (Pages 5 to 8)

5

1    PROCEEDINGS
2        MR. RANCK: Like the prior deposition,
3    Bob Bouse is not here, but is ordering a copy and he
4    is not attending by phone.
5        MR. SHAIBANI: That is fine.
6            GERARDO CRUZ
7        having been duly sworn, testified as follows:
8        EXAMINATION BY COUNSEL FOR DEFENDANTS
9    CHATEL REAL ESTATE, INC. AND THIERRY LIVERMAN
10   BY MR. RANCK:
11       Q    Mr. Cruz, my name is Matt Ranck. I
12   represent Thierry Liverman and Chatel Real Estate in
13   this lawsuit brought by John Bratton.
14           On the phone is Stefan Shaibani. He
15   represents John Bratton, who is the plaintiff in the
16   case.
17           Another defendant Mary White and one of her
18   companies is also in the case, but their lawyer is not
19   here today, nor is he attending by phone.
20           Can you state your name and address for the
21   record please?
22       A    Sure.

6

1        **My name is Gerardo Cruz. My address is**
2    **8358 Dunham Court, Apartment H, Springfield, Virginia**
3    **22152.**
4        Q    Mr. Cruz, have you been deposed before?
5        A    **This is the first time in my life.**
6        Q    First time in your life?
7        A    **Yes.**
8        Q    Very briefly what is going to happen is I
9    am going to ask you some questions.
10           You have probably seen depositions on TV or
11   something?
12       A    **Yes.**
13       Q    I just want to go over a couple of rules
14   since you haven't been through it before so you know
15   what makes it run a little more smoothly.
16           I am going to ask you some questions. All
17   you need to do is listen to the questions, make sure
18   you understand the question and answer completely and
19   honestly.
20           Okay?
21       A    **Yes.**
22       Q    If you answer the question, unless you tell

7

1    me differently, I am going to assume you understood
2    it.
3        Is that fair?
4        A    **That is fine. Yes.**
5        Q    I am going ask you to keep your voice up a
6    little bit, particularly since we have one of the
7    attorneys on the phone.
8        A    **Sure.**
9        Q    A couple of other just quick housekeeping
10   things.
11           The Court Reporter here is writing down
12   everything I say and you say. She can't write down
13   head nods and uh-huh, uhn-uhn, those kind of things.
14   So, if you can verbalize using words, verbalize your
15   answer, that would be helpful to us.
16           Okay?
17       A    **Okay.**
18       Q    Two other little things or three things.
19           We can't speak at the same time because she
20   can't take that down then. It is hard to figure who
21   is saying what. So, we need to let each other finish,
22   which I am sure won't be a problem.

8

1        Occasionally Mr. Shaibani on the phone may
2    object to a question I ask or when I am done he may
3    ask questions and I may object to those questions. If
4    one of the lawyers objects, you should let the lawyer
5    finish the objection, but then go ahead and answer
6    unless some lawyer tells you not to for some reason,
7    which I don't believe is going to happen.
8        A    **Okay.**
9        Q    The last thing is if you need a break at
10   any time, let us know and we will be happy to
11   accommodate you. I don't think we are going to be
12   here all that long this afternoon. And I appreciate
13   you coming in.
14           Can you tell me are you employed right now?
15       A    **Yes.**
16       Q    Where is that?
17       A    **I work for Conservation International.**
18           **This is my I.D.**
19       Q    What do you do there?
20       A    **I am an International Project Manager.**
21       Q    When did you start there?
22       A    **September 11, 2006.**

Case 1:06-cv-00694-JDB   Document 80-27   Filed 03/03/2008   Page 3 of 6
DEPOSITION OF GERARDO CRUZ
CONDUCTED ON FRIDAY, JANUARY 11, 2008

4 (Pages 13 to 16)

13

1    Q   Did that remain true the entire time you
2  were associated with him?
3    A   No.  There were instances where I tried to
4  do it full time.  Probably one month or two months.
5  But it didn't work out.  So, then I would look for
6  another job until I would try to have some sales in
7  real estate.
8    Q   Was that basically what you described true
9  the entire time you were associated with Bratton Real
10 Estate?
11   A   Very much so.  Yes.
12   Q   I am going to summarize and I just want you
13 to tell me if I have it right or wrong and correct me
14 if I am wrong.
15   A   Okay.
16   Q   Sometime in or around February of 2004 you
17 entered into a contract or something with Bratton Real
18 Estate.  You were going to be a real estate agent, but
19 it was on a more or less part time basis.  You had
20 full time employment elsewhere.  You were practicing
21 the real estate profession in the evenings and on
22 weekends and then sometime during the years that you

14

1  were there you occasionally from time to time would
2  try to do real estate full time, maybe for a month or
3  so, and it didn't work out for you, so you would go
4  back to part time.
5        Is that fair?
6    A   It is fair.
7    Q   Where was the office located when you
8  started, when you first became associated with it?
9    A   It was 10th Street.
10   Q   And later it moved to Georgetown?
11   A   Yes.  Wisconsin Avenue.
12   Q   While you were at the 10th Street office,
13 how many hours per week, including the weekends, were
14 you physically at the office?
15   A   At 10th Street?
16   Q   Yes.
17   A   Every agent had an office in their house.
18 You know, by office means the setting.  You wouldn't
19 have to go to spend the whole time in 10th Street.
20   Q   Did you sometimes go to the office?
21   A   During the weekends mostly.
22   Q   Were you there all day --

15

1    A   A few hours.
2    Q   -- or just stopping in to pick up some
3  things?
4    A   Yes.  I would stop occasionally.
5    Q   Did that change after you moved to
6  Georgetown or was that pretty much the same?
7    A   By the time --
8    Q   For you.  Not for others.  For you.
9    A   Okay.
10       By the time John moved, or let's say we
11 moved to Georgetown, that coincided with the time when
12 I moved from D.C. to Virginia.  So, it was more
13 complicated for me to be in Georgetown to spend some
14 time in the office.  So, I would go there probably one
15 or two hours.  Not even every weekend, to be precise.
16   Q   So, when you moved to Georgetown you
17 stopped by the office even less frequently because it
18 was harder for you because you now lived in Virginia?
19   A   Exactly.
20       I did most of the work on-line or I would
21 meet clients in the possible potential houses.
22   Q   Did you ever take a client, meet a client,

16

1  at the Georgetown office?
2    A   It happened.  I took two clients there.
3  Yes.
4    Q   How about the 10th Street office?
5    A   Once.
6    Q   After Mr. Bratton left Georgetown, after
7  Bratton Realty left Georgetown, it went to where?
8    A   You mean?
9    Q   The new office.
10   A   My understanding is that the new office is
11 on U Street.  But I was informed later.
12   Q   You had pretty much disassociated yourself
13 with the office by that time?
14       Because that move happened I think right
15 around the end of October.
16       MR. SHAIBANI:  Objection.
17 BY MR. RANCK:
18   Q   You can answer.
19   A   Okay.
20       When that happened I was on vacation.  I
21 was in Poland.  So, I did not know it happened until I
22 came back, until I returned from Poland, and I started

17
1  reading my e-mails. Oh, we moved.
2      Q   You didn't even know that the office was
3  moving?
4      A   I didn't know, but then I was informed.
5      Q   I mean beforehand. Before you went to
6  Poland on vacation, you didn't know the office was
7  moving?
8      A   No. I didn't know.
9      Q   When did you decide for good that real
10 estate wasn't for you?
11     A   Around the time I told him. November.
12     Let's say after I came from Poland I
13 said -- you know, you are married, you discuss
14 everything with your wife ideally -- I said it is time
15 to move on. So, I e-mailed John.
16     Q   You don't happen to have a copy of that
17 e-mail, do you?
18     A   It was in Hot Mail. I believe it was in
19 Hot Mail, to be honest. I don't keep records.
20     Not that I don't keep records. It is just
21 that the system doesn't. I cannot go back to the
22 sent.

18
1      MR. RANCK: Counsel, I know the other guy,
2  James Grant I think, sent an e-mail that has been
3  produced. I don't know that I have seen the one from
4  Mr. Cruz though.
5      Can you inquire of your client as to where
6  that e-mail is?
7      MR. SHAIBANI: Yes.
8      MR. RANCK: Thank you.
9      THE WITNESS: Can I say something?
10 BY MR. RANCK:
11     Q   Sure.
12     A   I'm sorry. I would like to rectify that.
13     That e-mail actually came from the AOL.
14     Q   From the AOL account?
15     A   Yes. Apologies for the confusion.
16     Q   That is okay.
17     Why did you decide real estate wasn't for
18 you and it was time to move on?
19     A   Why?
20     Because of the way of the market, because
21 after the bubble burst in '06, it became very
22 difficult to do business and I felt like it was the

19
1  type of business where you really need to invest and I
2  did not have the time or the money to do that.
3      It is a small company. So, each of us was
4  on their own.
5      Q   Now, in 2005 I take it you learned at some
6  point that Bratton Realty -- or did you learn at some
7  point that Bratton Realty was trying to move its
8  office from 10th Street to a different location?
9      A   In '05?
10     Q   Yes.
11     I can give you just a little more
12 information.
13     October '05 or thereabouts,
14 October/November, is when Bratton Realty moved from
15 10th Street to Georgetown.
16     So, I am asking before the move to
17 Georgetown did you know that Mr. Bratton and the
18 company were looking for a new location?
19     A   I heard that that was the plan. But like I
20 never heard of any possible place.
21     Q   You just heard it was moving, you didn't
22 hear where they were looking?

20
1      A   Well, it depends because I am thinking
2  before the Georgetown move I thought that we were
3  going to move to a different place. Not to
4  Georgetown.
5      Q   Where did you think you were going to move
6  to?
7      A   I thought the original idea was near
8  U Street. But that is just what I thought at the
9  time. No one told me, oh, it is going to be there.
10     Q   What caused you to think it was going to
11 move to U Street?
12     A   Because his clientele, or at least one of
13 the areas where he had a lot of clients, was not far
14 from U Street. So, I probably assumed he would have
15 an office not far from that area.
16     Then later I found out about Georgetown.
17     Q   You didn't have any discussions with
18 Mr. Bratton about moving to Georgetown before you
19 found out that you were actually moving to Georgetown?
20     MR. SHAIBANI: Objection. Asked and
21 answered.
22     MR. RANCK: I disagree. But the witness

DEPOSITION OF GERARDO CRUZ
CONDUCTED ON FRIDAY, JANUARY 11, 2008

8 (Pages 29 to 32)

---

29

1 answer.
2    A  Pretty much.
3    Q  Okay.
4    A  When I answered I wouldn't mind, it is
5 basically because I would take someone, but that
6 wouldn't be a client. It would be someone that would
7 stop by and would need the help of an agent. I would
8 be an agent, not taking his clients. That never
9 happened. Just to be clear.
10    Q  So, you would have helped out, you wouldn't
11 have minded helping Mr. Bratton out if he was too
12 busy --
13    MR. SHAIBANI:  Same objection.
14 BY MR. RANCK:
15    Q  -- but you would have considered it still
16 his client?
17    A  I work with my clients. I look for my
18 clients.
19       That thing never happened, to be honest.
20    Q  Did you ever speak to any of the other
21 agents at Bratton Realty about the move from
22 Georgetown to its present location?

---

30

1    A  With Jeanette Dembrell, who is the office
2 manager. Basically I got an e-mail saying now we are
3 here. And I said, oh, okay, I will stop by. That is
4 basically the comment that I had.
5       That is an exchange I should say. That is
6 an exchange I had with Jeanette.
7    Q  None of the other agents though?
8    A  No. Because I was about to leave real
9 estate. So, I didn't have contact with the others.
10    Q  I think you said that prior to them moving
11 the office from Georgetown you went on a vacation to
12 Poland with your wife; is that right?
13    A  Yes. I left mid October and returned two
14 days before Halloween. Yes.
15    Q  Is it fair to say that you made the
16 decision at that time, you were talking with your wife
17 and you made the decision then, to leave real estate?
18    A  No. It was actually after.
19    Q  When you came home?
20    A  Let's say after Thanksgiving to be more
21 precise.
22    Q  After Thanksgiving?

---

31

1    A  Yes.
2    Q  Was there a precipitating event that
3 finally caused you to decide to leave real estate?
4    MR. SHAIBANI:  Objection.
5    THE WITNESS:  I felt like probably I am
6 done.
7 BY MR. RANCK:
8    Q  This is the time?
9    A  Yes.
10       You know, John helped me a lot. He brought
11 me to the real estate business. And I said thank you
12 very much, but it is time to move on and I want to do
13 other things.
14    Q  Would you have left if the office stayed in
15 Georgetown? Would you have left anyway?
16    MR. SHAIBANI:  Objection.
17    THE WITNESS:  Yes.
18 BY MR. RANCK:
19    Q  Do you have any information about costs
20 that Bratton Realty incurred to relocate its offices
21 from Georgetown to where it is now?
22    A  I have no idea about that.

---

32

1    Q  Your position now with Conservation
2 International, you are a Project Manager you said.
3       That is a full time position?
4    A  Yes.
5    Q  You started working there in
6 September 2006? Is that what you said?
7    A  Yes.
8    Q  And it was full time then?
9    A  Yes.
10    MR. RANCK:  Stefan, I am going to pause one
11 minute.
12       Bear with me one minute please. I am just
13 about finished.
14    MR. SHAIBANI:  Sure.
15       How much longer do you have, by the way?
16    MR. RANCK:  I think I may be done. I am
17 just going to look at my notes real quickly.
18    (Pause.)
19    Mr. Cruz, I don't have any further
20 questions. I thank you for your time coming in.
21 Mr. Shaibani may have a few. I don't know.
22    MR. SHAIBANI:  I don't have any questions.

---

25

1    Q    Do you know a fellow named John Pagonis?
2    A    No.
3    Q    How about Barrett Anderson?
4    A    Repeat that name again.
5    Q    Barrett Anderson.
6    A    No.
7    Q    Gordon Forester?
8    A    No.
9    Q    In your observations of Mr. Bratton after
10   the move to Georgetown did his schedule change at all?
11        MR. SHAIBANI:  Objection.  Vague.
12        THE WITNESS:  Did his schedule what?
13   BY MR. RANCK:
14   Q    Change.  Did you notice a change in his
15   schedule at all?
16        Maybe you didn't see him enough to know.
17        MR. SHAIBANI:  Objection.  Foundation.
18   Vague.  Calls for speculation.
19   BY MR. RANCK:
20   Q    You can answer.
21   A    As I said, I didn't go that often to that
22   office.  So, whatever change happened, I didn't see

26

1    it.
2    Q    How about Mr. Bratton's personality?  Did
3    you notice any change in his personality after the
4    move to Georgetown?
5        MR. SHAIBANI:  Objection.  Calls for
6    speculation.
7    BY MR. RANCK:
8    Q    You can answer.
9    A    Change in personality?
10   Q    Yes.
11   A    No.  He was always a happy guy.
12        MR. RANCK:  I am pausing for a second,
13   Stefan.
14   BY MR. RANCK:
15   Q    Bear with me one second please so I can
16   just look at some notes.
17   A    That is fine.
18   Q    Are you aware in late 2005, right around
19   the time the office was moving, Mr. Bratton abandoning
20   any clients?
21        MR. SHAIBANI:  Objection.  Calls for
22   speculation.  Foundation.

27

1    BY MR. RANCK:
2    Q    You can answer.
3    A    I haven't heard anything like that.
4    Q    Okay.
5        You didn't hear at that time any clients or
6    anyone talk about any clients complaining about
7    Mr. Bratton's service?
8        MR. SHAIBANI:  Same objection.
9        THE WITNESS:  Again, the thing is since I
10   was not often in the office, I never heard of any
11   possible problems with clients.
12   BY MR. RANCK:
13   Q    And I am not suggesting there were any.  I
14   am just asking whether or not you heard anything about
15   any of that.
16   A    No.  I did not.
17   Q    Did you ever hear Mr. Bratton indicate that
18   he didn't have time to provide real estate services to
19   a client?
20        MR. SHAIBANI:  Objection.
21        THE WITNESS:  No.  I haven't.
22   BY MR. RANCK:

28

1    Q    If Mr. Bratton, again during that
2    October 2005 time frame, had come to you and said,
3    Gerardo, I have a client, I don't have time to help
4    him find a house or help him sell his house, can you
5    take it over for me, would you have done so?
6        MR. SHAIBANI:  Objection.  Calls for
7    speculation.  Foundation.  Relevance.
8        THE WITNESS:  I was a full time worker, as
9    I said.
10   BY MR. RANCK:
11   Q    If you had time, you might have done so?
12        MR. SHAIBANI:  Same objection.
13        THE WITNESS:  I wouldn't mind.
14   BY MR. RANCK:
15   Q    You wouldn't mind?
16   A    I would not mind.
17        MR. RANCK:  He said he would not mind,
18   Stefan.
19        THE WITNESS:  Can I say something or not?
20   BY MR. RANCK:
21   Q    Well, give me a second to come up with
22   another question unless you need to finish your