DEPOSITION OF TAKIA L. MOORE
CONDUCTED ON THURSDAY, DECEMBER 13, 2007

1 (Pages 1 to 4)

---

**Page 1**

```
 1
 2              UNITED STATES DISTRICT COURT
 3              FOR THE DISTRICT OF COLUMBIA
 4   - - - - - - - - - - - - - - - x
 5   JOHN BRATTON              )
 6     Plaintiff,              )Case No.
 7       v.                    )1:06CV00694
 8   CHATEL REAL ESTATE, INC.  )
 9   et al,                    )
10     Defendants.             )
11   - - - - - - - - - - - - - - - x
12
13            Deposition of Takia L. Moore
14                 Washington, D.C.
15            Thursday, December 13, 2007
16                   11:53 a.m.
17
18
19
20   Job No. 117725
21   Pages: 1-90
22   Reported by: Bonnie Russo
```

---

**Page 2**

```
 1   Deposition of TAKIA L. MOORE, held at the
 2   offices of:
 3
 4       Eccleston & Wolf, P.C.
 5       2001 S Street, Northwest
 6       Suite 310
 7       Washington, D.C. 20009
 8       (202) 857-1696
 9
10
11       Pursuant to agreement, before Bonnie
12   Russo, Court Reporter and Notary Public in and
13   for the District of Columbia.
```

---

**Page 3**

```
 1           A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       STEFAN SHAIBANI, ESQUIRE
         (By Phone)
 5       Litigation Associate, PLLC
         1150 Connecticut Avenue, Northwest
 6       9th Floor
         Washington, D.C. 20036
 7       Telephone: (202) 277-8892
 8
 9   ON BEHALF OF THE DEFENDANT CHATEL REAL ESTATE,
     INC.:
10
         MATTHEW A. RANCK, ESQUIRE
11       SETH KLEINER, ESQUIRE
         Eccleston & Wolf, P.C.
12       2001 S Street, Northwest
         Suite 310
13       Washington, D.C. 20009
         Telephone: (202) 857-1696
14
15   ON BEHALF OF THE DEFENDANT MARY WHITE:
16       ROBERT H. BOUSE, JR., ESQUIRE
         (By Phone)
17       Anderson, Coe & King, LLP
         North Charles Street
18       Suite 2000
         Baltimore, Maryland 21201
19       Telephone: (410) 752-1630
20
21
22
```

---

**Page 4**

```
 1                C O N T E N T S
 2   EXAMINATION OF TAKIA L. MOORE         PAGE
 3   By Mr. Ranck                          5, 73
 4                                         86
 5   By Mr. Shaibani                       66, 83
 6
 7
 8   E X H I B I T S
 9   (NONE)
```

EXHIBIT 26

---

Page 5

```
 1         PROCEEDINGS
 2  TAKIA L. MOORE,
 3  having been duly sworn, testified as follows:
 4     EXAMINATION BY COUNSEL FOR DEFENDANT
 5         CHATEL REAL ESTATE, INC.:
 6     BY MR. RANCK:
 7     Q.  Would you state your name and
 8  address for the record.
 9     A.  Takia Lashawn Moore, 1501 Little
10  Creek Road, Chester, Maryland 21619.
11     Q.  Ms. Moore, have you ever been
12  deposed before?
13     A.  No.
14     Q.  I represent Chatel Real Estate and
15  Thierry Liverman in this matter.  This is Mr.
16  Kleiner beside me.  He is from my office.
17        On the phone is Mr. Shaibani who
18  represents the plaintiff and Bob Bouse who
19  represents Mary White and some other Mary White
20  entity.
21        MR. BOUSE:  Mary White,
22  Incorporated.
```

Page 6

```
 1        MR. RANCK:  Thank you.
 2        BY MR. RANCK:
 3     Q.  I will ask you some questions this
 4  morning.  All you need to do is understand the
 5  question and answer completely and truthfully
 6  and honestly and all that kind of stuff.  I
 7  would ask that you let me know if you don't
 8  understand a question because if you answer I
 9  will assume you understood it and were
10  answering the question I asked.  Is that fair?
11     A.  Yes.
12     Q.  You will need to keep your voice up
13  a little because the other two lawyers are on
14  the phone.  Sometimes when witnesses answer
15  they start off with a strong voice but by the
16  end of the sentence or paragraph answer it has
17  trailed off.  They are not shy about speaking
18  up if they didn't hear something but if you
19  could make an effort to keep your voice up.  If
20  you need a break let us know.  I don't think we
21  will be here all that long.
22        The just two other quick things is
```

Page 7

```
 1  we can't talk over one another so I need to
 2  finish my question and you need to finish your
 3  answer before I ask the next question because
 4  the court reporter can't write everything down
 5  at one time.
 6        Finally, she can't type head nods
 7  and uh-huhs and uh-uhs so if you could answer
 8  in a word rather than whatever those other
 9  things are that would be great.
10     A.  Okay.
11     Q.  Can you tell me, Ms. Moore, what, if
12  anything, did you do to prepare for the
13  deposition today?
14     A.  I didn't really do anything to
15  prepare for the deposition.
16     Q.  It's not that you are supposed to.
17  I just need to ask the question.
18        Did you speak to Mr. Bratton about
19  the deposition today other than just the
20  logistics?
21     A.  I did not.
22     Q.  How about Mr. Shaibani or someone
```

Page 8

```
 1  else from his office?
 2     A.  I spoke with him yesterday just in
 3  regard to the deposition and --
 4     Q.  The logistics?
 5     A.  Yes.  The location and asked a
 6  couple of questions about why I was being
 7  called in and that was about it.
 8     Q.  What did he tell you about why you
 9  were being called in?
10     A.  Just that the other side wanted to
11  ask some questions about whatever my knowledge
12  was about the case.
13     Q.  Did you discuss substantively what
14  questions he thought you might ask and what
15  your answers were?
16     A.  No.
17     Q.  Have you reviewed any documents
18  pertaining to this case related to issues in
19  this case?
20     A.  No.
21     Q.  Any depositions?
22     A.  No.
```

13

1  A. No.
2  Q. You have known Mr. Bratton 31 years?
3  A. Uh-huh.
4  Q. How did you get to know him?
5  A. He is my uncle.
6  Q. Okay. Are you close?
7  A. Yes.
8  Q. Have you lived near him the entire
9  time other than I know he was overseas?
10 A. What is near? What do you consider
11 to be near?
12 Q. Have you lived across the country
13 away?
14 A. No.
15 Q. You have lived fairly in the same
16 geographic region?
17 A. Yes.
18 Q. And you have seen him regularly
19 throughout the 31 years?
20 A. Yes.
21 Q. Now, you also have some sort of
22 employer-employee type relationship with him?

14

1  You work for Bratton Realty?
2  A. Yes.
3  Q. You are an independent contractor.
4  I don't mean to get caught up in the legal
5  jargon.
6  A. Right.
7  Q. You are a licensed real estate
8  agent?
9  A. Yes.
10 Q. How long did you work where you were
11 associated with Bratton Realty in that
12 capacity?
13 A. Three and a half years.
14 Q. When did you receive your license?
15 A. It was 2004.
16 Q. Now, at that time Mr. Bratton
17 operated out of the 10th Street address, right?
18 A. Yes.
19 Q. And upon getting your license did
20 you go to work for him?
21 A. Yes.
22 Q. Were you full-time at that time as

15

1  an agent?
2  A. No. Initially I was part-time.
3  Q. Did you have some other job as well?
4  A. Yes.
5  Q. Did you ever have any position
6  associated with Bratton Realty other than as an
7  agent? That is were you ever the office
8  manager or some staff worker or anything?
9  A. No.
10 Q. So the only position you ever held
11 with Bratton Realty was a real estate agent?
12 A. Yes.
13 Q. You are still associated with
14 Bratton Realty?
15 A. Yes.
16 Q. But you are now inactive, as I
17 understand it; is that right?
18 A. That I am.
19 Q. Or going inactive?
20 A. Yes.
21 Q. What does that mean?
22 A. It means that I will be changing my

16

1  status as real estate agent. I am not -- I am
2  not selling real estate right now so as of
3  December I mean I am seeking full-time
4  employment right now.
5  Q. So you are still licensed? You are
6  just not going to be practicing as a real
7  estate professional?
8  A. Right.
9  Q. I didn't know if inactive is some
10 term of art within the real estate industry. I
11 know you can be on inactive status as an
12 accountant or a lawyer and it has a certain
13 connotation with regard to your license. Your
14 license status doesn't change at all. You are
15 just choosing to not buy or sell property for
16 clients; is that right?
17 A. Well, my D.C. license I have let go
18 inactive. My Maryland license at the time when
19 it's ready to expire I will decide that then if
20 I am going to renew my license or not. My fees
21 and everything are already paid so until that
22 point then --

**Page 17**

Q. That is just -- going inactive from your license standpoint is a matter of whether you pay the dues?

A. Right. Whether I renew it.

Q. You started off as part-time with Bratton Realty. Did there come a period of time when you went full-time?

A. Yes.

Q. When was that?

A. I started in September of 2004 and then in November of 2004 I went full-time.

MR. SHAIBANI: I lost the date.

MR. RANCK: November '04 went full-time.

BY MR. RANCK:

Q. You remained full-time up until when?

A. Well, again what do you consider to be full-time?

Q. Are you still -- are you actively trying to provide real estate services for clients right now?

**Page 18**

A. Yes.

Q. Okay. But you are seeking full-time employment and you are going to stop doing real estate services, right?

A. Yes.

Q. What type of education or training do you have? What type of positions are you looking for?

A. Sales, customer service, clerical, admin.

Q. And you are seeking full-time positions in one of those fields?

A. Yes.

Q. Why is it that you are transitioning away from real estate into one of those fields?

A. Because business has really slowed down and my income is not the same as what it was before.

Q. That is due to the downturn in the real estate market?

A. Yes.

Q. You were with Bratton Realty

**Page 19**

associated with Bratton Realty then in October 2005 when the move was made from 10th Street to Wisconsin Avenue, correct?

A. Yes.

Q. Now, how long -- prior to the Wisconsin Avenue property being obtained how long prior to that was Mr. Bratton looking for other space?

A. I'm not quite for sure. I think it was like I don't know maybe a couple of months. I'm not for sure.

Q. Do you know where else in the city he was looking other than Georgetown?

A. No.

Q. As a full-time agent at that time, again, the October, November time period, were you in the Bratton Realty office regularly?

A. No. I mostly worked from home.

Q. How many days would you say a week would you say you were actually in the office?

A. It wasn't really that I came in the office any number of days a week. It was maybe

**Page 20**

once or twice, three times a month.

Q. That was just to pick something up or drop something off?

A. Yes.

Q. Did you have any participation in looking for new space for Bratton Realty?

A. No.

Q. As far as you know did anyone else associated with Bratton Realty except Mr. Bratton?

A. I am not for sure. I am not for sure. I think that he had someone with him. I think Jeanette went to the Georgetown location or Daniel. I think Jeanette or Daniel went to the Georgetown location.

Q. When is the first time that you learned that he had found property he was interested in on Wisconsin Avenue?

A. The week -- the couple of days I was in the office filling in for Jeanette when he was preparing the lease back and forth with Chatel.

Page 53

1  real estate for clients?
2  A.  Yes.
3  Q.  And you were doing the same thing at
4  that time, right?
5  A.  Yes.
6  Q.  Were you in terms of your
7  availability and time were you maxed out where
8  you couldn't have helped another client or
9  could you have helped another client buy or
10  sell property if asked to do so during that
11  period of time?
12      MR. SHAIBANI: Plaintiffs object.
13      THE WITNESS: The time that I was
14  filling in in the office?
15      BY MR. RANCK:
16  Q.  Well, October 2005?
17  A.  Can you repeat the question?
18  Q.  I will ask it another way.
19      If Mr. Bratton had said, "hey,
20  Takia, I have got this client but I am wrapped
21  up with this trying to get this new space, can
22  you help him," you would have said sure, right?

Page 54

1  A.  I guess so.
2  Q.  A client looking to buy or sell
3  property you would have done what you do for
4  any other client, correct?
5  A.  Yes.
6      MR. RANCK: Just so you know, Seth
7  stepped out to get Ms. Moore a bottle of water
8  while I am looking at my notes for a moment.
9      BY MR. RANCK:
10  Q.  Do you recall any change in the
11  process in what was going on -- strike that.
12      Did you ever have any dealings with
13  regard to the lease with anyone other than the
14  person at Chatel and Mr. Bratton?
15  A.  No.
16  Q.  So if somebody else became involved
17  in that process at some point after Jeanette
18  was back you had no contact with them, correct?
19  A.  No.
20  Q.  How tight knit or close were the
21  agents at Chatel prior to the move to
22  Georgetown? Did they see each other?

Page 55

1  A.  Bratton?
2  Q.  What did I say?
3  A.  Bratton.
4  Q.  Chatel, yes. Thank you.
5  A.  Yeah, we were close.
6  Q.  In addition to Jeanette and
7  yourself, Mr. Chavez -- I'm sorry Mr. Cruz,
8  Geraldo Cruz, is still associated with Bratton?
9  A.  Yes.
10  Q.  He is inactive or going inactive as
11  well?
12  A.  Yes.
13  Q.  Do you know why he is going
14  inactive? Is it the same downturn in the
15  market?
16  A.  I don't know. I haven't --
17  Q.  Has he told you?
18  A.  No.
19  Q.  You haven't talked to him at all
20  about why he is changing his status?
21  A.  No.
22  Q.  Do you know when Joe Rinker left

Page 56

1  Bratton Realty?
2  A.  No.
3  Q.  Do you know where Joe Rinker is now,
4  what he is doing?
5  A.  No, I don't.
6  Q.  Did Mr. Rinker ever talk to you
7  about his leaving and why he was leaving?
8  A.  No.
9  Q.  How about L.D. Chavez? Same
10  questions. Do you know why Mr. Chavez left?
11  A.  No.
12  Q.  He never mentioned any reason that
13  he was leaving?
14  A.  No.
15  Q.  Do you know where he is now or what
16  he is doing?
17  A.  No.
18  Q.  How about Daniel Lee? He left to go
19  to New York to start a modeling career, right?
20  A.  Yes.
21  Q.  Did he tell you that?
22  A.  Yes.