DEPOSITION OF JAMES GRANT
CONDUCTED ON FRIDAY, DECEMBER 14, 2007

1 (Pages 1 to 4)

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

JOHN BRATTON, et al.,     :
                          :
    Plaintiffs,           :
                          :
    -vs-                  : Case No. 1:06CV00694
                          :
CHATEL REAL ESTATE, INC., :
et al.,                   :
                          :
    Defendants.           :

---

DEPOSITION OF JAMES GRANT
Washington, D.C.
Friday, December 14, 2007
2:40 p.m.

Job No.: 1 - 117767
Pages: 1 - 59
Reported by: Paula M. Flint

---

Page 2

Deposition of JAMES GRANT, held at the law offices of:

ECCLESTON & WOLF, P.C.
2001 S Street, Northwest
Suite 310
Washington, D.C. 20009-1125
(202) 857-1696

Pursuant to agreement, before Paula M. Flint, Notary Public of the District of Columbia.

---

Page 3

APPEARANCES

On behalf of the Plaintiff:
  BY: STEFAN SHAIBANI, ESQUIRE   (Via Phone)
      LITIGATION ASSOCIATE, PLLC
      1150 Connecticut Avenue, Northwest
      9th Floor
      Washington, D.C. 20036
      (202) 277-8892

On behalf of Defendant Mary White:
  BY: ROBERT H. BOUSE, JR., ESQUIRE   (Via Phone)
      ANDERSON, COE & KING, LLP
      201 North Charles Street
      Suite 2000
      Baltimore, Maryland 21201
      (410) 752-1630

---

Page 4

APPEARANCES CONTINUED

On behalf of Defendants Chatel Real Estate, Inc. and Thierry Liverman:
  BY: MATTHEW A. RANCK, ESQUIRE
      SETH P. KLEINER, ESQUIRE
      ECCLESTON & WOLF, P.C.
      2001 S Street, Northwest
      Suite 310
      Washington, D.C. 20009
      (202) 857-1696

*  *  *

EXHIBIT 27

---

DEPOSITION OF JAMES GRANT
CONDUCTED ON FRIDAY, DECEMBER 14, 2007

2 (Pages 5 to 8)

Page 5

```
 1            CONTENTS
 2   EXAMINATION OF JAMES GRANT         PAGE:
 3     Mr. Ranck                        6, 56
 4     Mr. Shaibani                     34
 5     Mr. Bouse                        52
 6            EXHIBITS
 7            (None)
 8
 9              *  *  *
```

Page 6

 1  Thereupon,
 2              JAMES GRANT,
 3  was called for examination by Counsel and, after
 4  having been duly sworn by the Notary, was examined
 5         and testified as follows:
 6     EXAMINATION BY COUNSEL FOR DEFENDANTS
 7     CHATEL REAL ESTATE, INC. and THIERRY LIVERMAN
 8  BY MR. RANCK:
 9     Q.  Can you please state your name and address
10  for the record, please?
11     A.  **James Grant. 19-C Ridge Road, Greenbelt,**
12  **Maryland 20770.**
13     Q.  And what's your business address, please?
14     A.  **801 D Street, Northeast. That's**
15  **Washington, D.C. 20002.**
16     Q.  Can you -- I'm going to go through a
17  couple of deposition rules or guide lines or
18  something for you, but one thing you're going to
19  need to do, if you can make an effort, please, is to
20  keep your voice up for the attorneys on the phone.
21  They might have trouble hearing you. Sometimes
22  witnesses tend to be fine at the beginning of their

Page 7

 1  answer and by the time they get to the end their
 2  voice has trailed off a little bit.
 3     A.  **All right.**
 4         MR. RANCK: I said their voices trailed
 5  off a little bit, but I let it trail off for
 6  dramatic effect, Counsel.
 7         MR. BOUSE: It was amazing. I am
 8  overwhelmed by it.
 9         MR. RANCK: When you guys speak, if you
10  can identify yourself for at least the party if when
11  you make objections, like you were doing yesterday.
12  BY MR. RANCK:
13     Q.  Mr. Grant, have you been deposed before,
14  ever?
15     A.  **Yes.**
16     Q.  When was that?
17     A.  **It was a long time ago.**
18     Q.  I'm going to just briefly tell you what's
19  going to happen here. I'm going to ask you
20  questions. When I'm done, either or both of the
21  attorneys on the phone may ask you a couple
22  questions. All you have to do is listen to the

Page 8

 1  question and answer the question truthfully and
 2  honestly and completely. Okay?
 3     A.  **Sure.**
 4     Q.  Make sure that you understand the question
 5  because we're all going to assume that you
 6  understood the question if you answer it. So if you
 7  don't understand it, give us some indication, tell
 8  us you don't understand, we'll rephrase it or what
 9  have you. Okay?
10     A.  **Okay.**
11     Q.  You need to answer, as you have been,
12  verbally rather than head nods or shakes or uh-uhs
13  and uh-huhs because the court reporter has trouble
14  taking that down. And we have to let each other
15  finish speaking, because she can't type down if
16  we're both talking at the same time. Is that all
17  right?
18     A.  **Okay.**
19     Q.  Counsel on the phone, or when they're
20  asking questions, I may interject objections from
21  time to time. That's just for the record. So you
22  can let counsel finish the objection but then go

Page 13

1  Q. Do you plan to become a broker?
2  A. No.
3  Q. How long have you been an agent?
4  A. Two and a half years.
5  Q. So that's, what, spring, early summer '04?
6  A. Early summer '05.
7  Q. '05, right. And from early summer '05
8  until the present, has being a real estate agent
9  been your sole occupation?
10 A. Yes.
11 Q. When did you go to work for Bratton
12 Realty?
13 A. July 5, 2005.
14 Q. Had you worked anywhere before Bratton
15 Realty as a real estate agent?
16 A. No.
17 Q. So this was your initiation into the real
18 estate field, correct?
19 A. Correct.
20 Q. And at that time Bratton was located on
21 10th Street?
22 A. Correct.

Page 14

1  Q. Now, when you interviewed with
2  Mr. Bratton, did he talk about a business plan or
3  anything of that nature?
4     MR. SHAIBANI: Objection, foundation.
5     MR. RANCK: Could you, again like
6  yesterday, Stefan, say plaintiffs' object perhaps?
7     MR. SHAIBANI: Yes. I'm sorry about that.
8     MR. RANCK: That's okay.
9  BY MR. RANCK:
10 Q. You can answer.
11 A. When we -- when I interviewed we did speak
12 of, you know, I guess potential of where you see
13 your business going, in terms of growth, yes.
14 Q. How many firms did you interview with?
15 A. Three.
16 Q. And you've never worked anywhere except
17 Bratton and where you are now. Is that right?
18 A. In real estate, correct.
19 Q. That's what I meant.
20    You interviewed with Mr. Bratton's firm
21 and two other firms?
22 A. Correct.

Page 15

1  Q. And who were the others?
2  A. Weichert and Long & Foster.
3  Q. Where is Weichert located?
4  A. That is Rockville. It's across the street
5  from White Flint.
6  Q. That's the office you would have been
7  working out of had you taken that job?
8  A. That's correct.
9  Q. How about Long & Foster?
10 A. The Long & Foster, that was actually a
11 little bit more casual. I didn't actually go. I
12 spoke to one of their representatives through a
13 friend and ended up not pursuing that. So it didn't
14 even get to the point where I'd actually picked the
15 office with them.
16 Q. You've known Mr. Bratton then for two and
17 a half years or so. Has your relationship been
18 exclusively professional or business or are you
19 friends, do you socialize, things of that nature?
20 A. It's mainly professional. You know, I
21 mean you socialize with people that you're
22 professional with also, so -- to a degree.

Page 16

1  Q. Do you consider yourself friends?
2  A. Yes.
3  Q. Do you still see Mr. Bratton socially as
4  opposed to involved in real estate transactions?
5  A. No. Even when I worked there I could
6  probably count the times I would actually see him.
7  Q. When you began working for Bratton Realty
8  in July of '05, was that a full-time position?
9  A. Yes.
10 Q. And the entire time that you were there
11 was full time, right?
12 A. Correct.
13 Q. When did you leave?
14 A. October 4, '07.
15 Q. Now, in --
16 A. Actually -- I'm sorry. October 4 is the
17 day that I signed on with Keller Williams. So
18 probably like within that week. Maybe up to a week
19 prior.
20 Q. Can we say just for the purposes of today
21 the first of October '07?
22 A. That's fine, yeah.

**Page 21**

1  A.  No.
2  Q.  As far as you know, did Mr. Bratton
3  abandon any of his clients or customers during
4  October 2005?
5      MR. SHAIBANI: Plaintiffs' object.
6  BY MR. RANCK:
7  Q.  You can answer.
8  A.  I wouldn't know.
9  Q.  You wouldn't know?
10 A.  No.
11 Q.  Are you aware of any complaints that any
12 clients or customers made regarding Mr. Bratton or
13 Bratton Realty Service during October 2005?
14 A.  Again, I wouldn't know that.
15 Q.  But I'm just asking. You're not aware of
16 any?
17 A.  No, I'm not aware of any.
18 Q.  And are you aware of any clients who left
19 Bratton Realty or Mr. Bratton or customers as a
20 result of the service they were getting or not
21 getting during October 2005?
22 A.  Not that I'm aware of.

**Page 22**

1  Q.  Were you available during October 2005 to
2  take on new clients, customers?
3  A.  Always. I'm always available.
4  Q.  There's a good real estate man. Always
5  available.
6      If Mr. Bratton had come to you and said,
7  hey, I've got this client, I just don't have time
8  because I'm trying to negotiate this lease, can you
9  take care of him and find him a property or help him
10 sell his property, you would have been more than
11 willing to jump in and help?
12 A.  Yes.
13     MR. SHAIBANI: Object.
14     MR. RANCK: Counsel, I'm going to pause
15 for one minute to look at my notes here quickly,
16 please. Well, actually I'm not going to pause yet.
17 I saw something I can ask before I pause.
18 BY MR. RANCK:
19 Q.  Did you assist in the move from
20 10th Street to Wisconsin Avenue?
21 A.  Yes. I guess some, yeah.
22 Q.  Certainly any stuff in the 10th Street

**Page 23**

1  office that was yours, you assisted in moving it, I
2  take it?
3  A.  Yes. And helped set up at the 10th Street
4  office.
5  Q.  At the Georgetown office, you mean?
6  A.  I'm sorry. Yes, correct, at the
7  Georgetown office. We did set up there.
8  Q.  Was your ability to assist clients or
9  customers impeded by what you had to do to help set
10 up?
11 A.  No.
12     MR. RANCK: Now I'm going to pause for a
13 minute, Counsel.
14 BY MR. RANCK:
15 Q.  Mr. Grant, you testified that you left
16 sometime in the very beginning of October 2007,
17 right?
18 A.  Yes.
19 Q.  And you're now located on D Street?
20 A.  Yes.
21 Q.  What area of D.C. is that?
22 A.  It's Capitol Hill.

**Page 24**

1  Q.  Why did you leave Bratton Realty?
2  A.  I guess, you know, a number of reasons.
3  But mainly is no personal growth. I wanted to go a
4  new direction.
5  Q.  And I'm sorry to pry into -- you used the
6  word "personal" -- into what you mean by personal
7  growth. What do you mean by that?
8  A.  I guess I've been -- I was in real estate
9  now slightly over two years. Done very well. And I
10 just was kind of looking at my future and down the
11 road and, you know, weighing all of my options and
12 seeing where I want to take my business.
13     And I decided that this company in
14 particular, Keller Williams, and a couple of the
15 people there, I was interested really in working
16 with. They do a lot of business. And they
17 structure their teams differently and I really
18 wanted to grow to the next level of having my own
19 team. So that was a big weighing factor in my move.
20 Q.  When you say have your own team, what do
21 you mean?
22 A.  I guess in the industry most people see

Page 25

1  each agent as you're an agent that works for either
2  Bratton Realty or a Weichert Realty, and every now
3  and then you see something like a -- you know, a
4  Joel Nelson group. You know, they're prominent in
5  different areas. There's different names that stand
6  out and you see their signs all over. You're like,
7  wow, how can this person be so busy. And then get
8  down to it and you peel the onion back, you see that
9  they have five people working with them, but it all
10 goes under one name. And basically all the deals
11 run through this one person so that person's
12 actually running a small business within that
13 office. And they develope these teams and in doing
14 that your volume goes up a lot more.
15     Q.  So you're running a small business within
16 Keller Williams almost?
17     A.  Correct, correct.
18     Q.  Is that what -- and Keller Williams is a
19 huge company, right?
20     A.  Yes.
21     Q.  Different kinds of clients, customers, or
22 no?

Page 26

1      A.  No. I would say my clientele is very
2  similar to the same clientele that I worked with at
3  Bratton Realty.
4      Q.  Have you formed -- been able to form your
5  own team?
6      A.  I am working on it, and yes, I have.
7      Q.  What is the Grant Real Estate Group?
8      A.  That's --
9      Q.  Is that the team you're trying to form
10 within Keller Williams?
11     A.  It is.
12     Q.  Is it fair to say, based on your testimony
13 there and the reasons for you leaving, that you
14 would have left Bratton Realty even if it had not
15 moved its office?
16         MR. SHAIBANI:  Plaintiffs' object.
17 Mischaracterizing the record, foundation.
18         MR. RANCK:  I didn't characterize the
19 record at all, Counsel.
20 BY MR. RANCK:
21     Q.  You can answer.
22     A.  I think a lot of things came into weigh.

Page 27

1  Definitely location came into weigh, and my
2  clientele and the clientele that I work with. You
3  know, having a Georgetown office was -- you know,
4  was a benefit.
5         A lot of the people I work with don't live
6  in Georgetown, but to be able to say, yes, we're a
7  small boutique in Georgetown has a lot more lure
8  than saying, yes, we're off of 10th Street behind
9  the Mini Mart. So yes, that does have a lot to
10 weigh in on it. It wasn't the only factor though.
11     Q.  But my question was --
12     A.  Was would I have left anyway.
13     Q.  Would you have left anyway.
14     A.  Well, it's hard to say because I left
15 after he was -- already announced that he was
16 moving.
17        So yes, I was thinking about changing, but
18 would I have left or not, you know, it's -- you
19 know, at some time maybe I would have. Would it
20 have been right at that minute, maybe, maybe not.
21 It's kind of hard to tell because there were a lot
22 of different factors that go into it, not just the

Page 28

1  location.
2      Q.  So the business opportunity, the ability
3  to develop your own team, none of that has to do
4  with location, right?
5      A.  Correct. That does not have to do with
6  location.
7      Q.  So those things didn't become only
8  important to you because you were leaving
9  Georgetown, right?
10     A.  No. And that would have been way too fast
11 to make that change.
12     Q.  And in fact, this was an important step
13 for you, leaving to go to Keller Williams, right?
14     A.  Yes.
15     Q.  It's not something that you did at the
16 drop of a hat or on a moment's notice, right?
17     A.  Not at all.
18     Q.  You gave it a lot of thought, right?
19     A.  Yes.
20     Q.  When did you first contact Keller Williams
21 or be in contact with them?
22     A.  Well, I guess it was probably a year --

Page 29

1 basically a year prior I had a transaction with one
2 of the gentleman over at Keller Williams that's
3 actually one of the principals in that office. And
4 since then he's just been always calling me.
5    Q.   This has been sort of incubating in your
6 mind, you've been thinking for -- you thought about
7 for a year before you left?
8         MR. SHAIBANI: Object.
9 BY MR. RANCK:
10   Q.   Is that fair?
11   A.   I would say no. It didn't really -- at
12 that point in time it was just like, you know, it's
13 great to have a friend, it's great to know somebody
14 who actually wants me to come over there. But no, I
15 really was not actually looking to move at that
16 time.
17   Q.   When did you finally get serious about it?
18 And who were you talking with at Keller Williams?
19   A.   At Keller Williams is -- there was two of
20 them. Joel Nelson is the person that I had the
21 transaction with, and the person that actually
22 contacted me is Marcus Jaffe. He's actually what

Page 30

1 they call a team leader. So he's the office manager
2 over there. So I've been --
3    Q.   When did he contact you, Jaffe?
4    A.   That was probably after the new year. So
5 sometime in January or thereabouts. December,
6 January. Somewhere after that transaction.
7    Q.   Is December, January, early 2007 then, a
8 fair time period for when this plan really started
9 formulating?
10   A.   I would say it's a time when I started to
11 think about it.
12        THE REPORTER: Was there an objection?
13        MR. BOUSE: This is Bob Bouse. Not from
14 me.
15        MR. SHAIBANI: I had objected to the last
16 question.
17        MR. RANCK: Counsel, bear with me for a
18 minute, please. And Mr. Grant.
19 BY MR. RANCK:
20   Q.   Do you have an office in Georgetown now?
21   A.   No.
22   Q.   Did you have any discussions with any of

Page 31

1 the other agents at Bratton Realty about your
2 leaving, the reasons for it?
3    A.   No, not --
4    Q.   Did you have any discussions with any
5 other agents of Bratton Realty about their plans to
6 stay or leave?
7    A.   No. I pretty much tried to keep my
8 business my own, and if there are going to be any
9 answers coming out I want them actually to come out
10 of my mouth and not somebody else saying them.
11   Q.   Do you know a fellow named Paul Stanton?
12   A.   It sounds familiar, but I cannot -- no, it
13 doesn't mean anything to me.
14   Q.   How about a couple, the Edwards?
15   A.   No.
16   Q.   How about Yepes, Y-E-P-E-S?
17   A.   No.
18   Q.   Scott Zimmerman?
19   A.   Scott Zimmerman, yes.
20   Q.   What do you know of Scott Zimmerman?
21   A.   His wife works in my office at Keller
22 Williams.

Page 32

1    Q.   Do you know a Mr. -- where they live?
2    A.   Where they live?
3    Q.   Yeah.
4    A.   No, I don't. I don't. I don't believe
5 his wife has the same last name either.
6    Q.   Do you know what her last name is?
7    A.   Off the top of my head, no. I'm not that
8 close with them.
9    Q.   Do you ever see her?
10   A.   It's been a while. It's probably -- not
11 since I've been there.
12   Q.   Have you ever met Mr. Zimmerman?
13   A.   On an occasion or two for like a
14 holiday -- probably once on site, on a property site
15 and once at a holiday party.
16   Q.   When you were working at Bratton Realty,
17 from the time -- at the 10th Street address you said
18 you didn't see Mr. Bratton all that frequently,
19 because when you came in he was typically in and out
20 already, right?
21   A.   Correct.
22   Q.   When you moved to Georgetown, when the

Case 1:06-cv-00694-JDB   Document 80-29   Filed 03/03/2008   Page 7 of 8

DEPOSITION OF JAMES GRANT
CONDUCTED ON FRIDAY, DECEMBER 14, 2007

9 (Pages 33 to 36)

---

**Page 33**

1  office moved to Georgetown, did you see him
2  regularly then?
3     A.  No, I wouldn't say anything was regular,
4  no.
5     Q.  Did you notice any change in Mr. Bratton's
6  demeanor or behavior or anything, the way he
7  conducted himself --
8        MR. SHAIBANI: Plaintiffs' object, vague.
9        MR. RANCK: I haven't finished my
10 question.
11 BY MR. RANCK:
12    Q.  -- if you compare Mr. Bratton as he was at
13 10th Street to as he was in Georgetown? You can
14 answer.
15    A.  No. I can't say that I saw a difference.
16       MR. RANCK: Counsel, I'd just like to take
17 a quick couple-a-minute break and step out in the
18 hall and talk to the brains of the outfit,
19 Mr. Kleiner here. And I think I'm either done or
20 pretty close to done. So if you'd give us just a
21 minute or two.
22       (A recess was taken.)

---

**Page 34**

1        MR. RANCK: Counsel, I've got no further
2  questions at this time.
3        MR. SHAIBANI: I have follow-up questions.
4        MR. BOUSE: Go ahead, Stefan.
5     EXAMINATION BY COUNSEL FOR PLAINTIFFS
6  BY MR. SHAIBANI:
7     Q.  Mr. Grant, as you know, I'm plaintiffs'
8  counsel in this case and I have some follow-up
9  questions for you.
10    A.  Okay.
11    Q.  You were asked why you left Bratton
12 Realty, and you gave a number of reasons. And what
13 I wanted to know is if the move from Wisconsin
14 Avenue in Georgetown to Shaw was a significant
15 factor in your decision to leave the company at the
16 time that you did.
17       MR. BOUSE: I object. This is Bob Bouse.
18       MR. RANCK: Objection as well.
19    A.  You know, I'm not sure if -- actually, one
20 of the things, one of the large factors was a move
21 in general, not just a move to Shaw, to tell you the
22 truth. It's not so much the Shaw as another move.

---

**Page 35**

1     Q.  In other words, the fact that the company
2  was moving two years after it had first moved into
3  that office was not an appealing aspect to you. Is
4  that correct?
5     A.  That's correct.
6     Q.  And while the company was in Georgetown --
7  strike that. I'll ask another question.
8        Did it seem to you that Bratton Realty did
9  not have sufficient stability for you to want to
10 stay there because it was moving out of its office
11 two years after it had first moved to Wisconsin
12 Avenue?
13       MR. BOUSE: I object. Bob Bouse.
14       MR. RANCK: Objection, leading.
15    A.  Yes, it was unstable and that's one of the
16 reasons I actually went with a larger company, with
17 something that's more stable.
18    Q.  Now, at the time you were working at the
19 Wisconsin Avenue office, did you notice that the
20 business environment was suitable for conducting
21 real estate tractions?
22    A.  Yes, it was suitable.

---

**Page 36**

1     Q.  How would you compare the Wisconsin Avenue
2  office to the Shaw office, in terms of its appeal to
3  real estate clientele, its esthetics and how it
4  would affect your business as a real estate agent?
5        MR. RANCK: Objection, speculation.
6        MR. BOUSE: I object. Bob Bouse.
7     A.  I couldn't answer. I've never been in
8  that office.
9     Q.  Did you drive by the office in Shaw?
10    A.  Yes.
11    Q.  And what was your perception of it when
12 you first saw it?
13       MR. BOUSE: I object.
14    A.  Not so happy.
15    Q.  Did you think to yourself that this is not
16 the type of location or office that you would want
17 to bring your own clients in?
18       MR. BOUSE: I object.
19       MR. RANCK: Same objection.
20    A.  I actually did not -- I met one -- in two
21 years I've only met one person in my office in
22 Georgetown. It was more for my business card than

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

*Rental Comp for Basement*

**Residential**

Metropolitan Regional Information Systems, Inc
CMA Statistics

20-Aug-2007 9:03:01PM
Page 1 of 1

## RENTED  9 LISTINGS

| | Price when initially entered | | | | | | Price at time of sale | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rented Price - Subsidy = Net Price / Orig. Price = % Of | | | | | Sold Price - Subsidy = Net Price / List Price = % Of | | | | | DOMM DOMP |
| Average | $1,702 | $0 | $1,702 | $1,833 | 92.80 | $1,702 | $0 | $1,702 | $1,721 | 98.90 | 53  53 |
| Median | $1,700 | $0 | $1,700 | $1,950 | 87.18 | $1,700 | $0 | $1,700 | $1,700 | 100.00 | 35  35 |

### Report Totals   Properties: 9

| | List Price: | / Orig. List Price: | = % of: | Sold Price: | - Subsidy: | = Net Price: | DOMM: | DOMP: |
|---|---|---|---|---|---|---|---|---|
| Average | $1,721 | $1,833 | 93.91 | $1,702 | | | 53 | 53 |
| Median | $1,700 | $1,950 | 87.18 | $1,700 | | | 35 | 35 |
| Low | $1,100 | $1,100 | 100.00 | $1,100 | | | 5 | 5 |
| High | $1,950 | $2,100 | 92.86 | $1,950 | | | 163 | 163 |

Courtesy of: John Bratton
Home: (202) 338-8732    Office: (202) 338-8732
Cell: (202) 744-2642    Email: mrdchomes@aol.com
Company: Bratton Realty
Office: (202) 338-6732   Fax: (202) 338-6733

Copyright (c) 2007 Metropolitan Regional Information Systems, Inc.
Information is believed to be accurate, but should not be relied upon without verification.
Accuracy of square footage, lot size and other information is not guaranteed.

COMPETITIVE MARKET ANALYSIS DISCLOSURE: This analysis is not an appraisal.
It is intended only for the purpose of assisting buyers or sellers or prospective buyers or sellers in deciding the listing, offering or sale price of the real property.

BRA 0672