---

**Page 1**

```
 1
 2        UNITED STATES DISTRICT COURT
 3        FOR THE DISTRICT OF COLUMBIA
 4   - - - - - - - - - - - - - - - x
 5   JOHN BRATTON            )
 6     Plaintiff,            )Case No.
 7     v.                    )1:06CV00694
 8   CHATEL REAL ESTATE, INC. )
 9   et al,                  )
10     Defendants.           )
11   - - - - - - - - - - - - - - - x
12
13        Deposition of Paul Stanton
14              Washington, D.C.
15        Thursday, December 13, 2007
16               4:00 p.m.
17
18
19
20   Job No. 117725
21   Pages: 1-50
22   Reported by: Bonnie Russo
```

---

**Page 2**

```
 1   Deposition of PAUL STANTON, held at the offices
 2   of:
 3
 4        Eccleston & Wolf, P.C.
 5        2001 S Street, Northwest
 6        Suite 310
 7        Washington, D.C. 20009
 8        (202) 857-1696
 9
10
11        Pursuant to agreement, before Bonnie
12   Russo, Court Reporter and Notary Public in and
13   for the District of Columbia.
```

---

**Page 3**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
  STEFAN SHAIBANI, ESQUIRE
  (By Phone)
  Litigation Associate, PLLC
  1150 Connecticut Avenue, Northwest
  9th Floor
  Washington, D.C. 20036
  Telephone: (202) 277-8892

ON BEHALF OF THE DEFENDANT CHATEL REAL ESTATE, INC.:

  MATTHEW A. RANCK, ESQUIRE
  SETH KLEINER, ESQUIRE
  Eccleston & Wolf, P.C.
  2001 S Street, Northwest
  Suite 310
  Washington, D.C. 20009
  Telephone: (202) 857-1696

---

**Page 4**

CONTENTS

| EXAMINATION OF PAUL STANTON | PAGE |
|---|---|
| By Mr. Ranck | 5, 46 |
| By Mr. Shaibani | 42 |

EXHIBITS

(NONE)

EXHIBIT 29

Page 5

```
 1         PROCEEDINGS
 2  PAUL STANTON,
 3  having been duly sworn, testified as follows:
 4      EXAMINATION BY COUNSEL FOR DEFENDANT
 5      CHATEL REAL ESTATE, INC.:
 6      BY MR. RANCK:
 7   Q.  Would you state your name and
 8  address for the record, please.
 9   A.  Paul Stanton, 5015 Baltimore Avenue,
10  Bethesda, Maryland 20816.
11   Q.  In engaging in some small talk
12  before the deposition you indicated that you
13  had been deposed once before years ago. I'm
14  not going to ask you about that. I am only
15  mentioning that so I can just reiterate one or
16  two rules for the deposition.
17      I am going to ask questions. When I
18  am done Mr. Shaibani may or may not ask
19  questions. All you have to do is answer them
20  completely and honestly. If you have answered
21  what I ask unless you tell me differently I
22  will assume you understood me. Is that fair?
```

Page 6

```
 1   A.  Yes.
 2   Q.  Mr. Shaibani may object from time to
 3  time and when he is asking questions I may
 4  object. That means nothing to you other than
 5  to pause and let the objection be stated. Even
 6  after one of us objects just answer unless
 7  somebody specifically instructs you not to
 8  answer for some reason which I don't think will
 9  happen.
10      You have to let me finish. I will
11  let you finish because the court reporter can't
12  take us down at the same time if we are both
13  talking, and you can't give head nods and head
14  shakes and uh-huhs and uh-uhs because that's
15  hard to distinguish again for the court
16  reporter so if you could respond verbally that
17  will be better.
18      Lastly, if you need a break at any
19  time just give a holler and we will accommodate
20  you.
21      Fair enough.
22   A.  Yes.
```

Page 7

```
 1   Q.  Let me ask first what, if anything,
 2  did you do to prepare for today's deposition,
 3  anything?
 4   A.  I did nothing.
 5   Q.  Do you know anything about the case
 6  that brings you here today?
 7   A.  Yes.
 8   Q.  I represent Chatel Real Estate and
 9  Thierry Liverman as does Mr. Kleiner next to
10  me. Stefan Shaibani represents Mr. Bratton.
11      Let me ask you first what is it that
12  you know about this case?
13   A.  I know that this is a discrimination
14  case and John feels like he was discriminated
15  against.
16   Q.  How do you know that?
17   A.  Well, I asked you when you first
18  called me and I think that you cleared it up
19  kind of the outline of the case originally for
20  me.
21   Q.  You and I have never spoken before
22  today I don't think. Might have been Mr.
```

Page 8

```
 1  Kleiner from my office.
 2   A.  Okay.
 3   Q.  You don't recall speaking to me
 4  previous?
 5   A.  I don't. One of you guys called,
 6  yes.
 7   Q.  Prior to my office contacting you
 8  with regard to the deposition and giving you
 9  that information did you know there was a
10  lawsuit in which Mr. Bratton was involved?
11   A.  No.
12   Q.  Since that time have you spoken --
13  you mentioned earlier you spoke with Stefan
14  Shaibani. Prior to going on the record you
15  indicated you spoke with him?
16   A.  Yes.
17   Q.  Have you spoke with him about this
18  case?
19   A.  Yes.
20   Q.  Have you spoke with him about this
21  deposition?
22   A.  Yes.
```

**29**

1  asking questions I didn't ask and hearing
2  things that haven't been said. I am trying to
3  find out how specific the witness's memory is.
4  He keeps using the phrase during this time
5  period which I am going back over two years so
6  I can understand that.
7       BY MR. RANCK:
8    Q.  But what I am asking you is do you
9  have a specific recollection that you were
10 looking for other property in October 2005?
11   A.  Yes.
12   Q.  Okay. Do you have a specific
13 recollection that you contacted Mr. Bratton in
14 October 2005 to help you with regard to that
15 property?
16   A.  I can't say it was October. During
17 that time period between the buying the house
18 and finishing the renovation I spent a lot of
19 time going around looking at properties. John
20 was involved with me during that time period.
21 I'm not sure if it was October, November.
22 Whenever. It was during that time period.

**30**

1    Q.  Were you -- did you ever complain to
2  Mr. Bratton during that time period that he
3  wasn't being responsive to you?
4    A.  No.
5    Q.  Did you ever complain to anyone in
6  the office that he wasn't being responsive to
7  you?
8    A.  No.
9    Q.  Did you ever complain to Mr. Bratton
10 or someone else in the office that he wasn't
11 being timely in whatever you were looking for
12 him to do?
13   A.  No.
14   Q.  Did you ever -- did you feel he
15 abandoned you?
16      MR. SHAIBANI: Objection.
17      THE WITNESS: No.
18      BY MR. RANCK:
19   Q.  Did Mr. Bratton ever tell you that
20 anywhere during that time period that he didn't
21 have time to provide you with the service that
22 you needed?

**31**

1    A.  I don't think John would ever say
2  that to a customer.
3    Q.  Did you feel that he didn't provide
4  you with competent real estate services during
5  that period of time?
6       MR. SHAIBANI: Objection.
7       THE WITNESS: No.
8       BY MR. RANCK:
9    Q.  No, he didn't or no, you didn't feel
10 that way?
11   A.  Repeat the question.
12   Q.  Sure. It is partially the way I
13 phrased it.
14      Did you feel he didn't provide you
15 with competent real estate services during that
16 period of time? My question is how you felt.
17   A.  I did not feel that John was being
18 incompetent with me at any time.
19   Q.  Earlier in '05 when you purchased
20 the 11th Street property were you exclusively
21 working with Mr. Bratton?
22   A.  No.

**32**

1    Q.  So did you have -- there are other
2  real estate professionals that you were working
3  with at the same time?
4    A.  Sure. As a buyer I have never been
5  married to an agent.
6    Q.  During this period of time that you
7  are talking to -- talking about sometime
8  between when you purchased the 11th Street and
9  when a renovation was done you had -- during
10 that whole time you had other agents that were
11 looking for properties for you?
12   A.  Yes.
13   Q.  One of these other agents found you
14 the Fairmont property?
15   A.  Yes.
16   Q.  Who was that? Oh, I may have it on
17 here. This is a property you purchased, right?
18   A.  1213?
19   Q.  Yes. 1213 Fairmont?
20   A.  Yes.
21   Q.  Who was your agent?
22   A.  On the purchase of that it was

**Page 33**

1  Joanna Argenio. Is that on there?
2  Q. No. This is an MRIS printout but it
3  shows the listing agent.
4  A. Is it Long & Foster?
5  Q. No. It's Tuck Taylor, Jeffrey
6  Jackson.
7  A. They were the listers and I had
8  Joanna do the purchase with me.
9  Q. Joanna Argenio?
10 A. Uh-huh.
11 Q. Who is she with?
12 A. Long & Foster.
13 Q. How many transactions have you had
14 with her?
15 A. At least four or five.
16 Q. Have you had transactions with other
17 agents at Long & Foster?
18 A. No.
19 Q. So she is your go to person there?
20 A. Yes.
21 Q. Do you have other agents as well?
22 A. I have had other agents.

**Page 34**

1  Q. During the 2005, 2006 time frame?
2  A. No.
3  Q. All of the transactions, the four or
4  five that you have had with Ms. Argenio, when
5  did they occur?
6  A. In the years subsequent to that.
7  She has been my agent many times so --
8  Q. More than the four or five?
9  A. About that time. Four or five. I
10 can't add them up.
11 Q. When is the first one? Was Fairmont
12 the first or no?
13 A. No. Fairmont was the last.
14 Q. Do you recall when you first saw the
15 Fairmont property?
16 A. No.
17 Q. Do you recall how long it had been
18 on the market when you first saw it?
19 A. Yes. It had been on the market a
20 long time. Two or three months. Does it have
21 it on there, the DOM?
22 Q. Yes. The list date is November 3,

**Page 35**

1  '05. And it says the close date was January
2  15, '05. Does that sound right?
3  A. Yes.
4  Q. So you saw it sometime in January
5  and bought it and closed fairly quickly?
6  MR. SHAIBANI: Objection. Early
7  January?
8  MR. RANCK: Yes.
9  MR. SHAIBANI: The contract date was
10 December 2 of '05.
11 MR. RANCK: I referenced the close
12 date.
13 MR. SHAIBANI: He must have seen the
14 property before he signed a contract on it.
15 That would have been before December 2nd.
16 MR. RANCK: That is fair, but, of
17 course, this assumes that all the information
18 on the MRIS is accurate.
19 BY MR. RANCK:
20 Q. Did you contract for it then in
21 December?
22 A. Yes.

**Page 36**

1  Q. And closed in January. Is that
2  consistent with your recollection?
3  A. Yes.
4  Q. So maybe it had been on the market
5  for maybe only one month assuming that this
6  November 3 was the first list date, right?
7  A. Contract date. Well, that is not
8  the first listing. This property had come down
9  in price so that is probably a reup listing.
10 Q. So the November 3 listing is not
11 perhaps the original listing?
12 A. Right.
13 Q. Had you been watching this property?
14 A. Yes.
15 Q. Waiting for it to come down in
16 price?
17 A. Waiting to be ready to buy
18 something.
19 Q. And Ms. Argenio had her eye on this
20 property for you?
21 MR. SHAIBANI: Objection.
22 BY MR. RANCK:

**Page 37**

1  Q. You were working with her?
2  A. No. I work by myself and then I
3  bring on an agent later on something like this
4  so I am using all the sources I have. I look
5  at properties and then I buy them with the help
6  of agents as well.
7  Q. Do you recall when you -- when did
8  you first look at that property? Do you recall
9  when that would have been?
10 A. It was about a week before that
11 contract date but I saw it before, months
12 before so I would say I saw it in September or
13 October and then again in November.
14 Q. Then you were ready to buy by early
15 December and put a contract in?
16 A. Yes.
17 Q. Do you recall when you engaged Ms.
18 Argenio with regard to this property?
19 A. Just before that contract date.
20 Q. Just before the contract date.
21 Okay. Why did you choose her?
22 A. I don't know. She seemed available.

**Page 38**

1  She has been my friend and agent for a long
2  time.
3  Q. How many transactions have you had
4  with Mr. Bratton other than the 11th Street?
5  A. That's the one.
6  Q. That's the only one?
7  A. And I have worked with him since.
8  Q. You are working with him now?
9  A. I am working with him now.
10 Q. When did you first work with him
11 after the 11th Street?
12 A. We started showing -- he started
13 showing me properties. Andy has shown me a lot
14 of properties so he regularly shows me real
15 estate and sends me listings.
16 Q. Where is Ms. Argenio's office?
17 A. In North Bethesda.
18 Q. Have you ever dealt with any of the
19 other agents at Bratton Realty?
20 A. No.
21 Q. Has Mr. Bratton ever assisted you
22 with the sale of a property?

**Page 39**

1  A. No. Except for one we are doing
2  now.
3  Q. Prior to the one you are doing now
4  have you engaged him to assist you to do that?
5  A. No.
6  Q. When did you engage him with regard
7  to the thing you are doing now?
8  A. About a month ago.
9  Q. Did you say you and Mr. Bratton
10 don't socialize or haven't?
11 A. Right. We have not historically
12 done a lot of socializing.
13     MR. RANCK: Stefan, I would like to
14 take a break for a minute or two and step out
15 and talk to my colleague. I may well be
16 finished. Okay?
17     MR. SHAIBANI: Sure. Yes.
18     (A short recess was taken.)
19     MR. RANCK: I have a couple more
20 quick questions.
21     BY MR. RANCK:
22 Q. Mr. Stanton, you testified earlier

**Page 40**

1  that you -- during this period of time you are
2  talking about you never felt like Mr. Bratton
3  wasn't working fast enough or anything like
4  that. Do you recall that?
5      MR. SHAIBANI: Objection.
6      THE WITNESS: Yes.
7      BY MR. RANCK:
8  Q. Did you ever tell him he wasn't
9  working fast enough for you during that period
10 of time?
11 A. No.
12     MR. SHAIBANI: Objection.
13     BY MR. RANCK:
14 Q. Can you describe Mr. Bratton for me
15 and I don't mean physically. I mean
16 personality and what have you?
17 A. I would be glad to. John is a
18 winner. He is smart, energetic, personable.
19 He is super popular. Someone you want to do
20 business with. I want to do business with him.
21 I like him.
22 Q. How often did you see him when he

**41**

1  was at his 10th Street address?
2  A.  Say that again.
3  Q.  How often did you see him? How
4  often were you around him?
5  A.  Just the few times we did business.
6  Q.  After he moved to Georgetown same
7  thing?
8  A.  Yes.
9  Q.  And up to the current same thing?
10  A.  Yes.
11  Q.  Is he always the person -- is he now
12  always the person he has been?
13  A.  Yes.
14  Q.  He hasn't changed over time?
15  A.  He is not substantially different
16  over time.
17  Q.  Did you ever notice during the
18  period of time that you have known him and
19  worked with him and been around him any
20  difference in his demeanor, attitude, anything
21  like that?
22  A.  No.

**42**

1       MR. RANCK: That's all the questions
2  I have.
3       EXAMINATION BY COUNSEL FOR PLAINTIFF
4       BY MR. SHAIBANI:
5  Q.  Mr. Stanton, I have a -- I'm John
6  Bratton's counsel. You were previously asked
7  about the competence of Mr. Bratton. I would
8  like to ask you to describe how you would view
9  his skills as a real estate broker.
10  A.  John is a first rate real estate
11  broker. He knows a lot about the business. Is
12  super energetic and he is an excellent agent.
13  Q.  And since he is assisting you now on
14  another transaction as being repeat business
15  you wouldn't work with him if you didn't feel
16  that he could help you with his transactions;
17  isn't that correct?
18  A.  That's right.
19  Q.  Now, there was some questions about
20  your purchase of a 1213 Fairmont Street
21  property. You mentioned that that was a
22  transaction that you signed a contract on

**43**

1  December 2 of '05?
2  A.  Okay.
3  Q.  Close date of January '06; is that
4  correct?
5  A.  Yes.
6  Q.  And you also mentioned that property
7  had been on the market for approximately two to
8  three months prior to the time you purchased
9  it?
10  A.  Yes. At least.
11  Q.  In what neighborhood was that
12  property located in?
13  A.  Columbia Heights.
14  Q.  Is that a neighborhood that Mr.
15  Bratton had showed you before in terms of
16  touring the area or sending you listings for?
17  A.  Yes.
18  Q.  And in October of '05 do you recall
19  if you went to look at that property or that
20  neighborhood in general?
21  A.  Yes.
22  Q.  And if Mr. Bratton had made himself

**44**

1  available to you to show you properties from
2  October 6 toward the end of October would you
3  have used him as an agent?
4       MR. RANCK: Objection. Speculation.
5       THE WITNESS: Repeat that question
6  again.
7       BY MR. SHAIBANI:
8  Q.  Basically what I am trying to find
9  out is if you would have seen or started using
10  Mr. Bratton as your agent to purchase the
11  Fairmont Street property if he had made himself
12  fully available to you when you needed him?
13       MR. RANCK: Speculation. Objection.
14       THE WITNESS: I have never been
15  married to a buying agent so it is likely I
16  would have used John but it's not certain.
17       BY MR. SHAIBANI:
18  Q.  We are not dealing with certainties
19  in this case. This is a civil case and a
20  preponderance is the standard.
21       Is there anything else you can think
22  of in terms of Mr. Bratton dealing with you in

Page 45

1  that period of time, October, November of '05?
2   A.  No.
3   Q.  Now, you also mentioned that Mr.
4  Bratton indicated to you that he wanted to move
5  to a Georgetown office to expand his business?
6   A.  Yes.
7   Q.  Did you get a chance to visit the
8  Wisconsin Avenue property at any time?
9   A.  Yes. I went there for a Christmas
10 party.
11  Q.  And have you -- how did you feel
12 about the office? The aesthetics and the
13 business appeal of that location?
14  A.  Say that again.
15  Q.  As a client of Bratton Realty did
16 you feel that that office was a good place to
17 do real estate business?
18  A.  Yes.
19  Q.  And how would you compare that
20 office to Mr. Bratton's current office in Shaw?
21  A.  This was much better and more
22 convenient. However, the parking was a bit of

Page 46

1  an issue.
2   Q.  By this you mean the Wisconsin
3  Avenue property?
4   A.  Yes.
5   MR. SHAIBANI: Thank you so much for
6  spending the afternoon with us. I don't have
7  any other questions at this point.
8   MR. RANCK: I have one or two
9  follow-ups.
10  FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
11  CHATEL REAL ESTATE, INC.
12  BY MR. RANCK:
13  Q.  Despite the fact that Mr. Bratton
14 has moved to an office in Shaw rather than
15 Georgetown you don't use his service, right?
16  A.  Yes.
17  Q.  That's because you are more
18 concerned about the quality of the service you
19 get than the location of the office; is that
20 right?
21  A.  Yes.
22  Q.  And the other agent you primarily

Page 47

1  use is located in Bethesda, right?
2   A.  Yes.
3   Q.  Now, with regard to the Fairmont
4  property you put a contract in shortly before
5  December 2nd, right?
6   A.  Yes.
7   Q.  And you were not ready to buy the
8  property until that time, correct?
9   MR. SHAIBANI: Objection.
10  THE WITNESS: I was ready to buy --
11 I was looking for the right property and so I
12 could have bought something before, during or
13 after that time period.
14  BY MR. RANCK:
15  Q.  There was -- and you chose -- in or
16 about the end of November or early December
17 when you were prepared to put a contract in on
18 that property you chose to contact Ms. Argenio?
19  A.  Uh-huh.
20  Q.  Other than the fact that you are
21 not, as you put it, married to any particular
22 broker is there any specific reason you didn't

Page 48

1  contact Mr. Bratton with regard to that
2  property?
3   MR. SHAIBANI: Objection.
4   THE WITNESS: I don't think there is
5  any specific reason.
6   BY MR. RANCK:
7   Q.  Just you as a businessman just chose
8  the broker that you think is most appropriate
9  for the transaction at issue, right?
10  MR. SHAIBANI: Objection.
11  THE WITNESS: Yes.
12  MR. RANCK: That's all I have.
13  MR. SHAIBANI: Thank you, Mr.
14 Stanton.
15  MR. RANCK: You have an opportunity
16 -- Stefan, is there somebody else with you?
17  MR. SHAIBANI: No. I am working out
18 of my home office today.
19  MR. RANCK: Mr. Stanton, you have a
20 right to read and sign the deposition, if you
21 care to do so, and fill out an errata sheet as
22 anything you think is in error, inaccurate or