**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

JOHN BRATTON, *et al.*,                    )
                                           )
            Plaintiffs,                    )
                                           )
            vs.                            )    Civil Action No. 06-694 (JDB)
                                           )
CHATEL REAL ESTATE, INC., *et al.*,        )
                                           )
            Defendants.                    )
_____)

**PLAINTIFFS' OPPOSITION TO THE THIRD MOTION FOR SUMMARY JUDGMENT**
**FILED BY DEFENDANTS MARY WHITE, MARY WHITE, INC.,**
**CHATEL REAL ESTATE, INC., AND THIERRY LIVERMAN**

      Plaintiffs, John Bratton and Bratton Realty, LLC, respectfully request the Court to deny

the third set of motions for summary judgment filed by Defendants Mary White, Mary White,

Inc., Chatel Real Estate, Inc. ("Chatel"), and Thierry Liverman (collectively "Defendants").  In

support of this Opposition, Plaintiffs rely upon the Memorandum of Points & Authorities below

and the Exhibits to Plaintiffs' Opposition (filed manually), and the Expert Reports of Thomas

Lynch on Standards of Conduct and Economic Damages.  In support of their Opposition,

Plaintiffs further incorporate by reference John Bratton's Opposition Briefs, Separate Statement

of Material Facts Not in Dispute, and all exhibits previously filed by John Bratton in response to

Defendants' First and Second Motions for Summary Judgment.

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANTS' THIRD MOTION FOR SUMMARY JUDGMENT**

      Defendants' most recent filing is a third attempt to seek summary judgment in this case

which presents clear triable issues of fact.  The Court denied Defendants' First and Second

Motions for Summary Judgment in this case in 2007.  In their latest motions for summary

judgment, Defendants raise the same arguments previously rejected by this Court in its July 31,

2007 Order denying Defendants' Motions for Summary Judgment on Standing, wherein the Court stated that a triable issue of fact existed as to whether John Bratton had individual standing to pursue this case by virtue of being a signatory to the final lease executed with Mary White. Defendants' arguments on standing should thus be rejected outright by this Court based on its July 31, 2007 Order.

Defendants' arguments on standing lack merit because John Bratton, not Bratton Realty, LLC, is the party to the final lease agreement executed with Mary White on October 31, 2005. This is *the only* lease executed between the parties in this case. This lease agreement identifies John Bratton as the "TENANT." Further, John Bratton and his office manager both testified that Mr. Bratton used his Wisconsin Avenue office for his own real estate development projects as well as Bratton Realty's real estate transactions. To the extent this case alleges discrimination in the terms and conditions of a lease, including denial of a month-to-month conversion, option to renew, and right of first refusal, which forced Plaintiffs to relocate their business after only two years of occupying Mary White's Property, Mr. Bratton has standing in his individual capacity. Clearly, Mr. Bratton possesses standing to pursue this action pursuant to 42 U.S.C. §§ 1981 and 1982 because *he* is the party to the contract at issue and because he used his Wisconsin Avenue office for his own development projects as well as Bratton Realty's office.

With respect to Chatel and Thierry Liverman's contentions that they are not liable because they were not involved with the lease negotiations that occurred between Plaintiffs and Mary White after October 12, 2005, the evidence shows the contrary. Specifically, Chatel and Mr. Liverman were fully involved in Plaintiffs' attempts to lease Mary White's property after October 12, 2005, insofar as they (1) drafted Plaintiffs' lease agreement on Chatel's letterhead after receiving instructions concerning the terms and conditions of the lease from Mary White's

attorney, John Gordon Forester, on October 26, 2005, (2) received a commission for the transaction while acting as Mary White's real estate broker, which was paid after Mr. Bratton executed the lease on October 31, 2005, (3) managed Mary White's property when Mr. Bratton signed his lease and continued to manage the property to the conclusion of the lease term, and (4) sent a $1,019 plumbing invoice to Mr. Bratton in February 2006 months after he executed the lease agreement with Mary White.  *See* Plaintiff's Statement of Material Facts Not in Dispute, ¶ 17.  Therefore, Defendants Chatel and Liverman cannot argue that they had no involvement with Plaintiffs after October 12, 2005 and that their liability in this case is lacking as a matter of law.

Similarly, there is no legal or factual basis for Defendant Liverman's contention that his personal liability in this case should be determined as a matter of law because of his alleged "limited involvement" with Plaintiffs in this case.  Mr. Liverman is Chatel's owner and broker, and he was fully involved in the transactions giving rise to Plaintiffs' claims, including making the false statement to Mr. Bratton that Mary White's property had been leased to another candidate which was not true.

Finally, Defendants' motions for summary judgment with respect to Plaintiffs' economic damages should be denied because Plaintiffs have suffered substantial monetary damages as a result of Defendants' discrimination in the terms and conditions of the lease and their unreasonable delay in leasing the space to Plaintiffs.  Plaintiffs' damages include lost commissions, relocation costs, lost profits, and lost rental revenue.  These damages are supported by documentary evidence and financial data, the Expert Report of Thomas Lynch on Economic Damages, and the deposition testimony of several witnesses, including John Bratton, Jeannette Dumbrell, James Grant, Paul Stanton, and Takia Moore, all of whom testified that Bratton Realty, LLC's relocation from Wisconsin Avenue in Georgetown to Shaw after occupying Mary

White's property for only two years was bad for business, resulted in substantial loss of time to devote to clients as well as significant relocation costs, and further contributed to Bratton Realty, LLC's loss of real estate agents.  Paul Stanton further testified that that he would have likely conducted his land sale deal with Mr. Bratton had he made himself available to Mr. Stanton in October 2005 when Plaintiffs were engaged in protracted lease negotiations with Defendants. Further, Mr. Bratton and Mr. Lynch both testified that Mr. Bratton would have been able to rent his 10th Street office for at least $1,500 per month for the duration of the two-year lease he held with Mary White had Plaintiffs been given a month-to-month conversion or option to renew the lease for the Wisconsin Avenue property.

### PLAINTIFFS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

This action arises from defendants' unlawful discrimination in the terms and conditions of a lease for Georgetown office space given to Plaintiffs under the following circumstances, as a result of which Plaintiffs suffered substantial economic damages:

1.      **John Pagones—Chatel's real estate agent who listed Mary White's Property on the MRIS—introduced the first lease drafted by John Bratton to Mary White by stating**:

> Pagones:      She asked me who the lease was from.
> Q:            Could you elaborate on that, what you talked about with her?
> A:            I told her it was a real estate office, and **it was an African-American. And I told her, be prepared for trouble.**[1]

2.      **Defendants misrepresented the availability of the 1622 Wisconsin Avenue Property to Plaintiffs on October 12, 2005.**  During her October 12 meeting with Thierry Liverman, Mary White asked him whether she "had" to accept John Bratton's lease.[2]  After the meeting, Mr. Liverman telephonically informed John Bratton that the Property was no longer available,

---

[1] Exhibit 13, John Pagones Depo. Trans., November 20, 2006, pp. 53-54, lines 21-4.
[2] Exhibit 6, Thierry Liverman Depo. Trans., January 11, 2007, p. 253-254, lines 17-6.

that it was already leased to someone else, that it was a done deal, and to not take it personally.[3]

Mr. Liverman relayed this information to John Bratton even though there was no lease executed

on the Property on October 12, 2005, and the only other potential tenant who expressed interest

in the Property, Roberta Medlin, had not even entered into a verbal commitment with Mary

White.[4]  Mr. Liverman testified that he was acting under instructions of his principal when he

informed John Bratton that Mary White had leased the property to the other candidate and "that's

just business."[5]

**3.      Mary White's purported justifications for rejecting John Bratton's five offers to
lease the Property have all been refuted or withdrawn.**  There were three purported

justifications to Mary White's decision to lease the property to Roberta Medlin.[6]  These are as

follows:

> **(a) Roberta Medlin was already a property owner in the area.[7]**  Nonetheless, John
>
> Bratton was also a property owner in the District of Columbia.  In fact, Mr. Bratton
>
> owned several properties in DC.  Significantly, Roberta Medlin's jewelry store went out
>
> of business about a year after it started.  Roberta Medlin did not make for a good
>
> financial candidate for the lease because she had no trailing revenues for prior years
>
> compared to Bratton Realty, LLC's $500,00 plus of annual revenue.

---

[3] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2006, p. 129, lines 9-19; p. 218-219, lines 16-16; p. 256-258, lines 21-5.

[4] Exhibit 14, Roberta Medlin Depo. Trans., dated September 16, 2006, pp. 25-26, lines 14-4.

[5] Exhibit 6, pp. 100-101, lines 2-11.

[6] Exhibit 15, Defendant Mary White's Answers to Interrogatories and Responses to Request for Production of Documents Propounded by Plaintiff John Bratton, Response to Interrogatory # 7, p. 9 (which sets forth the three selection criteria for why she preferred leasing the Property to Roberta Medlin); See also Exhibit 16, Defendant Chatel Real Estate's and Thierry Liverman's Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory # 6, p. 7.

[7] *Id.*

**(b) Mary White preferred the property to be leased to a jewelry store operator rather than to a potential competitor in the real estate industry.[8]**  In her responses to Plaintiff's First Set of Interrogatories, Ms. White claimed she wished to avoid having a tenant who would be a potential competitor in the real estate market.[9]  However, Ms. White subsequently stated in her deposition that she did not know where this information came from, and that her lawyers said it, not her.[10]  Further, Bratton Realty and Washington Fine Properties (where Ms. White joined in May 2005) are not competitors in the real estate market.  Washington Fine Properties predominantly handles the sale of multimillion dollar properties[11] and has listings for properties worth as much as $16.5 million.[12]  Bratton Realty, on the other hand, handles listings predominantly in the $400,000 - $600,000 range.[13]

**(c) Mary White had purportedly received an "extremely favorable reference" for Roberta Medlin from a "personal friend."[14]**  In actuality, there never was a "personal friend" who provided an "extremely favorable reference" to Ms. White.  Roberta Medlin testified in her deposition that she did not know Mary White prior to October 2005 and that they had no mutual friends.[15]  Nor could Mary White identify in her deposition the

---

[8] *See* Footnote 6, *supra*.

[9] Exhibit 15, Defendant Mary White's Answers to Plaintiff's Interrogatories, Response to Int. # 4, p. 4.

[10] Exhibit 8, Mary White Depo. Trans., pp. 132-134, lines 5-22 (in which she claims these words were "put in her mouth").

[11] Exhibit 11, Thomas Anderson Depo. Trans., January 8, 2007, p.64-65, lines 11-7.

[12] Exhibit 11, p.65, lines 9-19.

[13] Exhibit 9, John Bratton Depo. Trans., January 24, 2007, p.95, lines 6-9.

[14] *See* Footnote 6, *supra*.

[15] Exhibit 14, Roberta Medlin Depo. Trans., dated September 26, 2006, pp. 11-14, lines 21-1.

person who purportedly gave her a favorable reference for Roberta Medlin.  Ms. White

testified that the reference was neither verbal nor written![16]

**4.     Defendants discriminated against Plaintiffs with respect to the terms and conditions**

**of their lease.[17]**

(a)  **Plaintiffs were denied a right of first refusal.**  The lease drafted by defendants for

Roberta Medlin included a right of first refusal[18] even though Ms. Medlin never asked for

it.[19]  The lease executed between Mary White and John Bratton, on the other hand, had

the provision regarding a tenant's right of first refusal (¶41) crossed out[20] even though it

was a boilerplate clause in Chatel's Commercial Agreement of Lease.

(b)  **Plaintiffs were not allowed to convert their lease to month-to-month at the**

**expiration of the two-year term.**  The lease drafted by defendants for Roberta Medlin

included two provisions converting the lease to month-to-month at the expiration of the

initial lease term (¶¶ 53 & 45).[21]  These same provisions were crossed out in John

Bratton's lease agreement with Mary White.[22]

(c)  **Plaintiffs were denied an option to renew the lease at the expiration of the two-**

**year term.**  Defendants advertised the street-level of Mary White's property as available

---

[16] Exhibit 8, Mary White Depo. Trans., dated February 1, 2007, pp. 7-9, lines 9-11, pp. 70-72, lines 14-9.

[17] Exhibit 39, Chatel's Fair Housing Manual, p. 3.

[18] Exhibit 3, Chatel's Standard Commercial Lease Agreement between Roberta Medlin and Mary White, dated October 11, 2005, p. 6, ¶41, lines 10-12.

[19] Exhibit 14, Roberta Medlin Depo. Trans., p.44, lines 14-16.

[20] Exhibit 1, Chatel's Standard Commercial Lease Agreement between John Bratton and Mary White, dated October 31, 2005, p. 6, ¶41.

[21] Exhibit 3, at pp.6-7, ¶¶45 and 53.

[22] Exhibit 1, Commercial Lease Agreement between John Bratton and Mary White, Oct. 31, 2005, pp. 6-7, ¶¶45 and 53.

to the public for a lease term ranging from 12-48 months.[23]  The MRIS listing did not preclude the tenant's option to renew the lease,[24] and Mary White never informed Chatel when the property was first listed that she didn't want the prospective tenant to have an option to renew the lease.[25]  Nonetheless, John Bratton was informed that the street-level property was only available for a 2-year term, without an option to renew.[26]  In fact, John Gordon Forester (Mary White's lawyer) instructed Chatel's Liverman that the provision providing plaintiff with the option to renew the lease after his initial lease-term ended should be removed.[27]  There is no dispute that defendants wanted Plaintiffs to vacate the Property at the end of his two-year lease.[28]

**(d) Plaintiffs were required to pay $200 per month for real estate taxes; Roberta Medlin was not.**  Defendants demanded an additional $200 per month in real estate taxes be paid by John Bratton, even though the MRIS listings did not require this, and the lease drafted by defendants for Roberta Medlin did not require her to pay any property taxes.[29]

**5.     John Bratton and Bratton Realty, LLC have suffered substantial economic damages as a result of Defendants' discrimination**.

---

[23] Exhibit 4, MRIS Listing, Street-Level of the Property, October 6, 2005, p.2; See also John Pagones Depo. Trans., p. 75-76, lines 17-9 (in which he acknowledges that the 121/48 on the MRIS is a typographical error and should instead be 12/48, meaning the property was advertised as available for a lease term between 12 to 48 months).

[24] Exhibit 4.

[25] Exhibit 6, at p. 80, lines 14-20.

[26] Exhibits 19-21, John Gordon Forester's letters to John Bratton, dated October 18, 19 and 26, 2005.

[27] Exhibit 2, Facsimile from John Gordon Forester to Thierry Liverman, dated October 26, 2005.

[28] Exhibit 8, Mary White Depo. Trans., pp. 100-101; lines 9-2; See also Exhibit 6, Deposition Transcript of Thierry Liverman, pp. 198-199, lines 14-1 (in which they both admit that plaintiff must vacate the property after the 2-year lease term ends.)

[29] Compare Exhibit 1, ¶ 11with Exhibit 3, ¶ 11.

**(a)  Lost Rental Revenue**

Because of the denial of the option to renew and right to convert the lease to month-to-month at the end of the two-year term, Plaintiffs were forced to maintain two separate offices in DC—their previous office location at 1223 10th Street (which Mr. Bratton owned), and the property leased from Mary White—since Plaintiffs had no choice but to vacate the 1622 Wisconsin Avenue Property at the expiration of the lease on October 31, 2007.[30]  As a result, John Bratton lost rental revenue that he could have generated from the 1223 10th Street Property in Logan Circle for over $1,500 per month during the two-year term of his lease with Mary White.[31]  These damages amount to over $36,000.  *See* Expert Report of Thomas Lynch on Economic Damages; Transcript of December 4, 2007 Deposition of John Bratton, at 51-52, 97-102, 105, 107-108; Transcript of December 10, 2007 Deposition of Thomas Lynch, at 512-514.

**(b)  Relocation Costs**

Plaintiffs incurred expenses as a result of having to move Bratton Realty, LLC's office. These expenses included moving costs, purchasing new office furniture to fit the new office, painting costs, new equipment, new business cards, new letterhead, logos, marketing and advertising material, new telephone, DSL, and facsimile lines, new signage for property listings and banner for the office, and other fees.[32]  These expenses amounted to a substantial amount.  *See* Receipts Submitted by Plaintiffs for Relocation Expenses; Expert Report of Thomas Lynch on Economic Damages; Transcript of December 4, 2007 Deposition of John Bratton, at 50-51, 57, 59-60, 62-64, 67, 75-76, 79-

---

[30] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p. 63, lines 5-15.
[31] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 132-134, lines 14-2.
[32] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 123-124, lines 7-13.

82, 214-216; Transcript of December 10, 2007 Deposition of Thomas Lynch; Transcript

of the December 13, 2007 Deposition of Jeannette Dumbrell, at 50-56, 85-86; Transcript

of the December 14, 2007 Deposition of James Grant, at 49, 51-52.

**(c)  Lost Profits**

Bratton Realty, LLC suffered lost profits as a result of having to move its business from

1622 Wisconsin Avenue in Georgetown to a less favorable location in Shaw after only

two years.[33]  Mr. Bratton testified that clients tend to gravitate more towards the

Georgetown name and reputation[34] and the central location on Wisconsin Avenue draws

numerous clientele and greater foot traffic through its visibility.[35]  Losing the

Georgetown property and moving to a less prominent area was a "major blow" to

Plaintiffs' business, resulting in substantial loss of business deals and transactions.  The

move also resulted in loss of agents for Bratton Realty, LLC.  Thomas Lynch estimated

Plaintiffs' lost profit damages to amount to over $73,874, a figure he derived by

calculating two months of annual revenue generated by Bratton Realty, LLC in 2006.[36]

*See* Expert Report of Thomas Lynch on Economic Damages; Transcript of December 4,

2007 Deposition of John Bratton, at 53-55, 82, 85-87, 92-93, 217, 219-222; Transcript of

December 10, 2007 Deposition of Thomas Lynch; Transcript of the December 13, 2007

Deposition of Jeannette Dumbrell, at 44-46, 78-81, 83-84; Transcript of the December

14, 2007 Deposition of James Grant, at 27, 34-39, 41-42, 44-45, 47-48 ("I didn't want to

leave Georgetown. . . . I was shocked that we were leaving Georgetown. I was shocked

---

[33] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, pp.344-345, lines 16-13.
[34] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 124-125, lines 15-1.
[35] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 126-127, lines 20-3.
[36] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 126-128, lines 20-16.

that we couldn't find a place that was suitable for the company to stay."); Transcript of

December 13, 2007 Deposition of Takia Moore, at 58-59, 66-67, 69-73.

**(d) Lost Commissions**

Plaintiffs further sustained $55,622 in lost commissions for several real estate

transactions Mr. Bratton would have conducted with his clients Paul Stanton, Penelope

and Phillip Edwards, and the Yepes family had he not been preoccupied with obtaining a

lease for Mary White's property in October 2005 as a result of Defendants' unreasonable

24-day delay in leasing the Wisconsin Avenue Property to Plaintiffs. *See* Expert Report

of Thomas Lynch on Economic Damages; Transcript of the December 13, 2007

Deposition of Paul Stanton, at 10, 13-14, 17, 27, 29, 35-38, 42-44 ("it is likely I would

have used John"); Transcript of December 4, 2007 Deposition of John Bratton, at 109-

117, 119-120, 121, 123-130, 133-134, 223-225; Transcript of December 10, 2007

Deposition of Thomas Lynch; MRIS Listings for Transactions Conducted by Paul

Stanton, the Edwards, and the Yepes.

**6.    Plaintiff was required to submit income tax returns and bank statements to**

**financially qualify for the lease; Roberta Medlin was not**.  Under Mary White's instructions,

John Gordon Forester demanded that Mr. Bratton submit two years of income tax returns and

banks statements to financially qualify for the lease.[37]  At the time Plaintiffs submitted an

application to lease Mary White's property, Mr. Bratton had over $250,000 in his checking

account and clean credit.[38]  In contrast, only a credit check was conducted on Roberta Medlin,[39]

---

[37] Exhibit 19, John Gordon Forester's letter to John Bratton, dated October 18, 2005.

[38] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 77-78, lines 17-17; See also Exhibits 24-25, Bank of America Account Activity Pages for John Bratton's Bank Accounts, dated October 19, 2005; See also Exhibit 18, National Registry Check on John Bratton, dated October 12, 2005.

who was also self-employed. [40]  Interestingly, Roberta Medlin's jewelry store went out of business about a year after it was started.

7.    **Defendants refused to lease Mary White's basement to John Bratton even though the basement was advertised to the public as available for lease**.[41]  A company used to lease the basement of Mary White's property for several years until September 2005. When that tenant's lease expired in September 2005, Mary White instructed her temporary office manager, Barrett Anderson, to clean up the area and sell most of her office furniture on Craig's List.[42] Soon thereafter, on September 23, 2005, Mary White instructed Chatel to list the basement of the Property on the MRIS.[43]  Hope Edwards, the receptionist at Chatel, created the graphic designs for both the street-level and basement of the Property.[44]  In late September through early October 2005, Mary White attempted to lease the basement of the Property to a white male who worked out of his home in Georgetown.[45]  Nonetheless, when Plaintiffs attempted to lease the basement of Mary White's property in October 2005, it suddenly became unavailable.

---

[39] Exhibit 14, page 39, lines 8-16 and page 40, lines 8-11 of Roberta Medlin Depo. (in which Medlin admits that she was subject to a credit check and does not recall submitting any other documents in connection with her financial background to Chatel or Mary White); See also Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p. 226, lines 7-11; See also Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, p. 78, lines 1-6.

[40] Exhibit 14, Roberta Medlin Depo. Trans, dated September 26, 2006, p. page 37, lines 5-22; page 38, lines 1-22; page 39, lines 1-22; and page 40, lines 1-16, in which she admits that she does not recall being required to submit any financial information to Chatel or Mary White when she offered to lease the Property.

[41] Exhibit 5, MRIS Listing: Lower Level of the Property, Listing date: September 23, 2005 (October 6, 2005).

[42] Exhibit 12, Barrett Anderson Depo. Trans., dated November 16, 2006, p. 31, lines 14-19; pp. 133-134, lines 7-22.

[43] See Footnote 41, supra.

[44] Exhibit 7, Hope Edwards Depo. Trans., pp. 37-38, lines 17-8; See also Exhibit 41, Promotional Advertisement for the 1622 Wisconsin Ave. lower level commercial space.

[45] Exhibit 12, p. 19-21, lines 14-10 (in which he discusses Mary White's several interactions with the unnamed male living in Georgetown who only wished to lease the back portion of the lower-level of the Property.)

8.      **Mary White's contention that she withdrew the listing for the basement because she needed to use it as her own office until renovations on "her new office" at Washington Fine Properties were complete is false**.[46]   Mary White signed an independent contractor agreement with Washington Fine Properties on May 10, 2005 and was officially affiliated with them by no later than July 2005 when her license was transferred there.[47]   After joining Washington Fine Properties, Mary White had access to its offices located at 1101 30th Street[48] and 3201 New Mexico Avenue,[49] which she used to attend meetings, handle business dealings and conduct transactions.  Ms. White used Washington Fine Properties' offices in handling her first transaction involving purchase of a property located at 1342 29th Street, which settled on June 20, 2005 for $659,000.[50]   She rarely, if ever, physically occupied or had use for the 1622 Wisconsin Avenue Property, which is why she wished to lease the basement of the Property in September 2005.  Her decision not to rent the basement of the Property came only after John Bratton offered to rent both levels of her Property.[51]

---

[46] Exhibit 15, Defendant Mary White's Answers to Interrogatories and Responses to Request for Production of Documents Propounded by Plaintiff John Bratton, Response to Interrogatory #8, p. 10; See also Exhibit 16, Defendants Chatel Real Estate's and Thierry Liverman's Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory # 6, p. 7.

[47] Exhibit 28, Independent Contractor Agreement executed between Mary White and Washington Fine Properties on May 10, 2005.

[48] Exhibit 11, Thomas Anderson Depo. Trans, p. 22, lines 10-17, (in which Mr. Anderson asserts that Mary White would physically come to the 1101 30th Street location); See also Exhibit 8, p.137, lines 1-12.

[49] Exhibit 11, pp. 46-50, lines 16-11; See also Exhibit 8, p. 137, lines 13-15.

[50] Exhibit 23, Letter from Gerald Dziecichowicz at Saul Ewing to Stefan Shaibani, dated October 5, 2006.

[51] Exhibit 21, Letter from John Gordon Forester to John Bratton, dated October 26, 2005 (claiming that lease was only available for the street level, this was not a new term and had been presented as such from the beginning.)  See also Exhibit 13, John Pagones Depo. Trans., dated November 20, 2006, p.24, lines 9-13 (in which Pagones admits that Mary White decision not to rent the lower-level of the Property was made after John Bratton inquired about the Property.)

**9.      Defendants engaged in illegal steering by favoring a Georgetown resident to lease the Property rather than Plaintiffs, who did not reside in Georgetown.**[52]  One of the reasons defendants preferred to lease the Property to Roberta Medlin rather than John Bratton was because Ms. Medlin was already a property owner in Georgetown.[53]  Having an established residence in Georgetown ultimately made Roberta Medlin the more attractive and "first-class" candidate for leasing the property,[54] while John Bratton was perceived as a "second-class" candidate.

**10.      Defendants processed Roberta Medlin's application much faster than John Bratton's application, in violation of Chatel's First-Come, First-Served policy**.[55]

      **(a)      John Bratton first visited and expressed serious interest in the 1622 Wisconsin Avenue Property on October 6, 2005.**[56]  Despite his repeated attempts to acquire a blank lease agreement, rental application and information from Chatel regarding the landlord's requirements for the lease, he was continually denied this information.[57]  Similarly, Mary White did not respond to Mr. Bratton's letter and telephone calls.  Defendants' behavior continued for five days, as John Bratton attempted

---

[52] Exhibit 15, Defendant Mary White's Answers to Interrogatories and Responses to Request for Production of Documents Propounded by Plaintiff John Bratton, Response to Interrogatory # 7, p.9 (setting forth the first selection criteria for offering the lease to Roberta Medlin.  See also Exhibit 16, Defendants Chatel Real Estate's and Thierry Liverman's Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory # 8, p. 7 (which sets forth the first factor Mary White based her decision on.)

[53] *Id.*  Both defendants cite their first reason for choosing to lease the property to Roberta Medlin rather than John Bratton to be that Ms. Medlin was "already a property owner in the area."

[54] See Exhibit 6, Thierry Liverman Depo. Trans., dated January 11, 2007, p. 97, lines 3-7 (in which Mr. Liverman states that Mary White, based on second-hand information, believed Roberta Medlin's husband to be a "first class person.")

[55] Exhibit 39, Chatel's Fair Housing Manual.

[56] Exhibit 10, John Bratton's Depo. Trans., dated January 19, 2007, p. 89, lines 3-9.

[57] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p. 105-106, lines 8-5.

to draft five separate leases[58] without any aid from defendants.  Each lease he drafted

from October 6 to October 11, 2005, was, in turn, rejected.

(b)    **Roberta Medlin expressed interest in the Property on October 11, 2005,[59]**

**five days after John Bratton had already visited and expressed serious interest in**

**securing the Property.**  Mary White agreed to meet with Roberta Medlin, gave Ms.

Medlin a personal tour of the property,[60] answered all of Ms. Medlin's questions

regarding the lease, assisted her in drafting a lease, and immediately contacted Thierry

Liverman at Chatel to meet with Ms. Medlin the same day.[61]  Defendants didn't run a

credit check on John Bratton until October 12, 2005, six days after he initially visited the

1622 Wisconsin Avenue Property and expressed interest in acquiring a lease agreement

for it,[62] yet they ran Roberta Medlin's credit check on October 11, 2005, the same day

she visited the Property.[63]  Indeed, pursuant to Mary White's request, Chatel met with

Roberta Medlin the first day she went to Chatel's office on October 11, 2005.  In this

way, defendants violated Chatel's First-Come First-Served Policy.[64]

11.    **The only reason Defendants leased the Property to Plaintiff for a two-year term was**

**because he had threatened to sue them for discrimination, and they wanted to conceal their**

**discrimination and avoid a lawsuit**.  In his conversation with Thierry Liverman on October 12,

---

[58] Exhibit 30, Signed Commercial Lease Agreement between John Bratton and Mary White, dated October 7, 2005; Exhibit 31, Signed Commercial Lease Agreement between John Bratton and Mary White, dated October 10, 2005; Exhibit 32-34, three different versions of Chatel's Standard Commercial Lease Agreement between John Bratton and Mary White, dated October 10, 2005.

[59] See Exhibit  40, Email from Barrett Anderson to Mary White, re: 1622 Lease Level 1, dated October 11, 2005.

[60] Exhibit 14, Roberta Medlin Depo. Trans., dated September 26, 2006, pp. 34-35, lines 17-4.

[61] Exhibit 6, Thierry Liverman Depo. Trans., dated January 11, 2007 pp. 135-137, lines 7-2.

[62] Exhibit 18, National Registry Check on John Bratton, dated October 12, 2005.

[63] Exhibit 17, National Registry Check on Roberta Jean Medlin, dated October 11, 2005.

[64] Exhibit 39, Chatel's Fair Housing Manual.

2005, Mr. Bratton informed Mr. Liverman he felt he had been discriminated against, that "he would take this to a higher level,"[65] and that he was going to file a complaint against defendants for discrimination.[66]  A few days after this news was relayed to Ms. White,[67] she hired her attorney, John Gordon Forester, to contact Plaintiff to commence "negotiating" the terms of the lease for the 1622 Wisconsin Avenue Property.[68]

**12.     Mr. Forester accused Mr. Bratton of being a "test case" for discrimination, because he was an African-American with long hair with dreadlocks, stating that he did not intend in good faith to lease Georgetown office space and was simply looking to "induce a lawsuit."[69]**

**13.     Under Mary White's instructions, Mr. Forester demanded new and unfavorable terms and conditions from John Bratton to dissuade him from leasing the Property.[70]**

Execution of the lease agreement between John Bratton and Mary White was contingent on John Bratton's acceptance of her particular terms.   There was no negotiation between the parties, but continuous demands for new terms and conditions.  Despite Mr. Forester's involvement to facilitate the lease, it ultimately took 24 days for John Bratton to execute the final lease from the date of his first offer on October 6, 2005.[71]  Drafting a lease for a small office space should not take so long.  This was a property renting for $2,500 a month, not the entire floor of a high-rise destined to be leased to a law firm.  Ultimately, despite Plaintiffs' clear financial ability to lease

---

[65] Exhibit 6, Thierry Liverman Depo. Trans., p. 102, lines 12-15.
[66] Exhibit 10, John Bratton Depo. Trans, January 19, 2007, p. 258, lines 3-11.
[67] Exhibit 6, pp. 102-105, lines 7-18.
[68] Exhibit 19, Letter from John Gordon Forester to John Bratton, dated October 18, 2005.
[69] Exhibit 9, John Bratton Depo. Trans., dated January 24, 2007, pp. 66-71, lines 8-2.
[70] Exhibit 19-21, Letters from John Gordon Forester to John Bratton, dated October 18, 19 and 26, 2005.
[71] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

the Property, it wasn't enough to outweigh the fact that he was black and had long hair with dreadlocks, and therefore, his money was no good to defendants.

14.    **John Pagones was previously involved in a discrimination suit which aired on Dateline-NBC in an Episode titled "No Way In," where he falsely stated to a person in a wheelchair inquiring about a property to lease in Georgetown:  "I have nothing in Georgetown."[72]**  It was later revealed in the Dateline-NBC episode that Chatel had several properties available in Georgetown on that day.  The Greater Housing Council of Washington, DC filed a discrimination suit against Chatel based on John Pagones' dishonest representation to the handicapped visitor.[73]  The case was subsequently settled, but the evidence speaks for itself. Significantly, Mary White testified that she did not care about John Pagones' conduct as set forth in the Dateline NBC episode,[74] and on a scale of one to ten, she gave him a "5 or 6 out of 10" with respect to his dealings with John Bratton.[75]

15.    **John Bratton is devastated by defendants' discriminatory treatment towards him.** Defendants' racial discrimination towards plaintiff has taken a toll on his emotional well-being. John Bratton now suffers from depression as a result and continues to battle the emotional trauma of the past 16 months on a daily basis.[76]

16.    **The final lease agreement was signed between Mary White and John Bratton, not Bratton Realty, LLC.[77]**  The October 31, 2005 lease identifies Mr. Bratton as the "Tenant."

---

[72] Exhibit 38, DVD of Dateline Episode titled "No Way In" (to be filed in paper).
[73] Exhibit 37, Washington Lawyers Committee for Civil Rights, Fair Housing Council of Greater Washington, p. 14.
[74] Exhibit 8, Mary White Depo. Trans., pp. 220-221, lines 19-20.
[75] Exhibit 8, Mary White Depo. Trans., pp. 17-18, lines 19-5.
[76] Exhibit 42.
[77] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

Defendants insisted that John Bratton be the tenant named on the lease, and not Bratton Realty, LLC.[78]

**17.    Chatel's contention that it had no involvement with John Bratton after October 12, 2005 is contrary to evidence.[79]**

**(a)    Chatel was intimately involved with drafting the October 31, 2005 lease agreement executed between John Bratton and Mary White.  Indeed, Mary White's lawyer, John Gordon Forester, sent a fax to Chatel's Liverman on October 26, 2005, instructing him to draft a lease for John Bratton.[80]**  Mr. Forester asked Mr. Liverman to change the terms of Chatel's Commercial Agreement of Lease in drafting the final lease agreement for John Bratton.  Specifically, Mr. Forester informed Mr. Liverman to limit the duration of the lease to two years only, excluding the tenant's right of first refusal and option to renew for a third year, and to remove the provision converting the lease to a month-to-month at the expiration of its term.  Chatel was further instructed to include an additional $200 per month in real estate taxes.[81]  Thierry Liverman testified in his deposition that he prepared Mr. Bratton's lease agreement incorporating the terms and conditions requested of Mr. Forester during "the first round" and transmitted a draft of the lease to Mr. Forester for further negotiations with John Bratton.[82]  Mr. Liverman

---

[78] Exhibit 2, Facsimile from John Gordon Forester to Thierry Liverman, dated October 26, 2005.
[79] See Defendants Chatel Real Estate, Inc and Thierry Liverman's First Motion for Summary Judgment, p. 5, ¶2, line 4.
[80] Exhibit 2; See also Exhibit 8, Mary White's Depo. Trans., pp. 96-98 (in which she admits she instructed Gordon Forester to request that Chatel draft the lease with the specified changes.)
[81] *See* Footnote 77, *supra.*
[82] Exhibit 6, p. 153-155, lines 5-2.

further testified that the final lease executed between John Bratton and Mary White, containing the cross-outs, was drafted by Chatel.[83]

**(b)      Chatel was Mary White's broker when John Bratton signed the final lease agreement, and Chatel received a commission for the deal.[84]**

**(c)      Chatel was managing Mary White's Property when John Bratton signed the lease on October 31, 2005, and Chatel continues to manage the Property to this day.[85]**

**(d)      As part of its management of the Property, Chatel sent a $1,019 plumbing invoice to John Bratton months after he moved into the Property.[86]** Paragraph 9 of the lease agreement between Ms. White and Mr. Bratton warrants the plumbing system to be in good working order as of the date the tenant takes possession of the property.[87] The plumbing system at Mary White's Property was problematic before John Bratton's move-in date, and he made complaints about it within 30 days of having moved in.[88] Neither Thierry Liverman or Mary White could identify John Bratton as being responsible for the

---

[83] Exhibit 6, pp. 154-155; See also Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

[84] Exhibit 6, Thierry Liverman Depo. Trans., pp. 68-69, lines 21-2; See also Exhibit 8, Mary White Depo. Trans., pp.27-28, lines 11-10 (in which she admits that even though she hired Gordon Forester to facilitate negotiating the lease, she still paid Chatel a commission for leasing the Property.)

[85] Exhibit 6, p. 113, lines 5-9 (in which Mr. Liverman admits that Chatel continues to manage the street and upper-level of Mary White's property); Exhibit 8, p. 275, lines 2-12 (in which Mary White admits that Chatel still manages the 1622 Property)

[86] Exhibit 22, Plumbing Invoice issued by Chatel Real Estate, Inc. to John Bratton, dated 02/08/06; See also Exhibit 6, Thierry Liverman Depo. Trans., p. 194, lines 8-21; See also Exhibit 8, Mary White Depo. Trans. p. 266 lines 7-15 (in which she states that her property was being managed by Chatel during the time the plumbing invoice was sent out.)

[87] Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005, ¶9, §b.

[88] Exhibit 10, John Bratton Depo. Trans., dated January 19, 2007, p.327, lines 6-16.

plumbing defects.[89]  Nonetheless, Chatel sent a $1,019 plumbing invoice to John Bratton

on February 18, 2006, as part of its management of Mary White's Property.

18.     **On February 27, 2007, Bratton Realty, LLC assigned to John Bratton all its claims**

**and any damages it may recover against Defendants in connection with this case.[90]**

19.     **Mary White's apparent motive in discriminating against Plaintiffs with respect to**

**lease of her Wisconsin Avenue property was due to her being mugged by several African-**

**American males in the 1980s in Georgetown.[91]**

## ARGUMENT

I.     **John Bratton Possesses Individual Standing To Pursue His Civil Rights Claims**
       **Against Defendants**

       A.     **John Bratton Is The Signatory To The Lease Executed With Mary White**

       Defendants contend John Bratton "individually lacks standing to sue the Chatels" for

violations of 42 U.S.C. §§ 1981 and 1982. Defendants' motion rests upon the faulty premise that

Bratton Realty, LLC, rather than John Bratton, was  the party to the lease agreement executed

with Mary White.  This is not so.

       John Bratton, not Bratton Realty, LLC, is the signatory to the final lease agreement

executed with Mary White dated October 31, 2005.  Significantly, John Bratton used the

Wisconsin Avenue Property for his own real estate development projects as well as Bratton

Realty's real estate transactions.  *See* Transcript of the December 4, 2007 Deposition of John

Bratton, at 226-227; Transcript of the December 13, 2007 Deposition of Jeannette Dumbrell, at

75-77, 89-90; Transcript of the Deposition of Takia Moore, at 68-69.  Further, Bratton Realty,

---

[89] Exhibit 6, p. 195, lines 7-13; See also Exhibit 8, pp. 266-268, lines 7-15.

[90] Exhibit 44, Agreement of Assignment Between John Bratton and Bratton Realty, LLC.

[91] Transcript of Mary White Deposition, at 207-209 ("I was attacked from behind by a gang and they were African-American").

LLC assigned to John Bratton all its claims against Defendants in connection with this case on February 27, 2007.  *See* Exhibit 44, Assignment Agreement.

Under these circumstances, John Bratton clearly possesses individual standing to pursue his discrimination claims against defendants.  *See Jackson v. Birmingham Board of Education*, 544 U.S. 167, 180 (2005) (coach of girls' high-school basketball team had standing to pursue retaliation claim for sex discrimination inflicted on his team even though he was not the victim of the discrimination complained of); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (white male landlord had standing to pursue discrimination suit under section 1982 against corporation owning private park for expelling him after he assigned a membership share and use rights in park to black person leasing his house).

Indeed, if John Bratton, as *the party* to the contract executed with Mary White and as the user of the Property and assignee to Bratton Realty, LLC, lacks standing to pursue his civil rights claims against Defendants pursuant to sections 1981 and 1982, no person or entity would have standing to pursue these claims.  *See America v. Preston*, 2006 WL 3178810, at *6 (D.D.C. 2006) (recognizing the standing of testers to sue under Title VII), *quoting from Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) ("A tester who has been the subject of a misrepresentation made unlawful under the Civil Rights Act has suffered injury in precisely the form the statute was intended to guard against . . . .  That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury"); *Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority*, 239 F.R.D. 9, at 16-18 (D.D.C. 2006) (disability rights advocacy group had standing to assert claims on behalf of class

against Washington Metropolitan Transit Authority for violations of the ADA arising from inadequate transit services).

Defendants' contentions to the contrary are based on an incorrect reading of the Supreme Court's decision in *Domino's Pizza v. McDonald*, 546 U.S. 470 (2006), and its progeny. In *Domino's Pizza*, the Supreme Court held that section 1981 requires "that the plaintiff be the person whose right to make and enforce contracts was impaired on account of race." 126 S. Ct. at 1251. The Court explained: "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as plaintiff has or would have rights under the existing or proposed contractual relationship." *Id.* at 1250. The plaintiff in *Domino's Pizza* was the sole shareholder of JWM Investments, Inc., a corporation that had entered into several construction contracts with Domino's Pizza. The Court dismissed the plaintiff's complaint because he was not a party to any of the contracts executed with Domino's. *Id.* at 1252.

In contrast, here, John Bratton is *the party* to the lease agreement executed with Mary White. This lease agreement identifies John Bratton as the "TENANT."[92] That this lease agreement was executed on October 31, 2005 does not deprive Mr. Bratton of standing to pursue his claims against defendants. *See Domino's Pizza*, 126 S. Ct. at 1252 ("Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's"). Sections 1981 and 1982 clearly intended to provide relief to persons injured from discriminatory treatment at the hands of those with whom they entered into contracts. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("the test for prudential standing is

---

[92] Exhibit 1 (introductory paragraph).

whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief").

Defendants' reliance upon *Gersman v. Group Health Association, Inc.*, 931 F.2d 1565 (D.C. Cir. 1991), *vacated and remanded,* 502 U.S. 1068, and *Guides, Ltd. v. Yarmouth Group Property Management, Inc.*, 295 F.3d 1065 (10th Cir. 2002), for the proposition that Mr. Bratton lacks standing to pursue his civil rights claims against defendants, is misguided.  In *Guides*, the Court held that the owner of a corporation lacked standing to pursue discrimination claims against a shopping center for its failure to extend a lease executed by the corporation.  The Court explained:  "Foote alleged discrimination based on her race.  However, the party seeking to contract with the defendants and to lease property, and thus the direct victim of the discrimination, was Foote's corporation, Africa House, rather than Foote herself."  295 F.3d at 1072.  Similarly, in *Gersman*, the party to the contract at issue was a corporation, not its shareholder:  "It was CSI, and not Gersman, whose contract was terminated.  Gersman, as a shareholder, has no standing to bring claims for an injury suffered by CSI."  931 F.2d 1569.[93] These cases are clearly distinguishable from the case at hand because here, John Bratton, not Bratton Realty, LLC, is the party to the lease agreement executed with Mary White.

Defendants next contend that John Bratton lacks standing because he was merely a "guarantor" to the lease executed with Mary White. Defendants' contention is contrary to the express language of the lease executed with Mary White.  The lease provides:  "This agreement of lease made and entered into this 31st day of October 2005 by and between Mary White

---

[93] *Shreeji Krupa, Inc. v. Leonardi Enterprises*, 2007 WL 178305 (N.D. Ill. 2007), relied upon by defendants, is also unavailing.  There, the Court found that the plaintiff, Mehta, lacked standing to pursue discrimination claims because he lacked privity of contract:  "Here, only Krupa had a contractual relationship with Leonardi, not Mehta. . . .  Mehta did not sign any documents guaranteeing the lease."  *Id.* at * 3.

(hereinafter 'LANDLORD') and John Bratton (hereinafter 'TENANT')."[94]  Defendants cannot contort the express language of the contract to render plaintiff a "guarantor" to the lease when he is the tenant named on the lease.  Significantly, Bratton Realty, LLC is nowhere referenced in the October 31, 2005 lease executed with Mary White.  The undisputed facts thus indicate that John Bratton is the party to the lease, not a guarantor.

**B.    The Injuries Suffered By John Bratton Are Distinct From Those Suffered By Bratton Realty, LLC**

Despite Defendants' contentions, John Bratton has suffered distinct economic damages from Bratton Realty, LLC, including lost commissions for deals he could not close with Paul Stanton, the Edwards, and the Yepes, and lost rental revenue from having to maintain two separate offices in DC when he would have otherwise rented his Logan Circle property for at least $1,500 per month for the duration of his lease with Mary White.  Further, Mr. Bratton has suffered significant emotional damages as a result of Defendants' discrimination.  In his words, Mr. Bratton has become increasingly "depressed" and "devastated by defendants' actions and behavior."[95]  *See also* Transcript of Deposition of Jeannette Dumbrell, at 87-88; Transcript of Deposition of Takia Moore, at 68-69.  These damages are unique to Mr. Bratton, not Bratton Realty, LLC.  The economic damages suffered by Bratton Realty, LLC, on the other hand, include relocation expenses and lost profits from having to move the business from 1622 Wisconsin Avenue to a less prestigious location.

As the party to the contract at issue, Mr. Bratton possesses standing to recover both the economic and emotional damages he has suffered as a result of defendants' discrimination with respect to the terms and conditions of his lease.  *See Bains LLC v. Arco Products Co.*, 405 F.3d

---

[94] Exhibit 1 (introductory paragraph).
[95] Exhibit 42, Affidavit of John Bratton, ¶¶ 5-8.

764, at 771 (9th Cir. 2005) ("Section 1981 extends its prohibition against racial discrimination in the making and enforcement of contracts to cover all phases and incidents of the contractual relationship, not just the termination of a contract").

## II.    Defendants Chatel And Thierry Liverman Were Fully Involved With The Discriminatory Treatment Of Plaintiffs And Cannot Escape Liability

Defendants Chatel and Liverman contend they were not involved in the negotiation and drafting of the final lease executed between Mary White and John Bratton after October 12, 2005, and that this Court should thus find that they are not liable as a matter of law. Specifically, they contend: "the Chatel Defendants' only involvement with regard to the final lease was sending Defendant White's attorney a blank lease in electronic format." Chatel's Motion for Summary Judgment, at 15. However, the evidence indicates that Defendants Chatel and Liverman were intimately involved with drafting the October 31, 2005 lease agreement executed between Mr. Bratton and Ms. White, they received a commission for the transaction as Ms. White's broker, and they continued to manage Ms. White's property for the duration of Mr. Bratton's two-year lease.

On October 26, 2005, Mary White's lawyer, John Gordon Forester, requested Chatel to draft a lease for John Bratton,[96] and to change the terms of Chatel's boilerplate Commercial Agreement of Lease in preparing the final lease. Specifically, Mr. Forester informed Mr. Liverman to limit the duration of the lease to two years, exclude the month-to-month conversion, option to renew, and right of first refusal, effectively precluding Plaintiffs from occupying the property for more than two years and forcing them to relocate their business. This caused significant economic damages to Plaintiffs. Chatel was further instructed to charge Mr. Bratton

---

[96] Exhibit 2; See also Exhibit 8, Mary White's Depo. Trans., pp. 96-98 (in which she admits she instructed Gordon Forester to request that Chatel draft the lease with the specified changes.)

an additional $200 per month in real estate taxes than that advertised to the public and offered to Roberta Medlin.[97]  Mr. Liverman testified that he prepared Mr. Bratton's lease incorporating the terms and conditions requested by Mr. Forester during "the first round" and transmitted a draft of the lease to Mr. Forester for further negotiations with Mr. Bratton.[98]  Mr. Liverman further testified that the final lease executed between Mr. Bratton and Ms. White, containing cross-outs of several of the standard terms, was drafted by Chatel.[99]

Further, Chatel acted as Ms. White's broker when Mr. Bratton signed the final lease agreement, and Chatel received a commission for the deal.[100]  Chatel further continued to manage Ms. White's property for the entire duration of Mr. Bratton's two-year lease.[101]  As part of its management of the Property, Chatel sent a $1,019 plumbing invoice to Mr. Bratton months after he moved into the Property even though Mr. Bratton was not responsible for the plumbing defects.[102]  *See* Paragraph 17 of Plaintiffs' Statement of Material Facts Not in Dispute.

## III.    Plaintiffs' Economic Damages Are Supported By The Evidence And Not Speculative

The economic damages suffered by Plaintiffs as a result of Defendants' discrimination are set forth in the Expert Report of Thomas Lynch on Economic Damages, which Plaintiffs

---

[97] *See* Footnote 77, *supra*.

[98] Exhibit 6, p. 153-155, lines 5-2.

[99] Exhibit 6, pp. 154-155; See also Exhibit 1, Signed Lease Agreement between John Bratton and Mary White, dated October 31, 2005.

[100] Exhibit 6, Thierry Liverman Depo. Trans., pp. 68-69, lines 21-2; See also Exhibit 8, Mary White Depo. Trans., pp.27-28, lines 11-10 (in which she admits that even though she hired Gordon Forester to facilitate negotiating the lease, she still paid Chatel a commission for leasing the Property.)

[101] Exhibit 6, p. 113, lines 5-9 (in which Mr. Liverman admits that Chatel continues to manage the street and upper-level of Mary White's property); Exhibit 8, p. 275, lines 2-12 (in which Mary White admits that Chatel still manages the 1622 Property)

[102] Exhibit 22, Plumbing Invoice issued by Chatel Real Estate, Inc. to John Bratton, dated 02/08/06; See also Exhibit 6, Thierry Liverman Depo. Trans., p. 194, lines 8-21; See also Exhibit 8, Mary White Depo. Trans. p. 266 lines 7-15 (in which she states that her property was being managed by Chatel during the time the plumbing invoice was sent out.)

hereby incorporate by reference.  Plaintiffs have provided references to the deposition testimony of several witnesses in support of their economic damages claims in **Paragraph 5** of the Statement of Material Facts Not in Dispute (*see supra,* at pages 8-11).  Plaintiffs will not repeat those claims here.  The Exhibits submitted in support of this Opposition Brief—including receipts for relocation costs, MRIS listings for transactions conducted by Paul Stanton, the Edwards, and the Yepes, John Bratton's income tax returns for the years 2005-2006, Bratton Realty, LLC's sales listings for 2005-2007, and the report on trends in housing) provide further support for Plaintiffs' economic damages claims.  It bears noting that the relocation expenses proposed by Mr. Lynch in his report were estimates because the actual move had not occurred at the time he prepared his report.  The receipts for Plaintiffs' relocation expenses have been submitted as exhibits.

Defendants do not argue that Plaintiffs may not recover economic damages in connection with their civil rights claims.  Clearly, economic damages, such as those alleged by Plaintiffs here, are recoverable under sections 1981 and 1982 of the Civil Rights Act.  *See Alexander v. City of Mikwaukee*, 474 F.3d 437, 450-452 (7th Cir. 2007) (economic damages were recoverable in white male police officers' civil rights action against city alleging racially discriminatory promotion practices); *Settlegoode v. Portland Public Schools*, 371 F.3d 503, at 509, 520 (9th Cir. 2004) (reinstating jury's award of $402,000 in economic damages to teacher in her civil rights action against school district alleging non-renewal of contract due to discrimination).

Defendants contend that Plaintiffs' economic damages are "speculative and unsupported by the undisputed facts."  However, the economic damages sought by Plaintiffs—consisting of (1) lost commissions, (2) lost profits, (3) relocation costs, and (4) lost rental revenue—are supported by evidence and not speculative.  *See* Expert Report of Thomas Lynch on Economic

Damages; Paragraph 5 of Statement of Material Facts Not in Dispute (*supra*, at 8-11).  These

damages were directly caused by Defendants' discrimination in the terms and conditions of the

lease offered to Plaintiffs which forced Bratton Realty, LLC to relocate from Wisconsin Avenue

in Georgetown to a less favorable location after only two years of occupying Mary White's

Property.  Defendants' unreasonable 24-day delay in leasing the Property to Plaintiffs also

resulted in lost real estate sales commissions to Plaintiffs.

The economic damages suffered by Plaintiffs are very real and in no way speculative.

Bratton Realty, LLC's forced move from Wisconsin Avenue in Georgetown to a less favorable

location in Shaw only two years after occupying Mary White's Property caused significant losses

to Plaintiffs.  Indeed, John Bratton actively attempted to lease or purchase another commercial

property in Georgetown for an entire year in 2006-2007 but was unable to do so.  *See* Transcript

of December 4, 2007 Deposition of John Bratton, at 22-26, 88, 107, 217;  Transcript of

Deposition of Jeannette Dumbrell, at 44-46; Transcript of Deposition of James Grant, at 44-48.

He was thus forced to move his business from Georgetown to a far less prestigious location in

Shaw where he could buy a commercial property.  Interestingly, Mary White's Property

remained vacant long after Plaintiffs vacated the Property in October 2007.  Apparently, Mary

White preferred not to receive any rents than to have Plaintiffs occupy her Property despite their

desire to do so for many years.  Plaintiffs clearly had the financial resources to occupy Ms.

White's Property but she refused to do business with them.

Although Plaintiffs have quantified the economic damages alleged in this case, the full

extent of the monetary losses sustained by Plaintiffs as a result of having to relocate their

business from Wisconsin Avenue in Georgetown to a less favorable location in Shaw due to

Defendants' discrimination will only be discovered in the years to come.

**CONCLUSION**

For the above reasons, Plaintiffs respectfully request the Court to deny the Third Motions for Summary Judgment filed by Defendants Mary White, Mary White, Inc., Chatel Real Estate, Inc., and Thierry Liverman.  Plaintiffs further respectfully request the Court to schedule a Pretrial Conference in this case.

Respectfully submitted,

Dated: April 11, 2008                    /s/ Stefan Shaibani
                                         Stefan Shaibani (Bar No. 490024)
                                         LITIGATION ASSOCIATE, PLLC
                                         1150 Connecticut Avenue, N.W.
                                         Suite 900
                                         Washington, DC 20036
                                         Tel:  (202) 862-4335
                                         Fax: (202) 828-4130

                                         *Attorney for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2008, I electronically filed "PLAINTIFFS'

OPPOSITION TO THE THIRD MOTION FOR SUMMARY JUDGMENT FILED BY

DEFENDANTS MARY WHITE, MARY WHITE, INC., CHATEL REAL ESTATE, INC.,

AND THIERRY LIVERMAN," and that service was thus effected upon defendants' counsels

listed below in accordance with Local Civil Rule 5.4(d):

Robert Bouse, Esq.
ANDERSON COE & KING, LLP
201 North Charles Street, Suite 2000
Baltimore, MD 21201
*Counsel for Defendants Mary White & Mary White, Inc.*

Matthew Ranck, Esq.
ECCLESTON & WOLF, P.C.
2001 S Street, NW, Suite 310
Washington, DC 20009
*Counsel for Defendants Chatel Real Estate, Inc. & Thierry Liverman*

/s/ Stefan Shaibani

30